# EXHIBIT G

**SPIES, POWERS & ROBINSON, P.C.**
ATTORNEYS AND COUNSELORS AT LAW

Cherry Tower
950 South Cherry Street, Suite 700
Denver, Colorado 80246

Telephone: (303) 830-7090
Facsimile: (303) 830-7089
www.sprlaw.net

April 21, 2020

**VIA EMAIL**

Colin C. Campbell
CAMPBELL, WAGNER, FRAZIER & DVORCHAK, LLC
5251 DTC Parkway, Suite 350
Greenwood Village, CO 80111
ccampbell@cwfd-law.net

Re: *RDA Hotel Management Company, and Lakewood Hotel Company v. Hudson Specialty Insurance Company*
U.S. District Court Case No.: 19-CV-2145-DDD-NYW
Our File No.: 3949.21

Dear Mr. Campbell:

Pursuant to your request, I have reviewed the file materials provided by your office in order to address the claim investigation and claim payments by Hudson Specialty Insurance Company in the referenced matter. Specifically, you have asked that I review and consider the opinions expressed by Lesley Ann Beyer in her report of March 18, 2020, and to provide any rebuttal analysis and opinions based on my independent review of the file. The opinions expressed below in rebuttal to her analysis are based on my education, experience in the industry, and continued consultation and advisement to the insurance industry on the matters addressed in Ms. Beyer's report.

A summary of my opinions and the basis of those opinions follows. At the end of this report is a list of documents reviewed in formulating the opinions expressed in this report. I also have reviewed and considered applicable case and statutory authority to assist in illustrating the basis of the industry standards that should be applied. Under separate cover I provided a current curriculum vitae and rates for expert consulting work under separate cover. Attached to this report as Addendum A is a summary of the documents and information that I have reviewed

A significant percentage of my practice concerns the investigation of property and business loss insurance claims in order to assist insurers in abiding the applicable industry standards and reaching appropriate coverage determinations. This involves the gathering of information, retention of appropriate experts in relevant fields of expertise, and advising clients as to the application of the facts to the policy. In some cases, the insurer will retain me to conduct the investigation, retain experts, and secure the cooperation of the insureds. This includes work and advice to Nationwide

Insurance Companies since the firm's inception in 1997.

In other instances, I serve in an advisory capacity to assist the insurer in securing the information, securing the reasonable and necessary inspections and examinations, and making appropriate determinations as to coverage and benefits owed. To a smaller degree, my practice and experience has included the advisement and assistance of insureds in responding to requests for cooperation from an insurance carrier. By necessity, this practice includes thousands of hours of experience in working with insureds, both those who are represented by counsel and those who are not, to assist them in understanding and complying with the insured's duties in the event of a loss and securing the information that is necessary to an appropriate claim determination.

As stated more fully below, it is my opinion that Hudson's investigation of the insured's claim and the payment of benefits in this matter is consistent with the policy of insurance, existing legal standards, and applicable industry standards. Throughout the pendency of the claim, Hudson was timely and responsive. Hudson was reasonably prompt in its response to the notice of loss. It immediately retained consultants in the appropriate areas of expertise and followed the information and opinions emanating from those consultants. It shared with its insured the information from Haag Engineering, timely communicated its understanding of the facts, and explained its tender of beneftis in accordance with those facts. Hudson also made timely requests for the insured's cooperation and compliance with policy conditions. RDA Management and its initial consultants appeared to agree with Hudson's initial investigation and loss payment, as expressed in RDA Management's withdraw of its claim. Some two years after the fact, RDA Management presented new information. Hudson responded constructively and reasonably to that new information, but its efforts to complete the additional investigation were frustrated and prejudiced by the insured's breach of policy Conditions. This is particularly important where, as here, there remains a critical question of fact as to whether certain claimed damage was caused by the subject weather event, or emanates from deferred maintenance obligations.

A. <u>Plaintiffs Complaint</u>.

The Plaintiffs' Complaint alleges three claims for relief: breach of contract, bad faith breach of insurance contract, citing C.R.S. §10-3-1104(h)(VII), and unreasonable delay and denial of benefits pursuant to C.R.S. 10-3-1115 and C.R.S. 10-3-1116. There are no allegations in the Complaint suggesting an ambiguity in the applicable insurance policy. There also are no allegations suggesting a disagreement as to whether there was coverage damage to the insured building caused by a wind and hail event of May 8, 2017. Rather, the dispute arises out of questions of fact concerning the extent of damage caused by the May 8, 2017 event and the reasonable cost and methodology for repairing that damage.

The Plaintiff broadly alleges that Hudson conducted and continues to conduct an improper, outcome-oriented investigation resulting in a biased, unfair and inequitable evaluation of the Plaintiff's covered loss. The Complaint also alleges that Hudson's investigation was substandard and pre-determined. It also characterizes correspondence from Hudson concerning its investigation

as coercive and duplicitous. Those characterizations are inconsistent with the content of the communications themselves.

B. The Policy and Building.

Hudson issued to "RDA Management Co.; Lakewood Hotel Associates; Lakewood Hotel" insurance Policy No. HCS101734 for the 13-story, Sheraton Denver West Hotel located in Lakewood, Colorado. The hotel features an indoor pool, fitness center and restaurant. The roof over the base area of the hotel is ballasted EPDM, with skylights providing roof cover in areas such as the lobby and a barrel vault skylight roof over the pool.

As to hail and wind damage to any roof surface, the policy contains an endorsement, which reads:

**ROOF VALUATION ENDORSEMENT**

IT IS HEREBY UNDERSTOOD AND AGREED THAT:-

Notwithstanding Valuation, Section B - Property, Clause 6, the Company's liability for insured loss on all roof surfaces of an age of 10 years or older at the time of insured loss for the of "Wind", as defined, or "Hail", as defined, will not exceed the least of the following:

(a) The "Actual Cash Value", as defined, at the time of loss; or

(b) The cost to repair or replace the damaged property with material of like kind and quality, with proper deduction for depreciation; or

(c The lesser of the amount of insured, Limit of Liability, or any Sublimit of Liability as stated in Section A - Declarations, Clauses 4 and 5.

The age of the roof surfacing is calculated from the date of original installation or the date of complete replacement, irrespective of any interim or partial repairs. Roof surfacing includes, but is not limited to, all roofing material immediately above the roof decking or where no decking exists, the roof itself and its material, including but in not limited to:

(a) the roofing material exposed to the weather;
(b) the underlayments applied for moisture protection;
(c All flashings, fasteners and vents required in the replacement of a roof covering.

Our understanding from the known facts is that all roof surfaces, including the glass barrel roof over the pool, were greater than 10 years old. We have seen nothing in the material suggesting a disagreement with this understanding.

