# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

RDA HOTEL MANAGEMENT )
COMPANY and LAKEWOOD HOTEL )
COMPANY, )
)
Plaintiffs, ) CIVIL ACTION
)
VS. ) NO.: 19-CV-02145-DDD-NYW
)
HUDSON SPECIALTY INSURANCE )
COMPANY, )
)
Defendant. )

\----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF
DAVID SCHWIER AS CORPORATE REPRESENTATIVE OF HUDSON
SPECIALTY INSURANCE COMPANY
JUNE 4, 2020
(Reported Remotely)

\----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF DAVID SCHWIER AS CORPORATE REPRESENTATIVE OF HUDSON SPECIALTY INSURANCE COMPANY, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on June 4, 2020, from 8:13 a.m. CST to 3:46 p.m. CST, via videoconference, before Crystal Gillespie, CSR in and for the State of Texas, reported by machine shorthand, at Regus, 51 JFK Parkway, First Floor West, Short Hills, New Jersey 07078, pursuant to the Federal Rules of Civil Procedure.



A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. CHRISTOPHER PEIRCE (Via videoconference)
MR. JEFFREY EMBRY (Via videoconference)
HOSSLEY EMBRY, LLP
515 SOUTH VINE AVENUE
TYLER, TEXAS 75702
(903) 526-1772
cpeirce@hossleyembry.com
jeff@hossleyembry.com

FOR THE DEFENDANT:

MR. COLIN CAMPBELL (Via videoconference)
CAMPBELL, WAGNER, FRAZIER & DVORCHAK, LLC
5251 DTC PARKWAY
SUITE 350
GREENWOOD VILLAGE, COLORADO 80111
(303) 831-5990
ccampbell@cwfd-law.net

ALSO PRESENT:

Mr. Jeff Miller, Videographer (Via videoconference)



INDEX


| | PAGE |
|---|---|
| Appearances | 02 |
| DAVID SCHWIER AS CORPORATE REPRESENTATIVE OF HUDSON SPECIALTY INSURANCE COMPANY | |
| Examination by Mr. Peirce | 06 |
| Examination by Mr. Campbell | 192 |
| Examination by Mr. Peirce | 195 |
| Examination by Mr. Campbell | 197 |
| Signature and Changes | 202 |
| Reporter's Certificate | 204 |


EXHIBITS


| NO. DESCRIPTION | PAGE |
|---|---|
| Exhibit No. 1 — Notice of deposition | 08 |
| Exhibit 2 — Hudson Claims Procedures | 24 |
| Exhibit 6 — Fairfax Financial Holdings Limited Interim Report | 12 |
| Exhibit 10 — Hudson Marketing Material | 14 |
| Exhibit 13 — Crawford Global Technical Services Report No. 1 | 87 |
| Exhibit 14 — Hudson Specialty Insurance Company Policy | 26 |
| Exhibit 16 — Hudson Insurance Company Reservation of Rights Letter | 91 |
| Exhibit 20 — E-mails | 100 |
| Exhibit 21 — E-mails | 101 |
| Exhibit 24 — E-mails | 76 |
| Exhibit 25 — Cunningham Lindsey Interim Invoice | 120 |
| Exhibit 26 — Matthew Sitzmann June 16, 2017, Report | 125 |




EXHIBITS (CONT)


| NO. DESCRIPTION | PAGE |
|---|---|
| Exhibit 27 — Matthew Sitzmann August 22, 2019, Report | 179 |
| Exhibit 28 — Cunningham Lindsey First and Final Report | 132 |
| Exhibit 29 — E-mails | 127 |
| Exhibit 30 — E-mails | 131 |
| Exhibit 31 — E-mails | 142 |
| Exhibit 32 — MCL Global First Report | 145 |
| Exhibit 33 — E-mails | 148 |
| Exhibit 34 — E-mails | 150 |
| Exhibit 36 — E-mails | 154 |
| Exhibit 37 — J.S. Held Report | 158 |
| Exhibit 38 — J.S. Held Estimate | 167 |
| Exhibit 47 — E-mails | 126 |

P R O C E E D I N G S
THE VIDEOGRAPHER: All right. Good morning everybody. We are now on the record. And this begins the video recorded deposition of David Schwier in the matter of RDA Hotel Management and Lakewood Hotel Company versus Hudson Specialty Insurance Company. Today is Friday, June 4th -- I'm sorry -- Thursday, June 4th, 2020. The time is approximately 8:13 a.m. Central Time. This case is filed in the United States District Court for the District of Colorado under Civil Action 19-CV-2145-DDD-NYW [sic]. And this deposition is requested by the plaintiff.
Court reporter is Crystal Gillespie. And the videographer is Jeff Miller. And this deposition is also being conducted remotely in accordance with the 17th Emergency Order pertaining to the COVID-19 emergency. Therefore, counsel, let me remind you that at the end of this deposition, we will need you to verbally identify yourself and state your orders for transcript and video.
And now for the record, counsel, if you will identify yourselves and who you represent and state your agreements, the court reporter will swear in the witness.
MR. PEIRCE: Christopher Peirce for the



plaintiffs.
MR. EMBRY: Jeff Embry for the plaintiffs.
MR. CAMPBELL: Good morning. Colin Campbell on behalf of defendant Hudson.
(Witness sworn.)
MR. PEIRCE: Madam Court Reporter, just a quick housekeeping matter, you have received the electronic version of all of the deposition exhibits to this deposition; is that correct?
THE COURT REPORTER: Yes, I have.
MR. PEIRCE: And those would include Exhibits 1 through 74?
THE COURT REPORTER: Yes, sir.
DAVID SCHWIER AS CORPORATE REPRESENTATIVE OF HUDSON SPECIALTY INSURANCE COMPANY,
having been first duly sworn, testified as follows:
EXAMINATION
BY MR. PEIRCE:
Q. All right. Would you please state your full name for the record, Mr. Schwier.
**A. Oh, yes. David Schwier, S-C-H-W-I-E-R.**
Q. Mr. Schwier, as I just introduced myself, my name is Christopher Peirce. I represent the plaintiffs in this lawsuit. Do you understand that?
**A. Yes, I do.**



Q. And do you understand that the Federal Rules of Civil Procedure require a corporation to provide a witness to testify on behalf of the corporation?
**A. Yes, I do.**
Q. And you have been designated to testify on behalf of Hudson Specialty Insurance Company, correct?
**A. Yes, I have.**
Q. In other words, you are not providing your personal opinions here today, but instead, Hudson's position on designated topics, correct?
**A. That is correct.**
Q. And you understand you are under oath here today?
**A. Yes.**
Q. And you understand the penalties of perjury apply to your testimony?
**A. Yes, I do.**
Q. Have you ever testified on behalf of Hudson Specialty Insurance Company or Hudson Insurance Group as a corporate representative in the past?
**A. Yes, I have.**
Q. How many times?
**A. Just once.**
Q. Do you recall the case name and where it was pending?



**A. It was in Lafourche Parish, Louisiana. And the case name was Guidry versus Hudson.**
(Exhibit 1 introduced.)
Q. (By Mr. Peirce) Mr. Schwier, can you take a look at Exhibit 1 on the screen? Do you see that?
**A. Yes. Could you enlarge it?**
Q. Can you see it now?
**A. I don't see it at all. It was on the corner of the screen.**
Q. You don't see that?
**A. No. I just see you and the court reporter.**
MR. PEIRCE: Can anybody else see it?
THE COURT REPORTER: I can see it.
MR. CAMPBELL: It is -- it is displaying on my screen.
MR. EMBRY: I see it on my screen.
MR. PEIRCE: And --
**THE WITNESS: Should I get the --**
MR. PEIRCE: Yeah. I mean, I'm going to have several exhibits to look at. So --
**THE WITNESS: Let me grab her really quick.**
MR. PEIRCE: Okay.
**THE WITNESS: Just one second.**
MR. PEIRCE: Can we go ahead and go off the record for a second?

THE COURT REPORTER: Yes.
MR. PEIRCE: Mr. Campbell, are we off record?
MR. CAMPBELL: Yes.
MR. PEIRCE: Okay.
(Recess taken from 8:17 a.m. CST to 10:00 a.m. CST.)
THE VIDEOGRAPHER: All right. We are back on the record at 11 o'clock Eastern Time.
Q. (By Mr. Peirce) Mr. Schwier, you understand we're back on the record?
**A. Yes.**
Q. Can you see Exhibit 1 in front of you to your deposition?
**A. Yes, I can.**
Q. And as I understand it, you are the corporate representative on behalf of Hudson Specialty Insurance Company on all of the topics listed in Exhibit 1 to your deposition; is that correct?
**A. Yes. That's correct.**
Q. Will you agree with me, Mr. Schwier, that if a question is unclear to you, that you will get me to point that out before answering the question and get me to rephrase it until you do understand it?
**A. Yes.**



Q. If you have not pointed that out, can we agree that you have understood my question?
**A. Yes.**
Q. If I ask you a direct question that you have understood, will you agree to provide a direct, nonevasive answer?
**A. Yes.**
Q. Mr. Schwier, what did you do to prepare for your deposition on the topics designated in Exhibit 1?
**A. I looked at the claim file. I had discussions with Colin Campbell. There's also some training documents that were given to me to look at. And I looked at the underwriting file.**
Q. Did you speak to anyone besides Mr. Campbell or any attorney?
**A. I spoke to Kaho Chan about the claim.**
Q. Did you speak to anyone else besides Mr. Chan or Mr. Campbell to prepare for your deposition?
**A. No.**
Q. Did you say no?
**A. No. No, I didn't -- I didn't speak to anybody besides those two.**
Q. Mr. Schwier, I want to talk a little bit about Hudson Specialty Insurance Company in general. As I understand it, Hudson Specialty Insurance Company is a



part of the Hudson Insurance Group; is that correct?
**A. That's correct.**
Q. And as I understand it, Hudson Insurance Group is the U.S. insurance division of Odyssey Group, a leading global provider of insurance; is that correct?
**A. Yes. We're a part of Odyssey Group.**
Q. And Odyssey Group is a wholly owned entity by Fairfax Financial Holdings Limited, correct?
**A. That's correct.**
Q. And is it true that Fairfax Financial Holdings Limited is the umbrella insurance company that receives almost 4 billion in premiums just in the last quarter?
MR. CAMPBELL: And I'll object to this point as asking a line of inquiry that was not a listed topic. I'll allow Mr. Schwier to go ahead and answer. But I don't believe that this is a pertinent inquiry.
**A. The -- the -- the premium number sounds correct. But Fairfax, I don't believe, is an insurance company. It's a holding company.**
Q. (By Mr. Peirce) Okay. So it's fair to say that at least 4 billion in premiums, thereabout -- I'm not trying to hold you to a specific number -- were collected in that period of time by Fairfax?
MR. CAMPBELL: Same -- same objection.
**A. The Fair -- the insurance companies in the**



**Fairfax group would have had -- would have had a similar premium. But I don't think that premium is paid to Fairfax. I think it just might be the wording of the question.**
(Exhibit 6 introduced.)
Q. (By Mr. Peirce) Can you look at Exhibit 6?
MR. PEIRCE: And let me share that.
Q. (By Mr. Peirce) Are you looking at Exhibit 6, Page 3? Well, first of all, look at Exhibit 6 to your deposition, Page 1.
**A. Okay. Fairfax Financial interim report?**
Q. Yes. And as you can see, this is an interim report for the months ending in March 31st, 2020; is that correct, on Page 1?
**A. Yes.**
Q. And then if you turn to Page 3, if you look at the top, it talks about consolidated statements of earnings. And then it -- just under that, it has a category for income?
**A. Yes.**
Q. And it talks about gross premiums earned. And then in 2020, it has 4,216.3, and that's U.S. millions, as indicated on the top left of Exhibit 6, Page 3, correct?
MR. EMBRY: Mr. Peirce, will you share your

screen?
MR. CAMPBELL: Chris.
MR. PEIRCE: Oh, I thought I was. I'm sorry.
MR. CAMPBELL: Yeah. Hey, Chris, just so that I don't hold up your deposition, do you -- do you -- would you agree that I can just have a continuing objection to any inquiry concerning premium dollars by Fairfax or any of its subsidiary companies?
MR. PEIRCE: Sure.
MR. CAMPBELL: Okay.
Q. (By Mr. Peirce) Mr. Schwier, do you see where I'm pointing?
**A. I see that the gross written premiums for the Fairfax Financial companies in the first quarter of 2020 were 4 -- well, it's going to be 4,000,775,000 or 4,775,000,000. Or were you looking at gross premium earned?**
Q. Gross premiums earned.
**A. Okay. I'm sorry. Yes. It's $4,216,000,00.**
Q. Would you agree with me, Mr. Schwier, that Hudson is a market leading large insurance company?
**A. I wouldn't call us a large insurance company. Our premium is about -- between 1.5 and 2 billion a year. So we're medium size. I think Fairfax would be**



**considered a large company.**
(Exhibit 10 introduced.)
Q. (By Mr. Peirce) Okay. Can you look at Exhibit 10 to your deposition?
**A. Okay.**
Q. And at least Hudson talks about itself being a market leading specialty insurer. You would agree with that?
MR. EMBRY: Mr. Peirce, would you share your screen, please?
MR. PEIRCE: Yeah. Apologies.
Q. (By Mr. Peirce) Do you see that, Mr. Schwier?
**A. Yes, I would agree.**
Q. And would you agree that Hudson also describes itself as being focused on providing its policyholders with a safe harbor for the risk they face?
**A. Yes, I agree.**
Q. Do you believe that is true, that Hudson provides its customer with a safe harbor for the risks they face?
**A. Yes.**
Q. Would you agree that Hudson recognizes that damage caused by large hail is a risk faced by those who insure a property, particularly a large commercial property like a hotel?



**A. Yes.**
Q. Would you agree that Hudson is very aware of the damage that can be caused by large hail and the long-term effects of such damage on a building from its broad experience in the industry?
MR. CAMPBELL: Object to form and foundation.
**A. Yes. We're aware that hail can cause damage.**
Q. (By Mr. Peirce) Including long-term effects of damage from that hail to a building, correct?
**A. Sure.**
Q. Isn't it also true that in choosing what type of insurance to sell, Hudson has announced that it has, quote, a broad risk appetite, closed quote, that allows the company to grow and sell more insurance? Do you agree with that statement?
**A. Yes.**
Q. Hudson also describes itself as, quote, a strong partner, closed quote, that is financially secure and stable. Do you agree with that?
**A. Yes, I do.**
Q. Do you agree that Hudson is headquartered in New York City but has offices throughout the United States and in Vancouver, Canada, correct?
**A. That's correct. Yes.**



Q. It is fair for the jury in this case to assume that Hudson has all of the resources necessary to be careful and deliberate when writing insurance policies and setting premium amounts, correct?
MR. CAMPBELL: Object to form and foundation.
**A. Yes.**
Q. (By Mr. Peirce) Mr. Schwier, I want to talk a little bit about the duties that Hudson owed to my clients in this case and as well as additional insureds and other just hypothetical scenarios. You would agree that Hudson owes duties to my clients under the terms of the insurance policy applicable to this claim, correct?
**A. Yes, I would.**
Q. And Hudson agrees the Colorado legislature has implemented certain laws that insurers such as Hudson must abide by in the handling of insurance claims, correct?
**A. That's correct.**
Q. And you understand the legislature is made up of the elected representatives of the state of Colorado?
**A. Yes.**
Q. And Hudson acknowledges that those laws are laid out in the Colorado Revised Civil Statutes, as well as other statutes in Colorado?

**A. I believe so, yes.**
Q. Is Hudson aware of the provisions listed in Title 10 of the Colorado Revised Statues that Hudson is required to abide by, or was required to abide by in this claim?
**A. Generally, yes.**
Q. And Hudson agrees it was subject to and required to follow the Sections 10-3-1103, 10-3-1104, 10-3-1115, and 10-3-1116 in the adjustment of claims in Colorado of this nature?
**A. I don't have those sections in front of me. But if they're claims handling guidelines, yes.**
Q. And Hudson agrees that it is -- there is a whole laundry list of deceptive trade practices that it is prohibited from conducting in the state of Colorado in the adjustment of claims, correct?
**A. I don't have those in front of me, but I believe so.**
Q. Well, let me ask you this. Are Hudson's adjusters handling claims in Colorado provided a copy of the laws they must abide by in the state of Colorado in handling claims?
**A. No. We -- we use a general set of guidelines that fall within what all the states produce. They're pretty similar state to state. We have specific**



**training for California. But everything else is -- they're general guidelines.**
Q. So just so I'm clear, the claim adjuster in this case was not provided the laws in the state of Colorado applicable to claims handling to guide that adjuster in this case, correct?
MR. CAMPBELL: Object to form.
**A. The Hudson claims handler, I don't believe he was provided those specific Colorado guidelines.**
Q. (By Mr. Peirce) Would you agree with me that one primary purpose of those laws in Colorado is to protect the consumer?
**A. Yes.**
Q. In other words, to protect my clients from an unfair or deceptive trade practice on the part of the insurance company, correct?
**A. Yes, among other things.**
Q. And you agree another purpose of the law is to ensure the prompt payment of claims?
**A. Yes.**
Q. Do you agree Hudson also owes my client a duty of good faith and fair dealing, correct?
**A. Yes.**
Q. Does Hudson understand that the reason this duty applies is because insurance companies are in a



position to gain an unfair advantage over their insureds because of their superior knowledge, resources, and bargaining power?
MR. CAMPBELL: Object, form and foundation.
**A. In some cases, that's true.**
Q. (By Mr. Peirce) You would agree that Hudson must treat its insured's interests with equal regard to its own interests, correct?
**A. Yes.**
Q. And the insurance claims process is not supposed to be an adversarial process, correct?
**A. No. No. And you're speaking of first-party claims of our insureds?**
Q. First-party claims, it's --
**A. Yes.**
Q. -- not supposed to be an adversarial process between Hudson and Hudson's insureds, correct?
**A. That's correct.**
Q. And you would agree that Hudson is duty bound to conduct a full, fair, and prompt investigation of a claim at its own expense, correct?
**A. That's correct.**
Q. Hudson must fully, fairly, and promptly evaluate and adjust a claim, correct?
**A. Yes.**



Q. Does Hudson understand the time deadlines to accept or reject a claim of this nature in Colorado?
**A. I would have to see the guideline. But we -- I know it's -- we have to respond promptly.**
Q. Can you tell me what the deadlines to accept or reject the claim applicable to this claim was or were under Colorado law?
MR. CAMPBELL: Object to form.
**A. No. I don't have that in front of me.**
Q. (By Mr. Peirce) Is it Hudson's opinion, despite not knowing that offhand or because it's not in front of you, is it Hudson's opinion that those deadlines to accept or reject a claim in Colorado with regard to this claim were met in this claim?
**A. In -- yes. Well, we -- we received the claim. We verified coverage. We conducted an investigation. And we evaluated the claim all within that very short period of time.**
Q. So just so I'm clear, it's Hudson's position it conducted a full and thorough investigation of this claim in 2017 based on all available information?
**A. That is correct.**
Q. Is it Hudson's position it conducted a full and thorough investigation of this claim in 2019 based on all available information?

Page 21

**A. Yes.**

Q. You would agree that Hudson may not deny a claim or any part of a claim based upon insufficient information, unreliable data, speculation, or biased information?

MR. CAMPBELL: Object to form.

**A. Could you repeat that?**

Q. (By Mr. Peirce) Sure. Hudson agrees that it may not deny a claim or any part of a claim based upon insufficient information, unreliable data, speculation, or biased information?

MR. CAMPBELL: Same objection.

**A. I think it depends. I'm a little confused by "insufficient information." There's claims where, yes, we can't provide coverage because there's not enough information.**

Q. (By Mr. Peirce) Right. But the way the question was phrased, "it may not deny a claim." So you're saying it's okay to deny a claim if Hudson has insufficient information?

**A. If we are unable to obtain information about a claim, if it's unobtainable, I don't see how we could pay a claim that we wouldn't know anything about. And --**

Q. All right.

Page 22

**A. -- I think I'm just a little confused by that question.**

Q. Yeah. And that's -- I'll take that -- let me take that "insufficient information" out of the question. Would you --

**A. Okay.**

Q. -- agree that Hudson may not deny a claim or any part of a claim based upon unreliable data, speculation, or biased information?

**A. Yes. Yes, I agree.**

Q. You agree that if Hudson denies a claim, whether partially or fully, Hudson must give written explanation pointing to facts and policy provisions and the reasons for denial in a timely fashion?

**A. Yes.**

Q. Hudson must not misrepresent facts or the policy's provisions, correct?

**A. That's correct.**

Q. Hudson is required by law in Colorado not to unnecessarily delay a decision on a claim, correct?

**A. Yes.**

MR. CAMPBELL: Object to form.

Q. (By Mr. Peirce) You agree that Hudson has a duty to review all relevant information objectively without bias, correct?

Page 23

**A. That's correct.**

Q. You agree that Hudson has a duty to obtain all information relevant to the subject claim as promptly as possible?

**A. Yes.**

Q. In other words, Hudson has a duty to fully investigate the matter in the time parameters required by law, correct?

**A. Yes. We have a duty to thoroughly investigate a matter and promptly.**

Q. And Hudson has a duty under the policy and Colorado law to determine the extent and amount of damages from a covered peril after a claim is reported, correct?

**A. Yes.**

Q. And Hudson does not rely solely on its insured to determine the extent and amount of covered damages after a claim is reported, correct?

**A. No. We work with our insureds on those matters.**

Q. And Hudson does its own independent investigation of covered losses, correct?

**A. That's correct.**

Q. Let's look at Hudson's own claim guidelines as far as what they say. And if you could pull up

Page 24

Exhibit 2 to your deposition.

(Exhibit 2 introduced.)

**A. Okay.**

Q. (By Mr. Peirce) If you look on Page 2 of Exhibit 2, this is an overview philosophy. These are Hudson's own claim guidelines, correct?

**A. Yes, they are.**

Q. And this states that Hudson's claim investigation must be conducted fairly, correct? It's on No. 1 on Page 2.

**A. Yes. "Claims investigations, evaluations, and settlements will be conducted fairly, and each claim will be treated on its own merits."**

Q. And Hudson requires its investigations to be prompt and thorough, correct?

**A. That's correct.**

Q. And the evaluation will be based on facts and evidence. The claims evaluation will be based on facts and evidence according to Hudson's own claim guidelines, correct?

**A. That's correct.**

Q. And you would agree that confirming coverage for a reported claim is a threshold responsibility of Hudson's claim department, correct?

**A. That's correct.**

Q. And Hudson agrees that all coverage decisions are time sensitive, correct?
**A. Yes.**
Q. Hudson agrees that failure to assert a valid coverage disclaimer in a timely manner may be deemed acceptance of coverage under Hudson's own guidelines, correct?
**A. If the facts of the disclaimer are known to us, yes.**
Q. I'm sorry. You said if the facts of the disclaimer are known to you, then yes?
**A. Yeah. We can't disclaim on something we don't know about. I think if something, in the course of a claim, came up which invalidated coverage, that would be grounds for a disclaim of coverage also.**
Q. Okay. But Hudson -- Hudson's own guidelines state what I just said. In other words, Hudson's own guidelines state a failure to assert a valid coverage disclaimer in a timely manner may be deemed acceptance of coverage, correct?
**A. And it may -- and it may be, yes.**
Q. I'm sorry?
**A. Yes, it may be.**
Q. Hudson states, "Therefore, it is incumbent that Hudson -- that the Hudson claims specialist recognizes



the importance and urgency of this responsibility." That's in Hudson's own claim guidelines, correct?
**A. That's correct.**
(Exhibit 14 introduced.)
MR. PEIRCE: Mr. Schwier, if you could pull up Exhibit 14 to your deposition. Let me know when you're ready.
**THE WITNESS: It's a copy of the policy?**
MR. PEIRCE: Yes.
**THE WITNESS: Okay.**
Q. (By Mr. Peirce) Exhibit 14 is a full copy of the policy applicable to this claim, correct?
**A. Yes.**
Q. And if you look on Page 30 of 52 of the document under Section D "Conditions." Let me know when you're ready.
**A. Okay. I'm on page -- all right. I'm on Page 30.**
Q. Do you see the Section D "Conditions," No. 2 "Access and Entry"?
**A. Yes.**
Q. And this states that the policy conditions require representatives of Hudson to survey and examine the property and to make an estimate of the loss or damage, correct?



**A. Yes, it does.**
Q. Does Hudson agree that if you fail to consider relevant information relating to the claim, it's investigation is faulty?
MR. CAMPBELL: Object to form, foundation.
**A. Could you repeat that?**
Q. (By Mr. Peirce) Sure. Does Hudson agree that if Hudson fails to consider relevant information relating to the claim, that its investigation of the claim is faulty?
MR. CAMPBELL: Same objection.
**A. Yes. We should investigate all relevant information.**
Q. (By Mr. Peirce) Does Hudson agree that under Colorado law, Hudson has a duty to promptly provide to my clients a reasonable explanation of the basis in the policy in relation to the facts or applicable law for Hudson's denial or partial denial of a claim?
MR. CAMPBELL: Object, form and foundation.
**A. Yes. We should tell the insured why a portion of a claim is not covered.**
Q. (By Mr. Peirce) And if you fail to do that, would you agree that Hudson has breached its duties owed to my clients under Colorado law?
MR. CAMPBELL: Object, form and foundation.



**A. If we disclaim coverage for something and didn't tell them why, yes, that -- that may be.**
Q. (By Mr. Peirce) Yeah. The question was: If you fail to promptly provide to an insured a reasonable explanation of the basis in the policy in relation to the facts or applicable law for Hudson's denial or partial denial, would that be a breach of your duties to the insured under Colorado law?
MR. CAMPBELL: Object, form and foundation, also asked and answered.
**A. It may be.**
Q. (By Mr. Peirce) I'm sorry? I didn't hear you.
**A. I said it may be, yes.**
Q. May be, yes. Do you agree that the bottom line to all of this line of questioning is that Hudson must treat its insureds fairly and objectively?
**A. Yes.**
Q. In other words, Hudson can't go into a claim looking for reasons to deny a claim before conducting a thorough, unbiased, reliable, and prompt investigation under the policy's terms in Colorado law?
**A. That's correct. We do not do that.**
Q. Hudson cannot predetermine the outcome of an investigation before the full investigation is completed, correct?

**A. Yes.**
MR. CAMPBELL: Object to form.
**A. That's correct.**
Q. (By Mr. Peirce) Does Hudson weigh information submitted by the experts and representatives retained by Hudson the same as information and reports submitted by experts and representatives retained by the insureds?
**A. Yes. We evaluate all information provided.**
Q. And if there's a cause for concern regarding the credibility of any information or person providing information relevant to the claim, Hudson has a duty to investigate and research that potential credibility, correct?
MR. CAMPBELL: Object to form, foundation.
**A. Yes.**
Q. (By Mr. Peirce) I want to switch gears briefly, Mr. Schwier, to talk about premiums. You agree that insurance premiums are the amount that my client has to pay for the insurance coverage that it gets?
**A. That's correct.**
MR. CAMPBELL: And this is subject to my continuing objection with regard to any inquiry about premiums being beyond the scope of any of the listed topics.
Q. (By Mr. Peirce) In other words, the premiums



are the price tag that Hudson gets to put on insuring the property, correct?
**A. Yes. It's the amount we charge for the policy and the coverage.**
Q. And that price tag can go up or down depending on the condition of the property and various other factors that are determined by Hudson, correct?
**A. Correct.**
Q. But Hudson is the one that gets to set the price tag, correct?
MR. CAMPBELL: Object to form.
**A. That's correct. It can be negotiated, but that's correct.**
Q. (By Mr. Peirce) But ultimately, even after a negotiation, Hudson gets to determine the amount it's willing to accept in return for the specific coverage, correct?
**A. That's correct.**
Q. And Hudson gets every opportunity to inspect the property before determining the price tag, correct?
**A. That's correct.**
Q. And you would agree that Hudson has plenty of experience recognizing a damaged building, one that is in poor condition, or one that already has hail damage, correct?



**A. That's correct. We identify a building that's had hail damage, or it's been poorly constructed.**
Q. And Hudson has a broad range of experience doing that before insuring properties, correct?
**A. Yes.**
Q. And you agree that those things can be considered in choosing the insurance policy language where setting the premium amount?
**A. Yes.**
Q. And my clients did not in any way obstruct or prevent Hudson from inspecting the property before Hudson issued coverage for the property in this case, correct?
**A. No, they did not.**
Q. Would you agree that the premium, which appears on the first page of Exhibit 14 to your deposition, in this case, was set by Hudson Specialty Insurance Company?
**A. Yes.**
Q. And my client paid approximately $46,500 per year to Hudson for the policy in this case, correct?
**A. Yes. That's the number on the policy.**
Q. Is it true, Mr. Schwier, that in the insurance industry, companies like Hudson, their primary source of income is premiums paid by customers like my clients?



MR. CAMPBELL: Object to form.
**A. That's correct. That's correct.**
Q. (By Mr. Peirce) Isn't it also true that the primary risk or expense that insurance companies face beyond normal operating expenses is when large claims have to be paid?
MR. CAMPBELL: Object to form.
**A. When -- yes. Our largest expense is paying claims.**
Q. (By Mr. Peirce) Isn't it also true that to try and limit any risk that Hudson may face, Hudson can add provisions for excluding certain items in insurance policies or language that limits the scope of coverage?
**A. Correct. We can limit the scope of coverage in a policy.**
Q. Isn't it also true that insurance companies like Hudson have the opportunity to inspect and check out a property's condition before they -- they agree to insure a property?
**A. Yes, we can.**
Q. So before that premium is set and the policy is actually signed, Hudson has every opportunity to do its homework on a property, correct?
**A. Correct.**
Q. If you look back at Exhibit 14 to your

Page 33

deposition, would you agree that the Hudson insurance Policy No. HCS101734 is the binding policy agreement for the claim made the basis of this case?
**A. Yes, it is.**
Q. And the policy identified as Exhibit 14 was drafted by Hudson, and the language chosen was done by Hudson Specialty Insurance Company, correct?
**A. Correct.**
Q. And you would agree that the language in this policy, Exhibit 14, was carefully considered before it was included?
**A. Yes.**
MR. CAMPBELL: Object to foundation.
Q. (By Mr. Peirce) Did you answer that? I'm sorry.
**A. Yes, I agree.**
Q. And do you agree that the highest levels of Hudson's management, including the president Christopher Gallagher and the corporate secretary Ms. Daskalakis, signed the actual policy, Exhibit 14?
**A. Yes. Those are, I believe, their auto signatures. But, yes, those are their names on the policy.**
Q. Right. And these auto signatures aren't authorized to be stamped on a policy without the express

Page 34

permission of the president and the corporate secretary, correct?
**A. That's correct.**
Q. And you agree that Hudson Specialty Insurance Company had the opportunity to review the type of coverage that was included in the policy, the nature and condition of the property they were insuring, and could have set the premium how Hudson saw fit?
MR. CAMPBELL: Again, object to form, foundation.
**A. Yes. That's correct.**
Q. (By Mr. Peirce) Is it fair and reasonable for RDA Management and the plaintiffs in this case to read the policy language you sent them and expect that if they pay the premium listed on the policy, that Hudson would provide the coverage stated in the policy?
MR. CAMPBELL: Object to foundation.
**A. Yes. That's correct.**
Q. (By Mr. Peirce) So if the jury in this case simply reads and applies the language of the policy that Hudson wrote, you agree that would be appropriate?
MR. CAMPBELL: Object to form.
**A. If they apply -- apply the policy to the facts of the claim, yes, that would be appropriate.**
Q. (By Mr. Peirce) In other words, there is no

Page 35

lack of fairness in simply expecting Hudson to do exactly what they promised to do in exchange for approximately 46,500 in yearly premiums, correct?
MR. CAMPBELL: Object to form.
**A. That's correct.**
Q. (By Mr. Peirce) And, Mr. Schwier, under the policy language in Exhibit 14, if I believe, as an insured, that a hailstorm has damaged my property and I give notice of the occurrence to Hudson within 14 days, does Hudson have a duty to thoroughly inspect my property for any damage that may have been caused by the peril of hail?
MR. CAMPBELL: Object to form.
**A. Yes. We verify coverage, and then perform a thorough and prompt investigation.**
Q. (By Mr. Peirce) And as I understand it, Hudson insured this property for a total of $31,850,000; is that correct?
**A. It's -- that sounds right. Yes.**
Q. And the policy provided coverage -- the term of the policy coverage was from September 1st, 2016, to September 1st, 2017, correct?
**A. That is correct.**
Q. And this was a renewal policy, correct?
**A. Yes, it was.**

Page 36

Q. When did Hudson first insure this hotel?
**A. It was the year before or the year before that. This -- this was -- there was at least one renewal. I think I might have seen that there was a second one.**
Q. So this may have been the third consecutive year that Hudson insured --
**A. Yeah.**
Q. -- the hotel?
**A. Yeah. It was at least the second, yes.**
Q. In any event, Hudson insured the hotel consecutively from the first moment it started insuring the hotel and through this claim, correct?
**A. Correct. There were no gaps.**
Q. And you agree that Hudson was able to include a definition section in the policy language in Exhibit 14 and could have inserted any definitions it felt were necessary and important in the policy, correct?
**A. Yes.**
MR. CAMPBELL: Object, foundation.
Q. (By Mr. Peirce) Was that a yes? I'm sorry.
**A. Yes. That's correct. We have a definition section. And we could add.**
Q. In fact, if you look at Exhibit 14, the definition section of the policy involved in this case goes on for some six pages. True?

**A. Yes. That's correct.**
Q. And Hudson included definitions of everything from earthquakes to computer viruses, correct?
MR. CAMPBELL: Object to form.
**A. Yes. It looks -- it looks like there's about 30 definitions.**
MR. PEIRCE: I'm trying to get my computer to go.
Q. (By Mr. Peirce) And you would agree that in return for the premium payment by my clients, the building at 360 Union Boulevard in Lakewood, Colorado was insured for, quote, all risks of direct physical loss or damage occurring during the period of insurance, closed quote, subject to the policy's exclusions and limitations, correct?
**A. That's correct.**
Q. And Hudson's insurance contract with my clients subject to this claim included the covered perils of wind and hail, correct?
**A. Yes.**
Q. And if you look on Page 6 of 28 at the bottom of Exhibit 14 --
**A. 6 of 52 or --**
Q. Yeah. We're at -- we're at -- it has the Bates stamp in the actual policy of 28. It's actually Page 12



of the PDF.
**A. I have it.**
Q. Yeah. At the top, hail is defined under the terms of the policy to mean any precipitation in the form of balls, pellets, clumps, or particles of ice, correct?
**A. That's correct.**
Q. And Hudson is -- is familiar and has, on occasion, included a definition of "functional impairment" or "functional loss" in its insurance policies; is that correct?
**A. Yes.**
Q. Hudson is familiar with cosmetic exclusions and endorsements, marring exclusions and endorsements, correct?
**A. Yes.**
Q. And you agree that Hudson did not define "damage" or "functional impairment" in the subject policy, Exhibit 14, correct? And feel free to look at the definitions.
**A. No. They're not defined in the definition section.**
Q. Are you aware -- and feel free to look at the policy -- of any definition of "damage" or "functional impairment" in the subject policy, Exhibit 14?



**A. "Damage" may be described further -- somewhere else in the policy. I don't think "functional impairment" is.**
Q. In fact, is "functional" or "function," to your knowledge, in the policy whatsoever?
**A. I don't recall it being. No.**
Q. Would you agree that there is not anything in the definition section that would define, quote, any damage, closed quote, as only that type of damage that causes some functional problem?
**A. That is not in the definitions. Correct.**
Q. In other words, if my roof, under this policy language, has lots of hail damage and dents but is still a working roof, I have coverage under this policy for repair and replacement of lifetime and quality of the roof, correct?
MR. CAMPBELL: Object to form.
**A. Yes. If your roof suffered damage due to hail, you would have coverage subject to the policy terms and conditions such as deductibles and other terms and conditions.**
Q. (By Mr. Peirce) Right. And "damage," as you just referenced in your answer, is not defined in the policy, correct?
**A. It is not in the definition section, no.**



Q. Are you aware of it being defined in any other section of the policy?
**A. I believe it's discussed in other sections. But I don't believe there's a definition of it, no.**
Q. I want to present to you, Mr. Schwier, an analogy that, I think, most people can relate to. And that's in the context of not a property building claim but, for instance, an auto claim, a car claim. Say your car, hypothetically, gets hit by hail, and the hood and the roof of the car are all dented up, but the car still operates. Are you with me so far?
**A. Yes.**
Q. And if there is a functional impairment requirement for that auto insurance, meaning there is no payment if the car still drives and operates, then in that context, there would be no coverage for hail, correct?
MR. CAMPBELL: Object to form.
**A. I'm sorry. Could you repeat -- could you repeat the end of it?**
Q. (By Mr. Peirce) Could I repeat what?
**A. There is -- there is hail dents on the roof and on the -- on the hood.**
Q. Right.
**A. Could you repeat the rest of it?**

Q. Sure. And if there's a functional exclusion saying that we don't pay for hail unless the car is functionally damaged, then there would be no coverage if the car still operated fine after the dents and dings in the hood and the roof, correct?

MR. CAMPBELL: Object to form.

**A. Yes. Under your example, the car is still functional.**

Q. (By Mr. Peirce) In the policy at issue in this case, the insured perils notes that, quote, this policy insures against all risks of direct physical loss or damage to insured property occurring during the period of insurance, except as excluded herein, correct?

**A. That's correct.**

Q. And is a hailstorm an insured peril under the policy?

**A. Yes. Hail damage is covered under the policy.**

Q. Is a dent or damage to some part of the building caused by hail a form of direct physical loss or damage under the terms of this policy?

MR. CAMPBELL: Object to form.

**A. Damage caused by hail can be damage under the policy, yes.**

Q. (By Mr. Peirce) Yeah. Is a dent or damage to some part of the building caused by hail a form of, quote, direct physical loss or damage, closed quote, under the terms of the policy?



MR. CAMPBELL: Object to form.

**A. Yes. It would be, subject to the other terms and conditions.**

Q. (By Mr. Peirce) If -- if that's true, then subject to the deductible, of course, anything that my clients' insured property had that was damaged by hail physically is covered, correct?

MR. CAMPBELL: Object to form.

**A. Yes, subject to any other terms and conditions that would apply.**

MR. PEIRCE: Let's look at some of the terms and conditions, if I could get you back to Exhibit 14. If you can look at Page 16 of 52 in the PDF of Exhibit 14. Let me know when you're ready.

**THE WITNESS: Okay. I'm on Page 16.**

Q. (By Mr. Peirce) And do you see the number 4 at the bottom of Page 10 of 28, which is PDF No. 16, excluded perils?

**A. Yes.**

Q. And the "Excluded Peril" section states, "This policy does not insure against loss, destruction, or damage caused directly or indirectly by any of the following excluded perils," period. "Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss, unless otherwise stated," period. And then it states, "This policy excludes loss or damage caused," and it gives a laundry list of A, B, C, D, E, F, G, H, I, J, K, through W, correct? Is that correct?



**A. Yeah. I was just scrolling down to see how many there are. Yes, it goes -- it goes through W.**

Q. Okay. So if you look at 4(m), for instance, on Page 7 -- or 17 of 52 of the PDF. If you look at 4(e). And this would -- this is one of the laundry lists of excluded perils, correct? Exclusions rather?

**A. Yes.**

Q. And it states, "By or arising out of, contributed to, or resulting from marring, scratching, exposure to light, contamination, decay or other spoilage, shrinkage or evaporation, leakage of contents, loss of weight, commingling of products; change in color, texture, flavor, or finish." If there was a period after "finish" in that sentence, Mr. Schwier, then the policy would not cover any marring, scratching, anything listed above that's caused by hail, correct?

**A. "Finish." Correct.**

Q. But the policy does not end after "finish" in this exclusion. It states, "Unless any such loss or damage is caused by a direct physical damage to insured property from a peril not excluded by this policy." And so that means that if -- if I have a hail loss, and because this "unless" language is included in this exclusion, if I have an older window that is sun damaged, cracked from the sun, marred from decay, but then it suffers direct physical damage, dents for example, from a hail ball, then it is not excluded, correct?



MR. CAMPBELL: Object to form.

**A. Correct. It wouldn't be excluded by this part of the policy. It would just be subject to the other terms and conditions.**

Q. (By Mr. Peirce) And the same thing applies with regard to exclusion 4(f) below with regard to any exclusion for faulty or improper material, workmanship, design, construction; errors -- errors, omission, or deficiency in material, workmanship, construction, or design from any cause. And then the same "unless" language is included in that, correct?

**A. Yes. That's correct.**

Q. So for instance, if there is a window of the hotel that has wear and tear, has gradually deteriorated gaskets and it's struck by hail and that hail allows water to intrude or that hail causes a dent to metal

trim, that would be direct physical damage that would be covered under the policy, correct?

**A. Subject to the other terms and conditions, yes.**

Q. And when you're adding this caveat of "subject to the other terms and conditions," what specifically, in that hypothetical, would you be referring to?

**A. It could be anything in the policy that would apply.**

Q. But simply stated, if I have hail, it hits a -- it hits a window that has been deteriorated from being exposed to the Colorado sun for a decade or two decades, and it causes damage, whether that damage is a dent or water intrusion or what have you, it's damage or physical loss, that is covered directly under this policy, Exhibit 14, correct?

MR. CAMPBELL: Object to form.

**A. Yes, unless there wasn't a term or condition that excluded it.**

Q. (By Mr. Peirce) In that scenario, can you think of a term or exclusion that would exclude coverage?

**A. Nothing comes to mind.**

Q. And the same thing applies with regard to exclusion 4(n) by wear and tear or gradual deterioration. This policy also has the same "unless direct physical loss to insured property from peril not



excluded ensues." Same "unless" language, correct?

**A. Which -- which one are you on?**

Q. 4(n) under the exclusions on Page 18 of 52 on the PDF.

**A. Okay.**

Q. Are you there, Mr. Schwier?

**A. Yes.**

Q. And it's the same language on this wear and tear exclusion, correct?

**A. "If by wear and tear or gradual deterioration, unless direct physical damage to insured property from a peril not excluded by this policy ensues, and then the company will only be liable for such ensuing direct physical damage."**

Q. Right. And what that's saying is that we don't cover wear and tear or gradual deterioration, unless direct physical damage to the property is caused by hail, for example, then -- then Hudson will only be reliable for such ensuing direct physical damage, correct?

**A. Correct. And it goes back to kind of what you were talking about before, is if something is caused by wear and tear, it's not caused by hail, or could not be -- it may not be caused by hail.**

Q. Right. And it's important that you put the



"may" in there, correct? I mean, you could, for instance, have wear and tear of a gasket where water is not intruding into the property. And then a hail ball hits the gasket, opens it up, and then water intrudes into the property envelope. Isn't that a potential scenario where this coverage would attach?

**A. Yes, potentially.**

Q. So even if Hudson chose to insure an older building that has wear and tear and deterioration, it is still fair to expect Hudson to provide coverage if the building is damaged by hail?

**A. Yes. We pay for the damage caused by the hail.**

Q. And the insured property under the terms of Exhibit 14, the policy, include the roof, the curtain wall system, signage, as well as interior rooms, correct?

**A. Yes.**

Q. And the policy at issue, Exhibit 14, also provides for business income loss in the extent that is incurred, correct?

**A. Yes, it does.**

Q. Would you agree with me that replacement cost is defined as the cost to repair, rebuild, or replace lost, damaged, or destroyed insured property with new material of equivalent size, kind, quality, and capacity



without deduction for depreciation?

**A. Yes. That sounds like the definition of replacement cost value.**

Q. And that's the definition included in Hudson's policy at issue in this case, correct?

**A. Yes, I believe so.**

Q. The policy's own terms in this case do not require functional damage to the roof or to the curtain wall system that impairs their functioning for there to be a covered loss, correct?

MR. CAMPBELL: Object to form.

**A. Correct.**

Q. (By Mr. Peirce) The Hudson policy does not require, quote, discernible permanent physical change, closed quote, from hail for coverage to attach, correct?

MR. CAMPBELL: Object to form.

**A. Could you repeat that?**

Q. (By Mr. Peirce) Sure. The Hudson policy at issue, Exhibit 14, does not require, quote, discernible permanent physical change, closed quote, from hail for coverage to attach under the policy, correct?

MR. CAMPBELL: Object to form.

**A. That's correct, as long as there is damage.**

Q. (By Mr. Peirce) Yeah. And that's what I'm getting at. The policy doesn't say discernible

permanent physical change. It says "any loss or damage," correct?
**A. Yes. Yes.**
Q. Okay. Would you agree that Hudson does not make gratuitous payments for perils not covered by the policy?
**A. That's correct.**
Q. In other words, if -- if a peril is not covered, Hudson is not going to pay my clients any money under the terms of the policy?
**A. We do not pay uncovered claims. Correct.**
Q. In other words, if the property, the hotel in question, did not sustain direct physical loss or damage from hail or wind to the hotel during the policy period, Hudson does not issue payment for hail or wind damage, correct?
**A. That is correct.**
Q. Had my clients ever reported a claim prior to this claim to Hudson?
**A. No, I don't believe there were any other claims under these policies. I think they had a couple of issues with leaks back in 2013 before we got on the risk.**
Q. Those prior claims were not with Hudson, correct?



**A. Correct.**
Q. And Hudson was aware of those prior claims before issuing the policy to the hotel, correct?
**A. Yes.**
MR. PEIRCE: Switching gear -- and, Mr. Schwier, if you need to take a break at any time, let me know, a restroom, water break, whatever. We'll take a short break. I just wanted to add that in there.
**THE WITNESS: I'm -- yeah. I'm good for now. Thank you.**
MR. PEIRCE: Okay.
Q. (By Mr. Peirce) As I understand it, Kaho Chan was the primary claim handler on this claim; is that correct?
**A. That's correct.**
Q. And is he a -- his title was and is senior vice president for claims; is that correct?
**A. I think he is a vice president for claims. I don't think he's a senior vice president.**
Q. Okay. How long has he been a vice president for claims?
**A. For longer than I've been there. I've been at Hudson for two and a half or three years. And he was when I started.**
Q. What year did you start with Hudson?



**A. In November of 2017.**
Q. As I understand it, your role is director of claims?
**A. That's correct.**
Q. Are you a direct supervisor or boss of Kaho Chan?
**A. No, I'm not.**
Q. Who is his direct supervisor?
**A. Christopher Morkan, M-O-R-K-A-N.**
Q. And what is -- what was Mr. Morkan's title at the time this claim was going on?
**A. I'm not sure of his exact title. I think he --**
Q. Are you familiar with the insurance industry term of "desk adjuster"?
**A. Yes.**
Q. And what is your understanding of what that means?
**A. It's the primary claim handler at a company.**
Q. In other words, it's the adjuster that makes decisions from his desk and does not physically go out and inspect the property, correct?
**A. Correct.**
Q. And Mr. Chan was the, quote, unquote, desk adjuster for Hudson in this claim, correct?
**A. Yes. And he still is.**



Q. And what city and state does Mr. Chan operate out of?
**A. He's in our New York office.**
Q. Do you know if Mr. Chan ever discussed this claim with his supervisors?
**A. I'm assuming he did. But I don't specifically know.**
Q. And other than Mr. Forkan [sic], do you know --
**A. I'm sorry.**
Q. -- of any other -- I'm sorry?
**A. It's -- it's Morkan with an "M."**
Q. With an "M"?
**A. Yeah, Morkan.**
Q. Morkan. Other than Mr. Morkan, do you know if Mr. Chan had any supervisors at the time this claim was being adjusted?
**A. Prior to Mr. Morkan, he -- I don't know who he reported to before then.**
Q. But while this claim was going on, was there another person, besides Mr. Morkan, involved as a supervisor?
**A. No, I don't believe so. But he would know for -- better.**
Q. So it's your belief that Mr. Chan would have discussed internally this claim with Mr. Morkan while it

Page 53

was going on, correct?
**A. Yes.**
Q. And would that include coverage decisions and evaluation of the loss, the exposure of Hudson, things of that nature?
**A. Those are all within his authority, so he may not have to talk to Chris about them. He would have the authority to make the coverage decisions and the payments in this matter up to his -- his own authority.**
Q. So there were no internal guidelines or requirements for Mr. Chan to report to Mr. Morkan at all?
**A. When the suit was filed against Hudson, that would be reported. But I don't think there's anything in the claim specifically that would cause a reporting up.**
Q. Okay. So Mr. Chan was -- was the end-all be-all prior to the inception of litigation; is that correct?
**A. Yes. Everything with this claim was within his authority.**
Q. Were you involved, as director of claims, at any point in time while this claim was being adjusted or handled?
**A. No. I -- I received notice of it when the**

Page 54

**claim went into suit. And I've been monitoring it since then.**
Q. And including the reinspection in 2019 by various experts hired by Hudson, were you involved in that process?
**A. I was not directly involved with it. But I was -- I was aware of it, yes.**
Q. Were you looped into strategy phone calls with J.S. Held, Crawford claims, while it was going on in 2019?
**A. No, I was not.**
Q. Okay. So if you're -- if you're copied on e-mails setting up conference calls and things of that nature with the experts charged with reinspecting the loss, that was just either a mistake, or you don't recall?
**A. I don't remember being on any calls. If I was invited to attend as a courtesy, I may have been. But I don't -- I don't specifically remember any calls with the consultants on this. But I have reviewed the file, and I have reviewed their reports.**
Q. So as far as the ultimate coverage decision by Hudson regarding 20 -- in 2017 or 2019, Mr. Chan had carte blanche to issue whatever language in the letter, whatever coverage decision and the amount of the claim,

Page 55

whatever exclusions applied to coverage. That was his sole decision at that time, correct?
**A. He would have controlled the coverage decisions. If he was disclaiming coverage, he probably would have spoken with his manager if he was disclaiming coverage completely on the matter. And the damages were within his authority. So, yeah, he could have -- most of these decisions would have been made at his -- at his level.**
Q. So you said after suit was filed, things changed; is that right?
**A. Well, it's -- I get involved, and I help coordinate the claim. But not much beyond that happens. He's still -- he's still the primary claim handler on the file.**
Q. Did -- does Hudson maintain any performance reviews or evaluations in writing of Mr. Chan?
**A. Yes. We should. I don't prepare them. But his manager may have.**
Q. And again, is his manager Mr. Morkan?
**A. Yes.**
Q. Was that true in 2017 and 2019?
**A. I'm not sure.**
Q. How often is Mr. Chan evaluated?
**A. We're evaluated every year.**

Page 56

Q. And again, that's a written report of his performance every year; is that correct?
**A. It's a survey evaluation. It's like a -- it's on a computer. And it's a ranking system. You know, so it's not -- not a true written evaluation. There could be comments. But, yes, there is -- there is a report.**
Q. Do you believe Mr. Chan had any preconceived notions about anything regarding this claim?
MR. CAMPBELL: Object to --
**A. No.**
MR. CAMPBELL: -- foundation.
Q. (By Mr. Peirce) Does Hudson know who Briana Miller is?
**A. I know who she is from looking at the file. But I don't think Hudson had a previous relationship with her in any manner.**
Q. Can Hudson tell the jury what the expertise of Ms. Miller was with regard to insurance adjusting?
MR. CAMPBELL: Object to foundation.
**A. Just that she was one of our contact with the insured.**
Q. (By Mr. Peirce) But what I'm getting at, does Hudson know if she had any training in the adjustment of insurance claims whatsoever?
**A. No. I -- I don't know.**

Page 57

Q. And likewise, Hudson doesn't know if she was a licensed insurance adjuster, correct?
**A. No. I -- I don't know.**
Q. Hudson doesn't know if Ms. Miller has any experience as a contractor or an engineer, correct?
**A. That's -- I -- I don't know. Kaho Chan might know. But I don't. No.**
Q. Mr. Schwier, you agree that Hudson has adopted standards for the prompt investigation of claims arising under its insurance policies, correct?
**A. Yes.**
Q. The claim procedures that we've already looked at, Exhibit 2, is that provided to Mr. Chan as part of his guidelines to follow in adjusting a claim?
**A. He is aware of them. And we have periodic training, refresher training, on it. So he's -- yes, he's aware of our claims handling guidelines.**
Q. Is he also handed a paper copy or a hard copy or a carbon copy on his computer of these guidelines?
**A. At some point, he probably was. My understanding, he was with the company since these guidelines have been in place for maybe five years. They -- they are before my time. New employees are given a copy of them. And over time, I'm sure he has a copy of them.**

Page 58

Q. And he was given guidelines as to how to set reserves as well, correct?
**A. Yeah. We have internal guidelines on how we set reserves.**
Q. Would those be a part of Exhibit 2, or were there separate and distinct internal reserve guidelines?
**A. I don't think they are -- they are written anywhere, except the -- the procedures may have a guideline to set timely reserves, I believe timely and appropriate reserves. But I don't think there's anything very specific in them about it.**
Q. And I think you answered this earlier. But to your understanding, Mr. Chan was not provided the regulations dictated by the Colorado Revised Civil Statutes governing claim handling, correct? He wasn't given a paper copy or an electronic copy of those, to your knowledge?
**A. Not that I'm aware of, no.**
Q. And Mr. Chan resided outside of the state of Colorado the entire time this claim was being handled, correct?
**A. That's correct.**
Q. What about written best practices? Does Hudson provide its claims adjusters or handlers any written best practices?

Page 59

**A. The claims handling procedures exhibit, that would be our written best practices.**
Q. Other than that, nothing that you know of?
**A. No.**
Q. Would you agree that Hudson's adjusters are required to follow its own guidelines and claims procedures delineated in Exhibit 2?
**A. Yes. We follow those.**
MR. CAMPBELL: Object to form.
Q. (By Mr. Peirce) Mr. Schwier, would this loss at issue in this case qualify as a large loss under Hudson's guidelines?
**A. I don't believe so, because it hasn't reached $500,000 yet. So if it's under $500,000, the large loss reporting procedure wouldn't be implicated.**
Q. So your understanding is that unless the loss reaches 500,000, it's not defined as a large loss under Hudson's guidelines, correct?
**A. Correct. That's the threshold amount for a large loss at Hudson.**
Q. And as I understand it, Mr. Schwier, Hudson hired, in 2017, Cunningham Lindsey and Bill Walls to adjust this claim in Colorado for Hudson Specialty, correct?
**A. That's correct.**

Page 60

Q. And do you know if Cunningham Lindsey designated this loss as a major and complex loss?
**A. I think this -- the group at Cunningham Lindsey has a name like that. But I don't know what their procedure -- the name of that group at Cunningham Lindsey, I think, says major complex loss or something along those lines in their group name. But I don't know how they categorize claims.**
Q. Are you aware that William Walls, Bill Walls, describes himself as a major and complex loss adjuster for Cunningham Lindsey at that time?
**A. I think I've seen that, yes.**
Q. (By Mr. Peirce) And for purposes of conducting its physical adjusting investigation of the property damage in 2017, Hudson relied solely on Cunningham Lindsey to adjust the damages, correct?
**A. With our review, correct.**
Q. Did Hudson ever review Cunningham Lindsey's claim handling guidelines or claim instructions?
**A. Kaho Chan may have at some point. But I -- I haven't.**
Q. Well, if Mr. Chan did, that should be included somehow in the claim file, correct?
**A. Unless he looked at them for a different file.**
Q. Does Hudson even know if Cunningham Lindsey

even has any claim guidelines?
**A. No. I'm not aware that they do.**
Q. So as far as you know, sitting here today, you're not sure if Hudson possesses any written documents from Cunningham Lindsey as to how Cunningham Lindsey investigates claims, correct?
**A. That's correct.**
Q. Same with regard to Cunningham Lindsey guidelines. You're not aware if Hudson possesses any guidelines from Cunningham Lindsey, correct?
**A. That's correct.**
Q. So for instance, with a -- with a 14-story hotel, Hudson doesn't have any idea what the protocol for an investigation by Cunningham Lindsey would entitle in that scenario, correct?
**A. Well, they -- what their guidelines would be, or what their assignment is to do?**
Q. For example, if Mr. Chan instructs Mr. Walls to go investigate the coverage loss for hail from the May 8th, 2017, storm and says go to the Sheraton hotel, investigate the loss, Hudson doesn't know what Cunningham Lindsey's protocol for that investigation was, correct?
MR. CAMPBELL: Object to form.
**A. I think we gave them the assignment to**



**immediately reach out to the hotel and set up a visit and go there. But beyond that, I don't know what kind of instructions we gave.**
Q. (By Mr. Peirce) Right. For instance, after getting to the hotel, "Mr. Walls, what rooms do we start with? What outside damage do we look at? How do we look at floor 4? How do we look at floor 12? Where is" -- you know, all of those things, that's not listed anywhere in the claim guidelines. It's -- of Hudson. It's not identified in the claim file, to your knowledge, correct?
**A. That's correct, except to the extent that, I think, we did have a list of issues with -- from the hailstorm. I think there were a list of items in the first notice. And there may have been an e-mail, you know, telling us what they thought the issues from the hailstorm were.**
Q. Right. So if the hotel property loss notice, which you'll agree, as an attorney and an insurance professional, is a one-page document typically, right?
**A. Correct.**
Q. And if that lists a major hailstorm that caused damage to the roof, the windows, punctured a skylight in the lobby, as far as digesting that information and then telling Mr. Walls to go investigate it, Hudson doesn't



have any knowledge as to what Mr. Walls precisely did to investigate all of that damage, correct?
MR. CAMPBELL: Object to form.
**A. Correct. We only know -- we -- we only know what he did based on his reports subsequent to his visit.**
Q. (By Mr. Peirce) And I'll represent to you that we -- we were just provided the file of Cunningham Lindsey earlier this week. And it was not produced previously as part of Hudson's documentation. Hudson does not keep a file of Cunningham Lindsey internally, correct? Meaning, other than a report, like, they issue a first report. It will have that. But as far as invoices of how much time Mr. Walls took to do something or pictures that weren't put in a report, Hudson doesn't typically contain that information in its file, correct?
**A. We have an invoice saying how much time he spent doing something. But to the second part, I mean, if he took 500 pictures and only put seven in his report, correct, those other -- the other information may not make it to our claim file. He may provide it; he may not.**
Q. Does Hudson know what is meant by the term "approved vendor"?
**A. Yes.**



Q. Does Hudson maintain an approved vendor list?
**A. Kaho Chan might -- might have one for these property losses. When we need a property adjuster, we reach out to him. You know, we give him the information on what type of loss it was and the location. And he usually gives us a referral. I don't know how formalized his process is. But he gives us referrals.**
Q. You mean Kaho Chan does?
**A. Yes. Is that -- I'm sorry. That's what I said.**
Q. So when you say -- when you say "he gives us referrals," Kaho Chan says, "Hey, we've got a Sheraton hotel hail damage claim. I recommend Bill Walls out of Denver to go adjust it"?
**A. Correct. If there's a claim in my group that we need a property adjuster on, I would send the adjuster to Kaho to ask who to hire.**
Q. But does Kaho have a list of approved people in, say, Colorado?
**A. Yeah. I don't -- I don't know how formalized his list is beyond "these are the two people I know in Colorado." I don't know if he keeps a spreadsheet or how he does it.**
Q. But what I'm getting at, is that -- that's not a companywide form or database. That's just Kaho does

what he wants, can refer whoever, and you can say yea or nay to the adjuster, correct? "You" being Hudson.

**A. Correct. Correct. We -- we would rely on his expertise. He would give us the person. We would rely on that.**

Q. But in this case, there's no communication with higher-ups at Hudson. Kaho Chan simply decided Bill Walls would be the guy, correct? He didn't run it up the chain?

**A. Correct. He can do that on his own.**

Q. Does the same apply to engineers used by Hudson, that same process where, you know, Kaho can say, "Well, I've used Haag in other cases. Therefore, I'm going to use Haag again"?

**A. Yes. He has the authority to retain them.**

Q. There is no approved companywide engineer database for Hudson, correct?

**A. No, there isn't.**

Q. But as far as -- as far as a procedure for selecting, for instance, a Cunningham Lindsey or Bill Walls, does Hudson have any procedure whatsoever in making that determination?

**A. No. We -- we rely on him. He -- he's the property expert. He does most of the claims. So he would be the one to choose those.**



Q. What does Hudson consider a TPA?

**A. A TPA would be if Kaho assigns another desk adjuster to a claim, and then they would hire Cunningham Lindsey.**

Q. Okay. So this is not a scenario where a TPA was authorized. This is just Kaho Chan's desk adjuster. He decides on his own to hire Cunningham Lindsey based on his past experience. And as far as the usage and how many times he's used Bill Walls or Cunningham Lindsey or Haag or Matthew Sitzmann, that's a question for Kaho Chan?

**A. Correct.**

Q. Do you know what rate of pay Hudson paid Bill Walls to adjust this claim?

**A. I saw his invoice at some time. But I don't specifically recall.**

Q. If I represent to you it's $303 an hour, you have no reason to dispute that?

**A. No. If that's what the -- if that's what's in the file, that's what's in the file.**

Q. Does Hudson know if Haag and Cunningham Lindsey were repeatedly hired by Hudson in other claims?

**A. I've heard of Bill Walls before. And I know he's hired Cunningham Lindsey. And I know we've had other claims with Haag.**



Q. Did Hudson rely on anything besides the reports and findings of Cunningham Lindsey and Haag in making its coverage evaluation in 2017 in this case?

**A. I don't believe so.**

Q. And Hudson was in charge of making the final coverage decision, not anyone else, correct?

**A. That's correct.**

Q. So the qualifications of William Walls, they're not documented in the claim file material, correct?

**A. Sometimes they prepare an engagement letter that has that sort of information in it. But I -- I don't believe I saw one in this -- in this file.**

Q. Can Hudson tell the jury about the qualifications of William Walls?

**A. Yes. Kaho would have more information about it. But I know he's a very seasoned veteran. He's actually retired now, or semiretired. But he -- yes. He's been in the industry a very long time doing this type of work.**

Q. What made you become aware of that fact, that he's been around for a long time, seasoned professional? I mean, how do you know that information?

**A. Just from -- just from claims handling in general. I know he's been around for a very long time. I believe he was with a carrier at some point. And then**



**he went into -- and then he works now -- he went to Cunningham Lindsey. He might have gone somewhere else too.**

Q. Were you aware that William Walls, his son Ryan Walls, and Andrew Larson were all employed together at Cunningham Lindsey in 2017?

**A. Yeah. I think I saw their names together.**

Q. Were you aware they all decided to leave Cunningham Lindsey on the same date of December 1st, 2017?

**A. I wasn't aware of that. But I know -- I knew there was some reason they went to -- I think they went to Crawford. I'm not sure exactly the relationship there. But I -- yeah. I don't know if -- I don't think they're at Cunningham Lindsey anymore, any longer.**

Q. Were you aware of the fact that William Walls, Ryan Walls, and Andrew Larson were all individually sued by Cunningham Lindsey for leaving and allegedly taking all of their client database to Crawford?

**A. No, I was not.**

MR. CAMPBELL: Object, form.

Q. (By Mr. Peirce) And yet Hudson chose to hire Andrew Larson to be its new adjuster in 2019 despite his prior affiliation with Cunningham Lindsey and Walls, correct?

**A. I think that's why we did hire him.**
Q. Because he was affiliated with the same company that had previously been hired by Hudson?
**A. Because he was working on the claim previously with Walls.**
Q. Do you have a record that Mr. Andrew Larson had worked on the claim in 2017?
**A. No. But I -- I think the reason it moved from Cunningham Lindsey to Crawford was -- I think it was because of -- I don't think we stopped using Cunningham Lindsey and started using Crawford on this because we wanted to change vendors. I think we were trying to keep it with the same people.**
Q. Well, that was going to be my next question. Why didn't you continue to use Mr. Walls? If he was at the -- he moved to Crawford at the same time Andrew Larson did. Why was he not involved in 2019? He was still operating as an adjuster at Crawford at that time.
**A. Yeah. I'm not really sure. I wonder -- I thought he retied for some reason, but I don't know why I thought that.**
Q. And just to clarify, a minute ago you intimated that Andrew Larson may have been involved in 2017. I don't see any record of that in any document. Are you aware, sitting here right now, whether Mr. Larson was



involved in any respect in 2017 in adjusting the claim?
**A. No, I'm not. I know he did the 2019. In 2019, he did the reports for Crawford.**
Q. Mr. Schwier, you're in agreement that the reserves on an insurance claim take into account money that is necessary to settle a claim and to consider the expenses on a claim?
**A. That's correct. We have expense reserve and a loss reserve.**
Q. And those are two separate pots?
**A. Yes.**
Q. Were the adjusters, including Mr. Chan, provided instructions on how to set reserves from Hudson?
**A. We don't have specific guidelines on how to set reserves. But you -- when your evaluation reveals that you may need money in the future, yeah, you're supposed to -- you're supposed to reserve, you know, as early as possible. So if you think -- if you think you're going to have a claim that's going to need to be paid, you should try to get some sort of reserve up just so, you know, if it develops, you're not putting up money right before you pay.**
Q. Would you agree that reserves are important for the financial health of an insurance company?



**A. Yes, especially on long-tail claims.**
Q. And you would agree that claim reserving is one of the most important responsibilities of the Hudson claim department?
**A. Yes.**
Q. If a claim is underreserved, it can affect the company's stated financial health, correct?
MR. CAMPBELL: Object to form.
**A. If a large -- if a large number of claims are underreserved. One -- I don't think one claim being underreserved would cause that issue.**
Q. (By Mr. Peirce) So even a $20 million claim, if it's underreserved, wouldn't affect the stated financial health of Hudson Specialty Insurance Company?
MR. CAMPBELL: Again, I object to form.
**A. It's not ideal. But I don't know if it'd have a tremendous effect, no.**
Q. (By Mr. Peirce) Would you agree that reserves can affect the calculation of premiums?
**A. Yes. That's correct.**
MR. CAMPBELL: Object to form.
Q. (By Mr. Peirce) And Hudson's claim guidelines state that claim reserves support actuarial assumptions, pricing decisions, as well as strategic business decisions; is that correct?



**A. Yes. That's correct.**
Q. Hudson states it is essential that the claim department reserve individual claims consistently, accurately, and timely; is that correct?
**A. Yes. That's correct.**
Q. And Hudson's guidelines state that lost reserves will be established timely and continually evaluated to reflect the true value of the claim and the cost of handling the claim to conclusion; is that correct?
**A. Yes. That's correct.**
Q. And Hudson states that reserves will be established with consideration, given the liability, injury, and economic damages, and reflect known facts, jurisdictional influences, and the claim handler's experience in handling similar claims; is that correct?
**A. Yes. That's correct.**
Q. And Hudson's guidelines state that reserves should be considered every time a file is reviewed. Would you agree with that statement?
**A. Yes.**
Q. Do you know how often this file was reviewed? In other words, was there a set schedule? Was it on the whim of Mr. Chan? How did that work?
**A. There would be two ways to do it. There would**

be -- he would have a set diary on how often he'd have something go on the file. But at the same time, if there was development, that could cause him to touch the file again. So let's say I'm sitting here today, and I do a task. And I say, "Okay. A week from now, I'll follow up." If Bill Walls calls me tomorrow, then I'd be in the file again the next day rather than a week from now.
Q. But assuming Mr. Walls or some development doesn't happen, was there a set schedule with regard to the diary? Was it once a week? Once every two weeks? Anything that you know of?
A. Yeah. I don't -- I don't know specifically his protocol for it. But I'd imagine on a case -- you know, first-party property case with developments like this, I'd imagine it's a pretty short diary that he keeps.
Q. Can an adjuster or a claim handler for Hudson be admonished or face discipline by Hudson for failing to properly set reserves?
A. It's not -- if you don't properly set reserves, you're not properly -- you know, it can be seen as not properly doing your job. So it is -- it's part of the claim handler's job to set reserves.
Q. I understand that. But with regard to specific discipline, if you looked in Mr. Chan's file and he had



it reserved for $5 and you determined the RCV value was north of $365,000, could Mr. Chan face discipline for that?
A. Yeah. It could be reviewed further and see if there's any issues. But that -- that could be an issue, yes.
Q. Would that be reflected on his performance reserves, hypothetically?
A. Hypothetically, it could. It'd probably have to be more than a one-time incident to mention it on somebody's review. But if it's -- if it's a chronic issue, like I said about the reserving, it's usually a cumulative issue. So if you saw a cumulative issue with underreserving, yes, I think that's -- I think that's a real claims handling issue.
Q. Does Hudson know what the initial reserves were set on this file at?
A. I think when we initially started reviewing it, it was set at $50,000 back in 2017.
Q. $50,000?
A. Yes, 5-0.
Q. Do you know what date or dates that was set at?
A. No. I -- it was pretty early on. It's when we started getting the invoices. But I don't remember the specific date. It would have been -- if this was a



March -- or if this was a May incident and, you know, by June we were working this up, it would have been soon thereafter.
Q. Do you know what that $50,000 was based on?
A. I think there was a reference from Cunningham Lindsey that they saw that as a potential exposure once they got all the bills in.
Q. Okay. So when you say "bills in," what does that mean?
A. Oh, they were getting invoices in from the various vendors that Sheraton used. They were submitting invoices for their repair work. And we were having those reviewed. And the preliminary -- I think the preliminary view of it was that there were going to be invoices in excess of the deductible for covered losses of $50,000.
Q. Okay. And when you -- first of all, breaking that down a little bit, you're talking about invoices secured by my client's general manager Briana Miller, correct?
A. That's correct. There was -- yeah. She was involved with it, yes.
Q. And you're talking about Mr. Walls, the Cunningham Lindsey adjuster, waiting until he received these estimates, and then advising Kaho Chan that, "Hey,



I think you should set a reserve at around $50,000." Is that fair?
A. Yeah. I think --
MR. CAMPBELL: Object to form.
A. -- what -- I think he was also speaking with these -- these representatives from these vendors.
Q. (By Mr. Peirce) When you say "he," who are you referring to?
A. Bill Walls.
Q. Okay.
A. Or Haag. It might have been Haag too. But somebody -- somebody was -- when they were meeting with -- when they were meeting at the site, I think they met the vendors too. And so they were working with the vendors.
(Exhibit 24 introduced.)
Q. (By Mr. Peirce) Mr. Schwier, can you look at Exhibit 24 to your deposition?
A. Okay. I got it.
Q. Okay. If you scroll down a little bit to the e-mail from Bill Walls to Kaho Chan on May 31st, 2017. Do you see that?
A. May 31st. Got it.
Q. And cc'd on this e-mail is Sherrill Leppich. Who is Sherrill Leppich?

**A. I'm not sure.**

Q. Okay. So in any event, this is an e-mail dated May 31st, 2017, correct?

**A. Yes.**

Q. And do you see in the first paragraph of the e-mail that essentially Bill Walls is updating Kaho Chan saying, "Hey, we got the claim on 5-23 from you. We called the insured and broker," et cetera. Do you see that first paragraph?

**A. Yes.**

Q. So within eight days, Bill Walls is updating Kaho Chan. And if you scroll to the bottom, "recommending a net reserve of $50,000 pending the cost of the pool dome." Do you see that last sentence.

**A. Yes.**

Q. And the sentence above that says, "We have requested repair estimates for pool dome, inserts in window, and glass repairs." Do you see that?

**A. Yes.**

Q. And a couple paragraphs above that, it says, "The wind and hail deductible is $100,000. We have retained Haag to inspect the skylights which are said to be leaking." And then he says, "The roof is ballasted. It does not appear that hail could have damaged the roof." Do you see that?



**A. Yes.**

Q. So at least if we're taking this at face value, Mr. Walls did not have the estimates in hand when he's recommending a $50,000 net reserve to Mr. Chan on May 31st, 2017. Is that fair?

**A. Yeah, that's fair. Yeah. It's -- it looks like it's just based on what he knew about the damage.**

Q. And do you know if the reserves were set at $50,000?

**A. Yeah, I believe they were.**

Q. And it was -- they were set at $50,000 at this time?

**A. I don't recall specifically when they were. But --**

Q. Would it be --

**A. -- yes.**

Q. -- approximately this time, May 31st, 2017?

**A. I don't -- I don't recall.**

Q. Does Hudson have any record of when or if this $50,000 net reserve was set internally with Hudson?

**A. Yes. We could run a report and find out when it was set.**

Q. So you could run a report of all reserves set in the file?

**A. Yes, the timing of when a -- when a reserve is**



**changed. I could find out every time a reserve is changed.**

Q. Do you know when the reserves were next changed after they were set at $50,000, assuming they were?

**A. They were reset to zero when we closed it.**

Q. Okay. And after that, when were they next changed, if at all?

**A. They were changed again to pay -- to make the payment, the $230- or $240,000 payment. They were increased to pay that.**

Q. So if that check for 238,000-and-some-odd dollars was issued on August 29th, 2019, that's the next date that they would have been changed, on or about then when the payment was issued?

**A. Well, every time -- they went from 50,000 to 0 when it closed. When it reopened, they probably stayed at 0. And then, yes, before -- sometime between the file being reopened and us paying it, they would have gone up to that $238,000 amount.**

Q. And that would be despite receiving a $17 million-plus loss estimate from Aguilar Construction Services in April of 2019, correct? Meaning the reserve didn't change from 0 to anything until Hudson paid 238,000 based on Hudson's own retained expert's findings, correct?



**A. Correct. They weren't -- they weren't changed until -- I'm not sure exactly how long before we paid the bill they were changed. But they -- they weren't changed until -- until we had some indication of a number from our experts.**

Q. Is there a reason that they weren't changed at all after receipt of the signed proof of loss and the $17 million-plus estimate of Aguilar Construction Services in April of 2019?

**A. I think just because we were investigating it. You know, we needed to investigate the damages.**

Q. Did you take at face value an objective assessment of the damages from Mr. Aguilar, or did you discount that entirely and say, "Hey, we need to do -- have our own experts look at this, and then we'll just take whatever they say"?

MR. CAMPBELL: Object to form.

**A. I think we -- just as in the case with -- in 2017, we'd wait -- we'd wait for a response from our expert before we changed reserves. We wouldn't change it just on getting notice of damages. We'd wait for our expert to respond.**

Q. (By Mr. Peirce) If you can look at Exhibit 2 again, Mr. Schwier.

**A. Yeah.**

Q. Can you look at Page 8 of 15?
**A. Yeah.**
Q. So at least as early as April of 2019, this was a property damage claim alleging damage in excess of $250,000, correct?
**A. That's correct.**
Q. In fact, Hudson's own experts determined the replacement cost value exceeded $250,000, correct?
**A. Yes.**
Q. In light of that, was the early warning procedure dictated by this guideline implemented in April of 2019 or thereafter?
**A. I don't know. I wouldn't be involved in that procedure. But this would be where the claim tailor would escalate the claim to his manager. I'm not sure if -- for first-party property losses, what the procedure is for this. It may differ. This is more for a third-party claim and bodily injury claims.**
Q. But it specifically says "property damage claims," correct?
**A. Right. For -- I think it's more geared -- geared towards third-party property damage claims. I'm not sure what the -- what the escalation procedure would be on a -- on a first-party claim.**
Q. But nonetheless, this guideline doesn't



describe it as a third-party property claim or anything with regard to third-party claims, correct?
**A. No. It just talks about, you know, the -- it's -- it's almost like reserving. If you don't have enough information to reserve, the early warning procedure kind of, you know, replaces that, so everybody knows about a large loss even if you don't have enough information to reserve it. I just don't know one that -- it's more geared towards the third-party claims. I just don't know how -- how it's geared towards the first party, like what Kaho's procedure is with -- with these policies.**
Q. But as Hudson Insurance Company or Hudson -- Hudson Specialty Insurance Company, you're not aware that any claims early warning procedure was invoked whatsoever on this claim, correct?
**A. It may be or may not have. I'm not aware of it.**
Q. Was this claim tagged as a large loss after receiving the $17 million-plus estimate and signed proof of loss?
**A. No. For us, "large loss" is a term of art for a claim with more than 500 -- $500,000 in reserves or $500,000 in payment. So this wouldn't have hit that. It still hasn't hit that -- that criteria.**



Q. What requires Hudson to change a reserve to 500,000-plus?
**A. He would complete a large loss report. And --**
Q. So what would -- what would dictate Mr. Chan from completing a large loss report? In other words, the threshold of 500,000, where would that come from in order for Mr. Chan to fill out a large loss report and then to -- for Hudson to tag it as a large loss?
**A. For him to change a reserve to greater than $500,000, he would have to complete the report, and then that would turn into a large loss.**
Q. Right. I get that. But what I'm asking is, how would he get the damage threshold to equate to a large loss? Where would that damage threshold come from?
**A. From his evaluation.**
Q. Which would include what? Where would the number come from for 500,000 or above?
**A. In this case -- I mean, maybe -- maybe an example. In this case, he set the reserve to $240,000 based on the J.S. Held estimates and his own review of them. If that estimate would have come in at $540,000 instead of $340,000 or 240, he would have created a large loss report for it. Does that answer your question?**



Q. Not exactly. What I'm getting at is, Mr. Chan did have a copy of a loss estimate of damage of over $17 million. But yet that didn't trigger him to complete a large loss report. It was not until he received a report from the experts retained specifically by Hudson that he evaluated his coverage decision and payment decision. In other words, you're not objectively considering other damage models if you're only using your own retained expert's damage estimates, correct?
MR. CAMPBELL: Object to form.
**A. We're -- we're looking at both. He didn't have -- he couldn't make an -- he couldn't change his evaluation until he received the other side.**
Q. (By Mr. Peirce) So is it Hudson's testimony that it will not change its coverage evaluation or change its reserves or draft a large loss report until it has an evaluation from an expert retained by Hudson at a minimum?
**A. No. It's that it would be based on information available to us. If you're looking at what we had in 2017, when he gets that report in 2019, he has what he has in 2017 in his file and he says, "Well, this was a $145,000 claim. 18 months later, it's $17 million. I need a second opinion. I need to have this looked at**

Page 85

**again." You wouldn't go from -- you wouldn't get that report in and say, "Okay. I'm going to create a $17 million reserve on a claim that, a year and a half ago after the storm, we thought was $150,000 without having it looked at further." Does that make sense?**

Q. A little bit. But we'll get into the claim and what was evaluated in the two time periods. Maybe that will answer the question. I just -- I'm just trying to get as a -- you know, is the thing that gave Mr. Chan pause the fact that, "Oh, my gosh. It went from what I thought was a at-deductible or below-deductible claim to $17 million. Therefore, I'm not paying anything or changing my reserves or entering a large loss report until I can get my own engineers to give me an evaluation." And that's what I'm getting at. He's not changing anything in the reserves until he's got somebody that Hudson has hired to give him a second opinion.

**A. Yeah. I just -- I don't know if that's 100 percent of the case here just because there was that other report in 2017. I think that's the caveat, is that we -- we've looked at it already.**

Q. So your testimony on behalf of Hudson Specialty Insurance Company is that in 2017, Hudson evaluated the entire scope of damaged property from the May 8th, 2017,

Page 86

hailstorm, correct?

**A. Yes. Everything that we were aware of.**

Q. And Hudson, as you've already testified, had a duty to conduct a complete and thorough investigation of all of the covered damages, correct?

**A. Fair and thorough. I think complete and thorough might be the same thing.**

MR. PEIRCE: Okay. If you can look at Exhibit 13, Mr. Schwier. Give me a second to pull it up.

**THE WITNESS: Would -- would this be a good time to take a break?**

MR. PEIRCE: Sure. We can take a break.

**THE WITNESS: Or when you're --**

MR. PEIRCE: Yeah. We can take a break. Why don't we take ten minutes?

**THE WITNESS: Okay.**

MR. CAMPBELL: Okay.

MR. PEIRCE: All right. Thank you.

THE VIDEOGRAPHER: We're off the record at 11:51 Central Time, which will be 12:51 Eastern.

(Break taken from 11:51 a.m. CST to 12:08 p.m. CST.)

THE VIDEOGRAPHER: All right. This begins Segment No. 2 of the testimony of David Schwier. We are

Page 87

back on the record at 1:08 Eastern, 12:08 Central.

(Exhibit 13 introduced.)

Q. (By Mr. Peirce) Mr. Schwier, can you look at Exhibit 13 to your deposition? This is the Crawford Global Technical Services Report No. 1 dated August 25th, 2019. Let me know when you're ready.

**A. Okay. I have it.**

Q. So first of all, Crawford was the company that Hudson retained in 2019 to adjust this loss, correct?

**A. Yes.**

Q. And as we discussed before, Andrew Larson was the adjuster for Crawford that was previously with Cunningham Lindsey in 2017 but didn't -- didn't, as far as we know, work on the claim in 2017; is that correct?

**A. That's correct.**

Q. So this discusses, on the first page, a net reserve of 265,217.88, correct? And a gross loss of 365,217.88, correct?

**A. That's correct.**

Q. And this was from the date of loss of May 8th, 2017, from the cause of loss of hail, correct?

**A. Correct.**

Q. And this was undisputed damage from the May 8th, 2017, storm to the Sheraton Denver West Hotel, correct?

Page 88

**A. Yes.**

Q. And payment was issued of this amount of 238,510.61 on August 29th, 2019, correct?

**A. Yes. Sounds correct.**

Q. And that was based on the damage estimate of 365,217.88 less the $100,000 deductible less nonrecoverable depreciation, plus core cuts that were done of the roof of $500, correct?

**A. That's correct. I just -- I think we take the depreciation before the deductible. But, yes. The deductible comes at the end.**

Q. Got you. But nevertheless, this payment was issued for an undisputed covered cause of loss from a May 8th, 2017, hailstorm on August 29th, 2019, correct?

**A. That's correct.**

Q. And that, if my math is right, is two years, three months, and a week after the claim was reported, correct, at least initially?

**A. Yes. That's from the initial date of report, yes.**

Q. And does Hudson consider that ultimate payment of the covered loss from the May 8th, 2017, storm to be a prompt payment of a meritorious and undisputed claim?

**A. Based on these circumstances, yes.**

Q. And as Hudson's guidelines provide, Hudson

agrees that all coverage decisions are time sensitive, correct?
**A. Yes.**
Q. And failure to assert a valid coverage disclaimer in a timely manner may be deemed acceptance of coverage as we've discussed, correct?
**A. It could be, yes.**
Q. What was Kaho Chan's authority, monetary authority, with respect to the highest threshold payment on this claim where he would not need any additional approval or authority?
**A. I'm not sure. But I believe it was either $350- or $500,000.**
Q. So 350,000 to 500,000, Hudson believes, was Mr. Chan's authority with respect to paying a claim where he would not need approval of upper management, correct?
**A. That's correct. And he wouldn't need the large loss procedure.**
Q. And that large loss procedure was never invoked by Mr. Chan, correct?
**A. No. It wouldn't be -- the document wouldn't be published until the reserve goes over 500,000.**
Q. The reserve was what?
**A. Until the reserve goes over $500,000.**



Q. Which never happened in this case, correct?
**A. Correct.**
Q. But getting back to my point, Mr. Chan doesn't have to talk to a manager. He doesn't have to speak to a supervisor about this claim whatsoever if Mr. Chan believes the covered amount is between 350,000 to $499,999?
**A. For this claim, I don't think he had to discuss it. Yeah. I think it's -- I think this claim was within his authority.**
Q. But that decision is solely Mr. Chan's in this claim, correct?
**A. Yes, if that's what his authority was.**
Q. If it was less than that, it could have been lower, correct?
**A. Correct. Then he --**
Q. That was a bad question. What I'm saying is, if his -- if his threshold limit was 250,000, that same logic would apply, but the number would be 250,000, correct?
**A. Correct.**
Q. Was there any reinsurance involved in this claim?
**A. No, not that I'm aware of.**
Q. Can you explain to the jury what a reservation



of rights is?
**A. It's a notice to the insured that there's potentially coverage issues and notifying them of what they might be.**
Q. Did Hudson ever send out a reservation of rights letter in this claim?
**A. Yes. I believe Kaho issued one. And he also -- I believe he also reserved his rights when he made the payment. He wrote a cover letter reserving his rights.**
Q. Do you recall the first time that a reservation of rights letter or correspondence was issued by Hudson?
**A. I think that letter from Kaho was -- it was from 2019. I don't recall exactly when.**
(Exhibit 16 introduced.)
Q. (By Mr. Peirce) I think if you look at Exhibit 16, Mr. Schwier, to your deposition, is that the first reservation of rights letter that was issued by Hudson in this claim?
**A. Yes, I believe so.**
Q. And can you read, briefly, the first -- or second paragraph of that reservation of lights letter?
**A. Sure.**
**THE WITNESS: Beginning with "your client"?**
MR. PEIRCE: You don't need to read it out



loud. Just to yourself.
**THE WITNESS: Okay.**
(Witness peruses document.)
**THE WITNESS: Yes.**
Q. (By Mr. Peirce) Okay. Do you see where Mr. Chan, in reserving the rights in this letter, states that Hudson, through an independent adjuster, retained Matthew Sitzmann of Haag Engineering to inspect the insured's property and assess the scope of hail damage sustained. Do you see that?
**A. Yes.**
Q. And he says that happened in 2017, correct?
**A. Correct.**
Q. Is that accurate as to the scope of the investigation of Matthew Sitzmann in 2017? In other words, did Hudson, through an independent adjuster, retain Matthew Sitzmann to inspect the entire property and assess the scope of the hail damage sustained?
**A. I think he's a roofing expert. So I believe he just looked at the roof.**
Q. And not only that -- I'm sorry. And not only that, Mr. Schwier, he didn't even look at the entire roof, right?
MR. CAMPBELL: Object to form.
Q. (By Mr. Peirce) I mean, as reported to Hudson,

he didn't look at the entire roof in 2017, correct?
MR. CAMPBELL: Object to form.
**A. Do you mean all the -- are you talking about the very top of the roof or --**
Q. (By Mr. Peirce) No.
**A. -- what exactly?**
Q. I'm not -- first of all, how many levels of roofs -- of the roof was there on the hotel?
**A. Well, I think mostly we talked about the level with the skylights that's on top of the mezzanine there. And then there's a roof way on top of that -- that tower also. He was focused on the one on the -- I guess we'll call it the mezzanine roof, the roof right there. I guess the third or fourth floor.**
Q. Right. But how many roofing levels were there on the hotel?
**A. Well, there's, like, the bottom. Then that. And then up top. And then there's a little portion where, you know, it kind of -- it goes up in levels.**
Q. So do you have any reason to dispute there were four levels of roofing surface?
**A. Yeah. That sounds -- yeah.**
Q. And you talked about Sitzmann focusing on the mezzanine level roof. But that -- he wasn't specifically tasked with looking at the entire mezzanine



level roof in 2017, was he?
MR. CAMPBELL: Object to form.
**A. My understanding was that they -- when they were retained, the focus were the skylights and some leaks in the ceiling that were all from that roof.**
Q. (By Mr. Peirce) Right. So the answer to my question was, yes, he did not look at the entire mezzanine level roof, correct?
MR. CAMPBELL: Object to form and foundation.
**A. Yeah. I'm not sure. I'm not sure if he looked at the whole entire mezzanine level roof or not.**
Q. (By Mr. Peirce) Well, what is Hudson aware of with respect to the inspection that Mr. Sitzmann did in 2017 of the roofing surface?
**A. He wrote a report, which I reviewed. He may have had -- I don't know if he had conversations with Kaho Chan or Cunningham Lindsey also about it. I've reviewed his report.**
Q. If Matthew Sitzmann had a direct conversation with Kaho Chan about the relevancy of coverage, should Mr. Chan have recorded that somehow as a log note or an e-mail or something in the claim file to have a record of that conversation?
**A. If it was new information, yes.**



Q. And do you recall, besides his report, Matthew Sitzmann -- well, first of all, do you recall, from looking at the claim file, whether Mr. Chan recorded any conversation with Mr. Sitzmann in the claim file?
**A. No, I don't recall.**
Q. In fact, did Mr. Sitzmann ever directly communicate with Kaho Chan, to Hudson's knowledge?
**A. I don't know.**
Q. So the only information that came directly from Sitzmann of Haag that Hudson was aware of in 2017, to your knowledge, was the report that he drafted in 2017; is that correct?
**A. The only thing I've seen from him was his 2017 report, yes.**
Q. Do you know when Matthew Sitzmann inspected the property?
**A. The letter says June 7th. I'm assuming it was around then.**
Q. And do you recall the e-mail we discussed earlier between Mr. Walls and Mr. Chan about the net reserve of $50,000?
**A. Yes.**
Q. And do you recall that exhibit, that e-mail? Let me find it real quick. Exhibit 24, do you have it in front of you?



**A. Yes.**
Q. And again, you just said that Matthew Sitzmann didn't inspect the property until June 7th. And by June 7th, Bill Walls had already advised Kaho Chan that he didn't think the roof was damaged, correct?
**A. I said that Kaho's reservation of rights letter indicates that he inspected it on June 7th. I don't -- I'm not aware of any other inspection he did.**
Q. Right. What I'm getting at is that before that even happened, Mr. Walls was reporting to Mr. Chan that he didn't believe the roof was damaged; is that correct, based on the dates?
**A. Yeah. On the 31st, he says, "Damages observed confirm -- conform with the insured's listing, including skylight dome. Over the pool has dents. Lobby skylight north side has a hole in it. Leaks in the ceiling in the fitness center. Leaks in lobby. And window vinyl inserts cracked."**
Q. Yeah. If you keep going, Mr. Schwier, at the bottom of that e-mail, it says, "This area was repaired about six months ago. And as the roof is ballasted, it does not appear that hail could have damaged the roof." Did I read that right?
**A. Yeah.**
Q. And that is Mr. Walls reporting that to

Mr. Chan before an engineer ever inspects the roof, correct?

**A. It may have been, yes.**

Q. Did Hudson ever provide Haag a copy of the insurance policy?

**A. Not that I'm aware of.**

Q. Did Hudson ever provide Haag or J.S. Held or Crawford a definition of hail or wind damage to operate off of?

**A. Not that I'm aware of.**

Q. In other words, Hudson did not provide Haag or Crawford or J.S. Held with a definition of what constituted recoverable hail damage under the policy, correct?

**A. I don't believe so, no.**

Q. Mr. Schwier, can you explain to the jury what an underwriting file is?

**A. What we refer to as an underwriting file are the documents that our underwriting department uses to evaluate -- evaluate a risk and all the associated correspondence.**

Q. And as part of the underwriting file, just typically, things that would be included possibly would include photos of the condition of the property, correct?



**A. Yes, if there are any.**

Q. Inspection reports of the property before the policy is issued, correct?

**A. Yes.**

Q. And part of the reason that underwriting investigation is done is to protect Hudson Specialty Insurance Company, correct?

MR. CAMPBELL: Object to form.

**A. Protect us in what way?**

Q. (By Mr. Peirce) For exposure to risks. You want to know the condition of the property. You want to know what, generally, it looks like and its condition, any inspections that have been done, any prior losses, before issuing coverage, correct?

**A. Yes.**

Q. And my clients gave Hudson every opportunity to inspect the property before they insured it, correct?

**A. I don't know if it was discussed.**

Q. You're not aware of anything my client did to prevent Hudson or its underwriting department from inspecting the loss before the policy was issued, correct?

**A. Yeah. Not that I'm aware of, no.**

Q. It's my understanding the underwriting department of Hudson was going to survey the risks prior to the policy's inception; is that correct?



**A. I'm sorry?**

Q. They were going to survey, quote, unquote, survey the risks of the property before the inception of the policy; is that correct?

**A. Yeah. I saw a note in the underwriting file about that.**

Q. Does Hudson agree that at the time of the issuance of the policy at issue, this Sheraton Denver West Hotel was an upscale hotel?

**A. That's how it's described in the underwriting file.**

Q. I'm sorry?

**A. That's how it's described in the underwriting file.**

Q. And Hudson agrees with that, correct?

**A. Yes.**

Q. Hudson was aware of two prior losses from the hotel from an internal water pipe and some water damage, correct?

**A. Yes.**

Q. And what years did those losses occur?

**A. I thought they were 2013, around there.**

Q. Both of them occurred in 2013, correct?

**A. That was my recollection, yes.**



MR. PEIRCE: Mr. Schwier, I want you to look at Exhibit 20 to your deposition. Let me know when you have that up.

(Exhibit 20 introduced.)

**THE WITNESS: There it is. I have it.**

Q. (By Mr. Peirce) And can you identify who Tor Bernard is?

**A. He's in the underwriting group up in -- I think they're in Canada, in Vancouver.**

Q. And is CW Specialty the underwriting arm of Hudson Insurance Group or Hudson Specialty?

**A. I think that stands for Commonwealth Specialty. They were acquired by Hudson at some point in time. I'm not really sure when. Before -- they were acquired before this -- this policy incepted.**

Q. So in any event, on July 7th, 2015, Tor Bernard is discussing the policy -- or discussing the property, correct?

**A. Correct.**

Q. And he's talking about the prior losses that occurred, correct, in 2013?

**A. Correct.**

Q. And at the end of this e-mail on July 7th, 2015, he states, "In hindsight, we should have inspected the hotel. Will requisition an inspection if we renew."

Did I read that correctly?
**A. Yes.**
Q. And so what he's saying is that the underwriting department of Hudson did not inspect the hotel before insuring it, correct?
**A. That's correct.**
Q. And do you know if this requisition for an inspection or if an inspection actually happened prior to renewing the policy?
**A. I didn't see any record of it.**
(Exhibit 21 introduced.)
MR. PEIRCE: And if you can turn to Exhibit 21 of your deposition. Let me know when you have that up.
**THE WITNESS: All right. I have it.**
Q. (By Mr. Peirce) Nathan Smith is also with CW Specialty; is that correct?
**A. Yes.**
Q. And he sent an e-mail on August 11th, 2016. This is a couple of weeks before the policy at issue in our case went into effect, correct?
**A. Yes.**
Q. And the "TIV" means total insured value, correct?
**A. Yes.**


Q. And the total insured value, as indicated by Nathan Smith, at the Sheraton Denver West went up from 29.136 million to 31.85 million; is that correct?
**A. That's correct.**
Q. What would cause that to increase by that amount?
**A. I don't know.**
Q. Do you know if any renovations were done by the time Hudson had insured it prior to the date of loss on May 8th, 2017?
**A. No, I don't.**
Q. If you -- I'm going to scroll down. If you look at the e-mail from Tom Wilson to Nathan Smith that same day, August 10th, 2016. Do you see this e-mail?
**A. Yes.**
Q. And Tom Wilson, do you know his role with CW Specialty, by any chance?
**A. No, I don't.**
Q. He says, "Previous approvals suggest that an engineering report would be a good idea after two large losses. But this has not yet been completed. Please make sure to get this done upon binding this year. Otherwise, okay to renew flat as suggested." That engineering report was never done, correct?
**A. I didn't see it. No.**


Q. In hindsight, does Hudson wish it would have done an engineering report at this time?
MR. CAMPBELL: Object to form.
**A. I don't know if it would -- would have been relevant. Maybe.**
Q. (By Mr. Peirce) Well, certainly you would agree with me, Mr. Schwier, that a condition of a property before a policy is bound is relevant to the underwriting department of an insurance company, correct?
**A. Correct.**
Q. And so there is relevance to determining a date certain and the condition of a property, correct?
**A. Yes.**
Q. And despite instructions to conduct such a report to determine the condition via an engineer, Hudson's underwriting department did not do that?
**A. It doesn't look like they did, no.**
Q. There are no photographs of the condition of the roofing surface in Hudson's entire file prior to the policy being issued, correct?
**A. Our underwriting file or our claim -- you're just speaking of our underwriting file?**
Q. Right. Was that correct?
**A. I don't recall -- I don't recall seeing any.**
Q. And there are no photographs in the


underwriting file of the condition of the curtain wall system prior to the policy being issued, correct?
**A. No. I don't recall seeing any photos in it.**
Q. And you don't recall seeing any photos in the underwriting file of the indication of any wear and tear of any gaskets to the hotel curtain wall, correct?
**A. Yeah, I don't recall seeing any photos at all.**
Q. You don't recall seeing any weep hole issues or previous water damage to the hotel whatsoever in the underwriting file, correct?
**A. No. I didn't see any photos at all.**
Q. Do you believe that it is important to determine whether damage was preexisting, or whether it was wear and tear prior to the inception of the policy? It would be important to know the condition of the property prior to insuring it?
MR. CAMPBELL: Object to form.
**A. It is helpful, yes.**
Q. (By Mr. Peirce) And that did not happen in this claim, correct?
**A. It didn't happen with this policy, if we're talking about the underwriting file.**
Q. And with this property, correct?
**A. Right. Yes. Correct. The property, that's better wording.**

Page 105

Q. Mr. Schwier, do you know where this property at issue is located?
**A. Yes.**
Q. Where is that?
**A. It's near Denver, Colorado.**
Q. Do you know where Lakewood, Colorado is?
**A. I've never been there, but I've kind of seen the area on a map.**
Q. Can Hudson tell the jury the description of what the property is?
**A. Yeah. It's a 13- or 14-story hotel. You know, it looks like it was built in the -- I think it was built in the early '80s. And it's -- you know, it's pretty big. It's got a -- it's large at the base. And then it gets smaller. And then they have a tower room in the middle. That's about it. It's in a -- I don't know if I'd call it a suburban area. It's not -- it's not in a downtown area or anything. It's -- it's -- it's outside of a city.**
Q. And what was the material the roofing surface comprised of on the date of loss of May 8th of 2017?
**A. Are you talking about the -- the mezzanine roofing surface?**
Q. Well, we can start there.
**A. Okay. It's concrete. And it has a layer, like**

Page 106

**a protective layer. And they had ET -- EPDM foam -- or the EPDM coating. And then there were a couple of inches of river rocks on it, these smooth rocks.**
Q. Does Hudson know how much of the roofing surface, for instance, on the mezzanine level that you just described was exposed to the elements on May 8th, 2017? In other words, the EPDM was exposed to the elements, and it was not covered by any ballast, rock, or river rock?
**A. I -- I saw some photos that showed exposed parts. And it looks like those were reviewed for the Haag report. It was -- a lot of these photos are -- are difficult to see, you know, the whole angle. You know, there's spots of photos, so it's kind of hard to tell how much of it it actually is.**
Q. And that was in the Haag report from 2019, correct?
**A. Yeah. But I -- I thought I saw some photos from 2017 as well.**
MR. PEIRCE: We can look at the Haag report in a little while. But I'll represent to you I saw the Pictometry photographs in the 2019 Haag report. But if you're --
**THE WITNESS: Okay.**
MR. PEIRCE: -- aware sitting here that

Page 107

they were in 2017, please let me know.
Q. (By Mr. Peirce) How -- does Hudson know how many square feet the hotel is?
**A. No. I wouldn't know.**
Q. Does Hudson know what type of curtain wall system comprised the hotel?
**A. I don't know the name of it, no.**
Q. So with regard to -- and that includes Kaho Chan, right? Hudson -- you speak on behalf of Hudson Insurance Company today. And Kaho Chan would likewise not know what the curtain wall system was comprised of, correct, without referring to an expert or somebody else?
MR. CAMPBELL: Object to form.
**A. He might know. Yeah. He might know. I'm basing my -- my knowledge off the reports. I don't know if he had separate conversations.**
Q. (By Mr. Peirce) Do you know if Mr. Chan did any type of independent research into what the curtain wall was comprised of or what certain damage could do to the curtain wall as opposed to other damage?
**A. I don't know.**
Q. Would Hudson have any reason to dispute that the square footage of the hotel is approximately 250,000?

Page 108

MR. CAMPBELL: Object, foundation.
**A. Yeah. I -- I don't know the square footage of the hotel.**
Q. (By Mr. Peirce) No reason to dispute that number, though?
MR. CAMPBELL: Object to foundation.
**A. No. It looked pretty large.**
Q. (By Mr. Peirce) Is Hudson familiar with the May 8th, 2017, hailstorm in the Lakewood and Denver, Colorado area in general?
**A. Yes.**
Q. And it was the largest hailstorm, at least by insurance industry standards, in Colorado history. You're aware of that?
**A. I wasn't aware it was the largest ever, no.**
Q. Did Hudson sustain any other large losses in the Denver area from that date from any other properties?
**A. I don't know. I don't believe so, but I'm -- I'm not sure on that.**
Q. Did Hudson do any investigation as far as damage in the immediate vicinity of the Sheraton Denver West Hotel from the same hailstorm?
**A. Not that I'm aware of. I think they just looked at meteorologist -- meteorological reports.**

Page 109

Q. What date did Hudson receive notice of the claim?

**A. May -- I'd have to check the file. I think it was May 22nd, but I'd have to check the -- the notice.**

Q. And as I understand it, I think that's accurate, Mr. Schwier. As I understand it, Kaho Chan was assigned as the adjuster the next day; is that correct?

**A. Yeah. It would have been that day or the next day or the day after.**

Q. And that day that he was assigned, he reached out to Bill Walls at Cunningham Lindsey to begin an investigation of the claim; is that correct?

**A. Yes.**

Q. Can you tell me what Hudson knows about Ryan Walls and his adjusting experience?

**A. I'm not familiar with him. I don't know if Kaho has used him in the past. I know he worked at Cunningham Lindsey. I don't know anything else about him.**

Q. Did Hudson understand that Mr. Ryan Walls is a licensed attorney in Colorado?

**A. I -- I don't know.**

Q. Was Hudson aware that Mr. Walls has defended insurance companies in suits of this very nature and

Page 110

allegations of the same that are being brought by my clients in this case?

**A. I was not aware, no.**

Q. Did Hudson ever authorize Ryan Walls to work on this claim?

**A. I don't know if Kaho did. I -- the assignment I saw was to Cunningham Lindsey. And it might have been to Bill Walls in -- specifically him. But I don't -- I don't recall seeing any e-mail assigning him.**

Q. And yet Mr. Walls, Ryan Walls, was the one that authored the final report of Cunningham Lindsey in 2017, correct?

**A. Yes. I saw his name on the -- on the final report. That's the only mention I saw of him.**

Q. Hudson agrees the entire property was covered by the perils of -- from the perils of wind and hail on May 8th, 2017, correct?

**A. Correct.**

Q. And RDA, the plaintiffs in this case, reported damage caused by hail and wind to the property on May 27th [sic], 2017, correct?

**A. They reported the damage on the 27th?**

Q. They reported the damage on May 22nd, 2017.

**A. Oh, 22nd. Yes. I believe that's true. Yes.**

Q. What were Hudson's instructions to Bill Walls

Page 111

regarding inspecting the damage?

**A. I don't specifically recall from the e-mail. I think it was reaching out to the insured. There may have been a description of the accident in there or the first notice. I don't recall.**

Q. Were those instructions to Mr. Walls documented in the claim file as to what he was supposed to inspect?

**A. I -- I thought there was -- I thought I saw an e-mail to him to reach out. But I don't -- I don't recall exactly where I saw that.**

Q. You mean an e-mail to reach out to the insured?

**A. Right. I'm thinking that. I'm not sure if that had further instructions in it. I just don't recall.**

Q. Right. And my -- my question was a little different. Specifically with regard to instructions on inspecting the hotel from Kaho Chan or Hudson to Walls, these are not documented anywhere in the claim file, to your knowledge, correct?

**A. Not that I recall, no.**

Q. Would Hudson agree that a reasonable investigation after a loss is reported should have included inspecting the entire property to determine if direct physical loss or damage to the property was caused by hail or wind?

Page 112

MR. CAMPBELL: Object to form.

**A. Yeah. You would go look at the damage, yes.**

Q. (By Mr. Peirce) And Hudson agrees that if an adjuster is uncertain if a part of the property sustained direct physical loss or damage from hail, then Hudson should obtain information from someone with an expertise in that particular area?

MR. CAMPBELL: Object to form.

**A. I'm not sure if I understand the question.**

Q. (By Mr. Peirce) Sure. If -- for instance, hypothetically speaking, Hudson retains Bill Walls. Bill Walls doesn't know if the curtain wall is damaged or not from hail. Shouldn't he, because Hudson has assigned him to be its eyes on the ground, get the approval from Hudson to have an expert or somebody that does know if it was damaged from hail or find out if it was damaged from hail? Would you agree with that?

MR. CAMPBELL: Object to form.

**A. Yeah. You can do that.**

Q. (By Mr. Peirce) And it's not -- and the question is a little different. It's not if you can do that. That's required by Hudson. If its boots on the ground adjuster doesn't know if damage was caused from a covered peril, Hudson should find someone that can assess that, correct?

Page 113

A. I --

MR. CAMPBELL: Object to form.

A. -- think in -- I think in this case, there was a construction company that did that. They weren't retained by Hudson. But I think there was a construction company that reviewed the curtain wall and gave us invoices for the damage.

MR. PEIRCE: I'm going to object as nonresponsive.

Q. (By Mr. Peirce) Mr. Schwier, my question is: Hudson has a duty to conduct a full and reasonable investigation, correct, of a -- of a claim?

A. Yes.

Q. And if Hudson's people that it retains to adjust the claim on its behalf report to Hudson that they're not sure if damage is caused from a covered cause of loss, then Hudson has an obligation to retain someone with that expertise. That's all I'm asking you.

A. Right.

MR. CAMPBELL: Object to form.

A. You could retain somebody. You could retain somebody or find some other way of finding out that information. Yes.

Q. (By Mr. Peirce) All right.

A. The solution to every claims problem isn't

Page 114

hiring another expert.

Q. Would you agree that an adjuster should not deny or recommend denial of a claim if an adjuster lacks the expertise to discern whether hail or wind caused direct physical loss or damage to a portion of the property?

A. An adjuster shouldn't deny a claim if they -- could you repeat the question?

Q. Sure. An adjuster should not deny or partially deny a claim and if an adjuster lacks the expertise to discern whether hail or wind caused direct physical loss or damage to a portion of the property?

A. I don't think I could see a situation where we would rely on others for their expertise. If we -- if we see no indication that our information is incorrect, I could see where you could deny coverage even though you're not a trained expert in the field.

Q. That's a little bit of a different answer to a little bit of a different question. My question wasn't whether you're relying on somebody else or don't have information. You flat out should not deny or recommend denial of a claim if the adjuster lacks expertise to discern whether or not hail or wind caused direct physical loss or damage to a portion of the property, correct?

Page 115

MR. CAMPBELL: Object to form, also asked and answered.

A. I just think -- I'm just -- I must be missing something here. So I'm -- we're disclaiming coverage. Are you saying that we shouldn't disclaim coverage for hail damage if we're not sure it's not hail damage?

Q. If you're not sure if it is hail damage. For instance, if Bill Walls went out there and said, "Okay. I've got an invoice for C Green Construction. And they looked at two window gaskets. And they said those two window gaskets were hail damage and need to be replaced." What about the rest of the curtain wall system? Did Bill Walls ever report to Hudson in 2017 that the condition of the rest of the curtain wall system was damaged or not by hail? And if he didn't know that, shouldn't he get somebody that did know that?

MR. CAMPBELL: Object to form.

A. It's -- Bill Walls talks to a construction expert who says this is damaged by the hail. And he asked, "Is there anything else damaged? Do you have any other invoices?" And he said, "No."

Q. (By Mr. Peirce) Do you have any record of -- do you have any record of Hudson of Bill Walls ever asking any of the contractors for any other damage from hail to any other portion of the property other than what was

Page 116

reported by those contractors?

A. Maybe -- maybe I read into it when he's asking -- I saw e-mails asking if there's any additional information that needed to be provided. Maybe it's in there. But no, I'm not -- I wasn't at those meetings, so I couldn't tell you exactly what they discussed. But my understanding was that they provided invoices for all the damage that they found when they all investigated it together.

Q. You're talking about e-mails between Bill Walls and Briana Miller, correct?

A. Yes. I -- my understanding is that when we received the claim, there were already vendors. We'll call them vendors because I think there was a construction company. There was BluSky Restoration and a glass company. There were already vendors that shared in a retainer. Maybe they retained them for -- maybe they just used them all the time for the care of the building. And we used them to help us assess the damage. We worked with the insured.

And we -- on large construction -- or large commercial projects, that's what you do, is you don't just bring in, you know, a bunch of our people. There's people that know the building, like the building engineer and other people like that. We rely on them to

**show us -- you know, show us what's wrong. And that's my understanding of what happened here.**

MR. PEIRCE: And I'm going to respectfully object as nonresponsive.

Q. (By Mr. Peirce) Mr. Schwier, do you know what Mr. Walls' inspection of the property consisted of?

**A. I don't know if it's in his report, what he specifically did. It sounded like he was there on a couple of occasions, maybe more, and walked around the property. But, no, I wasn't there, so I don't know exactly what he looked at.**

Q. And Hudson charged Mr. Walls with inspecting the property after the claim was made, correct?

**A. Correct.**

Q. How long would Hudson expect Mr. Walls, generally, to spend inspecting the hotel after a claim of this nature was reported?

**A. Oh, I don't know. That would -- I guess it would depend on the extent of the damages and a bunch of factors.**

Q. Well, the extent of the damages is part of the obligation of Hudson to determine, correct?

**A. Right.**

Q. And so if -- if the hotel is 14 stories and 250,000 square feet, Hudson has no instructions or



expectation of how long it would take Mr. Walls to inspect it?

**A. No. Because he's going to go there. And he's going to meet with the building engineer and these other people. And they're going to walk around and however long it takes them. I don't know how long it would take. You know, he has to do it. He's out there reviewing it.**

Q. Hudson did not provide him any parameters on how long that should take?

**A. Not that I saw.**

Q. Hudson didn't approve any budget of Mr. Walls to inspect the property, correct?

**A. No. I don't -- I didn't see a budget.**

Q. Hudson did approve a budget for J.S. Held to inspect the property in 2019, correct?

**A. Yes. They may have given us one.**

Q. In other words, before the inspection occurred, Hudson approved the estimated costs of J.S. Held inspecting the entire property, correct?

**A. I believe so.**

Q. But Hudson did not do that for Mr. Walls, correct?

**A. Well, Mr. Walls is the independent adjuster. I think going into a job like that, he can't -- you know,**



**he's reaching out to the insured. He can't come up and say, "Okay. Here's the budget. I think this will take me 20 hours." I don't think he really knows until he gets there and he looks at everything. And, you know, he had to retain Haag. He had to work with Haag. He doesn't know how long it's going to take. They might -- new issues might come up.**

Q. Right. But after he went out there on May 25th, 2017, he didn't submit any kind of follow-up budget for any kind of inspection, correct?

**A. Not that I saw, no.**

Q. And wasn't J.S. Held's budget north of $50,000 to inspect it in 2019?

**A. Yeah. They had a -- they had a big project. They're the engineers on it. So they had several people working on it.**

Q. And as I understand it, from what Mr. Walls observed on the day he inspected on May 25th, 2017, he observed damages that conformed with the insured's list, including the skylight dome over the pool having dents. The lobby skylight had a hole in it. There were leaks in the ceiling of the fitness center. Ceiling leak in the lobby on the south side. Does that refresh your recollection as to what Mr. Walls noted on his inspection?



**A. Yes. And that -- from what I remember, that was brought to his attention by --**

Q. That was brought to his attention by representatives of my clients, correct?

**A. Correct. Yes.**

Q. But that -- excuse me. That is not the sole obligation of Hudson, to just look at what my client reports, correct?

**A. No.**

(Exhibit 25 introduced.)

MR. PEIRCE: Okay. And could you look at Exhibit 25 to your deposition. Let me know when you're ready to proceed.

**THE WITNESS: Okay. I have it.**

Q. (By Mr. Peirce) Okay. This is an interim invoice from Cunningham Lindsey to Hudson Insurance Group relating to the property and the hail claim, correct?

**A. Yes.**

Q. And if you scroll down, you see the time tabulation for May 25th, 2017, "Inspect Inspection"? It talks about what Mr. Walls did on that day?

**A. Yes.**

Q. And so his entire inspection that day was 1.8 hours, at least according to this time sheet,

Page 121

correct?
A. Yes. Well --
Q. And he talks about -- were you talking? I'm sorry.
A. No. I was just reading the rest of the day here.
Q. Yeah. I mean, the rest is meeting and travel. But the actual inspection itself, 1.8 hours?
A. Right. Meetings and inspection. It looked like there were some meetings in here too. But, yeah, the actual -- what he puts under "Inspect Inspection," yeah, he billed 1.8 hours for that.
Q. And if you look at the bottom of that page, on the same day, he uploaded caption photographs. How many photos does it indicate that he took?
A. "Upload/caption photograph. Mount and caption of 22 photos."
Q. Okay. And when you were talking about the mezzanine level roof, what -- what floor level was that?
A. I think it's on top of the third floor.
Q. Okay. So if you look at the time entry for Mr. Walls on May 25th, 2017, what does it indicate that he inspected with regard to the roofing surfaces?
A. Well, it says, "Craig and I" -- this whole -- starting with, "Craig and I inspected the interior leak

Page 122

areas." That's inside the building. "The skylight broken from hail." Which I can't tell if he's inside or outside looking at that. "Viewed the area of the leak." Again, I don't know if that's inside or outside. "And found no puncture hole on the roof which would give rise to a leak." So that's outside.
"Note the roof is ballasted with river rock," outside. "The skylight area at the area of the leak has been patched/caulked before. And about six months ago, a roofer patched about 50 by 50 of the roof by the skylight area where the leak on exterior is found." Sounds like it's outside.
"I noted the west-facing vinyl window trim. The inserts were broken." So that's on the roof. But he's -- I guess he's looking at the windows on -- from up -- that may be the fourth floor.
"Inspected the interior pool dome which was very dented and hard to photo." I think that's actually from the outside. But he says it's on the inside. I think I've seen the photos of that. And I think they're cracked on the outside.
"Inspected the roof on the twelfth floor. And the sixth floor, no damage, but insured is complaining of a leak." So he looked at that. And then he spoke to Craig. And they looked at the pool dome.

Page 123

Q. At least it indicates that roofs that were inspected were on the twelfth floor and the sixth floor, right?
A. Yeah.
Q. And Mr. Walls confirmed the west-facing vinyl window trim inserts were broken out, correct?
A. The broken window behind the -- is that -- are you reading from that same entry?
Q. "Noted the west-facing vinyl window trim inserts were broken."
A. "Noted." Okay. Yes.
Q. Did Mr. Walls do any further investigation to determine if there was any ensuing damage from those broken window inserts, to your knowledge?
A. Oh, I don't know. No, I don't know.
Q. Do you know if Mr. Walls confirmed the age of the roof at any time?
A. I -- I don't recall. I think he -- I think he mentioned it's over ten years old. But I don't -- I don't recall.
Q. I know he mentions it. But does he do anything to verify that?
A. I don't know.
Q. And that's -- that triggers coverage under the policy, correct? The age of the roof? In other words,

Page 124

the ten-year mark is important as far as coverage is -- goes, correct?
A. Yes. There's a -- there's a roof valuation endorsement that applies if the roof is older than ten years.
Q. In fact, Mr. Walls had instructed Hudson that he was going to go look up and do some research with the City of Lakewood to see if he could determine the age of the roof, correct?
A. Yeah. I believe he looked.
Q. And he never did look, did he?
A. Oh, I don't -- I don't know. I thought there was a mention of that. But I don't know.
Q. There was a mention he was going to do it, but he never -- Hudson doesn't know that he ever did it, correct?
A. I didn't see anything that he ever did it, no.
Q. Okay. So as we discussed, Mr. Walls, after this May 25th, 2017, inspection, and then he wrote to Mr. Chan on May 31st recommending a net reserve of 50,000. That's before Mr. Sitzmann goes out to the property on June 7th, correct?
A. Yeah. I don't know if Mr. Sitzmann went out to the property before then. It looks like on May 30th, he was setting up dates for June 7th or 8th to go there.

Page 125

MR. PEIRCE: Why don't we look at Exhibit 26, which is the 2017 Haag report.

**THE WITNESS: 26?**

MR. PEIRCE: Yeah, 26.

**THE WITNESS: Okay.**

(Exhibit 26 introduced.)

Q. (By Mr. Peirce) This report was issued on June 16th, 2017; is that correct?

**A. Yes.**

Q. And do you see what it says what he did and when he did it on the first paragraph of Page 2?

**A. Yes. Yes. It says he inspected it on June 7th.**

Q. Yeah. So he inspected it on June 7th. But he inspected that Sheraton Denver West Hotel to determine the cause of water intrusion at a bank of skylights above the lobby and specifically whether the leak was due to hail. Does this give any indication that Matthew Sitzmann did a comprehensive evaluation of the roofing surface on June 7th of 2017?

MR. CAMPBELL: Object, foundation.

**A. Well, I mean, you could -- reading his report, it goes through what he did. You know, he talks about the visit. He talks about the weather that day. He talked about his inspection. There's several sections**

Page 126

**in here.**

Q. (By Mr. Peirce) Right. There's several sections. But he didn't do a comprehensive evaluation of the roofing surface, correct?

MR. CAMPBELL: Object, foundation.

**A. He does an evaluation of the roofing surface.**

Q. (By Mr. Peirce) Do you understand, Mr. Schwier, what I mean by "comprehensive evaluation"?

**A. No.**

Q. In other words, in the first paragraph, it indicates he was told to look at a specific area, correct?

**A. Correct.**

Q. And so does he report to Hudson in this report that he examined all four levels of the roof and reported that there was no hail to any area of the roof, hail damage to any area of the roof?

**A. No. And it doesn't look like anything was discussed with them. It looks like him and Craig Ulrich looked at the one part where the damage had -- where the alleged damage was.**

(Exhibit 47 introduced.)

MR. PEIRCE: And if you look at Exhibit 47 to your deposition.

**THE WITNESS: Yeah.**

Page 127

Q. (By Mr. Peirce) So here, Mr. Walls is e-mailing Mr. Sitzmann on May 26th saying, "We got a fairly sizable leak in the roof as a result of the storm. Their skylights have been caulked, and the roof has been patched. The roof is ballasted with EPDM and could find no damage to the membrane from hail. The leak is sizable and, as stated, was patched about six months ago. I need to know if this is related to the May 8th, 2017, storm. Do you have capacity to assist?" That's the instruction received by Sitzmann from Bill Walls, correct?

**A. Yes.**

Q. And if you recall, Mr. Walls had inspected the property the day before and went on the roofing surface on floors 6 and 12, correct?

**A. Yeah, among --**

Q. At least according -- according to his time entry at least?

**A. Right.**

(Exhibit 29 introduced.)

Q. (By Peirce) All right. Okay. If you could look at Exhibit 29. First of all, Matthew Sitzmann issued his engineering report on June 16th, 2017, correct? We -- we discussed that, correct?

**A. I didn't note that. I immediately --**

Page 128

Q. Yeah. I -- yeah. I had you read it at the top. But it's -- we can go back to it. Just --

**A. I'll take your word for it.**

Q. Okay. Yeah. Exhibit 29, do you see the e-mail from Bill Walls to Briana Miller, who was the general manager of the Sheraton Denver West on July 14th, 2017, at 1:59 p.m.?

**A. Maybe I'm on the wrong -- I -- I think I'm on the wrong one here. Exhibit 29?**

Q. Yeah, Exhibit 29.

**A. Okay. Yeah. I have RT Specialty from Dori Bowers to Brenda McGovern.**

Q. If you scroll down, it's the July 14th e-mail that's on --

**A. Okay. I got that. I'm sorry. I got it.**

Q. Yeah. It's at 1:59, July 14th, 2017, from Bill Walls to Briana Miller. It says, "Will RDA Management be withdrawing their claim. Or in the alternative, if RDA Management will submit the estimates, we can send RDA a below-deductible letter." Did I read that right?

**A. Yes.**

Q. So by July 14th, 2020, Walls was asking Ms. Miller if my clients would withdraw their claim or submit additional estimates, and they could send RDA a below-deductible letter?

Page 129

**A. She's responding to her e-mail below where she writes to -- to Bill and says, "Hello, Bill. I believe the sum of our proposals related to our hail damage will not exceed our deductible."**

Q. Right. That's from the --

**A. "If you wish to discuss further, you can contact John -- our corporate office, John Bresnahan." And then he replies, yes, what -- what you read. So it's not -- he's not asking her. She's responding to her and asked if -- if we short the letter, is what it sounds like to me.**

Q. Right. He's talking about specific estimates that Ms. Miller has received from vendors at the hotel, correct?

**A. Correct.**

Q. And he's following up. If you go to the bottom of the chain July 11th, it talks about, "Have you sent the estimates? We're waiting on them." And she says, "I'm at the mercy of the vendors." And he said, "Can you provide me the names? And I will call and push them." But it ends up culminating in an e-mail from Bill Walls to Briana asking if RDA will be withdrawing their claim or submitting the estimates. "We can send RDA a below-deductible letter" in response to the prior e-mails from Briana, correct?

Page 130

**A. Yeah, in response to her saying that she believes that they're not going to exceed the deductible.**

Q. But this is --

**A. And then Bill Walls tries to reach out to --**

Q. Go ahead.

**A. Okay. So she's writing to him saying they're not going to reach it. And even below that, they're talking about he's volunteering to reach out with her. You know, we're trying to handle this promptly. You know, if it helps -- she's saying she's having trouble with her vendors. He's saying, "I'll help you out. Give me their phone numbers." You know, it sounds to me like he's doing a good job.**

Q. Okay. So Hudson believes Mr. Walls did a good job, correct?

**A. Yeah.**

Q. Okay. So is that the -- is that the determination whether the insured's invoices from vendors will total the deductible and whether there's a coverable claim or not? Is it dependent, in other words, on the estimates that the insured gets on their own to determine the amount of loss of a covered claim under Hudson's policy?

**A. They -- they submit their repair estimates. We**

Page 131

**review them for reasonableness and necessity and covered under the policy. And if it exceeds the deductible, we pay it.**

Q. But that's not the entire story, correct? Hudson has a duty to investigate on its own at its own expense, correct?

MR. CAMPBELL: Object to form.

**A. Yes.**

Q. (By Mr. Peirce) In other words, Hudson can't rely solely, as you've already testified, Mr. Schwier, solely on its insured to calculate its damage model, correct?

MR. CAMPBELL: Object to form.

**A. We're talking with our --**

**THE WITNESS: There's somebody coming-- cutting in and out.**

**A. We're working with our insured to come up with these damage estimates. These vendors were already retained when we started working on this claim. We're working with them.**

Q. (By Mr. Peirce) Part of working -- and part of working with them is to do a full and reasonable investigation at Hudson's own expense, correct?

**A. Correct.**

(Exhibit 30 introduced.)

Page 132

Q. (By Mr. Peirce) So if you look at Exhibit 30.

**A. 30. Okay.**

Q. This is a July 14th, 2020, e-mail from Bill Walls to Briana Miller. I'm sorry. July 26th, 2017, e-mail from Bill Walls to Briana Miller. Well, let me try this one more time.

Exhibit 30 is an e-mail from Bill Walls to Mr. Bresnahan of RDA saying, "We received an e-mail from Briana Miller advising the estimates she had received from the hail damage to the hotel would not exceed the $100,000 hail deductible. We followed requesting copies of the estimates or a formal letter withdrawing the claim. As we have not heard further from RDA, we are retiring our file." Did I read that accurately?

**A. Yes.**

Q. Is that the date that Hudson retired their file as well?

**A. No. I thought it was later. I thought the file was closed a couple months later.**

(Exhibit 28 introduced.)

Q. (By Mr. Peirce) Well, if you look back at Exhibit 28, the first and final report from Bill Walls.

**A. One second. It's a little slow. Okay. Okay. I got it.**

Q. That's dated the same day as that e-mail we

just looked at 7-26-17, correct?
**A. Yes.**
Q. And does Hudson know if it closed its file that day or no?
**A. I don't recall. I thought it was a later date. But I don't recall the exact date that we closed our file.**
Q. And the first and final report, Exhibit 28, references this loss as a "hail loss cat 1732." Do you know what that means?
**A. Okay. We're on the same exhibit.**
Q. 28.
**A. 28. Right. Okay. And it refers to cat loss up top? Okay. I see it, type of loss. Hail loss. Yeah. Okay. I've got it. Yeah.**
Q. Do you know what that refers to?
**A. Yeah. It's a catastrophe loss. It's -- they assign it a cat -- they call it a cat code. And the code for it is 1732.**
Q. Who -- who assigns it a cat code?
**A. I don't know who originally assigns it. But as the insurance carrier, we use the same code -- we'll use that code for all our hail claims that occurred on that day in that -- from that storm. It's almost like a -- you have a hurricane code. You know, a hurricane will**



**have its own code. And storms that have over, I believe it's a $5 million threshold have their own code.**
Q. That's what I was going to ask you. Is there -- is there a threshold for categorizing it as a cat storm?
**A. Yeah. It's a financial threshold.**
Q. And you said it was $5 million?
**A. I seem to remember it's $5 million.**
Q. So --
**A. It may be different now.**
Q. Would 1732 dictate the Denver area, Colorado? What would that signify?
**A. It would be -- yeah. I think it's any -- any reported damage from this specific storm. So it would be, yeah, wherever the area was that this storm hit.**
Q. But the -- but the cat designation, that comes internally from Hudson?
**A. I don't know who publishes the cat codes. I don't know how we get them.**
Q. So it's possible Mr. Walls looked this up and found it somewhere?
**A. Or it's possible we gave it to him.**
Q. And this says, in this first and final report, Exhibit 28, "Below you will find our first and final report as this loss was agreed to by the insured to be



below the 100,000 hail deductible." Do you see that?
**A. Yes.**
Q. Did Ms. Miller agree the loss was below the deductible, or did she say the vendors' invoices would not exceed the deductible?
MR. CAMPBELL: Object to form.
**THE WITNESS: What's her e-mail? That was Exhibit 31.**
MR. PEIRCE: I don't think it's 31.
**THE WITNESS: It was the one before that? Do you recall which number it was?**
MR. PEIRCE: Let me look. I don't -- I'll have to go back. You know what? I don't know where -- where I lost it. We'll get back to it.
Q. (By Mr. Peirce) But anyway, you don't -- do you have any recollection sitting here whether that's what Ms. Miller reported, whether it was the vendor invoices or agreed that the total damage amount was less than 100,000?
**A. I know we read it five --**
MR. CAMPBELL: Object to form.
**A. -- minutes ago. And that answers the question. So, I mean, I'd rather just read it again than guess what we were talking about.**
MR. PEIRCE: I thought I had it up.



Q. (By Mr. Peirce) Okay. Exhibit 30. Bill Walls, Exhibit 30, on July 26th, says, "Mr. Bresnahan, we received an e-mail from Briana Miller advising the estimate she had received on the hail damage to the hotel would not exceed the $100,000 deductible." That's from Bill Walls on July 26th, 2017. The same day he sent this report, which is Exhibit 28, correct?
**A. Yes.**
Q. And so now that we've looked back at that, you would agree that that was what was reported, not that the loss was under the $100,000 deductible, correct?
MR. CAMPBELL: Object to form.
**A. I'd go back to what she said in that e-mail. I thought she said that her bills didn't exceed the deductible. But we have it. We read it five minutes ago. That's why I was referring back to it. I don't have it in front of me.**
Q. (By Mr. Peirce) Okay. Look at Exhibit 29. This is July 13th, 2017, from Briana Miller to Bill Walls. "I believe the sum of proposals related to our hail damage will not exceed our deductible."
**A. Yes.**
Q. And so that's saying "the sum of proposals related to our hail damage." That's not saying she agrees it's under the 100,000, correct?

Page 137

MR. CAMPBELL: Object to form.
MR. PEIRCE: I'm not trying to trick you. I'm just using the words on the paper here.
**A. She is saying --**
Q. (By Mr. Peirce) I literally read what she said. Do you agree that she said that?
**A. "I believe the sum of proposals related to our hail damage will not exceed our deductible."**
Q. Correct.
**A. And you're asking me if she thinks --**
Q. I was asking you what Bill Walls wrote to Kaho Chan was accurate, that the insured agreed the loss was under -- below the hail deductible of 100,000.
**A. Not that she agreed to it, she told us it was.**
Q. She said "the sum of the proposal," correct, not the loss? Those were her actual words. I'm not trying to parse words with you. That's what it says on the paper, correct?
**A. It says, "I believe the sum of the proposals related to our hail damage will not exceed our deductible." And that's when he offers, "Will RDA Management be withdrawing their claim? Or in the alternative, if RDA Management will submit these estimates" --**
MR. PEIRCE: Anyway, we'll let the -- we'll

Page 138

let the --
**THE WITNESS: I'm not -- I'm not reading that she has any further damage beyond these estimates. If that -- if you're seeing somewhere that she says that there's other damage beyond these estimates, I'm -- I'm not reading that here.**
MR. PEIRCE: Yeah. We'll go ahead and move -- I'm going to object as nonresponsive. We'll go ahead and move on, Mr. Schwier. The documents speak for themselves, I think. The -- the jury can parse the words.
Q. (By Mr. Peirce) Do you know how much Haag charged to inspect the hotel in 2017?
**A. I don't recall the bills in the file. I don't recall the exact amount.**
Q. Any reason to dispute it was $2,700?
**A. No.**
Q. Walls said, when he inspected on May 25th, 2017, he discussed the findings of his inspection with Hudson. Do you recall what those findings were?
**A. I'm sorry. Can you repeat that?**
Q. Sure. Bill Walls inspected the hotel on May 25th, 2017. And then he reported having a conversation with Hudson after that inspection. Does Hudson know what the conversation entailed?

Page 139

**A. If it was in the notes, I'd have to refer to the notes. But I don't -- I don't know what the conversation was about. I don't recall.**
**THE WITNESS: Is this a good time for -- it's 2:30. Is this a good time to take a little break, or...**
MR. PEIRCE: What do you envision? Are you talking about a more than ten-minute break?
**THE WITNESS: I don't -- I was -- at some point today, I would like to eat lunch. But I'm kind of on the side of a highway area. I don't know. So I don't know really where I'd go. But it's 2:30 here. I mean, are we going to be -- if we're going till 5:00, I'd like to eat lunch before 5 o'clock.**
MR. CAMPBELL: We're not going to go to 5:00. Dave, just so you know, there's a five-hour limitation on the deposition. And we've been at it for about 3 hours and 15 minutes when we take the first break out of it. So we have no more than another hour and 45 minutes at most.
MR. PEIRCE: Ms. Court Reporter, what do you have for the official time?
THE COURT REPORTER: Mr. Miller, do you have the time?
THE VIDEOGRAPHER: Hang on just a second.

Page 140

I can calculate it up.
MR. PEIRCE: Well, we can go off the record while we're calculating the time and discuss what we want to do for a break.
THE VIDEOGRAPHER: All right. We're off the record at 2:27 Eastern Time.
(Break taken from 1:27 p.m. CST to 2:14 p.m. CST.)
THE VIDEOGRAPHER: All right. This begins Segment No. 3 of the testimony of David Schwier. We're back on the record at 3:14 Eastern Time.
Q. (By Mr. Peirce) Mr. Schwier, can you look at Exhibit 26? It's the 2017 Haag report.
**A. Yes, I have it.**
Q. How many total photographs did Haag provide with regard to its investigation in 2017? If you scroll to the bottom on Page 30.
**A. As soon as I start scrolling, it freezes on me. One second.**
Q. Are you still frozen?
**A. Yeah. No. No. It's scrolling down now. Just it's going one page at a time. There we go. I just got to the bottom. It looks like 33 in Attachment C and one in Attachment A, so 34.**
Q. Okay. 34 pictures were provided to Hudson by

Page 141

the engineer retained by Cunningham Lindsey in 2017, correct?

**A. Yes, in this report.**

Q. And those were all the photographs that were reviewed by Hudson prior to making its coverage decision in 2017, correct?

MR. CAMPBELL: Object to form.

**A. I believe -- I believe so, yes.**

Q. (By Mr. Peirce) And if you look at Page 15 of 30, Photo No. 4, that's a photograph depicting hail dents going up the trim of the west elevation, correct?

**A. I'm sorry. I didn't see pictures in here. It's moving really slowly. Which one were you on?**

Q. 4.

**A. Page 15?**

Q. Yeah, Page 15 of 30, No. 4.

**A. Got it. Yes. There is dents on the left side of the aluminum column going up.**

Q. Yeah. It goes all the way up. You can see dents, correct?

**A. Yeah. Yes.**

Q. And those were identified by the engineer hired by Hudson as hail dents related to the storm, correct?

**A. Yes.**

Q. And that is direct physical loss covered by the

Page 142

policy, correct?

**A. Yes.**

Q. Can Hudson tell the jury how many seals of the windows of the hotel were damaged by the May 8th, 2017, storm?

**A. How many -- what are you referring to as seals?**

Q. Well, does Hudson know what seals of the windows are?

**A. The seals around the windows?**

Q. Right. So how many -- how many locations were seals around the windows damaged by hail from the May 8th, 2017, storm, according to Hudson?

**A. I don't know.**

(Exhibit 31 introduced.)

MR. PEIRCE: If you look at Exhibit 31, Mr. Schwier.

**THE WITNESS: Is that the one I'm on?**

MR. PEIRCE: No.

**THE WITNESS: No.**

MR. PEIRCE: You're on 26.

**THE WITNESS: Okay.**

Q. (By Mr. Peirce) Are you there?

**A. Okay. Yeah. I got 31.**

Q. So on August 7, 2017, Bill Walls was advised by the agent for my clients that they were reporting more

Page 143

damages being discovered and the amount of work was escalating. And Bill Walls e-mails Briana on that -- August 7th, 2017, and says, "Please advise if the newly discovered damages will exceed the 100,000 hail deductible and forward all the vendor estimates/invoices to our attention." And that happened on August 7th, correct?

**A. Yes.**

Q. Is it Hudson's position the insured is required to determine that answer, whether the damages will exceed the $100,000 deductible?

**A. I believe Seagren had an invoice for repairing some of this work. And it sounds like he's asking if they have renewed their estimate.**

Q. I appreciate that answer, Mr. Schwier. That wasn't my question. Does Hudson believe it is the insured's responsibility to determine if the discovered damages will exceed the deductible?

**A. No. We can determine that.**

Q. So as of the first report, the estimated building damage was less than the 100,000 deductible. And then subsequent to that, in October, it was 145,553.25, correct?

**A. Yes.**

Q. And what -- what additional investigation did

Page 144

Hudson do between July 26th and October to make that change and a determination?

**A. I'm not sure I understand the question. We --**

Q. Sure. Did -- did Hudson reinspect the property from July 26th, 2017, until October 10th, 2017?

**A. I don't believe so.**

Q. The only thing that Hudson did was receive new damage estimates from vendors of my clients, correct?

**A. Right. When you're working within your deductible, if you have bills, if you don't think they're going to top the deductible, you just pay them yourself. You don't need to involve the insurance carrier.**

MR. PEIRCE: Objection as nonresponsive after "right."

Q. (By Mr. Peirce) If you look at Exhibit 32 --

MR. CAMPBELL: And just for the record, since this is a discovery deposition, I don't believe that there is a valid objection as nonresponsive.

MR. PEIRCE: And I don't --

MR. CAMPBELL: You can go ahead.

MR. PEIRCE: Mr. Campbell, you can object however you want. But I don't know that -- I don't know what you're referring to as a discovery deposition.

MR. CAMPBELL: This is a discovery

deposition.
MR. PEIRCE: Why are you -- I mean, under what rule?
MR. CAMPBELL: Because you have not designated it as a deposition to preserve testimony, it is therefore a discovery deposition.
MR. PEIRCE: You can preserve however many objections you want to preserve, Mr. Campbell. I'm just going to forward on.
Q. (By Mr. Peirce) So if you could look at Exhibit 30 --
MR. CAMPBELL: I know. I just -- but that's why I made the objection for the record.
MR. PEIRCE: Okay.
MR. CAMPBELL: You can go ahead.
MR. PEIRCE: Fair enough. Your objection is noted.
(Exhibit 32 introduced.)
Q. (By Mr Peirce) Exhibit 32, Mr. Schwier, do you have that in front of you?
**A. Okay. I have it.**
Q. Do you have it in front of you?
**A. Yes.**
Q. And this is the first report dated October 10th, 2017, by Cunningham Lindsey. Do you have



any idea why it's called "first report"?
**A. No.**
Q. So this was authored by Ryan Walls, right?
**A. Yes.**
Q. And the damage -- the damages were now estimated at 146,799.42, correct?
**A. That's correct.**
Q. That would exceed the deductible of 100,000, correct?
**A. Correct.**
Q. And this report determined the net claim for RDA, after application of the deductible and nonrecoverable depreciation, was $1,500, some odd dollars, 1,578.66, correct?
**A. That's correct.**
Q. And if you scroll to the back of this report, the last five pages, how many photographs are submitted to Hudson in support of this report?
**A. It's -- it's loading. One second. I can see the one with hail splatter. And then it -- I'm on page -- okay. One, two. Is Page 17 blank?**
Q. Page 17 is a photograph. There's five photographs, Mr. Schwier. I mean --
**A. I'll take your word for it. Yeah. Nothing past Page -- there's -- there's something wrong with the**



**size of them. They're not -- they're coming up very large on my screen.**
Q. So five photographs submitted by Ryan Walls from Cunningham Lindsey where he changes the damage estimate from less than the deductible to an RCV of $146,000, and no inspection was done in the interim. It was simply additional vendor invoices that were submitted by my clients that changed that number, correct?
**A. Correct. This is with the vendor invoices. It's the total of the vendor invoices that are attached to the report.**
Q. Right. And Hudson agrees that all the vendor invoices attached to this report that's Exhibit 32 are covered damages from the hailstorm on May 8th, 2017, correct?
**A. Yes.**
Q. Does Hudson know how many square feet of glazing is on this hotel?
**A. No, I do not.**
Q. Does Hudson know, either through itself or its retained experts, how many -- how many feet of the glazing that was actually analyzed for hail damage from the May 8th, 2017, storm?
**A. I don't recall seeing that in the reports.**



Q. Did Hudson ever ask the experts that were retained for this information?
**A. I don't know.**
(Exhibit 33 introduced.)
Q. (By Mr. Peirce) If you could look at Exhibit 33, Mr. Schwier. This is an e-mail from Bill Walls to Briana Miller dated October 13, 2017. Do you see that?
**A. Yes.**
Q. And we -- it says, "Briana, we attach a proof -- final proof of loss in the net amount of 1,578.66." That number matches the amount after subtraction of depreciation, nonrecoverable depreciation, and the -- the estimate as outlined by Ryan Walls, correct, that we just looked at?
**A. I read that. I saw that first sentence you read. And then I didn't see where you read the rest of that. I read, "We attach" --**
Q. Well, the report we were just looking at that was called first report that was drafted by Ryan Walls, it says the net amount is 1,578.66 after application of the deductible and nonrecoverable depreciation. The RCV value was 146,000-some-odd dollars. Is that --
**A. Okay. I thought you were reading from this e-mail. I didn't see that written in here.**

Page 149

Q. No, no.
**A. You're reading from the last exhibit.**
Q. Yeah.
**A. Okay.**
Q. In the e-mail, I'm referring to the proof of loss number matching that number we just talked about, the 1,500 --
**A. I see. I see. Yes. $1,576.66.**
Q. And the statement of loss provides -- in Mr. Walls' e-mail, it says, "The statement of loss provides an outline as to how we determine the loss using the invoices provided by RDA Management," correct?
**A. Yes.**
Q. And that's how the -- that's how the damage number was configured by Hudson. It was using the invoices provided by RDA Management, correct?
**A. Yeah. Their -- all their vendors sent invoices. We reviewed them. And we credited them at 100 percent value and added them up. And that's -- they came up with that top number. And we did the math straight down.**
Q. Right. But my question was, that's how the determination of loss was estimated by Hudson using the invoices provided by RDA Management. That's a simple yes, right?

Page 150

**A. Yes. Their vendors -- we took all their vendor invoices and totaled them.**
Q. If you look at the --
MR. PEIRCE: And I'm going to object after "yes" as nonresponsive.
(Exhibit 34 introduced.)
Q. (By Mr. Peirce) If you look at the Exhibit 34, this is the e-mail to Walls from Briana Miller the next day. And Ms. Miller says, "The reason they're cancelling the insurance claim entirely is since they will be incurring all expenses," correct?
**A. Okay. The bottom is Bill Walls to her. And then she replies.**
Q. October 18th, 2017, at 1:20 p.m.
**A. Right. "Hello, Bill. Thank you for sending this over. We would like to cancel this insurance claim entirely since we will be incurring all expenses. If you need additional information, please contact John Bresnahan at," and his phone number.**
Q. Mr. Schwier, from looking at the analysis that was done by the Hudson retained experts, how many windows are comprised of a typical hotel room in the hotel?
**A. Well, each set, they have the sliding window. And then you have the -- the two glass things beneath**

Page 151

**them. That's the spandrels, I think they're called.**
Q. Yeah. There's two spandrels, a sliding window, and an insulated vision, as -- at least as outlined by J.S. Held, correct?
**A. Yes.**
Q. That's four -- essentially four windows in each room, if you call them windows. Spandrels, glass, whatever you want to call them, there's four of them, correct?
**A. Yes, four pieces of glass.**
Q. Yeah. And if there's 242 rooms and then additional boardrooms and meeting rooms, approximately over 1,000 windows in the hotel?
**A. Yes, possibly.**
Q. And does Hudson have any idea, through any of its experts, how many were actually inspected in 2017?
**A. I think a couple of the -- I think a couple windows were broken that were replaced. I'd have to look at the invoices. There were invoices for broken windows.**
Q. So of the over 1,000 windows in the hotel, maybe a handful were inspected by Hudson in 2017. Is that fair?
**A. Yeah, the ones that we were pointed to that had damage.**

Page 152

Q. Would the same answer apply to the actual sealants of the windows as far as how many were inspected by Hudson in 2017? Maybe a handful?
**A. Yes. There were invoices -- there were -- there was an invoice for the bug seals. Is that what you're talking about? Or the other -- I'm not -- when you say "seals," I'm not sure which seals you're talking about.**
Q. Well, we can refer to bug seals. We can refer to any part of the window, the gaskets, the sealants on the outside of the window. How many windows were examined on the exterior of the property in 2017 by experts retained by Hudson, not retained vendors of my client, experts retained by Hudson?
**A. I don't know.**
Q. What about interior hotel rooms? In 2017, how many interior hotel rooms were actually inspected by experts retained only by Hudson in 2017?
**A. I don't recall seeing anything about indoor rooms being an issue or being inspected.**
Q. So zero hotel rooms were inspected by Hudson Insurance retained experts in 2017, correct?
**A. From what I'm aware of, yes.**
Q. On April 19th, 2019, Hudson received a sworn proof of loss, loss evaluation report, and expert

reports, as well as a letter of rep from a licensed public adjuster Kevin Aguilar, correct?

**A. Yes.**

Q. And Mr. -- Mr. Aguilar had attached to his proof of loss a damage estimate, as well as a forensic meteorology report, an engineer report from an HVAC mechanical expert, and some other documents, correct?

**A. Yes.**

Q. And that was the estimate of damage we were referring to earlier over $17 million, correct?

**A. Yes.**

Q. And after receiving that, Hudson hired Andrew Larson, who was formerly with Cunningham Lindsey, was now with Crawford, to analyze the claim for damage -- damages, correct?

**A. That's correct.**

Q. And various experts were subsequently hired from J.S. Held, including Drew Houser, Jeffrey Anderson, Jocelyn Hoffmeyer. And Haag engineer Matthew Sitzmann was reenlisted to go look at the property again, correct?

**A. Yes. That's correct.**

Q. What was the purpose from Hudson Insurance Company to reinspect the hotel by all these experts?

**A. The same as the first time around. We received**



**a claim in. It mentioned specific damage. So Bill Walls went there. Saw he needed a roof expert. So he hired a roof expert. When we got the new report, it mentioned different types of damage. So we hired our adjuster, and they hired experts in those fields.**

Q. So was the instruction to go look at it and determine the scope of damage from the May 8th, 2017, hailstorm?

**A. Yes.**

(Exhibit 36 introduced.)

Q. (By Mr. Peirce) So if you look at Exhibit 36, Mr. Schwier.

**A. I'm here. I got it.**

Q. Okay. This is an e-mail from Hudson claim handler Kaho Chan to Andrew Larson on May 7th of 2019. This is, like, three weeks after getting the Aguilar estimate and sworn proof of loss. He states the purpose was to -- was for RDA Management to identify additional damage that was not pointed out to Haag during the initial inspection. And that's underlined, correct?

**A. Yes.**

Q. And that's emphasized by Kaho Chan to Andrew Larson, the new adjuster, correct?

**A. Correct.**

Q. I'm a little bit confused by that instruction



in that was there an understanding that the insured was pointing out all of the alleged damage to Haag Engineering in 2017?

**A. Well, let's review the e-mail that it's responding to below. He's writing to Kaho, and he says, "Please find the attached budget for J.S. Held building consultants and engineering services. This budget appears to be very comprehensive and includes services or fees related to cause and origin investigation as well as repair consulting of water intrusion, curtain wall components, mechanical systems, and stucco systems. I spoke with Drew Houser of J.S. Held last week and understand their first availability of an inspection is May or June. Matt Sitzmann is going to reinspect. And pending receipt of the Haag budget for your approval of the J.S. Held and Haag budgets, I will prepare a preliminary request for information to include documentation, including a request from the ROR, that will assist us and our consultants in analyzing the claims." So that's the statement that he is referring to.**

Q. Great. That had nothing to do with the question that I asked you, though. The question was, was RDA required to point out all of the damages to Haag Engineering in 2017, according to Hudson?



**A. Well, when we went there and we met with the building engineer and the general manager and the -- their vendors, we asked what the problem is. And they point at the ceiling, and they point at broken windows. The items in the Aguilar report are different items. They're -- some of them are on different sides of the building. So, yes, there are -- there are items that were not pointed out. They are additional damages that were not pointed out to Haag during the initial loss inspection.**

Q. Was Haag the adjuster on the loss? Was Haag communicating with Briana Miller of RDA or John Bresnahan?

**A. No. I think that's shorthand. I think he meant Cunningham Lindsey and Haag. But he's just saying Haag here. I think he means everybody.**

Q. So the purpose was to -- for RDA to identify to these new set of experts and this new adjuster damages that were not pointed out to Haag and/or Cunningham Lindsey, even though it doesn't say that, during the initial loss inspection; is that right?

**A. Right. I think this followed an information request. I'm not sure if our information request -- it sounds like it predated this e-mail. So we're waiting for additional information from them.**

Page 157

Q. And just to be fair, you did have an entirely line item estimate of damages and a proof of loss in support of that number by -- I don't know -- three weeks before this, correct?

**A. Was that the Aguilar report?**

Q. Right, and the estimate, line by line items.

**A. Yes. And I think Kaho requested additional information.**

Q. How did Kaho request additional information? In a letter?

**A. I think he -- I think he sent a letter with several questions. I don't know if it was before this e-mail or afterwards. But I know he requested additional information at some point.**

Q. At some point?

**A. Yeah. It was around this time.**

Q. Has Hudson Insurance ever evaluated the entire hotel property for any direct physical loss or damage from hail from the May 8th, 2017, storm?

**A. I'm not sure if I -- when you say "the entire property," I'm not sure what you mean.**

Q. I'm using plain English. I'm not trying to be facetious. The entire property meaning all areas of the property. Did Hudson ever do an independent evaluation irrespective of any pointing out or directing of damage

Page 158

by my clients? Did Hudson ever do an independent, full, and entire investigation of the hotel property for direct physical loss or damage from hail from the May 8th, 2017, storm?

**A. The J.S. Held evaluation with Haag in 2019 was pretty comprehensive. But I don't know if that fits your definition of "entire."**

Q. Well, we'll talk about how comprehensive it was. But I'm asking you a question. You're Hudson Insurance Company. I am wanting to know has Hudson Insurance Company inspected the entire property for direct physical loss or damage from hail caused by the May 8th, 2017, storm?

**A. We inspected every part of the property that we thought could have been impacted by hail --**

Q. Did that include --

**A. -- in the storm of -- I'm sorry. Did -- did you want me to finish, or...**

Q. No. Go ahead. I didn't know you weren't finished.

**A. That -- that's all right. No. Continue.**

(Exhibit 37 introduced.)

MR. PEIRCE: So let's look at the Exhibit 37, which is the J.S. Held combined report that was prepared after the inspection done on June 6th,

Page 159

2019.

**THE WITNESS: No. 37?**

MR. PEIRCE: Correct.

**THE WITNESS: Okay.**

Q. (By Mr. Peirce) So J.S. Held, under Kaho Chan's direction to Andrew Larson, reinspects the property over several days in June of 2019, correct?

**A. Does it say the date here they went? Yeah. I believe it was June 25th and 26th.**

Q. June 25th and 26th. Okay. Did they inspect it on --

**A. I'm looking for it, but I don't see in -- yeah. It looks like on Page 4, it identifies when everybody visited. And it was some on the 25th; some on the 26th.**

Q. Okay. And then they authored this report jointly on August 9th, 2019, correct? Is that correct?

**THE WITNESS: I'm just scrolling up to the date.**

MR. PEIRCE: Oh, okay.

**A. Yes. It's August 9th, 2019.**

Q. (By Mr. Peirce) And this was the report that, including the estimate at the end of the report, that Hudson used to make its coverage decision in 2019 of paying the 238,000-some-odd dollars, correct?

**A. Yes. There was this report. I think there was**

Page 160

**an additional Haag report. There may have been a Crawford report also.**

Q. So the Crawford report that we already looked at that implemented these findings from J.S. Held and Haag? That's the one you're referring to?

**A. I'm sorry. I couldn't hear you.**

Q. You're referring to the report that we already looked at, the Crawford report, final report that incorporated the J.S. Held findings we're looking at right now, and the Matthew Sitzmann findings. Is that the one you're talking about, the Crawford?

**A. Yeah. Yes. I believe so, yes.**

Q. Okay. And this is -- this is what -- in combination with this report, the Sitzmann reports, and the Crawford report, that's in toto what Hudson is relying on to issue its coverage decision in 2019, correct?

**A. Yes, I believe so.**

Q. And J.S. Held reports that in this report, Exhibit 37, it did not examine the full extent of the north-facing curtain wall, correct?

MR. CAMPBELL: Object to form.

**A. Yes. They discuss it.**

Q. (By Mr. Peirce) They did not evaluate the areas of the second level curtain wall located under a cover

Page 161

of protection, correct?
**A. I don't think I answered your first question yet.**
Q. I thought you said yes?
**A. No. I said I'm checking.**
Q. Okay.
**A. So you're looking at the north face. I don't know if it's in this report or a later report after we made the payment. But they discussed the different sides of the building and what they looked at.**
Q. See Page 7. "Due to the uneven slope of the surface of the parking lot on the north side of the hotel, we were unable to access the full extents of the north-facing curtain wall." And they talk about what they couldn't see from the pool area.
**A. Yes. Yes.**
Q. So J.S. Held didn't look at the full extents -- I think it's "extent" -- but extents of the north-facing curtain wall. Of the 242 rooms of the hotel, J.S. Held examined the interior of 35 west-facing rooms and 36 east-facing rooms, correct?
**A. That sounds correct. Yes.**
Q. And the purpose, according to J.S. Held in this very report, Exhibit 37, is that they wanted to evaluate as many rooms as possible, correct?

Page 162

**A. Yes. They were looking for -- they were comparing the water damage in the west side where the storm impact was with the east side where they didn't believe there was any storm impact to see if there was similar water damage.**
Q. Right. So they looked at 29 percent of the total rooms of the hotel, correct?
**A. Yes. I assume they thought that was a big enough sample.**
Q. I'm sorry?
**A. I'm sorry. Go head. Oh, no. I was still speaking. I'm assume -- I'm assuming they thought that was a large enough sample size. But I don't -- I don't know why they would look at that many.**
Q. Does Hudson believe that's a large enough sample size to determine which side of the building had more water intrusion?
**A. I think their results -- the results show that they were consistent in the amount of water damage between the two.**
Q. But yet there remains 71 percent of the rooms to look at to make a determination on that point, correct?
**A. Yeah.**
Q. And J.S. Held, through Hudson, determined -- or

Page 163

Hudson, through J.S. Held, determined that nearly all of the sill covers on the west-facing curtain wall exhibited fractures due to hailstone impacts, correct?
**A. Yes.**
Q. And 29 out of the 35 west-facing rooms showed water intrusion, correct?
**A. That's correct.**
Q. Meaning out of the 29 rooms that J.S. Held looked at -- I mean out of the 35 they looked at, 29 had water intrusion, correct?
**A. Yes. It was about the same as on the east side.**
Q. Let me ask you this. As far as the determination of what was the cause of the water intrusion on all of these rooms, did J.S. Held make that determination as to each room?
**A. They drew conclusions that are in their report. They -- basically, they -- if you look at their photographs, they have various things that are shrinking and peeling and different things in the different windows that they bring up as causes.**
Q. Did they make the determination as to each room what was the source of the water intrusion?
**A. I don't know if they did it on each one. But they did it with a number of them.**

Page 164

Q. Did Hudson ever investigate whether the water intruded into the hotel from the broken sill covers on all of the nearly west-facing windows that J.S. Held found were fractured?
MR. CAMPBELL: Object to foundation.
**A. Did we -- J.S. Held found them fractured, yes.**
Q. (By Mr. Peirce) Did J.S. Held do any cause and origin investigation to determine if water that went into those fractured window sills that they did find intruded the hotel in any capacity?
MR. CAMPBELL: Object to form.
**A. I don't think they concluded that the water that came in -- that could have come in through those sills would have gotten into the rooms.**
Q. (By Mr. Peirce) They didn't conclude that one way or the other, correct?
MR. CAMPBELL: Object to form.
**A. I thought they may have concluded that it didn't.**
Q. (By Mr. Peirce) They concluded that the -- can you point in the report, Exhibit 37, where it says that?
MR. CAMPBELL: I'll object to that question. It's a very detailed, lengthy report. I don't think that's a fair question.
**THE WITNESS: I'll look at it.**

Page 165

Q. (By Mr. Peirce) Well, you're Hudson Insurance Company. You tell -- Hudson tell me, is it your position, as Hudson Insurance Company, that J.S. Held determined the cause and origin of the water intrusion into all 71 rooms that they inspected?
**A. I -- they looked at all -- in the 71 rooms they inspected, to the best of my knowledge, they did not find any of the water damage was caused by hail.**
Q. And your position is that they determined the cause and origin was not from hail in each of those 71 rooms, correct?
**A. That's my understanding, yes. If it would have been from hail, I think they would have added it to their -- their damage assessment.**
Q. Why did it take Hudson over four months to investigate the loss from receipt of the proof of loss on April 19th, 2010? I mean 20 --
**A. '19 or '20?**
Q. Sorry. April 19th, 2019. Why did it take over four months for Hudson to reinvestigate and issue payment?
**A. It's a big proof of loss. They -- you can see it's an extensive investigation that took place. I think four months for an investigation of that size is pretty reasonable.**

Page 166

Q. It took two and a half days, correct?
**A. The -- the review of the site took two and a half days.**
Q. And it took -- your position is it took an additional three and a half months to issue a report?
**A. Yeah. I think it was being interpreted. I think we requested information at some point in there. We requested additional information. I have to look at the file.**
Q. Did J.S. Held make its determination on discernible permanent physical change caused by hail with respect to reporting hail damage to Hudson?
**A. Yes. They found hail damage.**
Q. Right. That wasn't my question. Did -- did J.S. Held use the definition of "hail damage" as discernible permanent physical change to the property to report hail damage to Hudson Insurance?
**A. I don't recall that specific language. But it might be in there.**
Q. And again, as we discussed, that's not what the policy states, correct?
MR. CAMPBELL: Object to form.
**A. Correct.**
Q. (By Mr. Peirce) Are you aware that J.S. Held used that definition to determine the amount of repair

Page 167

costs?
**A. They might have.**
Q. I'm sorry?
**A. They might have.**
(Exhibit 38 introduced.)
Q. (By Mr. Peirce) So if you look at Exhibit 38, that's the Joseph Guidice estimate; is that correct?
**A. Yes.**
Q. And Guidice found -- this is -- this is the basis of the payment, correct, from Hudson in 2019?
**A. Yes. This was also in the back of the J.S. Held report, I believe.**
MR. PEIRCE: Right. This is just separated out.
**THE WITNESS: Okay. It's the same thing?**
MR. PEIRCE: Yeah, it's the same one.
**THE WITNESS: Okay.**
MR. PEIRCE: It's just separated out as a different exhibit.
Q. (By Mr. Peirce) And this is a final determination of 365,217.88 if depreciation is recovered, correct?
**A. Correct.**
Q. And Mr. Guidice found that the -- the damages to the roof were 171,685?

Page 168

**A. That's correct.**
Q. And that was not the number that was evaluated in 2017; is that correct?
**A. That's correct.**
Q. I guess the question is: Why wasn't this determined in 2017 if the roof was investigated?
**A. Well, it's a -- it's a different calculation. He's taking a much smaller -- we go through them -- I guess we go through them first at a time here. I think the cap flashing that he -- that he puts in here, it was -- it was dented. And I think the Haag report said it's dented -- dented, but it still serves its purpose. And this -- he actually has it replace -- replacing it minus depreciation. For the next one, the skylight, that's the Seagren bill. He takes a smaller depreciation for the skylight. So that number is larger.**
**And then I'm -- yeah. He calls them both skylights. I think one of these -- I think that might be -- the pool vault. That might not be the skylight. But the No. 10, the skylight bid, we replaced the one with the hole in it. And he has all nine down here. I believe the one with the hole was already replaced by the time he reviewed this. But in his estimate, he replaces all nine rather than just the one.**

Page 169

**It was subject to -- then it says on the bottom here, "This item is pending roof evaluation findings by Haag Engineering." So what I believe happened was he took these numbers and supplied them to Haag. And we kept them in.**

Q. Right. So you said a lot there. The question I had was, was Haag looked at the roof, including the cap flashing, back in 2017. Why wasn't it included as a damage element in 2017?

**A. I believe they said that anything that had to be replaced. It was just dented, but it was still functioning.**

Q. So again, as we talked about, policy doesn't require functional damage, correct?

**A. That's correct.**

MR. CAMPBELL: Object to form.

Q. (By Mr. Peirce) And that should have been paid in 2017, correct?

MR. CAMPBELL: Object to form.

**A. I don't know if it should have been. I mean, you're talking about some flashing on a roof. If it's still functional, they may not want to replace it.**

Q. (By Mr. Peirce) So is it Hudson's position that if cap flashing is functionally not damaged, it is not recoverable under the policy from hail?

Page 170

**A. No. But it wasn't -- I -- I think at the point in time, it was just as I said, that it was damaged but functional.**

Q. All right. So -- okay. Where is the identity of the 126 window sills that were fractured by hail on the west side of the building that J.S. Held found in this estimate on Exhibit 38?

**A. I think they're -- they're combined in with something. I'm not sure what. I'm not sure where they included them.**

Q. Cannot point me to that in this five-page estimate or seven-page estimate?

**A. No. I don't -- I don't see it. I don't -- I don't see it broken out.**

Q. Is it true that J.S. Held observed hailstone impact indentations in the cap flashing on all four sides of the structure?

**A. That may be true.**

Q. And J.S. Held stated that indicated hailstones had fallen with sufficient force to create indentations into the sheet metal from all directions, including on the date of loss, correct?

**A. Yes. But they could have been from different storms.**

Q. Yeah. I get that. But did J.S. Held do any

Page 171

investigation into that?

**A. I don't know. They did mention in their report a handful of different hail events from -- I think the earliest one was 2009. And then there were -- there were a few more recent. And then one actually after the date of their investigation. So maybe there were six or seven hailstorms listed in -- in their report.**

Q. And Hudson acknowledges --

MR. PEIRCE: And I'm going to object as nonresponsive to that.

Q. (By Mr. Peirce) Hudson acknowledges that hail spatter marks fade over time in certain materials, correct?

**A. Yes.**

Q. And that's reported not only by J.S. Held to Hudson but by Haag to Hudson, correct, in their reports?

**A. I believe so, yes.**

Q. So when J.S. Held is looking at spatter marks in June of 2019, that's essentially two years after the date of loss, correct?

**A. Yes. But I believe it was also -- I think it was the last hailstorm. I don't think there was a storm since then. But there were some before then.**

MR. PEIRCE: Bear with me a second. Okay. From the May 8th -- if you look at Exhibit 37, this is

Page 172

Page 89 of 108. This is --

**THE WITNESS: No. 37?**

MR. PEIRCE: Yeah, 37, Page 89 of 108. This is a CoreLogic hail verification report that was --

**THE WITNESS: Just one second.**

MR. PEIRCE: -- part of J.S. Held's estimate.

**THE WITNESS: Just one second. It's giving me a little trouble here. Page 87?**

MR. PEIRCE: Right.

**THE WITNESS: Okay.**

MR. PEIRCE: 89. Page 89.

**THE WITNESS: Okay. It won't let me past 86 anyway. It's still loading. Now I'm at 87.**

MR. PEIRCE: Are you there?

**THE WITNESS: Yeah. It's coming down. It's because of all the pictures, it's just taking forever to load. And I'm almost there, though. I'm at 86 now. Okay. CoreLogic, Page 89. I'm here.**

Q. (By Mr. Peirce) Okay. So May 8th -- CoreLogic -- this is a report done May 28th, 2019, by, presumably, J.S. Held. It's part of their report. And it -- CoreLogic is, you know, an online storm event database. It talks about what hail is hitting at a location on a date and, you know, within a mile or three

miles or ten miles. So as far as this report, it was generated on May 28th, 2019. It goes back all the way to June 13th, 20 -- or 2009, correct, if you look at the next page?

**A. Yes.**

Q. And the biggest hail that hit this property in this approximate ten-year period was on the date of loss, correct?

**A. Yes.**

Q. And so the CoreLogic report is being relied on by J.S. Held, right?

**A. Yes, along with -- I think they did a couple of different -- they mention a couple of different things in their report. But, yes, they used this one.**

Q. Do you mean -- what do you mean a couple of different things? Weather?

**A. I -- yeah. I think they used -- they used -- there were -- there were some loss -- I forget what they call it. There were a couple of ground -- people on the ground within a couple miles that -- that had --**

Q. Right.

**A. -- measurable hail. I think they -- they might have used -- it's in their memo. They -- they go through in this memo and their rebuttal. In other words, they go through the various things that they --**



**they did to determine the size of the hail. I don't think it was just this report that they relied on.**

Q. Okay. But hail -- this gives an "at location." The other things you're talking about are from storm spotters at different locations, correct?

**A. Yeah. This one -- yeah. This one says "at location" on it. Correct.**

Q. Yeah. So there -- there is nothing indicating a hail event at the location from May 8th, 2017, until they ran the report, correct?

**A. Yeah. That's correct.**

Q. And so if J.S. Held is reporting that different sides of the building are getting hit by newer hail, do you have any idea what they're basing that on?

**A. I don't know if they said -- that was kind of the answer I was trying to say before, is I don't know if they were saying it was newer hail or just hail. And that's why I was referring back to this -- this study, is that there had been previous hailstorms. But the May 8th, 2017, had been the most recent. And I think I remember somewhere too there being one after they even looked at the property. So it's between now -- between when they looked at the property and now, I think there was a more recent one. But nothing between May 8th and when they looked at it like this shows.**



Q. So you're saying between May 28th and June 25th, you think there was a hail event?

**A. No. I'm sorry. I'm -- between May 8th, 2017, and when they looked at it, I don't believe there was a hail event. I think we're saying the same thing. Yeah.**

Q. And J.S. Held reported in this report, Exhibit 37, that the hail indentations on all four sides indicated hailstones had fallen with sufficient force to create indentations in the sheet metal from all directions. Indentations in sheet metal is a covered loss under the policy, assuming it's during a policy period from a covered peril of hail, correct?

**A. Correct. They just don't say which hailstorm it's from. They say it's hail damage, but they don't say when. So even if you had two -- if you had two, you know, not only might it not be part of -- in our policy period, you may have subject -- be subject to a separate $100,000 deductible even if it is during our policy period. That's why it's important for us to look at these, you know, right away.**

Q. Right. And Hudson did nothing to make that determination, whether it was --

MR. CAMPBELL: Object to form.

Q. (By Mr. Peirce) -- a 2015 storm or a 2016 storm. Which by the way, Hudson insured, correct, in



2016?

**A. Yeah. That was my point, is if there was a 2016 storm during the policy period, you might run into a situation where you have a second deductible. But it would still be potentially covered under our policy. But yet as far as I can tell, they weren't able to differentiate between any storms because it had been so long.**

Q. Well, I mean, isn't that kind of the point of why you do a comprehensive investigation in 2017 instead of waiting until 2019 to examine whether it was related to May 8th, 2017, or not? I mean, this was reported 14 days after the loss event, correct?

**A. Right. But for example, if you know that there was a hailstorm that came from the west and you're investigating leaks and broken windows, you wouldn't necessarily go around on the east side and say, "Hey, here's hail. When is this from?" It just doesn't sound like something --**

Q. Is it Hudson's position only one side of the building was hit by hail from the May 8th, 2017, storm?

**A. I think it came from the southwest. And there was -- there was some other damage found. But, I mean, it was basically -- the vast majority of the storm hit the west side.**

Q. So is it Hudson's position only the west side of the building was damaged from hail on May 8th, 2017?

**A. No. I think they found a little damage on the other parts. But it was definitely focused on wind-driven hail from the west southwest. And that's what the storm indicates.**

Q. Has Hudson reviewed the eyewitness testimony of the fact witness catty-corner across the street from the date of loss that's been taken in this cause?

**A. I don't believe so.**

Q. Is Hudson aware of the sides of the building --

**A. When --**

Q. -- that were reportedly hail damaged on the building catty-corner across the street from the Sheraton Denver West by this fact witness?

**THE WITNESS: When is the fact witness' report from?**

MR. PEIRCE: He's been deposed in the case. Your counsel was there.

**THE WITNESS: Okay. So it's recent?**

MR. PEIRCE: Yes.

**THE WITNESS: Okay.**

**A. No, I don't -- I don't think -- I don't think I reviewed it.**

Q. (By Mr. Peirce) And J.S. Held did observe hail



indentations to the north- and east-facing walls. That's correct, right?

**A. Yes, I believe they did. But they didn't attribute it -- I don't know if they attributed it to this storm or not.**

Q. They didn't determine that one way or the other, correct?

MR. CAMPBELL: Object to form.

**A. Yeah. I don't recall.**

Q. (By Mr. Peirce) J.S. Held determined that hail spatter marks were one-inch wide on the west-facing sliding wall and curtain walls, correct?

**A. Yes, I believe so.**

Q. J.S. Held observed three fractured spandrel lights on the west face of the curtain wall. These were 3 feet tall by 6 feet wide, correct?

**A. Yes, the glass windows.**

Q. J.S. Held observed hail spatter on the west-facing curtain wall cover caps, the frames, the rails, and the stiles of the sliding windows, correct?

**A. I believe so.**

Q. Is hail spatter considered any loss or damage under the terms of the Hudson policy?

**A. Just the mark that the -- if you're talking about just the -- the water mark, no, because I don't**



**think it's physical damage. I think it just wipes it off. If you're talking about the indentation, I think that's different.**

Q. Indentation is covered. A mark caused by hail that you can, quote, unquote, wipe off is not covered. Is that Hudson's --

**A. Well, yeah. I'm trying to -- I'm trying to differentiate. If you're -- you know, if it's a water mark and there's no -- there's no dent, you know, I think it just goes away. I don't -- I don't know if that's really property damage.**

Q. Well, what about spatter marks observed by J.S. Held on the west-facing facade wall in 2019 that they correlated to the May 8th, 2017, storm? Are those covered?

**A. If they caused indentations and they thought they had to be repaired, yes.**

MR. PEIRCE: Bear with me. If you could look at Exhibit 37. Strike that. Not 37. Hold on. Let me find it. 27.

**THE WITNESS: Okay.**

(Exhibit 27 introduced.)

MR. PEIRCE: Exhibit 27 is the second Haag report that was prepared by Matthew Sitzmann.

**THE WITNESS: Okay. I have a bunch of 27s.**



**Is there just a -- just regular 27?**

MR. PEIRCE: It should say, yeah, 27. The A, B, C, D, E, F is the exhibits to the Haag report.

**THE WITNESS: Okay. So just 20 -- Exhibit 27, no letter?**

MR. PEIRCE: Yeah, just the report.

**THE WITNESS: Okay. Okay. I got it.**

Q. (By Mr. Peirce) Okay. Do you see the Page 2?

**A. Yes.**

Q. First paragraph says -- and it's directed to Andrew Larson of Crawford -- "In accordance with your request, we inspected the Sheraton Denver West Hotel to determine the extent of hail-caused damage to the roof from a storm on May 8th, 2017. We inspected the hotel on June 25th, 2019." It states, "We had inspected the hotel roof previously on June 7th, 2017, to determine the cause of water intrusion at a bank of skylights above the lobby." Does that kind of illuminate what the actual scope of Mr. Sitzmann's evaluation in 2017 was?

**A. I think that was the reason he went there. I don't think it's -- I -- I think for -- it's not being made to be an exhaustive list of what he's done. It's just saying that's why he went there.**

Q. Was it -- in Hudson's mind, did Matthew Sitzmann evaluate the entire roofing surface, including

all levels of the roof, in 2017, or is it Hudson's position he didn't do the full evaluation? He just looked at certain things that were pointed out by the insured?

MR. CAMPBELL: Object to form.

**A. Well, I think it's -- I think it's more the latter. And he looked at -- he met with the insured and met with the vendors and the building engineer. And they walked him around and pointed things out. And he looked at other things while he was up there. He was being guided by them, yes.**

Q. (By Mr. Peirce) But the only thing that Hudson can go off of with regard to the scope of the Sitzmann evaluation is what Sitzmann reported to Hudson through his reports, correct?

**A. Yeah, and any -- yes, and any conversations he had with either Cunningham Lindsey or us.**

Q. Well, I mean, we've already established that Hudson makes the coverage decision, correct?

**A. That's correct.**

Q. So Hudson can only rely on the information it has. And you're saying that, "Well, there may have been some information relayed from Bill Walls to Kaho Chan from Matthew Sitzmann as to the scope of his evaluation in 2017, but I don't really know." That's really the



answer there?

**A. Well, I'm -- I'm just saying that there may have been discussions at that time that I am unaware of. Right.**

Q. But there's no indication of a discussion between Kaho Chan and Matthew Sitzmann one on one, is there?

**A. No, not that I saw.**

Q. Mr. Sitzmann, in this 2019 -- August 22nd, 2019, report that's Exhibit 27, determined he found 2.5-inch wide dents over two years after the loss, correct?

**A. 2-inch wide dents. Are you talking about the -- are you talking -- there's spatter marks. Or what -- what page are you referring to?**

Q. Let me see if I can find it. Might have spelled it.

**A. The bottom of Page 5. No. That's --**

Q. Page 2 at the bottom.

**A. It's Page 2 on the bottom?**

Q. Yeah. "The largest" -- he's talking about the "caps of powered vents on the roof were dented by hail. The largest dents were approximately 2 and a half inches wide at their base."

**A. Yes.**



Q. Does Hudson have any idea what kind of hail causes 2 and a half inch wide dents at the base of the vents?

**A. And the sentence after that said, "Some deformations were larger when multiple hailstorms struck -- had struck nearby to one another."**

Q. Yeah. Is there any --

**A. Repeat that. Yeah. "Deformations were larger where multiple hailstorms had struck nearby to one another," is the next sentence.**

Q. Now, where can I go to determine that multiple hailstones struck nearby one another to cause a 2 and a half inch wide dent? Meaning, it's one dent, not multiple dents next to each other. Is there any indication from this report that I can refer to a photograph for this position?

**A. Is there a photograph in the report about what position?**

Q. Yeah. Does Matthew Sitzmann reference anything with regard to this statement about the size of the dent and what caused it? Meaning he's extrapolated to me, and there were, you know, multiple hailstones struck nearby to one another. But he doesn't give us any kind of photograph to show us any kind of evidence with regard to that, correct?



**A. Right. And I -- I -- yeah. I don't think -- it's 112 pages. I don't know if there were.**

Q. Hudson was -- Mr. Sitzmann reported that the substrate of the EPDM membrane was dented beneath the membrane. Do you recall receiving that information from Sitzmann?

**A. In his 2019 report?**

Q. Correct.

**A. Yeah. He -- if we're talking about the same thing, he found that it was -- the material was dented below where the river rocks were. And it looked like, in some areas, the river rock had been cleared out of the way. And he was looking at it. And there was indentations. Is that what you're referring to?**

Q. Do you see on Page 3, at the bottom, the second to the last paragraph?

**A. Page 3 of the report. Second to last paragraph.**

Q. Last sentence.

**A. "We pressed -- we pressed the membrane with our fingertips in areas of sparse rock coverage. The substrate beneath the membrane was dented."**

Q. Is dented membrane a covered cause of loss from hail under the terms of the Hudson policy at issue?

MR. CAMPBELL: Object to form.

**A. When he -- when I read that, I thought he was saying that his fingertips dented the -- I read that as he pushed his fingertips in the area, and it dented the membrane. Maybe I'm just missing -- that's how I read that.**

Q. (By Mr. Peirce) So you're combining the two sentences to mean that he pressed on them causing the denting of the membrane?

**A. Yeah. I --**

Q. Did you ever --

**A. That's how I read it. I didn't read them as two separate ideas. What's it say before that? He walked, closely inspected the membrane areas. The EPDM was not -- the membrane was not torn by hail. "We pressed on the membrane with our fingers in areas of sparse rock coverage. The substrate beneath the membrane was dented." Maybe they are different ideas. I don't -- when I read it initially, I just thought he was denting it with his finger. And I wasn't sure what that exactly meant.**

MR. PEIRCE: I thought me made a conclusion. Hold on. If you look on Page -- Page 6 of 112 where he has his conclusions in his report.

**THE WITNESS: Okay. Yeah. I'm here.**

Q. (By Mr. Peirce) Do you see No. 3 where it says,



"There was not an effect from hail on the insulation that could be differentiated from the dents that were created normally from applying the ballast to the roof surface"?

**A. Yes.**

Q. Does that indicate that there were dents in the membrane, but he's kind of saying, "Well, you can't differentiate them between hail and the rocks covering the roof surface"?

**A. Yeah. I thought -- this goes back to what I was saying just before, is I think he found denting. When they moved the rocks, he found it denting. So he thought they were caused by the rocks. Because when he looked at bare areas in 2017, he didn't see any dents. He didn't see any tears on the bare material. But he did see these indentations where there were rocks. So he didn't think they were caused by hail. Because if they wasn't on the bare surface, you wouldn't expect it to be under the covered surface. That's how I read it.**

Q. Okay. But there are exposed portions of the EPDM membrane exposed to the elements on May 8th, 2017, correct?

**A. Yes. And I think he looked at those.**

Q. Regardless of whether you interpreted his report to say it was his finger or you can't tell



between what was caused by hail and what was caused by rocks, my question was, originally, if hail caused a dent in the membrane, is that covered under the Hudson policy?

MR. CAMPBELL: Object, form and foundation.

**A. So if a dent was caused but it didn't tear and it was from hail and not just the rocks, I guess it could be covered. Sure.**

Q. (By Mr. Peirce) Are you -- is that a question, or are you saying that is Hudson's position?

**A. I -- I'm getting caught up in your question. I -- I -- if what you're saying is if there is a dent in the membrane underneath the rocks that was caused by -- either we know it's caused by hail and not the rocks --**

Q. Or if it was caused by hail from an exposed surface, that -- just a dent, not a tear, is that covered under the terms of the policy?

**A. If it was from our storm and it's not wear and tear, it's from the hail, I -- I guess it would be covered.**

Q. Isn't -- isn't a dent --

MR. CAMPBELL: And let me just jump in here. I object to the form and foundation of that question.

Q. (By Mr. Peirce) Isn't a dent from hail in the



EPDM membrane physical damage, hypothetically, if it was from hail?

MR. CAMPBELL: Object to form and foundation.

MR. PEIRCE: Let me clean that up.

Q. (By Mr. Peirce) If there is a dent in the EPDM membrane and it was an exposed area not covered by ballast rocks, does Hudson consider that physical damage or loss under the terms of the policy?

MR. CAMPBELL: Object to form and foundation.

**A. If there's a -- if there's a dent in the material but it's not physically damaged, it's got the same capabilities that it did before, I don't --**

Q. (By Mr. Peirce) You're reading into my question with things that I didn't put in my question. The question was, if hail caused dents in exposed EPDM membrane, is that direct physical loss or damage under the terms of the Hudson policy?

MR. CAMPBELL: Object to form and foundation.

**A. It may be, yes.**

Q. (By Mr. Peirce) Just so I'm clear, Hudson did no investigation to determine what caused water intrusion to 71 percent of the rooms, correct?

Page 189

MR. CAMPBELL: Object. Object to form and foundation.
Q. (By Mr. Peirce) First of all, let me -- let me backtrack. Hudson did no investigation to determine if there was water intrusion into 71 percent of the rooms of the hotel, correct?
MR. CAMPBELL: Object to form and foundation.
**A. From what I -- from what I understand, J.S. Held looked at the 36 rooms of the one side -- it's about 70 rooms -- when they were looking at the water intrusion issue.**
Q. (By Mr. Peirce) They looked at how -- what percentage? I'm sorry.
**A. I think you said before it was 29 percent. I don't -- it was 70 or 71 of the 100 -- 245 rooms.**
Q. J.S. Held did find May 8th, 2017, hail hit the south-facing assembly, correct, of the building?
**A. I believe so, yes.**
Q. Would -- is it Hudson's position that hail-created spatter marks, from May 8th, 2017, would have faded on the sliding doors of the hotel by the time that J.S. Held inspected in June of 2019?
**A. They may have faded over the two years, yes.**
Q. If hail caused physical damage or loss to any

Page 190

of the gaskets in the windows, those would need to be replaced by material of like, kind, and quality under the terms of the Hudson policy, correct?
**A. If hail caused damage to the gasket, yeah, you would replace the gaskets.**
Q. Did Hudson do any evaluation as to how many gaskets were damaged by hail of the total hotel, of the entire hotel?
**A. I'm not sure.**
Q. Do you know what the replacement of like, kind, and quality of the curtain wall system would entail if necessary?
**A. I think it was in the Aguilar report.**
Q. But did Hudson do any investigation into it or just looked at the Aguilar report?
**A. I think J.S. Held had it in their estimate.**
Q. They had a complete replacement estimate for the curtain wall system?
**A. No. I think the only one with a complete replacement estimate was in the Aguilar report. Because the J.S. Held report doesn't contemplate the need for a complete replacement to repair the hail damage.**
Q. Do you know what -- who manufactured the -- the window system in the hotel?
**A. I don't believe I do.**

Page 191

Q. And when I say "you," I mean Hudson does not, correct?
**A. Yeah. Not as far as I know, no.**
Q. The reason for the coverage position that Hudson ultimately made was solely based on the experts that it hired, including J.S. Held, Haag, Crawford, and Cunningham Lindsey; is that correct?
**A. And our own review of the file. We don't take everything by -- we don't just take everything that we're handed and -- and pay it. We review it ourselves also.**
Q. But the only things you reviewed were what the experts submitted to you determining coverage, correct? That and the policy itself?
**A. And the vendor invoices that we previously received. I'm trying to think if there's anything else out there. But, you know, everything that you see in the file is what we looked at.**
Q. Okay. But that was -- everything I have that you have produced in your file is what you used to make the coverage determination, correct?
**A. Yes.**
Q. And the primary basis for making a coverage determination that the damage was not in the realm of what the Aguilar Construction estimate determined but

Page 192

that of J.S. Held was due to the fact that Hudson believed the majority of items included in the Aguilar Construction estimate were not covered under the terms of the policy, correct?
MR. CAMPBELL: Object to form.
**A. Correct. They weren't caused by this hailstorm in May of 2017.**
MR. PEIRCE: Okay. I will pass the witness.
MR. CAMPBELL: Mr. Schwier, I just have a few follow-up questions for you.

EXAMINATION

BY MR. CAMPBELL:
Q. You've been asked a number of questions concerning the scope of repair recommended by J.S. Held and their evaluation of what damage was caused by hail and what was not. What I'd like you to do is turn to Page 15 of Exhibit 37.
**THE WITNESS: Okay. Just one second. It takes a minute to load.**
MR. PEIRCE: Sure.
**THE WITNESS: Okay. I'm on Page 15.**
Q. (By Mr. Campbell) Okay. Well, one of the questions you were asked is whether J.S. Held evaluated the causation of interior water damage. Could you take

a look at that first full paragraph on Page 15 and read that paragraph to yourself?

**A. Sure.**

(Witness peruses document.)

**THE WITNESS: Okay.**

Q. (By Mr. Campbell) Isn't it, in fact, true that J.S. Held documented in their report their conclusion that the interior water damage was due to a lack of deferred maintenance and was not the result of the date of loss hail event?

MR. PEIRCE: Objection, leading. Objection, form.

**A. That's correct. The paragraph -- yes. That's correct. This paragraph states that it's due to -- it's deferred maintenance. And they go through -- they determine that through their observation of widespread shrinkage of gaskets, failed gaskets, embrittlement of sealant, adhesive failures, separation of metal components, failed repairs. And it was on both sides of the building.**

Q. (By Mr. Campbell) Another line of questioning was whether all of the parapet wall caps' flashing was the result of this particular hailstorm. Could you look at the first bullet point under the repair recommendation?



**A. Yes. I'm here.**

Q. And it -- it's fairly brief. Can you just read into the record what J.S. Held's conclusions were?

**A. Yes. It says, "The west- and south-facing cap flashing was dented, which includes approximately 392 linear feet of cap flashing. Although the east- and north-face cap flashing has also been dented by hailstone impacts, our -- it is our opinion that the east- and north-facing exterior walls were not impacted on May 8th, 2017, but were indented over time by other hail events."**

Q. So now that this has refreshed your recollection, are you aware that J.S. Held did, in fact, evaluate which of the cap flashing damage was due to this particular event?

MR. PEIRCE: Objection, leading.

**A. Yes.**

MR. PEIRCE: And objection, form.

**A. Yes, they did.**

Q. (By Mr. Campbell) And then fine -- finally, you were asked questions about whether Hudson holds a position, and by the same token, whether J.S. Held holds a position as to how many windows exhibited gasket damage or seal or glazing damage to the windows. Read the rest of the repair recommendations on this page to



yourself if you would.

(Witness peruses document.)

**THE WITNESS: Okay.**

Q. (By Mr. Campbell) Does J.S. Held identify any gasket damage to the windows at the curtain wall elevations of this hotel?

**A. No.**

Q. Does J.S. Held identify any hail-related damage to the seals of windows at the curtain wall elevations of this hotel?

**A. No.**

Q. And from your review of the plaintiffs' expert report, have you seen where they have identified any windows in these curtain wall assemblies that exhibit either gasket or seal damage as a result of hail impacts?

**A. No, I didn't see any.**

MR. CAMPBELL: Those are all my questions. Thank you.

MR. PEIRCE: Mr. Schwier, I have a couple of follow-ups.

FURTHER EXAMINATION

BY MR. PEIRCE:

Q. Have you reviewed the 8,000-some-odd pages and photographs taken by Steve Shannon, the plaintiffs'



expert in this case?

**A. No. I have -- I haven't read the entire document. I flipped -- I scrolled through it.**

Q. So you can't, as Hudson Insurance Company, look this jury in the eye and say that you've analyzed whether the plaintiffs' experts took photographs of damage to all the gaskets in the hotel?

**A. There was nothing in that report that I saw that indicated that.**

Q. You didn't review the entire report, correct?

**A. I scrolled through it, but I did not read the entire report. If you'd like to point something out to me, I can look at it.**

Q. You're sitting here as Hudson Insurance Company. You have not reviewed the entire report. You've scrolled through it. And you just told the jury that there were no pictures of hail damage to gaskets. Is that your testimony?

**A. You're telling me -- you're asking if I reviewed all 8,200 pages of the report?**

Q. That's correct, sir.

**A. I have not. But the report -- the parts that I scrolled through and looked at, I didn't see any pictures. We can look through it. I --**

Q. Well, similar to the J.S. Held experts, you had

surely liked for them to look at 71 percent more of the hotel. They didn't look at all the gaskets. They don't say what gaskets they looked at, correct?

**A. Which specific --**

Q. In other words, they don't identify across the broad spectrum of the hotel all of the gaskets they looked at and ruled out as being hail damaged. There is no indication in the J.S. Held report of that, correct?

**A. They -- they show photos of different gasket issues in their photos.**

Q. Yeah. I know they show a couple. My question wasn't that. My question was comprehensive evaluations. They don't have that in their report, correct?

MR. CAMPBELL: Object to form.

**A. They looked -- they looked at 30 percent of the windows.**

Q. (By Mr. Peirce) All right. 71 percent is a lot more than 29 percent, correct?

**A. It's more than 29 percent.**

MR. PEIRCE: I'll pass the witness.

MR. CAMPBELL: Just a brief follow-up, Mr. Schwier.

FURTHER EXAMINATION

BY MR. CAMPBELL:

Q. You're aware, are you not, that Carl Martin is



the engineer retained by plaintiff to address the causation issues that's the scope of hail damage caused by this storm?

**A. Yes. And I reviewed that entire report.**

Q. And in Mr. Martin's report, he nowhere identifies any particular windows that exhibited hail-related damage to gaskets or seal. Is that your understanding?

MR. PEIRCE: Objection to form and --

**A. That's correct.**

MR. PEIRCE: -- foundation.

**A. And that's correct. And when I was answering your question previously, that was the report I was referring to.**

Q. (By Mr. Campbell) And Mr. Peirce asked you a few questions about Mr. Shannon's report. I'll represent to you that Mr. Shannon is plaintiffs' cost estimating expert. And you told us you reviewed the narrative portion of his report, correct?

**A. Yes.**

Q. And in the narrative portion or his report, Mr. Shannon expressed no opinions concerning a causation analysis of what damage was caused by hail versus other conditions. Is that your understanding?

**A. Yes. Not that I'm aware of.**



MR. PEIRCE: Objection, foundation and form.

MR. CAMPBELL: All right. Thanks. That's all I've got. Thank you.

MR. PEIRCE: Nothing further.

THE COURT REPORTER: Do you need a copy, Mr. Campbell?

MR. CAMPBELL: I -- I definitely need a copy of the transcript. And let me check, and, Jeff, I will get back to you as to whether I need a copy of the videotape. How do I -- how do I reach you to let you know one way or the other?

THE VIDEOGRAPHER: You can either -- I have an e-mail address that is pinevideo -- P-I-N-E video -- at mail.com, M-A-I-L.com. You can let me know that way. Or you can send an e-mail to Lexitas here in Tyler. Well, probably just send it to me. And then I'll birddog it that way.

MR. CAMPBELL: And was that vine video? "V" as in --

THE VIDEOGRAPHER: Pine.

MR. CAMPBELL: -- Victor with the first letter?

THE VIDEOGRAPHER. No. P, as in potato, I-N-E video.



MR. CAMPBELL: Pine.

THE VIDEOGRAPHER: Pine video.

MR. CAMPBELL: At?

THE VIDEOGRAPHER: At mail.com. M-A-I-L.com.

MR. CAMPBELL: Got it. Okay.

THE VIDEOGRAPHER: And --

MR. CAMPBELL: I'll get back to you on that then. Thank you.

THE VIDEOGRAPHER: Okay. Very good. And so anyone else that needs a copy of the video or --

MR. PEIRCE: Jeff, yeah. Jeff, we need an MPEG synced.

THE VIDEOGRAPHER: Okay. Go ahead and say your name as who --

MR. PEIRCE: Chris Peirce.

THE VIDEOGRAPHER: Thank you. All right. You got it. Anyone else?

MR. PEIRCE: Colin, just before you -- is Colin gone?

MR. CAMPBELL: No. I'm still here.

MR. PEIRCE: Did you ever check on Mr. Chan for Tuesday?

MR. CAMPBELL: Yeah. He -- he would be free that Tuesday afternoon.

MR. PEIRCE: Okay.

THE VIDEOGRAPHER: Let me go ahead and take us off the record at 4:46 p.m. Eastern Time.

(End of proceedings.)



CHANGES AND SIGNATURE

WITNESS NAME: DAVID SCHWIER AS CORPORATE REPRESENTATIVE OF HUDSON SPECIALTY INSURANCE COMPANY

DATE: JUNE 4, 2020

PAGE LINE CHANGE REASON

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________



I, DAVID SCHWIER AS CORPORATE REPRESENTATIVE OF HUDSON SPECIALTY INSURANCE COMPANY, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

___________________________

DAVID SCHWIER AS CORPORATE REPRESENTATIVE OF HUDSON SPECIALTY INSURANCE COMPANY

THE STATE OF __________)

COUNTY OF _____________)

Before me, ___________________________, on this day personally appeared DAVID SCHWIER AS CORPORATE REPRESENTATIVE OF HUDSON SPECIALTY INSURANCE COMPANY, known to me (or proved to me under oath or through ___________________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this __________ day of ________________________, __________.

___________________________

NOTARY PUBLIC IN AND FOR

THE STATE OF ____________________

COMMISSION EXPIRES: _____________



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

RDA HOTEL MANAGEMENT )
COMPANY and LAKEWOOD HOTEL )
COMPANY, )
)
Plaintiffs, )
) CIVIL ACTION
VS. )
) NO.: 19-CV-02145-DDD-NYW
)
HUDSON SPECIALTY INSURANCE )
COMPANY, )
)
Defendant. )

REPORTER'S CERTIFICATION
ORAL AND VIDEOTAPED DEPOSITION OF DAVID SCHWIER AS CORPORATE REPRESENTATIVE OF HUDSON SPECIALTY INSURANCE COMPANY
JUNE 4, 2020
(Reported Remotely)

I, Crystal Gillespie, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, DAVID SCHWIER AS CORPORATE REPRESENTATIVE OF HUDSON SPECIALTY INSURANCE COMPANY, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

__X__ was requested by the deponent or a party before the completion of the deposition and returned

within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Subscribed and sworn to on this the 1st day of July, 2020.

[signature]

CRYSTAL GILLESPIE, TEXAS CSR 8575
Expiration Date: 11/30/2021
Firm Registration No. 793
Lexitas Legal
100 East Ferguson Street
Suite 900
Tyler, Texas 75702
(903) 593-3213

### Exhibits

**Hudson Exh 001** 3:12 8:3,5 9:13,18 10:9

**Hudson Exh 002** 3:13 24:1,2,5 57:13 58:5 59:7 80:23

**Hudson Exh 006** 3:14 12:5,6,8,9,23

**Hudson Exh 010** 3:16 14:2,4

**Hudson Exh 013** 3:17 86:9 87:2,4

**Hudson Exh 014** 3:18 26:4,6,11 31:16 32:25 33:5,10,20 35:7 36:15,23 37:22 38:19,25 42:15,16 45:15 47:14,18 48:19

**Hudson Exh 016** 3:19 91:15,17

**Hudson Exh 020** 3:20 100:2,4

**Hudson Exh 021** 3:21 101:11,13

**Hudson Exh 024** 3:22 76:16,18 95:24

**Hudson Exh 025** 3:23 120:10,12

**Hudson Exh 026** 3:24 125:2,6 140:13

**Hudson Exh 027** 4:3 179:22,23 180:5 182:10

**Hudson Exh 028** 4:4 132:20,22 133:8 134:24 136:7

**Hudson Exh 029** 4:5 127:20,22 128:4,9,10 136:18

**Hudson Exh 030** 4:6 131:25 132:1,7 136:1,2 145:11

**Hudson Exh 031** 4:7 135:8 142:14,15

**Hudson Exh 032** 4:8 144:16 145:18,19 147:14

**Hudson Exh 033** 4:9 148:4,6

**Hudson Exh 034** 4:10 150:6,7

**Hudson Exh 036** 4:11 154:10,11

**Hudson Exh 037** 4:12 158:22,24 160:20 161:24 164:21 171:25 175:7 179:19 192:18

**Hudson Exh 038** 4:13 167:5,6 170:7

**Hudson Exh 047** 4:14 126:22,23

### $

**$1,500** 146:13

**$1,576.66** 149:8

**$100,000** 77:21 88:6 132:11 136:5,11 143:11 175:18

**$145,000** 84:24

**$146,000** 147:6

**$150,000** 85:4

**$17** 79:21 80:8 82:20 84:3,24 85:3,12 153:10

**$2,700** 138:16

**$20** 71:12

**$230-** 79:9

**$238,000** 79:19

**$240,000** 79:9 83:20

**$250,000** 81:5,8

**$303** 66:17

**$31,850,000** 35:17

**$340,000** 83:23

**$350-** 89:13

**$365,000** 74:2

**$4,216,000,00** 13:20

**$46,500** 31:20

**$499,999** 90:7

**$5** 74:1 134:2,7,8

**$50,000** 74:19,20 75:4,16 76:1 77:13 78:4,9,11,20 79:4 95:21 119:12

**$500** 88:8

**$500,000** 59:14 82:23,24 83:10 89:13,25

**$540,000** 83:22

### 0

**0** 79:15,17,23

### 1

**1** 6:12 8:3,5 9:13,18 10:9 12:10,14 24:10 87:5

**1,000** 151:13,21

**1,500** 149:7

**1,578.66** 146:14 148:12,21

**1.5** 13:24

**1.8** 120:25 121:8,12

**10** 14:2,4 17:3 42:19 168:21

**10-3-1103** 17:8

**10-3-1104** 17:8

**10-3-1115** 17:9

**10-3-1116** 17:9

**100** 85:20 149:19 189:16

**100,000** 135:1,19 136:25 137:13 143:4,21 146:8

**108** 172:1,3

**10:00** 9:7

**10th** 102:14 144:5 145:25

**11** 9:9

**112** 184:2 185:23

**11:51** 86:21,22

**11th** 101:19 129:17

**12** 37:25 62:7 127:15

**126** 170:5

**12:08** 86:23 87:1

**12:51** 86:21

**13** 86:9 87:2,4 148:7

**13-** 105:11

**13th** 136:19 173:3

**14** 26:4,6,11 31:16 32:25 33:5,10,20 35:7,9 36:15, 23 37:22 38:19,25 42:15, 16 45:15 47:14,18 48:19 117:24 176:12

**14-story** 61:12 105:11

**145,553.25** 143:23

**146,000-some-odd** 148:23

**146,799.42** 146:6

**14th** 128:6,13,16,22 132:3

**15** 81:1 139:18 141:9,15, 16 192:18,22 193:1

**16** 42:15,17,19 91:15,17

**16th** 125:8 127:23

**17** 43:10 146:21,22

**171,685** 167:25

**1732** 133:9,19 134:11

**17th** 5:16

**18** 46:3 84:24

**18th** 150:14

**19** 165:18

**19-CV-2145-DDD-NYW** 5:11

**19th** 152:24 165:17,19

**1:08** 87:1

**1:20** 150:14

**1:27** 140:7

**1:59** 128:7,16

**1st** 35:21,22 68:9

**2**

**2** 13:24 24:1,2,4,5,10 26:19 57:13 58:5 59:7 80:23 86:25 125:11 180:8 182:19,20,23 183:2,12

**2-inch** 182:13

**2.5-inch** 182:11

**20** 54:23 100:2,4 119:3 165:17,18 173:3 180:4

**2009** 171:4 173:3

**2010** 165:17

**2013** 49:22 99:23,24 100:21

**2015** 100:16,24 175:24

**2016** 35:21 101:19 102:14 175:24 176:1,3

**2017** 20:21 35:22 51:1 54:23 55:22 59:22 60:15 61:20 67:3 68:6,10 69:7, 23 70:1 74:19 76:21 77:3 78:5,17 80:19 84:22,23 85:21,24,25 87:13,14,21, 24 88:14,22 92:12,15 93:1 94:1,15 95:10,11,13 102:10 105:21 106:7,19 107:1 108:9 110:11,17, 21,23 115:13 119:9,18 120:21 121:22 124:19 125:2,8,20 127:9,23 128:6,16 132:4 136:6,19 138:13,19,23 140:13,16 141:1,6 142:4,12,24 143:3 144:5 145:25 147:15,24 148:7 150:14 151:16,22 152:3,12,16, 18,22 154:7 155:3,25 157:19 158:4,13 168:3,6 169:8,9,18 174:9,20 175:3 176:10,12,21 177:2 179:14 180:14,16,19 181:1,25 186:14,21 189:17,21 192:7 194:10

**2019** 20:24 54:3,10,23 55:22 68:23 69:17 70:2 79:12,22 80:9 81:3,12 84:22 87:6,9 88:3,14 91:14 106:16,22 118:16 119:13 152:24 154:15 158:5 159:1,7,16,20,23 160:16 165:19 167:10 171:19 172:21 173:2 176:11 179:13 180:15 182:9,10 184:7 189:23

**2020** 5:8 12:13,22 13:15 128:22 132:3

**21** 101:11,13

**22** 121:17

**22nd** 109:4 110:23,24 182:9

**238,000** 79:24

**238,000-and-some-odd** 79:11

**238,000-some-odd** 159:24

**238,510.61** 88:3

**24** 76:16,18 95:24

**240** 83:23

**242** 151:11 161:19

**245** 189:16

**25** 120:10,12

**250,000** 90:18,19 107:25 117:25

**25th** 87:6 119:9,18 120:21 121:22 124:19 138:18,23 159:9,10,14 175:2 180:15

**26** 125:2,3,4,6 140:13 142:20

**265,217.88** 87:17

**26th** 127:2 132:4 136:2,6 144:1,5 159:9,10,14

**27** 179:20,22,23 180:1,2,5 182:10

**27s** 179:25

**27th** 110:21,22

**28** 37:21,25 42:19 132:20, 22 133:8,12,13 134:24 136:7

**28th** 172:21 173:2 175:1

**29** 127:20,22 128:4,9,10 136:18 162:6 163:5,8,9 189:15 197:18,19

**29.136** 102:3

**29th** 79:12 88:3,14

**2:14** 140:8

**2:27** 140:6

**2:30** 139:5,12

### 3

**3** 12:9,16,23 139:18 140:10 178:16 184:15,17 185:25

**30** 26:14,18 37:6 131:25 132:1,2,7 136:1,2 140:17 141:10,16 145:11 197:15

**30th** 124:24

**31** 135:8,9 142:14,15,23

**31.85** 102:3

**31st** 12:13 76:21,23 77:3 78:5,17 96:13 124:20

**32** 144:16 145:18,19 147:14

**33** 140:23 148:4,6

**34** 140:24,25 150:6,7

**35** 161:20 163:5,9

**350,000** 89:14 90:6

**36** 154:10,11 161:20 189:10

**360** 37:11

**365,217.88** 87:18 88:6 167:21

**37** 158:22,24 159:2 160:20 161:24 164:21 171:25 172:2,3 175:7 179:19 192:18

**38** 167:5,6 170:7

**392** 194:5

**3:14** 140:11

### 4

**4** 11:12,21 13:16 42:18 62:7 141:10,14,16 159:13

**4(e)** 43:10

**4(f)** 44:15

**4(m)** 43:9

**4(n)** 45:23 46:3

**4,000,775,000** 13:16

**4,216.3** 12:22

**4,775,000,000** 13:17

**45** 139:20

**46,500** 35:3

**47** 126:22,23

**4:46** 201:3

**4th** 5:7,8

### 5

**5** 139:14 182:18

**5-0** 74:21

**5-23** 77:7

**50** 122:10

**50,000** 79:15 124:21

**500** 63:19 82:23

**500,000** 59:17 83:6,18 89:14,23

**500,000-plus** 83:2

**52** 26:14 37:23 42:15 43:10 46:3

**5:00** 139:13,16

### 6

**6** 12:5,6,8,9,23 37:21,23 127:15 178:16 185:22

**6th** 158:25

### 7

**7** 43:10 142:24 161:11

**7-26-17** 133:1

**70** 189:11,16

**71** 162:21 165:5,6,10 188:25 189:5,16 197:1,17

**74** 6:12

**7th** 95:17 96:3,4,7 100:16, 23 124:22,25 125:13,14, 20 143:3,6 154:15 180:16

### 8

**8** 81:1

**8,000-some-odd** 195:24

**8,200** 196:20

**80s** 105:13

**86** 172:14,19

**87** 172:9,14

**89** 172:1,3,12,19

**8:13** 5:8

**8:17** 9:6

**8th** 61:20 85:25 87:20,24 88:14,22 102:10 105:21 106:6 108:9 110:17 124:25 127:8 142:4,12 147:15,24 154:7 157:19 158:4,13 171:25 172:20 174:9,20,24 175:3 176:12,21 177:2 179:14 180:14 186:21 189:17,21 194:10

**9**

**9th** 159:16,20

**A**

**a.m.** 5:8 9:6,7 86:22

**abide** 16:17 17:4,21

**accept** 20:2,5,13 30:16

**acceptance** 25:6,19 89:5

**access** 26:20 161:13

**accident** 111:4

**accordance** 5:15 180:11

**account** 70:5

**accurate** 92:14 109:6 137:12

**accurately** 72:4 132:14

**acknowledges** 16:23 171:8,11

**acquired** 100:13,14

**Action** 5:11

**actual** 33:20 37:25 121:8, 11 137:16 152:1 180:19

**actuarial** 71:23

**add** 32:11 36:22 50:8

**added** 149:19 165:13

**adding** 45:4

**additional** 16:10 89:10 116:3 128:24 143:25 147:7 150:18 151:12 154:18 156:8,25 157:7,9, 14 160:1 166:5,8

**address** 198:1 199:14

**adhesive** 193:18

**adjust** 19:24 59:23 60:16 64:14 66:14 87:9 113:15

**adjusted** 52:16 53:23

**adjuster** 18:3,6 51:14,19, 24 57:2 60:10 64:3,16,17 65:2 66:3,6 68:23 69:18 73:17 75:24 87:12 92:7, 16 109:7 112:4,23 114:2, 3,7,9,10,22 118:24 153:2 154:5,23 156:11,18

**adjusters** 17:20 58:24 59:5 70:12

**adjusting** 56:18 57:14 60:14 70:1 109:16

**adjustment** 17:9,16 56:23

**admonished** 73:18

**adopted** 57:8

**advantage** 19:1

**adversarial** 19:11,16

**advise** 143:3

**advised** 96:4 142:24

**advising** 75:25 132:9 136:3

**affect** 71:6,13,19

**affiliated** 69:2

**affiliation** 68:24

**afternoon** 200:25

**age** 123:16,25 124:8

**agent** 142:25

**agree** 9:21 10:1,5 13:7,21 14:7,13,14,17,22 15:2,16, 20,22 16:11 18:10,18,21 19:6,19 21:2 22:7,10,11, 23 23:2 24:22 27:2,7,14, 23 28:14 29:17 30:22 31:6,15 32:18 33:1,9,16, 17 34:4,21 36:14 37:9 38:17 39:7 47:22 49:4 57:8 59:5 62:19 70:24 71:2,18 72:20 99:8 103:6 111:21 112:17 114:2 135:3 136:10 137:6

**agreed** 134:25 135:18 137:12,14

**agreement** 33:2 70:4

**agreements** 5:23

**agrees** 16:15 17:7,13 21:8 25:1,4 89:1 99:16 110:15 112:3 136:25 147:13

**Aguilar** 79:21 80:8,13 153:2,4 154:16 156:5 157:5 190:13,15,20 191:25 192:2

**ahead** 8:24 11:15 130:6 138:7,9 144:21 145:15 158:19 200:14 201:2

**allegations** 110:1

**alleged** 126:21 155:2

**allegedly** 68:18

**alleging** 81:4

**alternative** 128:18 137:23

**aluminum** 141:18

**amount** 23:12,17 29:18 30:3,15 31:8 54:25 59:19 79:19 88:2 90:6 102:6 130:23 135:18 138:15 143:1 148:11,12,21 162:19 166:25

**amounts** 16:4

**analogy** 40:6

**analysis** 150:20 198:23

**analyze** 153:14

**analyzed** 147:23 196:5

**analyzing** 155:19

**and/or** 156:19

**Anderson** 153:18

**Andrew** 68:5,17,23 69:6, 16,23 87:11 153:12 154:15,22 159:6 180:11

**angle** 106:13

**announced** 15:13

**answering** 9:23 198:12

**answers** 135:22

**anymore** 68:15

**Apologies** 14:11

**appears** 31:15 155:8

**appetite** 15:14

**applicable** 16:13 18:5 20:6 26:12 27:17 28:6

**application** 146:12 148:21

**applied** 55:1

**applies** 18:25 34:20 44:14 45:22 124:4

**apply** 7:16 34:23 42:12 45:8 65:11 90:19 152:1

**applying** 186:3

**approval** 89:11,16 112:15 155:15

**approvals** 102:19

**approve** 118:12,15

**approved** 63:24 64:1,18 65:16 118:19

**approximate** 173:7

**approximately** 5:8 31:20 35:3 78:17 107:24 151:12 182:23 194:5

**April** 79:22 80:9 81:3,12 152:24 165:17,19

**area** 96:20 105:8,17,18 108:10,17 112:7 122:3,8, 11 126:11,16,17 134:11, 15 139:11 161:15 185:3 188:7

**areas** 122:1 157:23 160:24 184:12,21 185:13, 15 186:14

**arising** 43:14 57:9

**arm** 100:10

**art** 82:22

**assemblies** 195:14

**assembly** 189:18

**assert** 25:4,18 89:4

**assess** 92:9,18 112:25 116:19

**assessment** 80:13 165:14

**assign** 133:18

**assigned** 109:7,11 112:14

**assigning** 110:9

**assignment** 61:17,25 110:6

**assigns** 66:2 133:20,21

**assist** 127:9 155:19

**assume** 16:1 162:8,12

**assuming** 52:6 73:9 79:4 95:17 162:12 175:11

**assumptions** 71:23

**at-deductible** 85:11

**attach** 47:6 48:15,21 148:10,18

**attached** 147:11,14 153:4 155:6

**Attachment** 140:23,24

**attend** 54:18

**attention** 120:2,3 143:6

**attorney** 10:15 62:19 109:22

**attribute** 178:4

**attributed** 178:4

**August** 79:12 87:6 88:3, 14 101:19 102:14 142:24 143:3,6 159:16,20 182:9

**authored** 110:11 146:3 159:15

**authority** 53:6,8,9,21 55:7 65:15 89:8,9,11,15 90:10, 13

**authorize** 110:4

**authorized** 33:25 66:6

**auto** 33:21,24 40:8,14

**availability** 155:13

**aware** 15:2,8 17:2 38:23 40:1 50:2 54:7 57:15,17 58:18 60:9 61:2,9 67:20 68:4,8,11,16 69:25 82:14, 17 86:2 90:24 94:13 95:10 96:8 97:6,10 98:19, 23 99:18 106:25 108:14, 15,24 109:24 110:3 152:23 166:24 177:11 194:13 197:25 198:25

**B**

**back** 9:8,11 32:25 42:14 46:21 49:22 74:19 87:1

90:3 128:2 132:21 135:13,14 136:9,13,16 140:11 146:16 167:11 169:8 173:2 174:18 186:10 199:10 200:8

**backtrack** 189:4

**bad** 90:17

**ball** 44:8 47:3

**ballast** 106:8 186:3 188:8

**ballasted** 77:23 96:21 122:7 127:5

**balls** 38:5

**bank** 125:16 180:17

**bare** 186:14,15,18

**bargaining** 19:3

**base** 105:14 182:24 183:2

**based** 20:21,24 21:3,9 22:8 24:17,18 63:5 66:7 75:4 78:7 79:24 83:21 84:20 88:5,24 96:12 191:5

**basically** 163:18 176:24

**basing** 107:16 174:14

**basis** 27:16 28:5 33:3 167:10 191:23

**Bates** 37:24

**be-all** 53:18

**Bear** 171:24 179:18

**begin** 109:12

**Beginning** 91:24

**begins** 5:3 86:24 140:9

**behalf** 6:4 7:3,6,18 9:17 85:23 107:9 113:15

**belief** 52:24

**believed** 192:2

**believes** 89:14 90:6 130:2,15

**below-deductible** 85:11 128:20,25 129:24

**beneath** 150:25 184:4,22 185:16

**Bernard** 100:7,16

**bias** 22:25

**biased** 21:4,11 22:9

**bid** 168:21

**big** 105:14 119:14 162:8 165:22

**biggest** 173:6

**bill** 59:22 60:9 64:13 65:7, 20 66:9,13,23 73:6 76:9, 21 77:6,11 80:3 96:4 109:12 110:8,25 112:11, 12 115:8,13,18,23 116:10 127:10 128:5,16 129:2,22 130:5 132:3,5,7,22 136:1, 6,19 137:11 138:22 142:24 143:2 148:6 150:12,15 154:1 168:15 181:23

**billed** 121:12

**billion** 11:12,21 13:24

**bills** 75:7,8 136:14 138:14 144:10

**binding** 33:2 102:22

**birddog** 199:18

**bit** 10:23 16:9 75:18 76:20 85:6 114:18,19 154:25

**blanche** 54:24

**blank** 146:21

**Blusky** 116:15

**boardrooms** 151:12

**bodily** 81:18

**boots** 112:22

**boss** 51:5

**bottom** 28:14 37:21 42:19 77:12 93:17 96:20 121:13 129:16 140:17,23 150:12 169:1 182:18,19,20 184:15

**Boulevard** 37:11

**bound** 19:19 103:8

**Bowers** 128:12

**breach** 28:7

**breached** 27:23

**break** 50:6,7,8 86:12,13, 15,22 139:5,8,19 140:4,7

**breaking** 75:17

**Brenda** 128:12

**Bresnahan** 129:7 132:8 136:2 150:19 156:13

**Briana** 56:12 75:19 116:11 128:5,17 129:22, 25 132:4,5,9 136:3,19 143:2 148:7,10 150:8 156:12

**briefly** 29:16 91:21

**bring** 116:23 163:21

**broad** 15:5,14 31:3 197:6

**broken** 122:2,14 123:6,7, 10,14 151:18,19 156:4 164:2 170:14 176:16

**broker** 77:8

**brought** 110:1 120:2,3

**budget** 118:12,14,15 119:2,10,12 155:6,7,15

**budgets** 155:16

**bug** 152:5,9

**building** 15:4,10 30:23 31:1 37:11 40:7 41:19,25 47:9,11 116:19,24 118:4 122:1 143:21 155:6 156:2,7 161:10 162:16 170:6 174:13 176:21 177:2,11,14 181:8 189:18

193:20

**built** 105:12,13

**bullet** 193:24

**bunch** 116:23 117:19 179:25

**business** 47:19 71:24

## C

**calculate** 131:11 140:1

**calculating** 140:3

**calculation** 71:19 168:7

**California** 18:1

**call** 13:23 93:13 105:17 116:14 129:20 133:18 151:7,8 173:19

**called** 77:8 146:1 148:20 151:1

**calls** 54:8,13,17,19 73:6 168:18

**Campbell** 6:3,4 8:14 9:2,4 10:11,14,18 11:13,24 13:2,5,11 15:6 16:5 18:7 19:4 20:8 21:6,12 22:22 27:5,11,19,25 28:9 29:2, 14,21 30:11 32:1,7 33:13 34:9,17,22 35:4,13 36:19 37:4 39:17 40:18 41:6,21 42:3,10 44:10 45:16 48:11,16,22 56:9,11,19 59:9 61:24 63:3 68:21 71:8,15,21 76:4 80:17 84:11 86:18 92:24 93:2 94:2,9 98:8 103:3 104:17 107:14 108:1,6 112:1,8, 18 113:2,20 115:1,17 125:21 126:5 131:7,13 135:6,21 136:12 137:1 139:15 141:7 144:17,21, 22,25 145:4,8,12,15 160:22 164:5,11,17,22 166:22 169:16,19 175:23 178:8 181:5 184:25 187:5,22 188:3,10,20 189:1,7 192:5,10,13,23 193:6,21 194:20 195:4,18 197:14,21,24 198:15 199:3,7,8,19,22 200:1,3, 6,8,21,24

**Canada** 15:24 100:9

**cancel** 150:16

**cancelling** 150:10

**cap** 168:10 169:8,24 170:16 194:4,6,7,14

**capabilities** 188:14

**capacity** 47:25 127:9 164:10

**caps** 178:19 182:22

**caps'** 193:22

**caption** 121:14,16

**car** 40:8,9,10,15 41:2,4,7

**carbon** 57:19

**care** 116:18

**careful** 16:3

**carefully** 33:10

**Carl** 197:25

**carrier** 67:25 133:22 144:13

**carte** 54:24

**case** 5:9 7:24 8:2 16:1,10 18:4,6 31:12,17,21 33:3 34:13,19 36:24 41:10 48:5,7 59:11 65:6 67:3 73:14,15 80:18 83:19,20 85:20 90:1 101:21 110:2, 19 113:3 177:18 196:1

**cases** 19:5 65:13

**cat** 133:9,13,18,20 134:5, 16,18

**catastrophe** 133:17

**categorize** 60:8

**categorizing** 134:4

**category** 12:19

**catty-corner** 177:8,14

**caught** 187:11

**caulked** 127:4

**causation** 192:25 198:2, 22

**caused** 14:23 15:3 35:11 41:19,22,25 42:24 43:4, 22 44:1 46:17,22,23,24 47:12 62:22 110:20 111:25 112:23 113:16 114:4,11,23 158:12 165:8 166:11 179:4,16 183:21 186:13,17 187:1,2,6,13, 14,15 188:17,24 189:25 190:4 192:6,16 198:2,23

**causing** 185:7

**caveat** 45:4 85:21

**cc'd** 76:24

**ceiling** 94:5 96:16 119:22 156:4

**center** 96:17 119:22

**Central** 5:9 86:21 87:1

**cetera** 77:8

**chain** 65:9 129:17

**Chan** 10:16,17 50:12 51:6, 23 52:1,4,15,24 53:11,17 54:23 55:17,24 56:7 57:6, 13 58:13,19 60:20,22 61:18 64:2,8,12 65:7 66:11 70:12 72:24 74:2 75:25 76:21 77:6,12 78:4 83:4,7 84:1 85:9 89:21 90:3,5 92:6 94:18,21,22 95:3,7,20 96:4,10 97:1 107:9,10,18 109:6 111:17 124:20 137:12 154:15,22 181:23 182:6 200:22

**Chan's** 66:6 73:25 89:8,15 90:11 159:5

**chance** 102:17

**change** 43:18 48:14,20 49:1 69:12 79:23 80:20 83:1,9 84:13,16,17 144:2 166:11,16

**changed** 55:11 79:1,2,3,7, 8,13 80:1,3,4,6,20 147:8

**changing** 85:13,16

**charge** 30:3 67:5

**charged** 54:14 117:12 138:13

**check** 32:17 79:11 109:3, 4 199:9 200:22

**checking** 161:5

**choose** 65:25

**choosing** 15:12 31:7

**chose** 47:8 68:22

**chosen** 33:6

**Chris** 13:2,5 53:7 200:16

**Christopher** 5:25 6:23 33:18 51:9

**chronic** 74:11

**circumstances** 88:24

**city** 15:23 52:1 105:19 124:8

**Civil** 5:10 7:2 16:24 58:14

**claim** 10:10,16 16:13 17:5 18:3 19:21,24 20:2,6,13, 14,15,17,21,24 21:3,9,18, 19,22,23 22:7,8,11,20 23:3,13,18,24 24:6,8,12, 19,23,24 25:14 26:2,12 27:3,9,10,18,21 28:18,19 29:11 33:3 34:24 36:12 37:18 40:7,8 49:18,19 50:13 51:11,18,24 52:5, 15,19,25 53:15,20,23 54:1,25 55:13,14 56:8 57:12,14 58:15,20 59:23 60:19,23 61:1 62:9,10 63:21 64:13,15 66:3,14 67:9 69:4,7 70:1,5,6,7,20 71:2,4,6,10,12,22,23 72:2,8,9,15 73:17,23 77:7 81:4,14,15,18,24 82:1,16, 19,23 84:24 85:3,6,11 87:14 88:17,23 89:10,15 90:5,8,9,12,23 91:6,19 94:23 95:3,4 103:21 104:20 109:2,13 110:5 111:7,18 113:12,15 114:3,7,10,22 116:13 117:13,16 120:17 128:18, 23 129:23 130:21,23 131:19 132:13 137:22 146:11 150:10,16 153:14 154:1,14

**claims** 16:17 17:9,12,16, 20,22 18:5,8,19 19:10,13, 14 21:14 24:11,18 25:25 32:5,9 49:11,20,24 50:2, 17,18,21 51:3 53:22 54:9 56:24 57:9,17 58:24 59:1, 6 60:8 61:6 65:24 66:22, 25 67:23 71:1,9 72:3,16 74:15 81:18,20,22 82:2,9, 15 113:25 133:23 155:20

**clarify** 69:22

**clean** 188:5

**clear** 18:3 20:19 188:23

**cleared** 184:12

**client** 18:21 29:18 31:20 68:19 91:24 98:19 120:7 152:14

**client's** 75:19

**clients** 16:10,12 18:14 27:16,24 31:10,25 37:10, 17 49:9,18 98:16 110:2 120:4 128:23 142:25 144:8 147:8 158:1

**clients'** 42:8

**closed** 15:14,19 37:14 39:9 42:1 48:15,20 79:5, 16 132:19 133:3,6

**closely** 185:13

**clumps** 38:5

**coating** 106:2

**code** 133:18,19,20,22,23, 25 134:1,2

**codes** 134:18

**Colin** 6:3 10:11 200:19,20

**collected** 11:23

**color** 43:19

**Colorado** 5:10 16:15,21, 24,25 17:3,10,15,20,21 18:5,9,11 20:2,7,13 22:19 23:12 27:15,24 28:8,21 37:11 45:11 58:14,20 59:23 64:19,22 105:5,6 108:10,13 109:22 134:11

**column** 141:18

**combination** 160:14

**combined** 158:24 170:8

**combining** 185:6

**coming--** 131:15

**comments** 56:6

**commercial** 14:24 116:22

**commingling** 43:18

**Commonwealth** 100:12

**communicate** 95:7

**communicating** 156:12

**communication** 65:6

**companies** 11:25 13:9,15 18:25 31:24 32:4,16 109:25

**company** 5:6 6:15 7:6,19 9:18 10:24,25 11:11,19

13:22,23 14:1 15:15 18:16 31:18 33:7 34:5 46:13 51:18 57:21 69:2 70:25 71:14 82:13,14 85:24 87:8 98:7 103:9 107:10 113:4,6 116:15,16 153:24 158:10,11 165:2,3 196:4,15

**company's** 71:7

**companywide** 64:25 65:16

**comparing** 162:2

**complaining** 122:24

**complete** 83:3,10 84:4 86:4,6 190:17,19,22

**completed** 28:25 102:21

**completely** 55:6

**completing** 83:5

**complex** 60:2,6,10

**components** 155:11 193:19

**comprehensive** 125:19 126:3,8 155:8 158:6,8 176:10 197:12

**comprised** 105:21 107:6, 11,20 150:22

**computer** 37:3,7 56:4 57:19

**concern** 29:9

**conclude** 164:15

**concluded** 164:12,18,20

**conclusion** 72:9 185:22 193:7

**conclusions** 163:17 185:23 194:3

**concrete** 105:25

**concurrently** 43:2

**condition** 30:6,24 32:18 34:7 45:17 97:24 98:11, 12 103:7,12,15,18 104:1, 15 115:14

**conditions** 26:15,19,22 39:20,21 42:5,11,14 44:13 45:3,5 198:24

**conduct** 19:20 86:4 103:14 113:11

**conducted** 5:15 20:16,20, 23 24:9,12

**conducting** 17:15 28:19 60:13

**conference** 54:13

**configured** 149:15

**confirm** 96:14

**confirmed** 123:5,16

**confirming** 24:22

**conform** 96:14

**conformed** 119:19

**confused** 21:13 22:1 154:25

**consecutive** 36:5

**consecutively** 36:11

**consideration** 72:13

**considered** 14:1 31:7 33:10 72:19 178:22

**consisted** 117:6

**consistent** 162:19

**consistently** 72:3

**consolidated** 12:17

**constituted** 97:13

**constructed** 31:2

**construction** 44:17,18 79:21 80:8 113:4,6 115:9, 18 116:15,21 191:25 192:3

**consultants** 54:20 155:7, 19

**consulting** 155:10

**consumer** 18:12

**contact** 56:20 129:7 150:18

**contamination** 43:16

**contemplate** 190:21

**contents** 43:17

**context** 40:7,16

**continually** 72:7

**continue** 69:15 158:21

**continuing** 13:7 29:22

**contract** 37:17

**contractor** 57:5

**contractors** 115:24 116:1

**contributed** 43:15

**contributes** 43:2

**controlled** 55:3

**conversation** 94:20,24 95:4 138:24,25 139:3

**conversations** 94:17 107:17 181:16

**coordinate** 55:13

**copied** 54:12

**copies** 132:11

**copy** 17:20 26:8,11 57:18, 19,24,25 58:16 84:2 97:4 199:6,9,10 200:11

**core** 88:7

**Corelogic** 172:4,19,21,23 173:10

**corner** 8:8

**corporate** 6:14 7:20 9:16 33:19 34:1 129:7

**corporation** 7:2,3

**correct** 6:9 7:6,10,11 9:19,20 11:1,2,5,8,9,18

12:14,24 15:10,24,25 16:4,13,18,19 17:16 18:6, 16,22 19:8,11,17,18,21, 22,24 20:22 22:17,18,20, 25 23:1,8,14,18,22,23 24:6,9,15,16,20,21,24,25 25:2,7,20 26:2,3,12,25 28:22,25 29:3,13,20 30:2, 7,8,10,12,13,17,18,20,21, 25 31:1,4,13,21 32:2,14, 23,24 33:7,8 34:2,3,11,18 35:3,5,18,22,23,24 36:12, 13,17,21 37:1,3,15,16,19 38:6,7,11,15,19 39:11,16, 24 40:17 41:5,13,14 42:9 43:6,12,22,23 44:9,11,20, 21 45:2,15 46:1,9,20,21 47:1,16,20 48:5,10,12,15, 21,23 49:2,7,11,16,17,25 50:1,3,14,15,17 51:4,21, 22,24 53:1,19 55:2 56:2 57:2,5,10 58:2,15,21,22 59:18,19,24,25 60:16,17, 23 61:6,7,10,11,15,23 62:11,12,21 63:2,4,12,16, 20 64:15 65:2,3,8,10,17 66:12 67:6,7,9 68:25 70:8 71:7,20,25 72:1,4,5,10, 11,16,17 75:20,21 77:3 79:22,25 80:1 81:5,6,8,20 82:2,16 84:10 86:1,5 87:9,14,15,17,18,19,21, 22,25 88:3,4,8,9,14,15,18 89:2,6,17,18,21 90:1,2, 12,15,16,20,21 92:12,13 93:1 94:8 95:12 96:5,11 97:2,14,25 98:3,7,14,17, 22 99:1,5,16,20,24 100:18,19,21,22 101:5,6, 17,21,24 102:3,4,24 103:9,10,12,20,23 104:2, 6,10,20,23,24 106:17 107:12 109:8,13 110:12, 17,18,21 111:19 112:25 113:12 114:25 116:11 117:13,14,22 118:13,16, 20,23 119:10 120:4,5,8, 18 121:1 123:6,25 124:2, 9,16,22 125:8 126:4,12, 13 127:11,15,24 129:14, 15,25 130:16 131:4,6,12, 23,24 133:1 136:7,11,25 137:9,15,18 141:2,6,11, 20,23 142:1 143:7,23 144:8 146:6,7,9,10,14,15 147:9,10,16 148:15 149:12,16 150:11 151:4,9 152:22 153:2,7,10,15,16, 21,22 154:20,23,24 157:4 159:3,7,16,24 160:17,21 161:1,21,22,25 162:7,23 163:3,6,7,10 164:16 165:11 166:1,21,23 167:7,10,22,23 168:1,3,4 169:14,15,18 170:22 171:13,16,20 173:3,8 174:5,7,10,11 175:12,13, 25 176:13 178:2,7,12,16, 20 181:15,19,20 182:12 183:25 184:8 186:22 188:25 189:6,18 190:3 191:2,7,13,21 192:4,6 193:13,14 196:10,21 197:3,8,13,18 198:10,12, 19

**correctly** 101:1

**correlated** 179:14

**correspondence** 91:12 97:21

**cosmetic** 38:13

**cost** 47:22,23 48:3 72:9 77:13 81:8 198:17

**costs** 118:19 167:1

**counsel** 5:17,21 177:19

**couple** 49:21 77:20 101:20 106:2 117:9 132:19 151:17 173:12,13, 15,19,20 195:20 197:11

**court** 5:10,13,23 6:6,10,13 8:11,13 9:1 139:21,23 199:6

**courtesy** 54:18

**cover** 43:21 46:16 91:9 160:25 178:19

**coverable** 130:21

**coverage** 20:16 21:15 24:22 25:1,5,6,14,15,18, 20 28:1 29:19 30:4,16 31:12 32:13,14 34:6,16 35:14,20,21 39:14,19 40:16 41:3 45:20 47:6,10 48:15,21 53:3,8 54:22,25 55:1,3,4,6 61:19 67:3,6 84:6,16 89:1,4,6 91:3 94:21 98:14 114:16 115:4,5 123:24 124:1 141:5 159:23 160:16 181:19 184:21 185:16 191:4,13,21,23

**covered** 23:13,17,22 27:21 37:18 41:17 42:9 45:2,14 48:10 49:5,9 75:15 86:5 88:13,22 90:6 106:8 110:15 112:24 113:16 130:23 131:1 141:25 147:15 175:10,12 176:5 179:4,5,15 184:23 186:19 187:3,8,17,20 188:7 192:3

**covering** 186:8

**covers** 163:2 164:2

**COVID-19** 5:16

**cracked** 44:6 96:18 122:21

**Craig** 121:24,25 122:25 126:19

**Crawford** 54:9 68:13,19 69:9,11,16,18 70:3 87:4, 8,12 97:8,12 153:14 160:2,3,8,11,15 180:11 191:6

**create** 85:2 170:20 175:9

**created** 83:23 186:3

**credibility** 29:10,12

**credited** 149:18

**criteria** 82:25

**Crystal** 5:13

**CST** 9:6,7 86:22,23 140:7, 8

**culminating** 129:21

**cumulative** 74:13

**Cunningham** 59:22 60:1, 3,5,11,15,18,25 61:5,8, 10,14,22 63:8,11 65:20 66:3,7,9,21,24 67:2 68:2, 6,9,15,18,24 69:9,10 75:5,24 87:13 94:18 109:12,19 110:7,11 120:16 141:1 145:25 147:4 153:13 156:15,19 181:17 191:7

**curtain** 47:14 48:8 104:1,6 107:5,11,19,21 112:12 113:6 115:12,14 155:10 160:21,25 161:14,19 163:2 178:12,15,19 190:11,18 195:5,9,14

**customer** 14:19

**customers** 31:25

**cuts** 88:7

**cutting** 131:16

**CW** 100:10 101:17 102:17

D

**damage** 14:23 15:3,4,8,10 26:25 30:24 31:2 35:11 37:13 38:18,24 39:1,9,13, 18,22 41:12,17,18,20,22, 24 42:1,24 43:1,4 44:1,7 45:1,12,13 46:11,14,17, 19 47:12 48:8,23 49:2,13, 15 60:15 62:6,23 63:2 64:13 78:7 81:4,19,22 83:13,14 84:2,8,9 87:23 88:5 92:9,18 97:8,13 99:19 104:9,13 107:20,21 108:22 110:20,22,23 111:1,24 112:2,5,23 113:7,16 114:5,12,24 115:6,7,11,24 116:8,20 122:23 123:13 126:17,20, 21 127:6 129:3 131:11,18 132:10 134:14 135:18 136:4,21,24 137:8,20 138:3,5 143:21 144:8 146:5 147:4,23 149:14 151:25 153:5,9,14 154:1, 4,7,19 155:2 157:18,25 158:3,12 162:2,5,19 165:8,14 166:12,13,15,17 169:9,14 175:14 176:23 177:3 178:22 179:1,11 180:13 188:1,8,18 189:25 190:4,22 191:24 192:16, 25 193:8 194:14,24 195:5,8,15 196:7,17 198:2,7,23

**damaged** 30:23 35:8 41:3 42:8 44:6 47:11,24 77:24 85:25 96:5,11,22 112:12, 16,17 115:15,19,20 142:4,11 169:24 170:2 177:2,13 188:13 190:7 197:7

**damages** 23:13,17 55:6 60:16 72:14 80:11,13,21 86:5 96:13 117:19,21 119:19 143:1,4,10,18 146:5 147:15 153:15 155:24 156:8,18 157:2 167:24

**Daskalakis** 33:19

**data** 21:4,10 22:8

**database** 64:25 65:17 68:19 172:24

**date** 68:9 74:22,25 79:13 87:20 88:19 102:9 103:11 105:21 108:17 109:1 132:16 133:5,6 159:8,18 170:22 171:6,20 172:25 173:7 177:9 193:9

**dated** 77:2 87:5 132:25 145:24 148:7

**dates** 74:22 96:12 124:25

**Dave** 139:16

**David** 5:4 6:14,21 86:25 140:10

**day** 73:7 102:14 109:7,9, 10,11 119:18 120:22,24 121:5,14 125:24 127:14 132:25 133:4,24 136:6 150:9

**days** 35:9 77:11 159:7 166:1,3 176:13

**deadlines** 20:1,5,12

**dealing** 18:22

**decade** 45:11

**decades** 45:11

**decay** 43:16 44:6

**December** 68:9

**deceptive** 17:14 18:15

**decided** 65:7 68:8

**decides** 66:7

**decision** 22:20 54:22,25 55:2 67:6 84:6,7 90:11 141:5 159:23 160:16 181:19

**decisions** 25:1 51:20 53:3,8 55:4,8 71:24,25 89:1

**deductible** 42:7 75:15 77:21 88:6,10,11 129:4 130:3,20 131:2 132:11 135:1,4,5 136:5,11,15,21 137:8,13,21 143:5,11,18, 21 144:10,11 146:8,12 147:5 148:22 175:18

176:4

**deductibles** 39:20

**deduction** 48:1

**deemed** 25:5,19 89:5

**defendant** 6:4

**defended** 109:24

**deferred** 193:9,15

**deficiency** 44:18

**define** 38:17 39:8

**defined** 38:3,21 39:23 40:1 47:23 59:17

**definition** 36:15,21,24 38:9,21,24 39:8,25 40:4 48:2,4 97:8,12 158:7 166:15,25

**definitions** 36:16 37:2,6 38:20 39:11

**deformations** 183:5,8

**delay** 22:20

**deliberate** 16:3

**delineated** 59:7

**denial** 22:14 27:18 28:6,7 114:3,22

**denies** 22:11

**dent** 41:18,24 44:25 45:12 179:9 183:13,20 187:3,6, 12,16,21,25 188:6,12

**dented** 40:10 122:18 168:11,12 169:11 182:22 184:4,10,22,23 185:2,3, 17 194:5,7

**denting** 185:8,19 186:11, 12

**dents** 39:13 40:22 41:4 44:7 96:15 119:20 141:11,17,20,23 182:11, 13,23 183:2,14 186:2,6, 14 188:17

**Denver** 64:14 87:24 99:9 102:2 105:5 108:9,17,22 125:15 128:6 134:11 177:15 180:12

**deny** 21:2,9,18,19 22:7 28:19 114:3,7,9,10,16,21

**department** 24:24 71:4 72:3 97:19 98:20,25 101:4 103:9,16

**depend** 117:19

**dependent** 130:21

**depending** 30:5

**depends** 21:13

**depicting** 141:10

**deposed** 177:18

**deposition** 5:4,11,14,18 6:8,9 9:14,19 10:9,18 12:10 13:6 14:4 24:1 26:6 31:16 33:1 76:18 87:4 91:17 100:2 101:13 120:12 126:24 139:17 144:18,24 145:1,5,6

**depreciation** 48:1 88:7,10 146:13 148:13,14,22 167:21 168:14,16

**describe** 82:1

**describes** 14:14 15:18 60:10

**description** 105:9 111:4

**design** 44:17,19

**designated** 7:5,10 10:9 60:2 145:5

**designation** 134:16

**desk** 51:14,20,23 66:2,6

**destroyed** 47:24

**destruction** 42:23

**detailed** 164:23

**deteriorated** 44:23 45:10

**deterioration** 45:24 46:10, 16 47:9

**determination** 65:22 130:19 144:2 149:23 162:22 163:14,16,22 166:10 167:21 175:22 191:21,24

**determine** 23:12,17 30:15 103:15 104:13 111:23 117:22 123:13 124:8 125:15 130:23 143:10,17, 19 149:11 154:7 162:16 164:8 166:25 174:1 178:6 180:13,16 183:11 188:24 189:4 193:16

**determined** 30:7 74:1 81:7 146:11 162:25 163:1 165:4,9 168:6 178:10 182:10 191:25

**determining** 30:20 103:11 191:13

**development** 73:3,9

**developments** 73:15

**develops** 70:22

**diary** 73:1,11,16

**dictate** 83:4 134:11

**dictated** 58:14 81:11

**differ** 81:17

**differentiate** 176:7 179:8 186:8

**differentiated** 186:2

**difficult** 106:13

**digesting** 62:24

**dings** 41:4

**direct** 10:4,5 37:12 41:11, 19 42:1 44:1,7 45:1,25 46:11,13,17,19 49:13 51:5,8 94:20 111:24 112:5 114:5,11,23 141:25 157:18 158:3,12 188:18

**directed** 180:10

**directing** 157:25

**direction** 159:6

**directions** 170:21 175:10

**directly** 42:24 45:14 54:6 95:6,9

**director** 51:2 53:22

**discern** 114:4,11,23

**discernible** 48:14,19,25 166:11,16

**discipline** 73:18,25 74:2

**disclaim** 25:12,15 28:1 115:5

**disclaimer** 25:5,8,11,19 89:5

**disclaiming** 55:4,5 115:4

**discount** 80:14

**discovered** 143:1,4,17

**discovery** 144:18,24,25 145:6

**discuss** 90:8 129:6 140:3 160:23

**discussed** 40:3 52:4,25 87:11 89:6 95:19 98:18 116:6 124:18 126:19 127:24 138:19 161:9 166:20

**discusses** 87:16

**discussing** 100:17

**discussion** 182:5

**discussions** 10:10 182:3

**displaying** 8:14

**dispute** 66:18 93:20 107:23 108:4 138:16

**distinct** 58:6

**District** 5:10

**division** 11:4

**document** 26:15 62:20 69:24 89:22 92:3 193:4 195:2 196:3

**documentation** 63:10 155:18

**documented** 67:9 111:6, 18 193:7

**documents** 10:12 61:5 97:19 138:9 153:7

**dollars** 13:8 79:12 146:14 148:23 159:24

**dome** 77:14,17 96:15 119:20 122:17,25

**doors** 189:22

**Dori** 128:11

**downtown** 105:18

**draft** 84:17

**drafted** 33:6 95:11 148:20

**drew** 153:18 155:12 163:17

**drives** 40:15

**due** 39:18 125:18 161:11 163:3 192:1 193:8,14 194:14

**duly** 6:16

**duties** 16:9,12 27:23 28:7

**duty** 18:21,25 19:19 22:24 23:2,6,9,11 27:15 29:11 35:10 86:4 113:11 131:5

### E

**e-mail** 62:15 76:21,24 77:2,6 94:23 95:19,23 96:20 100:23 101:19 102:13,14 110:9 111:2,9, 11 128:4,13 129:1,21 132:3,5,7,8,25 135:7 136:3,13 148:6,25 149:5, 10 150:8 154:14 155:4 156:24 157:13 199:14,16

**e-mailing** 127:1

**e-mails** 54:13 116:3,10 129:25 143:2

**earlier** 58:12 63:9 95:20 153:10

**earliest** 171:4

**early** 70:18 74:23 81:3,10 82:5,15 105:13

**earned** 12:21 13:18,19

**earnings** 12:18

**earthquakes** 37:3

**east** 162:3 163:11 176:17

**east-** 194:6,9

**east-facing** 161:21 178:1

**Eastern** 9:9 86:21 87:1 140:6,11 201:3

**eat** 139:10,14

**economic** 72:14

**effect** 71:17 101:21 186:1

**effects** 15:4,9

**elected** 16:21

**electronic** 6:8 58:16

**element** 169:9

**elements** 106:6,8 186:21

**elevation** 141:11

**elevations** 195:6,9

**embrittlement** 193:17

**Embry** 6:2 8:16 12:25 14:9

**emergency** 5:16,17

**emphasized** 154:22

**employed** 68:5

**employees** 57:23

**end** 5:18 40:20 43:24 88:11 100:23 159:22 201:4

**end-all** 53:17

**ending** 12:13

**endorsement** 124:4

**endorsements** 38:14

**ends** 129:21

**engagement** 67:10

**engineer** 57:5 65:16 97:1 103:15 116:25 118:4 141:1,22 153:6,19 156:2 181:8 198:1

**engineering** 92:8 102:20, 24 103:2 127:23 155:3,7, 25 169:3

**engineers** 65:11 85:14 119:15

**English** 157:22

**enlarge** 8:6

**ensues** 46:1,12

**ensuing** 46:13,19 123:13

**ensure** 18:19

**entail** 190:11

**entailed** 138:25

**entering** 85:13

**entire** 58:20 85:25 92:17, 22 93:1,25 94:7,12 103:19 110:15 111:23 118:20 120:24 131:4 157:17,20,23 158:2,7,11 180:25 190:8 196:2,10, 12,15 198:4

**entitle** 61:14

**entity** 11:7

**entry** 26:20 121:21 123:8 127:18

**envelope** 47:5

**envision** 139:7

**EPDM** 106:1,2,7 127:5 184:4 185:13 186:21 188:1,6,17

**equal** 19:7

**equate** 83:13

**equivalent** 47:25

**errors** 44:17

**escalate** 81:15

**escalating** 143:2

**escalation** 81:23

**essential** 72:2

**essentially** 77:6 151:6 171:19

**established** 72:7,13 181:18

**estimate** 26:24 79:21 80:8 82:20 83:22 84:2 88:5 136:4 143:14 147:5 148:14 153:5,9 154:17 157:2,6 159:22 167:7 168:25 170:7,12 172:7 190:16,17,20 191:25 192:3

**estimated** 118:19 143:20 146:6 149:23

**estimates** 75:25 77:17 78:3 83:21 84:9 128:19, 24 129:12,18,23 130:22, 25 131:18 132:9,12 137:24 138:3,5 144:8

**estimates/invoices** 143:5

**estimating** 198:18

**evaluate** 19:24 29:8 97:20 160:24 161:24 180:25 194:14

**evaluated** 20:17 55:24,25 72:8 84:6 85:7,24 157:17 168:2 192:24

**evaluation** 24:17,18 53:4 56:3,5 67:3 70:16 83:16 84:14,16,18 85:15 125:19 126:3,6,8 152:25 157:24 158:5 169:2 180:19 181:2,14,24 190:6 192:16

**evaluations** 24:11 55:17 197:12

**evaporation** 43:17

**event** 36:10 43:2 77:2 100:16 172:23 174:9 175:2,5 176:13 193:10 194:15

**events** 171:3 194:11

**evidence** 24:18,19 183:24

**exact** 51:12 133:6 138:15

**EXAMINATION** 6:17 192:12 195:22 197:23

**examine** 26:23 160:20 176:11

**examined** 126:15 152:12 161:20

**exceed** 129:4 130:2 132:10 135:5 136:5,14,21 137:8,20 143:4,11,18 146:8

**exceeded** 81:8

**exceeds** 131:2

**excess** 75:15 81:4

**exchange** 35:2

**exclude** 45:20

**excluded** 41:13 42:20,22, 25 43:1,12 44:2,8,11 45:18 46:1,12

**excludes** 43:4

**excluding** 32:12

**exclusion** 41:1 43:25 44:5,15,16 45:20,23 46:9

**exclusions** 37:14 38:13, 14 43:12 46:3 55:1

**excuse** 120:6

**exhaustive** 180:22

**exhibit** 8:3,5 9:13,18 10:9 12:5,6,8,9,23 14:2,4 24:1, 2,5 26:4,6,11 31:16 32:25 33:5,10,20 35:7 36:15,23 37:22 38:19,25 42:15,16 45:15 47:14,18 48:19 57:13 58:5 59:1,7 76:16, 18 80:23 86:9 87:2,4 91:15,17 95:23,24 100:2, 4 101:11,13 120:10,12 125:2,6 126:22,23 127:20,22 128:4,9,10 131:25 132:1,7,20,22 133:8,11 134:24 135:8 136:1,2,7,18 140:13 142:14,15 144:16 145:11, 18,19 147:14 148:4,6 149:2 150:6,7 154:10,11 158:22,24 160:20 161:24 164:21 167:5,6,19 170:7 171:25 175:7 179:19,22, 23 180:5 182:10 192:18 195:14

**exhibited** 163:3 194:23 198:6

**exhibits** 6:8,12 8:20 180:3

**expect** 34:14 47:10 117:15 186:18

**expectation** 118:1

**expecting** 35:1

**expense** 19:21 32:4,8 70:8 131:6,23

**expenses** 32:5 70:7 150:11,17

**experience** 15:5 30:23 31:3 57:5 66:8 72:16 109:16

**expert** 65:24 80:20,22 84:18 92:19 107:12 112:15 114:1,17 115:19 152:25 153:7 154:2,3 195:12 196:1 198:18

**expert's** 79:24 84:9

**expertise** 56:17 65:4 112:7 113:18 114:4,10, 14,22

**experts** 29:5,7 54:4,14 80:5,15 81:7 84:5 147:22 148:1 150:21 151:16 152:13,14,18,22 153:17, 24 154:5 156:18 191:5,13 196:6,25

**explain** 90:25 97:16

**explanation** 22:13 27:16 28:5

**exposed** 45:11 106:6,7,10 186:20,21 187:15 188:7, 17

**exposure** 43:16 53:4 75:6 98:10

**express** 33:25

**expressed** 198:22

**extensive** 165:23

**extent** 23:12,17 47:19 62:12 117:19,21 160:20 161:18 180:13

**extents** 161:13,17,18

**exterior** 122:11 152:12 194:9

**extrapolated** 183:21

**eye** 196:5

**eyes** 112:14

**eyewitness** 177:7

**F**

**facade** 179:13

**face** 14:16,20 32:4,11 73:18 74:2 78:2 80:12 161:7 178:15

**faced** 14:23

**facetious** 157:23

**fact** 36:23 39:4 67:20 68:16 81:7 85:10 95:6 124:6 177:8,15,16 192:1 193:6 194:13

**factors** 30:7 117:20

**facts** 22:13,16 24:17,18 25:8,10 27:17 28:6 34:23 72:14

**fade** 171:12

**faded** 189:22,24

**fail** 27:2,22 28:4

**failed** 193:17,19

**failing** 73:18

**fails** 27:8

**failure** 25:4,18 89:4

**failures** 193:18

**fair** 11:20,25 16:1 18:22 19:20 34:12 47:10 76:2 78:5,6 86:6 145:16 151:23 157:1 164:24

**Fairfax** 11:8,10,18,23 12:1,3,11 13:9,15,25

**fairly** 19:23 24:9,12 28:16 127:2 194:2

**fairness** 35:1

**faith** 18:22

**fall** 17:24

**fallen** 170:20 175:8

**familiar** 38:8,13 51:13 108:8 109:17

**fashion** 22:14

**faulty** 27:4,10 44:16

**Federal** 7:1

**feel** 38:19,23

**fees** 155:9

**feet** 107:3 117:25 147:18, 22 178:16 194:6

**felt** 36:16

**field** 114:17

**fields** 154:5

**file** 10:10,13 54:20 55:15 56:14 60:23,24 62:10 63:8,11,16,21 66:20 67:9, 12 72:19,22 73:2,4,7,25 74:17 78:24 79:18 84:23 94:23 95:3,4 97:17,18,22 99:6,12,15 103:19,21,22 104:1,5,10,22 109:3 111:7,18 132:14,16,19 133:3,7 138:14 166:9 191:8,18,20

**filed** 5:9 53:13 55:10

**fill** 83:7

**final** 67:5 110:11,13 132:22 133:8 134:23,24 148:11 160:8 167:20

**finally** 194:20

**financial** 11:8,10 12:11 13:15 70:25 71:7,13 134:6

**financially** 15:19

**find** 78:21 79:1 95:24 112:16,24 113:22 127:5 134:24 155:6 164:9 165:8 179:20 182:16 189:17

**finding** 113:22

**findings** 67:2 79:25 138:19,20 160:4,9,10 169:2

**fine** 41:4 194:20

**finger** 185:19 186:25

**fingers** 185:15

**fingertips** 184:21 185:2,3

**finish** 43:19,20,23,24 158:18

**finished** 158:20

**first-party** 19:12,14 73:15 81:16,24

**fit** 34:8

**fitness** 96:17 119:22

**fits** 158:6

**five-hour** 139:16

**five-page** 170:11

**flashing** 168:10 169:8,21, 24 170:16 193:22 194:5, 6,7,14

**flat** 102:23 114:21

**flavor** 43:19

**flipped** 196:3

**floor** 62:7 93:14 121:19,20 122:16,22,23 123:2

**floors** 127:15

**foam** 106:1

**focus** 94:4

**focused** 14:15 93:12 177:4

**focusing** 93:23

**follow** 17:8 57:14 59:6,8 73:6

**follow-up** 119:9 192:11 197:21

**follow-ups** 195:21

**footage** 107:24 108:2

**force** 170:20 175:8

**forensic** 153:5

**forever** 172:18

**forget** 173:18

**Forkan** 52:8

**form** 15:6 16:5 18:7 19:4 20:8 21:6 22:22 27:5,19, 25 28:9 29:2,14 30:11 32:1,7 34:9,22 35:4,13 37:4 38:5 39:17 40:18 41:6,19,21,25 42:3,10 44:10 45:16 48:11,16,22 59:9 61:24 63:3 64:25 68:21 71:8,15,21 76:4 80:17 84:11 92:24 93:2 94:2,9 98:8 103:3 104:17 107:14 112:1,8,18 113:2, 20 115:1,17 131:7,13 135:6,21 136:12 137:1 141:7 160:22 164:11,17 166:22 169:16,19 175:23 178:8 181:5 184:25 187:5,23 188:3,10,20 189:1,7 192:5 193:12 194:18 197:14 198:9 199:2

**formal** 132:12

**formalized** 64:7,20

**forward** 143:5 145:9

**found** 116:8 122:5,12 134:21 164:4,6 166:13 167:9,24 170:6 176:23 177:3 182:10 184:10 186:11,12

**foundation** 15:7 16:6 19:4 27:5,19,25 28:9 29:14 33:13 34:10,17 36:19 56:11,19 94:10 108:1,6 125:21 126:5 164:5 187:5,23 188:4,11,21 189:2,8 198:11 199:1

**fourth** 93:14 122:16

**fractured** 164:4,6,9 170:5 178:14

**fractures** 163:3

**frames** 178:19

**free** 38:19,23 200:25

**freezes** 140:18

**Friday** 5:7

**front** 9:13 17:11,17 20:9, 11 95:25 136:17 145:20, 22

**frozen** 140:20

**full** 6:19 19:20 20:20,23 26:11 28:24 113:11 131:22 158:1 160:20 161:13,17 181:2 193:1

**fully** 19:23 22:12 23:6

**function** 39:4

**functional** 38:9,10,18,24 39:2,4,10 40:13 41:1,8 48:8 169:14,22 170:3

**functionally** 41:3 169:24

**functioning** 48:9 169:12

**future** 70:17

G

**gain** 19:1

**Gallagher** 33:19

**gaps** 36:13

**gasket** 47:2,4 190:4 194:23 195:5,15 197:9

**gaskets** 44:24 104:6 115:10,11 152:10 190:1, 5,7 193:17 196:7,17 197:2,3,6 198:7

**gave** 61:25 62:3 85:9 98:16 113:7 134:22

**gear** 50:5

**geared** 81:21,22 82:9,10

**gears** 29:16

**general** 10:24 17:23 18:2 67:24 75:19 108:10 128:5 156:2

**generally** 17:6 98:12 117:16

**generated** 173:2

**Gillespie** 5:13

**give** 22:12 35:9 64:4 65:4 85:14,17 86:9 122:5 125:18 130:13 183:23

**giving** 172:8

**glass** 77:18 116:16 150:25 151:7,10 178:17

**glazing** 147:19,23 194:24

**global** 11:5 87:5

**good** 5:2 6:3 18:22 50:9 86:11 102:20 130:14,15 139:4,5 200:10

**gosh** 85:10

**governing** 58:15

**grab** 8:21

**gradual** 45:23 46:10,16

**gradually** 44:23

**gratuitous** 49:5

**Great** 155:22

**greater** 83:9

**Green** 115:9

**gross** 12:21 13:14,17,19 87:17

**ground** 112:14,23 173:19, 20

**grounds** 25:15

**group** 7:19 11:1,3,4,6,7 12:1 60:3,5,7 64:15 100:8,11 120:17

**grow** 15:15

**guess** 93:12,14 117:18 122:15 135:23 168:5,9 187:7,19

**guide** 18:5

**guided** 181:11

**guideline** 20:3 58:9 81:11, 25

**guidelines** 17:12,23 18:2, 9 23:24 24:6,19 25:6,16, 18 26:2 53:10 57:14,17, 19,22 58:1,3,6 59:6,12,18 60:19 61:1,9,10,16 62:9 70:15 71:22 72:6,18 88:25

**Guidice** 167:7,9,24

**Guidry** 8:2

**guy** 65:8

H

**Haag** 65:13,14 66:10,21, 25 67:2 76:11 77:22 92:8 95:10 97:4,7,11 106:12, 16,20,22 119:5 125:2 138:12 140:13,15 153:19 154:19 155:2,15,16,24 156:9,11,15,16,19 158:5 160:1,5 168:11 169:2,4,7 171:16 179:23 180:3 191:6

**hail** 14:23 15:3,8,10 30:24 31:2 35:12 37:19 38:3 39:13,18 40:9,16,22 41:2, 17,19,22,25 42:8 43:22 44:3,8,24,25 45:9 46:18, 23,24 47:3,11,12 48:15, 20 49:14,15 61:19 64:13 77:21,24 87:21 92:9,18 96:22 97:8,13 110:16,20 111:25 112:5,13,16,17 114:4,11,23 115:6,7,11, 15,19,24 120:17 122:2 125:18 126:16,17 127:6 129:3 132:10,11 133:9, 14,23 135:1 136:4,21,24 137:8,13,20 141:10,23 142:11 143:4 146:20 147:23 157:19 158:3,12,

15 165:8,10,13 166:11, 12,13,15,17 169:25 170:5 171:3,11 172:4,24 173:6, 22 174:1,3,9,13,17 175:2, 5,7,12,14 176:18,21 177:2,5,13,25 178:10,18, 22 179:4 182:22 183:1 184:24 185:14 186:1,8,17 187:1,2,7,14,15,19,25 188:2,17 189:17,25 190:4,7,22 192:16 193:10 194:11 195:15 196:17 197:7 198:2,23

**hail-caused** 180:13

**hail-created** 189:21

**hail-related** 195:8 198:7

**hailstone** 163:3 170:15 194:8

**hailstones** 170:19 175:8 183:12,22

**hailstorm** 35:8 41:15 62:14,17,22 86:1 88:14 108:9,12,23 147:15 154:8 171:22 175:13 176:15 192:6 193:23

**hailstorms** 171:7 174:19 183:5,9

**half** 50:23 85:3 166:1,3,5 182:23 183:2,13

**hand** 78:3

**handed** 57:18 191:10

**handful** 151:22 152:3 171:3

**handle** 130:10

**handled** 53:24 58:20

**handler** 18:8 50:13 51:18 55:14 73:17 154:15

**handler's** 72:15 73:23

**handlers** 58:24

**handling** 16:17 17:12,20, 22 18:5 57:17 58:15 59:1 60:19 67:23 72:9,16 74:15

**Hang** 139:25

**happen** 73:10 104:19,21

**happened** 90:1 92:12 96:10 101:8 117:2 143:6 169:3

**harbor** 14:16,19

**hard** 57:18 106:14 122:18

**HCS101734** 33:2

**head** 162:11

**headquartered** 15:22

**health** 70:25 71:7,14

**hear** 28:12 160:6

**heard** 66:23 132:13

**Held** 54:9 83:21 97:7,12 118:15,19 151:4 153:18 155:6,12,16 158:5,24 159:5 160:4,9,19 161:17, 19,23 162:25 163:1,8,15 164:3,6,7 165:3 166:10, 15,24 167:12 170:6,15, 19,25 171:15,18 172:22 173:11 174:12 175:6 177:25 178:10,14,18 179:13 189:10,17,23 190:16,21 191:6 192:1, 15,24 193:7 194:13,22 195:4,8 196:25 197:8

**Held's** 119:12 172:6 194:3

**helpful** 104:18

**helps** 130:11

**Hey** 13:5 64:12 75:25 77:7 80:14 176:17

**higher-ups** 65:7

**highest** 33:17 89:9

**highway** 139:11

**hindsight** 100:24 103:1

**hire** 64:17 66:3,7 68:22 69:1

**hired** 54:4 59:22 66:22,24 69:3 85:17 141:22 153:12,17 154:3,4,5 191:6

**hiring** 114:1

**history** 108:13

**hit** 40:9 82:24,25 134:15 173:6 174:13 176:21,24 189:17

**hits** 45:9,10 47:4

**hitting** 172:24

**Hoffmeyer** 153:19

**hold** 11:22 13:6 179:19 185:22

**holding** 11:19

**Holdings** 11:8,10

**holds** 194:21,22

**hole** 96:16 104:8 119:21 122:5 168:22,23

**homework** 32:23

**hood** 40:9,23 41:5

**hotel** 5:5 14:25 36:1,8,10, 12 44:23 49:12,14 50:3 61:13,20 62:1,5,18 64:13 87:24 93:8,16 99:10,19 100:25 101:5 104:6,9 105:11 107:3,6,24 108:3, 23 111:17 117:16,24 125:15 129:13 132:10 136:5 138:13,22 142:4 147:19 150:22,23 151:13, 21 152:16,17,21 153:24 157:18 158:2 161:13,19 162:7 164:2,10 180:12, 14,16 189:6,22 190:7,8, 24 195:6,10 196:7 197:2, 6

**hour** 66:17 139:19

**hours** 119:3 120:25 121:8, 12 139:18

**housekeeping** 6:7

**Houser** 153:18 155:12

**Hudson** 5:6 6:4,14 7:6,18, 19 8:2 9:17 10:24,25 11:1,3 13:22 14:6,14,18, 22 15:2,13,18,22 16:2,9, 12,15,16,23 17:2,3,7,13 18:8,21,24 19:6,17,19,23 20:1 21:2,8,19 22:7,11, 12,16,19,23 23:2,6,11,16, 21 24:14 25:1,4,16,24,25 26:23 27:2,7,8,14,15,23 28:15,18,23 29:4,6,11 30:1,7,9,15,19,22 31:3, 11,12,17,21,24 32:11,17, 22 33:1,6,7 34:4,8,15,21 35:1,9,10,16 36:1,6,10,14 37:2 38:8,13,17 46:18 47:8,10 48:13,18 49:4,9, 15,19,24 50:2,23,25 51:24 53:4,13 54:4,23 55:16 56:12,15,17,23 57:1,4,8 58:23 59:20,21, 23 60:15,18,25 61:4,9,13, 21 62:9,25 63:10,15,23 64:1 65:2,7,12,17,21 66:1,13,21,22 67:1,5,13 68:22 69:3 70:14 71:3,14 72:2,12 73:17,18 74:16 78:19,20 79:23 82:13,14 83:1,8 84:6,18 85:17,23, 24 86:3 87:9 88:21,25 89:14 91:5,12,19 92:7,16, 25 94:13 95:10 97:4,7,11 98:6,16,20,25 99:8,16,18 100:11,13 101:4 102:9 103:1 105:9 106:4 107:2, 5,9,23 108:8,16,21 109:1, 15,21,24 110:4,15 111:17,21 112:3,6,11,13, 15,22,24 113:5,11,15,17 115:13,23 117:12,15,22, 25 118:9,12,15,19,22 120:7,16 124:6,15 126:14 130:15 131:5,9 132:16 133:3 134:17 138:20,24, 25 140:25 141:5,23 142:3,7,12 143:16 144:1, 4,7 146:18 147:13,18,21 148:1 149:15,23 150:21 151:15,22 152:3,13,14, 18,21,24 153:12,23 154:14 155:25 157:17,24 158:1,9,10 159:23 160:15 162:15,25 163:1 164:1 165:1,2,3,15,20 166:12, 17 167:10 171:8,11,16 175:21,25 177:7,11 178:23 181:12,14,19,21 183:1 184:3,24 187:3 188:8,19,23 189:4 190:3, 6,14 191:1,5 192:1 194:21 196:4,14

**Hudson's** 7:9 17:19 19:17 20:10,12,19,23 23:24 24:6,8,19,24 25:6,16,17 26:2 27:18 28:6 33:18 37:17 48:4 59:5,12,18 63:10 71:22 72:6,18 79:24 81:7 84:15 88:25 95:7 103:16,19 110:25 113:14 130:24 131:23 143:9 169:23 176:20 177:1 179:6 180:24 181:1 187:10 189:20

**hurricane** 133:25

**HVAC** 153:6

**hypothetical** 16:11 45:6

**hypothetically** 40:9 74:8, 9 112:11 188:1

## I

**I-N-E** 199:25

**ice** 38:5

**idea** 61:13 102:20 146:1 151:15 174:14 183:1

**ideal** 71:16

**ideas** 185:12,17

**identified** 33:5 62:10 141:22 195:13

**identifies** 159:13 198:6

**identify** 5:19,22 31:1 100:6 154:18 156:17 195:4,8 197:5

**identity** 170:4

**illuminate** 180:18

**imagine** 73:14,16

**immediately** 62:1 127:25

**impact** 162:3,4 170:16

**impacted** 158:15 194:9

**impacts** 163:3 194:8 195:16

**impairment** 38:10,18,25 39:3 40:13

**impairs** 48:9

**implemented** 16:16 81:11 160:4

**implicated** 59:15

**importance** 26:1

**important** 36:17 46:25 70:24 71:3 104:12,15 124:1 175:19

**improper** 44:16

**incepted** 100:15

**inception** 53:18 99:1,4 104:14

**inch** 183:2,13

**inches** 106:3 182:23

**incident** 74:10 75:1

**include** 6:11 36:14 47:14 53:3 83:17 97:24 155:17 158:16

**included** 33:11 34:6 37:2, 18 38:9 44:4,20 48:4 60:22 97:23 111:23 169:8 170:10 192:2

**includes** 107:8 155:8 194:5

**including** 15:9 33:18 54:3 70:12 96:14 119:20 153:18 155:18 159:22 169:7 170:21 180:25 191:6

**income** 12:19 31:25 47:19

**incorporated** 160:9

**incorrect** 114:15

**increase** 102:5

**increased** 79:10

**incumbent** 25:24

**incurred** 47:20

**incurring** 150:11,17

**indentation** 179:2,4

**indentations** 170:16,20 175:7,9,10 178:1 179:16 184:14 186:16

**indented** 194:10

**independent** 23:21 92:7, 16 107:19 118:24 157:24 158:1

**indicating** 174:8

**indication** 80:4 104:5 114:15 125:18 182:5 183:15 197:8

**indirectly** 42:24

**individual** 72:3

**individually** 68:17

**indoor** 152:19

**industry** 15:5 31:24 51:13 67:18 108:13

**influences** 72:15

**information** 20:21,25 21:4,5,10,11,14,16,20,21 22:4,9,24 23:3 27:3,8,13 29:4,6,8,10,11 62:24 63:16,20 64:4 67:11,15, 22 82:5,8 84:20 94:25 95:9 112:6 113:23 114:15,21 116:4 148:2 150:18 155:17 156:22,23, 25 157:8,9,14 166:7,8 181:21,23 184:5

**initial** 74:16 88:19 154:20 156:9,21

**initially** 74:18 88:18 185:18

**injury** 72:14 81:18

**inquiry** 11:14,16 13:8 29:22

**inserted** 36:16

**inserts** 77:17 96:18 122:14 123:6,10,14

**inside** 122:1,2,4,19

**inspect** 30:19 32:17 35:10 51:21 77:22 92:8,17 96:3 98:17 101:4 111:7 118:2, 13,16 119:13 120:21 121:11 138:13 159:10

**inspected** 95:15 96:7 100:24 119:18 121:23,25 122:17,22 123:2 125:12, 14,15 127:13 138:18,22 151:16,22 152:3,17,20,21 158:11,14 165:5,7 180:12,14,15 185:13 189:23

**inspecting** 31:11 98:21 111:1,17,23 117:12,16 118:20

**inspection** 94:14 96:8 98:2 100:25 101:8 117:6 118:18 119:10,25 120:21, 24 121:8,9,11 124:19 125:25 138:19,24 147:6 154:20 155:13 156:10,21 158:25

**inspections** 98:13

**inspects** 97:1

**instance** 40:8 43:9 44:22 47:2 61:12 62:4 65:20 106:5 112:10 115:8

**instructed** 124:6

**instruction** 127:10 154:6, 25

**instructions** 60:19 62:3 70:13 103:14 110:25 111:6,13,16 117:25

**instructs** 61:18

**insufficient** 21:3,10,14,20 22:4

**insulated** 151:3

**insulation** 186:1

**insurance** 5:6 6:15 7:6,19 9:17 10:24,25 11:1,3,4,5, 11,18,25 13:22,23 15:13, 15 16:3,13,17 18:16,25 19:10 29:18,19 31:7,17, 23 32:4,12,16 33:1,7 34:4 37:13,17 38:10 40:14 41:13 51:13 56:18,24 57:2,10 62:19 70:5,25 71:14 82:13,14 85:24 97:5 98:7 100:11 103:9 107:10 108:13 109:25 120:16 133:22 144:12 150:10,16 152:22 153:23 157:17 158:10,11 165:1,3 166:17 196:4,14

**insure** 14:24 32:19 36:1 42:23 47:8

**insured** 23:16 27:20 28:4, 8 35:8,17 36:6,10 37:12 41:10,12,15 42:8 44:1 45:25 46:11 47:13,24 56:21 77:8 91:2 98:17 101:23 102:1,9 111:3,11

116:20 119:1 122:23 130:22 131:11,17 134:25 137:12 143:9 155:1 175:25 181:4,7

**insured's** 19:7 92:9 96:14 119:19 130:19 143:17

**insureds** 16:10 19:1,13,17 23:19 28:16 29:7

**insurer** 14:7

**insurers** 16:16

**insures** 41:11

**insuring** 30:1 31:4 34:7 36:11 101:5 104:16

**interests** 19:7,8

**interim** 12:11,12 120:15 147:6

**interior** 47:15 121:25 122:17 152:16,17 161:20 192:25 193:8

**internal** 53:10 58:3,6 99:19

**internally** 52:25 63:11 78:20 134:17

**interpreted** 166:6 186:24

**intimated** 69:22

**introduced** 6:22 8:3 12:5 14:2 24:2 26:4 76:16 87:2 91:15 100:4 101:11 120:10 125:6 126:22 127:20 131:25 132:20 142:14 145:18 148:4 150:6 154:10 158:22 167:5 179:22

**intrude** 44:25

**intruded** 164:2,10

**intrudes** 47:4

**intruding** 47:3

**intrusion** 45:13 125:16 155:10 162:17 163:6,10, 15,23 165:4 180:17 188:25 189:5,12

**invalidated** 25:14

**investigate** 23:7,9 27:12 29:12 61:19,21 62:25 63:2 80:11 131:5 164:1 165:16

**investigated** 116:8 168:6

**investigates** 61:6

**investigating** 80:10 176:16

**investigation** 19:20 20:16,20,24 23:22 24:9 27:4,9 28:20,24 35:15 57:9 60:14 61:14,22 86:4 92:15 98:6 108:21 109:13 111:22 113:12 123:12 131:23 140:16 143:25 155:9 158:2 164:8 165:23,24 171:1,6 176:10 188:24 189:4 190:14

**investigations** 24:11,14

**invited** 54:18

**invoice** 63:17 66:15 115:9 120:16 143:12 152:5

**invoices** 63:14 74:24 75:10,12,15,18 113:7 115:21 116:7 130:19 135:4,17 147:7,10,11,14 149:12,16,18,24 150:2 151:19 152:4 191:15

**invoked** 82:15 89:20

**involve** 144:12

**involved** 36:24 52:20 53:22 54:4,6 55:12 69:17, 23 70:1 75:22 81:13 90:22

**irrespective** 157:25

**issuance** 99:9

**issue** 41:9 47:18 48:5,19 49:15 54:24 59:11 63:12 71:11 74:5,12,13,15 99:9 101:20 105:2 152:20 160:16 165:20 166:5 184:24 189:12

**issued** 31:12 79:12,14 88:2,13 91:7,12,18 98:3, 21 103:20 104:2 125:7 127:23

**issues** 49:22 62:13,16 74:5 91:3 104:8 119:7 197:10 198:2

**issuing** 50:3 98:14

**item** 157:2 169:2

**items** 32:12 62:14 156:5,7 157:6 192:2

## J

**J.S.** 54:9 83:21 97:7,12 118:15,19 119:12 151:4 153:18 155:6,12,16 158:5,24 159:5 160:4,9, 19 161:17,19,23 162:25 163:1,8,15 164:3,6,7 165:3 166:10,15,24 167:12 170:6,15,19,25 171:15,18 172:6,22 173:11 174:12 175:6 177:25 178:10,14,18 179:13 189:10,17,23 190:16,21 191:6 192:1, 15,24 193:7 194:3,13,22 195:4,8 196:25 197:8

**Jeff** 5:14 6:2 199:9 200:12

**Jeffrey** 153:18

**job** 73:22,23 118:25 130:14,16

**Jocelyn** 153:19

**John** 129:7 150:18 156:12

**jointly** 159:16

**Joseph** 167:7

**July** 100:16,23 128:6,13, 16,22 129:17 132:3,4 136:2,6,19 144:1,5

**jump** 187:22

**June** 5:7,8 75:2 95:17 96:3,4,7 124:22,25 125:8, 13,14,20 127:23 155:14 158:25 159:7,9,10 171:19 173:3 175:2 180:15,16 189:23

**jurisdictional** 72:15

**jury** 16:1 34:19 56:17 67:13 90:25 97:16 105:9 138:10 142:3 196:5,16

## K

**Kaho** 10:16 50:12 51:5 57:6 60:20 64:2,8,12,17, 18,25 65:7,12 66:2,6,10 67:15 75:25 76:21 77:6, 12 89:8 91:7,13 94:18,21 95:7 96:4 107:8,10 109:6, 18 110:6 111:17 137:11 154:15,22 155:5 157:7,9 159:5 181:23 182:6

**Kaho's** 82:11 96:6

**Kevin** 153:2

**kind** 46:21 47:25 62:2 82:6 93:19 105:7 106:14 119:9,10 139:10 174:15 176:9 180:18 183:1,23,24 186:7 190:2,10

**knew** 68:11 78:7

**knowing** 20:11

**knowledge** 19:2 39:5 58:17 62:11 63:1 95:7,11 107:16 111:19 123:14 165:7

## L

**lack** 35:1 193:8

**lacks** 114:3,10,22

**Lafourche** 8:1

**laid** 16:24

**Lakewood** 5:5 37:11 105:6 108:9 124:8

**language** 31:7 32:13 33:6, 9 34:14,20 35:7 36:15 39:13 44:4,20 46:1,8 54:24 166:18

**large** 13:22,23 14:1,23,24 15:3 32:5 59:11,14,17,20 71:9 82:7,19,22 83:3,5,7, 8,11,14,24 84:4,17 85:13 89:18,20 102:20 105:14 108:7,16 116:21 147:2 162:13,15

**larger** 168:17 183:5,8

**largest** 32:8 108:12,15 182:21,23

**Larson** 68:5,17,23 69:6, 17,23,25 87:11 153:13 154:15,23 159:6 180:11

**laundry** 17:14 43:5,11

**law** 18:18 20:7 22:19 23:8, 12 27:15,17,24 28:6,8,21

**laws** 16:16,23 17:21 18:4, 11

**lawsuit** 6:24

**layer** 105:25 106:1

**leading** 11:5 13:22 14:7 193:11 194:16

**leak** 119:22 121:25 122:3, 6,9,11,24 125:17 127:3,6

**leakage** 43:17

**leaking** 77:23

**leaks** 49:22 94:5 96:16,17 119:21 176:16

**leave** 68:8

**leaving** 68:18

**left** 12:23 141:17

**legislature** 16:15,20

**lengthy** 164:23

**Leppich** 76:24,25

**letter** 54:24 67:10 91:6,9, 12,13,18,22 92:6 95:17 96:6 128:20,25 129:10,24 132:12 153:1 157:10,11 180:5 199:23

**level** 55:9 93:9,24 94:1,8, 12 106:5 121:19 160:25

**levels** 33:17 93:7,15,19,21 126:15 181:1

**Lexitas** 199:16

**liability** 72:13

**liable** 46:13

**licensed** 57:2 109:22 153:1

**lifetime** 39:15

**light** 43:16 81:10

**lights** 91:22 178:15

**likewise** 57:1 107:10

**limit** 32:11,14 90:18

**limitation** 139:17

**limitations** 37:15

**Limited** 11:8,11

**limits** 32:13

**Lindsey** 59:22 60:1,3,6, 11,16,25 61:5,6,8,10,14 63:9,11 65:20 66:4,7,9, 21,24 67:2 68:2,6,9,15, 18,24 69:9,11 75:6,24 87:13 94:18 109:12,19 110:7,11 120:16 141:1

145:25 147:4 153:13 156:15,20 181:17 191:7

**Lindsey's** 60:18 61:22

**linear** 194:6

**lines** 60:7

**list** 17:14 43:5 62:13,14 64:1,18,21 119:19 180:22

**listed** 9:18 11:14 17:2 29:23 34:15 43:22 62:8 171:7

**listing** 96:14

**lists** 43:11 62:22

**literally** 137:5

**litigation** 53:18

**load** 172:18 192:20

**loading** 146:19 172:14

**lobby** 62:24 96:15,17 119:21,23 125:17 180:18

**located** 105:2 160:25

**location** 64:5 172:25 174:3,7,9

**locations** 142:10 174:5

**log** 94:22

**logic** 90:19

**long** 48:23 50:20 67:18, 21,24 80:2 117:15 118:1, 6,10 119:6 176:8

**long-tail** 71:1

**long-term** 15:4,9

**longer** 50:22 68:15

**looked** 10:10,13 57:12 60:24 73:25 84:25 85:5, 22 92:20 94:11 108:7,25 115:10 117:11 121:9 122:24,25 124:10 126:20 133:1 134:20 136:9 148:15 160:3,8 161:10 162:6 163:9 165:6 169:7 174:22,23,25 175:4 181:3,7,10 184:11 186:14,23 189:10,13 190:15 191:18 196:23 197:3,7,15

**looped** 54:8

**loss** 26:24 37:13 38:10 41:11,19 42:1,23,25 43:3, 4,18,25 44:3 45:14,25 47:19 48:10 49:1,13 53:4 54:15 59:10,11,14,16,17, 20 60:2,6,10 61:19,21 62:18 64:5 70:9 79:21 80:7 82:7,19,21,22 83:3, 5,7,8,11,14,24 84:2,4,17 85:13 87:9,17,20,21 88:13,22 89:19,20 98:21 102:9 105:21 111:22,24 112:5 113:17 114:5,11,24 130:23 133:9,13,14,17 134:25 135:3 136:11 137:12,16 141:25 148:11 149:6,9,10,11,23 152:25 153:5 154:17 156:9,11,21 157:2,18 158:3,12 165:16,22 170:22 171:20 173:8,18 175:11 176:13 177:9 178:22 182:11 184:23 188:9,18 189:25 193:10

**losses** 23:22 64:3 75:16 81:16 98:13 99:18,22 100:20 102:21 108:16

**lost** 47:24 72:6 135:14

**lot** 106:12 161:12 169:6 197:17

**lots** 39:13

**loud** 92:1

**Louisiana** 8:1

**lower** 90:15

**lunch** 139:10,14

## M

**M-a-i-l.com.** 199:15 200:5

**M-O-R-K-A-N** 51:9

**Madam** 6:6

**made** 16:20 33:3 55:8 67:20 91:9 117:13 145:13 161:9 180:22 185:21 191:5

**mail.com** 199:15

**mail.com.** 200:4

**maintain** 55:16 64:1

**maintenance** 193:9,15

**major** 60:2,6,10 62:22

**majority** 176:24 192:2

**make** 26:24 49:5 53:8 63:21 79:8 84:13 85:5 102:22 144:1 159:23 162:22 163:15,22 166:10 175:21 191:20

**makes** 51:19 181:19

**making** 65:22 67:2,5 141:5 191:23

**management** 5:5 33:18 34:13 89:16 128:17,19 137:22,23 149:12,16,24 154:18

**manager** 55:5,19,20 75:19 81:15 90:4 128:6 156:2

**manner** 25:5,19 56:16 89:5

**manufactured** 190:23

**map** 105:8

**March** 12:13 75:1

**mark** 124:1 178:24,25 179:4,9

**market** 13:22 14:7

**marks** 171:12,18 178:11 179:12 182:14 189:21

**marred** 44:6

**marring** 38:14 43:15,21

**Martin** 197:25

**Martin's** 198:5

**matches** 148:12

**matching** 149:6

**material** 44:16,18 47:25 67:9 105:20 184:10 186:15 188:13 190:2

**materials** 171:12

**math** 88:16 149:20

**Matt** 155:14

**matter** 5:5 6:7 23:7,10 53:9 55:6

**matters** 23:20

**Matthew** 66:10 92:8,15,17 94:20 95:1,15 96:2 125:18 127:22 153:19 160:10 179:24 180:24 181:24 182:6 183:19

**Mcgovern** 128:12

**meaning** 40:14 63:12 79:22 157:23 163:8 183:13,21

**means** 44:3 51:17 101:23 133:10 156:16

**meant** 63:23 156:15 185:20

**measurable** 173:22

**mechanical** 153:7 155:11

**medium** 13:25

**meet** 118:4

**meeting** 76:12,13 121:7 151:12

**meetings** 116:5 121:9,10

**membrane** 127:6 184:4,5, 20,22,23 185:4,8,13,14, 15,17 186:7,21 187:3,13 188:1,7,18

**memo** 173:23,24

**mention** 74:10 110:14 124:13,14 171:2 173:13

**mentioned** 123:19 154:1, 4

**mentions** 123:21

**mercy** 129:19

**meritorious** 88:23

**merits** 24:13

**met** 20:14 76:14 156:1 181:7,8

**metal** 44:25 170:21 175:9, 10 193:18

**meteorological** 108:25

**meteorologist** 108:25

**meteorology** 153:6

**mezzanine** 93:10,13,24, 25 94:8,12 105:22 106:5 121:19

**middle** 105:16

**mile** 172:25

**miles** 173:1,20

**Miller** 5:14 56:13,18 57:4 75:19 116:11 128:5,17,23 129:13 132:4,5,9 135:3, 17 136:3,19 139:23 148:7 150:8,9 156:12

**million** 71:12 84:3,24 85:3,12 102:3 134:2,7,8 153:10

**million-plus** 79:21 80:8 82:20

**millions** 12:22

**mind** 45:21 180:24

**minimum** 84:19

**minus** 168:14

**minute** 69:22 192:20

**minutes** 86:16 135:22 136:15 139:18,20

**misrepresent** 22:16

**missing** 115:3 185:4

**mistake** 54:15

**model** 131:11

**models** 84:8

**moment** 36:11

**monetary** 89:8

**money** 49:9 70:5,17,22

**monitoring** 54:1

**months** 12:13 84:24 88:17 96:21 122:10 127:7 132:19 165:15,20,24 166:5

**Morkan** 51:9 52:11,13,14, 17,20,25 53:11 55:20

**Morkan's** 51:10

**morning** 5:2 6:3

**Mount** 121:16

**move** 138:8,9

**moved** 69:8,16 186:12

**moving** 141:13

**MPEG** 200:13

**multiple** 183:5,9,11,14,22

N

**names** 33:22 68:7 129:20

**narrative** 198:19,21

**Nathan** 101:16 102:2,13

**nature** 17:10 20:2 34:6 53:5 54:14 109:25 117:17

**nay** 65:2

**nearby** 183:6,9,12,23

**necessarily** 176:17

**necessity** 131:1

**needed** 80:11 116:4 154:2

**negotiated** 30:12

**negotiation** 30:15

**net** 77:13 78:4,20 87:16 95:20 124:20 146:11 148:11,21

**newer** 174:13,17

**newly** 143:3

**nonetheless** 81:25

**nonevasive** 10:6

**nonrecoverable** 88:7 146:13 148:13,22

**nonresponsive** 113:9 117:4 138:8 144:14,19 150:5 171:10

**normal** 32:5

**north** 74:2 96:16 119:12 161:7,12

**north-** 178:1

**north-face** 194:7

**north-facing** 160:21 161:14,18 194:9

**note** 94:22 99:6 122:7 127:25

**noted** 119:24 122:13 123:9,11 145:17

**notes** 41:10 139:1,2

**notice** 35:9 53:25 62:15, 18 80:21 91:2 109:1,4 111:5

**notifying** 91:3

**notions** 56:8

**November** 51:1

**number** 11:17,22 31:22 42:18 71:9 80:5 83:18 90:19 108:5 135:11 147:8 148:12 149:6,15,20 150:19 157:3 163:25 168:2,16 192:14

**numbers** 130:13 169:4

**O**

**oath** 7:12

**object** 11:13 15:6 16:5 18:7 19:4 20:8 21:6 22:22 27:5,19,25 28:9 29:2,14 30:11 32:1,7 33:13 34:9, 17,22 35:4,13 36:19 37:4 39:17 40:18 41:6,21 42:3, 10 44:10 45:16 48:11,16, 22 56:9,19 59:9 61:24 63:3 68:21 71:8,15,21 76:4 80:17 84:11 92:24 93:2 94:2,9 98:8 103:3 104:17 107:14 108:1,6 112:1,8,18 113:2,8,20 115:1,17 117:4 125:21 126:5 131:7,13 135:6,21 136:12 137:1 138:8 141:7 144:22 150:4 160:22 164:5,11,17,22 166:22 169:16,19 171:9 175:23 178:8 181:5 184:25 187:5,23 188:3,10,20 189:1,7 192:5 197:14

**objection** 11:24 13:8 21:12 27:11 29:22 144:14,19 145:13,16 193:11,12 194:16,18 198:9 199:1

**objections** 145:8

**objective** 80:12

**objectively** 22:24 28:16 84:8

**obligation** 113:17 117:22 120:7

**observation** 193:16

**observe** 177:25

**observed** 96:13 119:18,19 170:15 178:14,18 179:12

**obstruct** 31:10

**obtain** 21:21 23:2 112:6

**occasion** 38:9

**occasions** 117:9

**occur** 99:22

**occurred** 99:24 100:21 118:18 133:23

**occurrence** 35:9

**occurring** 37:13 41:12

**October** 143:22 144:1,5 145:25 148:7 150:14

**odd** 146:13

**Odyssey** 11:4,6,7

**offers** 137:21

**offhand** 20:11

**office** 52:3 129:7

**offices** 15:23

**official** 139:22

**older** 44:5 47:8 124:4

**omission** 44:17

**one-inch** 178:11

**one-page** 62:20

**one-time** 74:10

**online** 172:23

**opens** 47:4

**operate** 52:1 97:8

**operated** 41:4

**operates** 40:11,15

**operating** 32:5 69:18

**opinion** 20:10,12 84:25 85:18 194:8

**opinions** 7:9 198:22

**opportunity** 30:19 32:17, 22 34:5 98:16

**opposed** 107:21

**order** 5:16 83:7

**orders** 5:19

**origin** 155:9 164:8 165:4, 10

**originally** 133:21 187:2

**outcome** 28:23

**outline** 149:11

**outlined** 148:14 151:3

**overview** 24:5

**owed** 16:9 27:23

**owes** 16:12 18:21

**owned** 11:7

P

**P-I-N-E** 199:14

**p.m.** 86:23 128:7 140:7,8 150:14 201:3

**pages** 36:25 146:17 184:2 195:24 196:20

**paid** 12:2 31:20,25 32:6 66:13 70:20 79:23 80:2 169:17

**paper** 57:18 58:16 137:3, 18

**paragraph** 77:5,9 91:22 125:11 126:10 180:10 184:16,18 193:1,2,13,14

**paragraphs** 77:20

**parameters** 23:7 118:9

**parapet** 193:22

**Parish** 8:1

**parking** 161:12

**parse** 137:17 138:10

**part** 11:1,6 18:15 21:3,9 22:8 41:18,25 44:11 57:13 58:5 63:10,18 73:22 97:22 98:5 112:4 117:21 126:20 131:21 152:10 158:14 172:6,22 175:16

**partial** 27:18 28:7

**partially** 22:12 114:9

**particles** 38:5

**partner** 15:19

**parts** 106:11 177:4 196:22

**party** 82:11

**pass** 192:8 197:20

**past** 7:20 66:8 109:18 146:25 172:13

**patched** 122:10 127:5,7

**patched/caulked** 122:9

**pause** 85:10

**pay** 21:23 29:19 34:15 41:2 47:12 49:9,11 66:13 70:23 79:8,10 131:3 144:11 191:10

**paying** 32:8 79:18 85:12 89:15 159:24

**payment** 18:19 37:10 40:15 49:15 79:9,14 82:24 84:7 88:2,12,21,23 89:9 91:9 161:9 165:21 167:10

**payments** 49:5 53:9

**PDF** 38:1 42:15,19 43:10 46:4

**peeling** 163:20

**Peirce** 5:25 6:6,11,18,23 8:4,12,17,19,22,24 9:2,5, 10 11:20 12:6,7,8,25 13:3,10,12 14:3,9,11,12 15:9 16:8 18:10 19:6 20:10 21:8,17 22:23 24:4 26:5,9,11 27:7,14,22 28:3,12 29:4,16,25 30:14 32:3,10 33:14 34:12,19, 25 35:6,16 36:20 37:7,9 39:22 40:21 41:9,24 42:6, 13,18 44:14 45:19 48:13, 18,24 50:5,11,12 56:12, 22 59:10 60:13 62:4 63:7 68:22 71:12,18,22 76:7, 17 80:23 84:15 86:8,13, 15,19 87:3 91:16,25 92:5, 25 93:5 94:6,13 98:10 100:1,6 101:12,16 103:6 104:19 106:20,25 107:2, 18 108:4,8 112:3,10,20 113:8,10,24 115:22 117:3,5 120:11,15 125:1, 4,7 126:2,7,23 127:1,21 131:9,21 132:1,21 135:9, 12,15,25 136:1,18 137:2, 5,25 138:7,12 139:7,21 140:2,12 141:9 142:15, 18,20,22 144:14,16,20,22 145:2,7,10,14,16,19 148:5 150:4,7 154:11 158:23 159:3,5,19,21 160:24 164:7,15,20 165:1 166:24 167:6,13,16,18,20 169:17,23 171:9,11,24 172:3,6,10,12,15,20 175:24 177:18,21,25 178:10 179:18,23 180:2, 6,8 181:12 185:6,21,25 187:9,25 188:5,6,15,23 189:3,13 192:8,21 193:11 194:16,18 195:20,23 197:17,20 198:9,11,15 199:1,5 200:12,16,19,22 201:1

**pellets** 38:5

**penalties** 7:15

**pending** 7:25 77:13 155:15 169:2

**people** 40:6 64:18,21 69:13 113:14 116:23,24, 25 118:5 119:15 173:19

**percent** 85:20 149:19 162:6,21 188:25 189:5,15 197:1,15,17,18,19

**percentage** 189:14

**perform** 35:14

**performance** 55:16 56:2 74:7

**peril** 23:13 35:12 41:15 42:22 44:2 45:25 46:12 49:8 112:24 175:12

**perils** 37:18 41:10 42:20, 25 43:12 49:5 110:16

**period** 11:23 20:18 37:13 41:12 42:25 43:3,20 49:14 173:7 175:12,17,19 176:3

**periodic** 57:15

**periods** 85:7

**perjury** 7:15

**permanent** 48:14,20 49:1 166:11,16

**permission** 34:1

**person** 29:10 52:20 65:4

**personal** 7:9

**pertaining** 5:16

**pertinent** 11:16

**peruses** 92:3 193:4 195:2

**philosophy** 24:5

**phone** 54:8 130:13 150:19

**photo** 122:18 141:10

**photograph** 121:16 141:10 146:22 183:16,17, 24

**photographs** 103:18,25 106:22 121:14 140:15 141:4 146:17,23 147:3 163:19 195:25 196:6

**photos** 97:24 104:3,4,7,11 106:10,12,14,18 121:15, 17 122:20 197:9,10

**phrased** 21:18

**physical** 37:12 41:11,19 42:1 44:1,7 45:1,14,25 46:11,14,17,19 48:14,20 49:1,13 60:14 111:24 112:5 114:5,11,24 141:25 157:18 158:3,12 166:11, 16 179:1 188:1,8,18 189:25

**physically** 42:9 51:20 188:13

**Pictometry** 106:22

**pictures** 63:15,19 140:25 141:12 172:17 196:17,24

**pieces** 151:10

**Pine** 199:21 200:1,2

**pinevideo** 199:14

**pipe** 99:19

**place** 57:22 165:23

**plain** 157:22

**plaintiff** 5:12 198:1

**plaintiffs** 6:1,2,23 34:13 110:19

**plaintiffs'** 195:12,25 196:6 198:17

**plenty** 30:22

**point** 9:23 11:14 53:23 57:20 60:20 67:25 90:3 100:13 139:10 155:24 156:4 157:14,15 162:22 164:21 166:7 170:1,11 176:2,9 193:24 196:12

**pointed** 10:1 151:24 154:19 156:8,9,19 181:3, 9

**pointing** 13:13 22:13 155:2 157:25

**policies** 16:3 32:13 38:11 49:21 57:10 82:12

**policy** 16:13 22:13 23:11 26:8,12,22 27:17 28:5 30:3 31:7,21,22 32:15,21 33:2,5,10,20,23,25 34:6, 14,15,16,20,23 35:7,20, 21,24 36:15,17,24 37:25 38:4,19,24,25 39:2,5,12, 14,19,24 40:2 41:9,10,16, 17,20,23 42:2,23 43:4,21, 24 44:2,12 45:2,7,15,24 46:12 47:14,18 48:5,13, 18,21,25 49:6,10,14 50:3 97:5,13 98:3,21 99:5,9 100:15,17 101:9,20 103:8,20 104:2,14,21 123:25 130:24 131:2 142:1 166:21 169:13,25 175:11,16,18 176:3,5 178:23 184:24 187:4,17 188:9,19 190:3 191:14 192:4

**policy's** 22:17 28:21 37:14 48:7 99:1

**policyholders** 14:15

**pool** 77:14,17 96:15 119:20 122:17,25 161:15 168:20

**poor** 30:24

**poorly** 31:2

**portion** 27:20 93:18 114:5,12,24 115:25 198:19,21

**portions** 186:20

**position** 7:10 19:1 20:19, 23 143:9 165:3,9 166:4 169:23 176:20 177:1

181:2 183:16,18 187:10 189:20 191:4 194:22,23

**possesses** 61:4,9

**possibly** 97:23 151:14

**potato** 199:24

**potential** 29:12 47:5 75:6

**potentially** 47:7 91:3 176:5

**pots** 70:10

**power** 19:3

**powered** 182:22

**practice** 18:15

**practices** 17:14 58:23,25 59:2

**precipitation** 38:4

**precisely** 63:1

**preconceived** 56:7

**predated** 156:24

**predetermine** 28:23

**preexisting** 104:13

**preliminary** 75:13,14 155:17

**premium** 11:17 12:2 13:8, 17,24 16:4 31:8,15 32:21 34:8,15 37:10

**premiums** 11:12,21 12:21 13:14,19 29:17,18,23,25 31:25 35:3 71:19

**prepare** 10:8,18 55:18 67:10 155:16

**prepared** 158:25 179:24

**present** 40:5

**preserve** 145:5,7,8

**president** 33:18 34:1 50:17,18,19,20

**pressed** 184:20 185:7,15

**pretty** 17:25 73:16 74:23 105:14 108:7 158:6 165:25

**prevent** 31:11 98:20

**previous** 56:15 102:19 104:9 174:19

**previously** 63:10 69:3,4 87:12 180:16 191:15 198:13

**price** 30:1,5,10,20

**pricing** 71:24

**primary** 18:11 31:24 32:4 50:13 51:18 55:14 191:23

**prior** 49:18,24 50:2 52:17 53:18 68:24 98:13,25 99:18 100:20 101:8 102:9 103:19 104:2,14,16 129:24 141:5

**problem** 39:10 113:25 156:3

**procedure** 7:2 59:15 60:5 65:19,21 81:11,14,17,23 82:6,11,15 89:19,20

**procedures** 57:12 58:8 59:1,7

**proceed** 120:13

**proceedings** 201:4

**process** 19:10,11,16 54:5 64:7 65:12

**produce** 17:24

**produced** 63:9 191:20

**products** 43:18

**professional** 62:20 67:21

**prohibited** 17:15

**project** 119:14

**projects** 116:22

**promised** 35:2

**prompt** 18:19 19:20 24:15 28:20 35:15 57:9 88:23

**promptly** 19:23 20:4 23:3, 10 27:15 28:4 130:10

**proof** 80:7 82:20 148:11 149:5 152:25 153:5 154:17 157:2 165:16,22

**properly** 73:19,20,21,22

**properties** 31:4 108:18

**property** 14:24,25 26:24 30:2,6,20 31:11,12 32:19, 23 34:7 35:8,11,17 40:7 41:12 42:8 44:2 45:25 46:11,17 47:3,5,13,24 49:12 51:21 60:14 62:18 64:3,16 65:24 73:15 81:4, 16,19,22 82:1 85:25 92:9, 17 95:16 96:3 97:24 98:2, 11,17 99:4 100:17 103:7, 12 104:16,23,24 105:1,10 110:15,20 111:23,24 112:4 114:6,12,24 115:25 117:6,10,13 118:13,16,20 120:17 124:22,24 127:14 144:4 152:12 153:20 157:18,21,23,24 158:2, 11,14 159:6 166:16 173:6 174:22,23 179:11

**property's** 32:18

**proposal** 137:15

**proposals** 129:3 136:20, 23 137:7,19

**protect** 18:12,14 98:6,9

**protection** 161:1

**protective** 106:1

**protocol** 61:13,22 73:14

**provide** 7:2 10:5 21:15 27:15 28:4 34:16 47:10 58:24 63:21 88:25 97:4,7, 11 118:9 129:20 140:15

**provided** 17:20 18:4,9 29:8 35:20 57:13 58:13

63:8 70:13 116:4,7 140:25 149:12,16,24

**provider** 11:5

**providing** 7:8 14:15 29:10

**provisions** 17:2 22:13,17 32:12

**public** 153:2

**published** 89:23

**publishes** 134:18

**pull** 23:25 26:5 86:9

**puncture** 122:5

**punctured** 62:23

**purpose** 18:11,18 153:23 154:17 156:17 161:23 168:12

**purposes** 60:13

**push** 129:20

**pushed** 185:3

**put** 30:1 46:25 63:15,19 188:16

**puts** 121:11 168:10

**putting** 70:22

**Q**

**qualifications** 67:8,14

**qualify** 59:11

**quality** 39:15 47:25 190:2, 11

**quarter** 11:12 13:15

**question** 9:22,23 10:2,4 12:4 21:18 22:2,5 28:3 49:13 66:10 69:14 83:25 85:8 90:17 94:7 111:15 112:9,21 113:10 114:8,19 135:22 143:16 144:3 149:22 155:23 158:9 161:2 164:23,24 166:14 168:5 169:6 187:2,9,11, 24 188:15,16,17 197:11, 12 198:13

**questioning** 28:15 193:21

**questions** 157:12 192:11, 14,24 194:21 195:18 198:16

**quick** 6:7 8:21 95:24

**quote** 15:14,18,19 37:12, 14 39:8,9 41:10 42:1 48:14,15,19,20 51:23 99:3 179:5

**R**

**rails** 178:20

**ran** 174:10

**range** 31:3

**ranking** 56:4

**rate** 66:13

**RCV** 74:1 147:5 148:22

**RDA** 5:5 34:13 110:19 128:17,19,20,24 129:22, 24 132:8,13 137:21,23 146:12 149:12,16,24 154:18 155:24 156:12,17

**reach** 62:1 64:4 111:9,11 130:5,8,9 199:11

**reached** 59:13 109:11

**reaches** 59:17

**reaching** 111:3 119:1

**read** 34:13 91:21,25 96:23 101:1 116:2 128:1,20 129:8 132:14 135:20,23 136:15 137:5 148:16,17, 18 185:1,2,4,11,18 186:19 193:1 194:2,24 196:2,11

**reading** 121:5 123:8 125:22 138:2,6 148:24 149:2 188:15

**reads** 34:20

**ready** 26:7,16 42:16 87:6 120:13

**real** 74:15 95:24

**realm** 191:24

**reason** 18:24 66:18 68:12 69:8,20 80:6 93:20 98:5 107:23 108:4 138:16 150:9 180:20 191:4

**reasonable** 27:16 28:4 34:12 111:21 113:11 131:22 165:25

**reasonableness** 131:1

**reasons** 22:14 28:19

**rebuild** 47:23

**rebuttal** 173:24

**recall** 7:24 39:6 54:16 66:16 78:13,18 91:11,14 95:1,2,5,19,23 103:24 104:3,4,7,8 110:9 111:2, 5,10,14,20 123:18,20 127:13 133:5,6 135:11 138:14,15,20 139:3 147:25 152:19 166:18 178:9 184:5

**receipt** 80:7 155:15 165:16

**receive** 109:1 144:7

**received** 6:7 20:15 53:25 75:24 84:5,14 116:13 127:10 129:13 132:8,9 136:3,4 152:24 153:25 191:16

**receives** 11:11

**receiving** 79:20 82:20 153:12 184:5

**recent** 171:5 174:20,24 177:20

**recess** 9:6

**recognizes** 14:22 25:25

**recognizing** 30:23

**recollection** 99:25 119:24 135:16 194:13

**recommend** 64:13 114:3, 21

**recommendation** 193:25

**recommendations** 194:25

**recommended** 192:15

**recommending** 77:13 78:4 124:20

**record** 5:3,21 6:20 8:25 9:3,9,11 69:6,24 78:19 86:20 87:1 94:23 101:10 115:22,23 140:2,6,11 144:17 145:13 194:3 201:3

**recorded** 5:4 94:22 95:3

**recoverable** 97:13 169:25

**recovered** 167:22

**reenlisted** 153:20

**refer** 65:1 97:18 139:1 152:9 183:15

**reference** 75:5 183:19

**referenced** 39:23

**references** 133:9

**referral** 64:6

**referrals** 64:7,12

**referring** 45:6 76:8 107:12 136:16 142:6 144:24 149:5 153:10 155:20 160:5,7 174:18 182:15 184:14 198:14

**refers** 133:13,16

**reflect** 72:8,14

**reflected** 74:7

**refresh** 119:23

**refreshed** 194:12

**refresher** 57:16

**regard** 19:7 20:13 29:22 44:15 45:22 56:18 61:8 73:10,24 82:2 107:8 111:16 121:23 140:16 181:13 183:20,25

**regular** 180:1

**regulations** 58:14

**reinspect** 144:4 153:24 155:14

**reinspecting** 54:14

**reinspection** 54:3

**reinspects** 159:6

**reinsurance** 90:22

**reinvestigate** 165:20

**reject** 20:2,6,13

**relate** 40:6

**related** 127:8 129:3 136:20,24 137:7,20 141:23 155:9 176:11

**relating** 27:3,9 120:17

**relation** 27:17 28:5

**relationship** 56:15 68:13

**relayed** 181:23

**relevance** 103:11

**relevancy** 94:21

**relevant** 22:24 23:3 27:3, 8,12 29:11 103:5,8

**reliable** 28:20 46:19

**relied** 60:15 173:10 174:2

**rely** 23:16 65:3,4,23 67:1 114:14 116:25 131:10 181:21

**relying** 114:20 160:16

**remains** 162:21

**remember** 54:17,19 74:24 120:1 134:8 174:21

**remind** 5:17

**remotely** 5:15

**renew** 100:25 102:23

**renewal** 35:24 36:3

**renewed** 143:14

**renewing** 101:9

**renovations** 102:8

**reopened** 79:16,18

**rep** 153:1

**repair** 39:15 47:23 75:12 77:17 130:25 155:10 166:25 190:22 192:15 193:24 194:25

**repaired** 96:20 179:17

**repairing** 143:12

**repairs** 77:18 193:19

**repeat** 21:7 27:6 40:19,20, 21,25 48:17 114:8 138:21 183:8

**repeatedly** 66:22

**rephrase** 9:24

**replace** 47:23 168:13 169:22 190:5

**replaced** 115:12 151:18 168:21,24 169:11 190:2

**replacement** 39:15 47:22 48:3 81:8 190:10,17,20, 22

**replaces** 82:6 168:25

**replacing** 168:13

**replies** 129:8 150:13

**report** 12:11,13 53:11 56:1,6 63:12,13,15,20 78:21,23 83:3,5,7,10,24 84:4,5,17,22 85:2,13,21 87:5 88:19 94:16,19 95:1,

11,14 102:20,24 103:2,15 106:12,16,20,22 110:11, 14 113:15 115:13 117:7 125:2,7,22 126:14 127:23 132:22 133:8 134:23,25 136:7 140:13 141:3 143:20 145:24 146:1,11, 16,18 147:12,14 148:19, 20 152:25 153:6 154:3 156:5 157:5 158:24 159:15,21,22,25 160:1,2, 3,7,8,14,15,19 161:8,24 163:17 164:21,23 166:5, 17 167:12 168:11 171:2,7 172:4,21,22 173:1,10,14 174:2,10 175:6 177:17 179:24 180:3,6 182:10 183:15,17 184:7,17 185:23 186:25 190:13,15, 20,21 193:7 195:13 196:8,10,12,15,20,22 197:8,13 198:4,5,13,16, 19,21

**reported** 23:13,18 24:23 49:18 52:18 53:14 88:17 92:25 110:19,22,23 111:22 116:1 117:17 126:16 134:14 135:17 136:10 138:23 171:15 175:6 176:12 181:14 184:3

**reportedly** 177:13

**reporter** 5:13,23 6:6,10,13 8:11,13 9:1 139:21,23 199:6

**reporting** 53:15 59:15 96:10,25 142:25 166:12 174:12

**reports** 29:6 54:21 63:5 67:1 70:3 98:2 107:16 108:25 120:8 147:25 153:1 160:14,19 171:16 181:15

**represent** 5:22 6:23 63:7 66:17 106:21 198:17

**representative** 6:14 7:20 9:17

**representatives** 16:21 26:23 29:5,7 76:6 120:4

**request** 155:17,18 156:23 157:9 180:12

**requested** 5:12 77:17 157:7,13 166:7,8

**requesting** 132:11

**require** 7:2 26:23 48:8,14, 19 169:14

**required** 17:4,8 22:19 23:7 59:6 112:22 143:9 155:24

**requirement** 40:14

**requirements** 53:11

**requires** 24:14 83:1

**requisition** 100:25 101:7

**research** 29:12 107:19 124:7

**reservation** 90:25 91:5, 11,18,22 96:6

**reserve** 58:6 70:8,9,18,21 72:3 76:1 77:13 78:4,20, 25 79:1,22 82:5,8 83:1,9, 20 85:3 87:17 89:23,24, 25 95:21 124:20

**reserved** 74:1 91:8

**reserves** 58:2,4,9,10 70:5, 13,16,24 71:18,23 72:7, 12,18 73:19,20,23 74:8, 16 78:8,23 79:3 80:20 82:23 84:17 85:13,16

**reserving** 71:2 74:12 82:4 91:9 92:6

**reset** 79:5

**resided** 58:19

**resources** 16:2 19:2

**respect** 70:1 89:9,15 94:14 166:12

**respectfully** 117:3

**respond** 20:4 80:22

**responding** 129:1,9 155:5

**response** 80:19 129:24 130:1

**responsibilities** 71:3

**responsibility** 24:23 26:1 143:17

**rest** 40:25 115:12,14 121:5,7 148:17 194:25

**Restoration** 116:15

**restroom** 50:7

**result** 127:3 193:9,23 195:15

**resulting** 43:15

**results** 162:18

**retain** 65:15 92:17 113:17, 21 119:5

**retained** 29:5,7 77:22 79:24 84:5,9,18 87:9 92:7 94:4 113:5 116:17 131:19 141:1 147:22 148:2 150:21 152:13,14,18,22 198:1

**retainer** 116:17

**retains** 112:11 113:14

**retied** 69:20

**retired** 67:17 132:16

**retiring** 132:14

**return** 30:16 37:10

**reveals** 70:16

**review** 22:24 34:5 60:17, 18 74:11 83:21 131:1 155:4 166:2 191:8,10 195:12 196:10

**reviewed** 54:20,21 72:19, 22 74:4 75:13 94:16,19 106:11 113:6 141:5 149:18 168:24 177:7,24 191:12 195:24 196:15,20 198:4,18

**reviewing** 74:18 118:8

**reviews** 55:17

**Revised** 16:24 17:3 58:14

**rights** 91:1,6,8,10,12,18 92:6 96:6

**rise** 122:5

**risk** 14:16,23 15:14 32:4, 11 49:23 97:20

**risks** 14:19 37:12 41:11 98:10,25 99:4

**river** 106:3,9 122:7 184:11,12

**rock** 106:8,9 122:8 184:12,21 185:16

**rocks** 106:3 184:11 186:8, 12,13,16 187:2,7,13,14 188:8

**role** 51:2 102:16

**roof** 39:12,14,16,18 40:10, 22 41:5 47:14 48:8 62:23 77:23,25 88:8 92:20,23 93:1,4,8,11,13,24 94:1,5, 8,12 96:5,11,21,22 97:1 121:19 122:5,7,10,14,22 123:17,25 124:3,4,9 126:15,16,17 127:3,4,5 154:2,3 167:25 168:6 169:2,7,21 180:13,16 181:1 182:22 186:3,9

**roofer** 122:10

**roofing** 92:19 93:15,21 94:15 103:19 105:20,23 106:4 121:23 125:19 126:4,6 127:14 180:25

**roofs** 93:8 123:1

**room** 105:15 150:22 151:7 163:16,22

**rooms** 47:15 62:5 151:11, 12 152:16,17,20,21 161:19,20,21,25 162:7,21 163:5,8,15 164:14 165:5, 6,11 188:25 189:5,10,11, 16

**ROR** 155:18

**RT** 128:11

**rule** 145:3

**ruled** 197:7

**Rules** 7:1

**run** 65:8 78:21,23 176:3

**Ryan** 68:4,17 109:15,21 110:4,10 146:3 147:3 148:15,20

## S

**S-C-H-W-I-E-R** 6:21

**safe** 14:16,19

**sample** 162:9,13,16

**scenario** 45:19 47:6 61:15 66:5

**scenarios** 16:11

**schedule** 72:23 73:10

**Schwier** 5:4 6:14,20,21,22 8:4 9:10,21 10:8,23 11:15 13:12,21 14:12 16:8 26:5 29:17 31:23 35:6 40:5 43:20 46:6 50:6 57:8 59:10,21 70:4 76:17 80:24 86:9,25 87:3 91:17 92:22 96:19 97:16 100:1 103:7 105:1 109:6 113:10 117:5 126:7 131:10 138:9 140:10,12 142:16 143:15 145:19 146:23 148:6 150:20 154:12 192:10 195:20 197:22

**scope** 29:23 32:13,14 85:25 92:9,14,18 154:7 180:19 181:13,24 192:15 198:2

**scratching** 43:15,21

**screen** 8:5,9,15,16 13:1 14:10 147:2

**scroll** 76:20 77:12 102:12 120:20 128:13 140:16 146:16

**scrolled** 196:3,11,16,23

**scrolling** 43:7 140:18,21 159:17

**Seagren** 143:12 168:15

**seal** 194:24 195:15 198:7

**sealant** 193:18

**sealants** 152:2,10

**seals** 142:3,6,7,9,11 152:5,7,9 195:9

**seasoned** 67:16,21

**secretary** 33:19 34:1

**section** 26:15,19 36:15, 22,24 38:22 39:8,25 40:2 42:22

**sections** 17:8,11 40:3 125:25 126:3

**secure** 15:19

**secured** 75:19

**Segment** 86:25 140:10

**selecting** 65:20

**sell** 15:13,15

**semiretired** 67:17

**send** 64:16 91:5 128:19, 24 129:23 199:16,17

**sending** 150:15

**senior** 50:16,19

**sense** 85:5

**sensitive** 25:2 89:1

**sentence** 43:20 77:14,16 148:16 183:4,10 184:19

**sentences** 185:7

**separate** 58:6 70:10 107:17 175:17 185:12

**separated** 167:13,18

**separation** 193:18

**September** 35:21,22

**sequence** 43:2

**serves** 168:12

**services** 79:22 80:9 87:5 155:7,8

**set** 17:23 30:9 31:17 32:21 34:8 58:1,4,9 62:1 70:13,15 72:23 73:1,10, 19,20,23 74:17,19,22 76:1 78:8,11,20,22,23 79:4 83:20 150:24 156:18

**setting** 16:4 31:8 54:13 124:25

**settle** 70:6

**settlements** 24:12

**seven-page** 170:12

**Shannon** 195:25 198:17, 22

**Shannon's** 198:16

**share** 12:7,25 14:9

**shared** 116:16

**sheet** 120:25 170:21 175:9,10

**Sheraton** 61:20 64:12 75:11 87:24 99:9 102:2 108:22 125:15 128:6 177:15 180:12

**Sherrill** 76:24,25

**short** 20:17 50:8 73:16 129:10

**shorthand** 156:14

**show** 117:1 162:18 183:24 197:9,11

**showed** 106:10 163:5

**shows** 174:25

**shrinkage** 43:17 193:17

**shrinking** 163:19

**sic** 5:11 52:8 110:21

**side** 84:14 96:16 119:23 139:11 141:17 161:12 162:2,3,16 163:12 170:6 176:17,20,25 177:1 189:10

**sides** 156:6 161:10 170:17 174:13 175:7 177:11 193:19

**signage** 47:15

**signatures** 33:22,24

**signed** 32:22 33:20 80:7 82:20

**signify** 134:12

**sill** 163:2 164:2

**sills** 164:9,14 170:5

**similar** 12:1 17:25 72:16 162:5 196:25

**simple** 149:24

**simply** 34:20 35:1 45:9 65:7 147:7

**sir** 6:13 196:21

**site** 76:13 166:2

**sitting** 61:3 69:25 73:4 106:25 135:16 196:14

**situation** 114:13 176:4

**Sitzmann** 66:10 92:8,15, 17 93:23 94:14,20 95:2,4, 6,10,15 96:2 124:21,23 125:19 127:2,10,22 153:19 155:14 160:10,14 179:24 180:25 181:13,14, 24 182:6,9 183:19 184:3, 6

**Sitzmann's** 180:19

**sixth** 122:23 123:2

**sizable** 127:3,7

**size** 13:25 47:25 147:1 162:13,16 165:24 174:1 183:20

**skylight** 62:23 96:15 119:20,21 122:1,8,11 168:14,16,21

**skylights** 77:22 93:10 94:4 125:16 127:4 168:19 180:17

**sliding** 150:24 151:2 178:12,20 189:22

**slope** 161:11

**slow** 132:23

**slowly** 141:13

**smaller** 105:15 168:8,15

**Smith** 101:16 102:2,13

**smooth** 106:3

**sole** 55:2 120:6

**solely** 23:16 60:15 90:11 131:10,11 191:5

**solution** 113:25

**somebody's** 74:11

**son** 68:4

**sort** 67:11 70:21

**sound** 176:18

**sounded** 117:8

**sounds** 11:17 35:19 48:2 88:4 93:22 122:12 129:11 130:13 143:13 156:24 161:22

**source** 31:24 163:23

**south** 119:23

**south-facing** 189:18 194:4

**southwest** 176:22 177:5

**spandrel** 178:14

**spandrels** 151:1,2,7

**sparse** 184:21 185:16

**spatter** 171:12,18 178:11, 18,22 179:12 182:14 189:21

**speak** 10:14,17,21 90:4 107:9 138:9

**speaking** 19:12 76:5 103:22 112:11 162:12

**specialist** 25:25

**specialty** 5:6 6:15 7:6,19 9:17 10:24,25 14:7 31:17 33:7 34:4 59:23 71:14 82:14 85:23 98:6 100:10, 11,12 101:17 102:17 128:11

**specific** 11:22 17:25 18:9 30:16 58:11 70:15 73:24 74:25 126:11 129:12 134:14 154:1 166:18 197:4

**specifically** 45:5 52:6 53:15 54:19 66:16 73:13 78:13 81:19 84:5 93:25 110:8 111:2,16 117:8 125:17

**spectrum** 197:6

**speculation** 21:4,10 22:9

**spelled** 182:17

**spend** 117:16

**spent** 63:18

**splatter** 146:20

**spoilage** 43:17

**spoke** 10:16 122:25 155:12

**spoken** 55:5

**spots** 106:14

**spotters** 174:5

**spreadsheet** 64:22

**square** 107:3,24 108:2 117:25 147:18

**stable** 15:20

**stamp** 37:25

**stamped** 33:25

**standards** 57:9 108:13

**stands** 100:12

**start** 50:25 62:5 105:24 140:18

**started** 36:11 50:24 69:11 74:18,24 131:19

**starting** 121:25

**state** 5:19,22 6:19 16:21 17:15,21,25 18:4 25:17, 18 52:1 58:19 71:23 72:6, 18

**stated** 34:16 43:3 45:9 71:7,13 127:7 170:19

**statement** 15:16 72:20 149:9,10 155:20 183:20

**statements** 12:17

**states** 5:9 15:24 17:24 24:8 25:24 26:22 42:22 43:4,14,25 72:2,12 92:6 100:24 154:17 166:21 180:15 193:14

**Statues** 17:3

**statutes** 16:24,25 58:15

**stayed** 79:16

**Steve** 195:25

**stiles** 178:20

**stopped** 69:10

**stories** 117:24

**storm** 61:20 85:4 87:24 88:22 127:3,9 133:24 134:5,14,15 141:23 142:5,12 147:24 157:19 158:4,13,17 162:3,4 171:22 172:23 174:4 175:24,25 176:3,21,24 177:6 178:5 179:14 180:14 187:18 198:3

**storms** 134:1 170:24 176:7

**story** 131:4

**straight** 149:21

**strategic** 71:24

**strategy** 54:8

**street** 177:8,14

**Strike** 179:19

**strong** 15:19

**struck** 44:24 183:6,9,12, 22

**structure** 170:17

**stucco** 155:11

**study** 174:18

**subject** 17:7 23:3 29:21 37:14,18 38:18,25 39:19 42:4,7,11 44:12 45:3,4 169:1 175:17

**submit** 119:9 128:19,24 130:25 137:23

**submitted** 29:5,6 146:17 147:3,8 191:13

**submitting** 75:12 129:23

**subsequent** 63:5 143:22

**subsequently** 153:17

**subsidiary** 13:9

**substrate** 184:4,22

185:16

**subtraction** 148:13

**suburban** 105:17

**sued** 68:17

**suffered** 39:18

**suffers** 44:7

**sufficient** 170:20 175:8

**suggest** 102:19

**suggested** 102:23

**suit** 53:13 54:1 55:10

**suits** 109:25

**sum** 129:3 136:20,23 137:7,15,19

**sun** 44:5,6 45:11

**superior** 19:2

**supervisor** 51:5,8 52:21 90:5

**supervisors** 52:5,15

**supplied** 169:4

**support** 71:23 146:18 157:3

**supposed** 19:11,16 70:17, 18 111:7

**surely** 197:1

**surface** 93:21 94:15 103:19 105:20,23 106:5 125:20 126:4,6 127:14 161:12 180:25 186:4,9, 18,19 187:16

**surfaces** 121:23

**survey** 26:23 56:3 98:25 99:3,4

**sustain** 49:13 108:16

**sustained** 92:10,18 112:5

**swear** 5:23

**switch** 29:16

**Switching** 50:5

**sworn** 6:5,16 152:24 154:17

**synced** 200:13

**system** 47:15 48:9 56:4 104:2 107:6,11 115:13,15 190:11,18,24

**systems** 155:11

## T

**tabulation** 120:21

**tag** 30:1,5,10,20 83:8

**tagged** 82:19

**tailor** 81:14

**takes** 118:6 168:15 192:20

**taking** 68:18 78:2 168:8 172:17

**talk** 10:23 16:8 29:17 53:7 90:4 158:8 161:14

**talked** 93:9,23 125:25 149:6 169:13

**talking** 46:22 75:18,23 93:3 100:20 104:22 105:22 116:10 121:3,18 129:12 130:9 131:14 135:24 139:8 152:6,7 160:11 169:21 174:4 178:24 179:2 182:13,14, 21 184:9

**talks** 12:17,21 14:6 82:3 115:18 120:22 121:3 125:23,24 129:17 172:24

**tall** 178:16

**task** 73:5

**tasked** 93:25

**tear** 44:23 45:23 46:9,10, 16,23 47:2,9 104:5,14 187:6,16,19

**tears** 186:15

**Technical** 87:5

**telling** 62:16,25 196:19

**ten** 86:16 123:19 124:4 173:1

**ten-minute** 139:8

**ten-year** 124:1 173:7

**term** 35:20 45:17,20 51:14 63:23 82:22

**terms** 16:12 28:21 38:4 39:19,20 41:20 42:2,4,11, 14 44:13 45:3,5 47:13 48:7 49:10 178:23 184:24 187:17 188:9,19 190:3 192:3

**testified** 6:16 7:18 86:3 131:10

**testify** 7:3,5

**testimony** 7:16 84:15 85:23 86:25 140:10 145:5 177:7 196:18

**texture** 43:19

**thereabout** 11:21

**thing** 44:14 45:22 85:9 86:7 95:13 144:7 167:15 175:5 181:12 184:10

**things** 18:17 31:6 53:4 54:13 55:10 62:8 97:23 150:25 163:19,20 173:13, 16,25 174:4 181:3,9,10 188:16 191:12

**thinking** 111:12

**thinks** 137:10

**third-party** 81:18,22 82:1, 2,9

**thought** 13:3 62:16 69:20, 21 85:4,11 99:23 106:18 111:8 124:12 132:18 133:5 135:25 136:14 148:24 158:15 161:4

162:8,12 164:18 179:16 185:1,18,21 186:10,13

**threshold** 24:23 59:19 83:6,13,14 89:9 90:18 134:2,4,6

**Thursday** 5:7

**till** 139:13

**time** 5:8,9 9:9 11:23 20:1, 18 23:7 25:2 50:6 51:11 52:15 53:23 55:2 57:23, 24 58:20 60:11 63:14,17 66:15 67:18,21,24 69:16, 18 72:19 73:2 78:12,17 79:1,15 85:7 86:12,21 89:1 91:11 99:8 100:13 102:9 103:2 116:18 120:20,25 121:21 123:17 127:17 132:6 139:4,5,22, 24 140:3,6,11,22 153:25 157:16 168:9,24 170:2 171:12 182:3 189:22 194:10 201:3

**timely** 22:14 25:5,19 58:9 72:4,7 89:5

**times** 7:22 66:9

**timing** 78:25

**title** 17:3 50:16 51:10,12

**TIV** 101:23

**today** 5:7 7:9,13 61:3 73:4 107:10 139:10

**token** 194:22

**told** 126:11 137:14 196:16 198:18

**Tom** 102:13,16

**tomorrow** 73:6

**top** 12:17,23 38:3 93:4,10, 11,18 121:20 128:2 133:14 144:11 149:20

**topic** 11:15

**topics** 7:10 9:18 10:9

29:24

**Tor** 100:6,16

**torn** 185:14

**total** 35:17 101:23 102:1 130:20 135:18 140:15 147:11 162:7 190:7

**totaled** 150:2

**toto** 160:15

**touch** 73:3

**tower** 93:11 105:15

**TPA** 66:1,2,5

**trade** 17:14 18:15

**trained** 114:17

**training** 10:11 18:1 56:23 57:16

**transcript** 5:20 199:9

**travel** 121:7

**treat** 19:7 28:16

**treated** 24:13

**tremendous** 71:17

**trick** 137:2

**trigger** 84:3

**triggers** 123:24

**trim** 45:1 122:13 123:6,9 141:11

**trouble** 130:11 172:9

**true** 11:10 14:18 15:12 19:5 31:23 32:3,10,16 36:25 42:6 55:22 56:5 72:8 110:24 170:15,18 193:6

**Tuesday** 200:23,25

**turn** 12:16 83:11 101:12 192:17

**twelfth** 122:22 123:2

**Tyler** 199:16

**type** 15:12 34:5 39:9 64:5 67:19 107:5,19 133:14

**types** 154:4

**typical** 150:22

**typically** 62:20 63:16 97:23

U

**U.S.** 11:4 12:22

**Ulrich** 126:19

**ultimate** 54:22 88:21

**ultimately** 30:14 191:5

**umbrella** 11:11

**unable** 21:21 161:13

**unaware** 182:3

**unbiased** 28:20

**uncertain** 112:4

**unclear** 9:22

**uncovered** 49:11

**underlined** 154:20

**underneath** 187:13

**underreserved** 71:6,10, 11,13

**underreserving** 74:14

**understand** 6:24 7:1,12, 15 9:10,16,24 10:25 11:3 16:20 18:24 20:1 35:16 50:12 51:2 59:21 73:24 109:5,6,21 112:9 119:17 126:7 144:3 155:13 189:9

**understanding** 51:16 57:21 58:13 59:16 94:3 98:24 116:7,12 117:2 155:1 165:12 198:8,24

**understood** 10:2,5

**underwriting** 10:13 97:17, 18,19,22 98:5,20,24 99:6,

11,14 100:8,10 101:4 103:8,16,21,22 104:1,5, 10,22

**undisputed** 87:23 88:13, 23

**uneven** 161:11

**unfair** 18:15 19:1

**Union** 37:11

**United** 5:9 15:23

**unnecessarily** 22:20

**unobtainable** 21:22

**unquote** 51:23 99:3 179:5

**unreliable** 21:4,10 22:8

**updating** 77:6,11

**Upload/caption** 121:16

**uploaded** 121:14

**upper** 89:16

**upscale** 99:10

**urgency** 26:1

**usage** 66:8

**V**

**valid** 25:4,18 89:4 144:19

**valuation** 124:3

**Vancouver** 15:24 100:9

**vast** 176:24

**vault** 168:20

**vendor** 63:24 64:1 135:17 143:5 147:7,10,11,13 150:1 191:15

**vendors** 69:12 75:11 76:6, 14,15 116:13,14,16 129:13,19 130:12,20 131:18 144:8 149:17 150:1 152:13 156:3 181:8

**vendors'** 135:4

**vents** 182:22 183:3

**verbally** 5:19

**verification** 172:4

**verified** 20:16

**verify** 35:14 123:22

**version** 6:8

**versus** 5:6 8:2 198:23

**veteran** 67:16

**vice** 50:16,18,19,20

**vicinity** 108:22

**Victor** 199:22

**video** 5:4,20 199:14,19,25 200:2,11

**videotape** 199:11

**view** 75:14

**Viewed** 122:3

**vine** 199:19

**vinyl** 96:17 122:13 123:5, 9

**viruses** 37:3

**vision** 151:3

**visit** 62:1 63:6 125:24

**visited** 159:14

**volunteering** 130:9

**W**

**wait** 80:19,21

**waiting** 75:24 129:18 156:24 176:11

**walk** 118:5

**walked** 117:9 181:9 185:13

**wall** 47:15 48:9 104:1,6 107:5,11,19,21 112:12 113:6 115:12,14 155:11 160:21,25 161:14,19 163:2 178:12,15,19 179:13 190:11,18 193:22 195:5,9,14

**walls** 59:22 60:9 61:18 62:5,25 63:1,14 64:13 65:8,21 66:9,14,23 67:8, 14 68:4,5,16,17,24 69:5, 15 73:6,9 75:23 76:9,21 77:6,11 78:3 95:20 96:4, 10,25 109:12,16,21,24 110:4,8,10,25 111:6,17 112:11,12 115:8,13,18,23 116:10 117:12,15 118:1, 12,22,24 119:17,24 120:22 121:22 123:5,12, 16 124:6,18 127:1,10,13 128:5,17,22 129:22 130:5,15 132:4,5,7,22 134:20 136:1,6,20 137:11 138:18,22 142:24 143:2 146:3 147:3 148:7,15,20 150:8,12 154:2 178:1,12 181:23 194:9

**Walls'** 117:6 149:10

**wanted** 50:8 69:12 161:24

**wanting** 158:10

**warning** 81:10 82:5,15

**water** 44:25 45:13 47:2,4 50:7 99:19 104:9 125:16 155:10 162:2,5,17,19 163:6,10,14,23 164:1,8, 12 165:4,8 178:25 179:8 180:17 188:24 189:5,11 192:25 193:8

**ways** 72:25

**wear** 44:23 45:23 46:8,10, 16,23 47:2,9 104:5,14 187:18

**weather** 125:24 173:16

**week** 63:9 73:5,7,11 88:17 155:12

**weeks** 73:11 101:20 154:16 157:3

**weep** 104:8

**weigh** 29:4

**weight** 43:18

**west** 87:24 99:10 102:2 108:23 125:15 128:6 141:11 162:2 170:6 176:15,25 177:1,5,15 178:15 180:12

**west-** 194:4

**west-facing** 122:13 123:5, 9 161:20 163:2,5 164:3 178:11,19 179:13

**whatsoever** 39:5 56:24 65:21 82:16 90:5 104:9

**whim** 72:24

**wholly** 11:7

**wide** 178:11,16 182:11,13, 24 183:2,13

**widespread** 193:16

**William** 60:9 67:8,14 68:4, 16

**Wilson** 102:13,16

**wind** 37:19 49:14,15 77:21 97:8 110:16,20 111:25 114:4,11,23

**wind-driven** 177:5

**window** 44:5,22 45:10 77:18 96:17 115:10,11 122:13 123:6,7,9,14 150:24 151:2 152:10,11 164:9 170:5 190:24

**windows** 62:23 122:15 142:4,8,9,11 150:22 151:6,7,13,18,20,21 152:2,11 156:4 163:21 164:3 176:16 178:17,20 190:1 194:23,24 195:5,9, 14 197:16 198:6

**wipe** 179:5

**wipes** 179:1

**withdraw** 128:23

**withdrawing** 128:18 129:22 132:12 137:22

**witness'** 177:16

**word** 128:3 146:24

**wording** 12:3 104:25

**words** 7:8 18:14 23:6 25:17 28:18 29:25 34:25 39:12 49:8,12 51:19 72:23 83:5 84:7 92:16 97:11 106:7 118:18 123:25 126:10 130:22 131:9 137:3,16,17 138:11 173:25 197:5

**work** 23:19 67:19 72:24 75:12 87:14 110:4 119:5 143:1,13

**worked** 69:7 109:18 116:20

**working** 39:14 69:4 75:2 76:14 119:16 131:17,19, 20,21,22 144:9

**workmanship** 44:16,18

**works** 68:1

**writes** 129:2

**writing** 16:3 55:17 130:7 155:5

**written** 13:14 22:12 56:1,5 58:7,23,24 59:2 61:4 148:25

**wrong** 117:1 128:8,9 146:25

**wrote** 34:21 91:9 94:16 124:19 137:11

**Y**

**yea** 65:1

**year** 13:25 31:21 36:2,6 50:25 55:25 56:2 85:3 102:22

**yearly** 35:3

**years** 50:23 57:22 88:16 99:22 123:19 124:5 171:19 182:11 189:24

**York** 15:23 52:3