# EXHIBIT J

Transcript of

# Craig Scott Ulrich

RDA Hotel Management Company v. Hudson Specialty Insurance Company

June 23, 2020

CONCISE Legal Reporting, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CASE NO. 1:19-CV-2145-DDD-NYW

---

VIDEO CONFERENCE DEPOSITION OF CRAIG SCOTT ULRICH

June 23, 2020

---

RDA HOTEL MANAGEMENT COMPANY, and LAKEWOOD HOTEL COMPANY,

Plaintiffs,

vs.

HUDSON SPECIALTY INSURANCE COMPANY,

Defendant.

---

Pursuant to Notice and the Colorado Rules of Civil Procedure, the deposition of CRAIG SCOTT ULRICH, called by Defendant, was taken on Tuesday, June 23, 2020, commencing at 1:03 p.m., in Arapahoe County, Colorado by remote means before Dianna L. Buckstein, Registered Professional Reporter and Notary Public within and for the State of Colorado, appearing remotely from Denver County, Colorado.



REMOTE APPEARANCES

On Behalf of Plaintiffs:

Hossley & Embry, LLP
Christopher P. Peirce, Esq.
Jeffrey T. Embry, Esq.
100 Fillmore Street
5th Floor
Denver, Colorado 80206

On Behalf of Defendant:

Campbell Wagner Frazier & Dvorchak, LLC
Colin C. Campbell, Esq.
5251 DTC Parkway
Suite 350
Greenwood Village, Colorado 80111



I N D E X


| DEPOSITION OF CRAIG SCOTT ULRICH | |
|---|---|
| EXAMINATION BY: | PAGE |
| Mr. Campbell | 5, 81 |
| Mr. Peirce | 59, 84 |

| EXHIBITS | INITIAL REFERENCE |
|---|---|
| (None) | |

| PREVIOUSLY MARKED EXHIBITS | | PAGE |
|---|---|---|
| Exhibit 26 | 2017 Haag Report | 17 |
| Exhibit 32 | First Report Ryan Walls, dated 10/10/17 | 82 |
| Exhibit 37 | JS\|Held combined report, dated 8/9/19 | 38 |
| Exhibit 43 | ACS estimate and supporting documents | 48 |
| Exhibit 113 | Letter to John Bresnahan from Briana Miller, dated 5/19/17, Bates number HUD DEP0000138 | 15 |




P R O C E E D I N G S

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his testimony in this matter is under penalty of perjury. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and your agreement on the record.

THE DEPONENT: Craig Scott Ulrich, and declare what?

(Discussion off the record.)

THE DEPONENT: I so agree that I am testifying under the penalty of perjury.

MR. CAMPBELL: And this is Colin Campbell on behalf of Defendant Hudson Insurance, and I agree with this procedure.

MR. PEIRCE: And Chris Peirce on behalf of the plaintiffs. I also agree.

THE COURT REPORTER: Will the deponent kindly present his government-issued identification

by holding it up to the camera for verification.
(Deponent complies.)
THE COURT REPORTER: Thank you.
EXAMINATION
BY MR. CAMPBELL:
Q Can you please tell us your name.
A My name is Craig Scott Ulrich, U-l-r-i-c-h.
Q Mr. Ulrich, have you ever had the pleasure of going through a deposition before?
A No.
Q Have you spoken to Mr. Peirce or anyone else about what the procedures are for a deposition?
A Not the specifics, no. Just that we're going to -- on a very general basis.
Q All right. Well, one thing that is helpful primarily for Dianna's sake to keep in mind is that she is recording everything that is stated during this deposition, and it's very difficult for her if we ever talk at the same time.
So with that in mind, I ask that you wait until I finish my question before you start your answer, and I will do my best to extend the same courtesy to you to wait until you finish your



answer before I ask you another question.
A Very good.
Q We have found that at least with some of these depositions there are times where what someone says can be a little garbled, and so if that happens with one of my questions, that you don't hear my question, please let me know, and I'll be glad to rephrase it. And by the same token, if you do hear my question but I ask the question poorly to where you don't understand fully what it is I'm asking, please let me know that as well, in which event I will rephrase the question.
A Okay.
Q Okay. And if you don't ask for clarification, I will assume that you did understand the question. Fair enough?
A Yep.
Q Do you have any questions for me about the process that we're engaging in here this afternoon?
A Well, I'm afraid I don't know enough to have a question for you, so I guess we'll just muddle through, and I will definitely ask if I don't understand something.
Q Okay. Great.



Well, I am going to be asking you questions primarily about events surrounding a May 8, 2017 hailstorm --
A Uh-huh.
Q -- to which the Sheraton Denver West Hotel was subjected. I understand that you did work for RDA Management back in May of 2017; is that correct?
A Yes, sir.
Q What were the dates over the course of which you worked for RDA Management?
A I worked for them for three years. Starting in 2014, I worked through -- I gave notice in June. I continued to work for them for two months after that and left in August -- in the very beginning of August.
Q What were your reasons for choosing to leave your employment with RDA?
A Basically some frustrations that I had with how my job had morphed into something that wasn't what I initially had signed up for.
Q And in what ways was the job morphing that you didn't care for?
A There were aspects where I was doing a lot of maintenance work to -- instead of fixing



things, I felt like I was putting Band-Aids on them. The age of that building and such, the air conditioning was 35 years old original. I was spending a great deal of time working on the same problems on a day-to-day basis over and over where we weren't really dealing with the problem; we were keeping things running, so the problems just continued on a loop.
Q Were there any frustrations in that regard relating to any leaking issues with the building?
A No. We -- as engineers, we got our information two ways: either from what we call radio calls, which are generally housekeeping or a guest had pointed out a problem and we reacted to it, and it was usually something that we could take care of quickly.
There was also -- on a more long-term basis, if we needed materials or the job took longer, it went on what's called a preventative maintenance, which is looking for kind of a lot more of a long-term fix.
So we -- from a radio calls basis did not get very many -- many leakage calls. Maybe partly because very heavy blackout curtains and then

sheers and such didn't lead to -- it would have to be a pretty significant leak for us -- for our guests to have seen it or our housekeeping staff to have seen it.

Now, we did initiate a program where managers were assigned rooms to go in and do more of a deep inspection, which included looking at the windows and looking at the seals and that sort of thing.

We would find evidence -- not of major leaks, but we would find evidence of leaking on the sills that needed to be repaired. That wasn't -- the leaking water was not the common complaint that we would get on windows.

Q With regard to this program to do deep inspection of rooms, were those inspections documented in some form?

A Yes. We basically -- this was kind of a take-off of an earlier job that I had come from, which was a Marriott property.

We would come up with the -- oh, I would say 15 to 20 items that we would look at in a room, and we would make sure that we had enough people that we would get through the rooms on a quarterly basis and be looking for those things that



require more time and planning to address than we could do generally radio calls from guests and such were 20, 25 minutes in duration. If it took more than that, it may get moved over being a PM when we had more time to address it.

Q And how were the results of those deep inspections documented?

A On a sheet of paper. Everybody filled out a -- the same -- we're assigned rooms, and then they were given the paperwork they needed to do the inspections.

Q To your knowledge, were all 242 rooms in the hotel inspected as part of this program?

A Yes. And, again, the time frame was we wanted to do that on a quarterly basis.

Q So every quarter there would be an inspection?

A Yes. That was the -- it wasn't -- we would also -- if we had a reason to be in a room, we would -- as engineers, working on one thing, we might do an inspection sheet on the whole room since we were already there.

So we were pretty successful in getting into the rooms.

Q Were these inspection sheets kept in



hard copy format or were they scanned into a computer?

A No. They were done in hard copy.

Q And were they all kept in one folder or at one location?

A They were turned in to the general manager. Exactly what happened after that was -- was -- I'm not real sure of.

Q Okay. Mr. Ulrich, what is your undergraduate degree in?

A I don't have an undergraduate degree. I do have about 45 years in the hospitality industry.

Q Okay. And just in a thumbnail fashion, what's the nature of your work that you've done over the course of those 45 years in the hospitality industry?

A Well, 23 years of that was working in restaurants as a manager, and I became -- about 20 years ago became a single parent, transitioned into hotels and hotel management -- or motel maintenance.

I worked for three of the top five -- three of the top dozen hotels in Denver, according to U.S. News & World Reports, which includes the Oxford Hotel. A sideline to that was I also was in



charge of the office building, the new office building across the street.

So I had a 120-year-old building and a brand-new building. I also worked for the Hotel Monaco for 6 1/2 years and the Ritz-Carlton for three.

Q What was your title when you worked for RDA Management?

A Chief engineer.

Q As chief engineer, were you the head of the engineering department within the hotel?

A I was the head of -- as it was described in my job -- I mean, it's a loose -- every hotel has a different set of circumstances in terms of what you're in charge of.

I was in charge of overall the day-to-day maintenance of the hotel.

Q And did you have a staff of people who worked for you within that department?

A I had three.

Q Do you recall the May 8, 2017 hailstorm?

A I recall my impressions of it, which was -- it was a -- it was a memorable enough situation that I remember that aspects of it. I

remember going out the next day and looking at damage.
Q What were your -- what was your work schedule for RDA? Was it a Monday through Friday type of job?
A Pretty much, yes, sir.
Q This hailstorm occurred on a Monday. So you were present --
A Yeah.
Q -- at the hotel at the time?
A Yes.
Q You mentioned it was memorable. What are the impressions that stick with you about that hailstorm?
A Well, we have -- the hotel had parking out in front of it, usually the short-term plus the parking underneath the building.
Those cars that were outside -- I think there were four to five of them -- had some kind of broken windows, windshields, side windows, whatever.
It was -- the hail was quite noticeable. It was almost snowstorm esque hail, and just to see that kind of damage was notable. I've never seen anything come through that caused that



kind of damage.
Q Now, you mentioned that the following day you walked around the property to get some impression as to the extent of the damage. Is that fair to say?
A I was looking for major issues, yes.
Q And what would fall within the umbrella of major issues that you were looking for?
A Just damage to the facilities, just damage on what was just noticeable, I guess is the best way to put it, are there things that needed my immediate attention.
Q And did you make a checklist of the items that you observed during that walk-through?
A No, I did not. I basically, as part of my job, get to every part of the building. We do have shift reports that send us around to the major mechanical systems; and so we, each shift, have a pretty good look at the building top to bottom, at least on the inside.
Q What were the systems that you recall looking at following this hailstorm in your inspection for damage?
A Well, we would have done a normal inspection to begin with, but basically it was just



a visual walk-around -- it did not -- on a -- on a street level. We looked at the rooftop. We looked at just what we could see on a surface level.
Q And when you say "we," was there somebody assisting you with this walk-through?
A Parts of it, yes. I would bring a staff member with me, and we would -- we would walk it together.
Q And let's turn to Deposition Exhibit 113.
MR. CAMPBELL: Dianna, if you could pull that up for us.
Q (By Mr. Campbell) Mr. Ulrich, why don't you take a moment to review this e-mail. It's a May 19, 2017 e-mail authored by the general manager, Briana Miller.
Have you seen this document before?
A I've not seen that document. I do remember that -- you'll have to excuse me for a minute. I'm trying to . . .
Q Take your time.
A I was trying to get this thing back up where I could read it, and I think I made it even worse. There we go.
(The deponent perused the document.)



A Okay.
Q (By Mr. Campbell) Now, Ms. Miller explained to us during her deposition yesterday that she was not at the hotel on the day of the storm --
A Uh-huh.
Q -- but she was on vacation but that she learned about it from others on her return. And she expresses in this e-mail that the storm started with heavy rain, and about 2:50 p.m. the hail started, lasting only a few minutes.
Is that generally consistent with your recollections of the storm as well?
A Yes.
Q I'm going to ask you about each of these bullet points of damage that she describes in her e-mail, but I guess before doing that, upon your review of this list of damage that was identified at least as of May 19th, do you recall observing any damage -- hail-related damage that's not reflected in this e-mail?
A Okay. Pool skylights, skylight over the lobby. Yeah. Some of this is coming back to me because we're talking three years ago.
Q No, I understand.
A Nothing comes to mind. I will -- I

was the one that took the original inspectors up to the roof and looked at some of these aspects, basically allowing them to get where they needed to go to do their research more than any other aspect of it, but yes, I do remember these things, and I don't remember anything other than that specifically.

I mean, we could -- you could get onto a second-floor roof, which was over the driveway and level with the second floor, and most of all of this is what I was aware of at the time.

Q Okay. Well, I'm going to ask you about each of these, perhaps to try to jog your memory a little bit on some aspects of this.

And let's start with the skylights over the pool and -- just so we have some visual so that we all know what we're talking about.

MR. CAMPBELL: Dianna, could you bring up Exhibit 26, and it would be the 15th page of that exhibit. It should be a photo sheet with a couple of photos on it.

Q (By Mr. Campbell) So, Mr. Ulrich, are Photos 5 and 6 on this exhibit photos of the dome skylight over the pool area?

A Uh-huh. Yes, they are.



Q Do you recall whether you personally observed any hail damage to this skylight assembly?

A It's my recollection --

MR. PEIRCE: Object to form.

A I did not -- we did not find damage to the plastic panels that I can remember. I do know that some of the aluminum pieces framing, I think we received some denting and such.

I don't remember -- and I don't remember after that any of these panels being replaced, but I think the concern was, it was a brand-new ceiling and wanted to make sure that it got a thorough inspection.

Q (By Mr. Campbell) In Briana's e-mail that we were looking at earlier states that she had engaged Seagren Construction regarding the pool skylight.

A Uh-huh.

Q Is Seagren Construction a contractor that the hotel did work with back in this time frame?

A I would say they were their primary contractor for room renovations and large projects around the hotel.

Q Do you recall having any interaction



with Seagren with regard to hail damage to this full skylight?

A No, sir.

Q Seagren ended up submitting a couple of alternative bids for replacement of the skylight. The first bid was to redo the glazing, and then a day later they submitted a bid to replace the skylight altogether for a higher amount.

Do you recall having any discussions with anyone either at Seagren or within RDA concerning Seagren's scope of repair to this skylight?

A No. And it would be unlikely that I would. Briana would be the one spearheading this. She basically worked with Seagren as far as what the projects were going to be.

It would be something that I probably wouldn't be directly involved in, which was a frustration as well, but that's kind of the way that worked is. Basically I was up there to show them around and go through that same list that you had and show them where the damage was believed to be; but past that, no, and I wouldn't have had really any involvement with what the reports were that came back from the inspectors.



Q Okay. So it's your belief that Briana likely would have just communicated directly with Seagren --

A Oh, yeah.

Q -- without -- without you being in the loop?

A No. That would be something that the owner and Briana and Seagren would -- would go through. And if there were conversations to be had, it would be between those three groups, those three people.

Q Okay.

MR. CAMPBELL: Dianna, can you scroll forward several pages to Photo 12.

(Discussion off the record.)

Q (By Mr. Campbell) So, Mr. Ulrich, do you recognize Photos 12 and 13 to be of the bank of skylights that are over the lobby of the hotel?

A Yes, sir.

Q And Photo 13 is a close-up of one of the lenses within this bank of skylights that had been fractured by a hailstorm.

Do you recall that to have been the case?

A Yes, sir.

Q Do you recall who Bill Walls was?
A The name sounds familiar but not right off the top of my head.
Q Bill Walls was an outside adjuster that was retained by Hudson Insurance Company to do an inspection of the hail damage.
A Okay. I remember the individual. I didn't remember his name particularly.
Q Okay. And I believe he was out there on May 25th. So this would have been several weeks after the hailstorm, itself.
A Uh-huh.
Q Do you remember doing -- or accompanying Mr. Walls during his inspection of the property?
A Yes.
Q Tell me what you recall about that inspection.
A Oh, I think he went through every point of that letter that you have. There were -- I don't know that he was -- and, basically, when I have somebody that's inspecting, irregardless of what the position is, I'm letting them do their thing and come to their conclusions.
There were things that he pointed out



that he didn't believe came from this hail damage. There's things like this that were pretty obvious damage.
Having not seen what the final report was, it's hard to know, but basically we just -- I just made sure he got to all the places that he needed to go. My opinion --
Q Do you --
A My opinion -- I'm sorry. I don't think my opinion was something he was, you know, looking for particularly.
Q Do you recall what comments he made about damage that he did not think was hail related?
A I'm trying to think back and be as accurate as I can be. I know there were aspects that he looked at, and he did not believe it was. Specifically which items, I can't recall.
I think some of it he thought was -- age-wise was not as a result of this storm, but I couldn't tell you exactly what, you know -- what he was most concerned about.
He asked some questions, and I'd answer his questions, but there were things that were obvious. There were things that were less obvious.



Q There was another forensic engineer who came out several weeks later on June 7. His name is Matt Sitzmann. Do you recall having any interaction with Mr. Sitzmann during the course of his inspection?
A Basically, did the same thing as the first inspection, which was make sure that they were looking at the same thing I believed was being commented on in the letter.
Q Okay. Do you recall whether you saw anything that looked like hail damage to you on this bank of skylights that we see in Photo 12 other than the fracture to the one lens?
MR. PEIRCE: Objection, form.
A Okay. I'm sorry. I didn't get -- was there another -- there seemed to be another comment in there.
MR. PEIRCE: That was an objection. You can go ahead and answer, Mr. Ulrich.
A Give me a moment.
(The deponent perused the document.)
A I couldn't speak with certainty of -- I mean, we inspected the whole top part of that -- of that skylight, but I can't remember what his concerns were particularly.



