# EXHIBIT K

Transcript of

# 30(b)(6) of RDA Hotel Management Company - Deponent: Rennick Andreoli

RDA Hotel Management Company v. Hudson Specialty Insurance Company

June 26, 2020

CONCISE Legal Reporting, Inc.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**CASE NO. 1:19-CV-2145-DDD-NYW**

---

**30(b)(6) VIDEO CONFERENCE DEPOSITION OF RDA HOTEL MANAGEMENT COMPANY**
**DEPONENT: RENNICK ANDREOLI**

**June 26, 2020**

---

**RDA HOTEL MANAGEMENT COMPANY, and LAKEWOOD HOTEL COMPANY,**
**Plaintiffs,**
**vs.**
**HUDSON SPECIALTY INSURANCE COMPANY,**
**Defendant.**

---

**Pursuant to Notice and the Colorado Rules of Civil Procedure, the 30(b)(6) deposition of RDA HOTEL MANAGEMENT, RENNICK ANDREOLI, called by Defendant, was taken on Friday, June 26, 2020, commencing at 6:55 a.m., in Summit County, Ohio by remote means before Dianna L. Buckstein, Registered Professional Reporter and Notary Public within and for the State of Colorado, appearing remotely from Denver County, Colorado.**



**REMOTE APPEARANCES**

**On Behalf of Plaintiffs:**

**Hossley & Embry, LLP**
**Christopher P. Peirce, Esq.**
**Jeffrey T. Embry, Esq.**
**100 Fillmore Street**
**5th Floor**
**Denver, Colorado 80206**

**On Behalf of Defendant:**

**Campbell Wagner Frazier & Dvorchak, LLC**
**Colin C. Campbell, Esq.**
**5251 DTC Parkway**
**Suite 350**
**Greenwood Village, Colorado 80111**



**I N D E X**


**30(b)(6) DEPOSITION OF RDA HOTEL MANAGEMENT COMPANY -**
**DEPONENT: RENNICK ANDREOLI**

| EXAMINATION BY: | PAGE |
|---|---|
| Mr. Campbell | 5 |
| Mr. Peirce | -- |

| EXHIBITS | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 121 | Brand Approval for Interior Enhancements, 12/11/18, Sheraton Denver West | 73 |

**(Exhibits provided electronically to the court reporter.)**




P R O C E E D I N G S

(Deposition Exhibit 121, remotely introduced and provided electronically to the court reporter.)

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his testimony in this matter is under penalty of perjury. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and your agreement on the record.

THE DEPONENT: Rennick Andreoli, and I agree.

MR. CAMPBELL: Colin Campbell, counsel for Hudson Insurance, and I agree as well.

MR. PEIRCE: Chris Peirce, counsel for the plaintiffs. I agree as well.

THE COURT REPORTER: Will the deponent kindly present his government-issued identification by holding it up to the camera for verification.

(Deponent complies.)
THE COURT REPORTER: Thank you.
EXAMINATION
BY MR. CAMPBELL:
Q Well, good morning. Would you please tell us your name.
A Rennick Andreoli.
Q Mr. Andreoli, I am going to be asking you questions this morning concerning RDA Management's lawsuit against Hudson Insurance Company relating to hail damage from a May 8, 2017 hailstorm. And it's my understanding that you will be providing answers this morning on behalf of RDA Management.
Is that your understanding as well?
A That's correct.
Q And what is your position with RDA?
A I'm the president of RDA Hotel Management Company.
Q How long have you been president?
A Since 1990.
Q And do I understand correctly that RDA Management is in the business of operating hotels?
A That's our primary business, correct.
Q And presently are there five



properties that are under RDA's management?
A Correct.
Q And I assume that RDA has employees that are on site at each of those five locations, correct?
A Correct.
Q And does RDA also have a corporate office?
A We do.
Q And how many employees are there within the corporate office?
A Approximately 15.
Q I'd like to start by establishing certain basic parameters of a time line just to provide context for some of my following questions.
So the hailstorm that's at issue occurred on May 8 of 2017; is that correct?
A Correct.
Q And RDA submitted an insurance claim to Hudson Insurance on or about May 22nd of that year?
A Correct.
Q And Hudson assigned an independent adjuster, Bill Walls, to be involved in an investigation; and on October 17 of 2017, Mr. Walls



sent RDA a final proof of loss. Is that consistent with your recollection?
A To the best of my recollection, correct.
Q And on October 18 of 2017, RDA notified Mr. Walls that it was withdrawing its insurance claim?
A That's correct.
Q And about 18 months later, on April 19 of 2019, RDA's public adjuster, Kevin Aguilar, asked Hudson to reopen its claim.
Is that also consistent with your recollection?
A Yes, sir, correct.
Q And on June 25th and 26th of that same year, there was a re-inspection that was performed involving several different forensic engineering companies including JS|Held and Haag Engineering?
A Correct.
Q And then finally with regard to this time line, on August 29 of 2019, Hudson sent RDA the reports submitted by JS|Held and Haag Engineering along with a check for $238,010?
A That's correct.
Q Does RDA consider the June 25th and



26th re-inspection to have taken place within a reasonable time of Mr. Aguilar's April 19, 2019 submission?
MR. PEIRCE: Objection --
A Yes.
MR. PEIRCE: -- form.
Q (By Mr. Campbell) I'm sorry. I didn't catch the answer.
A Yes.
Q Does RDA consider Hudson to have paid the $238,010 within a reasonable time of the June 25th and 26th inspections?
MR. PEIRCE: Objection, form.
A I believe so, yes.
Q (By Mr. Campbell) Does RDA consider JS|Held's inspection performed in June of last year to have been reasonably thorough?
MR. PEIRCE: Objection, form.
A No, I don't believe so, because subsequent to that we continued to find further damage. No, I don't believe the scope of their inspection was thorough and complete.
Q (By Mr. Campbell) And can you clarify for me those aspects of the investigation which you consider to have not been thorough?

MR. PEIRCE: Objection, form.
A Basically the total scope of the property -- very narrow focus on what they re-inspected, and the damage was far more extensive than what we initially thought.
Q (By Mr. Campbell) So what areas of damage do you believe JS|Held missed in its initial investigation?
MR. PEIRCE: Objection, form.
A The roof, the curtain wall, the exterior paint -- which was dinged up.
(Interruption by the court reporter for clarity of the record.)
A -- exterior paint, the main entrance -- the framing that holds in the glass of the main entrance was very damaged, a number of our rooftop roof fans, et cetera, had extensive damage, coverage to the pool, et cetera, et cetera.
There was just a lot more damage than we initially thought there was, and I -- you know, I trust our insurance company to do a complete inspection, and that really didn't happen. So I (inaudible) mistake in the hindsight.
Q And I didn't catch what you said with regard to the pool. Could you repeat that?



A The cover -- the plastic cover to the pool, which had been replaced six to eight months prior to that, had severe damage and penetration from the hail.
Q And so when you were answering my question, did you understand I was asking about JS|Held's inspection that took place in June of 2019?
A I believe so, yes.
Q Okay. And it's your belief that the damage to the pool skylight had not been identified by that point?
MR. PEIRCE: Objection --
A No.
MR. PEIRCE: -- form.
A No, I don't think so.
Q (By Mr. Campbell) You don't think it had been identified yet?
A No. I think we identified it, and, again, I don't know -- the time line is difficult in terms of the number of different inspections we had by various different people to keep straight the different time line.
So the pool damage, that might have been part of JS|Held's inspection, but I'm -- I'm --



I just don't recall.
Q (By Mr. Campbell) Okay. Well, in fact, Hudson had included the cost to replace that skylight in its proof of loss back in 2017, had it not?
A I believe so. That was part of their -- you know, of their scope of the damage, correct.
Q Okay. So was there any aspect of that that was missed by Hudson?
A Yeah, I -- are we referring to the pool cover, or what are we referring to?
Q Well, that's what I thought you were referring to, was the dome skylight above the pool.
Are we talking about the same thing?
A Yes, we are.
Q Okay. As you sit here today, are you aware that Hudson had included the cost to replace that dome skylight in its proof of loss submitted back in October of 2017?
A I'm not familiar with the scope of those earlier claims. I'm just not familiar with all those details.
Q Did you try to apprise yourself of those details for purposes of preparing for this



deposition?
MR. PEIRCE: Objection, form.
A Not really, no.
Q (By Mr. Campbell) Why not?
MR. PEIRCE: Objection, form.
Q (By Mr. Campbell) You may answer.
A Could you restate the question? Restate the question for me, please.
Q Yes.
Did you attempt to apprise yourself of all of the details of this claim for purposes of preparing for this morning's deposition?
A Yes, I did. Yes, I did.
Q Okay. So despite that preparation, you don't recall the details of what aspects of the claim Hudson included in its October 2017 proof of loss?
A I do --
MR. PEIRCE: Object to form.
A I do recall the scope of the claim, and I do believe, yes, the pool cover was part of that, as well as the roof damage, and I just don't recall the total scope of that inspection by Hudson.
Q (By Mr. Campbell) Okay. So sticking with JS|Held's re-inspection in June of last year,

I'm not going to ask you if you agree with JS|Held's conclusions, but I will ask you whether you consider JS|Held's analysis to have been from your perspective fair and objective?
A I -- I don't know.
MR. PEIRCE: Object to form.
A I don't know.
Q (By Mr. Campbell) I mean, when it comes to JS|Held's inspection, I was more concerned with the larger scope and the additional damage to the property at that time.
Q But you expressed no opinion as to whether you consider JS|Held's inspection in June of last year, whether you consider that to have been fair and objective?
MR. PEIRCE: Objection, form.
A I -- I -- I just feel they missed the bigger picture. They focused on certain items, and there was a lot more damage to the property that I don't believe that they caught, and that -- that was very concerning.
The total scope of the damage to the overall property was far greater, and we may not have realized that at the time. As time has gone on now, we've ascertained that there was significantly



more damage.
Q (By Mr. Campbell) Are you familiar with the fact that Matthew Sitzmann of Haag Engineering has inspected the EPDM roof on the hotel on two separate occasions?
MR. PEIRCE: Objection to form.
A No. I'm not familiar with that. No, I don't recall that.
Q (By Mr. Campbell) I will represent to you the first time Mr. Sitzmann was on the roof was on June 7 of 2017, that was within a month of the hailstorm.
Were you aware that Mr. Sitzmann had inspected the roof at that time?
A Yes. I would say yes.
Q And are you also aware that Mr. Sitzmann conducted a further evaluation of the roof during the June 25th and 26th, 2019 re-inspection?
A I think -- yes, yes, I recall that.
Q Is it your understanding that Mr. Sitzmann found no evidence of hail damage to the EPDM roof?
MR. PEIRCE: Objection, form.
A Yeah, I believe that's the conclusion



he came to, yes.
Q (By Mr. Campbell) Do you have any reason to believe that's an unreasonable conclusion?
MR. PEIRCE: Objection, form.
A I mean, our experts disagree with that, and they found more damage, and we continued to have issues after the -- that inspection and after the hail damage.
Q (By Mr. Campbell) Who are the experts that you understand disagree with Mr. Sitzmann's conclusion that there was no hail damage to the EPDM roof?
A I really have to -- I mean, Kevin Aguilar was at the property, and he was there for a couple of weeks and doing his own inspections with the consultant, so -- and I was not privy to all of that.
I'm not at the property. So I'm not familiar with the time lines and -- of all of these different various people. I know that -- I put together a group of experts, so I'm familiar with those inspections, but I'm not familiar with all of these other people that were doing inspections. I'm just not.
Q Did you ever talk to Mr. Aguilar about



his observations and conclusions concerning the extent of hail damage to the hotel?
A Yes.
Q Tell me what you recall about your discussions with Mr. Aguilar.
A His opinion -- his professional opinion was that there was much more significant damage to the overall property, far greater than what we initially thought there was and what we relied on our insurance company to tell us; and so I believe that the whole inspections were not thorough enough.
Kevin's was much more detailed, and as I say, he spent one to two weeks doing inspections with various different engineers, and no, I don't know who all those engineers were.
My point of contact was Kevin, and he was giving us reports as to the extent of the damage, sending us detailed reports with pictures of the different areas of the hotel, et cetera.
And I physically went to the property some months later and did my own visual inspection and saw the kind of -- a lot more damage than what I ever anticipated.
Q And my question actually was more

specific. I wasn't asking you about your conversations with Mr. Aguilar about damages in the big picture but rather what discussions you had with Mr. Aguilar about the extent of damage to the EPDM roofing.
Do you recall any discussions that you had with Mr. Aguilar on that particular subject?
A Not really, no.
Q How about Carl Martin? Have you ever discussed with Mr. Martin what his observations accomplished?
A No, I've never had a conversation with that gentleman.
Q Have any employees of RDA identified what they consider to be hail damage to the EPDM membrane on the roof?
A No, not really. No, I -- no.
Q So RDA would have to rely entirely upon the opinions of its experts in order to identify any hail damage to the EPDM roofing; is that correct?
MR. PEIRCE: Objection, form.
A I think that's a fair statement, yes.
Q (By Mr. Campbell) And I will represent to you that during Carl Martin's



deposition yesterday, he clarified that he viewed there to have been hail damage only to one particular section of the EPDM membrane, particularly a section running along the south perimeter of the mezzanine roof.
Is this the first you've heard of that clarification of Mr. Martin's opinion?
MR. PEIRCE: Objection --
A Yes.
MR. PEIRCE: -- form, objection, foundation.
Q (By Mr. Campbell) And if Mr. Martin has testified as I have just described, would RDA have any reason to disagree with Mr. Martin?
MR. PEIRCE: Objection to form, objection to foundation.
A Colin, I really honestly -- yeah, who is Mr. Martin? I don't know Mr. Martin.
Q (By Mr. Campbell) Yeah. Your attorneys hired a forensic engineer out of Missouri to respond to and comment on the Haag Engineering and JS|Held reports, and Mr. Martin issued a report on behalf of RDA on March 20 of this year.
So he is RDA's retained expert addressing the scope of damage from this -- from



this storm.
So I take it that you are unaware of the scope of Mr. Martin's involvement until I just described it to you?
MR. PEIRCE: Objection, form.
A I really don't have any reason to object to his opinion, to be very honest with you.
Q (By Mr. Campbell) Now, you're aware that a section of the EPDM roof on the mezzanine level was patched back in September of 2013?
A Yes, yes.
Q And are you aware that the roofing contractor recommended a full-roof replacement at the time that it conducted that repair?
MR. PEIRCE: Objection to form. Objection to foundation.
A I don't recall.
Q (By Mr. Campbell) Did RDA choose not to replace the roof back in September of 2013?
MR. PEIRCE: Objection to form.
A Yes, that's accurate, correct.
Q (By Mr. Campbell) And why did RDA make the choice not to replace the roof at that time?
MR. PEIRCE: Objection, form.



A I believe we had done some minor repairs, and maybe we obviously stopped the leaks at that point, but we opted not to replace the whole roof.
Q (By Mr. Campbell) Craig Ulrich described for us during his deposition earlier this week that RDA replaced a larger section of the mezzanine roof in 2016.
Are you aware of that?
MR. PEIRCE: Objection, form, foundation.
A To the best of my recollection, that could be accurate.
Q (By Mr. Campbell) Does RDA have any documentation of that repair performed in 2016?
A I'd have to get back to you on that, if we could. I just don't recall so we may.
Q Okay. And the reason I ask is that while documentation of the 2013 repair was produced to us, I haven't seen any documentation of the 2016 repair either in the form of a work order or invoice or anything else.
What records would you need to review to see whether RDA does, in fact, have documentation of that 2016 repair?