The policy also contains several Conditions that are important to this analysis. These include, in pertinent part:

**Section D**

**CONDITIONS**

***

**3. Appraisal**

If the Insured and the Company fail to achieve agreement on the amount of loss, upon the written request of either, each will select a competent and disinterested appraiser. The appraisers will first select a competent and disinterested umpire, and failing for 15 days to agree upon such umpire, then, on the request of the Insured or the Company, such umpire will be selected by a Judge of a Court of Record in the state in which such appraisal is pending. The appraisers will then appraise the loss, stating separately the "Actual Cash Value" at the time of loss and the amount of loss, and failing to agree will submit their differences to the umpire. An award in writing of any two will determine the amount of loss.

The Insured and the Company will each pay the expense of its chosen appraiser and will bear equally the other expenses of the appraisal and umpire. Neither the Company nor the Insured will be held to have waived any of their rights by any act relating to appraisal.

***

**22. Notice of Loss**

The Insured will immediately report in writing to the Company every loss, damage or "Occurrence" which may give rise to a claim under this Policy and file with the Company within 90 days from the date of discovery of such loss, damage or "Occurrent", a detailed sworn Proof of Loss. The Insured warrants and agrees to give prompt notice to the local Police Authorities in the event of theft of Insured Property, provided theft is covered under this Policy.

***

**26. Payment of Loss**

Any adjusted claims will be paid or made good to the Insured within 30 days after presentation and acceptance of satisfactory proof of loss at the office of the Company. No loss will be paid or made good if the Insured has collected the same from others.

***

**31. <u>Requirement After Loss</u>**

In the event of physical loss or damage that may give rise to a claim under this Policy, the Insured will:

(a) Immediately give notice thereof in writing to the Company or an authorized agent of the Company;

(b) Deliver within 90 days after the loss, unless such time is extended in writing by the Company, a Proof of Loss verified by a statutory declaration;

I) Giving a complete inventory of the damaged property and showing in detail quantities, costs, value and particulars of amount of loss claimed;
ii) Stating when and how the loss occurred, and if caused by explosion or fire due to ignition, how the fire or explosion originated, insofar as the Insured knows or believes;
iii) Stating that the loss did not occur through the procurement or connivance of the Insured;
iv) Showing the amount of Other Insurance and the names of other Insurers;
v) Showing the interest of the Insured and of all others in the property with particulars of all liens, encumbrances and other charges upon the property;
vi) Showing any changes in occupation, location, possession, exposures, title or use of the property since the issuance of the Policy;
vii) Showing the place where the Insured Property was located at the time of loss;

(c If required, give a complete inventory of undamaged property, showing, in detail, quantities, costs, and values;

(d) If required, and if practicable, produce stock lists, warehouse receipts and books of account, and furnish invoices and other vouchers verified by statutory declaration and furnish a copy of the written

portion of any other contract.

***

**34. <u>Suit</u>**
No suit, action or proceeding for the recover of any claim under this Policy will be sustainable in any court of law or equity unless the same is commenced within 2 years after the inception of loss that gives rise to the claim. Provided, however, that if by the laws of the state within which this Policy is issued such limitation is invalid, then any such claims will be void unless such action, suit, or proceeding is commended within the shortest limit of time permitted by the laws of such state.

C. <u>Claim History</u>.

There was a significant wind and hail event in the area of the hotel on May 8, 2017. RDA Management provided notice of the loss to Hudson on May 22, 2017. The Property Loss Notice states that John Bresnahan of RDA Management was to be the primary contact person. As to the Description of Loss & Damage, the Notice of Loss reads, "Major hail storm caused damage to skylights over pool, skylight over lobby, windows and possibly the roof fo the Sheraton West Denver Hotel."

By email dated May 19, 2017, from Briana Miller of RDA Management to Mr. Bresnahan, Ms. Miller advised that she had retained BluSky Restoration "to assist in a full assessment of our roof/exterior." The email also provided a list of damage identified at that time. This included damage and evidence of condensation on the skylights over the pool, damage to the top external layer of a skylight over the lobby, two cracked windows over the Fitness Center, damage to an exterior window outside of Room 708, damage to a window pain on the third floor at the South end of the building (which window already had been removed by the hotel), water intrusion at the south side of the lobby skylights and in the sales office, and holes in window frames on unidentified exterior windows. The email references without specificity additional consultants contacted by Ms. Miller in addition to BluSky.

Less than 24 hours after receiving notice of the loss, Hudson retained Cunningham Lindsey to assist with the claim investigation. Bill Walls of Cunningham Lindsey made immediate contact with the insured and scheduled an inspection of the property for May 25, 2017. Hudson also retained Matthew Sitzmann, P.E., of HAAG Engineering to assist with the inspection and assessment of the damage. Mr. Sitzmann's May 30, 2017 letter confirming his retention defines his scope of work as, "**INSPECT ROOF OF HOTEL TO DETERMINE EXTENT OF HAIL DAMAGE. INSPECT SKYLIGHTS, WINDOWS, AND INTERIOR CEILING OF HOTEL LOBBY**."

Hudson Claim Support Manager Ashia Cooper timely acknowledged the loss in writing by

way of correspondence dated May 25, 2017. This was addressed to Mr. Bresnahan and Brenda McGovern, who has been identified by the title Claims Manager at RT Specialty. The correspondence advised of the assigned claim number and advised that claim examiner Kaho Chan had been assigned to the matter.

An email from Mr. Walls to Mr. Chan notes that damages observed during the inspection were confirmed with the insured's list of damages including dents to the skylight over the pool, a hole in the north side lobby skylight, leaks in the ceiling of the fitness center, a ceiling leak in the south side lobby, and cracked window and vinyl inserts. During the inspection Cunningham Lindsey asked that the insured provide information as to the age of the roof. Ms. Miller did not have that information immediately available, and it does not appear to have been provided later. As Mr. Walls notes in his email, the age of the roof was notable based on the above-quote Endorsement. He advised Mr. Chan that Cunningham Lindsey would research Lakewood building department documents to determine the last permit pulled for a roof replacement. Mr. Walls noted repairs six months prior to the loss. His email also notes his observation that the ballasted did not appear to have been damaged by hail. As to the damaged window referenced in Ms. Miller's email, Mr. Walls reported that the subject window did not appear to have been damaged by hail. Repair estimates for the dome roof over the pool, and information concerning window and glass repairs were requested from the insured.