Q (By Mr. Campbell) Sure. But I'm asking you actually more about your concerns or your observations. And I know this is a bit of a memory test. This happened some years ago.
A Yeah. At my age, everything is a memory test.
There was hail damage to soft metals. I couldn't tell you exactly where it was. I do know that you could see -- it isn't pitting, but you could see where hail had hit surfaces and had an effect on it.
Could I say with great certainty where that was? Not off the top of my head.
Q Okay. And we may look at some more photographs that might help to jog your memory on that, but as far as this bank of skylights, itself, anything come to mind of any concerns you had other than the one fractured lens?
A Well, I mean, we're always looking at that kind of a thing for anything that might lead to a leak. There was things that were done before this to address leaks, not on the skylight but on the roofing, itself.
So yeah, we just addressed that and just any damage that would come up, making sure that

that got part of the -- on the list at least.
Q Okay. Going down the list of damaged items mentioned in Ms. Miller's May 19 e-mail, the next several, I think, are fairly discrete and easy to understand. There's mention of two cracked windows at the fitness center.
Do you remember that as being an element of damage?
A Yeah. There were -- and actually things are coming back here a little bit.
Q Okay.
A There were two very cracked windows that got replaced immediately. They were not of the same variety as like a guest room window. So they were much smaller than that, but yes, they were cracked and had to be dealt with immediately.
Q And there's also a mention of a window outside Guest Room 708 that suffered a crack or a hole in it?
A That was not something that I found, that I was involved in finding. I heard of it. I did not see it and wasn't aware until I did hear about it.
Q And presumably that window was also quickly replaced?



A Not as much. I mean, the windows in the exercise rooms were pretty significant cracks, and I believe they were -- it wasn't just a crack. It was several cracks that could be quickly become an issue.
Q Okay. And then there was also a mention of a window pane outside on the third floor at the south end of the building.
Does that -- do you recall anything about that one?
A Third floor, south window? No, I'm not aware of that.
Q Okay. The next item on Ms. Miller's list describes: Ceiling is leaking at the south side of the lobby skylights, and in our sales office, leaking began immediately following the storm.
Do you recall having observed that leak that's mentioned?
A At the time of that storm, no. There have been leaks in the past, but I don't attribute one to that storm particularly. You know, it could be I just don't remember it, but I don't --
Q Sure.
A I don't remember it.



Q Tell me what you recall about any roof leaks that were experienced during your tenure as chief engineer.
A Well, that -- and I think you have pictures of it. If you look at the partial picture that's above the pane that you're looking at there, we had had on a couple of occasions, one being when I was there, all the rocks were pushed to the side. We went in, coated the roof due to leaks that were coming through.
Now, the leaks that -- I don't know if we're talking about leaks that came from the top of the unit or these were meant to be addressed -- seams, we found seams that had been pulled apart.
So that section had been -- had been redone and repaired and the rocks all put back into place.
There were some -- in the stairwell coming up to the roof, there had been some leaks, but that was the situation. You had the pool on one side and the exercise room on the other, and it wasn't in a highly used guest room area or even part of a guest room.
None on the upper roof that I can remember, and I'm trying to -- like I said, we did



replace that swimming pool covering, and that -- that was pretty much it in terms of roof leaks.
Q Let me ask you about the area where you pushed the rocks aside and -- roof.
(Interruption by the court reporter for clarity of the record.)
Q (By Mr. Campbell) Mr. Ulrich, with regard to the area where rocks were pushed aside and the roof was coated, is that in the mezzanine roof?
A No. It was just north of the skylight -- or just south of the skylight.
Q Of the skylight that we see here in --
A Yes --
Q -- Photo 12?
A -- yeah.
Q Okay. And who actually did that work?
A We had a contractor come out and do it. I couldn't tell you the name of the contractor.
Q Did you have any concern that if there were starting to be separations at seams in this roof, that perhaps there might be a need for a more full-scale repair or replacement of the roof?
MR. PEIRCE: Objection, form.
A That's -- we did not have another such area of concern that we had here. So -- and I'm not

an expert on roofs. I think if there were more issues, I think we knew what to look for going into the future, but we didn't have -- this was the biggest area of concern that we had in the hotel.

MR. CAMPBELL: And, Dianna, I will ask you to scroll down, and we're going to go to the page that has Photos 31 and 32. It's the second-to-the-last page of the exhibit. There we go.

Q (By Mr. Campbell) And, Mr. Ulrich, I'll represent to you that Matt Sitzmann of Haag Engineering was the forensic engineer who came out on June 7th to inspect this area of the roof that was near the skylight.

A Uh-huh.

Q And Photos 31 and 32 reference a 1-foot-9-inch-long split in the EPDM membrane beneath the coating.

A Yep.

Q Do you recall whether you were with Mr. Sitzmann when he exposed this tear in the seam during his inspection?

A Yes.

Q Do you recall having any discussion with Mr. Sitzmann at that time?



A Any discussion? Not specifically. It was a situation where what he's looking at in the -- where his hand is in the lower picture is the new roofing, and that's the old roofing.

And so that was -- that was something that we did a minor repair -- or I guess a short-term repair on at the time, but yes, I remember finding this -- finding the split.

Q And Mr. Sitzmann concluded that the split was likely due to mechanical abuse in his phrasing and was not hail related.

Would you have any reason to disagree with Mr. Sitzmann's assessment?

A I don't know what mechanical -- that's a term I'm not familiar with.

Q Okay. Well, I think he was using it broadly as distinguishing this from something that was hail related.

So if Mr. Sitzmann concluded that this tear was not due to the hailstorm, would you have any reason to disagree with his assessment?

MR. PEIRCE: Objection, form.

A Again, it makes some sense, but I'm not -- I wouldn't present myself as an expert on roofing.



Obviously, there was -- it was a -- it was a measurable split, but I mean, I've dealt with roofs just enough to know that a man needs to know his limitations, and I couldn't speak to exactly what caused it.

Q (By Mr. Campbell) Clint Eastwood told us that --

A I've remembered it for a long time.

Q How often were you up on this mezzanine roof during the course of your -- of your job responsibilities?

A We would go up to -- we had flags that hung over the front of the building. Those needed to be maintained. We had lights that shined on the flag. We did some maintenance on -- there were two exhaust fans that were part of the pool area. That had us up there, and that was probably the extent.

Q So at least once a week, if not more --

A No.

Q -- or less frequently?

A No. It would be -- the maintenance aspects would be done either on a monthly or quarterly basis, the flags on an as-needed basis.

So it was more we had a need to be up



there as opposed to we went up and checked on it kind of thing.

Q Okay. Now, this membrane was covered by a layer of river rock ballast; is that correct?

A Yes, sir.

MR. PEIRCE: Object to form.

Q (By Mr. Campbell) And when you went up there after the storm to take a look around, did it appear to you that the ballast had been moved around by either heavy rain or hailstones?

MR. PEIRCE: Objection, form.

A Nothing comes to mind. I mean, rock moves around a bit by its nature, winds and whatever. I did not notice anything where it was exposed or was unusual to my eye.

Q (By Mr. Campbell) And I guess that's what I was getting at more specifically is whether it appeared to you that any more of the membrane was exposed after the storm as compared to before.

A I didn't notice any.

MR. CAMPBELL: Dianna, let's scroll to Photo 9 in this same exhibit. I think it's the 17th page of the exhibit. There we go.

Q (By Mr. Campbell) And, Mr. Ulrich, these are photos that were taken by Mr. Sitzmann

during the course of his inspection, and Photos 9 and 10 are taken of bare membrane or a section of the roof where there was bare membrane exposed.
And Mr. Sitzmann makes the observation in his notes of these photographs that he doesn't show where the bare membrane was ruptured by hail.
Were you with Mr. Sitzmann when he took these particular photographs?
A I couldn't tell you. I know I took him up there and was with him for part of the time. I don't know if I was with him particularly at this particular moment or not.
Q Okay. Do you recall having any discussion with Mr. Sitzmann about whether he observed any hail-impact damage to exposed membrane?
A I have a vague memory of it. I don't have a specific memory of it. And, again, I'm not there to try to talk him out of everything. I'm up there to make sure he gets what he needs from me to do his inspection.
Q Do you recall whether you personally observed any damage of any kind to the membrane which appeared to you from a layperson's perspective to have been caused by hail?
A To the membrane, no. I don't --



nothing -- I have no recollection of that.
Q You had mentioned that there were several patches done of the roof. You mentioned one during -- that occurred on your watch.
Were you aware that perhaps there had been other repairs that had been done before you came on board with RDA?
MR. PEIRCE: Objection, form.
A There had been rumor -- again, secondhand people talking, but I couldn't tell you what sections had been worked on or anything. I think, you know -- I can only speak to the one that I -- that I saw.
Q (By Mr. Campbell) We've been provided with an invoice from Seagren Construction for a membrane patch dated in September of 2013. I take it that predated your involvement with this property?
A Yes.
Q So if there was a patch in September of 2013, your recollection was that there was a more recent one done sometime around 2014 that occurred while you were serving as the chief engineer; is that right?
A Well, I can't speak to the 2014 to



2017 with any kind of specificity, but I was aware of the one that happened '16-'17; but Seagren is the general contractor. They would have subbed this out to a roofing company.
So I know that when the project that I did, they tried to expand the work that was done to -- leaks are the most frustrating things in the world, because the leak where you see it is -- can be quite a bit of distance away.
That's why they went in and replaced such a large patch of it, to try to do everything they could to find where that leak was and stop it.
So instead of doing a patch that was 4 feet square whatever, they went in and did a whole big section.
Q And about how large of a section did they patch in two thousand --
A I was afraid you were going to ask that.
Q I would say 20 feet going out -- this was up against the side of the building and 20 feet out, and where you -- obviously where you saw the split was where it stopped. So I would say almost a 20-by-20 square.
Q Now, after this hailstorm, was there



some water damage to the ceiling of the lobby near the skylight?
A My remembrance is that there was. And basically we would see damage in terms of streaks down the wall, and we also had -- as I remember, we had had to put out some buckets to catch the water.
Q And where was -- where were these leaks observed on the interior of the lobby relative to the location of that tear in the transition of the seam that was found on the roof above?
MR. PEIRCE: Objection, form.
A Well, I would do better if I had the picture. Imagine in your mind where that skylight was. The left side borders on the hotel and the walls just maybe 15 feet going into the lobby.
So you looked at -- my remembrance of where the split in the membrane was was on the other side of the skylights and south. So it was a fair distance.
Q (By Mr. Campbell) Following this hailstorm, was a further patch done of the seam that was identified during Mr. Sitzmann's inspection?
A I know we did a quickie patch on it, and I believe somebody came in and looked at it, but I couldn't swear by it. Somebody came in and did

some work on it. I can more remember my work more than I remember -- I'm 70 percent sure that somebody -- it was repaired fairly quickly after it was discovered.
Q And did that seem to stop the leaking to the spot on the interior finishes of the lobby?
A Yes is my remembrance, but the other side of that is it's a weather-related issue. I mean, we got a lot of rain in a very short period of time in that storm.
You know, if you put a gun to my head, I would probably not -- you know, I can't remember what the weather was like, whether we received the kind of storm or anything like that kind of a storm again.
Q Understood.
Mr. Ulrich, we've been going for about an hour.
MR. CAMPBELL: Does everyone want to take about a five-minute break?
THE DEPONENT: I'm fine, but I'll go with whatever people want to do.
MR. PEIRCE: Let's do five minutes, if that works for everybody.
MR. CAMPBELL: All right. Let's do



that. Thanks.
(Recess taken, 2:02 p.m. to 2:08 p.m.)
Q (By Mr. Campbell) Mr. Ulrich, are you back?
A I am.
MR. CAMPBELL: Okay. Well, I'm going to shift topics, and, Dianna, I would like you to bring up a different photograph. This will be from Exhibit 37, and I think it's the 59th page on this exhibit.
Okay. I was off by one. Can you scroll down to the very next page. Great. Thanks.
Q (By Mr. Campbell) So, Mr. Ulrich, the last bullet point on Ms. Miller's May 19th e-mail reads: There are holes in the window framing directly outside of various room windows. We are unsure at this time the extent of this damage.
And what I've put on the screen for you to look at is a photo of fractures in the plastic sill cover of the west-facing sliding windows.
Was this a damaged item that was brought to your attention?
A After the fact. I think it was found by -- Ms. Miller and the housekeeping manager went



up and did a window survey, and I was shown this kind of after the fact.
Q And from your recollection, how prevalent was this type of damage to the windows?
A Well, again, this was something that Briana was spearheading. So she took this upon herself, and how prevalent it was, I don't know.
I do know that they surveyed -- my recollection is that they surveyed everything on that side of the building, but I didn't see or hear exactly how many -- I don't recollect how many rooms they talked about.
Q To your knowledge, was this sort of damage to the plastic sill covers found on any windows on the east side of the building?
A I couldn't speak to that. I don't even know if they looked at those, but I didn't hear one way or the other. I know it's not a common -- I had not seen it before they showed me some of the windows of what they had found.
Q We are in receipt of a proposal that was submitted by Glass Systems to replace these plastic covers on all exterior sliding windows on the west side.
Were you aware that Glass Systems



provided such a proposal?
A I seem to have a vague recollection to it, but capital projects were something that I not often was involved in. This was something that the GM and the owner would have had a game plan on.
Q Did you have any interaction with Glass Systems concerning this --
A No.
Q -- this issue in any respect?
A No.
Q Did not accompany them on any inspections they may have performed?
A No.
Q To your knowledge, were these sills replaced during the time that you remained as chief engineer for the hotel?
A I don't have any recollection of it happening in my time.
Q Do you recall any discussion you may have had with Ms. Miller or anyone else concerning any intent to replace these covers?
A I mean, they showed me the windows with -- you know, "Is this normal"; "Is this something you've seen before," along those lines; but I think the intent was always, you know, that

this was part of the damage that would need to be addressed, but past that, no.

Q Okay. We're going to go back and look at a few photographs from Exhibit 26.

MR. CAMPBELL: So, Dianna, let's start with -- I think it's Page 16 or the 16th page of Exhibit 26. Could you pull that one up for us, please.

It would be the next page then, because we're going to look at Photo Number 7.

Q (By Mr. Campbell) Mr. Ulrich, Photo 7 shows hail dents to a vent cap, and this is another photograph taken by Mr. Sitzmann.

Do you recall observing any damage to vent caps during Mr. Sitzmann's inspection of the property?

A I do remember that these caps -- a couple of them were blown off the fan assembly, itself. We found them a good distance away from -- these fit over exhaust fans, and that doesn't look like the normal damage that -- from wear and tear.

All I can tell you is had I seen that kind of damage on a piece of equipment before, I would have probably had it replaced.



Q Okay. Did you -- do you recall having seen this damage to either this or other vent caps after the storm?

A Well, that's what I'm kind of -- I don't remember seeing that kind of damage before the storm, let's put it that way, because it would have been something that would have shown up on my radar as something that needed to be addressed.

Q Okay. Did it show up on your radar as something that needed to be addressed after the storm?

A Well, after the storm it would have been something -- it probably wouldn't have been addressed until after the insurance was settled.

I mean, I can get it back in place, and it can do the job that it's supposed to do, and at that point until the claims were processed, I wouldn't have done anything with it.

Q Okay. Understood, but is this something that you were actually aware of in the aftermath of this storm, that this damage had occurred to these vent caps?

A No, because they're -- it's just not something that's -- I mean, it's a matter of ordering a new one. So it wouldn't have been



something that would have been -- I would have had that much worry about because I could have fixed it easily enough. I'm the engineer. I'm the guy that wants to put it back in place and not -- and get everything back to normal.

Q Okay. And, Mr. Ulrich, let's leave aside for the moment what would be done to address it. I just really want to focus in on whether you were aware following this hailstorm that there was this type of hail damage to these vent caps.

A Specifically, no. I do know that we had to go across that roof area, find these things, and put them back in place.

Was I particularly conscious of the damage? No, but I'm not also saying that it couldn't have been there. I'm at that point looking to get these back in place so we don't have any more issues, much more than, you know, the damage that was done.

Q I mean, would you agree with me that if you were replacing these vent caps after they blew off, it would have been apparent that these hail dents were in the caps?

MR. PEIRCE: Objection to form.

A Yeah, I guess what I'm saying is, I



did not recognize this kind of damage before the storm.

From my perspective, I'm not -- I'm looking at making sure that the equipment that this thing belongs to, it's -- it's functioning and it's protecting what it's there for, I mean, to protect the motors, to protect the fans.

At this point, you know, I don't know -- have any idea of the time frame that we're looking for in terms of replacing it. So I didn't pay that much attention to the damage to it.

And it wouldn't have been something that -- you know, if it came around and insurance isn't going to cover it, then we would have replaced it fairly quickly, but if not, we may have been waiting to see what the final judgment would be.

MR. CAMPBELL: Dianna, let's scroll up two pages to Photo Number 4. So if we can scroll up a little bit farther. There we go.

Q (By Mr. Campbell) Mr. Ulrich, Photo Number 4 is another photograph taken by Mr. Sitzmann during his inspection, and the caption reads: Metal trim on the west elevation of the tower was dented by hail.

Do you recall discussing this

observation with Mr. Sitzmann during the course of his inspection?
A On this specific -- on this specific question, no. We observed hail damage, and this is aluminum, and it doesn't take a whole lot to -- to affect aluminum. This specifically -- I mean, it would have been just one more example.
Q Was it apparent to you during your walk-through that the metal trim on the west elevation had been dented by hail?
A I don't have a remembrance of it. I do know that there was damage to aluminum -- aluminum -- metal pieces, but specific locations, he was taking pictures, he was writing down everything; and I let him refer -- I would be referring back to his report when it came back.
Q So prior to Mr. Sitzmann's inspection -- and, actually, going back to the first week or so following this hailstorm --
A Uh-huh.
Q -- did you do a walk-through with Briana Miller to point out where you had observed elements of hail damage?
A On the roof section, or are you talking building wide?