MR. PEIRCE: Objection to form and foundation.
A We'd have to go back to -- we'd have to pull our capital expenditures and see if that, in fact, happened. As I sit here today, I can't recollect exactly what was done.
Q (By Mr. Campbell) What record does RDA have of capital expenditures going back to 2016?
A I think we'd have a thorough recap of what we spend, obviously.
For accounting purposes, we have to determine what we expense or capitalize an item, so clearly we would have those expenses, or there would be some record of that.
Q So if a contractor submitted an invoice for payment to RDA for work done in 2016, you're confident that RDA would --
A Yes.
Q -- continue to have a record of that --
A Yes.
Q -- correct?
A Yes, sir. Yes.
Q Now, RDA also conducted a further repair to the mezzanine roof around the area of the



lobby skylight in June of last year, did it not?
A That could be. To the best of my recollection, there -- there's just a hundred moving parts of a lot of repairs through the course of a year on a property of this magnitude. So for me to sit here and recall exact dates as to what we replaced and what month, et cetera, et cetera, that's -- and I keep up with several hotels. So that would be difficult for me to recall that at this point.
Q And fair enough. And that's why I'm trying to be specific in the questions rather than just asking you to broadly tell me the dates of every repair you've done to the roof, because I understand that would be an unfair question.
A Yes, thank you.
Q And the reason I have specified a June 2019 repair is that we've been provided with an invoice through one of your experts' files, and we can pull it up if you want to see it, but basically it reflects that an area around the skylight lobby was repaired in June of 2019 at a cost of $4,500.
A That's probably accurate.
Q Why did RDA wait for more than two years to repair the roof leak around the lobby



skylight?
MR. PEIRCE: Objection to form, foundation.
A I don't recall those details. I have no idea. I'd have to go research that, but I -- it could be a number of different reasons, and I just don't have a good answer for you right now.
Q (By Mr. Campbell) What would be the possible reasons for waiting more than two years or almost two years to repair a roof leak?
MR. PEIRCE: Objection to form, foundation.
A I don't know if -- if it was leaking at the time, I don't know. Sometimes it's not hard to determine -- with these leaks, they move from one area to another. So it may have stopped leaking, and we chose -- leak so we would repair it.
THE COURT REPORTER: I'm sorry, sir. You cut out. You are coming in and out.
MR. PEIRCE: I can hear him perfectly fine, madam court reporter. So I don't want him to sit on top of a microphone.
Colin, can you hear him fine? I didn't hear him cut out just now.
MR. CAMPBELL: I've been able to hear



fairly well. There's been a few occasions where he's cut out toward the end of an answer.
THE COURT REPORTER: If you would prefer me dashing where it's cutting out, I can do that also.
MR. PEIRCE: But I don't have any issues hearing him myself, and I'm remote as well. So I -- anyway, I don't know that it's on his end. That's all.
MR. CAMPBELL: Dianna, did you catch all of his last answer?
THE COURT REPORTER: Well, there were parts in there where it cut out.
(The last answer was read back as follows: "We chose --")
THE COURT REPORTER: Then it cut out.
THE DEPONENT: Let me give you another answer then.
A So in answer to your question, Colin, I say: Those leaks, they come and go. So if there is a leak and there's something leaking into our lobby or to the interior of the building, then we would take steps to fix the leak; but, you know, it's just a matter of timing when things happen; and, you know, sometimes they come and go. And we

think we catch the leak, and we do a temporary fix, because we have not chosen to do a complete re-roof of that whole area due to the fact that -- where -- so we just have chosen not to do an extensive -- we have had other priorities.
So once we temporarily fix a leak, we move on and it stops leaking, then we go on to the next thing.
Q (By Mr. Campbell) There was a leak at the area of the lobby skylight that was identified immediately following the hailstorm back in May of 2017. I haven't seen any record that that leak was fixed at that time.
Do you have any reason to think that it was fixed at that time?
A I couldn't begin to tell you. I don't recall.
Q And the fix that did take place in June of last year occurred just three days before JS|Held and Haag Engineering went out to the site for their re-inspection.
MR. PEIRCE: Objection to form, foundation.
Q (By Mr. Campbell) Was that timing coincidental, or was there a reason why that repair



was done just a few days before that inspection?
MR. PEIRCE: Same objection.
A I don't know what that correlation is. I couldn't begin to answer that.
Q (By Mr. Campbell) You said you would have to research to be able to explain the timing of that repair.
What is it that you would research in order to better understand the circumstances giving rise to the timing of that repair?
MR. PEIRCE: Objection to form, foundation.
A A paid invoice.
Q (By Mr. Campbell) I'm sorry. Say again.
A A paid invoice.
Q So paid invoices would tell us the timing at which repairs were conducted, correct?
A Not necessarily. I mean, it could lag. I mean, depending on when the work was done and then they submit a -- first they submit a bid, come and do the work, submit an invoice, and then in our normal schedule of payables, it would get paid in 45 to 60 days, so who knows, so . . .
Q Okay.



A If there was a recurrence and it continued to leak, then obviously we wouldn't pay the invoice because there were still leaks. Then we would have to call them back out.
That's why it's very difficult to put a finger exactly on when all of these things happened exactly.
So all I can tell you is a good number of the leaks were fixed in that mezzanine roof. We had fixed all of the interior problems, and then we continued to have -- after the hailstorm, then we started having more leaks.
Q I would like to turn your attention back to the -- what I will refer to as the first phase of this investigation. That's what took place between May and October of 2017.
A Correct.
Q So are you with me?
A Yes, sir.
Q Is it your understanding that Bill Walls was the boots-on-the-ground person who conducted the investigation and evaluation of the hail damage on behalf of Hudson Insurance Company?
A That is correct.
Q And I understand that you don't



believe Mr. Walls conducted a thorough inspection, so I got that.
But in terms of the timing of what Mr. Walls did, do you believe that Mr. Walls inspected the property within a reasonable time of being given this assignment?
A Yes.
Q And do you believe that Mr. Walls completed his investigation within a reasonable time of the assignment?
A I'm really not in a position to comment on that. I really don't know what you call "reasonable." I don't know.
Q Well, RDA has alleged that Hudson unreasonably delayed in certain parts of its investigation and evaluation, and I just want to make sure I fully understand RDA's position with regard to that allegation.
So we have a complete record of all of Mr. Walls' e-mail communications both with Briana Miller and John Bresnahan.
Have you reviewed those e-mail communications?
A Not in a lot of great detail. I'm familiar with them but not in detail.

Q Okay. So do you recall what steps took place in the evaluation between May and October of 2017?
A Vaguely, yes. I can't recite every date, but I have a general idea of the time line.
Q So does RDA consider Mr. Walls to have unduly delayed in any portion of the work he did in handle this claim?
MR. PEIRCE: Objection, form.
A I can't say emphatically that that's the case, no.
Q (By Mr. Campbell) Does RDA consider Hudson to have pressured RDA to withdraw its claim in October of 2017?
A No.
Q Are you aware that that allegation was made in RDA's complaint?
A Yes, I -- yes.
Q So do I understand that RDA is withdrawing that allegation at this point?
A No, no, no, no. We withdrew our claim when we were informed that we would receive $1,500 for the damage that we had sustained, and that's the essence of what this is all about, when we discovered that there was significantly -- and I



mean significantly more damage.
So that's -- that's our real concern, so we trusted our insurance company to do a complete inspection, and I think in hindsight that might have been a mistake, so . . .
Q (By Mr. Campbell) And I understand that's your position, and I'm not trying --
(All speaking simultaneously.)
A What's that, sir?
Q (By Mr. Campbell) What you just described, I understand that's your position, and for the purpose of this question, I'm not trying to challenge or push back on it. My question is a much more narrowly focused one.
You told me that RDA doesn't consider Hudson to have pressured RDA to withdraw its claims. I'm just simply asking you to acknowledge that RDA is withdrawing that allegation from its complaint; is --
MR. PEIRCE: Objection, form.
Q (By Mr. Campbell) -- that correct?
A I defer to my lawyer on that. No, I can't answer that.
Q (By Mr. Campbell) Okay. So regardless of what is alleged in legal pleadings,



from a factual standpoint, you don't have any reason to believe that Hudson pressured RDA to withdraw its claim on October of 2017; is that correct?
MR. PEIRCE: Objection, form.
A I -- I guess the pressure came from the fact that -- the pressure, though, comes from the standpoint that we were only offered $1,500 for the damage that was sustained.
Does that answer your question?
Q (By Mr. Campbell) Not really, because $1,500 is the amount of money which Mr. Walls' calculations showed were owed under the policy based upon the damage that he had identified, correct?
A Let me expand. I guess at that point, we came to the conclusion that it wasn't worth filing a claim when we were only being offered $1,500 for the damage -- damages that had been sustained when we knew it was far more than that.
Q Wait. You said --
A Excuse me. I take that back.
We didn't know at the time what the extent of the damages were. We didn't feel any pressure. We were only offered $1,500 for the damage that was sustained. So that's why we withdrew it.



Q Okay. So let me ask the question a little differently because I think I understand what you're telling me.
Based upon information known to RDA at the time, RDA did not feel pressured to withdraw its claim; would that be fair to say?
MR. PEIRCE: Objection, form.
A No. I mean, I guess the only pressure was we were offered $1,500, so it wasn't worth filing the claim.
Q (By Mr. Campbell) And based upon information known to RDA at the time, you had no reason to think that the covered benefits were more than $1,500, did you?
A No.
MR. PEIRCE: Objection, form.
Q (By Mr. Campbell) I'm sorry. Did you answer?
A No. The answer was "no."
Q No, you -- no, RDA did not have reason to think that the covered benefits exceeded $1,500; is that right?
MR. PEIRCE: Objection, form.
A Correct.
Q (By Mr. Campbell) Okay. What did RDA

do with the insurance benefits paid by Hudson last August?
A Put it in the bank.
Q Which account?
A One of our operating accounts.
Q Does RDA maintain a separate reserve account for the Sheraton Denver West hotel?
A There is a reserve account that is with the lender. Every month we submit 5 percent of the trailing -- prior trailing 12 months -- 5 percent of the top-line gross revenue. So if we do 10 million, it would be $500,000, and that goes into a reserve account.
It's not necessarily earmarked for any particular projects. We draw upon that based on what we determined for budgeting purposes at the beginning of the year for the things that Marriott is requiring us to do, what the brand standards are, and what the preferred maintenance and other projects that we would like to under -- you know, undertake.
So typically we go through that 500 -- half a million or the 5 percent, whatever that number works out to be. We go through that in a 12-month calendar year, and then we supplement it



with operating revenues to maintain --
Q So the reserve account is not specific in this particular hotel but is a single account for use for all of the properties managed by RDA?
A It's an account that is held by Wells Fargo for that hotel, and they're the servicer. They hold the funds. We can draw on it twice, three times a year, we submit paid invoices, and then they send us our money.
Q Oh, so it is specific to just that hotel?
A Oh, yes. Oh, yeah, yeah, yeah. Each one of our properties has a reserve account, yes.
Q Now, I understand that RDA has not yet replaced the dome skylight over the pool. Am I correct in that?
A That is correct.
Q Why hasn't RDA replaced the dome skylight to this point?
A I -- I think we're waiting for resolution of this litigation.
Q Well, I will represent to you that the cost to replace that skylight was included in the money that was paid last August. So if my representation is correct --



A It doesn't mean --
Q -- why are you waiting for resolution of this lawsuit to make --
THE COURT REPORTER: One at a time, please.
MR. PEIRCE: Objection, form.
A So until we get a full scope of -- there was so much other damage, we have to prioritize, and that at the time was not a priority to go replace that at this time. And it's currently not leaking, so it was not a priority to us at this time, since it's not leaking.
Q (By Mr. Campbell) Out of the money that was received, the only repair I'm aware of that's taken place is the $4,500 paid in -- no, actually, that happened before. So I take it back.
To my knowledge, no repairs have been done on hail-related items since Hudson paid the $238,000 to RDA.
Would you agree with that?
A No, I -- I would have to go back and look at the file. I don't know for sure.
Q Do you recall any repairs having been done to any hail-related damage since August of last year?



MR. PEIRCE: Objection, form.
A I think there was some broken windows replaced, a couple broken skylights. Other than that, we have been very careful as to how we're spending our dollars, and then currently since March, we -- the hotel was shut down, and we were closed for a couple of months, so we are being very careful of what repairs we make.
Q (By Mr. Campbell) Wouldn't the time during which the hotel was closed down have been an appropriate time to have conducted repairs?
A No.
MR. PEIRCE: Objection, form. Colin, can you tell me is -- I mean, where in the notice are we talking about this topic?
MR. CAMPBELL: Maintenance and repair history for the hotel.
MR. PEIRCE: Objection, form.
A Do you want me to answer?
Q (By Mr. Campbell) Please.
A There -- since -- since COVID-19, the property has been typically shut down. So any dollars we had prior to that, we had to hold onto, collect our receivables so we could make our mortgage payments so we are not foreclosed upon.

So we have been very judicious in every dollar that we have and how we spend it. So it certainly wouldn't behoove us to go and replace a dome on our pool when it wasn't leaking and the hotel wasn't open.

So many of these things and even prior to this, we had delayed. Because of this litigation, we are going to put some things on hold until we can come to some resolution.

So we do -- we do the repairs as needed to maintain the property. If there was water pouring into our lobby, I assure you we would replace the roof or fix the roof or patch the roof.

So each individual situation is assessed. We look at it. We get several bids. And by the time we get to a decision to -- okay, are we going to do this, then five other problems have cropped up. So we are constantly re-prioritizing what items need to be repaired on the property since right now we have limited dollars, that we have slowed down obviously all capital so that we can keep the lights on at this point.

Q When was the roof installed to the hotel?

A Which roof are we talking about?



Q The -- both the mezzanine roof, as well as the upper roof above the 12th floor at the top of the tower. I'm talking specifically about the EPDM membrane with the river rock ballast.

A 2013, when we replaced some mechanical equipment on the 12th floor, we had found that underneath that tower with the chemicals, the water leakage that there was significant deterioration to that roof.

So once we ascertained that, we decided to -- since we were with a crane lifting that unit off the roof, it behooved us to replace that roof. So we did that in concert with replacing the tower.

As far as the mezzanine, I cannot tell you if that roof has been completely replaced. I think in 2001, we had substantial work done on the roof.

Q What do you recall was the nature of the work done in 2001?

A I think that we -- we pulled back some of the ballasted stone and did some repairs. I think we tried to put a coating material on it without burning off the roof, so just did minor repairs.



Q Was that prompted by some leaking that had developed?

A Yeah. Probably, yes. Yes, sir. Yes.

Q Has RDA conducted any reserve assessments over time with regard to the hotel?

A Can you repeat the question, sir.

Q Yes. Has RDA conducted any reserve assessments for the hotel?

A No, no. And, again, there are not categorized for reserve. It's a lump sum. It's a bucket of money that's there. We -- and we prioritize that on an annual basis based on what the renovation requirements are for the brand, what the lenders may require, what we want to do to the property, et cetera, et cetera.

It's a moving target. It changes monthly.

Q Has RDA at any point during your tenure tried to assess what the remaining useful life is of the roof so that it could plan financially for the cost to eventually replace that roof?

MR. PEIRCE: Objection, form.

A No, no, we have not.

Q (By Mr. Campbell) Now, Mr. Ulrich



informed us during his deposition that he turned in his notice to step down as chief building engineer in June of 2017.

Does that square with your recollection as well?

A To the best of my recollection, that could be, yes.

Q Did Mr. Ulrich share with you what his reasons were for stepping down?

A No, he did not.

Q Did you have any communication at all with Mr. Ulrich concerning his decision to step down from that position?

A No, I did not.

Q Did you talk to anybody else at the hotel such as perhaps Briana Miller as to why Mr. Ulrich was stepping down?

A I probably did, but I don't recall the specifics of that conversation.

Q Or how about the generalities of the conversation?

A I don't recall. We -- we've got, you know, 180 employees there, so I'm not familiar with every exit interview and all the particulars. I just don't recall.

Q When did RDA become aware of hail damage to the mechanical equipment on the roof?
A Probably May of 2017, I guess.
Q Are you aware that RDA --
A At some --
Q -- did not include that damage on its list of items --
A Well, because --
Q -- which Ms. Miller sent to Mr. Bresnahan?
THE COURT REPORTER: One at a time, please.
MR. PEIRCE: Objection, form, foundation.
Q (By Mr. Campbell) I'll finish the question. On the list of items which Briana Miller submitted to John Bresnahan in May of 2017?
MR. PEIRCE: Objection, form and foundation.
A They probably -- Briana was not totally familiar with the extent of that damage until Kevin Aguilar was at the property. He was there for approximately two weeks doing his inspections.
Briana would not be qualified to look



at that equipment nor probably the engineer, and he's really a maintenance man. It's a misnomer. He's not really an engineer per se; but anyhow, yeah, we just did not know the extent at that point. We didn't have any idea.
Q (By Mr. Campbell) Well, I'll share with you that Mr. Ulrich testified that he was indeed fully aware of the hail damage to the soft metal covers of the mechanical equipment.
So wouldn't you agree that RDA was aware of that damage in the immediate aftermath of that hailstorm?
MR. PEIRCE: Objection, form and foundation.
A I thought you -- you're asking me two different things. Mechanical equipment, that's a general, broad statement. I don't know what mechanical equipment you're referring to.
There are roof fans and the covers that go on those fans that were dinged up, and there was significant damage to that.
So if that's what you're calling "mechanical equipment," those are just roof fans. So we knew of some damage, but I don't know how -- we didn't know how extensive it was. And, again, we



were relying on our insurance company to do more of a complete inspection, which was not provided to us.
So we had people on the property, a general manager who is charged with running the day-to-day operations of that hotel, and she is not, you know, necessarily qualified to do a thorough inspection; and then -- and Craig -- then when the two of them were doing the best they could to ascertain what all of the damage was, Briana wasn't even on property during the storm.
So they were trying to piecemeal together to see what kind of damage we had, and we just had no idea how extensive it was. That's why we pay a lot of money to our insurance company to provide that information. And I'm sorry. They just didn't do a very complete inspection of the property, so we're thinking that, well, we only have $115,000 worth of damage, then that's why we decided to withdraw the claim.
Q (By Mr. Campbell) Mr. Andreoli, you understand, don't you, that Ms. Miller consulted with Craig Ulrich in preparing her list of items of --
A Yeah --
Q -- damage?