Mr. Sitzmann's report from the inspection is dated June 16, 2017. Per that report, Haag Engineering inspected the building on June 7, 2017. Mr. Craig Ulrich, who is identified as the building engineer for the hotel, also attended, as well as Mr. Walls of Cunningham Lindsey. It does not appear that RDA Management had BluSky or its other contractors/consultants attend the inspection. Haag's report notes that water had leaked to the interior at the south side of the bank of skylights above the hotel lobby.

The Haag report noted that the caps of powered vents and metal trim on the building had been dented by hail. A dent in a powered vent was slightly less than 2 inches wide at its base. A plastic dome skylight above the swimming pool was dented. The EPDM membrane was covered with a 1 to 2 inch layer of river rock. EPDM exposed at the curbs or transitions in roof elevation had not been torn by hail. The membrane had spatter marks where hail had removed grime or oxidation. The membrane was not torn in those areas. Additionally, the bank of skylights above the lobby had been patched. EPDM-patch had been applied to corners of the skylight frame. The plastic lens of one of the skylights above the lobby was punctured by hail. The EPDM membrane on the south side of the bank of skylights had been patched. Membrane patches had been applied in multiple areas. Coating had been applied to an area south of the bank of skylights. The coating was over top of the membrane and caulking patches and the coating had been covered with river rock. The coating had spatter marks where hail had impacted the surface in areas of sparse rock coverage. The membrane under the areas of impacts was not torn. There was a split in the coated area of the membrane. The split was located 15 feet 6 inches from the southeast corner of the bank of skylights above the lobby. The tear was a few feet from patches on the membrane. Concrete pavers had been placed on the three story roof section around the entire perimeter of the tower that extended above

that roof section. The EPDM membrane tear was adjacent to a row of pavers.

Haag Engineering determined that the EPDM membrane was not torn by hail and had been protected from the hail by a layer of river rock. Areas that were exposed at equipment curbs and changes in roof height were not fractured. Hail fractured a lens of one of the skylights above the lobby. Haag Engineering states in its report that the skylight lens that was fractured by hail could be replaced on an individual basis. Haag Engineering also notes that the leak at the south wall beneath the bank of skylights above the lobby was due to a long split in the EPDM membrane. The membrane split was in an area of previous patches on the roof. Haag concluded that the split likely was due to mechanical abuse in that area, and hail did not cause the tear. Haag advised that the split could be patched by cleaning the roof surface in that area and covering it with seal tape.

Haag Engineering concluded that the EPDM membrane was not damaged by hail. Haag opined that the leak at the south wall beneath a bank of skylights above the lobby was due to a long split in the EPDM membrane due to mechanical abuse, and hail fractured a lens of one of the skylights above the lobby and that it could be replaced on an individual basis.

A claim note entry dated July 11, 2017 notes that Mr. Wall was continuing to follow up with Ms. Miller, as to the name of the contractor who conducted the inspection of the dome over the pool, and the results of that inspection.

While the requested information was pending, Ms. Miller advised Mr. Walls in an email received by Mr. Walls on July 14, 2017, that the estimates that RDA Management had obtained to repair the identified hail-related damage did not exceed the $100,000 deductible that would apply to the claim. Mr. Walls requested copies of the estimates or a formal letter withdrawing the claim. No response was received. Accordingly, by email dated July 27, 2017, and addressed to Mr. Bresnahan of RDA Management, Mr. Walls confirmed the foregoing and advised that he would be closing his file at that time.

On August 7, 2017, Mr. Walls sent a confirming email to Ms. Miller regarding a call he received from Chuck Young of Seibert Keck Insurance Agency advising that more damages had been discovered and the amount of damage to be claimed had escalated. Mr. Walls asked that Ms. Miller forward all estimates and invoices to his attention. In response, Ms. Miller advised Mr. Walls that she was still awaiting additional bids for work and would send them upon receipt. Hudson maintained its file closure until it heard further from Ms. Miller.

On August 18, 2017, Mr. Walls again contacted Ms. Miller to inquire as to the status of the requested bids and invoices. Ms. Miller advised that she was still waiting one additional bid and hoped to have it the following week. Based on the insured's confirmation that it would be submitting additional estimates for consideration, Hudson reopened its claim.

On or about August 28, 2018, Ms. Miller provided to Mr. Walls additional estimates pertaining to the hail damage at the Sheraton Denver West Hotel. She also included photographs

of the damages. She did not share any information from BluSky Restoration. Mr. Wells authored a report dated October 10, 2017, wherein he forwarded and summarized the additional information received from the insured. The report notes that the information submitted by the insured still did not appear to exceed the $100,000 deductible based on the Roof Valuation Endorsement.

Hudson received and considered Mr. Walls' report on October 11, 2017. Based on its review of that information Hudson concluded that the bids from the insured's contractors presented a total claim for replacement cost benefits of $146,799.42, with $45,220.76 of non-recoverable depreciation based on the Roof Valuation Endorsement. After application of the $100,000 policy endorsement, Hudson determined that the net claim based on the information available at that time was $1,578.66.

On October 13, 2017, Mr. Walls, at the request of Hudson, forwarded to the insured a Proof of Loss form in the amount of $1,578.66 as well as a Statement of Loss, which outlined the basis of the proposed Proof of Loss given the estimates that had been submitted. On October 18, 2017, RDA Management advised in writing that it was withdrawing its claim, or, cancelling the claim "entirely."

I disagree strongly with the opinion expressed in Lesley Ann Beyer's report that this coures of communication was in anyway contrary to industry standards, or was cajoling or misrepresented the facts or policy. The insured requested additional time to consult with its own contractors and building engineer. After a period of months, the insured and its contractors appeared to agree with Hudson. During that time frame, neither the insured nor its contractors communicated confusion or a lack of resources, nor sought to clarify the facts reflected in Hudson's communications.

Thereafter, there were no communication from RDA Management until approximately April 19, 2019, when Public Adjuster Kevin Aguilar submitted a Public Adjusting Contract dated November 8, 2018, and an estimate written by Mr. Aguilar for $17,318,949.84 in total replacement cost value with an estimated depreciation factor of $692,616.55. The estimate appears to have been started on January 3, 2019, but has been submitted with a variety of print dates including April 9, 2019 and March 27, 2019. Mr. Aguilar's submission included a Sworn Statement in Proof of Loss in the amount of his estimate and signed on April 19, 2019. Mr. Aguilar's estimate makes no reference to the prior estimates obtained by RDA Management or its prior contractors such as BluSky restoration.