Q Building wide.
A No. I think she -- she had some -- obviously she did the rooms. We kind of -- it just worked out that we tried to cover as much as we could. There -- most of the damage -- my remembrance, because of the direction of the wind and the direction that the storm came in was hitting the west side of the building.
So yeah, I believe we went up early on before any inspectors came in, and we went through that list to make -- that she put together. I'm not sure we did past that -- past the time that the letter was generated.
Q So at the time that you and Ms. Miller put together that list, were you aware that there was dents to soft metals on the exterior of the building?
A I was, but we didn't put that letter together. I didn't have any -- I told her what I saw. We looked at -- at the conditions on the roof, but I was not involved in writing that letter.
Q Fair enough.
When you told Ms. Miller what you saw, did you mention to her that you had seen dents in the soft metals on the exterior of the building?



A Do I remember specifically? No. Would it have been something that -- we're looking for everything that might be of an issue, and whether that was on the west side of the building or whether that was part of the aluminum with the roof covering between two inspectors and she and I going up, I couldn't speak for sure of it; but I, basically, tried to make sure that she saw the extent of what I saw.
Q Would you have looked at the western elevation with Ms. Miller during the course of your walk-through with her?
MR. PEIRCE: Objection, form.
A As far as you can. I mean, it's -- it's -- this is -- it's hard to see past a floor or two if there's that kind of damage.
Q (By Mr. Campbell) Sure, but looking at Photo Number 4, this photo was taken from the mezzanine-level roof, correct?
A Yep.
Q Okay. And were you on the mezzanine-level roof with Ms. Miller during your walk-through?
A We were on the roof together during the walk-through. Specifically -- I can tell you



broad areas we looked at -- looked at. Whether this was -- this specific area was -- was on that list, I couldn't tell you. I don't want to guess on something. I'm sure if it was obvious from that area, but I don't remember having a conversation with her about it.
Q And just to complete that thought, when you say you're sure that "if it was obvious from that area," what you're telling me is if it was obvious from that area, then you believe you would have pointed that out to Ms. Miller?
A And I'm not sure I didn't. I just don't have a recollection of having that conversation with her.
Q I understand.
A I remember several areas of concern that seemed to show damage, but exactly how that conversation went, I couldn't speak to.
MR. CAMPBELL: Dianna, I'm going to ask you to pull up a photo from a different exhibit. This will be Exhibit 43, Page 20.
Q (By Mr. Campbell) Mr. Ulrich, this is a photograph from a report prepared by Aguilar Construction Services, and the caption reads: Damaged cap flashing.

Do you recognize what this cap flashing is?
A Yes.
Q Do you recognize that it's on the parapet wall --
A Yes.
Q -- the mezzanine wall? Did you observe hail dents to the cap flashing in the aftermath of this storm?
A Specifically to the flashing, I couldn't speak to that. I may have. It may have been something that we put on the list, but I don't have a specific remembrance of this flashing.
Q Mr. Ulrich, Ms. Miller told us during her deposition yesterday that the hotel replaced somewhere on the order of 50 windows on the west side in the 2013 to 2016 time frame.
Do you recall a program to replace west-facing windows during the time you were at the hotel?
A Yes. My understanding was that somewhere in the past the wrong shade of windows was put in, and they had a program once a quarter or once or twice a year to replace a couple of windows at a time.



Q Well, the context in which this was addressed in Ms. Miller's deposition is that there had been failure of the seals within the windows that was causing condensation or fogging between window panes.
Do you recall that as having been an issue during the time that you were at the hotel?
MR. PEIRCE: Objection, form.
A I didn't really have that much of an input into this program because it was already running and was not given to me as being one of my concerns.
I don't -- I mean, I -- you're going to with these kind of windows on usually a limited basis get some of that kind of moisture between the panes, but that wasn't the primary reason that I was told that we were changing the windows out.
Q (By Mr. Campbell) And when you say "the wrong shade of windows," can you elaborate? I'm not sure I understand what you're telling me.
A Well, all windows are tinted, and windows had been replaced that were tinted the wrong color, and it kind of stuck out when you have the wrong -- when one window doesn't match up against, you know, a bunch of windows in that section, it



kind of sticks out like a sore thumb.
Q Okay. So I'm going to show you about a half dozen photos reflecting various -- or the conditions of sealants at windows.
MR. CAMPBELL: And so, Dianna, can you bring up Exhibit 43, and we'll start with Page 49 of that exhibit.
Okay. That's not the one I was looking for. So I'll have to look myself.
(Discussion off the record.)
MR. CAMPBELL: I apologize. I meant Exhibit 37. Sorry. So Exhibit 37 but Page 49.
Q (By Mr. Campbell) And so, Mr. Ulrich, these half dozen photos I'm going to show you are all depicting the condition of the -- of the windows, and this particular photo shows a north-facing gasket. Wait a minute. That's not what I was looking for.
MR. CAMPBELL: Let's go to Page 69 and Photo 82.
Q (By Mr. Campbell) So Photo 82 has a caption: Overview of partial previous repair to east-facing window seal.
Do you see that photo?
A Yes.



Q And then let's turn to the next photo, so let's scroll down one page.
That shows a -- the caption for Photo 83 is: Close-up of repair sealant and original seal transition.
Do you see that photo?
A The top number, 83, yes.
MR. CAMPBELL: And then, Dianna, if we can scroll down two more pages to where we pull up Photos 87 and 88.
Q (By Mr. Campbell) Do you see these photos referencing overview of west-face glazing seal repair?
A Are those shot from the outside in?
Q That would be my assumption, but I can't answer that for you definitively.
It says "sealed weeps," and weeps are --
A Yeah, it almost --
(Interruption by the court reporter for clarity of the record.)
A It would have to be.
Q (By Mr. Campbell) And so to follow up that thought, Mr. Ulrich, that would indicate that these are photos showing the exterior of the

windows?
A Yes.
Q Okay. And I can show you other photos of sealant repair, but I guess my question for you is: Did the engineering department apply sealant to windows during the time that you were serving as chief engineer for the hotel?
A Not on the outside.
Q Did you do some on the interior?
A Well, going back to our discussion on the radio calls, we would on occasion get whistling -- whistling windows. The wind would hit them hard, and this sealant -- what we were dealing with is a gasket that comes in rolls, soft rubber that seals the inside of the window.
Every once in a while we would get one where the seams had shrunk and leaving a little pencil-lead-sized or pencil-sized hole between the two seams, which we would go in and put a little bathroom caulk to stop the air from coming through. Nothing that looks like this.
Q If this is a repair that would have been done during your tenure, would you have known about it?
A No.



Q Why not?
A One, it's a capital project. Unlike other places I've worked where capital projects were planned in 1-, 3-, 5-, 10-year increments and money was set aside; if it was costly, it wasn't in my purview. I would have never -- no.
Q Do you know whether deferred maintenance for the hotel was planned in any sort of three- or five-year increments for this particular hotel?
A Not that I was ever aware of. I mean, that was a decision basically that the owner sat down once a year and decided what those projects would be.
I made sure that they were aware of issues, that nothing would come and sneak up on them; but no, my input was never solicited.
Q When you would make management aware of certain issues, would you do so in writing or would you do so verbally?
A If I thought I had -- it would be something that could come back, I would usually put it in e-mails. And it was something that I wanted to refer back to later.
Q And who would those e-mails have been



directed to?
A Briana.
Q Taking the circumstance that you described for me a few minutes ago where there's a whistling window and so you apply sealant inside the window to bridge that gap, would there be -- typically be a work order that would have been prepared for that type of repair?
A No. They did not track radio calls, and they may be tracking them now, but they didn't track them back then. It was basically a phone call from the front desk.
Q If there was water intrusion for a window, would that be addressed through a radio call?
MR. PEIRCE: Objection to form.
A There's some. More often than not, it was something that was caught during the PM process, where they would specifically -- it was written in a way that we wanted people to get in and check the windows and the drapes and all of those things. So they would have been much more -- they would have gone through the effort of really checking out the seal where the guest may not.
Q (By Mr. Campbell) And by "PM



process," you're referring to the preventative maintenance procedure where rooms were inspected on a quarterly basis?
A Yes, sir.
Q Last thing I want to address with you, Mr. Ulrich, is have you look at a few photos of mechanical equipment at the hotel.
MR. CAMPBELL: So this will be from Exhibit 37. So, Dianna, can we pull up Photo 24 that I think is on Page 37 of that exhibit. So Page 37 of Exhibit 37. I'm always one page off. Let's scroll down one more page.
Q (By Mr. Campbell) So this is a photograph, Mr. Ulrich. It says CU, dash, 2 top casing. What is this piece of equipment?
A It's part of an air conditioning unit, either -- probably for servicing the kitchen equipment, walk-in freezers, that sort of thing.
Q And the photo depicts some hail indentations on the top of the air conditioning unit; is that correct?
A From what I can see, I see a couple of instances of that, yeah.
MR. CAMPBELL: And let's scroll down one page.

Q (By Mr. Campbell) And this is a photo of a cooling tower aluminum jacketing on pipe; is that correct?
A Yes.
Q It also exhibits some hail impacts; is that right?
A Well, there's some definite denting to it, yeah.
Q And then one more to look at.
MR. CAMPBELL: If we can scroll down three more pages to Photo 28.
Q (By Mr. Campbell) This is a photo of a relief hood. Is this also a part of the mechanical system for the hotel?
A Give me a moment. I'm trying to place it. I think it's on the south side of the building. It's up on the upper -- upper roof, I can tell you that. I'm not sure. I'd have to stare at it.
If it was a couple feet back from there, I would have some context. I believe it's up on the south area of it. This is a common cover for that sort of thing.
Q Okay. So I mean, we've looked at a few examples of hail dents to various metal enclosures that are part of the mechanical



equipment.
I guess my question for you is: In the aftermath of this hailstorm, did you become aware of hail dents to various metals involved in the HVAC equipment?
A Yes, I was aware of some of the damage that you're showing.
Q Did you bring that damage to anyone's attention?
A Actually, no, because it did not -- from an engineer's perspective, it did not -- it's doing what it's supposed to be doing, and this is protecting the equipment.
It didn't have any negative effect on the ability of that equipment to work properly, so it wouldn't have been something that I would have had a particular concern about.
Again, I think this is -- like you were showing the top of the first picture you showed me, that's kind of what that cover is supposed to do.
MR. CAMPBELL: Mr. Ulrich, those are all my questions. I appreciate your taking the time out of your day to do this for me. Thank you.
THE DEPONENT: You're welcome.



MR. PEIRCE: Mr. Ulrich --
THE DEPONENT: Go ahead.

EXAMINATION

BY MR. PEIRCE:
Q Mr. Ulrich, my name is Chris Peirce. I represent the plaintiffs in this case, and I just have some follow-up questions for you. I'm just going to skip around various topics.
The photographs that you were just looking at in Exhibit 37, do you recall those photographs that Mr. Campbell was pointing out to you?
A The last three.
Q Yeah. And he's been referring -- well, it's still up. This report, do you see where it says "Page 24 of 69," and he's looking at Photo -- you're looking at Photo 28 of Exhibit --
A Uh-huh.
Q Is that a "yes"?
A Yes.
Q I'll represent to you these photographs were taken in June -- June 25th of 2019, according to the time stamp in the photographs.
That's over two years after the May 8, 2017 hailstorm, correct?



A Yeah.
Q And is it fair to say that as far as what is accurately depicted in any photos taken over two years after the hailstorm, you wouldn't be able to confirm exactly it was the same condition as when you left the hotel in August of 2017?
A No.
Q And as I understand it, you were there for three years, from sometime in 2014 until sometime in August of 2017, as the building engineer, correct?
A Yes.
Q Do you recall what dates specifically you left in August of 2017?
A That I left?
Q Yes, sir.
A It had to be in the first week in August.
Q Do you know when the insurance company made their final decision on the claim in 2017?
A No. I wouldn't have been -- that wouldn't have been in my bailiwick.
Q Do you have any idea what they determined to be the covered amount of loss as they're subtracting the deductible and

non-recoverable depreciation?
A In this particular instance, no. There's been a couple of insurance matters that I can remember better than I can this.
So I'm not even sure I was told --
Q So --
A And by that time, I would have been somebody who was kind of an intern engineer. So I'm not sure they would anyways.
Q In other words, you didn't hear from Briana Miller or somebody else that the insurance company was offering 15-hundred-and-some-odd dollars to provide for benefits from the hailstorm after applying the deductible?
A Specifics like that, no.
Q Okay. You talked about -- earlier, Mr. Ulrich, about PM, or preventative maintenance, that was done. Was that something that you instituted or somebody else instituted at the hotel?
A I instituted it.
Q And do you recall what year specifically you instituted it?
A Well, I will tell you that the program became serious probably the fall of '16, if I remember correctly.



Q Okay. So the previous fall before this May 2017 hailstorm?
A Yes. And the seriousness is, they had always had a loose PM project, but it was not -- it was not detailed enough to be -- it was a -- it wasn't an effective way of going at it. It had to be broadened and taken more seriously.
Q And as I understand it from your testimony, you would divide up the inspection of each room with other members of the hotel staff.
Is that fair?
A Usually management staff, but management or supervisors, yes.
Q And you guys would go room to room inspecting each room in the hotel in these quarterly sessions?
A Yes, sir.
Q So if you did them quarterly, would it be fair to say you did one in the fall of 2016, as well as the spring of 2017 before that hailstorm?
A Oh, before the hailstorm? Yeah, we were well into that program by then.
Q And if I have your testimony -- and forgive me because I'm writing notes -- but you did not get many leakage calls is what you testified to



earlier and specifically about window leaking prior to the hailstorm; is that correct?
A Well, I can't say "prior to the hailstorm," because I don't know what happened after the hailstorm, but I can tell you that well over 90 percent of the time that we were addressing any leak, it came out of the PM program.
Again, the guests are not as inclined as we need them to be as a PM process to go in and look at the little details. So we would see the aftermath of leaks more often than the leaks, themselves.
Q What I'm getting at, Mr. Ulrich, is that in 2019, the insurance company hired some experts from a company called JS|Held to go look at approximately 71 interior hotel rooms, and they found water intrusion -- significant water intrusion in 80 percent of those rooms.
What I'm trying to find out is, from your recollection, was that something you were observing as doing preventative maintenance, 80 percent of the rooms had significant water intrusion when you were doing that preventative maintenance?
A Give me a moment and I'll -- "no" is the outright answer. In thinking back, I had a



gentleman who was primarily a painter and a drywaller. He did it both for the hotel and independently. He would every quarter -- quarterly I would say he'd have to varying degrees maybe six to -- six rooms that needed to be addressed to varying degrees.
Q And would those varying degrees be anything in the room?
A Well, some of the -- some of the rooms had -- no. That was specifically windows.
Q Okay.
A What "varying degrees" means that -- from what -- the way I'm putting it is there could be damage to the drywall around the windows, there could be damage on the sills which were sometimes drywall where we would have to go in and fix the drywall first and then paint.
Q Mr. Ulrich, with regard to the inspection that Mr. Walls did, I'll represent to you that his time sheet from that inspection indicates he was at the hotel on May 25, 2017, for about 1.8 hours doing his inspection.
Does that seem to register correct in your mind as the amount of time he spent there?
A That would -- I don't have a

recollection of it being longer or shorter than that. So that seems pretty reasonable.
I don't -- I know it wasn't an extended period of time, but -- because I spent that time with him.
Q And as I understand it, you were -- you were pointing out the list of items that had been pointed out to you from someone.
A When I took him up, yes --
Q In other words -- I'm sorry.
A Like I said, I was not involved with that list per se, but when the inspectors came in, that's what we went from.
Q And I think your testimony was that you were not getting in the way or interfering; you were letting Mr. Walls do his investigation; is that fair?
A That's pretty much how I let anybody who comes in and inspects -- I let them do their work, and I'm as interested in hearing an independent view as well.
Q Mr. Ulrich, were you a part of reporting the damage from the storm to the insurance company at all?
A No. That's not something that -- that



would be strictly a Briana thing.
Q Are you aware that the hotel reported major hail damage to the roof and windows of the hotel?
A I had not heard before you contacted me about the 80 windows and the leaking and such, no. I did know of what was on that list.
Q And you had never -- before today, you had never seen that e-mail that Briana had drafted, correct?
A Oh, I've seen it. I probably -- I remember there was a list that we went from, and she had had a list printed up, and so I had an idea to make sure that everything on that list got looked at.
Q Right, but I'm not -- I guess my question is a little different. I wasn't talking about the list, and it may have been provided to you in other means, but the actual e-mail, itself, that included the list, you weren't copied on the e-mail.
A Oh, no.
Q I was just asking have you ever seen it before today?
A No, not an e-mail.
Q Do you recall how you received the



list of items that you showed Mr. Walls?
A Basically, it was a list from some of the items or things that were very apparent when I walked around. Some of them were things that Briana wanted to have on the list as well when we -- we did our walk.
Q And, Mr. Ulrich, you were not charged with doing a room-by-room evaluation of every single item that could have been damaged from hail following the storm, correct?
A No. That other people did, but I wasn't a part of it.
Q When you say "other people did," who are you referring to?
A I believe the housekeeping supervisor and Briana. That's how I heard about like the window seals -- the plastic window seals and such. They had gone up and surveyed the rooms on their own.
Q Do you know if a contractor reported that or if Briana or a housekeeping person, or you just have no idea?
A I have -- you know, I don't know if I'm talking myself into this. There may have been a contractor involved, and she may have actually seen



some of this damage and called them in to get a second opinion and an idea of cost, but I can't -- because this was happening out of my purview, I don't have a solid memory of it.
Q Right. And that's why I'm asking that, Mr. Ulrich. It's fine to say you don't know where the information came from, but, you know, the way you phrased it earlier was that Briana went and did an inspection of every single hotel room; but do you know that for a fact, or is that something that you're just --
A No. That was my understanding.
Q Okay. Did she -- did Briana Miller ever tell you she looked at every single room and inspected it for damage for hail?
A I was told -- I can't tell you whether Briana said it or it was somebody that she -- I know more than one person. She took somebody else with her. I can't tell you who.
My -- my memory is that it was the housekeeping supervisor, but I couldn't swear by it.
Q When you're saying -- just so we're clear -- first of all, who was the housekeeping supervisor you're referring to?
A You asked too fast. I couldn't tell

you his name, but basically he -- he managed the front desk and housekeeping, part of the executive staff; and I'm sure it was just somebody to go up and write down what they found.
Q Nevertheless, you were not part of that process, correct --
A No, no.
Q -- in inspecting? Okay.
A It was something that they did -- it was something that -- something that needed to be done, but -- but -- so they went ahead and did their part of it.
Q Were you with Mr. Walls the entire time he was inspecting the hotel?
A I can't say that I was, because I had a radio and was on call. I don't remember one way or the other.
Q Did Mr. Walls do any testing of the physical property of the hotel in any respect?
A Testing? I'm not sure I understand.
Q Other than looking at the property and taking a few pictures, is there anything else you noticed Mr. Walls doing with respect to inspecting the damage?
A Wasn't in my recollection, no.