A -- yeah.
MR. PEIRCE: Objection, form, foundation.
A But they reported -- but they were only able to report what the obvious damage was. They would not be familiar if there was damage far beyond that, so they were kind of limited to what they were able to, again, see -- visually see, and that's -- they did the best they could to try to put that together.
Q (By Mr. Campbell) And to the extent that Mr. Ulrich did observe obvious damage to the mechanical equipment, do you have any explanation for why that was not included --
A No.
Q -- on the list of items that was submitted to Hudson Insurance?
MR. PEIRCE: Objection, form, foundation.
A I have no clue why that wasn't -- I have no clue.
Q (By Mr. Campbell) If Mr. Ulrich explained that it was simply because he did not consider that it needed to be addressed, would you have any reason to disagree with his assessment?

MR. PEIRCE: Objection, form and foundation.
A No, I wouldn't. No.
Q (By Mr. Campbell) Does RDA have in place a preventative maintenance program for guest rooms at the Sheraton Denver West hotel?
A Yes, yes, we do.
Q Describe for me what that program is.
A Well, depending on the availability of the rooms and the access that we can get to the rooms, a team would go through, including the general manager, front office manager, engineer, et cetera, and they would go through on a regular basis and what we call hit the room. They would look at what things -- is the wallpaper peeling, does the ceiling in the bathroom need to be painted?
So those things are done on a regular basis, which is very difficult when the property is busy in our season between May and October.
So we try to get to the rooms on the off season, and there's a program to go through and do that kind of work and look at, you know, any problems in the rooms; but sometimes it's detailed, and sometimes they get in and get out, and sometimes they miss things. So it's on an ongoing basis.



Q Optimally how frequently does RDA want those inspections to occur to the guest rooms?
A Twice a year.
Q And sometimes is there a write-up of the findings from the inspection?
A Yeah, they would recap the items in the rooms, correct.
Q Is there a particular form that RDA has where that -- where the results of the inspection are --
A Each property --
Q -- laid out?
A Each property uses a different form. Marriott has a form. Hilton has a form. So we use those forms to pick the rooms.
Q So Sheraton has a form as well?
A Well, Sheraton is really Marriott. Marriott bought out Sheraton, Starwood.
Q Understood. Thank you.
A It's a Marriott.
Q And when those forms are filled out, are they retained?
A Oh, I imagine they do. For how long, I couldn't possibly tell you. They go through, and then once the items and the work orders are



completed -- and some of it is just general housekeeping, so I don't know that those are held onto for an extensive period of time.
Q Does -- well, do you have any idea of how long those inspection forms are retained in RDA's records?
A I have no idea what Briana has held onto.
Q So that's -- it would be up to Briana to create the protocol for how long those forms are retained?
A Yeah, basically. I mean, they go through -- they do complete lists, and they give a list to the painter. A contractor comes in and does their job, and then -- I mean, there's really no reason to keep them.
I mean, once the tasks are completed and we painted the crown molding in Room 305, there's no reason to hold onto that once it's completed.
So I don't know if she's held onto all of those reports, but I don't know. If we have them at the property, I don't know.
Q How long has Marriott had an inspection form made available to RDA?



A Marriott bought Starwood approximately four or five years ago, so, you know, four or five years ago they probably submitted a form to the property, and sometimes we just create our own form and then go through and do a recap on each room.
Q How long has RDA had a preventative maintenance program in place for guest rooms at the hotel?
A The last five or six years we've -- we've -- to try to maintain our guest scores, we try to be more proactive, we try to get into the rooms and inspect. So we've picked up the pace in terms of trying to get into the rooms and do those inspections.
Q So what information -- what information --
THE COURT REPORTER: I can't hear. One at a time, please.
A It's a function of access to the rooms, as well as having the personnel available to get into the rooms and, once you create the list, getting the subsequent contractors and the personnel to do the work.
Now, what detailed lists Briana has on all of that, I couldn't possibly tell you that. I

have no idea.
Q (By Mr. Campbell) So what information with regard to preventative maintenance is provided to Marriott for purposes of your hotel's guest scores?
A We don't really submit anything to the brand. It's all done internally. We don't submit -- they come in and do their annual inspections, and they really monitor the property vis-a-vis what you call SALT scores or guest scores and determine what the guest feedback is from the Marriott Bonvoy members, et cetera.
Q So Marriott does an annual inspection?
A Yeah. Mostly, yes, for -- to maintain brand standards they'll look at conditions. They used to do that. Obviously that has all been on hold. They don't have the personnel to do that right now, so that hasn't been done lately.
Q Sure. So it hasn't been done since March?
A No, no.
Q Okay. Does Marriott provide RDA with a report of their annual inspections?
A Only if there's a problem. If we're failing in some area, cleanliness or conditions.



Q And does RDA retain those annual reports from Marriott to the extent that they are submitted by Marriott?
A I'm sure I have that in our records somewhere, but yeah, yes.
Q Going back how many years?
A Probably four or five, since -- since Marriott became involved.
Q Mr. Ulrich told us during his deposition that beginning in 2016, he instituted a policy of performing what he described as deep inspection of each guest room on a quarterly basis.
Are you aware that Mr. Ulrich instituted such a maintenance program?
A But I'm suspect as to whether that was able to be followed through on.
Q Why?
A Because we have been short of maintenance people. We've been -- we haven't had an engineer on and off there for a number of years.
Denver is a very low unemployment city. It's been very hard to find people. It took us 2 1/2 years to get a chief engineer. We just struggled to get and keep engineers.
There's like 150 hotels in the city of



Denver that are looking for maintenance people. So we've been running short, and it's just how we put out fires every day just trying to keep the property running and keep the -- minimize the number of rooms that are out of order.
Q Okay. Well, if I limit my question to the time that Mr. Ulrich was at the hotel -- and I think he described to us that he stayed through August of 2017. So with regard to those quarterly inspections that Mr. Ulrich did in 2016 and 2017, were you aware that he was even doing those?
A No, no. No, I was not.
Q But you have some doubts as to whether that program could have been maintained after Mr. Ulrich left because of the constraints he just described for us?
A Correct. It would be very hit and miss, and it would be something that Briana or the front office assistant manager would probably do on a hit-and-miss basis.
Q Okay.
MR. CAMPBELL: Why don't we take a five- or ten-minute break at this point. Is that okay with everybody?
MR. PEIRCE: Sure.



THE DEPONENT: Yep.
MR. CAMPBELL: Okay. Great. Thank you.
(Recess taken, 8:00 a.m. to 8:09 a.m.)
Q (By Mr. Campbell) Mr. Andreoli, are you ready to proceed?
A Just one second. Just one second.
Q Okay. Sure.
(Pause in the proceedings.)
Q (By Mr. Campbell) So are we ready to get going again?
A Yes, sir.
Q Mr. Andreoli, did RDA have a changeover in its operating systems within the past several years?
A Clarify the "operating systems."
Q Well --
A You mean the Marriott, or what do you mean?
Q Well, both in discovery responses, as well as in Ms. Miller's deposition, there was reference to a changeover in operating system. So that was the terminology that I understood RDA was using.
A Yes. Yes, that is correct then, yes.

Q And --
A Marriott changed their platform and how they were reporting and tracking information. You went from Starwood to Marriott, and it's not RDA by the way. It's at the hotel. You're talking at the hotel, not RDA.
Q Well, I was going to ask for that clarification, so thanks.
So what we're talking about is a changeover in the operating system for this specific hotel?
A For Marriott, yes, at the hotel level, not from RDA.
Q So did that require the hotel to re-input its existing records into a new system?
A I'm not sure.
Q And Ms. Miller testified that she thought this changeover occurred in October of 2017, and I guess there was some question about that only because I believe the written discovery responses indicated a date of October of 2018.
Would you know one way or the other when that changeover occurred?
A I would rely on whatever Briana said.
Q Was -- would it be your expectation or



RDA's expectation that at the time of this changeover, that all existing maintenance records would be downloaded and saved into the new system?
A Not that I'm -- no, I don't believe so. I don't think that was the case.
Q Why not?
MR. PEIRCE: Objection, form.
A I don't know. I mean, I just -- I don't know what Marriott required and what we had to go back and load into the system. I just -- I don't know.
Q (By Mr. Campbell) Regardless of the Marriott --
A I mean -- sorry.
Q Go ahead.
A Sorry. She -- Briana works directly with the -- with the people at Marriott. She's the one that's on the webinars. She deals directly with all of the different operating areas of Marriott, whether it be revenue management -- it's a plethora of things. I am not involved with that on a day-to-day basis. She goes through the training.
I'm just not familiar with when all of those things -- I mean, Marriott would control what went into the new system, not us. I don't know what



they put in the system.
Q Well, isn't it your expectation that the hotel would have had the ability to -- in whatever form -- preserve its maintenance records that it had on account?
A I don't know. I don't think -- no. So some of those records were lost, and some of those things were not put into the new operating system, so . . .
Q You say "some records were lost." Please explain what you mean by that.
A Again, Marriott would control that. Whatever the information, the data that they had in the system, they would download into the new operating platform, and I'm just not too familiar with the timing of all of that and what was entered and what they didn't bring forward or -- and, you know, I don't know how far back they went, et cetera. I'm just not aware of that.
Q Well, the maintenance records are RDA's records, are they not?
A Say that again, please, sir.
Q The record of past maintenance and preventative maintenance that existed at the time of this changeover, those were records that belonged to



RDA, were they not?
A Yes.
MR. PEIRCE: Objection to form.
Q (By Mr. Campbell) And so Marriott was not in a position to dictate to RDA as to which of those maintenance records to preserve, correct?
MR. PEIRCE: Objection, form.
A No, I -- no, I -- I don't know how far back they wanted. I don't know how much of the data they wanted. I don't know what they were going to require. I mean, it was probably lost in the old system. Don't forget, it was a two -- it was a -- you wouldn't know this. It was over a two-year transition.
Once Marriott bought Starwood, which had 16 of their own brands, and so they had to assimilate all of the different operating platforms from office systems, sales systems, et cetera.
So what was kept or what was required or what they wanted to go back and input, why would you put maintenance work orders from 2013 into the system today?
I just don't think it would be germane to anything. Somebody called and said "I want to replace a light bulb in my room" and it was at

5 o'clock on Room 230 in 2013, I assure you we don't keep all of those records.
Q (By Mr. Campbell) Does RDA contend that there has been increased leaking at guest room windows after the storm as compared to before?
A Yes.
Q We have been provided with an Excel spreadsheet for guest room calls for window leaks, and the dates on that Excel spreadsheet began in September of 2018 and continue forward through 2019.
Does that spreadsheet give us some indication of the prevalence of guest complaints of window leaks?
A Yes.
Q Does that Excel spreadsheet give us the best evidence that we have as to the prevalence of guest complaints of window leaks during that time frame?
A I don't know how thorough or complete it is, but I think it generally would capture most of the complaints.
Q And does RDA have a record of maintenance or repair work that is done on hotel rooms specific to responding to window leaks?
A RDA -- when you're referring to RDA at



the home -- we're -- we're in Akron, Ohio. So there's -- at the property level, they do not retain all of those work orders, and we clearly do not keep those records here at our corporate offices. We do not maintain that.
Q But it's your understanding that the hotel does not maintain all of those types of work orders themselves. Is that your understanding?
A That's my understanding.
Q Does RDA have a record of window-leak-related complaints for any time period prior to September of 2018?
A No. All rooms -- all the records were at the hotel, so --
Q Well, I understand that. Were you involved in the gathering of documents that were produced in response to our discovery requests?
A No.
Q Was that all handled by Ms. Miller, to your knowledge?
A Yes.
Q Well, I'll represent to you that I haven't seen any records reflecting any spreadsheet summary or other reference to window-related leaking complaints for a time period prior to September of



2018.
Would it be your assumption, then, that those records are simply unavailable?
A I --
MR. PEIRCE: Object to form.
A Yes, that's my assumption.
Q (By Mr. Campbell) And is it your further assumption that they would be unavailable because of this changeover in the operating system that we have been discussing previously?
A I -- I'm not sure.
Q You mentioned to me a few moments ago on --
A Let me back up. Let me respond.
Q Okay.
A So prior to 2017, there was no tracking of that kind of water penetration. There might have been an isolated case here and there, but after -- after the hailstorm, then the number of complaints and the problems then started to increase, but there was no -- there was no real problem with the water penetration prior to the hailstorm.
Q How do you know that?
A Well, I guess through general



conversations when I go to the property, talking to the chief engineer and talking to the general manager, or I would see -- or I would hear guest complaints that would be passed on to me, even though they don't keep all of those records, but there were not significant work orders or indication that there was a significant problem prior to 2017.
Q You mentioned a few moments ago that from your perspective there would be no reason for RDA or the hotel to maintain past maintenance records.
Isn't this insurance claim a reason to have maintained those past records?
MR. PEIRCE: Objection, form.
A I -- I don't -- I -- I don't know that we really needed to keep -- if they were writing down every complaint and every issue -- when the -- when the problems would occur, there would be a driving rainstorm, and then the water would start to penetrate the rooms.
So there may be some additional records that would show that kind of water penetration and issues, but I mean, those -- I mean, routine maintenance calls just aren't kept. I mean, if a guest calls and said there's some water coming

in on the window sill, I don't know that we kept those records.
Q Well, you apparently kept them in some form from September 2018 forward because we have the Excel spreadsheet that reflects those complaints.
A That's when it became a bigger problem, after the -- yes, it became a bigger problem.
Q Well, September of 2018 is some 16 months after this hailstorm. So are you telling me that it was not a problem from May 2017 through September 2018?
MR. PEIRCE: Objection to form.
A It grew. As time went on, either -- and, again, I'm not an engineer; I'm not an expert, but all I can say is that if water was laying on those mullions or penetrated in thawing -- freezing-thawing contraction, et cetera, could slowly cause deterioration over a period of time.
And I think there was some issues with -- up above -- not necessarily on the sill level but up above at the top of the window where water was penetrating and was peeling, itself. The popcorn-sprayed-on ceiling, that material would fall, and the guest would point that out.