Upon receipt of this estimate, Hudson re-opened its claim file on April 23, 2019, and issued a reservation of rights letter dated April 30, 2019. In its reservation of rights Hudson took the unusual step of agreeing to a tolling agreement to suspend the statute of limitations to allow additional time to address the new information that was submitted some two years after the loss. The reservation of rights letter included a copy of the Haag Engineering report. It also advised Mr. Aguilar that Hudson had retained Andrew Larson of Crawford Global Technical Services to assist with the field investigation and adjustment. Mr. Chan also advised Mr. Aguilar that Andrew Larson from Crawford Global Technical Services would coordinate the re-inspection. The letter also requested copies of all invoices for hail damage repair since the date of loss and the dates of the

inspections that prompted RDA Management's request that the claim be reopened.

By letter dated May 14, 2019, Mr. Larson confirmed the request for a reinspection with Mr. Aguilar and building engineer Craig Ulrich. Hudson also retained JS Held Engineering, as well as Haag to participate in the reinspection. Mr. Larson's May 14, 2019 letter also requested the following:

- Copies of all invoices for hail damage repair which has been performed to the Sheraton Denver West Hotel since May of 2017;
- Dates upon which subsequent investigations were performed which identified additional damages, thereby prompting RDA Management to renew its claim;
- Construction plans and curtain wall details;
- Any and all building permits for work performed since May 2017;
- Architecture plans and supplements;
- Maintenance and repair schedules and applicable invoices;
- Out of service room numbers due to leaks and duration rooms were out of service (including dates);
- Reported locations of active and repaired interior leaks (including dates of discovery and dates of repairs); and
- Supporting computation and documentation for the claimed business loss in the amount of $1,000,000.

This information was not forthcoming prior to RDA Management revoke the Tooling Agreement and initiating litigation. Counsel for Hudson wrote RDA's counsel Chris Peirce on July 8, 2019, to reiterate these requests as follows:

- Building Plans for Sheraton West hotel (architectural, mechanical, structural and curtain wall);
- All building permits for work performed on the Sheraton West hotel since May, 2017:
- A list of all room numbers which have reported active leaking within the past five years;
- Out of service reports, to include identification of room numbers that have been out of service, dates in which they were out of service, and reasons why they were out of service;
- A history of building maintenance performed throughout the life-span of the hotel, to include full record history of all contractor related work completed to exterior of the building, including bids to perform the work;
- A list of all repairs performed to the hotel since May 2017.
- For each line item of claimed damage identified in the Aguilar Construction estimate, please identify when the claimed damage was discovered, who discovered it, and what steps were taken upon discovery to repair or identify scope of repair of the perceived damage.

- Contact information for the prior building engineer, Craig Ulrich.
- Monthly hotel statistics for the time period January 2014 through the present, to include detail for number of rooms occupied, average room rate and other pertinent room revenue information.
- Detailed monthly income statements (profit and loss statements) for the hotel for the time period January 2015 through the present.
- Compiled/Reviewed/Audited annual financial statements for the years 2015 through 2018.
- All available monthly and/or annual STAR reports.

Based on the information provided to me, it does not appear that there has been a substantive response to these requests for information. The claim includes lost business income in the amount of $1,000,000 related to the anticipated lost occupancy during the repairs identified in the estimate provided by Mr. Aguilar. No supporting documentation was provided by the insured to determine the basis for the estimated lost income. The foregoing requests included requests to assist in understanding and verify the lost income claim.

J. S. Held, LLC, schedule a pre-visit meeting on June 6 to speak with the building engineer. Full inspections occurred on June 25 and June 26 with all parties. This included Haag as well.

On or about June 25, 2019, the law firm of Embry Law PC advised of its representation of the insured and that the tolling agreement had been cancelled.

A full inspection of the property was performed on June 25, 2019 and June 26, 2019.

The Haag Engineering report dated August 22, 2019, confirms the prior finding of multiple areas of dent formations on steel coping, curbs, vent flue caps, exhaust hoods, and insulation jacketing on pipes, aluminum caps, and the like. The report reiterated the prior finding of numerous mechanically caused cuts and gouges in the EPDM membrane attributable to moving the rocks that form the ballast. As to damage to EPDM single-ply membranes, the report states that hailstones on of 2-1/2" in diameter would be needed to tear ballasted-EPDM roofing. The consensus, even now, appears to be that the hail on the date of the loss was 1.5" in diameter with the possibility of some hailstones reaching 1.75" in diameter. The Haag report also notes the elasticity of the EPDM, ultimately concluding that the EPDM membrane was not torn by hail. The report also stated that the river rock ballast protected the membrane from hail impacts and the hail was not large enough to stretch the EPDM membranes to a point of rupturing. Further the report states dents on insulation could not be differentiated from dents created by the ballast on the roof surface. The Haag report also note that indentations to the capping on the parapets did not effect performance but that replacement would be required if the owner wished to address the dents.

The JS Held report is dated August 9, 2019. JS Held concluded that hail indentations had occurred to many exhaust hoods, two condensing units, two cooling towers and associated jacketed piping. As to the Mezzanine Curtain Wall, the Held report noted moderate to severely weathered

glazing gaskets existed. Hail impact indentations were found on curtain wall components of the south and west facing elevations. Some curtain wall cover caps reflected minor indentations similar to being caused by soft-hammer usage. As to the Curtain Wall and Interiors of Levels four through 12, the report identified fractures due to hail on nearly all of the observed west-facing sills. Trim pieces also showed indications of hail impacts. Gaskets between the glass and rails and siles exhibited shrinkage and had pulled away from their original positions. At some locations, gaskets had fallen out of the glazing pocket. Areas of sealant repairs were found that had failed. Water testing performed indicated water intrusion of the curtain wall would occur. Reported water damage to the interior finishes of the guest rooms is a result of deferred maintenance resulting in widespread failures of the building envelope over time and was not believed to be to a one-time weather event.

JS Held report provided repair recommendations to address indentations caused by hail; flashing curtain wall trim and metal HVAC caps and hoods would need to be replaced. More specifically, JS Held references the west and south cap flashing as damaged from the subject hail event. East and north-facing exterior walls were not impacted by this event but were attributable to other storm events. The repair estimate indicated a total replacement value of $365,217.88.[1]

Both JS Held and Haag Engineering's estimation that hail of an approximate size of 1.5" impacted the property. JS Held advised that the cost to repair the damage is $365,217.88 RCV/$338,010.61 ACV. Repairs included flashing, trim, skylights, HVAC caps and hoods, and glass. After applying the facts to the policy and applicable deductibles Hudson issued payment in the amount of $238,510.61 based on the actual case value loss, less the $100,000 deductible, plus the cost of the core cut repairs related to the June 25, 2019 roof inspection of $500.

On August 30, 2019 Chris Peirce, counsel for the insured, advised Hudson that it had received Mr. Chan's letter and check. Mr. Peirce requested that the check from Hudson be re-issued to Embry Law PC in trust for the insured. This lawsuit followed.