Q You mentioned earlier about him mentioning he didn't believe certain aspects were related to hail, and you don't recall what those elements were?
A Specifically, no. I couldn't speak with any certainty.
Q With regard to the engineer that came to the hotel on June 7th, 2017, Matthew Sitzmann, I think your testimony was that you were with him the entire time; is that correct?
A Well, I was -- I was with him from -- what I don't remember is whether I could have been called away for a few minutes and come back. I know I was with him at the beginning. I know I was with him at the end and locked everything up. I can't tell you if I was with him the whole time.
Q Is it your understanding that Mr. Sitzmann was only looking at a specific area around the skylights when he was inspecting the hotel roof?
A I know that was a focus of his. I couldn't -- I don't remember whether he looked at the other aspects or not.
Q Did you observe him looking at the other aspects of the roof?



A No.
Q With regard to the section of the roof that you were talking about had been repaired in the past, the 20-foot-by-20-foot-approximate area --
A Uh-huh.
Q -- just so I'm clear, what year did that occur, the actual repair?
A My recollection is, it was in '16.
Q And had there been leaking that you recalled from when it was repaired until the hailstorm?
A Yes, which is what they were addressing.
Q When you say "they were addressing," what do you mean?
A Well, that's why they were doing the work, was trying to chase down some leaks.
Q Right, but I'm talking about after the repair was done, the 20-foot-by-20-foot section, you're saying there were still leaks after that happened before the hailstorm?
A Some minor ones in places that -- basically it's almost a step-by-step process. You pick the most obvious place to go and do a repair, and that may not be the only repair you end up



doing.
So there was still one or two areas that were leaking.
Q Well, how -- I mean, describe to me what you remember from them leaking and where they were.
A They were in -- they were on the second floor in the sales office. This was on the south-side wall that they shared with the lobby. The lobby has a tall ceiling.
We would -- especially in snow times -- get a -- have to have a bucket up there to catch the leak.
Q Especially in what times?
A In -- when it snowed, you have a very slow leak or a very slow melt.
Q Is that in the sales office?
A Yep.
Q Is that what you said?
A Yes.
Q Are you disputing Briana's e-mail, that the leaking began in the ceiling of the south side of the lobby skylights immediately following the storm?
A Well, my recollection of where it was

leaking is on the middle to far side of the lobby, away from that particular leak. That's my remembrance -- or my understanding of it. I think we were trying to address leaks in the sales office. My recollection is it wasn't 100 percent successful.
Q So I'm not clear from your answer.
Are you saying there were leaks that you were addressing in a different area from where the leaks that Briana was reporting after the storm?
A Yep.
Q Okay. What would you do to address the leaks other than put a bucket down?
A We would go up, and that's where that new piece was put in. We would -- we had had that company up at least twice to expand the areas of concern to see if we could catch where it was leaking from.
Q You don't recall that company's name?
A No, because it was a sub of the general contractor, so no.
Q Your testimony earlier about the area that Mr. Sitzmann was addressing where there was a -- you said 1-foot-something --
A Yep.
Q -- tear in the membrane was a fair



distance from the leaking in the lobby, what would you qualify as a fair distance --
A Well, the patch was --
(Interruption by the court reporter for the clarity of the record.)
Q (By Mr. Peirce) Sure. Go ahead, Mr. Ulrich. I'm sorry.
A Well, you had a 20-foot patch which ran up to the side -- almost the full length up to the side of the building, and then probably 10 feet into the building is where I remember the leaks being.
Q So 10 feet away from where the tear in the membrane was approximately?
A No. You've got -- I think what -- what ends up being confusing is north, south, east, west here.
If you look at that area of the roof as being the west side, this patch was put on the north side of the west side of that building or on the south side. I'm sorry.
On the right -- as you're looking at the building, you have the skylight in front of you. That piece that he found was on the right side where they had put in a new piece of roofing material.



That's a good 20 feet away from the side of the building, and then the leak going inside into the lobby.
Q So it's a good 20 feet away?
A At least.
Q Mr. Ulrich, you were asked as a layman, you have no recollection of hail damage to the roof membrane, and I believe your answer was: To the membrane? And then you didn't recall.
Did you observe any other damage to the roof that -- other than the membrane?
A I'm not sure I really saw -- again, putting the seam damage aside from his pictures, I'm not sure. There was exposed membrane. I don't know if it was damaged or not. There are two pictures of exposed membrane there. Unlike the metal which is easy to spot the damage, I don't know that I spotted damage to the membrane.
Q Did you -- first of all, how many roofing levels are there on the hotel?
A Two.
Q Where would you characterize those as being?
A Well, ones on the top of the main section of the building, and the other -- this is a



parapet that comes out and covers the -- covers the driveway, and it's also a part of the lobby.
Q Do you recall where exactly you went with Mr. Walls, if anywhere, when he looked at the roof of the building?
A No.
Q Did you go on the roof with Mr. Walls?
A This is the first inspector or the second inspector?
Q The first one.
A Yes.
Q He was a little older gentleman --
A Yeah.
Q -- tall.
A Yeah, I went in. You have to have keys to get into the -- we keep the roof area locked. So I unlocked the room and was there, unlocked the doors, stayed with him, answered whatever questions I could.
Q When you say "unlock the doors," are you talking about the mezzanine-level roof or a different roof?
A I'm talking about the mezzanine level.
Q Did he go to any other level roof?
A Not that I remember.

Q Did he do any kind of inspection of the actual membrane of the roof?
A Not that I can say.
(Discussion off the record.)
Q (By Mr. Peirce) As I understand it, Mr. Ulrich, when you were there from 2014 until 2017, there was about six windows a year that were reporting some kind of issue that you had somebody address?
A I would say it wasn't six a year. It was as many as six per quarter where we did PMs.
Q As many as six a quarter, but you only started doing the PM in 2016 in the fall, right?
A Well, the best of my recollection.
Q Well, that's what -- I'm not asking for anything else.
A It's like -- well, yeah, you're asking me specifics on things that I haven't thought about in quite a while.
Q So if we take your best recollection, if you did quarterly PMs and you started in the fall of 2016, that would be two sets of PMs, correct?
A Two, and we would have been in the third.
Q You would have been in the -- by May



8th, you had already done the third quarterly?
A No. I didn't say we were done with the third quarter. We would have been in the --
Q Started? So --
A And -- and the other thing is just because we started this program doesn't mean we weren't doing the work before then. We were just much more organized in finding the issues.
Q Okay. But if you're doing this system and you started in the fall where it's an orderly system of 2016 and then you do a second one in the spring of 2017 and then you start a third one, you're looking at up to -- I don't know -- 15 windows maybe that you have addressed some sort of issue around; is --
A Yes.
Q -- that fair?
And that -- and that could range from a very minor issue to something else, correct?
A Yes.
Q What is the most minor issue that would cause a blip on a PM screen; in other words, cause your department to address it?
A If we saw any damage, be it water, be it the sun, the paint somehow was an issue, anything



that didn't look up to standard.
Q And once you identified that, your department would address it --
A Yep.
Q -- is that correct?
A Yes, sir.
Q And that dovetails into what you were testifying to earlier about the pencil-lead, you know, seams where a gasket was, you would caulk the inside -- or your department would caulk the --
A That was probably done either -- either the caulking was done or tape was put on at the time of a radio call because a guest was complaining.
If it was an ongoing issue, we would look for a more permanent solution than that.
Q But it would also include doing paint and if necessary any drywall --
A Yep.
Q -- repair, correct?
A Yep.
Q So if those -- if you were canvassing the hotel and addressing those issues, there shouldn't be continual, ongoing leaks by the time you're doing your third PM in May of 2017; is that



fair?
A Well, if it was a consistent -- if I was doing all the inspections, I would agree with you.
We are getting people that are new to the process and new to, you know, what to look for; and no, some of that is we're going to get different kinds of reports from different kinds of people until they get this under their belts.
Q But as far as what they observed and reported --
A Yeah.
Q -- you don't -- you don't really have any idea, I guess, if you weren't in the room and looking at it with your own eyes, correct?
A No. We are more proactively finding issues, and sometimes it's -- you're doing it on a priority basis. So as you go along, you get more and more detailed.
Q As I understand your testimony, those were actually filled out in hard copy, what you would find, and given to Briana Miller; but you don't know what happened to them after that?
A No.
Q No, you do not?

A No, I do not.
Q So whether she scanned them and tossed the hard copy, you don't know?
A Nope. I was never told of that.
(Pause in the proceedings.)
Q (By Mr. Peirce) You didn't have any conversations with anyone hired by Hudson besides Mr. Sitzmann and Mr. Walls; is that fair?
A No.
Q No, you did not?
A No, I did not.
MR. PEIRCE: All right, Mr. Ulrich. I'll pass the witness.
EXAMINATION
BY MR. CAMPBELL:
Q Mr. Ulrich, just a couple of follow-up questions, and then I think we're going to be done.
Did I hear you say that you understood there was a processed inventory hail damage in each hotel room?
A I said that I don't know how formal that was. I do know that -- my understanding was, I was told that Briana and I believe somebody else -- I believe it to be housekeeping supervisor went up and looked at all the rooms.



Now, how formal that was and -- and -- I can't tell you.
Q So you don't know if -- for example, you wouldn't know if there was a write-up of what was observed in each hotel room?
A No.
Q Okay. Last thing I wanted to ask you about is Mr. Peirce commented upon what Hudson determined to be the scope of repair to the hail damage. So I've got one more document to run by you.
MR. CAMPBELL: Dianna, can we pull up the last page of Exhibit 32.
(Discussion off the record.)
Q (By Mr. Campbell) So, Mr. Ulrich, I'll represent to you that this is the statement of loss that was prepared by Bill Walls, and so there's a list of damaged items on the left-hand side, and then there's a dollar figure for the cost to repair in the column with the heading Presented. And then it reflects a gross claim of $146,799.
My question for you is: Taking a look at a list of the items that are being addressed, does that list include all of the areas of hail damage which you had observed during your



walk-through of the property?
MR. PEIRCE: Objection, form.
(The deponent perused the document.)
A Well, some of these I don't recognize. They're in a kind of terminology that I . . .
(The deponent perused the document.)
A I don't know what storefront they were replacing. I'm assuming that's a full skylight replacement, or I don't know.
Without having seen what -- what the report was and a breakdown of it, I'm a little bit of a loss here. I don't know if it does or not.
Q (By Mr. Campbell) Okay. So what areas of hail damage are you thinking might not be covered by this list that you were aware of?
A Well, one, things that somebody else discovered that I didn't or wasn't aware of.
Q Sure. And I can only ask you about your own observations. So I just -- I'm curious whether there was any hail damage which you observed that does not appear to be reflected on this list.
A Okay.
(The deponent perused the document.)
MR. PEIRCE: Objection, form.
A What's the bug seals?



Q (By Mr. Campbell) That is that plastic cover running along the base of --
A There it is. Okay.
(Interruption by the court reporter for clarity of the record.)
Q (By Mr. Campbell) -- the windows.
A I don't -- I can't really say definitively that this is everything. That has many of the things that I was concerned about. It has some things that I wasn't part of knowing about.
I don't see anything right offhand that's missing, but there certainly could be things that I'm either not aware of or don't have a remembrance of.
Q Understood.
MR. CAMPBELL: All right. That's all for my questions. Thank you.
EXAMINATION
BY MR. PEIRCE:
Q Mr. Ulrich, just briefly, I just want to be clear on something.
Is it fair to say you don't know for a fact whether Briana Miller inspected every single hotel room after the hailstorm looking for hail damage?

A No, I cannot say that.
Q Meaning no, you don't know one way or the other if she did or not?
A No, I do not have firsthand knowledge of -- I didn't hear this from Briana. I heard it from -- well, I heard -- I was shown damage after the fact, but it was my understanding that she checked all the rooms. I can't swear by it.
Q Similar question as far as damage that later emanated from this hailstorm: You're not aware of when RDA or when Briana Miller became aware of every item of damage they're claiming was caused by the May 8th, 2017 storm, are you?
A No, no.
Q In other words, if water started leaking in Room 1222 and experts on behalf of my clients are saying it was caused from the May 8th, 2017 storm, you would have no idea of when the hotel became aware of that damage?
A No.
Q No, you would not?
A No, I would not.
Q And does that -- that generally hold true throughout the majority of the hotel? In other words, if there was a hail dent there that you



didn't lay eyes on, you don't know when it was discovered by someone at the hotel or on behalf of the hotel, correct?
A No, because I was not the lead person on generating this paperwork and keeping the owner informed. I don't think there was a great impendance in keeping me -- especially since I had -- by the time we got to the point of what you're speaking of, I had already given notice, and I think that even lessens the likelihood I would be involved in that kind of either knowledge or understanding of the -- of the full project.
Q Understood.
MR. PEIRCE: Thank you, Mr. Ulrich. I'll pass the witness.
MR. CAMPBELL: I think we're done.
THE COURT REPORTER: And, gentlemen, would you like the same order?
MR. PEIRCE: Yeah, just the exhibits we used for us.
THE COURT REPORTER: And a copy of the transcript?
MR. PEIRCE: Right.
MR. CAMPBELL: And, Mr. Ulrich, I should pass along to you that you have the right to



review this deposition for accuracy and make any corrections that you think are needed, and it's your call one way or the other whether you wish to do that.
THE DEPONENT: Yeah, now that you say that, I'm thinking I should CYA. Yeah, I would like to have a copy of it.
MR. CAMPBELL: Okay. Well, I can make arrangements to get it over to you electronically since we have your e-mail address.
THE DEPONENT: That's fine.
MR. CAMPBELL: All right. Well, I appreciate it.
MR. PEIRCE: Thank you.
WHEREUPON, the within proceedings were concluded at 3:29 p.m. on June 23, 2020.



**I, CRAIG SCOTT ULRICH, the deponent in the above deposition, do hereby acknowledge that I have read the foregoing transcript of my testimony and state under oath that it, together with any attached amendment to deposition pages, constitutes my sworn testimony.**

**______ I have made changes to my deposition.**

**______ I have NOT made any changes to my deposition.**

__________________________
**CRAIG SCOTT ULRICH**

**Subscribed and sworn or affirmed before me this ______ day of ____________, 20___.**

________________________________
**Notary Public**
**Commission expires: ____________**

REPORTER'S CERTIFICATE

STATE OF COLORADO )
) ss.
COUNTY OF DENVER )

I, DIANNA L. BUCKSTEIN, a Registered Professional Reporter and Notary Public, ID 19974020573, within and for the State of Colorado, do hereby certify that previous to the commencement of the examination, the deponent verbally declared his testimony in this matter was under the penalty of perjury; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature this 1st day of July, 2020.

My commission expires November 25, 2021.

______________________
Dianna L. Buckstein, RPR
Concise Legal Reporting, Inc.
P.O. Box 27523
Denver, Colorado 80227



Concise Legal Reporting, Inc.
P.O. Box 27523
Denver, Colorado 80227
720-556-1109

July 1, 2020

Mr. Craig Ulrich
Cscottulrich28@gmail.com
Re: Deposition of CRAIG SCOTT ULRICH
RDA Hotel Management Company v. Hudson Specialty Insurance Company
Case No. 1:19-CV-2145-DDD-NYW

Dear Mr. Ulrich:

Enclosed please find the original amendment sheet and deponent's certificate for the above deposition. After the amendment sheet and deponent's certificate are signed, please have both notarized and return to the deposing attorney within 35 days. Please forward copies to counsel of record and Concise Legal Reporting, Inc.

Thank you for your prompt attention to this matter.

Original transcript filed with Colin Campbell, Esq., on July 1, 2020.

Sincerely,

Dianna L. Buckstein, RPR
Concise Legal Reporting, Inc.
cc: All counsel



- AMENDMENT SHEET -

Deponent: CRAIG SCOTT ULRICH
Date of Deposition: June 23, 2020
Case: RDA Hotel Management Company v. Hudson Specialty Insurance Company

The deponent wishes to make the following changes in the testimony as originally given:

| Page | Line | Change | Reason |
|---|---|---|---|
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |

Signature of Deponent: ________________________

Subscribed and sworn to before me this ____ day of ___________, 2020.