Again, I don't know what kind of complete records were kept. If we have them --
Q (By Mr. Campbell) Okay.
A -- I can share them with you, but I just don't know, off the top of my head, how detailed that was.
Again, routine -- I mean, we may get 30 calls a day. So you can't constantly -- so once the work order is completed, then somebody marks on it, "Okay, completed," the problem has been resolved, the guest needs to either move from that room because you can't resolve the problem, or it's a minor problem, then the guest says "I don't want to move," so all of that information isn't necessarily tracked, every phone call from every guest from every room.
All I can tell you is that there was more and more problems along these lines, more water penetration and more damage as time went on, and that can be a very slow process. Once the damage or the system is compromised, whether it's the butt cover or the actual mullion underneath and the water that then started to work its way in, that could take 18 months; that could take 12 months.
I've been involved with hotels all my



life, and yeah, you see these kind of things happen, and it doesn't necessarily show immediately.
You could go out on May 18 and inspect every room and not see any damage. It just takes time for those things then to bubble up to -- no pun intended -- to bubble up and start showing problems.
And then when we -- definitely when we get windstorms with rain, then the water starts to penetrate in the curtain wall, but that did not happen prior to 2017.
We had a few minor cases with water intrusion, but it was minimal. Now it's very significant.
Q Just so the record is clear, we have no written record of those window-leaking-related complaints that occurred prior to May 8 of 2017; is that correct?
MR. PEIRCE: Object to form.
A If that's what Briana testified to, then that would be the case. She would keep those records there, and I don't monitor them from back here. I -- I'm at 35,000 feet. I look at the big problems. I go to the property, "Here's an issue, Mr. A, we're having in these rooms," and then we would address it, et cetera, et cetera, and then go



from there.
Q And so you mentioned the bug covers and the damage to those as something that could lead to progressive moisture infiltration over time; is that correct?
A Again, I'm not an expert on that. I am not an engineer. I'm only conjecturing. If you want me to conjecture, I will, but I prefer not to.
Q Okay. I'm only following up on your testimony. That's the only reason I asked the question.
Are you aware that the cost to replace those bug covers on west-facing windows was included in Hudson's proof of loss back in October of 2017?
MR. PEIRCE: Objection, form, foundation.
A No, I don't -- again, I don't recall the breakdown or the specific. I just don't recall a line item that would replace bug covers in a line item.
Q (By Mr. Campbell) As of, say, August of 2019 --
A Yes.
Q -- did -- did RDA have an inventory of which of the guest rooms which it believed had

experienced some form of moisture infiltration?
A I -- I -- again, I don't want to conjecture. I don't have a specific number. I just know that there was a significant number. Whether that was 60, 70, or 80, I just don't recall.
Q Well, what would be the source of information that would allow you to have any approximation of the number of hotel rooms that had experienced water infiltration?
MR. PEIRCE: Objection to form.
A A spreadsheet from Briana. I think that was already provided, but I don't know.
Q (By Mr. Campbell) I haven't seen a spreadsheet from Briana that provides that information. Have you seen one?
A I thought you were given that, sir.
MR. PEIRCE: Objection to form.
A I believe you were, or maybe from the engineers, I don't know.
Q (By Mr. Campbell) Well, there was a spreadsheet that reflected dates beginning September 2018 forward where guests had complained of water leaking.
A Yes.
Q And I'll represent to you it was a



very small number of windows that were on that list.
A But I thought you indicated --
MR. PEIRCE: Objection, form, foundation.
A I believe that I -- I do recall you said you had that list.
Q (By Mr. Campbell) I do, but that's simply a list of complaints. It's not an inventory of all rooms in which RDA had identified any --
A I don't know that we have that -- I'm not sure that we have that complete list. I really don't.
Q Okay. So if we take August of 2019 as a snapshot in time, would RDA be in a position to say how many rooms it believed at the time had experienced water intrusion?
MR. PEIRCE: Objection, form.
A I'd have to rely on Briana. I think she provided those lists.
Q (By Mr. Campbell) Well, I guess we're starting to talk in circles. I'll tell you once again I haven't seen any such list that provides that information.
MR. PEIRCE: Objection, form.
A Well, I guess, then, we're going to



have to rely or go back to Briana and get a complete updated list.
Q (By Mr. Campbell) Well -- so it's your understanding that such a list does, in fact, exist?
A No.
Q Well, would there be any way to go back and re-create it if it doesn't already exist?
MR. PEIRCE: Objection, form.
A I don't -- I don't know. I don't know if we can put that list together. I don't know how well they're tracking that.
Q (By Mr. Campbell) Okay.
A I mean, I don't mean to be evasive. I'm just -- I think I would have to ask Briana, which I'm happy to do, but I don't have that answer for you right now.
Q Okay. Well, you know -- and I don't -- I don't mean to be coy about this. The reason I'm asking these questions is that you've expressed your understanding that there was an increase in complaints of water intrusion over time.
A That's correct.
Q And it's -- but what you've told me is anecdotal information. What I'm trying to do is



figure out if there's any way to quantify that, and so that's why I've been asking the questions.
A I appreciate that, but I -- I will try to quantify that. I would have to go back to Briana, and we will get a more complete list.
Q And I will share with you -- you may be aware of this already, that JS|Held, as part of its investigation, went into I think 71 different guest rooms and found evidence of some degree of water intrusion in 55 of them.
And so what I'm curious about is whether RDA, itself, tried to proactively come up with any sort of an inventory of rooms with moisture intrusion prior to receiving that information from JS|Held?
A Briana may have completed a list --
Q Okay.
A -- but I don't know.
Q Does RDA have plans to replace the curtain wall system?
A I'm not sure at this point.
Q One of the documents that's been provided to us is a two-page bid from Grandview Glass. It's a March 18, 2020 proposal to replace the curtain wall at a cost of a little over $10

million.
Were you aware that this proposal has been prepared by Grandview Glass?
A Yes.
Q Who solicited that proposal?
A Kevin -- I believe Kevin Aguilar.
Q Okay. And so has RDA given any consideration to performing that work following receipt of that proposal?
A We just aren't -- we're not there yet. I'm just not sure at this time.
Q When did RDA develop the impression that there was increased leaking in guest rooms because of the storm?
MR. PEIRCE: Objection, form.
A I just don't want to take a stab in the dark. I would have to do a little research. I'm not sure. I'm thinking 2018. If I have to guess, sometime in 2018.
Q (By Mr. Campbell) And is that because that's when there was enough of a prevalence of guest complaints of window leaks to make you think that there must have been some effect from the storm?
A That's probably the case.



MR. PEIRCE: Objection, form.
A Briana would pass that information on to me, yes.
Q (By Mr. Campbell) In what form would Briana pass that information on to you?
A Telephonically.
Q Would RDA be able to identify which windows on the west-facing curtain wall it contends were damaged by the May 8, 2017 hailstorm?
A There again, I would have to go back and rely on Briana. I think she would be able to -- but I don't know how detailed it was in May of 2017, but the damage has continued to -- but I don't know if there's a specific number that we had right subsequent to the hailstorm.
Q At this point in time, without doing further research, can RDA identify a single hotel room window that it considers to have been damaged as a result of the hailstorm?
MR. PEIRCE: Objection, form.
A I'm sure we have that information somewhere, yes. I'm sure we could.
Q (By Mr. Campbell) And I --
A I can't provide you that, but Briana could.



Q Okay. Let me -- let me clarify that question, because it was apparent during the early stages of the investigation that there was damage to the bug seals.
So I'll just represent to you that Hudson's proof of loss submitted to RDA included the cost to replace all the bug seals on the west side. So we can take that out of the equation.
But apart from the damage to the bug seals, as you sit here today as RDA's representative answering these questions, can RDA identify a single hotel room window that it considers to have been damaged as a result of this hailstorm?
MR. PEIRCE: Objection, form.
A I believe, yes, we can, but I can't -- specific at this time.
Q (By Mr. Campbell) Why do you believe that information would be available to Ms. Miller?
MR. PEIRCE: Objection, form.
A She's on the property. I'm 2,000 miles away.
Q (By Mr. Campbell) Right, but let's say Ms. Miller went out there and looked at a particular window assembly tomorrow and she saw some signs of deterioration of the gaskets or the window



glazing seals, do you believe Briana Miller would be able to say that that damage was due to the storm rather than some progressive wear-and-tear condition?
A No, I think --
MR. PEIRCE: Objection, form.
A Briana would say that it was a direct result on the storm, and that's her -- that's her opinion. She's not an expert, because we -- actually, we rely on our experts to advise us and tell us what damage was caused to the curtain wall as a direct result of a very significant hailstorm.
Q (By Mr. Campbell) And, Mr. Andreoli, that's a fair answer. So if you would have to rely on your experts to answer that question, I will accept that.
I just want to make sure that since this is my one opportunity to find out RDA's position --
A Uh-huh.
Q -- I'm just trying to find out whether RDA has any information as to which windows were damaged separate and apart from what its experts might testify to.
A I just -- I just don't -- I have a

general idea, but I don't have specific room numbers. I just don't know the room numbers.
Q And if I ask the same question with regard to the east-facing windows on the curtain wall, is your answer the same?
A My answer is the same.
MR. CAMPBELL: Well, I know Dianna will be disappointed if we don't ask her to reference at least one exhibit, so, Dianna, can you pull up Exhibit 121.
Q (By Mr. Campbell) Mr. Andreoli, this is the first page of a document. There are multiple pages, and we can scroll down if you want to see them, but I'm just curious if you can tell me what this document is.
A I can't see a document. All I have is -- it says: Sheraton Denver West. It says: Brand Approved (sic) Enhance -- Enhancements. I'm not seeing another document.
MR. CAMPBELL: Dianna, can you scroll down so we can see the rest of that page. Okay, and let's stop there.
A Uh-huh.
MR. CAMPBELL: And, Dianna, let's scroll down one more page and the next page, please.



Okay.
Q (By Mr. Campbell) Now that we've scrolled through a few pages, are you -- does this ring any bells? Have you seen this document before?
A Yes. Yes, I have.
Q And what is it?
A It looks like our existing guest room finishes, and it's either -- and I don't know what stage this is at. These are the things they're asking us to replace or these are the things we replaced.
So I don't know the date on this, and we're constantly doing, you know, renovations to the rooms for the franchise agreement, and these are things that we negotiate on an ongoing basis with the brand to maintain the property and keep it fresh and relevant.
So whether it's guest rooms or corridors or bathrooms, that's always ongoing, and there's always negotiations back and forth.
We submit samples. We give them a color board. We give them the different items of the carpet, et cetera.
(Sneeze.)
THE DEPONENT: Bless you.



MR. CAMPBELL: Thank you.
A So I believe that's what I'm looking at, but I don't know the date on that, so . . .
Q (By Mr. Campbell) Yeah, and I believe there's a date of 2018 on one of the pages.
A Uh-huh.
Q By recollection, do you recall that Marriott approached RDA within the last few years about doing an update of its guest rooms?
MR. PEIRCE: Objection, form.
A Yeah. Again, as I say, that's ongoing. Those aren't required. The soft rehab -- what we call the soft rehab in the rooms is not required or wasn't required for a couple of more years, and obviously that's going to be delayed.
We're in the midst of -- or we were in the midst of major renovations to the bathrooms. We were on the last leg of doing those renovations.
Q And what were those renovations to the bathrooms?
A We did the tub surrounds, the flooring, new bathroom mirror, wall covering, about $7,000 per bathroom. We were doing on a pace of 40 to 50 bathrooms per year.
Q And when did those renovations start?



A Five, six years ago. Specifically on the bathrooms, five, six years ago.
Q And prior to the shutdown for the pandemic, had RDA started doing any major renovations to the guest rooms?
A No. We had finished up the last phase of the bathrooms, and we were doing the renovations to the front entrance of the hotel, both in the pipeline and finished, but the COVID-19, and then we put all further renovations on hold.
Q Now, Mr. Andreoli, I'm well aware that RDA disagrees with Hudson Insurance Company's assessment of the scope of repair that's appropriate for the hail-related damage to the hotel.
Apart from that disagreement as to what damage occurred and what's necessary to repair it, are there any other aspects of this claim handling that you consider to have been in bad faith?
MR. PEIRCE: Objection to form.
A Well, just to be honest, we relied on our insurance company. We trusted our insurance company to do the appropriate inspections.
As I said earlier, I think that in hindsight, that could have been a mistake, but we

just didn't feel that their inspection was complete, and you would rely on your insurance company to give you a thorough overview of what they felt.

That's what they do for a living. We pay them a lot of premiums, and we would have expected that they would have done a very thorough inspection of every aspect of that property.

So unfortunately that just didn't happen, and that's unfortunately brought us to this point.

Q (By Mr. Campbell) And apart from that perception that Hudson did not perform a complete inspection, are there any other aspects of this claim handling that you consider to have been in bad faith?

A No.

MR. PEIRCE: Objection to form.

Q (By Mr. Campbell) Or to have been unreasonable?

MR. PEIRCE: Objection, form.

A Well, other than the amount that they were willing to offer us to take care of the really extensive damage that we've subsequently found to be at the property.

MR. CAMPBELL: Those are all my



questions. Thank you.

THE DEPONENT: Very good. Thank you.

MR. PEIRCE: I'll reserve ours. Thank you.

THE DEPONENT: Thank you.

THE COURT REPORTER: Gentlemen, would you like your standing orders?

MR. PEIRCE: Yes for us, and, Dianna, if you can send a copy to me to read and sign for Mr. Andreoli.

THE COURT REPORTER: Great. Thank you.

WHEREUPON, the within proceedings were concluded at 8:51 a.m. on June 26, 2020.



**I, RENNICK ANDREOLI, the deponent in the above deposition, do hereby acknowledge that I have read the foregoing transcript of my testimony and state under oath that it, together with any attached amendment to deposition pages, constitutes my sworn testimony.**

**______ I have made changes to my deposition.**

**______ I have NOT made any changes to my deposition.**

**_________________________**
**RENNICK ANDREOLI**

**Subscribed and sworn or affirmed before me this ______ day of ____________, 20___.**

**_________________________**
**Notary Public**
**Commission expires: ____________**



**REPORTER'S CERTIFICATE**

**STATE OF COLORADO )**
**) ss.**
**COUNTY OF DENVER )**

**I, DIANNA L. BUCKSTEIN, a Registered Professional Reporter and Notary Public, ID 19974020573, within and for the State of Colorado, do hereby certify that previous to the commencement of the examination, the deponent verbally declared her testimony in this matter was under the penalty of perjury; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.**

**I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.**

**IN WITNESS WHEREOF, I have affixed my signature this 1st day of July, 2020.**

**My commission expires November 25, 2021.**

**Dianna L. Buckstein, RPR**
**Concise Legal Reporting, Inc.**
**P.O. Box 27523**
**Denver, Colorado 80227**

Concise Legal Reporting, Inc.
P.O. Box 27523
Denver, Colorado 80227
720-556-1109

July 1, 2020

Hossley & Embry, LLP
Christopher P. Peirce, Esq.
100 Fillmore Street
5th Floor
Denver, Colorado 80206

Re: 30(b)(6) deposition of RDA HOTEL MANAGEMENT
Deponent: RENNICK ANDREOLI
RDA Hotel Management Company v. Hudson
Specialty Insurance Company
Case No. 1:19-CV-2145-DDD-NYW

Dear Mr. Peirce:

Enclosed please find the original amendment sheet and deponent's certificate for the above deposition. It was agreed you would arrange for signature by the deponent with your copy of the transcript. After the amendment sheet and deponent's certificate are signed, please have both notarized and return to the deposing attorney within 35 days. Please forward copies to counsel of record and Concise Legal Reporting, Inc.

Thank you for your prompt attention to this matter.

Original transcript filed with Colin Campbell, Esq., on July 1, 2020.

Sincerely,

Dianna L. Buckstein, RPR
Concise Legal Reporting, Inc.
cc: All counsel



- AMENDMENT SHEET -

Deponent: RENNICK ANDREOLI
Date of Deposition: June 26, 2020

Case: RDA Hotel Management Company v. Hudson Specialty Insurance Company

The deponent wishes to make the following changes in the testimony as originally given:

| Page | Line | Change | Reason |
|---|---|---|---|
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |
| ____ | ____ | ______________________ | __________________ |

Signature of Deponent: _________________________

Subscribed and sworn to before me this ____ day of ___________, 2020.