E. Hudson's Claim Investigation and Adjustment Was Reasonable and in Conformance with Industry Standards and the Policy.

1. Industry Standards.

The standard of care for claims adjusting is largely measured by the applicable statutes, regulations and case law that applies. The following discussion includes several case citations. It is not intended as a legal opinion so much as noting the root-source of the industry standards that

[1]Ms. Beyer's report is critical of this number based on her understanding that JS Held did not include certain costs such as scaffolding and an OSHA compliant safety plan. That appears to be contrary to the facts. The April 17, 2020 report of Joseph Del Guidice, formerly of JS Held corrects that misunderstanding.

apply.

This is a "first-party" claim, as distinguished from a liability or "third-party" claim in which a third party sues the insured, and that insured, in turn, seeks a defense and indemnity from the liability carrier. In the context of a "first-party" claim, the contracted benefit is payable directly from the company to the insureds. *Goodson v. Am. Std. Ins. Co.*, 89 P.3d 409, 414 (Colo. 2004). Unlike third-party insurance, there is no quasi-fiduciary relationship between the insurer and the insured in the first-party context. *Brodeur v. American Home Assor. Co.*, 169 P.3d 139 (Colo. 2007). Furthermore, it is reasonable, particularly in the first-party context for the insurer to investigate claim issues that are"fairly debatable." *Zolman v. Pinnacol Assur.*, 261 P.3d 490, 496 (Colo. App. 2011). *Glacier Constr. Co. v. Travelers Prop. Cas. Co. of Am.*, 569 Fed. Appx. 582, 589-590 (10th Cir. 2014) (applying Colorado law and noting that while Code of Colorado Regulations §5-1-14, Section 4, does require an insurer to make a decision on claims within sixty days, a delay in paying a claim is justified by a fairly debatable issue of coverage).

Wide latitude is granted to a first-party insurer to investigate claims and to resist payment of unfounded claims. *Brodeur*. A first-party insurer will be found to have acted in bad faith only if it has intentionally denied (or failed to process or pay) a claim without a reasonable basis. *Travelers Insurance Co. v. Savio*, 706 P.2d 1258 (Colo. 1985). "Bad faith" in this context requires proof that the insurer not only acted unreasonably, but also did so knowingly or in reckless disregard of the fact that its conduct was unreasonable. Section 10-3-1113, C.R.S.; *American Fam. Mut. Ins. Co. v. Allen*, 10 P.3d 333 (Colo. 2004). In the first-party content, even if an insurer possesses a mistaken belief that the claim is not compensable, such a mistake does not constitute bad faith necessarily. It is the burden of the insured to establish the insurer's knowledge or reckless disregard of the fact that a valid claim has been submitted. *Brandon v. Sterling Colorado Beef*, 827 P.2d 559, 561 (Colo. App. 1991).

In the first-party content, even if an insurer possesses a mistaken belief that the claim is not compensable, it may be within the scope of permissible challenge even if its belief is incorrect. It is the burden of the insured to establish the insurer's knowledge or reckless disregard of the fact that a valid claim has been submitted. *Savio*, cited in *Brandon v. Sterling Colorado Beef*, 827 P.2d 559, 561 (Colo. App. 1991). An insurer is under no obligation to negotiate a settlement when there is a genuine disagreement as to the amount of compensable damages payable under the policy. *Bucholtz v. Safeco Ins. Co.*, 773 P.2d 590, 593 (Colo. App. 1998).

Subsection 1(h) of C.R.S. §10-3-1104 provides for the state regulation of insurance companies. It does not provide for a private cause of action, but it often is referenced in defining company practices that fall below the applicable standard of care. *Farmers Group, Inc. v. Trimble*, 658 P.2d 1370, 1377-78 (Colo. App. 1982), aff'd, 691 P.2d 1138 (Colo. 1984); *Schnacker v. State Farm Mut. Auto. Ins. Co.*, 843 P.2d 102 (Colo. App. 1992). The Act sets forth standards for the commissioner of insurance to utilize in monitoring whether an insurance company has engaged in an unfair or deceptive trade practice.

While the Act does not establish a standard of care actionable in tort, it may be used as valid, but not conclusive, evidence of industry standards. *Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 344 (Colo. 2004). C.R.S. §10-3-1104(1)(h) defines an unfair claims settlement practice as, among other things, refusing to pay claims without conducting a reasonable investigation based on all available information, or not providing a reasonable explanation of a denial of a claim. *Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d at 2004. The Act also states that a denial of an insured's claim must have a "basis in the insurance policy" or "applicable law." *Id*.

Relevant provisions of C.R.S. §10-3-1104 1(h) include:

(h) Unfair claim settlement practices: Committing or performing, either in willful violation of this part 11 or with such frequency as to indicate a tendency to engage in a general business practice, any of the following:

(I) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue; or

(II) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; or

* * *

(IV) Refusing to pay claims without conducting a reasonable investigation based upon all available information; or

(V) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; or

(VI) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear; or

(VII) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds; or

* * *

(XIV) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement; or

The facts discussed above do not support the conclusion that Hudson failed to conduct a reasonable and prompt investigation. To the contrary, Hudson inspected the loss with a well-respected engineering firm within days of the loss. Hudson, through its agents, shared the findings

of that inspection with RDA Management and advised of its coverage position, and the basis therefore. It did not incorrectly state the provisions of the policy. Nor did it incorrectly state its understanding of the facts and the basis of that understanding. Information from its consultants was shared with the insured and the insured's consultants.

What is troubling about Ms. Beyer's report is that it utilizes characterizations of conduct to support the opinions rather than the actual facts of the conduct. After completing its preliminary investigation and sharing the results of that investigation with its insureds, Hudson took the appropriate step of requesting a Sworn Statement in Proof of Loss. This is discussed in greater detail below. When there was no response to that request, Hudson followed-up appropriately. The insured requested more time and Hudson allowed that additional time. Later, the insured advised that its own consultants in 2017, including its building engineer who should know the building better than anyone, had not identified hail damage in an amount sufficient for RDA Management to pursue the claim further. RDA Management then withdrew the claim.

Ms. Beyer's report goes to great lengths to suggest a nefarious cajoling to force the insured to withdraw the claim. To the contrary, Hudson timely investigated and shared the results of that investigation with the insured. Hudson then applied the facts to the policy and communicated its coverage position to the insured with a request that the insured complete a Sworn Statement in Proof of Loss. When RDA Management did not respond, Hudson appropriately reminded RDA Management of the request and inquired as to whether RDA Management still intended to pursue the claim. RDA Management requested more time to confer with its own consultants and Hudson expressed no issues with that additional time. RDA Management then withdrew the claim. As discussed below, it is inappropriate to suggest cajoling when the company makes reasonable requests per the express conditions of the policy.