Notary's signature ____________________
Notary's Address______________________
My commission expires_________________

**A**

**ability** 58:15
**able** 60:4
**abuse** 30:10
**accompany** 40:11
**accompanying** 21:14
**accuracy** 87:1
**accurate** 22:15
**accurately** 60:3
**acknowledge** 4:3,6 88:2
**ACS** 3:16
**actual** 66:19 71:7 77:2
**address** 10:1,5 24:22 43:7 56:5 73:4,11 77:9 78:23 79:3 87:10 91:24
**addressed** 24:24 27:13 41:2 42:8,10,14 50:2 55:14 64:5 78:14 82:23
**addressing** 63:6 71:13,14 73:8 73:22 79:23
**adjuster** 21:4
**administered** 4:7
**affect** 45:6
**affirmed** 88:14
**affixed** 89:13
**aforesaid** 89:8
**afraid** 6:21 35:18
**aftermath** 42:21 49:9 58:3 63:11
**afternoon** 6:20
**age** 8:2 24:5
**age-wise** 22:19
**ago** 11:20 16:23 24:4 55:4
**agree** 4:17,21,23 43:20 80:3
**agreement** 4:12 4:13
**Aguilar** 48:23
**ahead** 23:19 59:2 69:11 74:6
**air** 8:2 53:20 56:16,20
**allowing** 17:3
**alternative** 19:5
**altogether** 19:8
**aluminum** 18:7 45:5,6,12,13 47:5 57:2
**amendment** 88:5 90:9,11 91:1
**amount** 19:8 60:24 64:24
**answer** 5:24 6:1 22:23 23:19 52:16 63:25 73:6 75:8
**answered** 76:18
**anybody** 65:18
**anyone's** 58:8
**anyways** 61:9
**apart** 27:14
**apologize** 51:11
**apparent** 43:22 45:8 67:3
**appear** 32:9 83:21
**APPEARANC...** 2:1
**appeared** 32:18 33:23
**appearing** 1:23
**apply** 53:5 55:5
**applying** 61:14
**appreciate** 58:23 87:13
**approximately** 63:16 74:14
**Arapahoe** 1:19
**area** 17:24 27:22 28:3,8,25 29:4 29:13 31:16 43:12 48:2,5,9 48:10 57:21 70:18 71:4 73:8,21 74:18 76:16
**areas** 48:1,16 72:2 73:15 82:24 83:14
**arrangement** 4:10
**arrangements** 87:9
**as-needed** 31:24
**aside** 28:4,8 43:7 54:5 75:13
**asked** 22:22 68:25 75:6 89:9
**asking** 6:11 7:1 24:2 66:22 68:5 77:15,17
**aspect** 17:4
**aspects** 7:24 12:25 17:2,14 22:15 31:23 70:2,23,25
**assembly** 18:2 41:18
**assessment** 30:13,21
**assigned** 9:6 10:9
**assisting** 15:5
**assume** 6:15
**assuming** 83:8
**assumption** 52:15
**attached** 88:4
**attention** 14:12 38:23 44:11 58:9 90:14
**attorney** 90:12
**attorneys** 4:2
**attribute** 26:21
**August** 7:15,16 60:6,10,14,18
**authored** 15:15
**aware** 17:11 25:22 26:12 34:5 35:1 39:25 42:20 43:9 46:15 54:11,15,18 58:4,6 66:2 83:15,17 84:13 85:11,11,19

**B**

**back** 7:7 15:22 16:22 18:20 19:25 22:14 25:10 27:16 38:4 41:3 42:15 43:4,5 43:13,17 45:15 45:16,18 53:10 54:22,24 55:11 57:19 63:25 70:13
**bailiwick** 60:22
**ballast** 32:4,9
**Band-Aids** 8:1
**bank** 20:17,21 23:12 24:16
**bare** 33:2,3,6
**base** 84:2
**basically** 7:19 9:18 14:15,25 17:3 19:15,20 21:21 22:5 23:6 36:4 47:8 54:12 55:11 67:2 69:1 71:23
**basis** 5:16 8:5,19 8:23 9:25 10:15 31:24,24 50:15 56:3 80:18
**Bates** 3:18
**bathroom** 53:20
**began** 26:16 72:22
**beginning** 7:16 70:14
**behalf** 2:2,7 4:20 4:23 85:16 86:2
**belief** 20:1
**believe** 21:9 22:1 22:16 26:3 36:24 46:9 48:10 57:20 67:15 70:2 75:8 81:23,24
**believed** 19:22 23:8
**belongs** 44:5
**belts** 80:9
**beneath** 29:18
**benefits** 61:13
**best** 5:24 14:11 77:14,20
**better** 36:12 61:4
**bid** 19:6,7
**bids** 19:5
**big** 35:15
**biggest** 29:4
**Bill** 21:1,4 82:17
**bit** 17:14 24:3 25:10 32:13 35:9 44:19 83:11
**blackout** 8:25
**blew** 43:22
**blip** 78:22

**blown** 41:18
**board** 34:7
**borders** 36:14
**bottom** 14:19
**Box** 89:22 90:1
**brand-new** 12:4 18:12
**break** 37:20
**breakdown** 83:11
**Bresnahan** 3:17
**Briana** 3:18 15:16 19:14 20:1,8 39:6 45:22 55:2 61:11 66:1,9 67:4,16,21 68:8,13,17 73:9 80:22 81:23 84:23 85:5,11
**Briana's** 18:14 72:21
**bridge** 55:6
**briefly** 84:20
**bring** 15:6 17:18 38:8 51:6 58:8
**broad** 48:1
**broadened** 62:7
**broadly** 30:17
**broken** 13:20
**brought** 38:23
**bucket** 72:12 73:12
**buckets** 36:6
**Buckstein** 1:21 89:4,21 90:18
**bug** 83:25
**building** 8:2,11 12:1,2,3,4 13:17 14:16,19 26:8 31:13 35:21 39:10,15 45:25 46:1,8 46:17,25 47:4 57:16 60:10 74:10,11,20,23 75:2,25 76:5
**bullet** 16:15 38:14
**bunch** 50:25

**C**

**C** 2:9 4:1
**call** 8:13 55:11 55:15 69:16 79:13 87:3
**called** 1:18 8:20 63:15 68:1 70:13
**calls** 8:14,23,24 10:2 53:11 55:9 62:25
**camera** 5:1
**Campbell** 2:8,9 3:5 4:19,20 5:5 15:11,13 16:2 17:18,22 18:14 20:13,16 24:1 28:7 29:5,10 31:6 32:7,16 32:21,24 34:14 36:20 37:19,25 38:3,6,13 41:5 41:11 44:17,20 47:17 48:19,22 50:18 51:5,11 51:13,19,21 52:8,11,23 55:25 56:8,13 56:24 57:1,10 57:12 58:22 59:11 81:15 82:12,15 83:13 84:1,6,16 86:16,24 87:8 87:12 90:15
**canvassing** 79:22
**cap** 41:12 48:25 49:1,8
**capital** 40:3 54:2 54:3
**caps** 41:15,17 42:2,22 43:10 43:21,23
**caption** 44:22 48:24 51:22 52:3
**care** 7:23 8:17
**cars** 13:18
**case** 1:3 20:24 59:6 90:7 91:3
**casing** 56:15
**catch** 36:6 72:13 73:16
**caught** 55:18
**caulk** 53:20 79:9 79:10
**caulking** 79:12
**cause** 78:22,23
**caused** 13:25 31:5 33:24 85:12,17
**causing** 50:4
**cc** 90:20
**ceiling** 18:12 26:14 36:1 72:10,22
**center** 25:6
**certain** 54:19 70:2
**certainly** 84:12
**certainty** 23:22 24:12 70:6
**certificate** 89:1 90:10,11
**certify** 89:6,11
**Change** 91:6
**changes** 88:8,9 91:4
**changing** 50:17
**characterize** 75:22
**charge** 12:1,15 12:16
**charged** 67:7
**chase** 71:17
**check** 55:20
**checked** 32:1 85:8
**checking** 55:23
**checklist** 14:13
**chief** 12:9,10 27:3 34:23 40:15 53:7
**choosing** 7:17
**Chris** 4:22 59:5
**Christopher** 2:4
**circumstance** 55:3
**circumstances** 12:14
**Civil** 1:17
**claim** 60:20 82:21
**claiming** 85:12
**claims** 42:17
**clarification** 6:15
**clarity** 28:6 52:21 74:5 84:5
**clear** 68:23 71:6 73:6 84:21
**clients** 85:17
**Clint** 31:6
**close-up** 20:20 52:4
**coated** 27:9 28:9
**coating** 29:18
**Colin** 2:9 4:19 90:15
**color** 50:23
**Colorado** 1:2,16 1:20,22,23 2:6 2:10 89:2,5,23 90:2
**column** 82:20
**combined** 3:14
**come** 9:19,21 13:25 21:24 24:17,25 28:17 54:16,22 70:13
**comes** 16:25 32:12 53:14 65:19 76:1
**coming** 16:22 25:10 27:10,19 53:20
**commencement** 89:6
**commencing** 1:19
**comment** 23:16
**commented** 23:9 82:8
**comments** 22:12
**commission** 88:20 89:15 91:24
**common** 9:13 39:18 57:21
**communicated** 20:2
**company** 1:8,9 1:12 21:5 35:4 60:19 61:12 63:14,15 65:24 73:15 90:6,7 91:3,3
**company's** 73:18
**compared** 32:19
**complaining** 79:14
**complaint** 9:13
**complete** 48:7
**complies** 5:2
**computer** 11:2
**concern** 18:11 28:19,25 29:4 48:16 58:17 73:16
**concerned** 22:21

84:9
**concerning** 19:11 40:7,20
**concerns** 23:25 24:2,17 50:12
**Concise** 89:22 90:1,12,19
**concluded** 30:9 30:19 87:16
**conclusions** 21:24
**condensation** 50:4
**condition** 51:15 60:5
**conditioning** 8:3 56:16,20
**conditions** 46:20 51:4
**CONFEREN...** 1:5
**confirm** 60:5
**confusing** 74:16
**conscious** 43:14
**consent** 4:10
**consistent** 16:11 80:2
**constitutes** 88:5
**Construction** 18:16,19 34:15 48:24
**contacted** 66:5
**context** 50:1 57:20
**continual** 79:24
**continued** 7:14 8:8
**contractor** 18:19 18:23 28:17,18 35:3 67:20,25 73:20
**conversation** 48:5,14,18
**conversations** 20:9 81:7
**cooling** 57:2
**copied** 66:20
**copies** 90:12
**copy** 11:1,3 80:21 81:3 86:21 87:7
**correct** 7:8 32:4 47:19 56:21 57:3 59:25 60:11 63:2 64:23 66:10 67:10 69:6 70:10 77:22 78:19 79:5,20 80:15 86:3
**corrections** 87:2
**correctly** 61:25
**cost** 68:2 82:19
**costly** 54:5
**counsel** 4:9 89:11 90:12,20
**County** 1:20,23 89:3
**couple** 17:20 19:4 27:7 41:18 49:24 56:22 57:19 61:3 81:16
**course** 7:10 11:16 23:4 31:10 33:1 45:1 47:11
**court** 1:1 4:2,24 5:3 28:5 52:20 74:4 84:4 86:17,21
**courtesy** 5:25
**cover** 38:20 44:14 46:4 57:21 58:20 84:2
**covered** 32:3 60:24 83:15
**covering** 28:1 47:6
**covers** 39:14,23 40:21 76:1,1
**crack** 25:18 26:3
**cracked** 25:5,12 25:16
**cracks** 26:2,4
**Craig** 1:5,17 3:3 4:14 5:7 88:1 88:11 90:4,6 91:2
**Cscottulrich2...** 90:5
**CU** 56:14
**curious** 83:19
**curtains** 8:25
**CYA** 87:6

**D**

**D** 3:1 4:1
**damage** 13:2,24 14:1,4,9,10,23 16:15,17,19,19 18:2,5 19:1,22 21:6 22:1,3,13 23:11 24:7,25 25:8 33:15,22 36:1,4 38:17 39:4,14 41:1 41:14,21,24 42:2,5,21 43:10,15,18 44:1,11 45:4 45:12,23 46:5 47:16 48:17 58:6,8 64:14 64:15 65:23 66:3 68:1,15 69:24 75:7,10 75:13,17,18 78:24 81:19 82:10,25 83:14 83:20 84:25 85:6,9,12,19
**damaged** 25:2 38:22 48:25
67:9 75:15 82:18
**dash** 56:14
**Date** 91:2
**dated** 3:13,15,18 34:16
**dates** 7:10 60:13
**day** 13:1 14:3 16:4 19:7 58:24 88:15 89:14 91:21
**day-to-day** 8:5 12:17
**days** 90:12
**deal** 8:4
**dealing** 8:6 53:13
**dealt** 25:16 31:2
**Dear** 90:8
**decided** 54:13
**decision** 54:12 60:20
**declare** 4:8,15
**declared** 89:6
**deductible** 60:25 61:14
**deep** 9:7,15 10:6
**Defendant** 1:13 1:18 2:7 4:20
**deferred** 54:7
**definite** 57:7
**definitely** 6:23
**definitively** 52:16 84:8
**degree** 11:10,11
**degrees** 64:4,6,7 64:12
**dent** 85:25
**dented** 44:23 45:10
**denting** 18:8 57:7
**dents** 41:12 43:23 46:16,24 49:8 57:24
58:4
**Denver** 1:23 2:6 7:5 11:23 89:3 89:23 90:2
**department** 12:11,19 53:5 78:23 79:3,10
**depicted** 60:3
**depicting** 51:15
**depicts** 56:19
**DEPO000138** 3:19
**deponent** 4:14 4:17,24 5:2 15:25 23:21 37:21 58:25 59:2 83:3,6,23 87:5,11 88:1 89:6 91:2,4,20
**deponent's** 90:10,11
**deposing** 90:12
**deposition** 1:5 1:17 3:3 4:3,4 4:5 5:10,14,20 15:9 16:3 49:15 50:2 87:1 88:2,5,8,9 89:7 90:6,10 91:2
**depositions** 6:4
**depreciation** 61:1
**describe** 72:4
**described** 12:13 55:4
**describes** 16:15 26:14
**desk** 55:12 69:2
**detailed** 62:5 80:19
**details** 63:10
**determined** 60:24 82:9
**Dianna** 1:20

15:11 17:18 20:13 29:5 32:21 38:7 41:5 44:17 48:19 51:5 52:8 56:9 82:12 89:4,21 90:18
**Dianna's** 5:18
**different** 12:14 38:8 48:20 66:17 73:8 76:22 80:7,8
**difficult** 5:20
**directed** 55:1
**direction** 46:6,7
**directly** 19:18 20:2 38:16
**disagree** 30:12 30:21
**discovered** 37:4 83:17 86:2
**discrete** 25:4
**discussing** 44:25
**discussion** 4:16 20:15 29:24 30:1 33:14 40:19 51:10 53:10 77:4 82:14
**discussions** 19:9
**disputing** 72:21
**distance** 35:9 36:19 41:19 74:1,2
**distinguishing** 30:17
**DISTRICT** 1:1 1:2
**divide** 62:9
**document** 15:17 15:18,25 23:21 82:10 83:3,6 83:23
**documented** 9:17 10:7
**documents** 3:16
**doing** 7:24 16:16 21:13 35:13 58:12,12 63:21 63:23 64:22 67:8 69:23 71:16 72:1 77:13 78:7,9 79:17,25 80:3 80:17
**dollar** 82:19
**dollars** 61:12
**dome** 17:23
**doors** 76:18,20
**dovetails** 79:7
**dozen** 11:23 51:3,14
**drafted** 66:9
**drapes** 55:21
**driveway** 17:9 76:2
**drywall** 64:14 64:16,17 79:18
**drywaller** 64:2
**DTC** 2:9
**due** 27:9 30:10 30:20
**duration** 10:3
**Dvorchak** 2:8

**E**

**E** 3:1 4:1,1
**e-mail** 15:14,15 16:8,16,20 18:14 25:3 38:14 66:9,19 66:20,24 72:21 87:10
**e-mails** 54:23,25
**earlier** 9:19 18:15 61:16 63:1 68:8 70:1 73:21 79:8
**early** 46:9
**easily** 43:3
**east** 39:15 74:16
**east-facing** 51:23
**Eastwood** 31:6
**easy** 25:4 75:17
**effect** 24:11 58:14
**effective** 62:6
**effort** 55:23
**either** 8:13 19:10 31:23 32:10 42:2 56:17 79:11,12 84:13 86:11
**elaborate** 50:19
**electronically** 87:9
**element** 25:8
**elements** 45:23 70:4
**elevation** 44:23 45:10 47:11
**emanated** 85:10
**Embry** 2:3,4
**employed** 89:11
**employment** 7:18
**Enclosed** 90:9
**enclosures** 57:25
**ended** 19:4
**ends** 74:16
**engaged** 18:16
**engaging** 6:19
**engineer** 12:9,10 23:1 27:3 29:12 34:23 40:16 43:3 53:7 60:11 61:8 70:7
**engineer's** 58:11
**engineering** 12:11 29:12 53:5
**engineers** 8:12 10:20
**entire** 69:13 70:10
**EPDM** 29:17
**equipment** 41:24 44:4 56:7,15,18 58:1,5,13,15
**especially** 72:11 72:14 86:7
**Esq** 2:4,4,9 90:15
**esque** 13:23
**estimate** 3:16
**evaluation** 67:8
**event** 6:12
**events** 7:2
**everybody** 10:8 37:24
**evidence** 9:10,11
**exactly** 11:7 22:20 24:8 31:4 39:11 48:17 60:5 76:3
**examination** 3:4 5:4 59:3 81:14 84:18 89:6
**example** 45:7 82:3
**examples** 57:24
**excuse** 15:19
**executive** 69:2
**exercise** 26:2 27:21
**exhaust** 31:16 41:20
**exhibit** 3:12,13 3:14,16,17 15:9 17:19,20 17:23 29:8 32:22,23 38:9 38:10 41:4,7 48:20,21 51:6 51:7,12,12 56:9,10,11 59:10,17 82:13
**exhibits** 3:8,11 57:5 86:19
**expand** 35:6 73:15
**experienced** 27:2
**expert** 29:1 30:24
**experts** 63:15 85:16
**expires** 88:20 89:15 91:24
**explained** 16:3
**exposed** 29:21 32:15,19 33:3 33:15 75:14,16
**expresses** 16:8
**extend** 5:24
**extended** 65:4
**extent** 14:4 31:17 38:17 47:9
**exterior** 39:23 46:16,25 52:25
**eye** 32:15
**eyes** 80:15 86:1