Notary's signature _____________________
Notary's Address_______________________
My commission expires___________________

**A**

**a.m** 1:21 52:4,4 78:14
**ability** 55:3
**able** 23:25 26:6 44:5,8 50:16 70:7,11 72:2
**accept** 72:16
**access** 45:10 48:19
**accomplished** 17:11
**account** 33:4,7,8 33:13 34:2,3,5 34:13 55:5
**accounting** 21:11
**accounts** 33:5
**accurate** 19:21 20:13 22:23
**acknowledge** 4:6,9 30:17 79:2
**actual** 62:22
**additional** 13:10 60:21
**address** 63:25 82:24
**addressed** 44:24
**addressing** 18:25
**adjuster** 6:24 7:10
**administered** 4:10
**advise** 72:10
**affirmed** 79:14
**affixed** 80:13
**aforesaid** 80:8
**aftermath** 42:11
**ago** 48:2,3 59:12 60:8 76:1,2
**agree** 4:18,20,22 13:1 35:20 42:10
**agreed** 81:12
**agreement** 4:15 4:16 74:14
**Aguilar** 7:10 15:14,25 16:5 17:2,4,7 41:22 69:6
**Aguilar's** 8:2
**ahead** 54:15
**Akron** 58:1
**allegation** 28:18 29:16,20 30:18
**alleged** 28:14 30:25
**allow** 65:7
**amendment** 79:5 81:11,14 82:1
**amount** 31:11 77:21
**analysis** 13:3
**Andreoli** 1:7,19 3:4 4:17 5:7,8 43:20 52:5,13 72:13 73:11 76:11 78:10 79:1,11 81:8 82:2
**anecdotal** 67:25
**annual** 39:12 49:8,13,23 50:1
**answer** 8:8 12:6 23:7 24:2,11 24:14,18,19 26:4 30:23 31:9 32:18,19 36:19 67:16 72:14,15 73:5 73:6
**answering** 10:5 71:11
**answers** 5:13
**anticipated** 16:24
**anybody** 40:15
**anyway** 24:8
**apart** 71:9 72:23 76:15 77:11
**apparent** 71:2
**apparently** 61:3
**APPEARANC...** 2:1
**appearing** 1:24
**appreciate** 68:3
**apprise** 11:24 12:10
**approached** 75:8
**appropriate** 36:11 76:13,23
**Approval** 3:11
**Approved** 73:18
**approximately** 6:12 41:23 48:1
**approximation** 65:8
**April** 7:9 8:2
**area** 21:25 22:21 23:16 25:3,10 49:25
**areas** 9:6 16:20 54:19
**arrange** 81:12
**arrangement** 4:13
**ascertain** 43:9
**ascertained** 13:25 38:10
**asked** 7:10 64:10 80:9
**asking** 5:8 10:6 17:1 22:13 30:17 42:15 67:20 68:2 74:10
**aspect** 11:9 77:7
**aspects** 8:24 12:15 76:17 77:13
**assembly** 71:24
**assess** 39:19
**assessed** 37:15
**assessment** 44:25 76:13
**assessments** 39:5,8
**assigned** 6:23
**assignment** 28:6 28:10
**assimilate** 56:17
**assistant** 51:19
**assume** 6:3
**assumption** 59:2 59:6,8
**assure** 37:12 57:1
**attached** 79:4
**attempt** 12:10
**attention** 27:13 81:17
**attorney** 81:15
**attorneys** 4:5 18:20
**August** 7:21 33:2 34:24 35:24 51:9 64:21 66:13
**availability** 45:9
**available** 47:25 48:20 71:18
**aware** 11:18 14:13,16 19:8 19:12 20:9 29:16 35:14 41:1,4 42:8,11 50:13 51:11 55:19 64:12 68:7 69:2 76:11

**B**

**back** 11:4,20 19:10,19 20:16 21:3,8 24:14 25:11 27:4,14 30:13 31:20 35:16,21 38:21 50:6 54:10 55:18 56:9,20 59:14 63:21 64:14 67:1,8 68:4 70:10 74:20
**bad** 76:18 77:14
**ballast** 38:4
**ballasted** 38:22
**bank** 33:3
**based** 31:12 32:4 32:11 33:15 39:12
**basic** 6:14
**basically** 9:2 22:20 47:12
**basis** 39:12 45:13,18,25 50:12 51:20 54:22 74:15
**bathroom** 45:16 75:22,23
**bathrooms** 74:19 75:17,20 75:24 76:2,7
**began** 57:9
**beginning** 33:17 50:10 65:21
**behalf** 2:2,7 5:13 18:23 27:23
**behoove** 37:3
**behooved** 38:12
**belief** 10:10
**believe** 8:14,19 8:21 9:7 10:9 11:6 12:21 13:20 14:25 15:3 16:11 20:1 28:1,4,8 31:2 53:20 54:4 65:18 66:5 69:6 71:15,17 72:1 75:2,4
**believed** 64:25 66:15

**bells** 74:4
**belonged** 55:25
**benefits** 32:13 32:21 33:1
**best** 7:3 20:12 22:2 40:6 43:8 44:9 57:16
**better** 26:9
**beyond** 44:7
**bid** 26:21 68:23
**bids** 37:15
**big** 17:3 63:22
**bigger** 13:18 61:6,7
**Bill** 6:24 27:20
**Bless** 74:25
**board** 74:22
**Bonvoy** 49:12
**boots-on-the-g...** 27:21
**bought** 46:18 48:1 56:15
**Box** 80:22 81:1
**brand** 3:11 33:18 39:13 49:7,15 73:18 74:16
**brands** 56:16
**break** 51:23
**breakdown** 64:18
**Bresnahan** 28:21 41:10,17
**Briana** 28:20 40:16 41:16,20 41:25 43:9 47:7,9 48:24 51:18 53:24 54:16 63:19 65:11,14 66:18 67:1,15 68:5 68:16 70:2,5 70:11,24 72:1 72:7
**bring** 55:17
**broad** 42:17
**broadly** 22:13
**broken** 36:2,3
**brought** 77:9
**bubble** 63:5,6
**bucket** 39:11
**Buckstein** 1:22 80:4,21 81:21
**budgeting** 33:16
**bug** 64:2,13,19 71:4,7,9
**building** 24:22 40:2
**bulb** 56:25
**burning** 38:24
**business** 5:23,24
**busy** 45:19
**butt** 62:21

**C**

**C** 2:9 4:1
**calculations** 31:12
**calendar** 33:25
**call** 27:4 28:12 45:14 49:10 62:15 75:13
**called** 1:19 56:24
**calling** 42:22
**calls** 57:8 60:24 60:25 62:8
**camera** 4:25
**Campbell** 2:8,9 3:6 4:19,19 5:4 8:7,15,23 9:6 10:17 11:2 12:4,6,24 13:8 14:2,9 15:2,9 17:24 18:12,19 19:8,18,22 20:5,14 21:7 23:8,25 24:10 25:9,24 26:5 26:14 29:12 30:6,10,21,24 31:10 32:11,17 32:25 35:13 36:9,16,20 39:25 41:15 42:6 43:20 44:11,22 45:4 49:2 51:22 52:2,5,10 54:12 56:4 57:3 59:7 62:3 64:21 65:13,20 66:7,20 67:3 67:13 69:20 70:4,23 71:17 71:22 72:13 73:7,11,20,24 74:2 75:1,4 77:11,18,25 81:18
**capital** 21:4,8 37:21
**capitalize** 21:12
**capture** 57:20
**care** 77:22
**careful** 36:4,8
**Carl** 17:9,25
**carpet** 74:23
**case** 1:3 29:11 54:5 59:18 63:20 69:25 81:9 82:3
**cases** 63:11
**catch** 8:8 9:24 24:10 25:1
**categorized** 39:10
**caught** 13:20
**cause** 61:18
**caused** 72:11
**cc** 81:23
**ceiling** 45:16 61:24
**certain** 6:14 13:18 28:15
**certainly** 37:3
**certificate** 80:1 81:12,14
**certify** 80:6,11
**cetera** 9:17,18 9:18 16:20 22:7,7 39:15 39:15 45:13 49:12 55:19 56:18 61:18 63:25,25 74:23
**challenge** 30:13
**Change** 82:6
**changed** 53:2
**changeover** 52:14,22 53:10 53:18,23 54:2 55:25 59:9
**changes** 39:16 79:8,9 82:4
**charged** 43:4
**check** 7:23
**chemicals** 38:7
**chief** 40:2 50:23 60:2
**choice** 19:23
**choose** 19:18
**chose** 23:17 24:15
**chosen** 25:2,4
**Chris** 4:21
**Christopher** 2:4 81:5
**circles** 66:21
**circumstances** 26:9
**city** 50:22,25
**Civil** 1:18
**claim** 6:19 7:7 7:11 12:11,16 12:20 29:8,13 29:21 31:3,16 32:6,10 43:19 60:12 76:17 77:14
**claims** 11:22 30:16
**clarification** 18:7 53:8
**clarified** 18:1
**clarify** 8:23 52:16 71:1
**clarity** 9:13
**cleanliness** 49:25
**clear** 63:14
**clearly** 21:13 58:3
**closed** 36:7,10
**clue** 44:20,21
**coating** 38:23
**coincidental** 25:25
**Colin** 2:9 4:19 18:17 23:23 24:19 36:13 81:18
**collect** 36:24
**color** 74:22
**Colorado** 1:2,17 1:24,25 2:6,10 80:2,5,23 81:2 81:6
**come** 24:20,25 26:22 37:9 49:8 68:12
**comes** 13:9 31:6 47:14
**coming** 23:19 60:25
**commencement** 80:6
**commencing** 1:21
**comment** 18:21 28:12
**commission** 79:20 80:15 82:24
**communication** 40:11
**communicatio...** 28:20,23
**companies** 7:18
**company** 1:6,10

1:11,14 3:3 5:11,19 9:21 16:10 27:23 30:3 43:1,14 76:22,23 77:2 81:8,9 82:3,3
**Company's** 76:12
**compared** 57:5
**complained** 65:22
**complaint** 29:17 30:18 60:17
**complaints** 57:12,17,21 58:11,25 59:20 60:4 61:5 63:16 66:8 67:22 69:22
**complete** 8:22 9:21 25:2 28:19 30:3 43:2,16 47:13 57:19 62:2 66:11 67:1 68:5 77:1,12
**completed** 28:9 47:1,17,20 62:9,10 68:16
**completely** 38:16
**complies** 5:1
**compromised** 62:21
**concern** 30:2
**concerned** 13:9
**concerning** 5:9 13:21 16:1 40:12
**concert** 38:13
**Concise** 80:22 81:1,15,22
**concluded** 78:14
**conclusion** 14:25 15:3,11 31:15
**conclusions** 13:2 16:1
**condition** 72:4
**conditions** 49:15 49:25
**conducted** 14:17 19:14 21:24 26:18 27:22 28:1 36:11 39:4,7
**CONFEREN...** 1:5
**confident** 21:17
**conjecture** 64:8 65:3
**conjecturing** 64:7
**consent** 4:13
**consider** 7:25 8:10,15,25 13:2,13,14 17:15 29:6,12 30:15 44:24 76:18 77:14
**consideration** 69:8
**considers** 70:18 71:12
**consistent** 7:1,12
**constantly** 37:18 62:8 74:13
**constitutes** 79:5
**constraints** 51:15
**consultant** 15:16
**consulted** 43:21
**contact** 16:17
**contend** 57:3
**contends** 70:8
**context** 6:15
**continue** 21:19 57:10
**continued** 8:20 15:6 27:2,11 70:13
**contraction** 61:18
**contractor** 19:13 21:15 47:14
**contractors** 48:22
**control** 54:24 55:12
**conversation** 17:12 40:19,21
**conversations** 17:2 60:1
**copies** 81:15
**copy** 78:9 81:13
**corporate** 6:7,11 58:4
**correct** 5:16,24 6:2,5,6,17,18 6:22 7:4,8,14 7:19,24 11:8 17:21 19:21 21:22 26:18 27:17,24 30:21 31:3,13 32:24 34:16,17,25 46:7 51:17 52:25 56:6 63:17 64:5 67:23
**correctly** 5:22
**correlation** 26:3
**corridors** 74:19
**cost** 11:3,18 22:22 34:23 39:21 64:12 68:25 71:7
**counsel** 4:12,19 4:21 80:11 81:15,23
**County** 1:21,25 80:3
**couple** 15:15 36:3,7 75:14
**course** 22:4
**court** 1:1 3:13 4:3,5,23 5:2 9:12 23:18,21 24:3,12,16 35:4 41:11 48:17 78:6,11
**cover** 10:1,1 11:12 12:21 62:22
**coverage** 9:18
**covered** 32:13 32:21
**covering** 75:22
**covers** 42:9,19 64:2,13,19
**COVID-19** 36:21 76:9
**coy** 67:19
**Craig** 20:5 43:7 43:22
**crane** 38:11
**create** 47:10 48:4,21
**cropped** 37:18
**crown** 47:18
**curious** 68:11 73:14
**currently** 35:10 36:5
**curtain** 9:10 63:9 68:20,25 70:8 72:11 73:4
**cut** 23:19,24 24:2,13,16
**cutting** 24:4

**D**

**D** 3:1 4:1
**damage** 5:11 8:21 9:4,7,17 9:19 10:3,11 10:24 11:7 12:22 13:10,19 13:22 14:1,22 15:6,8,11 16:2 16:8,19,23 17:4,15,20 18:2,25 27:23 29:23 30:1 31:8,13,17,24 35:8,24 41:2,6 41:21 42:8,11 42:21,24 43:9 43:12,18,25 44:5,6,12 62:19,20 63:4 64:3 70:13 71:3,9 72:2,11 76:14,16 77:23
**damaged** 9:16 70:9,18 71:13 72:23
**damages** 17:2 31:17,22
**dark** 69:17
**dashing** 24:4
**data** 55:13 56:9
**date** 29:5 53:21 74:12 75:3,5 82:2
**dates** 22:6,13 57:9 65:21
**day** 51:3 62:8 79:15 80:14 82:21
**day-to-day** 43:5 54:22
**days** 25:19 26:1 26:24 81:15
**deals** 54:18
**Dear** 81:10
**decided** 38:11 43:18
**decision** 37:16 40:12
**declare** 4:11
**declared** 80:6
**deep** 50:11
**Defendant** 1:15 1:20 2:7
**defer** 30:22
**definitely** 63:7
**degree** 68:9
**delayed** 28:15

29:7 37:7 75:15
**Denver** 1:25 2:6 3:12 33:7 45:6 50:21 51:1 73:17 80:3,23 81:2,6
**depending** 26:20 45:9
**deponent** 1:7 3:4 4:17,23 5:1 24:17 52:1 74:25 78:2,5 79:1 80:6 81:8 81:13 82:2,4 82:20
**deponent's** 81:12,14
**deposing** 81:15
**deposition** 1:5 1:18 3:3 4:2,6 4:7,8 12:1,12 18:1 20:6 40:1 50:10 52:21 79:2,5,8,9 80:7 81:7,12 82:2
**Describe** 45:8
**described** 18:13 19:4 20:6 30:11 50:11 51:8,16
**despite** 12:14
**detail** 28:24,25
**detailed** 16:13 16:19 45:23 48:24 62:6 70:12
**details** 11:23,25 12:11,15 23:4
**deterioration** 38:8 61:19 71:25
**determine** 21:12 23:15 49:11
**determined** 33:16
**develop** 69:12
**developed** 39:2
**Dianna** 1:22 24:10 73:7,9 73:20,24 78:8 80:4,21 81:21
**dictate** 56:5
**different** 7:17 10:21,22,23 15:20 16:15,20 23:6 42:16 46:13 54:19 56:17 68:8 74:22
**differently** 32:2
**difficult** 10:20 22:9 27:5 45:18
**dinged** 9:11 42:20
**direct** 72:7,12
**directly** 54:16 54:18
**disagree** 15:5,10 18:14 44:25
**disagreement** 76:15
**disagrees** 76:12
**disappointed** 73:8
**discovered** 29:25
**discovery** 52:20 53:20 58:17
**discussed** 17:10
**discussing** 59:10
**discussions** 16:5 17:3,6
**DISTRICT** 1:1 1:2
**document** 73:12 73:15,16,19 74:4
**documentation** 20:15,19,20,24
**documents** 58:16 68:22
**doing** 15:15,23 16:14 41:23 43:8 51:11 70:16 74:13 75:9,18,23 76:4,7
**dollar** 37:2
**dollars** 36:5,23 37:20
**dome** 11:14,19 34:15,18 37:4
**doubts** 51:13
**download** 55:14
**downloaded** 54:3
**draw** 33:15 34:7
**driving** 60:19
**DTC** 2:9
**due** 25:3 72:2
**Dvorchak** 2:8