Ms. Beyer's repeated suggestion that too much was asked of RDA Management's general manager for the hotel and that such constitutes some form of bad faith or unreasonable delay is a mystery. First, it is disingenuous to suggest that a person in that position is a mere hospitality professional. More important, Ms. Miller has significant resources available to her, both in terms of her company's own risk manager, who initially was the primary contact, and in the form of RDA Management's insurance broker. Ms. Beyer also makes little mention of the building engineer who was present for all inspections and would know of deferred maintenance issues.

Large commercial buildings such as this have significant maintenance and repair budgets. It is the general manager's job to employ the resources and personnel to maintain the building and make timely repairs as the building matures. One would not expect Ms. Miller to perform that work herself. Rather, she would employ individuals with whom she would consult and others who would perform the work. RDA Management's risk manager asked Hudson to make Ms. Miller the primary point of contact. This makes sense as her building engineer and her team would know the most about the building, its maintenance history, and the like. It is not bad faith for an insurer to follow the direction of the insured as to who should be the primary contact. This engenders good communication. Moreover, at no point did Ms. Miller express concern or confusion as to the

process, or seek clarification of information received. Throughout, she and her building engineer responded appropriately to information that was provided, and they communicated to Hudson that they were consulting with their own contractors to determine the loss attributable to the hail event and how they wished to proceed.

Nearly two years after the loss, the insured came forward with information in the form of a new consultant with a substantially revised view of the damages. Rather than take a draconian approach of declaring the insured to have breached the policy Conditions regarding the timely submission of a Proof of Loss, Hudson agreed to reopen its file to consider the Agular estimate. Hudson took the unusual step of waiving certain rights under the policy to allow RDA Management to submit the information. It is unclear why it took so long for RDA Management and its Public Adjuster to compile and submit this information, particularly given the dates on which the adjuster was retained. Regardless, Hudson allowed the additional time when it could have taken a more strident approach to the policy Conditions.

After reinspecting the loss with its original engineering consultant and bringing in a second engineering firm to assist, Hudson adjusted the claim appropriately to address the new information and issued funds consistent with the new information. Hudson also made pointed requests for information and documentation to further evaluate the less well-supported portions of the Aguilar estimate. Hudson also sought clarification of the deferred maintenance issues, particularly with respect to the curtain wall. The insured and its counsel chose not to cooperate, instead terminating the Tolling Agreement abruptly and initiating suit without compliance with the reasonable requests for information. In doing so, the insured chose not to seek an appraisal and truncated Hudson's ability to utilize the other investigatory tools outlined in the policy to clarify the basis and veracity of the claim presented by the insured nearly two years after the fact.

2. Mere Disagreement As to the Facts Does Not Support a Finding of Bad Faith or Unreasonable Delay Particularly Where As Here the Insured Breaches the Conditions of the Insurance Policy.

Not every disagreement over the extent of a covered loss equates to bad faith, nor triggers the punitive statute. Section 10-3-1115(1)(a), C.R.S., provides that a "person engaged in the business of insurance shall not unreasonably delay or deny payment of a claim for benefits owed to or on behalf of any first-party claimant." Indeed, under both the standards of bad faith breach of insurance contract and the unreasonable delay and denial of benefits statute, claims that are fairly debatable do not warrant a finding of unreasonableness or bad faith where, as here, there are reasonable questions as to coverage. As the Court of Appeals noted in *Vaccaro v. Am. Family Ins. Group*, 275 P.3d 750, 754 Colo. App. 2012), "if a reasonable person would find that the insurer's justification for denying or delaying payment of a claim was 'fairly debatable,' this weighs against a finding that the insurer acted unreasonably." *Id.*, citing *Sanderson v. Am. Family Mut. Ins. Co.*, 251 P.3d 1213, 1217 (Colo. App. 2010).

Colorado law recognizes that insurers have a duty to their policy holders and shareholders

not to pay claims that are not within the policy's coverage. *May v. Travelers Prop. Cas. Co. of Am.*, 263 F. App'x 673, 682 (10th Cir. 2008), citing, *Bailey v. Hudson Insurance Co.*, 844 P.2d 1336, 1340 (Colo. Ct. App. 1992). As such, "an insurer may challenge claims which are fairly debatable." *May*, 263 F.App'x 682; and *Brennan*, 961 P.2d at 557. The General Assembly has declared that it is in the public interest for insurers to investigate and resist the payment on claims, or portions of claims, that are not covered. In this manner, Colorado may require more than the mere challenging of claim which are debatable.

3. The Insured's Own Lack of Cooperation and Breach of Policy Conditions Must Be Considered in Conjunction with Characterizations of Delay.

In Colorado an insured bears the threshold burden of proving that its loss falls within the coverage grant of an insurance policy. *Colorado Intergovernmental Risk Sharing Agency v. Northfield Ins. Co.*, 207 P.3d 839, 842 (Colo. App. 2008). Moreover, the insured has an affirmative duty, both at common law and per the express Conditions of the policy to cooperate and communicate with the insurer. It cannot simply report an event and do nothing in terms of the affirmative duty to demonstrate a loss falling within coverage. Ms. Beyer's ignores entirely the insured's role and obligations in this process.

As quoted above, the policy Conditions mandate that any insured seeking coverage under the policy "will" cooperate with reasonable requests that allow the insurer to appropriately evaluate the extent of covered loss in the context of those competing interests of the insured's desired to have repairs and maintenance covered by insurance and the General Assembly's instruction that non-covered claims should be resisted.

It is settled law in Colorado that an insurer's duty to investigate a claimed loss "is balanced by the insured's contractual duty to provide information and cooperation . . . about the accident." *State Farm Mut. Auto. Ins. Co. v. Brekke*, 105 P.3d 177, 189 (Colo. 2004), citing *Farmers Auto. Inter-Insurance Exchange v. Konugres*, 119 Colo. 268, 275, 202 P.2d 959, 962 (1949). If the insured meets this duty, "virtually all relevant facts and issues likely to arise . . . will be known by both the insurance provider and its insured long before any suit is filed." *Brekke*, 105 P.3d at 189. See also *Harris v. Allstate Ins. Co.*, No. 09-CV-01953-LTB-MJW, 2010 U.S. Dist. LEXIS 61900, at *11-12 (D. Colo. June 22, 2010) (granting summary judgment on breach of contract and bad faith claims in favor of insurer where insured "did not provide [insurer] with information needed to fully investigate and evaluate her claim").