**F**

**facilities** 14:9
**facing** 51:17
**fact** 38:24 39:2 68:10 84:23 85:7
**failure** 50:3
**fair** 6:16 14:5 36:18 46:22 60:2 62:11,19 65:17 73:25 74:2 78:17 80:1 81:8 84:22
**fairly** 25:4 37:3 44:15

**fall** 14:7 61:24 62:1,19 77:13 77:21 78:10
**familiar** 21:2 30:15
**fan** 41:18
**fans** 31:16 41:20 44:7
**far** 19:15 24:16 47:14 60:2 73:1 80:10 85:9
**farther** 44:19
**fashion** 11:15
**fast** 68:25
**feet** 35:14,20,21 36:15 57:19 74:10,13 75:1 75:4
**felt** 8:1
**figure** 82:19
**filed** 90:15
**filled** 10:8 80:21
**Fillmore** 2:5
**final** 22:4 44:16 60:20
**find** 9:10,11 18:5 35:12 43:12 63:19 80:22 90:9
**finding** 25:21 30:8,8 78:8 80:16
**fine** 37:21 68:6 87:11
**finish** 5:23,25
**finishes** 37:6
**first** 3:13 19:6 23:7 45:18 58:19 60:17 64:17 68:23 75:19 76:8,10
**firsthand** 85:4
**fit** 41:20
**fitness** 25:6
**five** 11:22 13:19 37:23
**five-minute** 37:20
**five-year** 54:9
**fix** 8:22 64:16
**fixed** 43:2
**fixing** 7:25
**flag** 31:15
**flags** 31:12,24
**flashing** 48:25 49:2,8,10,13
**floor** 2:5 17:10 26:7,11 47:15 72:8
**focus** 43:8 70:21
**fogging** 50:4
**folder** 11:4
**follow** 52:23
**follow-up** 59:7 81:16
**following** 14:2 14:22 26:16 36:20 43:9 45:19 67:10 72:23 91:4
**foregoing** 88:3 89:9
**forensic** 23:1 29:12
**forgive** 62:24
**form** 9:17 18:4 23:14 28:23 30:22 32:6,11 34:8 36:11 43:24 47:13 50:8 55:16 83:2,24 89:9
**formal** 81:21 82:1
**format** 11:1
**forward** 20:14 90:12
**found** 6:3 25:20 27:14 36:10 38:24 39:14,20 41:19 63:17 69:4 74:24
**four** 13:19
**fracture** 23:13
**fractured** 20:22 24:18
**fractures** 38:19
**frame** 10:14 18:21 44:9 49:17
**framing** 18:7 38:15
**Frazier** 2:8
**freezers** 56:18
**frequently** 31:21
**Friday** 13:4
**front** 13:16 31:13 55:12 69:2 74:23
**frustrating** 35:7
**frustration** 19:19
**frustrations** 7:19 8:9
**full** 19:1 74:9 83:8 86:12
**full-scale** 28:22
**fully** 6:10
**functioning** 44:5
**further** 4:6 36:21 89:11
**future** 29:3

**G**

**G** 4:1
**game** 40:5
**gap** 55:6
**garbled** 6:5
**gasket** 51:17 53:14 79:9
**general** 5:16 11:6 15:15 35:3 73:20
**generally** 8:14 10:2 16:11 85:23
**generated** 46:13
**generating** 86:5
**gentleman** 64:1 76:12
**gentlemen** 86:17
**getting** 10:24 32:17 63:13 65:15 80:5
**Give** 23:20 57:15 63:24
**given** 10:10 50:11 80:22 86:9 89:9 91:5
**glad** 6:8
**Glass** 39:22,25 40:7
**glazing** 19:6 52:12
**GM** 40:5
**go** 9:6 15:24 17:4 19:21 20:8 22:7 23:19 29:6,9 31:12 32:23 37:21 41:3 43:12 44:19 51:19 53:19 59:2 62:14 63:9,15 64:16 69:3 71:24 73:13 74:6 76:7,24 80:18
**going** 5:10,16 7:1 13:1 16:14 17:12 19:16 25:2 29:2,6 35:18,20 36:15 37:17 38:6 41:3,10 44:14 45:18 47:6 48:19 50:13 51:2,14 53:10 59:8 62:6 75:2 80:7 81:17
**good** 6:2 14:19 41:19 75:1,4
**government-is...** 4:25
**great** 6:25 8:4 24:12 38:12 86:6
**Greenwood** 2:10
**gross** 82:21
**groups** 20:10
**guess** 6:22 14:10 16:16 30:6 32:16 43:25 48:3 53:4 58:2 66:16 80:14
**guest** 8:15 25:14 25:18 27:22,23 55:24 79:13
**guests** 9:3 10:2 63:8
**gun** 37:11
**guy** 43:3
**guys** 62:14

**H**

**Haag** 3:12 29:11
**hail** 13:22,23 16:9 18:2 19:1 21:6 22:1,13 23:11 24:7,10 30:11,18 33:6 33:24 41:12 43:10,23 44:24 45:4,10,23 49:8 56:19 57:5,24 58:4 66:3 67:9 68:15 70:3 75:7 81:19 82:9,24 83:14 83:20 84:24 85:25
**hail-impact** 33:15

**hail-related** 16:19
**hailstones** 32:10
**hailstorm** 7:3 12:22 13:7,14 14:22 20:22 21:11 30:20 35:25 36:21 43:9 45:19 58:3 59:25 60:4 61:13 62:2,20,21 63:2,4,5 71:11 71:21 84:24 85:10
**half** 51:3,14
**hand** 30:3
**happened** 11:7 24:4 35:2 63:4 71:21 80:23
**happening** 40:18 68:3
**happens** 6:6
**hard** 11:1,3 22:5 47:15 53:13 80:21 81:3
**head** 12:10,12 21:3 24:13 37:11
**heading** 82:20
**hear** 6:7,9 25:22 39:10,17 61:10 81:18 85:5
**heard** 25:21 66:5 67:16 85:5,6
**hearing** 65:20
**heavy** 8:25 16:9 32:10
**help** 24:15
**helpful** 5:18
**higher** 19:8
**highly** 27:22
**hired** 63:14 81:7
**hit** 24:10 53:12
**hitting** 46:7
**hold** 85:23
**holding** 5:1
**hole** 25:19 53:18
**holes** 38:15
**hood** 57:13
**hospitality** 11:12,17
**Hossley** 2:3
**hotel** 1:8,8 7:6 10:13 11:21,25 12:4,11,14,17 13:10,15 16:4 18:20,24 20:18 29:4 36:14 40:16 49:15,20 50:7 53:7 54:8 54:10 56:7 57:14 60:6 61:19 62:10,15 63:16 64:2,21 66:2,4 68:9 69:14,19 70:8 70:20 75:20 79:23 81:20 82:5 84:24 85:18,24 86:2 86:3 90:6 91:3
**hotels** 11:21,23
**hour** 37:18
**hours** 64:22
**housekeeping** 8:14 9:3 38:25 67:15,21 68:21 68:23 69:2 81:24
**HUD** 3:19
**Hudson** 1:12 4:20 21:5 81:7 82:8 90:6 91:3
**hung** 31:13
**HVAC** 58:5

**I**

**ID** 89:5
**idea** 44:9 60:23 66:13 67:22 68:2 80:14 85:18
**identification** 4:25
**identified** 16:17 36:22 79:2
**Imagine** 36:13
**immediate** 14:12
**immediately** 25:13,16 26:16 72:23
**impacts** 57:5
**impendance** 86:7
**impression** 14:4
**impressions** 12:23 13:13
**inclined** 63:8
**include** 79:17 82:24
**included** 9:7 66:20
**includes** 11:24
**increments** 54:4 54:9
**indentations** 56:20
**independent** 65:21
**independently** 64:3
**indicate** 4:12 52:24
**indicates** 64:20
**individual** 21:7
**industry** 11:13 11:17
**information** 8:13 68:7
**informed** 86:6
**INITIAL** 3:8
**initially** 7:21
**initiate** 9:5
**input** 50:10 54:17
**inside** 14:20 53:15 55:5 75:2 79:10
**inspect** 29:13
**inspected** 10:13 23:23 56:2 68:15 84:23
**inspecting** 21:22 62:15 69:8,14 69:23 70:19
**inspection** 9:7 9:16 10:17,21 10:25 14:23,25 18:13 21:6,14 21:18 23:5,7 29:22 33:1,20 36:22 41:15 44:22 45:2,18 62:9 64:19,20 64:22 68:9 77:1
**inspections** 9:16 10:7,11 40:12 80:3
**inspector** 76:8,9
**inspectors** 17:1 19:25 46:10 47:6 65:12
**inspects** 65:19
**instance** 61:2
**instances** 56:23
**instituted** 61:19 61:19,20,22
**insurance** 1:12 4:20 21:5 42:14 44:13 60:19 61:3,11 63:14 65:23 90:7 91:3
**intent** 40:21,25
**interaction** 18:25 23:4 40:6
**interested** 65:20 89:12
**interfering** 65:15
**interior** 36:8 37:6 53:9 63:16
**intern** 61:8
**Interruption** 28:5 52:20 74:4 84:4
**intrusion** 55:13 63:17,17,22
**inventory** 81:19
**investigation** 65:16
**invoice** 34:15
**involved** 19:18 25:21 40:4 46:21 58:4 65:11 67:25 86:11
**involvement** 19:24 34:17
**irregardless** 21:22
**issue** 26:5 37:8 40:9 47:3 50:7 77:8 78:15,19 78:21,25 79:15
**issues** 8:10 14:6 14:8 29:2 43:18 54:16,19 78:8 79:23 80:17
**item** 26:13 38:22 67:9 85:12
**items** 9:22 14:14 22:17 25:3 65:7 67:1,3 82:18,23

**J**

**jacketing** 57:2
**Jeffrey** 2:4

**job** 7:20,22 8:19 9:19 12:13 13:5 14:16 31:11 42:16
**jog** 17:13 24:15
**John** 3:17
**JS|Held** 3:14 63:15
**judgment** 44:16
**July** 89:14 90:3 90:15
**June** 1:6,19 7:14 23:2 29:13 59:22,22 70:8 87:16 91:2

**K**

**keep** 5:18 76:16
**keeping** 8:7 86:5 86:7
**kept** 10:25 11:4
**keys** 76:16
**kind** 8:21 9:18 13:20,24 14:1 19:19 24:20 32:2 33:22 35:1 37:14,14 39:2 41:24 42:4,5 44:1 46:3 47:16 50:14,15,23 51:1 58:20 61:8 77:1,8 83:5 86:11
**kindly** 4:25
**kinds** 80:8,8
**kitchen** 56:17
**knew** 29:2
**know** 6:7,11,21 17:17 18:6 21:21 22:5,10 22:15,20 24:3 24:8 26:22 27:11 30:14 31:3,3 33:9,11 34:12 35:5 36:23 37:11,12 39:7,8,17,18 40:23,25 43:11 43:18 44:8,9 44:13 45:12 50:25 54:7 60:19 63:4 65:3 66:7 67:20,23,23 68:6,7,10,17 70:13,14,21 75:14,17 78:13 79:9 80:6,23 81:3,21,22 82:3,4 83:7,9 83:12 84:22 85:2 86:1
**knowing** 84:10
**knowledge** 10:12 39:13 40:14 85:4 86:11
**known** 53:23

**L**

**L** 1:20 89:4,21 90:18
**LAKEWOOD** 1:8
**large** 18:23 35:11,16
**lasting** 16:10
**lay** 86:1
**layer** 32:4
**layman** 75:7
**layperson's** 33:23
**lead** 9:1 24:20 86:4
**leak** 9:2 24:21 26:19 35:8,12 63:7 72:13,16 73:2 75:2
**leakage** 8:24 62:25
**leaking** 8:10 9:11,13 26:14 26:16 37:5 63:1 66:6 71:9 72:3,5,22 73:1 73:17 74:1 85:16
**leaks** 9:11 24:22 26:21 27:2,9 27:11,12,19 28:2 35:7 36:8 63:11,11 71:17 71:20 73:4,7,9 73:12 74:11 79:24
**learned** 16:7
**leave** 7:18 43:6
**leaving** 53:17
**left** 7:15 36:14 60:6,14,15
**left-hand** 82:18
**Legal** 89:22 90:1 90:13,19
**length** 74:9
**lens** 23:13 24:18
**lenses** 20:21
**lessens** 86:10
**let's** 15:9 17:15 32:21 37:23,25 41:5 42:6 43:6 44:17 51:19 52:1,2 56:12 56:24
**letter** 3:17 21:20 23:9 46:13,18 46:21
**letting** 21:23 65:16
**level** 15:2,3 17:10 76:23,24
**levels** 75:20
**lieu** 4:6
**lights** 31:14
**likelihood** 86:10
**limitations** 31:4
**limited** 50:14
**Line** 91:6
**lines** 40:24
**list** 16:17 19:21 25:1,2 26:14 46:11,15 48:2 49:12 65:7,12 66:7,12,13,14 66:18,20 67:1 67:2,5 82:18 82:23,24 83:15 83:21
**litigation** 89:12
**little** 6:5 17:14 25:10 44:19 53:17,19 63:10 66:17 76:12 83:11
**LLC** 2:8
**LLP** 2:3
**lobby** 16:22 20:18 26:15 36:1,8,15 37:6 72:9,10,23 73:1 74:1 75:3 76:2
**location** 11:5 36:9
**locations** 45:13
**locked** 70:15 76:17
**long** 31:8
**long-term** 8:18 8:22
**longer** 8:20 65:1
**look** 9:22 14:19 24:14 27:5 29:2 32:8 38:19 41:3,10 41:21 51:9 56:6 57:9 63:10,15 74:18 79:1,16 80:6 82:22
**looked** 15:2,2 17:2 22:16 23:11 36:16,24 39:17 46:20 47:10 48:1,1 57:23 66:14 68:14 70:22 76:4 81:25
**looking** 8:21 9:7 9:8,25 13:1 14:6,8,22 18:15 22:11 23:8 24:19 27:6 30:2 43:16 44:4,10 47:2,17 51:9 51:18 59:10,16 59:17 69:21 70:18,24 74:22 78:13 80:15 84:24
**looks** 53:21
**loop** 8:8 20:6
**loose** 12:13 62:4
**loss** 60:24 82:17 83:12
**lot** 7:25 8:21 37:9 45:5
**lower** 30:3

**M**

**machine** 89:8
**main** 75:24
**maintained** 31:14
**maintenance** 7:25 8:21 11:21 12:17 31:15,22 54:8 56:2 61:17 63:21,23
**major** 9:10 14:6 14:8,17 66:3
**majority** 85:24
**making** 24:25

44:4
**man** 31:3
**managed** 69:1
**management** 1:8 7:7,11 11:21 12:8 54:18 62:12,13 90:6 91:3
**manager** 11:7 11:19 15:16 38:25
**managers** 9:6
**manner** 4:11
**MARKED** 3:11
**Marriott** 9:20
**match** 50:24
**material** 74:25
**materials** 8:19
**Matt** 23:3 29:11
**matter** 4:8 42:24 89:7 90:14
**matters** 61:3
**Matthew** 70:8
**mean** 12:13 17:8 23:23 24:19 26:1 31:2 32:12 37:9 40:22 42:15,24 43:20 44:6 45:6 47:14 50:13 54:11 57:23 71:15 72:4 78:6
**Meaning** 85:2
**means** 1:20 64:12 66:19
**meant** 27:13 51:11
**measurable** 31:2
**mechanical** 14:18 30:10,14 56:7 57:14,25
**melt** 72:16
**member** 15:7
**members** 62:10
**membrane** 29:17 32:3,18 33:2,3,6,15,22 33:25 34:16 36:17 73:25 74:14 75:8,9 75:11,14,16,18 77:2
**memorable** 12:24 13:12
**memory** 17:14 24:3,6,15 33:16,17 68:4 68:20
**mention** 25:5,17 26:7 46:24
**mentioned** 13:12 14:2 25:3 26:19 34:2,3 70:1
**mentioning** 70:2
**metal** 44:22 45:9 45:13 57:24 75:16
**metals** 24:7 46:16,25 58:4
**mezzanine** 28:9 31:10 49:7 76:23
**mezzanine-level** 47:19,22 76:21
**middle** 73:1
**Miller** 3:18 15:16 16:2 38:25 40:20 45:22 46:14,23 47:11,22 48:11 49:14 61:11 68:13 80:22 84:23 85:11
**Miller's** 25:3 26:13 38:14 50:2
**mind** 5:18,22 16:25 24:17 32:12 36:13 64:24
**minor** 30:6 71:22 78:19,21
**minute** 15:20 51:17
**minutes** 10:3 16:10 37:23 55:4 70:13
**missing** 84:12
**moisture** 50:15
**moment** 15:14 23:20 33:12 43:7 57:15 63:24
**Monaco** 12:5
**Monday** 13:4,7
**money** 54:4
**monthly** 31:23
**months** 7:15
**morphed** 7:20
**morphing** 7:22
**motel** 11:21
**motors** 44:7
**moved** 10:4 32:9
**moves** 32:13
**muddle** 6:23