**E**

**E** 3:1 4:1,1
**e-mail** 28:20,22
**earlier** 11:22 20:6 76:24
**early** 71:2
**earmarked** 33:14
**east-facing** 73:4
**effect** 69:23
**eight** 10:2
**either** 20:21 61:14 62:11 74:8
**electronically** 3:13 4:3
**Embry** 2:3,4 81:4
**emphatically** 29:10
**employed** 80:11
**employees** 6:3 6:10 17:14 40:23
**Enclosed** 81:11
**engineer** 18:20 40:2 42:1,3 45:12 50:20,23 60:2 61:15 64:7
**engineering** 7:17 7:18,22 14:4 18:21 25:20
**engineers** 16:15 16:16 50:24 65:19
**Enhance** 73:18
**Enhancements** 3:11 73:18
**entered** 55:16
**entirely** 17:18
**entrance** 9:15,16 76:8
**EPDM** 14:4,23 15:11 17:4,15 17:20 18:3 19:9 38:4
**equation** 71:8
**equipment** 38:6 41:2 42:1,9,16 42:18,23 44:13
**Esq** 2:4,4,9 81:5 81:18
**essence** 29:24
**establishing** 6:13
**et** 9:17,18,18 16:20 22:7,7 39:15,15 45:12 49:12 55:18 56:18 61:18 63:25,25 74:23
**evaluation** 14:17 27:22 28:16 29:2
**evasive** 67:14
**eventually** 39:21
**everybody** 51:24
**evidence** 14:22 57:16 68:9
**exact** 22:6
**exactly** 21:6 27:6,7
**examination** 3:5 5:3 80:6
**exceeded** 32:21
**Excel** 57:7,9,15 61:5
**Excuse** 31:20
**exhibit** 3:11 4:2 73:9,10
**Exhibits** 3:10,13
**exist** 67:5,8
**existed** 55:24
**existing** 53:15 54:2 74:7
**exit** 40:24
**expand** 31:14
**expectation** 53:25 54:1 55:2
**expected** 77:6
**expenditures** 21:4,8
**expense** 21:12
**expenses** 21:13
**experienced** 65:1,9 66:16
**expert** 18:24 61:15 64:6 72:9
**experts** 15:5,9 15:21 17:19 72:10,15,23
**experts'** 22:19
**expires** 79:20 80:15 82:24
**explain** 26:6 55:11
**explained** 44:23
**explanation** 44:13
**expressed** 13:12 67:21
**extensive** 9:4,17 25:4 42:25

43:13 47:3 77:23
**extent** 16:2,18 17:4 31:22 41:21 42:4 44:11 50:2
**exterior** 9:11,14

**F**

**fact** 11:3 14:3 20:24 21:5 25:3 31:6 67:4
**factual** 31:1
**failing** 49:25
**fair** 13:4,15 17:23 22:11 32:6 72:14
**fairly** 24:1
**faith** 76:19 77:15
**fall** 61:25
**familiar** 11:21 11:22 14:2,7 15:19,21,22 28:25 40:23 41:21 44:6 54:23 55:15
**fans** 9:17 42:19 42:20,23
**far** 9:4 13:23 16:8 31:18 38:15 44:6 55:18 56:8
**Fargo** 34:6
**feedback** 49:11
**feel** 13:17 31:22 32:5 77:1
**feet** 63:22
**felt** 77:3
**figure** 68:1
**file** 35:22
**filed** 81:18
**files** 22:19
**filing** 31:16 32:10
**filled** 46:21
**Fillmore** 2:5 81:5
**final** 7:1
**finally** 7:20
**financially** 39:21
**find** 8:20 50:22 72:18,21 81:11
**findings** 46:5
**fine** 23:21,23
**finger** 27:6
**finish** 41:15
**finished** 76:6,9
**finishes** 74:8
**fires** 51:3
**first** 14:10 18:6 26:21 27:14 73:12
**five** 5:25 6:4 37:17 48:2,2,9 50:7 76:1,2
**five-** 51:23
**fix** 24:23 25:1,6 25:18 37:13
**fixed** 25:13,15 27:9,10
**floor** 2:5 38:2,6 81:6
**flooring** 75:22
**focus** 9:3
**focused** 13:18 30:14
**followed** 50:16
**following** 6:15 25:11 64:9 69:8 82:4
**follows** 24:15
**foreclosed** 36:25
**foregoing** 79:3 80:9
**forensic** 7:17 18:20
**forget** 56:12
**form** 8:6,13,18 9:1,9 10:15 12:2,5,19 13:6 13:16 14:6,24 15:4 17:22 18:10,15 19:5 19:15,20,25 20:10,21 21:1 23:2,11 25:22 26:11 29:9 30:20 31:4 32:7,16,23 35:6 36:1,13 36:18 39:23 41:13,18 42:13 44:2,18 45:1 46:8,13,14,14 46:16 47:25 48:3,4 54:7 55:4 56:3,7 59:5 60:14 61:4,13 63:18 64:15 65:1,10 65:17 66:3,17 66:24 67:9 69:15 70:1,4 70:20 71:14,19 72:6 75:10 76:20 77:17,20 80:9
**forms** 46:15,21 47:5,10
**forth** 74:20
**forward** 55:17 57:10 61:4 65:22 81:15
**found** 14:22 15:6 38:6 68:9 77:23
**foundation** 18:11,16 19:16 20:11 21:2 23:3,12 25:23 26:12 41:14,19 42:14 44:3,19 45:2 64:16 66:4
**four** 48:2,2 50:7
**frame** 57:18
**framing** 9:15
**franchise** 74:14
**Frazier** 2:8
**freezing-** 61:17
**frequently** 46:1
**fresh** 74:16
**Friday** 1:20
**front** 45:12 51:19 76:8
**full** 35:7
**full-roof** 19:13
**fully** 28:17 42:8
**function** 48:19
**funds** 34:7
**further** 4:9 8:20 14:17 21:24 59:8 70:17 76:10 80:11

**G**

**G** 4:1
**gaskets** 71:25
**gathering** 58:16
**general** 29:5 42:17 43:4 45:12 47:1 59:25 60:2 73:1
**generalities** 40:20
**generally** 57:20
**gentleman** 17:13
**Gentlemen** 78:6
**germane** 56:23
**getting** 48:22
**give** 24:17 47:13 57:11,15 74:21 74:22 77:2
**given** 28:6 65:16 69:7 80:9 82:5
**giving** 16:18 26:9
**glass** 9:15 68:24 69:3
**glazing** 72:1
**go** 21:3 23:5 24:20,25 25:7 33:22,24 35:10 35:21 37:3 42:20 45:11,13 45:21 46:24 47:12 48:5 54:10,15 56:20 60:1 63:3,23 63:25 67:1,7 68:4 70:10
**goes** 33:12 54:22
**going** 5:8 13:1 21:8 37:8,17 50:6 52:11 53:7 56:10 66:25 75:15
**good** 5:5 23:7 27:8 78:2
**government-is...** 4:24
**Grandview** 68:23 69:3
**great** 28:24 52:2 78:11
**greater** 13:23 16:8
**Greenwood** 2:10
**grew** 61:14
**gross** 33:11
**group** 15:21
**guess** 31:5,14 32:8 41:3 53:19 59:25 66:20,25 69:19
**guest** 45:5 46:2 48:7,10 49:4 49:10,11 50:12 57:4,8,12,17 60:3,25 61:25 62:11,13,16 64:25 68:9 69:13,22 74:7 74:18 75:9 76:5
**guests** 65:22

**H**

**Haag** 7:18,22 14:3 18:21 25:20
**hail** 5:11 10:4 14:22 15:8,11 16:2 17:15,20 18:2 27:23 41:1 42:8
**hail-related** 35:18,24 76:14
**hailstorm** 5:12 6:16 14:12 25:11 27:11 42:12 59:19,23 61:10 70:9,15 70:19 71:13 72:12
**half** 33:23
**handle** 29:8
**handled** 58:19
**handling** 76:18 77:14
**happen** 9:22 24:24 63:1,10 77:9
**happened** 21:5 27:7 35:16
**happy** 67:16
**hard** 23:14 50:22
**head** 62:5
**hear** 23:20,23,24 23:25 48:17 60:3
**heard** 18:6
**hearing** 24:7
**held** 34:5 47:2,7 47:21
**Hilton** 46:14
**hindsight** 9:23 30:4 76:25
**hired** 18:20
**history** 36:17
**hit** 45:14 51:17
**hit-and-miss** 51:20
**hold** 34:7 36:23 37:8 47:19 49:17 76:10
**holding** 4:25
**holds** 9:15
**home** 58:1
**honest** 19:7 76:21
**honestly** 18:17
**Hossley** 2:3 81:4
**hotel** 1:5,10,10 1:19 3:3 5:18 14:4 16:2,20 33:7 34:3,6,11 36:6,10,17 37:5,24 39:5,8 40:16 43:5 45:6 48:8 51:7 53:5,6,11,12 53:14 55:3 57:23 58:7,14 60:10 65:8 70:17 71:12 76:8,14 81:7,8 82:3
**hotel's** 49:4
**hotels** 5:23 22:8 50:25 62:25
**housekeeping** 47:2
**Hudson** 1:14 4:20 5:10 6:20 6:23 7:11,21 8:10 11:3,10 11:18 12:16,23 27:23 28:14 29:13 30:16 31:2 33:1 35:18 44:17 76:12 77:12 81:8 82:3
**Hudson's** 64:14 71:6
**hundred** 22:3

**I**

**ID** 80:5
**idea** 23:5 29:5 42:5 43:13 47:4,7 49:1 73:1
**identification** 4:24
**identified** 10:11 10:18,19 17:14 25:10 31:13 66:9
**identify** 17:20 70:7,17 71:11
**imagine** 46:23
**immediate** 42:11
**immediately** 25:11 63:2
**impression** 69:12
**inaudible** 9:23
**include** 41:6
**included** 11:3,18 12:16 34:23 44:14 64:13 71:6
**including** 7:18 45:11
**increase** 59:21 67:22
**increased** 57:4 69:13
**independent** 6:23
**indicate** 4:15
**indicated** 53:21 66:2
**indication** 57:12 60:6
**individual** 37:14
**infiltration** 64:4 65:1,9
**information** 32:4,12 43:15 48:15,16 49:2 53:3 55:13 62:14 65:7,15 66:23 67:25 68:14 70:2,5 70:21 71:18 72:22
**informed** 29:22 40:1
**initial** 3:10 9:7
**initially** 9:5,20 16:9
**input** 56:20
**inspect** 48:12 63:3
**inspected** 14:4 14:14 28:5
**inspection** 8:16 8:22 9:22 10:7 10:25 12:23 13:9,13 15:7 16:22 26:1 28:1 30:4 43:2 43:7,16 46:5 46:10 47:5,25 49:13 50:12 77:1,7,13
**inspections** 8:12 10:21 15:15,22 15:23 16:11,14 41:24 46:2 48:14 49:9,23 51:10 76:23
**installed** 37:23
**instituted** 50:10 50:14
**insurance** 1:14 4:20 5:10 6:19 6:20 7:7 9:21 16:10 27:23 30:3 33:1 43:1 43:14 44:17 60:12 76:12,22 76:22 77:2 81:9 82:3
**intended** 63:6
**interested** 80:12
**interior** 3:11 24:22 27:10
**internally** 49:7
**Interruption** 9:12
**interview** 40:24
**introduced** 4:3
**intrusion** 63:12 66:16 67:22 68:10,14
**inventory** 64:24 66:8 68:13
**investigation** 6:25 8:24 9:8 27:15,22 28:9 28:16 68:8 71:3
**invoice** 20:21 21:16 22:19 26:13,16,22 27:3
**invoices** 26:17 34:8
**involved** 6:24 50:8 54:21 58:16 62:25
**involvement** 19:3
**involving** 7:17
**isolated** 59:18
**issue** 6:16 60:17 63:23
**issued** 18:22
**issues** 15:7 24:7 60:23 61:20
**item** 21:12 64:19 64:20
**items** 13:18 35:18 37:19 41:7,16 43:22 44:16 46:6,25 74:22

**J**

**Jeffrey** 2:4
**job** 47:15
**John** 28:21

41:17
**JS|Held** 7:18,22 9:7 18:22 25:20 68:7,15
**JS|Held's** 8:16 10:7,25 12:25 13:1,3,9,13
**judicious** 37:1
**July** 80:14 81:3 81:18
**June** 1:8,20 7:15 7:25 8:11,16 10:7 12:25 13:13 14:11,18 22:1,17,22 25:19 40:3 78:14 82:2

**K**

**keep** 10:22 22:8 37:22 47:16 50:24 51:3,4 57:2 58:3 60:5 60:16 63:20 74:16
**kept** 56:19 60:24 61:1,3 62:2
**Kevin** 7:10 15:13 16:17 41:22 69:6,6
**Kevin's** 16:13
**kind** 16:23 43:12 44:7 45:22 59:17 60:22 62:1 63:1
**kindly** 4:24
**knew** 31:18 42:24
**know** 9:20 10:20 11:7 13:5,7 15:20 16:16 18:18 23:13,14 24:8,23,25 26:3 28:12,13 31:21 33:20 35:22 40:23 42:4,17,24,25 43:6 45:22 47:2,21,22,23 48:2 53:22 54:8,9,11,25 55:6,18,18 56:8,9,10,13 57:19 59:24 60:15 61:1 62:1,5 65:4,12 65:19 66:10 67:10,10,11,18 68:18 70:12,13 73:2,7 74:8,12 74:13 75:3
**knowledge** 35:17 58:20
**known** 32:4,12
**knows** 26:24

**L**

**L** 1:22 80:4,21 81:21
**lag** 26:20
**laid** 46:12
**LAKEWOOD** 1:10
**larger** 13:10 20:7
**lately** 49:18
**lawsuit** 5:10 35:3
**lawyer** 30:22
**laying** 61:16
**lead** 64:3
**leak** 22:25 23:10 23:17 24:21,23 25:1,6,9,12 27:2
**leak-related** 58:11
**leakage** 38:8
**leaking** 23:13,16 24:21 25:7 35:11,12 37:4 39:1 57:4 58:24 65:23 69:13
**leaks** 20:2 23:15 24:20 27:3,9 27:12 57:8,13 57:17,24 69:22
**left** 51:15
**leg** 75:18
**legal** 30:25 80:22 81:1,16 81:22
**lender** 33:9
**lenders** 39:14
**let's** 71:22 73:22 73:24
**level** 19:10 53:12 58:2 61:22
**lieu** 4:9
**life** 39:20 63:1
**lifting** 38:11
**light** 56:25
**lights** 37:22
**limit** 51:6
**limited** 37:20 44:7
**line** 6:14 7:21 10:20,23 29:5 64:19,19 82:6
**lines** 15:19 62:18
**list** 41:7,16 43:22 44:16 47:14 48:21 66:1,6,8,11,22 67:2,4,11 68:5 68:16
**lists** 47:13 48:24 66:19
**litigation** 34:21 37:8 80:12
**little** 32:2 68:25 69:17
**living** 77:4
**LLC** 2:8
**LLP** 2:3 81:4
**load** 54:10
**lobby** 22:1,21,25 24:22 25:10 37:12
**locations** 6:4
**long** 5:20 46:23 47:5,10,24 48:6
**look** 35:22 37:15 41:25 45:14,22 49:15 63:22
**looked** 71:23
**looking** 51:1 75:2
**looks** 74:7
**loss** 7:1 11:4,19 12:17 64:14 71:6
**lost** 55:7,10 56:11
**lot** 9:19 13:19 16:23 22:4 28:24 43:14 77:5
**low** 50:21
**lump** 39:10

**M**

**machine** 80:8
**madam** 23:21
**magnitude** 22:5
**main** 9:14,16
**maintain** 33:6 34:1 37:11 48:10 49:14 58:5,7 60:10 74:16
**maintained** 51:14 60:13
**maintenance** 33:19 36:16 42:2 45:5 48:7 49:3 50:14,19 51:1 54:2 55:4 55:20,23,24 56:6,21 57:23 60:10,24
**major** 75:17 76:4
**man** 42:2
**managed** 34:4
**management** 1:6 1:10,19 3:3 5:14,19,23 6:1 54:20 81:7,8 82:3
**Management's** 5:10
**manager** 43:4 45:12,12 51:19 60:3
**manner** 4:14
**March** 18:23 36:6 49:20 68:24
**marks** 62:9
**Marriott** 33:17 46:14,17,18,20 47:24 48:1 49:4,12,13,22 50:2,3,8 52:18 53:2,4,12 54:9 54:13,17,19,24 55:12 56:4,15 75:8
**Martin** 17:9,10 18:12,14,18,18 18:22
**Martin's** 17:25 18:7 19:3
**material** 38:23 61:24
**matter** 4:11 24:24 80:7 81:17
**Matthew** 14:3
**mean** 13:8 15:5 15:13 26:19,20 30:1 32:8 35:1 36:14 47:12,15 47:17 52:18,19 54:8,14,24 55:11 56:11 60:23,23,24