Coverage is denied properly where the insured fails to cooperate "in some material and substantial respect." *State Farm Mut. Auto. Ins. Co. v. Secrist*, 33 P.3d 1272, 1275 (Colo. App. 2001). Whether there has been cooperation typically is a question of fact. *Konugres*, 202 P.2d at 963. However, where the facts are undisputed and only one reasonable inference may be drawn, cooperation is properly resolved as a matter of law. *Hansen v. Barmore*, 779 P.2d 1360, 1364 (Colo. App. 1989); *Edge Constr., LLC v. Owners Ins. Co.*, No. 14-CV-00912-MJW, 2015 WL 4035567, at *3 (D. Colo. June 29, 2015), aff'd, No. 15-1261, 2016 WL 4727376, (10th Cir. Sept. 9, 2016); *ITT*

*Specialty Risk Servs. v. Avis Rent A Car Systems, Inc.*, 985 P.2d 43, 46 (Colo. App. 1998).

Failure to cooperate constitutes a breach where the insurer suffers "material and substantial disadvantage." *Secrist*, 33 P.3d at 1275. In a first-party claim, prejudice is determined by whether the insurer has been able to complete a reasonable investigation with regard to whether the insured's claim is valid. *Id*. If the insured's refusal to cooperate prevents the insurer from completing such a reasonable investigation, prejudice should be found to exist. Specifically, it has been held that the insurer can deny coverage, following an insured's refusal to provide documents reasonably requested by the insurer, because the insured's refusal puts the insurer in the untenable position of either denying coverage or paying the claim without means to investigate its validity. 1 Allan D. Windt, Insurance Claims & Disputes § 3.2 (6th ed. 2016); *Pilgrim v. State Farm Fire & Cas. Ins. Co.*, 950 P.2d 479, 486 (Wash. Ct. App. 1997) (insurer prejudiced by insured's failure to provide financial information in first party claim because: "Without access to financial documents, State Farm could not evaluate the validity of the [insurance] claim. It could not decide whether the claim was covered, much less prepare a defense to the inevitable suit by [the insured] if it denied coverage").

The Court's observation in the *Pilgrim* case illustrates an important consideration in evaluating prejudice. The cooperation conditions in the policy address the insurer's undisputed right to knowledge of all salient facts, so that it can make correct claims decisions. The civil penalties for an incorrect coverage decision can be extreme. Yet, insurers in Colorado also owe a concurrent duty to all policyholders and shareholders to decline claims that are not within the policy's coverage. *May v. Travelers Prop. Cas. Co. of Am.*, 263 F. App'x 673, 682 (10th Cir. 2008), citing, *Bailey v. Allstate Insurance Co.*, 844 P.2d 1336, 1340 (Colo. Ct. App. 1992).

The tension between the obligation to disclaim non-covered claims, but also avoid any delay in confirming coverage, is untenable without the insured's cooperation.

Whether documents have been "reasonably requested" by an insurer depends on their materiality and relevancy. *Farmer v. Allstate Ins. Co.*, 396 F. Supp. 2d 1379, 1382-83 (N.D. Ga. 2005) (rejecting plaintiff's argument that financial information she failed to provide was not relevant where facts raised a reasonable concern as to the authenticity of the claim); *Rymsha v. Trust Ins. Co.*, 746 N.E.2d 561, 564 (Mass. App. Ct. 2001) (financial document "material and relevant"); *Keith v. Allstate Indem. Co.*, 19 P.3d 1077, 1079-80 (Wash. Ct. App. 2001) (same). The court may determine the relevance of requested information and documentation as a matter of law. *Doerr v. Allstate Ins. Co.*, 121 Fed. Appx. 638 (6th Cir. 2005) (affirming trial court's determination that financial records requested by insurer and not provided by insured were relevant to insurer's investigation and failure to provide them breached insured's duty to cooperate).

The foregoing illustrates the critical dynamic in this case which weighs against the conclusion that Hudson engaged in bad faith. RDA Management has an affirmative obligation to participate and contribute to the investigation. Here, requests for communication by Hudson after the initial site inspection were met with silence. RDA Management's building engineer was in attendance at the site inspection. To the extent, he, or RDA Management, had information contrary

to the findings of Haag, there is an obligation to communicate that information. Against the backdrop of the foregoing duties of the insured, it is unreasonable for the insured to remain silent and then later be heard to complain of delay, particularly where the insured has advised the insurer that it is reviewing the facts with its own consultants.

Communication and the sharing of information is critical. Requests for communication are not "cajoling," they are requests for information and communication. In 2017, after meeting with its own consultants and contractors, RDA Management made the choice to withdraw the claim. Upon receipt of the Aguilar estimate, Hudson reopened its investigation, adjusted its findings to address the information and sought additional information. The insured did not respond to the request for additional information.

5. The Insured's Duty to State and Prove Its Claim Likewise Is Reflected in the Proof of Loss Condition.

Ms. Beyer's report inappropriately dismisses the insured's failure to respond substantively to the requested Proof of Loss until nearly two years after the event. The report also ignores the abject refusal to cooperate with reasonable requests for additional information even after the insured submitted a Proof of Loss. The information requested in response to the Aguilar Proof of Loss is essential to understanding the basis of the claim and delineating covered damages born of a un fortuitous event versus ordinary wear and tear and general maintenance and upkeep.

Separate and apart from the failure to cooperate with reasonable requests for documents and historic information, the insured's failure to provide a timely Proof of Loss can represent a succinct policy breach warranting a denial of coverage. Although Hudson did not choose to deny coverage outright for the untimely submission of the requested Proof of Loss - instead agreeing to suspend its own rights to allow the insured more time – the breach of the policy Conditions in this regard informs the opinion that Hudson did not engage in an unreasonable delay of benefits.

Ms. Beyer's report repeatedly suggests a denial of benefits. I did not see any express denial of benefits in my review of the claim materials. Instead, Hudson received information, applied that information to the policy, and explained its claim payment position based on that information. When additional information was presented, Hudson responded appropriately and sought to address the additional information with requests for clarification and relevant historic data. This included the reiteration of requests for important information regarding the building maintenance and history. This particularly true because such information is knowable to the insured; not the insurer. These reasonable requests were met with silence and the sudden revocation of the Tolling Agreement.

Colorado long has recognized that there must be a substantial compliance with the terms of the policy requiring preliminary proofs of loss unless the company waives that requirement. *Hartford Fire Ins. Co. v. Smith*, 3 Colo. 422, 425 (1877). This is because the proof provides the essential tool by which the insurer can understand what is being claimed. *Id*. It cannot be disputed that Hudson made requests, both oral and written, for a proof of loss and provided necessary forms

on multiple occasions. Hudson also granted extensions of time to complete the proof. Asking for a Proof of Loss is consistent with industry standards as determined by Colorado law and the policy.