**N**

**N** 3:1 4:1
**name** 4:13 5:6,7 21:2,8 23:3 28:18 59:5 69:1 73:18
**nature** 11:15 32:13
**near** 29:14 36:1
**necessary** 79:18
**need** 28:21 31:25 41:1 63:9
**needed** 8:19 9:12 10:10 14:11 17:3 22:7 31:13 42:8,10 64:5 69:10 87:2
**needs** 31:3 33:19
**negative** 58:14
**never** 13:25 54:6 54:17 66:8,9 81:4
**Nevertheless** 69:5
**new** 12:1 30:3 42:25 73:14 74:25 80:5,6
**News** 11:24
**non-recoverable** 61:1
**Nope** 81:4
**normal** 14:24 40:23 41:21 43:5
**north** 28:10 74:16,20
**north-** 51:16
**notable** 13:24
**notarized** 90:11
**Notary** 1:22 88:19 89:5
**Notary's** 91:23 91:24
**notes** 33:5 62:24
**notice** 1:16 7:13 32:14,20 86:9
**noticeable** 13:23 14:10
**noticed** 69:23
**November** 89:15
**number** 3:18 41:10 44:18,21 47:18 52:7

**O**

**O** 4:1
**oath** 4:6 88:4
**Object** 18:4 32:6
**objection** 23:14 23:18 28:23 30:22 32:11 34:8 36:11 43:24 47:13 50:8 55:16 83:2,24
**objections** 4:10
**observation** 33:4 45:1
**observations** 24:3 83:19
**observe** 49:8 70:24 75:10
**observed** 14:14 18:2 26:18 33:15,22 36:8 45:4,22 80:10 82:5,25 83:20
**observing** 16:18 41:14 63:21
**obvious** 22:2,24 22:25 48:4,8 48:10 71:24
**obviously** 31:1 35:22 46:3
**occasion** 53:11
**occasions** 27:7
**occur** 71:7
**occurred** 13:7 34:4,22 42:22
**offering** 61:12
**offhand** 84:11
**office** 12:1,1 26:16 72:8,17 73:4
**oh** 9:21 20:4 21:19 62:21 66:11,21
**Okay** 6:13,14,25 11:9,14 16:1 16:21 17:12 20:1,12 21:7,9 23:10,15 24:14 25:2,11 26:6 26:13 28:16 30:16 32:3

33:13 38:6,11 41:3 42:1,9,19 43:6 47:21 51:2,8 53:3 57:23 61:16 62:1 64:11 68:13 69:8 73:11 78:9 82:7 83:13,22 84:3 87:8
**old** 8:3 30:4
**older** 76:12
**once** 31:18 49:23 49:24 53:16 54:13 79:2
**ones** 71:22 75:24
**ongoing** 79:15 79:24
**opinion** 22:7,9 22:10 68:2
**opposed** 32:1
**order** 49:16 55:7 86:18
**ordering** 42:25
**orderly** 78:10
**organized** 78:8
**original** 8:3 17:1 52:5 90:9,15
**originally** 91:5
**outcome** 89:12
**outright** 63:25
**outside** 13:18 21:4 25:18 26:7 38:16 52:14 53:8
**overall** 12:16
**overview** 51:22 52:12
**owner** 20:8 40:5 54:12 86:5
**Oxford** 11:25

**P**

**P** 2:4 4:1
**p.m** 1:19 16:9
38:2,2 87:16
**P.O** 89:22 90:1
**page** 3:4,11 17:19 29:7,8 32:23 38:9,12 41:6,6,9 48:21 51:6,12,19 52:2 56:10,11 56:11,12,25 59:16 82:13 91:6
**pages** 20:14 44:18 52:9 57:11 88:5
**paint** 64:17 78:25 79:17
**painter** 64:1
**pane** 26:7 27:6
**panels** 18:6,10
**panes** 50:5,16
**paper** 10:8
**paperwork** 10:10 86:5
**parapet** 49:5 76:1
**parent** 11:20
**parking** 13:15 13:17
**Parkway** 2:9
**part** 10:13 14:15 14:16 23:23 25:1 27:22 31:16 33:10 41:1 47:5 56:16 57:13,25 65:22 67:12 69:2,5,12 76:2 84:10
**partial** 27:5 51:22
**participating** 4:3
**particular** 33:8 33:12 51:16 54:9 58:17
61:2 73:2
**particularly** 21:8 22:11 23:25 26:22 33:11 43:14
**parties** 4:9 89:12
**partly** 8:25
**Parts** 15:6
**pass** 81:13 86:15 86:25
**patch** 34:16,20 35:11,13,17 36:21,23 74:3 74:8,19
**patches** 34:3
**Pause** 81:5
**pay** 44:11
**Peirce** 2:4 3:6 4:22,22 5:12 18:4 23:14,18 28:23 30:22 32:6,11 34:8 36:11 37:23 43:24 47:13 50:8 55:16 59:1,4,5 74:6 77:5 81:6,12 82:8 83:2,24 84:19 86:14,19 86:23 87:14
**penalty** 4:9,18 89:7
**pencil-lead** 79:8
**pencil-lead-siz...** 53:18
**pencil-sized** 53:18
**people** 9:24 12:18 20:11 34:10 37:22 55:20 67:11,13 80:5,8
**percent** 37:2 63:6,18,22 73:5
**performed** 40:12
**period** 37:9 65:4
**perjury** 4:9,18 89:7
**permanent** 79:16
**person** 4:7 67:21 68:18 86:4
**personally** 18:1 33:21
**perspective** 33:23 44:3 58:11
**perused** 15:25 23:21 83:3,6 83:23
**phone** 55:11
**photo** 17:20 20:14,20 23:12 28:14 32:22 38:19 41:10,11 44:18,20 47:18 47:18 48:20 51:16,20,21,24 52:1,4,6 56:9 56:19 57:1,11 57:12 59:17,17
**photograph** 38:8 41:13 44:21 48:23 56:14
**photographs** 24:15 33:5,8 41:4 59:9,11 59:22,23
**photos** 17:21,23 17:23 20:17 29:7,16 32:25 33:1 51:3,14 52:10,12,25 53:3 56:6 60:3
**phrased** 68:8
**phrasing** 30:11
**physical** 69:19
**physically** 4:4
**pick** 71:24
**picture** 27:5 30:3 36:13 58:19
**pictures** 27:5 45:14 69:22 75:13,15
**piece** 41:24 56:15 73:14 74:24,25
**pieces** 18:7 45:13
**pipe** 57:2
**pitting** 24:9
**place** 27:17 42:15 43:4,13 43:17 57:15 71:24 89:8
**places** 22:6 54:3 71:22
**plaintiffs** 1:10 2:2 4:23 59:6
**plan** 40:5
**planned** 54:4,8
**planning** 10:1
**plastic** 18:6 38:20 39:14,23 67:17 84:2
**please** 4:12 5:6 6:7,11 41:8 90:9,11,12
**pleasure** 5:10
**plus** 13:16
**PM** 10:4 55:18 55:25 61:17 62:4 63:7,9 77:13 78:22 79:25
**PMs** 77:11,21,22
**point** 21:20 38:14 42:17 43:16 44:8 45:22 86:8
**pointed** 8:15

21:25 48:11 65:8
**pointing** 59:11 65:7
**points** 16:15
**pool** 16:21 17:16 17:24 18:16 27:20 28:1 31:16
**poorly** 6:9
**position** 21:23
**predated** 34:17
**prepared** 48:23 55:8 82:17
**present** 4:4,25 13:8 30:24
**Presented** 82:20
**presumably** 25:24
**pretty** 9:2 10:23 13:6 14:19 22:2 26:2 28:2 65:2,18
**prevalent** 39:4,7
**preventative** 8:20 56:1 61:17 63:21,23
**previous** 51:22 62:1 89:6
**PREVIOUSLY** 3:11
**primarily** 5:18 7:2 64:1
**primary** 18:22 50:16
**printed** 66:13
**prior** 45:17 63:1 63:3
**priority** 80:18
**proactively** 80:16
**probably** 19:17 31:17 37:12 41:25 42:13 56:17 61:24
66:11 74:10 79:11
**problem** 8:6,15
**problems** 8:5,7
**procedure** 1:17 4:21 56:2
**procedures** 5:13
**proceedings** 81:5 87:15 89:9
**process** 6:19 55:18 56:1 63:9 69:6 71:23 80:6
**processed** 42:17 81:19
**Professional** 1:21 89:5
**program** 9:5,15 10:13 49:18,23 50:10 61:23 62:22 63:7 78:6
**project** 35:5 54:2 62:4 86:12
**projects** 18:23 19:16 40:3 54:3,13
**prompt** 90:14
**properly** 58:15
**property** 9:20 14:3 21:15 34:18 41:16 69:19,21 83:1
**proposal** 39:21 40:1
**protect** 44:6,7
**protecting** 44:6 58:13
**provide** 61:13
**provided** 34:14 40:1 66:18
**Public** 1:22 88:19 89:5
**pull** 15:12 41:7 48:20 52:9 56:9 82:12
**pulled** 27:14
**Pursuant** 1:16
**purview** 54:6 68:3
**pushed** 27:8 28:4,8
**put** 14:11 27:16 36:6 37:11 38:18 42:6 43:4,13 46:11 46:15,18 49:12 49:23 53:19 54:22 73:12,14 74:19,25 79:12
**putting** 8:1 64:13 75:13

**Q**

**qualify** 74:2
**quarter** 10:16 49:23 64:3 77:11,12 78:3
**quarterly** 9:25 10:15 31:24 56:3 62:15,18 64:3 77:21 78:1
**question** 5:23 6:1,7,9,9,12,16 6:22 45:4 53:4 58:2 66:17 82:22 85:9
**questions** 6:6,18 7:2 22:22,23 58:23 59:7 76:19 81:17 84:17 89:9
**quickie** 36:23
**quickly** 8:17 25:25 26:4 37:3 44:15
**quite** 13:22 35:9
77:19

**R**

**R** 4:1
**radar** 42:7,9
**radio** 8:14,23 10:2 53:11 55:9,14 69:16 79:13
**rain** 16:9 32:10 37:9
**ran** 74:9
**range** 78:18
**RDA** 1:8 7:7,11 7:18 12:8 13:4 19:10 34:7 85:11 90:6 91:3
**reacted** 8:15
**read** 15:23 88:3
**reads** 38:15 44:22 48:24
**real** 11:8
**really** 8:6 19:23 43:8 50:9 55:23 75:12 80:13 84:7
**reason** 10:19 30:12,21 50:16 91:6
**reasonable** 65:2
**reasons** 7:17
**recall** 12:21,23 14:21 16:18 18:1,25 19:9 20:23 21:1,17 22:12,17 23:3 23:10 26:9,18 27:1 29:20,24 33:13,21 40:19 41:14 42:1 44:25 49:18 50:6 59:10 60:13 61:21 66:25 70:3
73:18 75:9 76:3
**recalled** 71:10
**receipt** 39:21
**received** 18:8 37:13 66:25
**Recess** 38:2
**recognize** 20:17 44:1 49:1,4 83:4
**recollect** 39:11
**recollection** 18:3 34:1,21 39:3,9 40:2,17 48:13 63:20 65:1 69:25 71:8 72:25 73:5 75:7 77:14,20
**recollections** 16:12
**record** 4:13,16 20:15 28:6 51:10 52:21 74:5 77:4 82:14 84:5 90:12
**recording** 5:19
**redo** 19:6
**redone** 27:16
**reduced** 89:8
**refer** 45:15 54:24
**reference** 3:8 29:16
**referencing** 52:12
**referring** 45:15 56:1 59:14 67:14 68:24
**reflected** 16:19 83:21
**reflecting** 51:3
**reflects** 82:21
**regard** 8:10 9:15 19:1 28:8

64:18 70:7 71:2
**regarding** 18:16
**register** 64:23
**Registered** 1:21 89:4
**related** 22:13 30:11,18 70:3 89:11
**relating** 8:10
**relative** 36:8
**relief** 57:13
**remained** 40:15
**remember** 12:25 13:1 15:19 17:5,6 18:6,9 18:10 21:7,8 21:13 23:24 25:7 26:23,25 27:25 30:8 36:5 37:1,2,12 41:17 42:5 47:1 48:5,16 61:4,25 66:12 69:16 70:12,22 72:5 74:11 76:25
**remembered** 31:8
**remembrance** 36:3,16 37:7 45:11 46:6 49:13 73:3 84:14
**remote** 1:20 2:1
**remotely** 1:23 4:5
**renovations** 18:23
**repair** 19:11 28:22 30:6,7 51:22 52:4,13 53:4,22 55:8 71:7,19,24,25 79:20 82:9,19
**repaired** 9:12 27:16 37:3 71:3,10
**repairs** 34:6
**rephrase** 6:8,12
**replace** 19:7 28:1 39:22 40:21 49:18,24
**replaced** 18:11 25:13,25 35:10 40:15 41:25 44:14 49:15 50:22
**replacement** 19:5 28:22 83:9
**replacing** 43:21 44:10 83:8
**report** 3:12,13 3:14 22:4 45:16 48:23 59:15 83:11
**reported** 66:2 67:20 80:11
**reporter** 1:21 4:2,24 5:3 28:5 52:20 74:4 84:4 86:17,21 89:5
**REPORTER'S** 89:1
**reporting** 4:5,11 65:23 73:9 77:8 89:22 90:1,13,19
**reports** 11:24 14:17 19:24 80:8
**represent** 29:11 59:6,21 64:19 82:16
**require** 10:1
**research** 17:4
**respect** 40:9 69:19,23
**responsibilities** 31:11
**restaurants** 11:19
**result** 22:19
**results** 10:6
**retained** 21:5
**return** 16:7 90:11
**review** 15:14 16:17 87:1
**right** 5:17 21:2 34:24 37:25 57:6 66:16 68:5 71:18 74:22,24 77:13 81:12 84:11,16 86:23,25 87:12
**Ritz-Carlton** 12:5
**river** 32:4
**rock** 32:4,12
**rocks** 27:8,16 28:4,8
**rolls** 53:14
**roof** 17:2,9 27:1 27:9,19,24 28:2,4,9,9,21 28:22 29:13 31:10 33:3 34:3 36:10 43:12 45:24 46:20 47:5,19 47:22,24 57:17 66:3 70:20,25 71:2 74:18 75:8,11 76:5,7 76:16,21,22,24 77:2
**roofing** 24:23 30:4,4,25 35:4 74:25 75:20
**roofs** 29:1 31:3
**rooftop** 15:2
**room** 4:4 9:23 10:19,21 18:23 25:14,18 27:21 27:22,23 38:16 62:10,14,14,15 64:8 68:9,14 76:17 80:14 81:20 82:5 84:24 85:16
**room-by-room** 67:8
**rooms** 9:6,16,24 10:9,12,24 26:2 39:11 46:3 56:2 63:16,18,22 64:5,9 67:18 81:25 85:8
**RPR** 89:21 90:18
**rubber** 53:14
**Rules** 1:16
**rumor** 34:9
**run** 82:10
**running** 8:7 50:11 84:2
**ruptured** 33:6
**Ryan** 3:13

**S**

**S** 4:1
**sake** 5:18
**sales** 26:15 72:8 72:17 73:4
**sat** 54:12
**saw** 23:10 34:13 35:22 46:20,23 47:8,9 75:12 78:24
**saying** 43:15,25 68:22 71:20 73:7 85:17
**says** 6:5 52:17 56:14 59:16
**scanned** 11:1 81:2
**schedule** 13:4
**scope** 19:11 82:9
**Scott** 1:5,17 3:3 4:14 5:7 88:1 88:11 90:6 91:2
**screen** 38:18 78:22
**scroll** 20:13 29:6 32:21 38:12 44:17,18 52:2 52:9 56:12,24 57:10
**se** 65:12
**Seagren** 18:16 18:19 19:1,4 19:10,15 20:3 20:8 34:15 35:2
**Seagren's** 19:11
**seal** 51:23 52:5 52:13 55:24
**sealant** 52:4 53:4,5,13 55:5
**sealants** 51:4
**sealed** 52:17
**seals** 9:8 50:3 53:15 67:17,17 83:25
**seam** 29:21 36:10,21 75:13
**seams** 27:14,14 28:20 53:17,19 79:9
**second** 17:10 68:2 72:8 76:9 78:11
**second-floor** 17:9
**second-to-the-...** 29:8
**secondhand** 34:10
**section** 27:15 33:2 35:15,16