62:7 67:14,14 67:19
**means** 1:22
**mechanical** 38:5 41:2 42:9,16 42:18,23 44:13
**members** 49:12
**membrane** 17:16 18:3 38:4
**mentioned** 59:12 60:8 64:2
**metal** 42:9
**mezzanine** 18:5 19:9 20:8 21:25 27:9 38:1,15
**microphone** 23:22
**midst** 75:16,17
**miles** 71:21
**Miller** 28:21 40:16 41:9,16 43:21 53:17 58:19 71:18,23 72:1
**Miller's** 52:21
**million** 33:12,23 69:1
**minimal** 63:12
**minimize** 51:4
**minor** 20:1 38:24 62:13 63:11
**mirror** 75:22
**misnomer** 42:2
**missed** 9:7 11:10 13:17
**Missouri** 18:20
**mistake** 9:23 30:5 76:25
**moisture** 64:4 65:1 68:13
**molding** 47:18
**moments** 59:12 60:8
**money** 31:11 34:9,24 35:13 39:11 43:14
**monitor** 49:9 63:21
**month** 14:11 22:7 33:9
**monthly** 39:17
**months** 7:9 10:2 16:22 33:10 36:7 61:10 62:24,24
**morning** 5:5,9 5:13
**morning's** 12:12
**mortgage** 36:25
**move** 23:15 25:7 62:11,14
**moving** 22:3 39:16
**mullion** 62:22
**mullions** 61:17
**multiple** 73:12

**N**

**N** 3:1 4:1
**name** 4:16 5:6
**narrow** 9:3
**narrowly** 30:14
**nature** 38:19
**necessarily** 26:19 33:14 43:6 61:21 62:15 63:2
**necessary** 76:16
**need** 20:23 37:19 45:16
**needed** 37:11 44:24 60:16
**needs** 62:11
**negotiate** 74:15
**negotiations** 74:20
**never** 17:12
**new** 53:15 54:3 54:25 55:8,14 75:22
**normal** 26:23
**notarized** 81:14
**Notary** 1:23 79:19 80:5
**Notary's** 82:23 82:24
**notice** 1:17 36:14 40:2
**notified** 7:6
**November** 80:15
**number** 9:16 10:21 23:6 27:8 33:24 50:20 51:4 59:19 65:3,4,8 66:1 70:14
**numbers** 73:2,2

**O**

**O** 4:1
**o'clock** 57:1
**oath** 4:9 79:4
**object** 12:19 13:6 19:7 59:5 63:18
**objection** 8:4,13 8:18 9:1,9 10:13 12:2,5 13:16 14:6,24 15:4 17:22 18:8,10,15,16 19:5,15,16,20 19:25 20:10 21:1 23:2,11 25:22 26:2,11 29:9 30:20 31:4 32:7,16 32:23 35:6 36:1,13,18 39:23 41:13,18 42:13 44:2,18 45:1 54:7 56:3 56:7 60:14 61:13 64:15 65:10,17 66:3 66:17,24 67:9 69:15 70:1,20 71:14,19 72:6 75:10 76:20 77:17,20
**objections** 4:13
**objective** 13:4 13:15
**observations** 16:1 17:10
**observe** 44:12
**obvious** 44:5,12
**obviously** 20:2 21:10 27:2 37:21 49:16 75:15
**occasions** 14:5 24:1
**occur** 46:2 60:18
**occurred** 6:17 25:19 53:18,23 63:16 76:16
**October** 6:25 7:5 11:20 12:16 27:16 29:2,14 31:3 45:19 53:18,21 64:14
**offer** 77:22
**offered** 31:7,16 31:23 32:9
**office** 6:8,11 45:12 51:19 56:18
**offices** 58:4
**Oh** 34:10,12,12 46:23
**Ohio** 1:21 58:1
**okay** 10:10 11:2 11:9,17 12:14 12:24 20:18 26:25 29:1 30:24 32:1,25 37:16 49:22 51:6,21,24 52:2,8 59:15 62:3,10 64:9 66:13 67:13,18 68:17 69:7 71:1 73:21 74:1
**old** 56:11
**once** 25:6 38:10 46:25 47:17,19 48:21 56:15 62:8,20 66:21
**ongoing** 45:25 74:15,19 75:12
**open** 37:5
**operating** 5:23 33:5 34:1 52:14,16,22 53:10 54:19 55:8,15 56:17 59:9
**operations** 43:5
**opinion** 13:12 16:6,7 18:7 19:7 72:9
**opinions** 17:19
**opportunity** 72:18
**opted** 20:3
**Optimally** 46:1
**order** 17:19 20:21 26:9 51:5 62:9
**orders** 46:25 56:21 58:3,8 60:6 78:7
**original** 81:11 81:18
**originally** 82:5
**outcome** 80:12
**overall** 13:23 16:8
**overview** 77:3
**owed** 31:12

**P**

**P** 2:4 4:1 81:5
**P.O** 80:22 81:1

**pace** 48:12 75:23
**page** 3:5 73:12 73:21,25,25 82:6
**pages** 73:13 74:3 75:5 79:5
**paid** 8:10 26:13 26:16,17,23 33:1 34:8,24 35:15,18
**paint** 9:11,14
**painted** 45:16 47:18
**painter** 47:14
**pandemic** 76:4
**parameters** 6:14
**Parkway** 2:9
**part** 10:25 11:6 12:21 68:7
**participating** 4:6
**particular** 17:7 18:3 33:15 34:3 46:8 71:24
**particularly** 18:4
**particulars** 40:24
**parties** 4:12 80:12
**parts** 22:4 24:13 28:15
**pass** 70:2,5
**passed** 60:4
**patch** 37:13
**patched** 19:10
**Pause** 52:9
**pay** 27:2 43:14 77:5
**payables** 26:23
**payment** 21:16
**payments** 36:25
**peeling** 45:15 61:23
**Peirce** 2:4 3:7 4:21,21 8:4,6 8:13,18 9:1,9 10:13,15 12:2 12:5,19 13:6 13:16 14:6,24 15:4 17:22 18:8,10,15 19:5,15,20,25 20:10 21:1 23:2,11,20 24:6 25:22 26:2,11 29:9 30:20 31:4 32:7,16,23 35:6 36:1,13 36:18 39:23 41:13,18 42:13 44:2,18 45:1 51:25 54:7 56:3,7 59:5 60:14 61:13 63:18 64:15 65:10,17 66:3 66:17,24 67:9 69:15 70:1,20 71:14,19 72:6 75:10 76:20 77:17,20 78:3 78:8 81:5,10
**penalty** 4:12 80:7
**penetrate** 60:20 63:9
**penetrated** 61:17
**penetrating** 61:23
**penetration** 10:3 59:17,22 60:23 62:19
**people** 10:22 15:20,23 43:3 50:19,22 51:1 54:17
**percent** 33:9,11 33:23
**perception** 77:12
**perfectly** 23:20
**perform** 77:12
**performed** 7:16 8:16 20:15
**performing** 50:11 69:8
**perimeter** 18:5
**period** 47:3 58:11,25 61:19
**perjury** 4:12 80:7
**person** 4:10 27:21
**personnel** 48:20 48:22 49:17
**perspective** 13:4 60:9
**phase** 27:15 76:6
**phone** 62:15
**physically** 4:7 16:21
**pick** 46:15
**picked** 48:12
**picture** 13:18 17:3
**pictures** 16:19
**piecemeal** 43:11
**pipeline** 76:9
**place** 8:1 10:7 25:18 27:15 29:2 35:15 45:5 48:7 80:8
**plaintiffs** 1:12 2:2 4:22
**plan** 39:20
**plans** 68:19
**plastic** 10:1
**platform** 53:2 55:15
**platforms** 56:17
**pleadings** 30:25
**please** 4:15 5:5 12:8 35:5 36:20 41:12 48:18 55:11,22 73:25 81:11,14 81:15
**plethora** 54:20
**point** 10:12 16:17 20:3 22:10 29:20 31:14 34:19 37:22 39:18 42:4 51:23 61:25 68:21 70:16 77:10
**policy** 31:12 50:11
**pool** 9:18,25 10:2,11,24 11:12,14 12:21 34:15 37:4
**popcorn-spra...** 61:24
**portion** 29:7
**position** 5:17 28:11,17 30:7 30:11 40:13 56:5 66:14 72:19
**possible** 23:9
**possibly** 46:24 48:25
**pouring** 37:12
**prefer** 24:4 64:8
**preferred** 33:19
**premiums** 77:5
**preparation** 12:14
**prepared** 69:3
**preparing** 11:25 12:12 43:22
**present** 4:7,24
**presently** 5:25
**preserve** 55:4 56:6
**president** 5:18 5:20
**pressure** 31:5,6 31:23 32:8
**pressured** 29:13 30:16 31:2 32:5
**prevalence** 57:12,16 69:21
**preventative** 45:5 48:6 49:3 55:24
**previous** 80:6
**previously** 59:10
**primary** 5:24
**prior** 10:3 33:10 36:23 37:6 58:11,25 59:16 59:22 60:7 63:10,16 68:14 76:3
**priorities** 25:5
**prioritize** 35:9 39:12
**priority** 35:9,11
**privy** 15:16
**proactive** 48:11
**proactively** 68:12
**probably** 22:23 39:3 40:18 41:3,20 42:1 48:3 50:7 51:19 56:11 69:25
**problem** 49:24 59:22 60:7 61:7,8,11 62:10,12,13
**problems** 27:10 37:17 45:23 59:20 60:18 62:18 63:6,23
**Procedure** 1:18
**proceed** 52:6
**proceedings** 52:9 78:13 80:9
**process** 62:20
**produced** 20:19

58:17
**professional** 1:23 16:6 80:5
**program** 45:5,8 45:21 48:7 50:14 51:14
**progressive** 64:4 72:3
**projects** 33:15 33:20
**prompt** 81:17
**prompted** 39:1
**proof** 7:1 11:4 11:19 12:16 64:14 71:6
**properties** 6:1 34:4,13
**property** 9:3 13:11,19,23 15:14,18 16:8 16:21 22:5 28:5 36:22 37:11,19 39:15 41:22 43:3,10 43:17 45:18 46:11,13 47:23 48:4 49:9 51:3 58:2 60:1 63:23 71:20 74:16 77:7,24
**proposal** 68:24 69:2,5,9
**protocol** 47:10
**provide** 6:15 43:15 49:22 70:24
**provided** 3:13 4:3 22:18 43:2 49:3 57:7 65:12 66:19 68:23
**provides** 65:14 66:22
**providing** 5:13
**public** 1:23 7:10 79:19 80:5
**pull** 21:4 22:20 73:10
**pulled** 38:21
**pun** 63:5
**purpose** 30:12
**purposes** 11:25 12:11 21:11 33:16 49:4
**Pursuant** 1:17
**push** 30:13
**put** 15:20 27:5 33:3 37:8 38:23 44:9 51:2 55:1,8 56:21 67:11 76:10

**Q**

**qualified** 41:25 43:6
**quantify** 68:1,4
**quarterly** 50:12 51:9
**question** 10:6 12:7,8 16:25 22:15 24:19 30:12,13 31:9 32:1 39:6 41:16 51:6 53:19 64:11 71:2 72:15 73:3
**questions** 5:9 6:15 22:12 67:20 68:2 71:11 78:1 80:9

**R**

**R** 4:1
**rain** 63:8
**rainstorm** 60:19
**RDA** 1:5,10,18 3:3 5:9,13,17 5:18,22 6:3,7 6:19 7:1,5,21 7:25 8:10,15 17:14,18 18:13 18:23 19:18,22 20:7,14,24 21:8,16,17,24 22:24 28:14 29:6,12,13,19 30:15,16,17 31:2 32:4,5,12 32:20,25 33:6 34:4,14,18 35:19 39:4,7 39:18 41:1,4 42:10 45:4 46:1,8 47:25 48:6 49:22 50:1 52:13,23 53:4,6,13 56:1 56:5 57:3,22 57:25,25 58:10 60:10 64:24 66:9,14 68:12 68:19 69:7,12 70:7,17 71:6 71:11 72:22 75:8 76:4,12 81:7,8 82:3
**RDA's** 6:1 7:10 18:24 28:17 29:17 47:6 54:1 55:21 71:10 72:18
**re-create** 67:8
**re-input** 53:15
**re-inspected** 9:4
**re-inspection** 7:16 8:1 12:25 14:19 25:21
**re-prioritizing** 37:18
**re-roof** 25:2
**read** 24:14 78:9 79:3
**ready** 52:6,10
**real** 30:2 59:21
**realized** 13:24
**really** 9:22 12:3 15:13 17:8,17 18:17 19:6 28:11,12 31:10 42:2,3 46:17 47:15 49:6,9 60:16 66:11 77:22
**reason** 15:3 18:14 19:6 20:18 22:17 25:14,25 31:1 32:13,20 44:25 47:16,19 60:9 60:12 64:10 67:20 82:6
**reasonable** 8:2 8:11 28:5,9,13
**reasonably** 8:17
**reasons** 23:6,9 40:9
**recall** 11:1 12:15 12:20,23 14:8 14:20 16:4 17:6 19:17 20:17 22:6,9 23:4 25:17 29:1 35:23 38:19 40:18,22 40:25 64:17,18 65:5 66:5 75:7
**recap** 21:9 46:6 48:5
**receipt** 69:9
**receivables** 36:24
**receive** 29:22
**received** 35:14
**receiving** 68:14
**Recess** 52:4
**recite** 29:4
**recollect** 21:6
**recollection** 7:2 7:3,13 20:12 22:3 40:5,6 75:7
**recommended** 19:13
**record** 4:16 9:13 21:7,14,19 25:12 28:19 55:23 57:22 58:10 63:14,15 81:15
**records** 20:23 47:6 50:4 53:15 54:2 55:4,7,10,20 55:21,25 56:6 57:2 58:4,13 58:23 59:3 60:5,11,13,22 61:2 62:2 63:21
**recurrence** 27:1
**reduced** 80:8
**refer** 27:14
**reference** 3:10 52:22 58:24 73:9
**referring** 11:11 11:12,14 42:18 57:25
**reflected** 65:21
**reflecting** 58:23
**reflects** 22:21 61:5
**regard** 7:20 9:25 28:18 39:5 49:3 51:9 73:4
**regardless** 30:25 54:12
**Registered** 1:22 80:4
**regular** 45:13,17
**rehab** 75:12,13
**related** 80:11
**relating** 5:11
**relevant** 74:17
**relied** 16:10 76:21
**rely** 17:18 53:24 66:18 67:1

70:11 72:10,14 77:2
**relying** 43:1
**remaining** 39:19
**remote** 1:22 2:1 24:7
**remotely** 1:24 4:2,8
**Rennick** 1:7,19 3:4 4:17 5:7 79:1,11 81:8 82:2
**renovation** 39:13
**renovations** 74:13 75:17,18 75:19,25 76:5 76:7,10
**reopen** 7:11
**repair** 19:14 20:15,19,21,25 21:25 22:14,18 22:25 23:10,17 25:25 26:7,10 35:14 36:16 57:23 76:13,16
**repaired** 22:22 37:19
**repairs** 20:2 22:4 26:18 35:17,23 36:8 36:11 37:10 38:22,25
**repeat** 9:25 39:6
**replace** 11:3,18 19:19,23 20:3 34:23 35:10 37:3,13 38:12 39:21 56:25 64:12,19 68:19 68:24 71:7 74:10
**replaced** 10:2 20:7 22:7 34:15,18 36:3 38:5,16 74:11
**replacement** 19:13
**replacing** 38:13
**report** 18:22 44:5 49:23
**reported** 44:4
**reporter** 1:23 3:13 4:4,5,23 5:2 9:12 23:18 23:21 24:3,12 24:16 35:4 41:11 48:17 78:6,11 80:5
**REPORTER'S** 80:1
**reporting** 4:8,14 53:3 80:22 81:1,16,22
**reports** 7:22 16:18,19 18:22 47:22 50:2
**represent** 14:9 17:25 34:22 58:22 65:25 71:5
**representation** 34:25
**representative** 71:10
**requests** 58:17
**require** 39:14 53:14 56:11
**required** 54:9 56:19 75:12,14 75:14
**requirements** 39:13
**requiring** 33:18
**research** 23:5 26:6,8 69:17 70:17
**reserve** 33:6,8 33:13 34:2,13 39:4,7,10 78:3
**resolution** 34:21 35:2 37:9
**resolve** 62:12
**resolved** 62:11
**respond** 18:21 59:14
**responding** 57:24
**response** 58:17
**responses** 52:20 53:20
**rest** 73:21
**restate** 12:7,8
**result** 70:19 71:13 72:8,12
**results** 46:9
**retain** 50:1 58:2
**retained** 18:24 46:22 47:5,11
**return** 81:14
**revenue** 33:11 54:20
**revenues** 34:1
**review** 20:23
**reviewed** 28:22
**right** 23:7 32:22 37:20 49:18 67:17 70:14 71:22
**ring** 74:4
**rise** 26:10
**river** 38:4
**rock** 38:4
**roof** 9:10,17 12:22 14:4,10 14:14,18,23 15:12 17:16 18:5 19:9,19 19:23 20:4,8 21:25 22:14,25 23:10 27:9 37:13,13,13,23 37:25 38:1,2,9 38:12,13,16,18 38:24 39:20,22 41:2 42:19,23
**roofing** 17:5,20 19:12
**rooftop** 9:17
**room** 4:7 45:14 47:18 48:5 50:12 56:25 57:1,4,8 62:12 62:16 63:4 70:18 71:12 73:1,2 74:7
**rooms** 45:6,10 45:11,20,23 46:2,7,15 48:7 48:11,13,20,21 51:4 57:24 58:13 60:20 63:24 64:25 65:8 66:9,15 68:9,13 69:13 74:14,18 75:9 75:13 76:5
**routine** 60:24 62:7
**RPR** 80:21 81:21
**Rules** 1:17
**running** 18:4 43:4 51:2,4