More recent case law in Colorado demonstrates that strict compliance with a contractual provision is required if there is a prescribed time and time is of the essence. *FDIC v. Kan. Bankers Sur. Co.*, 840 F.3d 1167, 1173 (10th Cir. 2016), citing *Hopkins v. Underwood*, 126 Colo. 224, 247 P.2d 1000, 1002 (Colo. 1952) ("where time is the essence of a contract, it means that the provision in the contract which fixes the time of performance is to be regarded as a vital term of the contract"); *Sports Premiums, Inc. v. Kaemmer*, 42 Colo. App. 172, 595 P.2d 696, 699 (Colo. App. 1979); and *Ranta Constr., Inc. v. Anderson*, 190 P.3d 835, 841 (Colo. App. 2008) (indicating that where time is of the essence in a contract, one party's failure to timely perform discharges the other party of the duty to perform).

An adequate proof of loss is that which accomplishes the basic purpose of enabling the insurer to adequately assess its rights and liabilities by advising the insurer of the nature and extent of loss and allowing the insurer to adequately focus its investigation and protect itself against fraud. 13 COUCH ON INSURANCE 3D at § 180:41, citing *O'Brien v. North River Ins. Co. of City of New York*, 212 F. 102 (4th Cir. 1914).

The request for a Proof of Loss provides an insurer with a critical means of communicating with the insured what the insured intends to claim. That knowledge then will inform what additional investigation was reasonable and necessary. The insured's delay in complying with this request prejudices the insurer's right to know the insured's intent and to better define the scope of the investigation. Here, Ms. Beyer's opinion seems to illustrate the conundrum presented to insurer's when there is not cooperation with the Proof of Loss Condition. As the court in *Globe Indemnity* noted, the insurer is entitled to know the exact facts of the loss and the insured often is the sole individual with knowledge of those facts. As the court held in *Mello v. Hingham Mut. Fire Ins. Co.*, 421 Mass. 333, 656 N.E.2d 1247, 1252 (Mass. 1995), an insurer's "contractual right is to determine promptly -- while the evidence and memories are still fresh -- the validity of any loss for which it might become liable. The insurer is under a corresponding duty to pay any claim promptly, and if it is later found to have inappropriately delayed or withheld payment, it may significantly increase its own liability."

The insured did not present a Proof of Loss in 2017 when requested. Instead, after consulting with its contractors, the insured made the unilateral decision to withdraw the claim. Neither the insured nor its contractors expressed or suggested that the original inspection was in error. Ms. Beyer's report suggests that Hudson inappropriately restricted Haag's investigation. That is contrary to Haag's own letter of retention. Moreover, the investigation of Hudson and Haag was dictated by the facts given to them by RDA Management, including its risk manager and building engineer. When additional information was submitted two years later, Hudson responded appropriately, but then again was met with an uncooperative and uncommunicative insured and consultants of the insured.

It is unreasonable and contrary to the policy conditions to suggest bad faith or an unreasonable delay or denial of benefits never claimed nor documented during the initial investigation and adjustment. As noted above, an insured has a corresponding duty of good faith and fair dealing in the context of an insurance claim. *Bailey*, 844 P.2d at 1339.

F. Summation.

Based on the foregoing Hudson's investigation, claim payments and communication appear to be consistent with industry standards and the information presented to it by its insured. This is particularly true given the failure of the insured and its building engineer and consultants to provide critical historic information concerning the building maintenance history and repair. I do not believe it is appropriate to suggest an unreasonable delay in benefits, particularly where the insured makes the unilateral decision to withdraw the claim after conferring with its own resources and independent contractors. Although the insured may disagree with the application of the facts to the policy, the fairly debatable standard illustrates the manner in which the disagreement at issue does not rise to a violation of industry standards or a delay or denial of benefits without a reasonable basis.

It is my opinion that Hudson's investigation and adjustment of this loss was reasonable and in keeping with appropriate industry standards. I trust that the foregoing adequately addresses my opinions and the analysis that serves as the basis of those opinions. If there are additional issues, facts, precedent or opinions that you would like me to address, please advise.

Thank you for your attention and consideration.

Sincerely,
**SPIES, POWERS & ROBINSON, P.C.**

/s/ *Brendan O. Powers*

Brendan O. Powers

## LIST OF DOCUMENTS REVIEWED

1. Plaintiff's Original Complaint and Jury Demand
2. Defendant's Answer and Jury Deman
3. Plaintiff's Initial Rule 26 Disclosures and documents
4. Defendant's F.R.C.P. 26(a)(1) Initial Disclosures
5. Property Loss Notice
6. 5/19/17 Email from Briana Miller to John Bresnahan
7. 5/3/17 Letter from Haag Engineering to Hudson Specialty Insurance c/o Cunningham Lindsey
8. 6/16/17 Haag Report
9. 3/17/19 Aguilar Construction Services Estimate
10. 8/9/19 JS Held Report
11. Commonwealth Specialty Loss Prevention Recommendations
12. Photographs
13. Hudson Insurance Group Policy
14. 10/10/17 MCL Global First Report Package
15. Defendant's Responses to Plaintiffs' First Set of Interrogatories
16. Defendant's Responses to Plaintiffs' First Request for Admissions
17. Defendant's Responses to Plaintiffs' First Request for Production of Documents
18. Defendant's Supplemental Responses to Plaintiffs' First Request for Production of Documents
19. Defendant's Second Supplemental Response to Plaintiffs' First Request for Production of Documents
20. Plaintiffs' First Supplemental Rule 26 Disclosures and documents
21. Defendant's Supplemental F.R.C.P. 26(a)(1) Disclosures
22. 4/30/19 Reservation of Rights letter from Hudson to Kevin Aguilar
23. 5/14/19 Letter from Crawford to Kevin Aguilar
24. 5/25/17 Hudson Acknowledgment Letter
25. 6/19/19 Letter from Hossley Embry
26. 8/25/29 Crawford Report No. 1
27. 8/29/19 Letter from Hudson to Hossley Embry
28. Hudson Claim Summary notes
29. 4/17/20 Golden Forensics Technical Report
30. Plaintiffs' Expert Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(2)
31. 12/30/18 LRC Services Report
32. 3/18/20 Engineering Perspective, Inc. Report
33. 3/18/20 Beyer Consulting Service Report
34. 3/20/20 Disaster Response Group Report
35. Lesley Ann Beyer CV and rates
36. Rocco Calaci CV
37. 3/19/20 Mark B. Bober Report