45:24 50:25 71:2,19 75:25
**sections** 34:11
**see** 13:24 15:3 23:12 24:9,10 25:22 28:12 35:8 36:4 39:10 44:16 47:15 51:24 52:6,11 56:22 56:22 59:15 63:10 73:16 84:11
**seeing** 42:5
**seen** 9:3,4 13:25 15:17,18 22:4 39:19 40:24 41:23 42:2 46:24 66:9,11 66:22 67:25 83:10
**send** 14:17
**sense** 30:23
**separations** 28:20
**September** 34:16,20
**serious** 61:24
**seriously** 62:7
**seriousness** 62:3
**Services** 48:24
**servicing** 56:17
**serving** 34:23 53:6
**sessions** 62:16
**set** 12:14 54:5
**sets** 77:22
**settled** 42:14
**shade** 49:22 50:19
**shared** 72:9
**sheers** 9:1
**sheet** 10:8,21 17:20 64:20 90:9,11 91:1
**sheets** 10:25
**Sheraton** 7:5
**shift** 14:17,18 38:7
**shined** 31:14
**short** 37:9
**short-term** 13:16 30:7
**shorter** 65:1
**shorthand** 89:8
**shot** 52:14
**show** 19:20,22 33:6 42:9 48:17 51:2,14 53:3
**showed** 39:19 40:22 58:19 67:1
**showing** 52:25 58:7,19
**shown** 39:1 42:7 85:6
**shows** 41:12 51:16 52:3
**shrunk** 53:17
**side** 13:20 26:15 27:8,21 35:21 36:14,18 37:8 39:10,15,24 46:8 47:4 49:17 57:16 72:23 73:1 74:9,10,19,20 74:20,21,24 75:1 82:18
**sideline** 11:25
**signature** 89:14 91:20,23
**signed** 7:21 90:11
**significant** 9:2 26:2 63:17,22
**sill** 38:20 39:14
**sills** 9:12 40:14 64:15
**Similar** 85:9
**Sincerely** 90:16
**single** 11:20 67:8 68:9,14 84:23
**sir** 7:9 13:6 19:3 20:19,25 32:5 56:4 60:16 62:17 79:6
**situation** 12:25 27:20 30:2
**Sitzmann** 23:3,4 29:11,21,25 30:9,19 32:25 33:4,7,14 41:13 44:21 45:1 70:8,18 73:22 81:8
**Sitzmann's** 30:13 36:22 41:15 45:17
**six** 64:4,5 77:7 77:10,11,12
**skip** 59:8
**skylight** 16:21 17:24 18:2,17 19:2,5,8,12 23:24 24:22 28:11,11,12 29:14 36:2,13 74:23 83:8
**skylights** 16:21 17:15 20:18,21 23:12 24:16 26:15 36:18 70:19 72:23
**sliding** 38:20 39:23
**slow** 72:16,16
**smaller** 25:15
**sneak** 54:16
**snow** 72:11
**snowed** 72:15
**snowstorm** 13:23
**soft** 24:7 46:16
46:25 53:14
**solicited** 54:17
**solid** 68:4
**solution** 79:16
**somebody** 15:5 21:22 36:24,25 37:3 61:8,11 61:19 68:17,18 69:3 77:8 81:23 83:16
**sore** 51:1
**sorry** 22:9 23:15 51:12 65:10 74:7,21
**sort** 9:8 39:13 54:8 56:18 57:22 78:14
**sounds** 21:2
**south** 26:8,11,14 28:11 36:18 57:16,21 72:22 74:16,21
**south-side** 72:9
**speak** 23:22 31:4 34:12,25 39:16 47:7 48:18 49:11 70:5
**speaking** 86:9
**spearheading** 19:14 39:6
**Specialty** 1:12 90:7 91:3
**specific** 33:17 45:3,3,13 48:2 49:13 70:18
**specifically** 17:7 22:17 30:1 32:17 43:11 45:6 47:1,25 49:10 55:19 60:13 61:22 63:1 64:10 70:5
**specificity** 35:1
**specifics** 5:15
61:15 77:18
**spending** 8:4
**spent** 64:24 65:4
**split** 29:17 30:8 30:10 31:2 35:23 36:17
**spoken** 5:12
**spot** 37:6 75:17
**spotted** 75:17
**spring** 62:20 78:12
**square** 35:14,24
**ss** 89:2
**staff** 9:3 12:18 15:7 62:10,12 69:3
**stairwell** 27:18
**stamp** 59:23
**standard** 79:1
**stare** 57:18
**start** 5:23 17:15 41:5 51:6 78:12
**started** 16:8,10 77:13,21 78:4 78:6,10 85:15
**starting** 7:13 28:20
**state** 1:22 88:4 89:2,5
**stated** 5:19
**statement** 82:16
**states** 1:1 18:15
**stating** 4:13
**stayed** 76:18
**step-by-step** 71:23
**stick** 13:13
**sticks** 51:1
**stop** 35:12 37:5 53:20
**stopped** 35:23
**storefront** 83:7
**storm** 16:4,8,12 22:19 26:17,20

26:22 32:8,19 37:10,14,14 42:3,6,11,12 42:21 44:2 46:7 49:9 65:23 67:10 72:24 73:9 85:13,18
**streaks** 36:4
**street** 2:5 12:2 15:2
**strictly** 66:1
**stuck** 50:23
**sub** 73:19
**subbed** 35:3
**subjected** 7:6
**submitted** 19:7 39:22
**submitting** 19:4
**Subscribed** 88:14 91:21
**subtracting** 60:25
**successful** 10:23 73:5
**suffered** 25:18
**Suite** 2:10
**sun** 78:25
**supervisor** 67:15 68:21,24 81:24
**supervisors** 62:13
**supporting** 3:16
**supposed** 42:16 58:12,20
**sure** 9:23 11:8 18:12 22:6 23:7 24:1,25 26:24 33:19 37:2 44:4 46:12 47:7,8 47:17 48:4,8 48:12 50:20 54:15 57:18 61:5,9 66:14
69:3,20 74:6 75:12,14 83:18
**surface** 15:3
**surfaces** 24:10
**surrounding** 7:2
**survey** 39:1
**surveyed** 39:8,9 67:18
**swear** 36:25 68:21 85:8
**swimming** 28:1
**sworn** 88:5,14 91:21
**system** 57:14 78:9,11
**systems** 14:18 14:21 39:22,25 40:7

**T**

**T** 2:4
**take** 8:16 15:14 15:21 32:8 34:16 37:20 45:5 77:20
**take-off** 9:19
**taken** 1:18 32:25 33:2 38:2 41:13 44:21 47:18 59:22 60:3 62:7 89:7
**talk** 5:21 33:18
**talked** 39:12 61:16
**talking** 16:23 17:17 27:12 34:10 45:25 66:17 67:24 71:3,18 76:21 76:23
**tall** 72:10 76:14
**tape** 79:12
**tear** 29:21 30:20 36:9 41:22 73:25 74:13
**tell** 5:6 21:17 22:20 24:8 27:1 28:18 33:9 34:10 41:23 47:25 48:3 57:17 61:23 63:5 68:14,16,19,25 70:16 82:2
**telling** 48:9 50:20
**tenure** 27:2 53:23
**term** 30:15
**terminology** 83:5
**terms** 12:14 28:2 36:4 44:10
**test** 24:4,6
**testified** 62:25
**testifying** 4:18 79:8
**testimony** 4:8 62:9,23 65:14 70:9 73:21 80:20 88:3,6 89:7,9 91:5
**testing** 69:18,20
**Thank** 5:3 58:24 84:17 86:14 87:14 90:14
**Thanks** 38:1,12
**thing** 5:17 9:9 10:20 15:22 21:24 23:6,8 24:20 32:2 44:5 56:5,18 57:22 66:1 78:5 82:7
**things** 8:1,7 9:25 14:11 17:5 21:25 22:2,23 22:24 24:21 25:10 35:7 43:12 55:21
67:3,4 77:18 83:16 84:9,10 84:12
**think** 13:19 15:23 18:7,11 21:19 22:10,13 22:14,18 25:4 27:4 29:1,2 30:16 32:22 34:12 38:9,24 40:25 41:6 46:2 56:10 57:16 58:18 65:14 70:9 73:3 74:15 81:17 86:6,10 86:16 87:2
**thinking** 63:25 83:14 87:6
**third** 26:7,11 77:24 78:1,3 78:12 79:25
**thorough** 18:13
**thought** 22:18 48:7 52:24 54:21 77:18
**thousand** 35:17
**three** 7:12 11:22 11:23 12:6,20 16:23 20:10,10 57:11 59:13 60:9
**three-** 54:9
**thumb** 51:1
**thumbnail** 11:14
**time** 5:21 8:4 10:1,5,14 13:10 15:21 17:11 18:20 26:20 29:25 30:7 31:8 33:10 37:10 38:17 40:15,18 44:9 46:12,14 49:17,19,25
50:7 53:6 58:23 59:23 61:7 63:6 64:20,24 65:4 65:5 69:14 70:10,16 79:13 79:24 86:8 89:8
**times** 6:4 72:12 72:14
**tinted** 50:21,22
**title** 12:7
**today** 66:8,23
**token** 6:8
**told** 31:6 46:19 46:23 49:14 50:17 61:5 68:16 81:4,23
**top** 11:22,23 14:19 21:3 23:23 24:13 27:12 52:7 56:14,20 58:19 75:24
**topics** 38:7 59:8
**tossed** 81:2
**tower** 44:23 57:2
**track** 55:9,11
**tracking** 55:10
**transcript** 86:22 88:3 89:9 90:15
**transition** 36:9 52:5
**transitioned** 11:20
**tried** 35:6 46:4 47:8
**trim** 44:23 45:9
**true** 85:24 89:9
**try** 17:13 33:18 35:11
**trying** 15:20,22 22:14 27:25 57:15 63:19

71:17 73:4
**Tuesday** 1:18
**turn** 15:9 52:1
**turned** 11:6
**twice** 49:24 73:15
**two** 7:14 8:13 25:5,12 31:15 35:17 44:18 47:6,16 52:9 53:19 59:24 60:4 72:2 75:15,21 77:22 77:23
**type** 13:5 39:4 43:10 55:8
**typewritten** 89:8
**typically** 55:7

**U**

**U-l-r-i-c-h** 5:8
**U.S** 11:24
**Uh-huh** 7:4 16:5 17:25 18:18 21:12 29:15 45:20 59:18 71:5
**Ulrich** 1:5,18 3:3 4:14 5:7,9 11:9 15:13 17:22 20:16 23:19 28:7 29:10 32:24 37:17 38:3,13 41:11 43:6 44:20 48:22 49:14 51:13 52:24 56:6,14 58:22 59:1,5 61:17 63:13 64:18 65:22 67:7 68:6 74:7 75:6 77:6 81:12,16 82:15 84:20 86:14,24 88:1 88:11 90:4,6,8 91:2
**umbrella** 14:8
**undergraduate** 11:10,11
**underneath** 13:17
**understand** 6:10 6:15,24 7:6 16:24 25:5 48:15 50:20 60:8 62:8 65:6 69:20 77:5 80:20
**understanding** 49:21 68:12 70:17 73:3 81:22 85:7 86:12
**understood** 37:16 42:19 81:18 84:15 86:13
**unit** 27:13 56:16 56:21
**UNITED** 1:1
**unlock** 76:20
**unlocked** 76:17 76:18
**unsure** 38:17
**unusual** 32:15
**upper** 27:24 57:17,17
**usually** 8:16 13:16 50:14 54:22 62:12

**V**

**v** 90:6 91:3
**vacation** 16:6
**vague** 33:16 40:2
**variety** 25:14
**various** 38:16 51:3 57:24 58:4 59:8
**varying** 64:4,6,7 64:12
**vent** 41:12,15 42:2,22 43:10 43:21
**verbally** 4:7 54:20 89:6
**verification** 5:1
**VIDEO** 1:5
**view** 65:21
**Village** 2:10
**visual** 15:1 17:16
**vs** 1:11

**W**

**Wagner** 2:8
**wait** 5:23,25 51:17
**waiting** 44:16
**waive** 4:10
**walk** 15:7 67:6
**walk-around** 15:1
**walk-in** 56:18
**walk-through** 14:14 15:5 45:9,21 47:12 47:23,25 83:1
**walked** 14:3 67:4
**wall** 36:5 49:5,7 72:9
**walls** 3:13 21:1,4 21:14 36:15 64:19 65:16 67:1 69:13,18 69:23 76:4,7 81:8 82:17
**want** 37:19,22 43:8 48:3 56:5 84:20
**wanted** 10:15 18:12 54:23 55:20 67:5 82:7
**wants** 43:4
**wasn't** 7:21 9:12 10:18 25:22 26:3 27:22 50:16 54:5 62:6 65:3 66:17 67:12 69:25 73:5 77:10 83:17 84:10
**watch** 34:4
**water** 9:13 36:1 36:6 55:13 63:17,17,22 78:24 85:15
**way** 14:11 19:19 39:18 42:6 55:20 62:6 64:13 65:15 68:8 69:16 85:2 87:3
**ways** 7:22 8:13
**we'll** 6:22 51:6
**we're** 5:16 6:19 10:9 16:23 17:17 24:19 27:12 29:6 41:3,10 44:9 47:2 68:22 80:7 81:17 86:16
**we've** 34:14 37:17 57:23
**wear** 41:22
**weather** 37:13
**weather-related** 37:8
**week** 31:18 45:19 60:17
**weeks** 21:10 23:2
**weeps** 52:17,17
**welcome** 58:25
**went** 8:20 21:19 27:9 32:1,7 35:10,14 38:25 46:9,10 48:18 65:13 66:12 68:8 69:11 76:3,15 81:24
**weren't** 8:6 66:20 78:7 80:14
**west** 7:5 39:24 44:23 45:9 46:8 47:4 49:16 74:17,19 74:20
**west-face** 52:12
**west-facing** 38:20 49:19
**western** 47:10
**WHEREOF** 89:13
**whistling** 53:12 53:12 55:5
**wide** 45:25 46:1
**wind** 46:6 53:12
**window** 25:14 25:17,24 26:7 26:11 38:15 39:1 50:5,24 51:23 53:15 55:5,6,14 63:1 67:17,17
**windows** 9:8,14 13:20,20 25:6 25:12 26:1 38:16,21 39:4 39:15,20,23 40:22 49:16,19 49:22,24 50:3 50:14,17,19,21 50:22,25 51:4 51:16 53:1,6 53:12 55:21 64:10,14 66:3 66:6 77:7

78:14 84:6
**winds** 32:13
**windshields** 13:20
**wish** 87:3
**wishes** 91:4
**witness** 4:7 81:13 86:15 89:13
**words** 61:10 65:10 78:22 85:15,25
**work** 7:6,14,25 11:15 13:3 18:20 28:16 35:6 37:1,1 55:7 58:15 65:20 71:17 78:7
**worked** 7:11,12 7:13 11:22 12:4,7,19 19:15,20 34:11 46:4 54:3
**working** 8:4 10:20 11:18
**works** 37:24
**world** 11:24 35:8
**worry** 43:2
**worse** 15:24
**wouldn't** 19:18 19:23 30:24 42:13,18,25 44:12 58:16 60:4,21,22 82:4
**write** 69:4
**write-up** 82:4
**writing** 45:14 46:21 54:19 62:24
**written** 55:19
**wrong** 49:22 50:19,22,24

**X**

**X** 3:1

**Y**

**yeah** 13:9 16:22 20:4 24:5,24 25:9 28:15 43:25 46:9 52:19 56:23 57:8 59:14 60:1 62:21 76:13,15 77:17 80:12 86:19 87:5,6
**year** 49:24 54:13 61:21 71:6 77:7,10
**years** 7:12 8:3 11:12,16,18,20 12:5 16:23 24:4 59:24 60:4,9
**Yep** 6:17 29:19 47:20 72:18 73:10,24 79:4 79:19,21
**yesterday** 16:3 49:15

**Z**

**0**

**1**

**1** 90:3,15
**1-** 54:4
**1-foot-9-inch-l...** 29:17
**1-foot-somethi...** 73:23
**1.8** 64:21
**1/2** 12:5
**1:03** 1:19
**1:19-CV-2145...** 1:3 90:7
**10** 33:2 74:10,13
**10-year** 54:4
**10/10/17** 3:13
**100** 2:5 73:5
**113** 3:17 15:10
**12** 20:14,17 23:12 28:14
**120-year-old** 12:3
**1222** 85:16
**13** 20:17,20
**146,799** 82:21
**15** 3:17 9:22 36:15 78:13
**15-hundred-a...** 61:12
**15th** 17:19
**16** 41:6 61:24 71:8
**16-'17** 35:2
**16th** 41:6
**17** 3:12
**17th** 32:22
**19** 15:15 25:3
**19974020573** 89:5
**19th** 16:18 38:14
**1st** 89:14

**2**

**2** 56:14
**2:02** 38:2
**2:08** 38:2
**2:50** 16:9
**20** 9:22 10:3 11:19 35:20,21 48:21 75:1,4 88:15
**20-by-20** 35:24
**20-foot** 74:8
**20-foot-by-20-...** 71:19
**20-foot-by-20-...** 71:4
**2013** 34:16,21 49:17
**2014** 7:13 34:22 34:25 60:9 77:6
**2016** 49:17 62:19 77:13,22 78:11
**2017** 3:12 7:3,7 12:21 15:15 35:1 59:25 60:6,10,14,20 62:2,20 64:21 70:8 77:7 78:12 79:25 85:13,18
**2019** 59:22 63:14
**2020** 1:6,19 87:16 89:14 90:3,15 91:2 91:22
**2021** 89:15
**23** 1:6,19 11:18 87:16 91:2
**24** 56:9 59:16
**242** 10:12
**25** 10:3 64:21 89:15
**25th** 21:10 59:22
**26** 3:12 17:19 41:4,7
**27523** 89:22 90:1
**28** 57:11 59:17

**3**

**3-** 54:4
**3:29** 87:16
**31** 29:7,16
**32** 3:13 29:7,16 82:13
**35** 8:3 90:12
**350** 2:10
**37** 3:14 38:9 51:12,12 56:9 56:10,11,11 59:10
**38** 3:14

**4**

**4** 35:13 44:18,21 47:18
**43** 3:16 48:21 51:6
**45** 11:12,16
**48** 3:16
**49** 51:6,12

**5**

**5** 3:5 17:23
**5-** 54:4
**5/19/17** 3:18
**50** 49:16
**5251** 2:9
**59** 3:6
**59th** 38:9
**5th** 2:5

**6**

**6** 12:5 17:23
**69** 51:19 59:16

**7**

**7** 23:2 41:10,11
**70** 37:2
**708** 25:18
**71** 63:16
**720-556-1109** 90:2
**7th** 29:13 70:8

**8**

**8** 7:3 12:21 59:24
**8/9/19** 3:15
**80** 63:18,21 66:6
**80111** 2:10
**80206** 2:6
**80227** 89:23 90:2
**81** 3:5
**82** 3:13 51:20,21