**S**

**S** 4:1
**sales** 56:18
**SALT** 49:10
**samples** 74:21
**saved** 54:3
**saw** 16:23 71:24
**says** 62:13 73:17 73:17
**schedule** 26:23
**scope** 8:21 9:2 11:7,21 12:20 12:23 13:10,22 18:25 19:3 35:7 76:13
**scores** 48:10 49:5,10,10
**scroll** 73:13,20 73:25
**scrolled** 74:3
**se** 42:3
**seals** 71:4,7,10 72:1
**season** 45:19,21
**second** 52:7,7
**section** 18:3,4 19:9 20:7
**see** 20:24 21:4 22:20 43:12 44:8,8 60:3 63:1,4 73:13 73:16,21
**seeing** 73:19
**seen** 20:20 25:12 58:23 65:13,15 66:22 74:4
**send** 34:9 78:9
**sending** 16:19
**sent** 7:1,21 41:9
**separate** 14:5 33:6 72:23
**September** 19:10,19 57:10 58:12,25 61:4 61:9,12 65:21
**servicer** 34:6
**severe** 10:3
**share** 40:8 42:6 62:4 68:6
**sheet** 81:11,14 82:1
**Sheraton** 3:12 33:7 45:6 46:16,17,18 73:17
**short** 50:18 51:2
**shorthand** 80:8
**show** 60:22 63:2
**showed** 31:12
**showing** 63:6
**shut** 36:6,22
**shutdown** 76:3
**sic** 73:18
**side** 71:7
**sign** 78:9

**signature** 80:14 81:12 82:20,23
**signed** 81:14
**significant** 16:7 38:8 42:21 60:6,7 63:13 65:4 72:12
**significantly** 13:25 29:25 30:1
**signs** 71:25
**sill** 61:1,21
**simply** 30:17 44:23 59:3 66:8
**simultaneously** 30:8
**Sincerely** 81:19
**single** 34:3 70:17 71:11
**sir** 7:14 21:23 23:18 27:19 30:9 39:3,6 52:12 55:22 65:16
**sit** 11:17 21:5 22:6 23:22 71:10
**site** 6:4 25:20
**situation** 37:14
**Sitzmann** 14:3 14:10,13,17,22
**Sitzmann's** 15:10
**six** 10:2 48:9 76:1,2
**skylight** 10:11 11:4,14,19 22:1,21 23:1 25:10 34:15,19 34:23
**skylights** 36:3
**slow** 62:20
**slowed** 37:21
**slowly** 61:18
**small** 66:1
**snapshot** 66:14
**Sneeze** 74:24
**soft** 42:8 75:12 75:13
**solicited** 69:5
**somebody** 56:24 62:9
**sorry** 8:7 23:18 26:14 32:17 43:15 54:14,16
**sort** 68:13
**source** 65:6
**south** 18:4
**speaking** 30:8
**Specialty** 1:14 81:9 82:3
**specific** 17:1 22:12 34:2,10 53:10 57:24 64:18 65:3 70:14 71:16 73:1
**specifically** 38:3 76:1
**specifics** 40:19
**specified** 22:17
**spend** 21:10 37:2
**spending** 36:5
**spent** 16:14
**spreadsheet** 57:8,9,11,15 58:23 61:5 65:11,14,21
**square** 40:4
**ss** 80:2
**stab** 69:16
**stage** 74:9
**stages** 71:3
**standards** 33:18 49:15
**standing** 78:7
**standpoint** 31:1 31:7
**start** 6:13 60:19 63:6 75:25
**started** 27:12 59:20 62:23 76:4
**starting** 66:21
**starts** 63:8
**Starwood** 46:18 48:1 53:4 56:15
**state** 1:24 79:4 80:2,5
**statement** 17:23 42:17
**STATES** 1:1
**stating** 4:16
**stayed** 51:8
**step** 40:2,12
**stepping** 40:9,17
**steps** 24:23 29:1
**sticking** 12:24
**stone** 38:22
**stop** 73:22
**stopped** 20:2 23:16
**stops** 25:7
**storm** 19:1 43:10 57:5 69:14,24 72:2 72:8
**straight** 10:22
**Street** 2:5 81:5
**struggled** 50:24
**subject** 17:7
**submission** 8:3
**submit** 26:21,21 26:22 33:9 34:8 49:6,8 74:21
**submitted** 6:19 7:22 11:19 21:15 41:17 44:17 48:3 50:3 71:6
**Subscribed** 79:14 82:21
**subsequent** 8:20 48:22 70:15
**subsequently** 77:23
**substantial** 38:17
**Suite** 2:10
**sum** 39:10
**summary** 58:24
**Summit** 1:21
**supplement** 33:25
**sure** 28:17 35:22 49:19 50:4 51:25 52:8 53:16 59:11 66:11 68:21 69:11,18 70:21 70:22 72:17
**surrounds** 75:21
**suspect** 50:15
**sustained** 29:23 31:8,18,24
**sworn** 79:5,14 82:21
**system** 52:22 53:10,15 54:3 54:10,25 55:1 55:9,14 56:12 56:22 59:9 62:21 68:20
**systems** 52:14 52:16 56:18,18

**T**

**T** 2:4
**take** 19:2 24:23 25:18 31:20 35:16 51:22 62:24,24 66:13 69:16 71:8 77:22
**taken** 1:20 8:1 35:15 52:4 80:7
**takes** 63:4
**talk** 15:25 40:15 66:21
**talking** 11:15 36:15 37:25 38:3 53:5,9 60:1,2
**target** 39:16
**tasks** 47:17
**team** 45:11
**Telephonically** 70:6
**tell** 5:6 16:4,10 22:13 25:16 26:17 27:8 36:14 38:15 46:24 48:25 62:17 66:21 72:11 73:14
**telling** 32:3 61:10
**temporarily** 25:6
**temporary** 25:1
**ten-minute** 51:23
**tenure** 39:19
**terminology** 52:23
**terms** 10:21 28:3 48:12
**testified** 18:13 42:7 53:17 63:19
**testify** 72:24
**testimony** 4:11 64:10 79:3,6 80:7,9 82:5
**thank** 5:2 22:16 46:19 52:2 75:1 78:1,2,3,5 78:11 81:17
**thanks** 53:8
**thawing** 61:17 61:18
**thing** 11:15 25:8
**things** 24:24 27:6 33:17 37:6,8 42:16

45:15,17,25 54:21,24 55:8 63:1,5 74:9,10 74:15
**think** 10:16,17 10:19 14:20 17:23 21:9 25:1,14 30:4 32:2,13,21 34:20 36:2 38:17,21,23 51:8 54:5 55:6 56:23 57:20 61:20 65:11 66:18 67:15 68:8 69:22 70:11 72:5 76:24
**thinking** 43:17 69:18
**thorough** 8:17 8:22,25 16:11 21:9 28:1 43:6 57:19 77:3,6
**thought** 9:5,20 11:13 16:9 42:15 53:18 65:16 66:2
**three** 25:19 34:7
**time** 6:14 7:21 8:2,11 10:20 10:23 13:11,24 13:24 14:10,14 15:19 19:14,24 23:14 25:13,15 28:5,9 29:5 31:21 32:5,12 35:4,9,10,12 36:9,11 37:16 39:5 41:11 47:3 48:18 51:7 54:1 55:24 57:17 58:11,25 61:14 61:19 62:19 63:5 64:4 66:14,15 67:22 69:11 70:16 71:16 80:8
**times** 34:8
**timing** 24:24 25:24 26:6,10 26:18 28:3 55:16
**today** 11:17 21:5 56:22 71:10
**told** 30:15 50:9 67:24
**tomorrow** 71:24
**top** 23:22 38:3 61:22 62:5
**top-line** 33:11
**topic** 36:15
**total** 9:2 12:23 13:22
**totally** 41:21
**tower** 38:3,7,14
**tracked** 62:15
**tracking** 53:3 59:17 67:12
**trailing** 33:10,10
**training** 54:22
**transcript** 79:3 80:9 81:13,18
**transition** 56:14
**tried** 38:23 39:19 68:12
**true** 80:9
**trust** 9:21
**trusted** 30:3 76:22
**try** 11:24 44:9 45:20 48:10,10 48:11 68:3
**trying** 22:12 30:7,12 43:11 48:13 51:3 67:25 72:21
**tub** 75:21
**turn** 27:13
**turned** 40:1
**twice** 34:7 46:3
**two** 14:5 16:14 22:24 23:9,10 41:23 42:15 43:8 56:12
**two-page** 68:23
**two-year** 56:13
**types** 58:7
**typewritten** 80:8
**typically** 33:22 36:22

**U**

**Uh-huh** 72:20 73:23 75:6
**Ulrich** 20:5 39:25 40:8,12 40:17 42:7 43:22 44:12,22 50:9,13 51:7 51:10,15
**unavailable** 59:3 59:8
**unaware** 19:2
**underneath** 38:7 62:22
**understand** 5:22 10:6 15:10 22:15 26:9 27:25 28:17 29:19 30:6,11 32:2 34:14 43:21 58:15
**understanding** 5:12,15 14:21 27:20 58:6,8,9 67:4,21
**understood** 46:19 52:23
**undertake** 33:21
**unduly** 29:7
**unemployment** 50:21
**unfair** 22:15
**unfortunately** 77:8,9
**unit** 38:12
**UNITED** 1:1
**unreasonable** 15:3 77:19
**unreasonably** 28:15
**update** 75:9
**updated** 67:2
**upper** 38:2
**use** 34:4 46:14
**useful** 39:19
**uses** 46:13

**V**

**v** 81:8 82:3
**Vaguely** 29:4
**various** 10:22 15:20 16:15
**verbally** 4:10 80:6
**verification** 4:25
**VIDEO** 1:5
**viewed** 18:1
**Village** 2:10
**vis-a-vis** 49:10
**visual** 16:22
**visually** 44:8
**vs** 1:13

**W**

**Wagner** 2:8
**wait** 22:24 31:19
**waiting** 23:9 34:20 35:2
**waive** 4:13
**wall** 9:10 63:9 68:20,25 70:8 72:11 73:5 75:22
**wallpaper** 45:15
**Walls** 6:24,25 7:6 27:21 28:1 28:4,4,8 29:6
**Walls'** 28:20 31:11
**want** 22:20 23:21 28:16 36:19 39:14 46:1 56:24 62:13 64:8 65:2 69:16 72:17 73:13
**wanted** 56:9,10 56:20
**wasn't** 17:1 31:15 32:9 37:4,5 43:9 44:20 75:14
**water** 37:11 38:7 59:17,22 60:19 60:22,25 61:16 61:23 62:18,22 63:8,11 65:9 65:22 66:16 67:22 68:10
**way** 53:5,22 62:23 67:7 68:1
**we're** 34:20 36:4 43:17 49:24 53:9 58:1,1 63:24 66:20,25 69:10 74:13 75:16
**we've** 13:25 22:18 40:22 48:9,10,12 50:19 51:2 74:2 77:23
**wear-and-tear** 72:3
**webinars** 54:18
**week** 20:7
**weeks** 15:15 16:14 41:23
**Wells** 34:5
**went** 16:21 25:20 53:4 54:25 55:18 61:14 62:19 68:8 71:23
**west** 3:12 33:7 45:6 71:7 73:17

**west-facing** 64:13 70:8
**WHEREOF** 80:13
**willing** 77:22
**window** 57:8,13 57:17,24 61:1 61:22 69:22 70:18 71:12,24 71:25
**window-** 58:10
**window-leaki...** 63:15
**window-related** 58:24
**windows** 36:2 57:5 64:13 66:1 70:8 72:22 73:4
**windstorms** 63:8
**wishes** 82:4
**withdraw** 29:13 30:16 31:2 32:5 43:19
**withdrawing** 7:6 29:20 30:18
**withdrew** 29:21 31:25
**witness** 4:10 80:13
**work** 20:21 21:16 26:20,22 29:7 38:17,20 45:22 46:25 48:23 56:21 57:23 58:3,7 60:6 62:9,23 69:8
**works** 33:24 54:16
**worth** 31:15 32:9 43:18
**wouldn't** 27:2 36:9 37:3 42:10 45:3 56:13
**write-up** 46:4
**writing** 60:16
**written** 53:20 63:15

**X**

**X** 3:1

**Y**

**yeah** 11:11 14:25 18:17,19 34:12,12,12 39:3 42:4 43:24 44:1 46:6 47:12 49:14 50:5 63:1 75:4,11
**year** 6:21 7:16 8:16 12:25 13:14 18:23 22:1,5 25:19 33:17,25 34:8 35:25 46:3 75:24
**years** 22:25 23:9 23:10 48:2,3,9 50:6,20,23 52:15 75:8,15 76:1,2
**Yep** 52:1
**yesterday** 18:1

**Z**

**0**

**1**

**1** 81:3,18
**1,500** 29:22 31:7 31:11,17,23 32:9,14,21
**1/2** 50:23
**1:19-CV-2145...** 1:3 81:9
**10** 33:12 68:25
**100** 2:5 81:5
**115,000** 43:18
**12** 33:10 62:24
**12-month** 33:25
**12/11/18** 3:11
**121** 3:11 4:2 73:10
**12th** 38:2,6
**15** 6:12
**150** 50:25
**16** 56:16 61:9
**17** 6:25
**18** 7:5,9 62:24 63:3 68:24
**180** 40:23
**19** 7:9 8:2
**1990** 5:21
**19974020573** 80:5
**1st** 80:14

**2**

**2** 50:23
**2,000** 71:20
**20** 18:23 79:15
**2001** 38:17,20
**2013** 19:10,19 20:19 38:5 56:21 57:1
**2016** 20:8,15,20 20:25 21:8,16 50:10 51:10
**2017** 5:11 6:17 6:25 7:5 11:4 11:20 12:16 14:11 25:12 27:16 29:3,14 31:3 40:3 41:3 41:17 51:9,10 53:18 59:16 60:7 61:11 63:10,16 64:14 70:9,12
**2018** 53:21 57:10 58:12 59:1 61:4,9,12 65:22 69:18,19 75:5
**2019** 7:10,21 8:2 10:8 14:18 22:18,22 57:10 64:22 66:13
**2020** 1:8,20 68:24 78:14 80:14 81:3,18 82:2,22
**2021** 80:15
**22nd** 6:20
**230** 57:1
**238,000** 35:19
**238,010** 7:23 8:11
**25** 80:15
**25th** 7:15,25 8:12 14:18
**26** 1:8,20 78:14 82:2
**26th** 7:15 8:1,12 14:18
**27523** 80:22 81:1
**29** 7:21

**3**

**30** 62:8
**30(b)(6)** 1:5,18 3:3 81:7
**305** 47:18
**35** 81:15
**35,000** 63:22
**350** 2:10

**4**

**4,500** 22:22 35:15
**40** 75:23
**45** 26:24

**5**

**5** 3:6 33:9,10,23 57:1
**50** 75:24
**500** 33:23
**500,000** 33:12
**5251** 2:9
**55** 68:10
**5th** 2:5 81:6

**6**

**6:55** 1:21
**60** 26:24 65:5

**7**

**7** 14:11
**7,000** 75:23
**70** 65:5
**71** 68:8
**720-556-1109** 81:2
**73** 3:11

**8**

**8** 5:11 6:17 63:16 70:9
**8:00** 52:4
**8:09** 52:4
**8:51** 78:14
**80** 65:5
**80111** 2:10
**80206** 2:6 81:6
**80227** 80:23 81:2