# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02145-DDD-NYW

RDA HOTEL MANAGEMENT COMPANY and LAKEWOOD HOTEL COMPANY,

Plaintiffs,

vs.

HUDSON SPECIALTY INSURANCE COMPANY

Defendant.

---

VIDEOCONFERENCE DEPOSITION OF WILLIAM F. WALLS

---

PURSUANT TO NOTICE, the above-entitled videoconference (Zoom) deposition was taken on behalf of the Plaintiffs at Calderwood-Mackelprang, Inc., 9745 East Hampden Avenue, Suite 220, Denver, Colorado, on June 11, 2020, at 1:02 p.m., before Jana Mackelprang, Certified Realtime Reporter, Registered Professional Reporter, and Notary Public.



APPEARANCES:

For the Plaintiffs:
JEFFREY T. EMBRY, ESQ.
CHRISTOPHER P. PEIRCE, ESQ.
Hossley Embry, LLP
515 South Vine Avenue
Tyler, Texas 75702
(903) 526-1772
(903) 526-1773
jeff@hossleyembry.com
cpeirce@hossleyembry.com
(Present via Zoom)

For the Defendant:
COLIN CAMPBELL, ESQ.
Campbell, Wagner, Frazier & Dvorchak, LLC
5251 DTC Parkway, Suite 350,
Greenwood Village, Colorado 80111
(303) 831-5990
ccampbell@cwfd-law.net

EXAMINATION INDEX


| | |
|---|---|
| By Mr. Pierce | Page 4 |
| By Mr. Campbell | Page 86 |




EXHIBIT INDEX


| FOR IDENTIFICATION | INITIAL REFERENCE |
|---|---|
| Exhibit 24 - 4/24/2019 E-mail from Kaho to Larson | 23 |
| Exhibit 25 - Cunningham Lindsey Invoices | 25 |
| Exhibit 26 - 6/15/2017 Haag Report | 36 |
| Exhibit 28 - 7/26/2017 Cunningham Lindsey First and Final Report | 62 |
| Exhibit 31 - 8/7/2017 E-mail from Bill Walls to Miller | 77 |
| Exhibit 32 - 10/10/2017 Cunningham Lindsey First Report | 79 |
| Exhibit 43 - Photos | 53 |
| Exhibit 50 - May and June 2017 E-mails between Chan, Bernard, and Bill Walls | 70 |
| Exhibit 52 - 6/15/2017 E-mail from Sitzmann to Bill Walls | 70 |
| Exhibit 55 - August - October 2017 E-mails among Miller, Bill Walls, Bresnahan, et al. | 84 |




P R O C E E D I N G S

WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

* * * * *

WILLIAM F. WALLS,

having been first duly sworn to state the whole truth, testified as follows:

EXAMINATION

BY MR. PEIRCE:

Q. Can you please state your full name.
**A. William Franklin Walls.**
Q. Mr. Walls, do you prefer to go by William or Bill or do you have a preference?
**A. Bill is fine.**
Q. Okay, Bill. My name is Chris Peirce. I represent the plaintiffs in a lawsuit against Hudson Specialty regarding a May 8th, 2017, hail claim. Do you understand that?
**A. Yes, sir.**
Q. I'm going to show you what's been marked as Exhibit 94. This is a copy of a notice of your deposition. Have you ever seen this before?
**A. I have.**
Q. And part of the notice asks you to bring

documents with you today. Did you bring any documents with you?
**A. No, sir. I had no documents.**
Q. You have no documents?
**A. No, sir.**
Q. That included any texts exchanged on your phone. You have none?
**A. None.**
Q. Mr. Walls, have you ever given a deposition before?
**A. Yes, sir.**
Q. How many?
**A. Two, maybe.**
Q. When was the last one you gave?
**A. Close to 20 years ago. That's as good as I --**
Q. Okay. Well, I'll give you a brief refresher, since it's been 20 years or so.
You understand you're under oath here today?
**A. I do.**
Q. It's just as if you're down at the courthouse giving testimony in front of a judge and jury. Do you understand that?
**A. Yes, sir.**



Q. Would you agree that if I ask you a question that's not clear to you, to stop me and ask me to rephrase it until you do understand it?
**A. Yes, sir.**
Q. And if you don't do that, can we agree that you have understood my question?
**A. Yes, sir.**
Q. And if I ask you a direct question that you've understood, will you agree to provide a direct, nonevasive answer?
**A. I don't understand that question.**
Q. Sure. If I ask you a question and you haven't stopped me and you understand the question, will you agree to provide a direct, nonevasive answer?
**A. I think -- yes, I will. I will.**
Q. Okay. In other words, you're not going to provide me an indirect, evasive answer, if you have understood the question?
**A. No, but if you ask it yes or no, I'll give you a yes or no.**
Q. Gotcha. What did you do to prepare for your deposition, Mr. Walls?
**A. I think I met with Mr. Campbell for 30 minutes, something like that, at his office, just to go over a few things. And that's pretty much it.**



Q. When did that meeting occur?
**A. I believe, sir, that was July -- or June 3rd.**
Q. June 3rd?
**A. Yes, sir.**
Q. So last week, right?
**A. I guess that was last week, yeah. Today is the 11th.**
Q. So you met for about 30 minutes?
**A. Yeah, it wasn't very long.**
Q. Did you review documents?
**A. I think there were a few documents that I looked at.**
Q. Which ones?
**A. I think it was my report of July 26, a few e-mails, a statement of loss, and a record of what was in the file, the electronic notes.**
Q. Meaning like long notes?
**A. Yeah, long notes, yes, sir.**
Q. Did Mr. Campbell instruct you about how to answer certain items or lines of questioning?
**A. No, sir.**
Q. Did you go over any anticipated questions?
**A. No, sir.**



Q. Are you stating that Mr. Campbell is representing you here today?
**A. No, sir.**
Q. Did you do anything else to prepare for your deposition besides that meeting with Mr. Campbell?
**A. No, sir. Got cleaned up to come.**
Q. Did you speak to anybody at Hudson?
**A. No, sir.**
Q. Did you speak to Andrew Larson?
**A. No, sir.**
Q. Didn't speak to Matthew Sitzmann at Haag?
**A. No, sir.**
**Can I clarify one thing?**
Q. Sure.
**A. I did not speak to Andrew Larson about this. However, occasionally, I have talked to Andrew just to find out, on this coronavirus stuff, how he and his wife and children are doing. So I don't want to infer that I haven't talked to Andrew because I have, but I haven't talked to him about --**
Q. Well, anything about this claim or lawsuit?
**A. No, sir.**
Q. Okay. Mr. Walls, are you retired at this time, or are you still employed?

Page 9

**A. I am retired but retained as a consultant by Crawford & Company.**
Q. What does that mean? Are you picking and choosing what you want to do?
**A. No, sir. What I do is, for the meager amount of money that they pay me, no benefits, nothing like that, everybody in the company that needs to talk to me will call to say, "Hey, Bill, I've got this issue; what would you do" -- whatever -- I'm available. They give me no phone or anything. I'm right here at the end of my cell phone, and I will speak to them.**
Q. You do that for a salary?
**A. It's a salary. It's a salary.**
Q. How long have you been in that position?
**A. Well, in -- I've been in that position, I think -- let's see, 2018 -- since 2019, I think. I believe it's 2019.**
Q. What would you call your position?
**A. Well, I like to call myself director of excellence, but I think they just call me the consultant.**
Q. So you're not going into the office, anything of that nature, before COVID?
**A. I go into the office every once in a while, yes.**

Page 10

Q. You're free to come and go as you please kind of deal?
**A. Sure. Sure. I hired all the guys that are there now. They're kind of like, not only my friends, but family.**
Q. So you hired, for instance, Andrew Larson?
**A. Yes, sir.**
Q. Did you hire your son Ryan?
**A. Yes, sir.**
Q. How many -- how many adjusters with Crawford are in the Denver office?
**A. There's Ryan; my other son, Chance; Andy; Rob Williams; and Woody Woodward. So that's five.**
Q. And you hired all of them for Crawford?
**A. Yes, sir.**
Q. And I understand, before Crawford, you worked for Cunningham Lindsey. Is that correct?
**A. That's correct, sir.**
Q. And you left Cunningham Lindsey on December 1st, 2015; is that correct?
**A. I believe that's the correct date, yes, sir.**
Q. And I have had to ask a couple of other deponents in this case about the leaving from

Page 11

Cunningham Lindsey to Crawford, but my understanding is there was a lawsuit involved stemming out of it, and it was dealing with Cunningham Lindsey not being happy that you and Andy and Ryan left and claiming that you had taken certain business with you; is that fair?
**A. I guess that would be a fair analogy, yes.**
Q. And they had sued you individually in federal court, correct?
**A. Correct.**
Q. And that's recently so?
**A. Recently might be a little much. I think it was over a year ago, close to a year ago.**
Q. So if the court records show May 2020 as it being settled, that's not your recollection?
**A. Well, that may be what the court records show, but I know that 2019, there was some kind of communication saying a couple of issues, and that there was going to be a settlement. Now, I don't know from the time there was a settlement agreement to when the court documents were filed that you may be right because I don't have those.**
Q. Did you work on this claim at any point in 2019?
**A. I don't recall working on this claim in 2019, no, sir.**

Page 12

Q. Were you approached about working on this claim in 2019?
**A. I don't remember being approached.**
Q. So, as I understand it, all work that you conducted on this claim was done in 2017; is that correct?
**A. That's my recollection.**
Q. Prior to this claim, you had worked for Hudson Insurance on other claims?
**A. Yes, sir.**
Q. Do you recall about how many?
**A. No, sir, I don't recall how many. I would tell you it was quite a few.**
Q. What's quite a few to you?
**A. 500.**
Q. And what kind of time period does that span?
**A. About seven years.**
Q. How many of those were hail claims, approximately?
**A. I don't recall.**
Q. Any idea, a ballpark, percentage-wise?
**A. 10 percent. 20 percent.**
Q. 10 to 20 percent?

**A. Yes, sir.**
Q. What was the large majority of them?
**A. Fires or marina claims.**
Q. What was your domain or jurisdiction with regard to handling claims? Did you go all over the country or Colorado?
**A. I would, but, Chris, I'll tell you this: I didn't go all over the country if it didn't make sense. If I had someone I could work with in Dallas, I would have them assist me and do all the legwork.**
Q. What about work with Kaho Chan specifically prior to this? How many claims did you work with Kaho?
**A. Half of that 500, I conjecture.**
Q. 250 claims with Kaho Chan?
**A. Probably, but please remember that is my conjecture.**
Q. Sure. What about prior hail claims that you worked with Kaho Chan, any idea?
**A. No, sir, I don't.**
Q. Have you ever worked on a hail claim with a property this size with Kaho Chan before?
**A. Yes.**
Q. Which property?
**A. I think there was a large loss in**



**Amarillo, a large loss in Oklahoma City. You're talking specifically hail?**
Q. Yes, sir, with Kaho Chan.
**A. Yeah, that's the two big ones that I remember, the two larger ones that come to mind.**
Q. And those were prior to this May 8th, 2017, storm?
**A. Yes, sir.**
Q. What kind of property was the property in Amarillo?
**A. It was -- it's been a few years ago, so I'm recalling -- this had been a Levi factory that was turned into a large warehouse. I think it was an agricultural equipment warehouse, yes, sir.**
Q. What about the one in Oklahoma City?
**A. It was a hotel.**
Q. What hotel?
**A. I can't remember. I can only remember that the gentleman that owned it, his name was Patel.**
Q. Do you recall what year you adjusted that claim?
**A. No, sir.**
Q. Do you recall if it was five or ten or fifteen years ago?
**A. Five to ten.**



Q. As I understand it, Mr. Walls, you were retained by Mr. Chan specifically to serve as a field adjuster for purposes of inspecting the claimed damages of my clients from the May 8th, 2017, hailstorm; is that correct?
**A. That's correct.**
Q. Can you tell me where the property is located?
**A. It's up on Union, off of Sixth Avenue, but I don't remember the address, to be quite honest.**
Q. And it's a hotel, correct?
**A. Yes, sir. It's a Sheraton, I believe.**
Q. And you're familiar with that storm and area, correct?
**A. Yes, sir.**
Q. It was quite a large storm, correct?
**A. Yes, sir.**
Q. And, in fact, it was the biggest hailstorm in Colorado's history from the standpoint of insurable losses, correct?
**A. I think I heard that, yes, sir.**
Q. Did you adjust any other large properties in this hailstorm?
**A. Is that relevant?**
Q. You're not going to answer it?



**A. No, I'm not telling you that I'm not going to answer it. I mean, what's the relevance?**
Q. My job is to ask questions. You can depose me maybe later, but it will go a lot faster -- I mean, you can object
**A. I'm not trying to object around. Yes, I did, I handled other large losses because of that storm.**
Q. Any other hotels?
**A. No.**
Q. Did you advertise as a major and complex loss adjuster while you were at Cunningham Lindsey, or is that how you were marketed at Cunningham Lindsey?
**A. That's how I was marketed at Cunningham Lindsey.**
Q. What would that mean as far as major and complex loss?
**A. Well, the major and complex loss unit was comprised of senior adjusters or adjusters who were qualified or learning to be qualified to handle large losses.**
**Complex losses could be, perhaps, losses that weren't necessarily large, but were complex because of issues. Whether it was coverage or damages, it could be complex. And all complex losses are not**

**major losses.**
Q. Do you make that determination yourself?
**A. No, I think probably my clients do when they send me the loss.**
Q. Would this loss qualify as a major and complex loss to you?
**A. Yes, I would say so.**
Q. Mr. Walls, you did not know the condition of the hotel property before May 8th, 2017, correct?
**A. Correct.**
Q. You never reviewed at any point in time the underwriting file for the property, correct?
**A. Correct.**
Q. What was the material on the roof comprised of on the date of loss of the hotel?
**A. It was ballasted EPDM.**
Q. Do you know what type of curtain wall system was on the hotel at the time of the loss?
**A. I don't know if it was unitized or stick. I can't remember, Chris.**
Q. Do you recall getting any investigation as to the manufacturing of the curtain wall system while you were investigating the claim?
**A. I did not.**
Q. Do you know if the curtain wall system



was face-sealed, water-managed, or pressure-equalized?
**A. I do not.**
Q. I may have asked you this, but you don't know the name of the manufacturer of the system on the hotel?
**A. I do not.**
Q. How many floors comprise that hotel, Mr. Walls?
**A. I do not remember.**
Q. You received notice, the records show, of the claim from Mr. Chan on May 23rd, 2017. Does that sound right?
**A. That sounds correct.**
Q. At any point in time did you ever speak to anybody besides Kaho Chan at Hudson about the claim?
**A. Yes.**
Q. Who else did you speak to?
**A. I spoke to John Bresnahan.**
Q. You believe he's with Hudson?
**A. No, I believe he's the risk manager for RDA Management.**
Q. Do you recall what question I asked you?
**A. I thought you said did I speak to anyone other than Mr. Chan?**
Q. No, I didn't.



**A. Okay.**
Q. The question was: Did you speak to anyone at Hudson other than Mr. Chan?
**A. I apologize. No.**
Q. So from the inception of the assignment on May 23rd all the way to your last work on the file in October of 2017, the only representative of Hudson you ever spoke to was Kaho Chan, true?
**A. True.**
Q. What instructions did you receive from Kaho Chan on inspecting the damage caused by the May 8, 2017, hailstorm?
**A. I don't remember specifically what he told me to do, if anything. I don't think I remember that.**
Q. Did he put anything in writing about what inspection you were to conduct on the hotel?
**A. I don't recall that, Chris.**
Q. If Mr. Chan had requested that you inspect the entire hotel for damage from the storm, that's something that you could have arranged, correct?
MR. CAMPBELL: Object to form.
THE DEPONENT: I'm not sure I understand your question, Chris.
Q. (By Mr. Peirce) Well, let's take, for



example, what Hudson did in 2019. They hired J.S. Held. J.S. Held spent two days at the property rappelling, looking at various rooms, photographing damage in various rooms, photographing damage on the exterior elevations, things of that nature, a comprehensive analysis of damage.
If Mr. Chan had said, "Bill, I want you to look at the entire property and determine what's damaged by hail," that's something that you could have done, correct?
**A. If he said that, yes.**
Q. In other words, you could have blanketed a week or however long it took, gotten him to approve whatever experts were necessary, done rappelling, done photographing, all that jazz, correct?
**A. Correct.**
Q. Mr. Chan did not request that you do that, correct?
**A. I never recall him requesting that I have anyone rappel on the building. I don't remember --**
Q. I'm not -- I'm sorry, go ahead.
**A. I don't remember him giving me specific instructions except we met with the insured, who had already had their vendors out and look at the damages, the vendors that maintained the hotel for them.**

MR. PEIRCE: Objection. Nonresponsive.
Q. (By Mr. Peirce) Mr. Walls, we'll get to other parts of this claim in a little bit and what you did and didn't do and who you got information from; but as far as Mr. Chan instructing you, he did not say, "Bill, go evaluate the entire hotel for hail damage"?
MR. CAMPBELL: Object to form.
THE DEPONENT: He did not say that, but he did not tell me not to.
Q. (By Mr. Peirce) And you didn't -- he didn't request a budget from you, correct?
**A. I don't recall that.**
Q. And you did not provide him the budget before doing an investigation, correct?
**A. I don't believe so.**
Q. Mr. Walls, we received a copy of your Cunningham Lindsey file earlier this week or last. You had the property loss notice from the agent of my client in your file, correct?
**A. I almost always do, so I would say yes, that's accurate.**
Q. From your experience in the industry, you know that a property loss notice is typically something generated by the agent for the insured?
**A. Sure, yes.**



Q. And it usually says, "Acord Property Loss Notice" at the top?
**A. Yes.**
Q. And in this case, do you recall what was reported as the damage?
**A. I don't know if the Acord had the list of damage or if there was something accompanying the assignment that had the list of damages.**
Q. So if the Acord said there was a major hailstorm, possible damage to roof and windows of the hotel, you have no reason to dispute that, right?
MR. CAMPBELL: Object. Foundation.
THE DEPONENT: No.
Q. (By Mr. Peirce) You inspected the hotel on May 25th, 2017; is that correct?
**A. Yes, sir.**
Q. And as I understand your inspection, based on us asking questions of Hudson and Mr. Chan and looking at the file materials, you went and looked at damages from my client's list of damages; is that right?
**A. No, I don't think that's correct.**
Q. Why is that not correct?
**A. Because when I met with Briana and Craig, they took me around the hotel -- or not Briana, but**



**Craig, the building engineer, took me around the hotel and showed me the damages, not only that they were claiming, but we also walked around the building.**
Q. You testified earlier -- and correct me if I'm wrong -- that you had a list of damages?
**A. That's correct, they had a list of damages, yes, sir.**
Q. Let me show you an exhibit, which is an e-mail from you. This is an e-mail from you to Kaho Chan on May 31st, 2017. Do you see that?
MR. CAMPBELL: Which exhibit is this, Chris?
MR. PEIRCE: Oh, I'm sorry, it's Exhibit 24.
Q. (By Mr. Peirce) Mr. Walls, can you see this?
**A. I can. I'm reading it.**
Q. Okay.
**A. Yes, sir, I see it.**
Q. So you see the second paragraph here?
**A. Yes, sir.**
Q. Is that accurate as to what the inspection entailed?
**A. Well, those were -- I think we might have looked at more stuff, but the fact of the matter is,**



**this is damage that I observed, Chris.**
Q. Okay. In your e-mail to Kaho, you don't say, "I looked at more stuff," correct?
**A. That's correct, I don't say that.**
Q. So from Kaho Chan's standpoint, he's receiving your initial inspection report, and it's essentially saying what it states, what damage you observed, correct?
**A. Correct.**
Q. You also instructed Kaho Chan that you were waiting on the information about the age of the roof from Ms. Miller, but that she'd only been there a short period of time and cannot provide this, correct?
**A. Correct.**
Q. You determined the roof was older than 10 years old, correct?
**A. It was my -- it was -- looking at this and talking to Craig, it was my opinion that this roof had been on this building longer than 10 years. And I asked them, if it wasn't, to provide me documentation as to when the roof was completely replaced.**
Q. And you didn't receive that documentation?
**A. No, sir, I didn't.**
Q. And so you reported to Mr. Chan that the

roof was over 10 years old?
**A. Yes.**
Q. Is that correct?
**A. Correct.**
Q. Mr. Walls, how long did you inspect the hotel on May 25th, 2017?
**A. I think Craig and I were there for maybe a couple of hours or something like that.**
Q. Again, I don't mean when you were visiting a room or something like that, but I mean actually looking at damages.
**A. We didn't visit in a room very long, Chris.**
Q. So a couple of hours?
**A. A couple of hours. I don't know if it was two hours, two and a half hours, 1.7 hours, I don't remember that, but that's what I remember, that it was a couple hours that I was there, in that area.**
Q. Let me show you briefly your billing invoice. This is Exhibit 25. Mr. Walls, it seems to indicate that your inspection on the 25th took 1.8 hours, according to your billing. Is that right?
**A. Okay. That's right.**
Q. And it talks in here in this billing entry about what you presumably looked at, correct?



**A. Let's see. Craig and I inspected ...**
MR. CAMPBELL: Why don't you read to yourself because it's hard for her to record it.
THE DEPONENT: Oh, I'm sorry. I'm sorry. Okay.
Q. (By Mr. Peirce) Is that what you inspected on the 25th?
**A. Yes.**
Q. Am I reading that correctly, that you looked at the roof levels on the 12th and 6th floors?
**A. Yes.**
Q. Do you know how many roof levels there are on this property?
**A. I'm going to say three, but I don't recall, Chris, exactly.**
Q. This record, down at the bottom on the same day, indicates you took 22 photographs.
**A. Uh-huh.**
Q. Is that what you recall that you took?
**A. Yes.**
Q. You didn't take more than 22 photographs on May 25th, 2017?
**A. No.**
Q. It indicates you confirmed the west-facing vinyl window trim inserts were broken; is



that correct?
**A. Yes.**
Q. And did you determine that was due to hail damage?
**A. It's my recollection that they were going to have inspections done by the repair company that did the maintenance repairs on the building, and that we would talk about that.**
**I believed, it was my opinion then, from what I saw -- just an opinion -- that the cracked vinyl around the windows probably preexisted the storm, likely did, because that west-facing side of the building had a lot of UV. And the windows, I believe -- I don't want to say anything I can't recall, but I do believe that the windows did have condensation in them, which looked like it was long term.**
Q. So unpacking that a bit, you are of the opinion that the west-facing vinyl window trim inserts were broken, but it was not because of the May 8th, 2017, hailstorm; is that correct?
**A. I thought that was quite likely, yes, sir.**
Q. And did you ever give that opinion to Hudson? In other words, the opinion that it was not hail related?



**A. I don't recall.**
Q. Was there anything involved in that decision that it was not hail related, Mr. Walls, other than just your opinion?
**A. No, sir. It also involved my conversation with Craig Ulrich, which I think that's the name of the building engineer that I met with. He and I went around and we discussed all of this, what he was showing me.**
Q. Are you aware that Hudson, in 2019, determined that 126 window sills were fractured by the May 8th, 2017, hailstorm?
**A. I am not.**
Q. Would you disagree with that coverage position?
MR. CAMPBELL: Object. Foundation.
THE DEPONENT: I don't know if it was a coverage position, but I certainly wouldn't argue if they said they had someone rappel down and found that they were broken. I wouldn't argue with that. It's just that, at the time of my inspection, it appeared that this was old damage.
Q. (By Mr. Peirce) I'm not saying whether you argued that they were broken or not. I'm saying, do you disagree with the conclusion that those

fractures were due to the May 8th, 2017, hailstorm?
**A. I don't have anything to draw a conclusion, but I wouldn't disagree.**
Q. But a few minutes ago, you told me that they were likely not due to the hailstorm of May 8th, 2017.
**A. That was my opinion.**
Q. Okay. So it's fair to say you did not inspect all of the roofing levels on May 25th, 2017, correct?
**A. No, I think we did. Craig and I went up on two other roofs, because I remember we went up -- there's a stairs that acts as a scuttle.**
Q. So when you say you inspected the roof on the twelfth floor and the sixth floor, you're saying today that you looked at all the levels?
**A. That's my recall.**
Q. Okay. What did you do to inspect the roof surface on May 25th, 2017?
**A. I don't know what I did. I can't recall.**
Q. And as far as Hudson Insurance Company is concerned, they can only rely on what you report to them, correct?
**A. Yes, sir.**
Q. And did Mr. Chan ever ask you, "Hey,



Bill, did you look at all the roof damage and see if any of it was caused by hail?"
**A. Not to my recall.**
Q. And you recommended to Kaho Chan of Hudson to retain an engineer from Haag; is that correct?
**A. That's correct.**
Q. And as I understand it, Haag didn't get out there until June 7th, 2017; is that right?
**A. Correct, sir.**
Q. Did you inspect the hotel with the Haag engineer at that time?
**A. I was out there for a while. I don't believe I stayed the entire time that Haag was out there.**
Q. Did you go up on the roofing surfaces with Haag or no?
**A. I went up on the, I think, the mezzanine with him. Where they were saying that the water was coming in the lobby, I went up there with Haag.**
Q. When you did go out there on May 25th, 2017, you were shown a window that was broken on the southeast side of the hotel. Do you recall that?
**A. Yes, sir.**
Q. And you opined it was not related to



hail?
**A. Yes.**
Q. What was your opinion as to what it was related to?
**A. A rock being thrown through the window.**
Q. Do you recall what elevation that was?
**A. If I'm correct, that was on the south side of the building -- well, the southeast side of the building, behind a stanchion.**
Q. But how high up, do you recall?
**A. It was on the mezzanine area.**
Q. And why do you believe that somebody threw a rock?
**A. Because there were large rocks all around it. But the fact is, the damage to the window, the damage to the window was behind a large stanchion, in a position where I do not believe the hail would have hit that window.**
Q. Did you, on May 25th, 2017, Mr. Walls, do a comprehensive inspection of all the windows in the hotel to determine if hail damaged them?
**A. I'm not sure what you mean by "comprehensive." Do you mean did I go in every room? Did I rappel down the side of it? I did not do that.**
Q. How many rooms did you go in at all?



**A. I can't recall, but I went in several.**
Q. Where can I see that you documented that you went in several rooms?
**A. I don't recall.**
Q. So if I'm Hudson and I'm only looking at your documents, you don't recall reporting that to Hudson?
**A. I don't recall.**
Q. Do you recall going in the interior of these rooms that you allegedly went in and looking at the exterior window sills to see if there was damage?
**A. I know I went in the room, but I can't tell you what exactly we looked at on the windows.**
Q. Is it fair to say you don't recall if you looked at the exterior of any windows or not, sitting here today?
**A. No, I recall going in the room -- a number of rooms, not just one or two, but a number of rooms.**
Q. What's "a number of rooms" to you, Mr. Walls?
**A. Maybe four or five.**
Q. Do you recall what levels those rooms were on?
**A. They were all on different levels. They**

**had different exposures. Some were on the southwest side of the building. And I even looked at some on the east side of the building.**
Q. Okay. But you're saying you remember, in some of them, looking out at the exterior; is that correct?
**A. Yes.**
Q. Did you observe damage on any of the exteriors of the rooms that you did go in?
**A. No.**
Q. Do you recall how many rooms are in this hotel?
**A. I do not.**
Q. Did you ever inspect for possible sources of water intrusion into the hotel rooms?
**A. I inspected with Haag for water intrusion into the lobby. I also looked at some rooms that had very old, dark stains in them, on the some of the upper floors that weren't under the roof, but I don't specifically want to say I inspected for water intrusion.**
Q. Did you ever report what you just said to Hudson?
**A. I have no idea if I did or not. I don't recall that.**



Q. Did Mr. Chan ever ask you, "Hey, Bill did you observe any water intrusion into the hotel rooms caused by hail?"
**A. I don't recall.**
Q. You also stated on May 31st to Kaho Chan that you were going to do research at the building department of Lakewood to determine the last permit pulled. You didn't follow through on that, correct?
**A. I called the building department, but I must tell you that after this storm, it was pretty tough to get anybody to talk to you. They would not pull records.**
Q. So as of May 31st, if you look at your e-mail to Kaho Chan, you were telling him that you did not believe the roof was damaged from hail, correct?
**A. That's correct.**
Q. And that's before Matthew Sitzmann inspected the hotel, correct?
**A. Correct.**
Q. And you recommended a net reserve of $50,000, correct?
**A. Correct.**
Q. And that was simply based on the vendor invoices from my clients' vendors or contractors, correct?



**A. Yes.**
Q. Did you have any conversation with Mr. Chan about that number, about 50,000?
**A. I don't recall.**
Q. As I understand it, you hired Matthew Sitzmann with Haag after Kaho approved it on May 30th, 2017. Is that correct?
**A. That's correct.**
Q. And as I understand it, he was retained to inspect the skylights, windows, and interior ceiling of the hotel lobby because of that leak that you mentioned earlier?
**A. Yes.**
Q. Did you have any prior experience with Matthew Sitzmann?
**A. I've used him a few times.**
Q. How many is "a few"?
**A. I don't know. I probably used Matt, over the years, 10 times.**
Q. That was before this date of loss?
**A. Yes.**
Q. Have you used him after the May 8th, 2017, storm, except for this claim?
**A. No.**
Q. Is it fair to say you used Haag Engineering many, many times in your career?
MR. CAMPBELL: Object to form.
THE DEPONENT: I have used many roof engineers many times, not just Haag.
Q. (By Mr. Peirce) In fairness, my question was just about Haag.
**A. Right.**
Q. How many times have you used Haag Engineering to evaluate claims for you or for a client insurance company in your career?
**A. You're talking about the entire Haag operation?**
Q. Yes, sir.
**A. Maybe 50 times.**
Q. So you used Haag about 50 times in your career, and you've been drawing Matthew Sitzmann about 10 times; is that correct?
**A. Yes. Yes.**
Q. As I understand it, Mr. Sitzmann issued his report to you, Exhibit 26, on June 16th, 2017. Is that correct?
**A. That's what it says, yes, sir.**
Q. Do you recall reading this report?
**A. Yes, sir.**
Q. And the actual report itself is, what,

three and a half pages?
**A. Yes.**
Q. And if you look at the first paragraph, it says, "In accordance with your request" -- and I'm assuming he's meaning you -- "we inspected the Sheraton Denver West Hotel to determine the cause of water intrusion at a bank of skylights above the lobby, and specifically whether the leak was due to hail. We inspected the hotel on June 7, 2017."
**A. Yes.**
Q. Is that what Mr. Sitzmann's assignment was at this time?
**A. I have no recollection of how accurate what he put in there was, but I know one of the things that we wanted to know was -- Craig Ulrich and I were quite -- it appeared that the skylights had been patched and patched and patched. And we believed that there was some other avenue of water intrusion other than the skylights.**
**So one of the reasons that we had him go out there was because Craig and I had discussed this and we were going to have Haag find out where the water was coming from.**
Q. When you said, "where the water was coming from," you're referring to one specific area?



**A. Well, no, not one specific area. The entire roof, near the lobby. I mean --**
Q. I mean, where the water is intruding into the interior, you're trying to source that, correct?
**A. Correct.**
Q. And that was Mr. Sitzmann's direction, to find out the source of that information, correct?
**A. Correct.**
Q. He doesn't say in his report to you, "I'm inspecting the entire roofing system to determine if there's a tear or if there's hail damage to the entire membrane," correct?
**A. I don't believe the report said that.**
Q. That's your recollection, though, of what he actually did? He didn't inspect the entire EPDM membrane for any damage from hail, correct?
MR. CAMPBELL: Object to the form.
THE DEPONENT: Well, you say that like you don't understand that the roof had 2 or 3 inches of river stone on top of it, so you couldn't inspect the EPDM itself.
MR. PEIRCE: Objection. Nonresponsive.
Q. (By Mr. Peirce) Mr. Walls, do you remember what I asked you?
MR. CAMPBELL: I'll object to your



objection.
MR. PEIRCE: Colin, that's not a proper objection and you know it.
MR. CAMPBELL: Hold it, Chris, it is. I don't think you have any right to object to his answer, in the first place.
MR. PEIRCE: I can object as nonresponsive under the federal rules.
MR. CAMPBELL: In a deposition, I don't agree.
MR. PEIRCE: Well, let's take it up with the judge. You don't think I can object as nonresponsive to a question?
MR. CAMPBELL: In a discovery deposition, no, I don't.
MR. PEIRCE: Under the Rules of Civil Procedure?
MR. CAMPBELL: In a discovery deposition, no, I don't.
MR. PEIRCE: Where are you getting -- you've made this objection multiple times -- what is the rule that you're citing to say that I have to preserve it as a trial objection over a discovery deposition? What rule are you referring to?
MR. CAMPBELL: Because in a discovery



deposition --
MR. PEIRCE: I'm not asking for an explanation. Just what rule? This is discovery and this is a trial deposition. What rule are you citing?
MR. CAMPBELL: Chris, I will give you an explanation.
In a discovery deposition, I limit my objections to form or foundation. In a preservation deposition, I would make objections based upon Rules of Evidence, and I would also do a full cross-examination of the witness.
Those two types of depositions take place under completely different formats. And that is why you would need to specifically designate a deposition as a preservation deposition if you intend to use it as such at trial.
MR. PEIRCE: Colin, that's why I'm asking you what rule you're citing for that position. I understood the position. I don't agree with it, but I understand it. What I'm asking you is: What are you using as the basis for that distinction? Is there a federal rule I'm missing? Is there a local rule I'm missing?
MR. CAMPBELL: Chris, we can have this discussion later. This is not my deposition. It's

Mr. Walls'.
MR. PEIRCE: You keep making this distinction, and I'm asking you to explain, and you're not explaining. You're not citing a rule. But we can address it later, but I've been very clear that I've been asking you to cite the basis.
MR. CAMPBELL: And I have been very clear in explaining the basis, that they are completely different formats.
MR. PEIRCE: I understand you believe they're completely different. I disagree that the federal rules or the local rules require that distinction. What I'm asking you is to cite what you're basing it on.
MR. CAMPBELL: In 38 years of practice, I have never encountered an attorney in a single deposition who has not recognized the distinction between a discovery deposition and a preservation deposition. So the position you are advancing now is one I have never heard before.
MR. PEIRCE: Okay. Are you done, Colin? We can talk about it later.
MR. CAMPBELL: Sure.
MR. PEIRCE: I'm just going to keep going. But what's the basis for objecting to my



nonresponsive objection?
MR. CAMPBELL: Because I think it was responsive, and a witness is entitled to give a full answer to any question you ask, and you don't have the right to either cut him off or make an editorial comment on whether you, in your own opinion, think it was a proper answer or not.
MR. PEIRCE: I have the right of objecting as nonresponsive, and I believe I gave him the opportunity to complete his answer, and I will continue to do that.
MR. CAMPBELL: You have the right to ask followup questions, but I don't believe you have the right to object to an answer in a discovery deposition as being nonresponsive. And if you think it is nonresponsive, and I disagree, then I will express my objection to your position so we have it on the record that I think it was a proper answer.
MR. PEIRCE: Okay, let's move along.
Q. (By Mr. Peirce) Mr. Walls, are you stating today under oath that Mr. Sitzmann did a comprehensive evaluation of any hail damage to the roofing surface when he inspected the property on June 7th, 2017?
**A. I don't recall. I don't recall what he**



**did that day, but I am not saying that he did a comprehensive inspection.**
Q. And you weren't with him the entire time, correct?
**A. I believe that's accurate.**
Q. I can't remember your testimony. Were you with him at all when he was looking at the roofing system itself?
**A. I was for some of the time. I wanted to go up there. I did not go up there inspecting this. I believe that the roof leaks were probably not due to hail, but that was because of the ballasting. And I wanted to help the hotel, Craig, find the leak, which Haag did.**
Q. Do you recall if ...
MR. PEIRCE: Objection. Nonresponsive, by the way.
MR. CAMPBELL: I object to your objection.
MR. PEIRCE: I'll allow you to object to my objection as nonresponsive as a continuing objection. You don't have to keep saying it.
MR. CAMPBELL: Fair enough.
Q. (By Mr. Peirce) Mr. Walls, as far as Mr. Sitzmann's evaluation, since you didn't finish the



day, quote/unquote, with him, was your only analysis what he provided in this report to you of what he inspected, in the June 16, 2017, report?
**A. Yes, sir.**
Q. Did you do any independent investigation of the roof damage other than what Mr. Sitzmann did?
**A. Are you asking me if I did an inspection of the entire roof?**
Q. No, that's not what I asked you. I said did you do any investigation of the roof damage other than what Mr. Sitzmann did? Did you do any independent investigation yourself?
**A. Yes.**
Q. What was that?
**A. I walked the entire roof with Craig Ulrich.**
Q. And you testified earlier that you couldn't tell that it was damaged because it was covered by rock, gravel ballast?
**A. I could not see the EPDM was damaged, but I will add that Craig did not point out any leaks on the interior, under that mezzanine.**
Q. Mr. Sitzmann concluded the EPDM membrane was not damaged by hail, correct?
**A. I believe that's what he concluded, yes.**

Page 45

Q. And these are his opinions right here in his report. "The EPDM membrane was not damaged by hail."
**A. Yes.**
Q. Did you understand that to mean not functionally damaged?
**A. Yes.**
Q. And as I understand it from your file that I recently received, you were provided a copy of the policy, the Hudson policy applicable to this claim, correct?
**A. Yes, sir.**
Q. And did you read the policy?
**A. Yes, sir.**
Q. Did you understand what the policy covered as far as hail damage?
**A. Yes.**
Q. What was your understanding of what it covered with regard to hail damage?
**A. Well, the policy itself covers direct physical loss.**
Q. And was that your understanding?
**A. That's my understanding, that the policy --**
Q. I'm sorry, are you done?

Page 46

**A. I was going to add that the policy also had two endorsements, one specifically for wind and hail deductible of $100,000 and the roof valuation endorsement.**
Q. And you're referring to the ACD limit if the roof is over 10 years old?
**A. Yes.**
Q. Which you've already testified you concluded was 10 years old. Didn't really have a definite basis for that, right?
**A. Correct.**
**Can I clarify something, Chris? Because you slipped a couple little things into your audits. You said I concluded that it was not -- or was of the opinion, but to say I had no basis? I did have a basis. Nobody could tell me if that roof had been replaced. Okay?**
Q. You're talking about the age issue?
**A. Yes. So I did have a basis.**
Q. As far as how old it was, you determined, based on looking at it, that it was under 10 years old?
**A. It appeared to be maybe the original roof.**
Q. Did you read in the policy that you reviewed for Hudson any restriction for functional damage, to your recollection?
**A. No, I didn't read anything in there that said that functional damage was not covered, because functional damage means there still has to be direct physical loss to the EPDM roof.**
Q. Direct physical loss or any damage, right?
MR. CAMPBELL: Object to form.
THE DEPONENT: No, sir, I don't believe any damage because any damage could be somebody ran a car into it before, and now you're trying to say that hail caused it.
Q. (By Mr. Peirce) From a covered peril, Mr. Walls, direct physical loss or damage from a covered peril, correct?
**A. Hail is a covered peril.**
Q. Right, but what I'm getting at is the policy states it covers hail that causes direct physical damage, correct?
**A. Yes.**
Q. It doesn't require functional damage, correct?
MR. CAMPBELL: Object to form.
THE DEPONENT: I believe you're incorrect. I disagree with that.

Page 48

Q. (By Mr. Peirce) So it's your position as the chief investigator of Hudson Insurance Company in 2017 that the policy requires functional hail damage, correct?
**A. It has to have physical damage. If you're saying that any damage that happened is covered, that's incorrect.**
Q. Mr. Walls, I'm saying direct physical loss or damage. Is there some definition that you're reading into that that I'm not?
**A. Well, what is direct physical loss?**
Q. Let me ask you: Is that defined in the policy?
**A. No, I don't think it's defined in the policy, but I think it's defined in the industry, and I'm sure there are court cases on it.**
Q. Okay. So when you're adjusting the claim for Hudson, you're interpreting it as, well, you've got to have some kind of functional damage from hail for it to be covered, right?
**A. Well, there has to be some damage to the roof.**
Q. I'm sorry --
**A. You have to have some damage to the roof, Chris. You can't just go up there and say, "Okay, it**

Page 47

**hailed here; we need a new roof."**
**Have you been on that roof, Chris?**
Q. Mr. Walls, what I'm asking you is: When you're investigating this claim for Hudson, are you requiring -- for instance, let's take the EPDM roof -- are you requiring hail to tear the membrane to provide coverage for the roof, or is it dent from hail that's sufficient?
**A. Well, it would be a couple of things. I see where you're going with this, Chris, and I'm not moving into that position.**
**This roof had rock poured on it at one time. You're talking to me about dents from hail. This roof had rocks. And I don't know if you've ever been up there when they've ballasted a roof, but these guys are not gentle, caring people. They go up there and they put it into the wheelbarrow, then they dump it out on the roof.**
**So I think if there's any damage to the underlayment, it probably would be from that because that roof did not have damage from hail to that ballasted roof. It just didn't happen.**
**When I say, "the roof," we're talking about the membrane.**
MR. PEIRCE: And I'm going to



respectfully object as nonresponsive.
Q. (By Mr. Peirce) Mr. Walls, what I'm trying to get at is: Not just the roof, but when you're looking at the entire scope of the damage from the May 8th, 2017, hailstorm, as the boots on the ground, so to speak, for Hudson, what type of evaluation or threshold are you requiring for hail damage? Are you requiring it to impair the function of a part of the building, or are you requiring simply a dent or indentation or marring?
**A. You're talking about two different things, and there's different case laws on cosmetic damage, which probably, in Texas, you see a lot of to metal roofs. But there has to be some direct physical loss or damage to the roof. It just can't be that it hailed on it.**
Q. What do you define as direct physical loss or damage, Mr. Walls? As you investigated this claim, what were you using as a definition?
**A. Well, it would have to be something that would -- that as a direct result of the hail, the direct physical loss from the hail would have to -- the roof would have to be not appropriate for its intended use, but it would have to be from the hail, not leaking from attendant rain.**



Q. So it has to cause some change in the intended use, correct? I'm using your words.
**A. I would say that's probably accurate.**
Q. Does the same thing apply to the cap flashing of the curtain walls? In other words, if there's a dent and it still functions as a system, you're saying that's not covered? That's hail damage, correct?
**A. No, sir, I'm not telling you that's not covered. It's hail. I'm just saying that parapet caps have one intended purpose, and that is to absorb dents from hail or to keep water off the transition to protect the top of the parapet wall. Having a hail dent in a parapet cap doesn't necessarily render it damaged. I'll just say that. It doesn't render it damaged.**
Q. And what are you basing that on?
**A. I'm basing that on my experience with roofers.**
Q. Anything else?
**A. Engineers.**
Q. Anything else?
**A. Not that I can recall at this time, Chris.**
Q. Do you know if Matthew Sitzmann, in



evaluating the roof on June 7th, ever raked any sections of the rock?
**A. I don't recall.**
Q. Do you know if he took any core samples of the roof?
**A. He did not. I'm pretty sure of that.**
Q. Did you observe all of Mr. Sitzmann's photographs that he took in 2017, or just the ones that are in his report?
**A. Just the ones in his report.**
Q. Do you recall that Mr. Sitzmann opined that hail could have restricted the flow of drains, causing water accumulation on the roof?
**A. Would you restate that question?**
Q. Sure. Do you recall that Mr. Sitzmann opined that hail could have restricted the flow of drains, causing water accumulations on the roof?
**A. I do not recall that.**
Q. Would you agree with that, disagree, or have no opinion as to that?
**A. I would agree with it.**
Q. Mr. Walls, if you could look at a few pictures. These were taken, I'll represent to you, by Aguilar Construction Services after you were finished working on the claim in 2017. These were taken, I

believe, in 2019.
**A. Uh-huh.**
Q. I'm just going to show you a couple -- these are membrane pictures. What is your thought process on what these depict? For instance, photo 6, 16 of 83 of Exhibit 43.
**A. That looks like a rock or something mechanical has hit this EPDM.**
Q. What would you typically see for hail damage on an EPDM roofing surface? In other words, what would lead you to believe that it was hail as opposed to mechanical damage?
**A. Well, a couple of things, Chris. Number one, most of the time when I see EPDM damaged, it's by very large, sharp, jagged hail, and the roofs are not ballasted.**
Q. Anything else?
**A. Nothing comes to my mind right at this time.**
Q. So this picture 6 is mechanical damage probably from a rock, in your opinion?
**A. It could be a rock. It could be somebody walking on a rock.**
Q. Definitely not hail, though?
**A. Well, I don't know that it's definitely**



**not hail because I don't know if this is of the hotel.**
Q. I'm just telling you to look at the actual photograph based on your experience. I'm not telling you where it is or any of that. From your experience, which you've been in the industry a long time -- correct, Mr. Walls?
**A. Yes, sir.**
Q. You've looked at a lot of EPDM roofs, correct?
**A. Correct.**
Q. And I'm asking you -- just, for instance, on photograph 6 of Exhibit 43, you're telling me, it's probably mechanical damage from some source, but, in your opinion, it's definitely not hail, correct?
**A. No, I'm saying if this is the roof on the hotel, I believe it's mechanical or someone walking on it. I don't believe that that is hail, but I wouldn't rule that out because I can't look at a photograph and tell you. I need to be on the roof.**
Q. Okay. What about picture 5, the same thing apply there?
**A. Yeah, I'd have to be on the roof to tell you if that was hail damage or if it was in fact mechanical damage.**
Q. But you can't tell just looking at the



picture itself?
**A. Of course not.**
Q. What makes it a requirement to be on the roof itself to determine whether it's mechanical or hail?
**A. Well, there's a couple of things. Number one, I need to know where this is. If it's beside an HVAC system, where somebody has been up there with pipes and buckets and wrenches and stuff like that, that might make a difference. Number two, was the roof ballasted?**
Q. Anything else?
**A. Yeah, I just -- I have to look at it, see what condition the roof is in to see if -- you know, some of the roofs, if they're left out here in Colorado, because of our altitude -- we have a lot of UV -- roofs become very brittle. When people walk on ballast or throw things on the roof, they can be punctured or torn. But generally your EPDM is pretty resistant to hail.**
Q. Mr. Walls, you weren't present when any ballast was applied to this roof, right?
**A. No, I wasn't.**
Q. And you don't know how it was applied, correct?



**A. I've got a pretty good idea, but, no, I don't know how this was applied.**
Q. And are you aware of any neighboring properties that had EPDM roofs that were replaced and damaged from this storm?
**A. No, I'm not aware of that.**
Q. Were you aware that there were exposed surfaces of this EPDM roof at the time of the May 8th, 2017, hailstorm?
**A. There was a section that had been repaired, and I don't think that the ballast had been put back completely, but the EPDM patch, which was a pretty big patch, the EPDM patch, if I recall, was brand new.**
Q. Is that the only area you believe that was exposed to the elements on May 8th, 2017?
**A. That's all I can recall.**
Q. Do you have any idea what was exposed to the elements on May 8th, 2017?
**A. I can't recall.**
Q. What I'm asking you is: Do you have any evidence to base any opinion on what was exposed on May 8th, 2017?
**A. My basis -- well, no, I don't.**
Q. Mr. Walls, on July 14th, 2017, you

e-mailed Briana Miller, correct?
**A. Yes.**
Q. And you asked if RDA would be withdrawing their claim; or, in the alternative, if they would submit estimates, then you could send them a lower deductible letter, correct?
**A. Yes, I see that.**
Q. And then Exhibit -- hold on a second, let me find it -- on July 26, 2017, you e-mailed RDA's representative about retiring your file because the estimates Ms. Miller provided would not exceed the $100,000 deductible; is that correct?
**A. Yes, that's what --**
MR. CAMPBELL: Object to form.
THE DEPONENT: Yes, that's what it says.
Q. (By Mr. Peirce) And as I understand it, you at that point, as the Cunningham Lindsey representative, did retire your file at that point?
**A. Yes, sir.**
Q. And did you believe that Cunningham Lindsey had done a comprehensive investigation of all of the possible hail damage to the property from the May 8th, 2017, hailstorm, as of that date?
MR. CAMPBELL: Object to form.
THE DEPONENT: It was my belief that we



had worked with the insured to ascertain the damages. I never, ever told them not to send me estimates, but they weren't sending the estimates for the damages that they showed me and we agreed on from their regular contractors. We had agreed to do that because that was the easiest way for RDA, Ms. Miller, Mr. Ulrich to work with the same people that they had used over the years, or at least since they had been there.
MR. PEIRCE: Objection. Nonresponsive.
Q. (By Mr. Peirce) Mr. Walls, I wasn't asking about what my clients provided or didn't provide. I asked: Was that a comprehensive investigation by Cunningham Lindsey of all of the damage to the property from hail from the May 8th, 2017, hailstorm?
MR. CAMPBELL: Object to form.
THE DEPONENT: Yes.
Q. (By Mr. Peirce) So it's your position, on behalf of Cunningham Lindsey, that you evaluated the entire property as of July 26, 2017, to determine if hail damage from the May 8th, 2017, storm occurred?
**A. No.**
Q. So the distinction you're making is that my clients hadn't provided you any more estimates or contractor bids from any vendors or contractors of



theirs that would indicate any more damage than you already looked at; and, therefore, you felt like you did a comprehensive investigation?
**A. I worked with Ms. Miller, Mr. Bresnahan, and Mr. Ulrich to determine the extent of damages through them, with allowing them to provide estimates to us of the damage.**
Q. Mr. Walls, are you aware that Hudson has testified in this case that they're required to do an independent and full investigation of the covered loss?
**A. Yes -- well, no, I'm not aware of it, but that would be the norm.**
Q. So irrespective of what my clients provided, do you believe that Cunningham Lindsey did a full and comprehensive investigation of all of the covered loss?
**A. Can you define "full and comprehensive"?**
Q. Well, for instance, did you look at the exterior damage on all of the west curtain wall?
**A. Well, that would be a no, if you're asking me that.**
Q. Well, that's what I'm asking. Comprehensive means --
**A. Yes, I understand what comprehensive means, Chris. I did not rappel down the side or hire**



**anybody to rappel down; but when it was brought to the attention, I'm assuming that somebody hired somebody to rappel down the side of the building.**
Q. Nor was it ever discussed with Kaho Chan, between you and Kaho Chan at any point, of doing a comprehensive investigation, correct?
**A. Correct.**
MR. CAMPBELL: Chris, when you get to a good breaking point ... we've been at it for about an hour and 20 minutes.
MR. PEIRCE: Sure. Let's take a break right now, then. Ten minutes?
MR. CAMPBELL: Yeah, that's fine.
(A recess was taken from 2:22 p.m. to 2:34 p.m.)
Q. (By Mr. Peirce) Mr. Walls, I'm not sure if I asked you earlier, but we're not set for trial in this case yet, but did I already ask you about relocating or moving? Do you have any plans to do either?
**A. No, I'm not relocating, but my wife and I, we go to Branson in October.**
Q. Branson, Missouri?
**A. Branson, Missouri. My wife loves it there. And we spend September in Dolores, Colorado,**

**heretofore.**
Q. How long are you in Branson typically?
**A. Four days. That's all I can afford.**
Q. And that's in October?
**A. Yes.**
Q. Okay. But other than that, you don't have any plans to move from Colorado?
**A. No.**
Q. I'm going to show you your report in this case. You see that?
**A. I do.**
Q. It's Exhibit 26. Is this your report that you issued to Kaho Chan?
**A. It is.**
Q. And that was the only report in the file that you actually drafted; is that correct?
**A. That's correct.**
Q. Now, I understand your son Ryan drafted the second report, also called first report, for some reason, right?
**A. Correct.**
Q. Can you tell me what Ryan's involvement was in this claim?
**A. In October, I had a loss, a meeting or something. I know this. And during the period of**



**October 10, 11, and 12, I was in Kansas City. And I think Ryan, at my request, put together the damages submitted and authored a report to Kaho.**
Q. When you say he put together the damages submitted, you just mean from my clients' contractors and vendors?
**A. Yes, sir, that's exactly what I mean.**
Q. And are those the ones -- we can look at it later -- but those are the ones that he attached to the October report?
**A. Yes, sir.**
Q. Is he the one who prepared the statement of loss that was included in the October report?
**A. I do not know. I don't know if I did that or if he did it, but -- I can't recall, Chris.**
Q. Okay. In this Exhibit 28, this is defined as "Hail Loss Cat 1732." Where did you get that information from?
**A. PCS.**
Q. What does PCS stand for?
**A. Property Claim Services.**
Q. And what is that? Is that a website? A database?
**A. Property Claim Services is owned by the insurance industry, and they issue all the catastrophe**



**numbers for tracking for hurricanes, hailstorms. I believe now, if the damages are over so many millions of dollars, that they issue these numbers.**
Q. That means total insurable losses in an area, or something like that?
**A. Yeah, and it includes commercial, homeowners, cars.**
Q. You don't know what the threshold number is for this storm?
**A. I don't recall what it was in this storm.**
Q. And on this Exhibit 28, it says, "Major & Complex Loss" at the top right-hand corner, under "Cunningham Lindsey," and the top left; is that correct?
**A. Yes, sir.**
Q. You told me earlier that you believe this is a major and complex loss or qualified. Would you consider this a large loss?
**A. At the time it was received and inspected, that's all relative. To me, a large loss is much larger than this; but to someone who does homeowners, it's probably considered a large loss.**
Q. Is there a damage threshold you consider for --
**A. No. I have clients that send me smaller**



**claims too. They send me smaller claims or special -- claims that need special attention. I did Mr. Donald Sturm's residence, not because I wanted to, but because I was asked by the insurance company to do it so that he could deal with me. So not --**
Q. I'm sorry.
**A. I was just going to say, every loss I had -- you know, I've done Paul Edgerley's home. He's the CEO of Bain Capital. I've done a number of homes out here for people, and I don't do residential, but I do, sometimes as a favor to my clients, go handle residential losses.**
Q. Just so I'm clear, there's no definition of large loss as far as dollar amount, though, correct?
**A. No, there's no threshold.**
Q. But when you're adjusting losses for large homeowners or heads of companies, et cetera, are you representing them, or are you representing -- or being retained by the insurance company?
**A. I'm being retained by the insurance company.**
Q. You never served as a public adjuster?
**A. No.**
Q. Do you believe that there is a negative connotation associated with public adjusters in the

industry?
**A. Absolutely not.**
Q. Would you agree with the sentiment there's good and bad actors on both sides?
**A. Well, sure.**
Q. Okay, Mr. Walls, this talks about your inspection, Exhibit 28, on May 25th. And then it says you discussed your findings with Hudson. Would that be Kaho Chan?
**A. Yes.**
Q. Now, we deposed Kaho Chan and the corporate rep for Hudson, and they talked about you forwarded this to them. Is there anything in particular you recall discussing with Mr. Chan when you sent this report in?
**A. No, I don't recall discussing anything with Kaho.**
Q. On page 3 of 8, it talks about the damages observed, and it states, "conformed with the insured's list as follows," and you see the bulleted items?
**A. Uh-huh.**
Q. Is that a yes?
**A. Yes. I'm having trouble reading. I'm sorry, Chris.**



Q. That's okay. I just want to make sure your answer was on the record.
**A. Yes.**
Q. And when you're saying, "list," are you just referring to invoices and bids from contractors?
**A. No. I had an e-mail or -- I had something from them, and I don't recall what it was, that had all -- they had done an inspection. They had all this damage. And one of their correspondences mentioned to me that they were having the exterior inspected by BluSky, the exterior and the roof was going to be inspected by BluSky Restoration, who does a ton of this kind of stuff in town. But I never saw any results of that.**
Q. So your position is that my client, in some e-mail, provided a list of all of the damaged items?
**A. Yes.**
Q. And do you recall who allegedly sent this list in?
**A. I can't remember if it was Mr. Bresnahan, Ms. Miller, or Mr. Ulrich.**
Q. Did you ever have any e-mail correspondence with Mr. Ulrich?
**A. No, sir, I did not.**



Q. So the only people that you corresponded with was Briana Miller and John Bresnahan?
**A. Yes.**
Q. At least for my client, right?
**A. Yes, sir.**
Q. But you're saying that either Briana or John sent you an e-mail that had a list of claimed damages, correct?
**A. Yes.**
Q. Was there a monetary amount attached to the list inside the body of the e-mail that you allegedly received?
**A. I do not recall.**
Q. And if you allegedly received this e-mail, it should be in your file, correct?
**A. I believe so, yes.**
Q. Would there ever be an instance where it would not be in your file?
**A. There could be an instance that it wasn't in my file. Could be, yes.**
Q. And, I'm sorry, your answer about whether they included a dollar amount for each item, like the ceiling and the lobby area?
**A. I told you that I do not recall if they had any.**



Q. Was this bulleted itemization on page 3 of 8, was this what was in the body of the e-mail that you allegedly received, these descriptions? You see where it says, "Pool dome had dents in plastic cover"; "Lobby skylight broken"; et cetera?
**A. I'm sorry, Chris, it just takes me longer to read it because it's small.**
Q. Sure.
**A. I think that's a summary of it. I would not want to tell you that that was exactly what was in the e-mail that they sent to me, but I believe that's probably a pretty close representation of what they were claiming as damages.**
Q. And Ms. Miller was telling you that the loss estimates she received would not exceed 100,000; is that your position?
**A. Well, it wasn't my position. That's what she told me.**
Q. Okay. So you agree that she told you that the loss estimates would not exceed the hail deductible?
**A. Yes, sir.**
Q. When we're talking about loss estimates, those are the ones that Briana Miller went and got on her own, right?

A. These were the ones that she was submitting to Hudson Insurance as their damages.
Q. Right, but you weren't involved in procuring or securing those estimates of damage?
A. No, sir, I was not.
Q. What is an ITC valuation?
A. Insured to -- well, it's insured to value, but ...
Q. What does ITC stand for? I'm sorry.
A. Insured to -- I can't remember what the C -- I guess I've been retired too long, I can't remember what the C stands for, but it's insured to value.
Q. This report in Exhibit 28 talks about the use of experts and how Hudson authorized you to retain Haag to inspect the roof relative to the claimed damage resulting in water leaks into the lobby area of the hotel?
A. Yes.
Q. And that was Mr. Sitzmann's role, correct?
A. Yes, sir.
Q. So as I understand it, as we discussed before we took a break a while ago, after you sent this report, you closed your file, correct?



A. I retired my file, yes, sir.
Q. And if you look at -- if you look at Exhibit 52 to your deposition, this is an e-mail from Matthew Sitzmann to you on June 15th, 2017, at 2:56 p.m., correct?
A. Yes.
Q. And he's providing you his report on the hotel, correct?
A. Yes.
Q. And that's the first time you received it, correct?
A. That's the first time I received it.
Q. If you look at Exhibit 50 to your deposition, this is an e-mail from you to Kaho Chan on the same day, June 15th, 2017. You're discussing inspecting the roof where the insured said the leak was caused by the storm. However, it was related to the large tear in the roof membrane, which was not the result of the hail. And you say, "Right now we are awaiting a bid on the pool dome. It does not appear the damage, unless we have a real surprise, will exceed the $100,000 wind hail deductible."
That's what you told Mr. Chan on June 15th, 2017, at 2:16 p.m., correct?
A. Correct.



Q. And this was in response to an e-mail from Kaho Chan to you asking about the quantum. In other words, how much are we talking for the loss, correct?
A. Yes, sir.
Q. So when you responded, Mr. Walls, that unless we have a real surprise, it will not exceed the $100,000 deductible, that was before you had Mr. Sitzmann's report, correct?
A. Correct.
Q. Do you know if Mr. Sitzmann provided you photographs of all levels of the roof?
A. I don't recall that.
Q. Did you ever provide -- first of all, do you know what I'm referring to, Mr. Walls, when I say the beauty cap on the building walls?
A. You talking about the parapet cap?
Q. I'm talking about the cap flashing. Let me see if I can find a picture for you.
A. I know what the cap flashing is, yeah.
Q. It's called in the industry several different terms, I believe, but beauty cap is another one, cap flashing.
Did you report to Hudson all of the damage from the cap flashing caused by hail?



A. I don't believe there was, your words, all that damage. I believe there were some dings, but it did not look like it had functionally damaged the cap.
Q. Okay. So the reason you didn't report it to Hudson, from what you observed, was that it was not functionally damaged, correct?
A. Well, there's maybe another reason too. Oftentimes when I inspect commercial roofs and they have the cap flashing, there may be prior hailstorms, prior events. There might be a myriad of things on the cap flashing.
Q. Okay. I saw that in there. The two reasons you wouldn't have reported this to Hudson was because, number one, it wouldn't be functionally damaged; and, number two, it may have been caused by something else that wasn't the result of this hailstorm?
A. Right. It might have just been several storms, because we have a lot of storms in those areas.
Q. Right. And you went, what, two weeks after the big storm on May 8th, 2017, correct?
A. I went two days, I think, after it was reported.
Q. Right, but you remember when the storm

was, right, May 8th?
**A. I remember.**
Q. And you went on May what? 25th?
**A. 25th, yes.**
Q. All right. What do you call -- this is Exhibit 26, which is a Haag report. Do you see this metal trim?
**A. Yes, sir.**
Q. Is that what you call it, metal trim? What do you call that?
**A. That's trim -- the trim there that hides the curtain wall hangers.**
Q. So did you report this as damage to the metal trim? You see where it has dents up and down it?
**A. Well, I see some dents. The bends were probably there when they installed that. I hate to say that, but that often happens. But I do see some dents in it. And I think, if I talked to Briana, they were going to have Seagren look at that.**
Q. Do you recall that, Mr. Walls, or that's just --
**A. Well, we had conversations about that, but they were going to secure estimates on this damage through their vendors.**
Q. But your retained expert, Mr. Sitzmann,



captured this, correct?
**A. Yes, we saw that, I remember, when we were out there.**
Q. And he says in this caption that it was dented by hail. He doesn't say it was installation or anything like that, correct?
**A. Well, let's clarify something, Chris. When you see some of these things where these are arched when they're put on and they're not perfectly straight, that's not hail damage. The dent can be by hail.**
Q. Right, but I'm not asking that. I was just asking what Sitzmann determined it to be.
**A. Well, he said it was dented by hail.**
Q. But you didn't give Mr. Chan a cost estimate of how much it would cost to replace all the dents --
**A. No, because --**
MR. CAMPBELL: Hold it. Before you answer, object to form. I'm sorry, go ahead.
Q. (By Mr. Peirce) Let me finish my question, Mr. Walls, and then I'll let you finish your answer.
You did not give a cost estimate to Hudson for hail indentations similar to what we're



seeing in Exhibit 4 of -- or picture 4 of Exhibit 26 after this investigation that you conducted, correct?
MR. CAMPBELL: Object to form.
THE DEPONENT: I did not provide them with it because I was awaiting the Sheraton RDA Management estimate from their repair facilities.
Q. (By Mr. Peirce) Mr. Walls, you surely have the experience to do your own cost evaluation of covered damage, correct?
**A. Are you asking me, can I use Xactimate?**
Q. I'm asking you whether you have the expertise to do your own cost evaluation of covered damage from hail. I believe it's yes, but if it's not, let me know.
**A. It is yes.**
Q. I believe you've done cost estimates throughout your career, correct?
**A. Not so much lately. When I say, "lately," when I started handling commercial, large commercial losses, I usually worked with the insured to secure the extent of damage through their contractor rather than me writing an estimate and having an attorney and a PA say, "You're not an expert on that and you lowball these people" or "you wrote it too much." So I work with them to determine the cost to**



**repair the building.**
Q. So how many estimates have you done in your career? Thousands?
**A. Maybe.**
Q. Maybe more?
**A. Maybe.**
Q. Tens of thousands?
**A. No, not tens of thousands, Chris, because until 1991, we didn't have Xactimate.**
Q. Let me ask you this, Mr. Walls: If you have a contractor whose tunnel vision is only looking at certain areas, is it fair to rely on the insured to report the damage through that contractor, or is there an independent duty to evaluate all of the covered damage?
MR. CAMPBELL: Object to form.
THE DEPONENT: I think there's an independent duty for me to validate and verify the damages that are presented by the insureds.
Q. (By Mr. Peirce) So the keyword there is "presented" by the insureds. So if it's not presented by the insured, Mr. Walls, you're not going to evaluate it; is that fair?
**A. No, that's incorrect.**
Q. Okay. So tell me how you evaluate it if

it's not presented by the insured.
**A. I don't think I have an answer for that.**
Q. Okay. So, as I understand it, after you closed your file on July 26th, 2017, it was reopened in August because there was a report from Mr. Bresnahan that there was additional damage; is that right?
**A. Yes.**
Q. And this is Exhibit 31, which is an e-mail from you to Briana and John Bresnahan. I guess the agent reported it, "advising more damages have been discovered and the amount of work has escalated."
Do you recall receiving that information?
**A. I don't think I recall it, but I guess I did. You're asking me if I recall something three years ago.**
Q. Sure. I sometimes forget what happened last week, I agree with you, but, nevertheless, it's in your e-mail back to them about what information you received, correct?
**A. Right, yes.**
Q. Okay. So, at that point in August of 2017, was the Cunningham Lindsey file reopened?
**A. I can't answer that.**
Q. Would it be the occasion where you would keep your file closed and still work on the file?



**A. Yes.**
Q. Okay. So it's possible it was closed at this time; it's possible it was reopened, correct?
**A. Yes.**
Q. And you're asking -- after receiving this information, you're asking Briana and John Bresnahan, "Please advise if the newly discovered damages will exceed the $100,000 Hail deductible and forward all of the vendor estimates/invoices to our attention," correct?
**A. Correct.**
Q. That's at the bottom of that e-mail?
**A. Yeah.**
Q. Did you request that, Mr. Walls?
**A. Well, I can't see the bottom of it. It's from me --**
Q. Let me pull it up a little bit.
**A. Yes, I said that.**
Q. In order to confirm this new damage, you did not go back out to the property again, correct?
**A. Correct.**
Q. So how did you verify this was covered damage or not, the new damage?
**A. I don't know that there was any damage that was substantially different when they sent us all**



**the invoices.**
Q. Okay. Your first report said the damage was $100,000 or less, right?
**A. Right.**
Q. And then Ryan, through, I guess, you approving it maybe, issued this October 10, 2017 report, correct?
**A. Yes.**
Q. That's Exhibit 32, correct? I'll show you --
**A. Mine isn't Bates-stamped.**
Q. -- an October 10, 2017, report from Cunningham Lindsey that was drafted by Ryan Walls, correct?
**A. Correct.**
Q. In this report, the building damage is now $145,000?
**A. Yes.**
Q. That's quite a bit more than the $100,000, correct?
**A. Yes, sir.**
Q. But, as I understand it, Cunningham Lindsey didn't go back out to the property and look at the new claimed damage. Correct?
**A. I think that's accurate.**



Q. Why would you recommend payment for that amount if it wasn't -- if you didn't verify it was covered or not?
**A. Because we had the estimates in the invoices, which appeared to comport with covered items. It was just an increase; in other words, they found some more. They increased it. Chris, you have to remember, I was working with your client.**
Q. Right, I understand. You're doing everything in your power to help our client; is that correct?
**A. Well, I'm certainly working with them. That's a pretty broad statement.**
Q. But you're also working with Hudson, correct, and you're getting paid by Hudson, correct?
**A. Yes.**
Q. Okay. Just so I'm clear, when you went out originally, you did confirm whether the damages were covered or not, correct?
**A. Yes, if they were related to the hailstorm, yes.**
Q. And then after receiving new damages, Cunningham Lindsey revised their estimate without confirming and reinspecting the property?
**A. That would be correct.**

Q. So is it your testimony that you reviewed this entire first report that's Exhibit 32 before it went out to Hudson?

**A. Yes.**

Q. How did that work? Did Ryan send it to you? Did you help him type it?

**A. No, I believe on these, that he e-mails them to me.**

Q. So you were out of town and he e-mailed it to you, and you said, Good to go, send it on?

**A. That's what I said, yeah, Good to go.**

Q. But did Ryan do any evaluation of the new damages that were submitted?

**A. No.**

Q. Everything with regard to adjusting or investigation from Cunningham Lindsey's perspective in 2017 was done by you, correct?

**A. Yes, sir.**

Q. And Ryan didn't have any involvement aside from typing this report?

**A. Yes, that's correct.**

Q. The information and data contained within the report in Exhibit 32 is all coming from you?

**A. Yes, sir.**

Q. And as I understand it, this report,



Exhibit 32, determined the net claim was $1,578.66?

**A. Yes, sir.**

Q. And that means that after application of the $100,000 deductible and the nonrecoverable depreciation determined by Cunningham Lindsey, my clients would receive $1,578.66 in their pocket?

**A. Correct.**

Q. Do you know how many photographs Cunningham Lindsey supplied as part of this report to Hudson?

**A. I don't recall.**

Q. I think the back of the report has the photos. So one, two, three, four, five photos?

**A. Yeah, there's five photos there. They're not my photos.**

Q. They're photos obtained by my clients?

**A. By Seagren.**

Q. Or some vendor of my client?

**A. Yes.**

Q. So as far as the submission of photographs in total from 2017, you submitted 22 photographs to Kaho Chan after your May 25th inspection, correct?

**A. Correct.**

Q. And then five in this report. And then



there were 33 in Matthew Sitzmann's report?

**A. Correct.**

Q. Were there any other photographs that were submitted to Hudson that you're aware of in 2017?

**A. I'm unaware of any other photographs.**

Q. So with regard to what you were contending was the damage amount, covered damages were, as determined by you, was 145,553.25 of the building?

**A. Yes.**

Q. And that was based on the statement of loss, I believe --

**A. It's at the bottom.**

Q. Oh, it's at the bottom?

**A. Yeah. Keep going. It's below the photographs, Chris.**

Q. It's by the photographs?

**A. Yeah, I saw it.**

Q. I thought it was in here somewhere.

MR. CAMPBELL: It's the last page.

Q. (By Mr. Peirce) Okay. So this is the statement of loss that was provided by you to Hudson, correct?

**A. Yes, sir.**

Q. And all of this, this 146,799.42 was covered losses from the May 8th, 2017, hailstorm,



correct, with the exception of any nonrecoverable depreciation?

**A. That's the damages that had been submitted. We did not disagree with it.**

Q. Meaning you were recommending that Hudson pay them as being caused by the hailstorm on May 8th, 2017, correct?

**A. Yes, sir.**

Q. Well, I'm getting there.

Mr. Walls, on October 13th -- what number is this? Let me show you what I've marked as Exhibit 55. This is an e-mail on October 13th, 2017, from you to Ms. Miller.

**A. Yes, sir.**

Q. Is that correct?

**A. Yes, sir.**

Q. And this is essentially, I guess, attaching the statement of loss we just looked at?

**A. Yes, sir.**

Q. And it says, "The Statement of Loss provides an outline as to how we determined the loss using the invoices provided by RDA Management." And that is how you determined the amount of loss, correct?

**A. Yes, sir.**

Q. You also state -- you also apparently

attached the proof of loss to this e-mail?
**A. Yes, sir.**
Q. And that proof of loss was $1,578.66?
**A. That was the net amount, yes, sir.**
Q. Right. And that's the amount that was on the proof of loss that you attached, correct?
**A. To my recollection.**
Q. And if you look at Ms. Miller's e-mail back to you on October 18th, she says, We would like to cancel the claim since we will be incurring all the expenses?
**A. Yes, sir.**
Q. Is that correct?
**A. That's what it says, yes, sir.**
Q. Did you ever talk to her about that?
**A. I do believe we had a conversation, but I don't know what it was exactly.**
Q. Are you aware of the damages that Hudson later determined were caused by the May 8th, 2017, storm?
**A. I have no idea, Chris.**
Q. Would you be surprised to learn it was over $365,000?
MR. CAMPBELL: Object. Foundation.
THE DEPONENT: I'm not surprised at



anything anymore, Chris.
MR. PEIRCE: Good answer. Good answer.
Okay, Mr. Walls, I'll pass you for now.
Thank you.

EXAMINATION

BY MR. CAMPBELL:
Q. Mr. Walls, I just want to clarify one thing. You were asked earlier in this deposition about a reference you made in your first report that vinyl window trim inserts were broken?
**A. Yes, sir.**
Q. And when we looked at the statement of loss that was contained within that final report, there was reference to replacing bug seals at a cost of over $18,000?
**A. Yes.**
Q. So was it your understanding that the broken vinyl trim inserts were in fact included in the evaluation of this loss?
**A. The bug seals for sliding doors and the vinyl inserts, I thought were the same thing. That's what I thought.**
Q. Okay. And that's why I was asking for your understanding. I may not have asked the question --



**A. The rubber/vinyl inserts, yeah.**
Q. Does that mean the statement of loss does in fact include the cost to fix the damage that you had noted in your report?
**A. Yes.**
Q. And then also you were asked about some damage to the trim on the elevations of the curtain wall?
**A. Right.**
Q. Again, the statement of loss includes a value of over $44,000 for exterior wall repairs. So, again, is it your understanding that, in your report, you did include the cost to repair the damage to the exterior trim that you observed?
**A. Yes.**
MR. PEIRCE: Objection. Form and foundation.
MR. CAMPBELL: Those are all the questions I have. Thank you.
MR. PEIRCE: Thank you, Mr. Walls.
THE DEPONENT: Thank you, Chris. Have a good day.
MR. PEIRCE: You too.
(WHEREUPON, the deposition was concluded at 3:15 p.m.)



CHANGES AND SIGNATURE

WITNESS NAME: WILLIAM F. WALLS
DATE OF DEPOSITION: JUNE 11, 2020

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|

I, WILLIAM F. WALLS, have read the foregoing deposition and hereby affix my signature that same is true and correct except as noted above.

___________________________
WILLIAM F. WALLS, witness

THE STATE OF ________________)
COUNTY OF ____________________)

Before me, __________________________, on this day personally appeared WILLIAM F. WALLS, known to me (or proved to me under oath or through ___________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that said person executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _______________, ________.

___________________________
Notary Public in and for
the State of ______________



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02145-DDD-NYW

RDA HOTEL MANAGEMENT COMPANY and LAKEWOOD HOTEL COMPANY,

Plaintiffs,

vs.

HUDSON SPECIALTY INSURANCE COMPANY

\-------------------------------------------------------

REPORTER'S CERTIFICATE
VIDEOCONFERENCE DEPOSITION OF WILLIAM F. WALLS
TAKEN ON JUNE 11, 2020

\-------------------------------------------------------

I, JANA MACKELPRANG, Certified Realtime Reporter, Registered Professional Reporter, and Notary Public, hereby certify to the following:

That the witness, WILLIAM F. WALLS, was duly sworn by me and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition was submitted on _____________________ to the attorney for Plaintiffs to examine, signature, and return to me by ________________;

That the amount of time used by each party is as follows:

Mr. Christopher P. Peirce - 108 minutes



Mr. Colin Campbell - 3 minutes

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Christopher P. Peirce, Attorney for Plaintiffs, RDA Hotel Management Company and Lakewood Hotel Company

Colin Campbell, Attorney for Defendant, Hudson Specialty Insurance Company

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

Certified to by me this 23rd day of June, 2020.

_________________________
JANA MACKELPRANG
CSR, CRR, RPR
CO Notary ID 19874123903
Expiration Date: 1/24/2024

**Exhibits**

**Walls Exh 024** 3:3 23:13, 14

**Walls Exh 025** 3:4 25:20

**Walls Exh 026** 3:5 36:20 61:12 73:6 75:1

**Walls Exh 028** 3:6 62:16 63:11 65:7 69:14

**Walls Exh 031** 3:8 77:8

**Walls Exh 032** 3:9 79:9 81:2,23 82:1

**Walls Exh 043** 3:11 53:6 54:12

**Walls Exh 050** 3:12 70:13

**Walls Exh 052** 3:13 70:3

**$**

**$1,578.66** 82:1,6 85:3

**$100,000** 46:3 57:12 70:22 71:8 78:8 79:3,20 82:4

**$145,000** 79:17

**$18,000** 86:15

**$365,000** 85:23

**$44,000** 87:11

**$50,000** 34:21

**1**

**1.7** 25:16

**1.8** 25:21

**10** 12:24,25 24:15,19 25:1 35:19 36:17 46:6,9,21 62:1 79:6,12

**100,000** 68:15

**11** 62:1

**11th** 7:8

**12** 62:1

**126** 28:11

**12th** 26:10

**13th** 84:10,12

**145,553.25** 83:8

**146,799.42** 83:24

**14th** 56:25

**15th** 70:4,15,24

**16** 44:3 53:6

**16th** 36:20

**1732** 62:17

**18th** 85:9

**1991** 76:9

**1st** 10:21

**2**

**2** 38:19

**20** 5:15,18 12:24,25 60:10

**2015** 10:21

**2017** 4:18 12:6 14:7 15:4 17:9 18:11 19:7,12 22:15 23:10 25:6 26:22 27:20 28:12 29:1,6,9,19 30:9,22 31:19 35:7,23 36:20 37:9 42:24 44:3 48:3 50:5 52:8,25 56:9,16,19,23,25 57:9,23 58:15,20,21 70:4, 15,24 72:22 77:4,22 79:6, 12 81:17 82:21 83:4,25 84:7,12 85:19

**2018** 9:16

**2019** 9:16,17 11:17,24 12:1,3 20:1 28:10 53:1

**2020** 11:14

**22** 26:17,21 82:21

**23rd** 18:11 19:6

**24** 23:14

**25** 25:20

**250** 13:15

**25th** 22:15 25:6,21 26:7, 22 29:9,19 30:21 31:19 65:7 73:3,4 82:22

**26** 7:15 36:20 57:9 58:20 61:12 73:6 75:1

**26th** 77:4

**28** 62:16 63:11 65:7 69:14

**2:16** 70:24

**2:22** 60:14

**2:34** 60:15

**2:56** 70:5

**3**

**3** 38:19 65:18 68:1

**30** 6:23 7:9

**30th** 35:6

**31** 77:8

**31st** 23:10 34:5,13

**32** 79:9 81:2,23 82:1

**33** 83:1

**38** 41:15

**3:15** 87:25

**3rd** 7:3,4

**4**

**4** 75:1

**43** 53:6 54:12

**5**

**5** 54:20

**50** 36:14,15 70:13

**50,000** 35:3

**500** 12:16 13:14

**52** 70:3

**55** 84:12

**6**

**6** 53:5,20 54:12

**6th** 26:10

**7**

**7** 37:9

**7th** 30:9 42:24 52:1

**8**

**8** 19:11 65:18 68:2

**83** 53:6

**8th** 4:18 14:6 15:4 17:9 27:19 28:12 29:1,5 35:22 50:5 56:8,16,19,23 57:23 58:14,21 72:22 73:1 83:25 84:6 85:19

**9**

**94** 4:22

**A**

**Absolutely** 65:2

**absorb** 51:11

**accompanying** 22:7

**accordance** 37:4

**accumulation** 52:13

**accumulations** 52:17

**accurate** 21:21 23:22 37:13 43:5 51:3 79:25

**ACD** 46:5

**Acord** 22:1,6,9

**actors** 65:4

**acts** 29:13

**actual** 36:25 54:3

**add** 44:21 46:1

**additional** 77:6

**address** 15:10 41:5

**adjust** 15:22

**adjusted** 14:20

**adjuster** 15:3 16:12 64:22

**adjusters** 10:11 16:19 64:25

**adjusting** 48:17 64:16 81:15

**advancing** 41:19

**advertise** 16:11

**advise** 78:7

**advising** 77:10

**afford** 61:3

**age** 24:11 46:18

**agent** 21:18,24 77:10

**agree** 6:1,5,9,14 39:10 40:19 52:19,21 65:3 68:19 77:17

**agreed** 58:4,5

**agreement** 11:20

**agricultural** 14:14

**Aguilar** 52:24

**ahead** 20:21 74:20

**allegedly** 32:10 66:19 67:12,14 68:3

**allowing** 59:6

**alternative** 57:4

**altitude** 55:16

**Amarillo** 14:1,10

**amount** 9:6 64:14 67:10,22 77:11 80:2 83:7 84:23 85:4,5

**analogy** 11:6

**analysis** 20:6 44:1

**Andrew** 8:9,15,16,19 10:6

**Andy** 10:13 11:4

**anticipated** 7:23

**anymore** 86:1

**apologize** 19:4

**apparently** 84:25

**appeared** 28:21 37:16 46:22 80:5

**applicable** 45:10

**application** 82:3

**applied** 55:22,24 56:2

**apply** 51:4 54:21

**approached** 12:2,4

**approve** 20:13

**approved** 35:6

**approving** 79:6

**approximately** 12:21

**arched** 74:9

**area** 15:14 25:18 31:11 37:25 38:1 56:15 63:5 67:23 69:17

**areas** 72:20 76:12

**argue** 28:18,20

**argued** 28:24

**arranged** 19:21

**ascertain** 58:1

**asks** 4:25

**assignment** 19:5 22:8 37:11

**assist** 13:10

**assuming** 37:5 60:2

**attached** 62:9 67:10 85:1, 6

**attaching** 84:18

**attendant** 50:25

**attention** 60:2 64:2 78:9

**attorney** 41:16 75:23

**audits** 46:13

**August** 77:5,21

**authored** 62:3

**authorized** 69:15

**avenue** 15:9 37:18

**awaiting** 70:20 75:5

**aware** 28:10 56:3,6,7 59:8,11 83:4 85:18

**B**

**back** 56:12 77:18 78:20 79:23 82:12 85:9

**bad** 65:4

**Bain** 64:9

**ballast** 44:19 55:18,22 56:11

**ballasted** 17:16 49:15,22 53:16 55:11

**ballasting** 43:12

**ballpark** 12:23

**bank** 37:7

**base** 56:22

**based** 22:18 34:23 40:9 46:21 54:3 83:10

**basing** 41:14 51:17,18

**basis** 40:21 41:6,8,25 46:10,15,16,19 56:24

**Bates-stamped** 79:11

**beauty** 71:16,22

**behalf** 58:19

**belief** 57:25

**believed** 27:9 37:17

**bends** 73:15

**benefits** 9:6

**bid** 70:20

**bids** 58:25 66:5

**big** 14:4 56:13 72:22

**biggest** 15:18

**Bill** 4:14,15,16 9:8 20:7 21:6 30:1 34:1

**billing** 25:19,22,24

**bit** 21:3 27:17 78:17 79:19

**blanketed** 20:12

**Blusky** 66:11,12

**body** 67:11 68:2

**boots** 50:5

**bottom** 26:16 78:12,15 83:12,13

**brand** 56:14

**Branson** 60:22,23,24 61:2

**break** 60:11 69:24

**breaking** 60:9

**Bresnahan** 18:18 59:4 66:21 67:2 77:5,9 78:6

**Briana** 22:24,25 57:1 67:2,6 68:24 73:18 77:9 78:6

**briefly** 25:19

**bring** 4:25 5:1

**brittle** 55:17

**broad** 80:13

**broken** 26:25 27:19 28:20, 24 30:22 68:5 86:10,18

**brought** 60:1

**buckets** 55:9

**budget** 21:11,13

**bug** 86:14,20

**building** 20:20 23:1,3 24:19 27:7,13 28:7 31:8,9 33:2,3 34:6,9 50:9 60:3 71:16 76:1 79:16 83:8

**bulleted** 65:20 68:1

**business** 11:5

**C**

**call** 9:8,18,19,20 73:5,9,10

**called** 34:9 61:19 71:21

**Campbell** 6:23 7:20 8:1,5 19:22 21:7 22:12 23:11 26:2 28:16 36:2 38:17,25 39:4,9,14,18,25 40:5,24 41:7,15,23 42:2,12 43:18, 23 47:8,23 57:14,24 58:16 60:8,13 74:19 75:3 76:16 83:19 85:24 86:6 87:18

**cancel** 85:10

**cap** 51:4,14 71:16,17,18, 20,22,23,25 72:4,10,12

**Capital** 64:9

**caps** 51:10

**caption** 74:4

**captured** 74:1

**car** 47:11

**career** 36:1,10,16 75:17 76:3

**caring** 49:16

**cars** 63:7

**case** 10:25 22:4 50:12 59:9 60:18 61:10

**cases** 48:16

**Cat** 62:17

**catastrophe** 62:25

**caused** 19:11 30:2 34:3 47:12 70:17 71:25 72:16 84:6 85:19

**causing** 52:13,17

**ceiling** 35:10 67:23

**cell** 9:11

**CEO** 64:9

**cetera** 64:17 68:5

**Chan** 13:11,15,19,22 14:3 15:2 18:11,15,24 19:3,8, 11,19 20:7,17 21:5 22:18 23:10 24:10,25 29:25 30:4 34:1,5,14 35:3 60:4, 5 61:13 65:9,11,14 70:14, 23 71:2 74:15 82:22

**Chan's** 24:5

**Chance** 10:13

**change** 51:1

**chief** 48:2

**children** 8:18

**choosing** 9:4

**Chris** 4:16 13:7 17:20 19:18,24 23:12 24:1 25:13 26:15 39:4 40:5,24 46:12 48:25 49:2,10 51:24 53:13 59:25 60:8 62:15 65:25 68:6 74:7 76:8 80:7 83:15 85:21 86:1 87:21

**cite** 41:6,13

**citing** 39:22 40:4,18 41:4

**City** 14:1,15 62:1

**Civil** 4:3 39:16

**claim** 4:18 8:21 11:23,25 12:3,6,9 13:21 14:21 17:23 18:11,15 21:3 35:23 45:10 48:17 49:4 50:19 52:25 57:4 61:23 62:21,24 82:1 85:10

**claimed** 15:3 67:7 69:16 79:24

**claiming** 11:4 23:3 68:13

**claims** 12:10,20 13:3,5, 12,15,18 36:9 64:1,2

**clarify** 8:13 46:12 74:7 86:7

**cleaned** 8:6

**clear** 6:2 41:5,7 64:13 80:17

**client** 21:19 36:9 66:15 67:4 80:8,10 82:18

**client's** 22:20

**clients** 15:4 17:3 58:11,24 59:13 63:25 64:11 82:6, 16

**clients'** 34:24 62:5

**close** 5:15 11:13 68:12

**closed** 69:25 77:4,25 78:2

**Colin** 39:2 40:17 41:21

**Colorado** 13:6 55:16 60:25 61:7

**Colorado's** 15:19

**comment** 42:6

**commercial** 63:6 72:9 75:19,20

**communication** 11:18

**companies** 64:17

**company** 9:2,7 27:6 29:21 36:10 48:2 64:4,19,21

**complete** 42:10

**completely** 24:21 40:13 41:8,11 56:12

**complex** 16:11,17,18,22, 23,25 17:6 63:12,17

**comport** 80:5

**comprehensive** 20:6 31:20,23 42:22 43:2 57:21 58:12 59:3,15,17, 23,24 60:6

**comprise** 18:7

**comprised** 16:19 17:15

**concerned** 29:22

**concluded** 44:23,25 46:9, 14 87:24

**conclusion** 28:25 29:3

**condensation** 27:15

**condition** 17:8 55:14

**conduct** 19:17

**conducted** 12:6 75:2

**confirm** 78:19 80:18

**confirmed** 26:24

**confirming** 80:24

**conformed** 65:19

**conjecture** 13:14,17

**connotation** 64:25

**considered** 63:22

**Construction** 52:24

**consultant** 9:1,21

**contained** 81:22 86:13

**contending** 83:7

**continue** 42:11

**continuing** 43:21

**contractor** 58:25 75:21 76:11,13

**contractors** 34:24 58:5,25 62:5 66:5

**conversation** 28:6 35:2 85:16

**conversations** 73:22

**copy** 4:22 21:16 45:9

**core** 52:4

**corner** 63:12

**coronavirus** 8:17

**corporate** 65:12

**correct** 10:18,19,21,22 11:9,10 12:7 15:5,6,11, 14,16,20 17:9,10,12,13 18:13 19:21 20:10,15,16, 18 21:11,14,19 22:15,22, 23 23:4,6 24:3,4,8,9,13, 14,16 25:3,4,25 27:1,20 29:10,23 30:6,7,10 31:7 33:6 34:8,15,16,18,19,21, 22,25 35:7,8 36:17,21 38:4,5,7,8,12,16 43:4 44:24 45:11 46:11 47:15, 19,22 48:4 51:2,8 54:6,9, 10,14 55:25 57:1,6,12 60:6,7 61:16,17,21 63:14 64:14 67:8,15 69:21,25 70:5,8,11,24,25 71:4,9,10 72:7,22 74:1,6 75:2,9,17 77:19 78:3,10,11,20,21 79:7,9,14,15,20,24 80:11, 15,19,25 81:17,21 82:7, 23,24 83:2,22 84:1,7,15, 23 85:6,13

**correctly** 26:9

**corresponded** 67:1

**correspondence** 66:24

**correspondences** 66:9

**cosmetic** 50:12

**cost** 74:15,16,24 75:8,12, 16,25 86:14 87:3,13

**country** 13:6,8

**couple** 10:24 11:18 25:8, 14,15,18 46:13 49:9 53:3, 13 55:6

**court** 11:9,14,16,21 48:16

**courthouse** 5:23

**cover** 68:4

**coverage** 16:24 28:14,18 49:7

**covered** 44:19 45:16,19 47:3,13,15,16 48:6,20 51:7,10 59:10,16 75:9,12 76:14 78:22 80:3,5,19 83:7,25

**covers** 45:20 47:18

**COVID** 9:23

**cracked** 27:10

**Craig** 22:24 23:1 24:18 25:7 26:1 28:6 29:11 37:15,21 43:13 44:15,21

**Crawford** 9:2 10:12,15,17 11:1

**cross-examination** 40:10

**Cunningham** 10:18,20 11:1,3 16:12,13,14 21:17 57:17,20 58:13,19 59:14 63:13 77:22 79:13,22 80:23 81:16 82:5,9

**curtain** 17:17,22,25 51:5 59:19 73:12 87:7

**cut** 42:5

**D**

**Dallas** 13:9

**damage** 19:11,20 20:4,6 21:6 22:5,7,10 24:1,7 27:4 28:22 30:1 31:15,16 32:11 33:8 38:11,16 42:22 44:6,10 45:16,19 47:1,3,4,6,10,14,19,21 48:3,5,6,9,19,21,24 49:19,21 50:4,8,13,15,18 51:7 53:10,12,20 54:13, 23,24 57:22 58:14,21 59:1,7,19 63:23 66:9 69:4,16 70:21 71:25 72:2 73:13,23 74:10 75:9,13, 21 76:13,15 77:6 78:19, 23,24 79:2,16,24 83:7 87:3,7,13

**damaged** 20:9 31:21 34:15 44:18,20,24 45:2,6 51:15,16 53:14 56:5 66:16 72:3,7,16

**damages** 15:3 16:24 20:24 22:8,20 23:2,5,7 25:11 58:1,3 59:5 62:2,4 63:2 65:19 67:8 68:13 69:2 76:19 77:10 78:7 80:18,22 81:13 83:7 84:3 85:18

**dark** 33:18

**data** 81:22

**database** 62:23

**date** 10:22 17:15 35:20 57:23

**day** 26:17 43:1 44:1 70:15 87:22

**days** 20:2 61:3 72:23

**deal** 10:2 64:5

**dealing** 11:3

**December** 10:21

**decision** 28:3

**deductible** 46:3 57:6,12 68:21 70:22 71:8 78:8 82:4

**define** 50:17 59:17

**defined** 48:12,14,15 62:17

**definite** 46:10

**definition** 48:9 50:19 64:13

**dent** 49:7 50:10 51:6,14 74:10

**dented** 74:5,14

**dents** 49:13 51:11 68:4 73:14,15,17 74:17

**Denver** 10:12 37:6

**department** 34:7,9

**depict** 53:5

**DEPONENT** 19:23 21:8 22:13 26:4 28:17 36:3 38:18 47:9,24 57:15,25 58:17 75:4 76:17 85:25 87:21

**deponents** 10:25

**depose** 16:4

**deposed** 65:11

**deposition** 4:23 5:10 6:22 8:5 39:9,14,18,24 40:1,4, 7,9,14,15,25 41:17,18,19 42:14 70:3,14 86:8 87:24

**depositions** 40:12

**depreciation** 82:5 84:2

**descriptions** 68:3

**designate** 40:14

**determination** 17:2

**determine** 20:8 27:3 31:21 34:7 37:6 38:10 55:4 58:20 59:5 75:25

**determined** 24:15 28:11 46:20 74:13 82:1,5 83:8 84:21,23 85:19

**difference** 55:10

**dings** 72:2

**direct** 6:8,9,14 45:20 47:4, 6,14,18 48:8,11 50:14,17, 21,22

**direction** 38:6

**director** 9:19

**disagree** 28:14,25 29:3 41:11 42:16 47:25 52:19 84:4

**discovered** 77:11 78:7

**discovery** 39:14,18,23,25 40:3,7 41:18 42:14

**discussed** 28:8 37:21 60:4 65:8 69:23

**discussing** 65:14,16 70:15

**discussion** 40:25

**dispute** 22:11

**distinction** 40:21 41:3,13, 17 58:23

**documentation** 24:20,23

**documented** 32:2

**documents** 5:1,3,4 7:11, 12 11:21 32:6

**dollar** 64:14 67:22

**dollars** 63:3

**Dolores** 60:25

**domain** 13:4

**dome** 68:4 70:20

**Donald** 64:2

**doors** 86:20

**drafted** 61:16,18 79:13

**drains** 52:12,17

**draw** 29:2

**drawing** 36:16

**due** 27:3 29:1,5 37:8 43:11

**duly** 4:7

**dump** 49:17

**duty** 76:14,18

## E

**e-mail** 23:9 24:2 34:14 66:6,16,23 67:7,11,15 68:2,11 70:3,14 71:1 77:9,18 78:12 84:12 85:1, 8

**e-mailed** 57:1,9 81:9

**e-mails** 7:16 81:7

**earlier** 21:17 23:4 35:12 44:17 60:17 63:16 86:8

**easiest** 58:6

**east** 33:3

**Edgerley's** 64:8

**editorial** 42:5

**electronic** 7:17

**elements** 56:16,19

**elevation** 31:6

**elevations** 20:5 87:7

**employed** 8:25

**encountered** 41:16

**end** 9:11

**endorsement** 46:4

**endorsements** 46:2

**engineer** 23:1 28:7 30:5, 12

**Engineering** 36:1,9

**engineers** 36:4 51:21

**entailed** 23:23

**entire** 19:20 20:8 21:6 30:14 36:11 38:2,10,11, 15 43:3 44:8,15 50:4 58:20 81:2

**entitled** 42:3

**entry** 25:25

**EPDM** 17:16 38:15,21 44:20,23 45:2 47:5 49:5 53:8,10,14 54:8 55:19 56:4,8,12,13

**equipment** 14:14

**escalated** 77:11

**essentially** 24:7 84:17

**estimate** 74:16,24 75:6,22

80:23

**estimates** 57:5,11 58:2,3, 24 59:6 68:15,20,23 69:4 73:23 75:16 76:2 80:4

**estimates/invoices** 78:9

**evaluate** 21:6 36:9 76:14, 22,25

**evaluated** 58:19

**evaluating** 52:1

**evaluation** 42:22 43:25 50:7 75:8,12 81:12 86:19

**evasive** 6:17

**events** 72:11

**evidence** 40:10 56:22

**EXAMINATION** 4:9 86:5

**exceed** 57:11 68:15,20 70:21 71:7 78:8

**excellence** 9:20

**exception** 84:1

**exchanged** 5:6

**exhibit** 4:22 23:8,11,13 25:20 36:20 53:6 54:12 57:8 61:12 62:16 63:11 65:7 69:14 70:3,13 73:6 75:1 77:8 79:9 81:2,23 82:1 84:12

**expenses** 85:11

**experience** 21:22 35:14 51:18 54:3,5 75:8

**expert** 73:25 75:23

**expertise** 75:12

**experts** 20:14 69:15

**explain** 41:3

**explaining** 41:4,8

**explanation** 40:3,6

**exposed** 56:7,16,18,22

**exposures** 33:1

**express** 42:16

**extent** 59:5 75:21

**exterior** 20:5 32:11,15 33:5 59:19 66:10,11 87:11,14

**exteriors** 33:9

**F**

**face-sealed** 18:1

**facilities** 75:6

**fact** 15:18 23:25 31:15 54:23 86:18 87:3

**factory** 14:12

**fair** 11:5,6 29:8 32:14 35:25 43:23 76:12,23

**fairness** 36:5

**familiar** 15:13

**family** 10:5

**faster** 16:4

**favor** 64:11

**federal** 4:3 11:9 39:8 40:22 41:12

**felt** 59:2

**field** 15:2

**fifteen** 14:24

**file** 7:17 17:12 19:6 21:17, 19 22:19 45:8 57:10,18 61:15 67:15,18,20 69:25 70:1 77:4,22,25

**filed** 11:21

**final** 86:13

**find** 8:17 37:22 38:7 43:13 57:9 71:19

**findings** 65:8

**fine** 4:15 60:13

**finish** 43:25 74:21,22

**finished** 52:24

**Fires** 13:3

**fix** 87:3

**flashing** 51:5 71:18,20,23, 25 72:10,12

**floor** 29:15

**floors** 18:7 26:10 33:19

**flow** 52:12,16

**follow** 34:8

**followup** 42:13

**forget** 77:16

**form** 19:22 21:7 36:2 38:17 40:8 47:8,23 57:14, 24 58:16 74:20 75:3 76:16 87:16

**formats** 40:13 41:9

**forward** 78:8

**forwarded** 65:13

**found** 28:19 80:6

**foundation** 22:12 28:16 40:8 85:24 87:17

**fractured** 28:11

**fractures** 29:1

**Franklin** 4:12

**free** 10:1

**friends** 10:5

**front** 5:23

**full** 4:11 40:10 42:3 59:10, 15,17

**function** 50:8

**functional** 46:25 47:3,4, 21 48:3,19

**functionally** 45:6 72:3,7, 15

**functions** 51:6

**G**

**gave** 5:14 42:9

**generally** 55:19

**generated** 21:24

**gentle** 49:16

**gentleman** 14:19

**give** 5:17 6:20 9:10 27:23 40:5 42:3 74:15,24

**giving** 5:23 20:22

**good** 5:15 56:1 60:9 65:4 81:10,11 86:2 87:22

**Gotcha** 6:21

**gravel** 44:19

**ground** 50:6

**guess** 7:7 11:6 69:11 77:9,13 79:5 84:17

**guys** 10:3 49:16

**H**

**Haag** 8:11 30:5,8,11,14, 17,20 33:16 35:6,25 36:4, 6,8,11,15 37:22 43:14 69:16 73:6

**hail** 4:18 12:20 13:18,21 14:2 20:9 21:6 27:4,25 28:3 30:2 31:1,17,21 34:3,15 37:8 38:11,16 42:22 43:12 44:24 45:3, 16,19 46:3 47:12,16,18 48:3,19 49:6,7,13,21 50:7,21,22,24 51:7,10,12, 13 52:12,16 53:9,11,15, 24 54:1,14,17,23 55:5,20 57:22 58:14,21 62:17 68:20 70:19,22 71:25 74:5,10,11,14,25 75:13 78:8

**hailed** 49:1 50:16

**hailstorm** 15:4,19,23 19:12 22:10 27:20 28:12 29:1,5 50:5 56:9 57:23 58:15 72:18 80:21 83:25 84:6

**hailstorms** 63:1 72:10

**half** 13:14 25:16 37:1

**handle** 16:20 64:11

**handled** 16:7

**handling** 13:5 75:19

**hangers** 73:12

**happen** 49:22

**happened** 48:6 77:16

**happy** 11:3

**hard** 26:3

**hate** 73:16

**heads** 64:17

**heard** 15:21 41:20

**Held** 20:2

**heretofore** 61:1

**Hey** 9:8 29:25 34:1

**hides** 73:11

**high** 31:10

**hire** 10:9 59:25

**hired** 10:3,6,15 20:1 35:5 60:2

**history** 15:19

**hit** 31:17 53:8

**hold** 39:4 57:8 74:19

**home** 64:8

**homeowners** 63:7,22 64:17

**homes** 64:9

**honest** 15:10

**hotel** 14:16,17 15:11 17:9, 15,18 18:5,7 19:17,20 20:25 21:6 22:11,14,25 23:1 25:6 30:11,23 31:21 33:12,15 34:2,18 35:11 37:6,9 43:13 54:1,16 69:18 70:8

**hotels** 16:9

**hour** 60:10

**hours** 25:8,14,15,16,18,22

**Hudson** 4:17 8:7 12:10 18:15,19 19:3,7 20:1 22:18 27:24 28:10 29:21 30:5 32:5,7 33:23 45:10 46:25 48:2,18 49:4 50:6 59:8 65:8,12 69:2,15 71:24 72:6,14 74:25 80:14,15 81:3 82:10 83:4, 21 84:5 85:18

**hurricanes** 63:1

**HVAC** 55:8

**I**

**idea** 12:23 13:19 33:24 56:1,18 85:21

**impair** 50:8

**inception** 19:5

**inches** 38:19

**include** 87:3,13

**included** 5:6 62:13 67:22 86:18

**includes** 63:6 87:10

**incorrect** 47:25 48:7 76:24

**increase** 80:6

**increased** 80:7

**incurring** 85:10

**indentation** 50:10

**indentations** 74:25

**independent** 44:5,11

59:10 76:14,18

**indirect** 6:17

**individually** 11:8

**industry** 21:22 48:15 54:5 62:25 65:1 71:21

**infer** 8:19

**information** 21:4 24:11 38:7 62:18 77:12,18 78:6 81:22

**initial** 24:6

**inserts** 26:25 27:18 86:10, 18,21 87:1

**inside** 67:11

**inspect** 19:20 25:5 29:9, 18 30:11 33:14 35:10 38:15,20 69:16 72:9

**inspected** 22:14 26:1,7 29:14 33:16,20 34:18 37:5,9 42:23 44:3 63:20 66:11,12

**inspecting** 15:3 19:11 38:10 43:10 70:16

**inspection** 19:17 22:17 23:23 24:6 25:21 28:21 31:20 43:2 44:7 65:7 66:8 82:23

**inspections** 27:6

**installation** 74:5

**installed** 73:16

**instance** 10:6 49:5 53:5 54:11 59:18 67:17,19

**instruct** 7:20

**instructed** 24:10

**instructing** 21:5

**instructions** 19:10 20:23

**insurable** 15:20 63:4

**insurance** 12:10 29:21 36:10 48:2 62:25 64:4,19, 20 69:2

**insured** 20:23 21:24 58:1 69:7,10,12 70:16 75:20 76:12,22 77:1

**insured's** 65:20

**insureds** 76:19,21

**intend** 40:15

**intended** 50:23 51:2,11

**interior** 32:9 35:10 38:4 44:22

**interpreting** 48:18

**intruding** 38:3

**intrusion** 33:15,16,21 34:2 37:7,18

**investigated** 50:18

**investigating** 17:23 49:4

**investigation** 17:21 21:14 44:5,10,12 57:21 58:13 59:3,10,15 60:6 75:2 81:16

**investigator** 48:2

**invoice** 25:20

**invoices** 34:24 66:5 79:1 80:5 84:22

**involved** 11:2 28:2,5 69:3

**involvement** 61:22 81:19

**irrespective** 59:13

**issue** 9:9 46:18 62:25 63:3

**issued** 36:19 61:13 79:6

**issues** 11:18 16:24

**ITC** 69:6,9

**item** 67:22

**itemization** 68:1

**items** 7:21 65:21 66:17 80:5

**J**

**J.S.** 20:1,2

**jagged** 53:15

**jazz** 20:15

**job** 16:3

**John** 18:18 67:2,7 77:9 78:6

**judge** 5:23 39:12

**July** 7:2,15 56:25 57:9 58:20 77:4

**June** 7:3,4 30:9 36:20 37:9 42:24 44:3 52:1 70:4,15,24

**jurisdiction** 13:4

**jury** 5:24

**K**

**Kaho** 13:11,13,15,19,22 14:3 18:15 19:8,11 23:9 24:2,5,10 30:4 34:5,14 35:6 60:4,5 61:13 62:3 65:9,11,17 70:14 71:2 82:22

**Kansas** 62:1

**keyword** 76:20

**kind** 10:2,4 11:17 12:17 14:9 48:19 66:13

**L**

**Lakewood** 34:7

**large** 13:2,25 14:1,13 15:16,22 16:7,20,23 31:14,16 53:15 63:18,20, 22 64:14,17 70:18 75:19

**larger** 14:5 63:21

**Larson** 8:9,15 10:7

**laws** 50:12

**lawsuit** 4:17 8:22 11:2

**lead** 53:11

**leak** 35:11 37:8 43:13 70:16

**leaking** 50:24

**leaks** 43:11 44:21 69:17

**learn** 85:22

**learning** 16:20

**leaving** 10:25

**left** 10:20 11:4 55:15 63:13

**legwork** 13:10

**letter** 57:6

**levels** 26:10,12 29:9,16 32:23,25 71:12

**Levi** 14:12

**limit** 40:7 46:5

**Lindsey** 10:18,20 11:1,3 16:12,13,15 21:17 57:17, 21 58:13,19 59:14 63:13 77:22 79:13,23 80:23 82:5,9

**Lindsey's** 81:16

**lines** 7:21

**list** 22:6,8,20 23:5,6 65:20 66:4,16,20 67:7,11

**lobby** 30:20 33:17 35:11 37:7 38:2 67:23 68:5 69:17

**local** 40:22 41:12

**located** 15:8

**long** 7:10,18,19 9:14 20:13 25:5,12 27:16 54:5 61:2 69:11

**longer** 24:19 68:6

**looked** 7:13 22:19 23:25 24:3 25:25 26:10 27:16 29:16 32:13,15 33:2,17 54:8 59:2 84:18 86:12

**loss** 7:16 13:25 14:1 16:12,17,18 17:4,5,6,15, 18 21:18,23 22:1 35:20 45:21 47:5,6,14 48:9,11 50:15,18,22 59:10,16 61:24 62:13,17 63:12,17, 18,20,22 64:7,14 68:15, 20,23 71:3 83:11,21 84:18,20,21,23 85:1,3,6 86:13,19 87:2,10

**losses** 15:20 16:7,21,22, 25 17:1 63:4 64:12,16 75:20 83:25

**lot** 16:4 27:13 50:13 54:8 55:16 72:20

**loves** 60:24

**lowball** 75:24

**lower** 57:5

**M**

**made** 39:21 86:9

**maintained** 20:25

**maintenance** 27:7

**major** 16:11,16,18 17:1,5 22:9 63:11,17

**majority** 13:2

**make** 13:8 17:2 40:9 42:5 55:10 66:1

**makes** 55:3

**making** 41:2 58:23

**Management** 18:21 75:6 84:22

**manager** 18:20

**manufacturer** 18:4

**manufacturing** 17:22

**marina** 13:3

**marked** 4:21 84:11

**marketed** 16:13,14

**marring** 50:10

**material** 17:14

**materials** 22:19

**Matt** 35:18

**matter** 23:25

**Matthew** 8:11 34:17 35:5, 15 36:16 51:25 70:4 83:1

**meager** 9:5

**meaning** 7:18 37:5 84:5

**means** 47:4 59:23,25 63:4 82:3

**mechanical** 53:8,12,20 54:13,16,24 55:4

**meeting** 7:1 8:5 61:24

**membrane** 38:12,16 44:23 45:2 49:6,24 53:4 70:18

**mentioned** 35:12 66:10

**met** 6:23 7:9 20:23 22:24 28:7

**metal** 50:14 73:7,9,14

**mezzanine** 30:18 31:11 44:22

**Miller** 24:12 57:1,11 58:6 59:4 66:22 67:2 68:14,24 84:13

**Miller's** 85:8

**millions** 63:2

**mind** 14:5 53:18

**Mine** 79:11

**minutes** 6:24 7:9 29:4 60:10,12

**missing** 40:22,23

**Missouri** 60:23,24

**monetary** 67:10

**money** 9:6

**move** 42:19 61:7

**moving** 49:11 60:19

**multiple** 39:21

**myriad** 72:11

## N

**nature** 9:23 20:5

**necessarily** 16:23 51:14

**negative** 64:24

**neighboring** 56:3

**net** 34:20 82:1 85:4

**newly** 78:7

**nonevasive** 6:10,14

**nonrecoverable** 82:4 84:1

**nonresponsive** 21:1 38:22 39:8,13 42:1,9,15, 16 43:16,21 50:1 58:9

**norm** 59:12

**noted** 87:4

**notes** 7:17,18,19

**notice** 4:22,25 18:10 21:18,23 22:2

**number** 32:18,20 35:3 53:13 55:6,10 63:8 64:9 72:15,16 84:10

**numbers** 63:1,3

## O

**oath** 5:19 42:21

**object** 16:5,6 19:22 21:7 22:12 28:16 36:2 38:17, 25 39:5,7,12 42:14 43:18, 20 47:8,23 50:1 57:14,24 58:16 74:20 75:3 76:16 85:24

**objecting** 41:25 42:9

**objection** 21:1 38:22 39:1, 3,21,23 42:1,17 43:16,19, 21,22 58:9 87:16

**objections** 40:8,9

**observe** 33:8 34:2 52:7

**observed** 24:1,8 65:19 72:6 87:14

**obtained** 82:16

**occasion** 77:24

**occasionally** 8:16

**occur** 7:1

**occurred** 58:21

**October** 19:7 60:22 61:4, 24 62:1,10,13 79:6,12 84:10,12 85:9

**office** 6:24 9:22,24 10:12

**Oftentimes** 72:9

**Oklahoma** 14:1,15

**older** 24:15

**operation** 36:12

**opined** 30:25 52:11,16

**opinion** 24:18 27:9,10,18, 23,24 28:4 29:7 31:3 42:6 46:15 52:20 53:21 54:14 56:22

**opinions** 45:1

**opportunity** 42:10

**opposed** 53:12

**order** 78:19

**original** 46:22

**originally** 80:18

**outline** 84:21

**owned** 14:19 62:24

## P

**p.m.** 60:14,15 70:5,24 87:25

**PA** 75:23

**pages** 37:1

**paid** 80:15

**paragraph** 23:20 37:3

**parapet** 51:10,13,14 71:17

**part** 4:25 50:9 82:9

**parts** 21:3

**pass** 86:3

**patch** 56:12,13

**patched** 37:17

**Patel** 14:19

**Paul** 64:8

**pay** 9:6 84:6

**payment** 80:1

**PCS** 62:19,20

**Peirce** 4:10,16 19:25 21:1, 2,10 22:14 23:13,15 26:6 28:23 36:5 38:22,23 39:2, 7,11,16,20 40:2,17 41:2, 10,21,24 42:8,19,20 43:16,20,24 47:13 48:1 49:25 50:2 57:16 58:9,10, 18 60:11,16 74:21 75:7 76:20 83:20 86:2 87:16, 20,23

**people** 49:16 55:17 58:7 64:10 67:1 75:24

**percent** 12:24,25

**percentage-wise** 12:23

**perfectly** 74:9

**peril** 47:13,15,16

**period** 12:17 24:13 61:25

**permit** 34:7

**perspective** 81:16

**phone** 5:7 9:10,11

**photo** 53:5

**photograph** 54:3,12,18

**photographing** 20:3,4,15

**photographs** 26:17,21 52:8 71:12 82:8,21,22 83:3,5,15,16

**photos** 82:13,14,15,16

**physical** 45:21 47:5,6,14, 19 48:5,8,11 50:14,17,22

**picking** 9:3

**picture** 53:20 54:20 55:1 71:19 75:1

**pictures** 52:23 53:4

**pipes** 55:9

**place** 39:6 40:12

**plaintiffs** 4:17

**plans** 60:19 61:7

**plastic** 68:4

**pocket** 82:6

**point** 11:23 17:11 18:14 44:21 57:17,18 60:5,9 77:21

**policy** 45:10,13,15,20,24 46:1,24 47:18 48:3,13,15

**pool** 68:4 70:20

**position** 9:14,15,18 28:15, 18 31:17 40:18,19 41:19 42:17 48:1 49:11 58:18 66:15 68:16,17

**poured** 49:12

**power** 80:10

**practice** 41:15

**preexisted** 27:11

**prefer** 4:13

**preference** 4:14

**prepare** 6:21 8:4

**prepared** 62:12

**present** 55:21

**presented** 76:19,21 77:1

**preservation** 40:8,15 41:18

**preserve** 39:23

**pressure-equalized** 18:1

**pretty** 6:25 34:10 52:6 55:19 56:1,13 68:12 80:13

**prior** 12:9 13:12,18 14:6 35:14 72:10,11

**Procedure** 4:4 39:17

**proceedings** 4:2

**process** 53:5

**procuring** 69:4

**proof** 85:1,3,6

**proper** 39:2 42:7,18

**properties** 15:22 56:4

**property** 13:22,24 14:9 15:7 17:9,12 20:2,8 21:18,23 22:1 26:13 42:23 57:22 58:14,20 62:21,24 78:20 79:23 80:24

**protect** 51:13

**provide** 6:9,14,17 21:13 24:13,20 49:6 58:12 59:6 71:14 75:4

**provided** 44:2 45:9 57:11 58:11,24 59:14 66:16 71:11 83:21 84:22

**providing** 70:7

**public** 64:22,25

**pull** 34:12 78:17

**pulled** 34:8

**punctured** 55:19

**purpose** 51:11

**purposes** 15:3

**pursuant** 4:3

**put** 19:16 37:14 49:17 56:12 62:2,4 74:9

## Q

**qualified** 16:20 63:17

**qualify** 17:5

**quantum** 71:2

**question** 6:2,6,8,11,12,13, 18 18:22 19:2,24 36:5 39:13 42:4 52:14 74:22 86:25

**questioning** 7:21

**questions** 7:24 16:3 22:18 42:13 87:19

**quote/unquote** 44:1

## R

**rain** 50:25

**raked** 52:1

**ran** 47:10

**rappel** 20:20 28:19 31:24 59:25 60:1,3

**rappelling** 20:3,14

**RDA** 18:21 57:3 58:6 75:5 84:22

**RDA's** 57:9

**read** 26:2 45:13 46:24 47:2 68:7

**reading** 23:17 26:9 36:23 48:10 65:24

**real** 70:21 71:7

**reason** 22:11 61:20 72:5,8

**reasons** 37:20 72:14

**recall** 11:25 12:12,13,22 14:20,23 17:21 18:22 19:18 20:19 21:12 22:4 26:15,19 27:14 28:1 29:17,20 30:3,23 31:6,10 32:1,4,6,8,9,14,17,23 33:11,25 34:4 35:4 36:23 42:25 43:15 51:23 52:3, 11,15,18 56:13,17,20 62:15 63:10 65:14,16 66:7,19 67:13,24 71:13 73:20 77:12,13,14 82:11

**recalling** 14:12

**receive** 19:10 24:22 82:6

**received** 18:10 21:16 45:9 63:19 67:12,14 68:3,15 70:10,12 77:19

**receiving** 24:6 77:12 78:5 80:22

**recently** 11:11,12 45:9

**recess** 60:14

**recognized** 41:17

**recollection** 11:15 12:8 27:5 37:13 38:14 47:1 85:7

**recommend** 80:1

**recommended** 30:4 34:20

**recommending** 84:5

**record** 7:16 26:3,16 42:17 66:2

**records** 11:14,16 18:10 34:12

**reference** 86:9,14

**referring** 37:25 39:24 46:5 66:5 71:15

**refresher** 5:18

**regard** 13:5 45:19 81:15 83:6

**regular** 58:4

**reinspecting** 80:24

**related** 27:25 28:3 30:25 31:4 70:17 80:20

**relative** 63:20 69:16

**relevance** 16:2

**relevant** 15:24

**relocating** 60:19,21

**rely** 29:22 76:12

**remember** 12:4 13:16 14:5,18 15:10 17:20 18:9 19:13,14 20:20,22 25:17 29:12 33:4 38:24 43:6 66:21 69:10,12 72:25 73:2 74:2 80:8

**render** 51:14,15

**reopened** 77:4,22 78:3

**rep** 65:12

**repair** 27:6 75:6 76:1 87:13

**repaired** 56:11

**repairs** 27:7 87:11

**rephrase** 6:3

**replace** 74:16

**replaced** 24:21 46:17 56:4

**replacing** 86:14

**report** 7:15 24:6 29:22 33:22 36:20,23,25 38:9, 13 44:2,3 45:2 52:9,10 61:9,12,15,19 62:3,10,13 65:15 69:14,25 70:7 71:9, 24 72:5 73:6,13 76:13 77:5 79:2,7,12,16 81:2, 20,23,25 82:9,12,25 83:1 86:9,13 87:4,12

**reported** 22:5 24:25 72:14,24 77:10

**reporting** 32:6

**represent** 4:17 52:23

**representation** 68:12

**representative** 19:7 57:10,18

**representing** 8:2 64:18

**request** 20:17 21:11 37:4 62:2 78:14

**requested** 19:19

**requesting** 20:19

**require** 41:12 47:21

**required** 59:9

**requirement** 55:3

**requires** 48:3

**requiring** 49:5,6 50:7,8,9

**research** 34:6

**reserve** 34:20

**residence** 64:3

**residential** 64:10,12

**resistant** 55:20

**respectfully** 50:1

**responded** 71:6

**response** 71:1

**responsive** 42:3

**restate** 52:14

**Restoration** 66:12

**restricted** 52:12,16

**restriction** 46:25

**result** 50:21 70:19 72:17

**resulting** 69:17

**results** 66:14

**retain** 30:5 69:15

**retained** 9:1 15:2 35:9 64:19,20 73:25

**retire** 57:18

**retired** 8:24 9:1 69:11 70:1

**retiring** 57:10

**review** 7:11

**reviewed** 17:11 46:25 81:1

**revised** 80:23

**right-hand** 63:12

**risk** 18:20

**river** 38:20

**Rob** 10:14

**rock** 31:5,13 44:19 49:12 52:2 53:7,21,22,23

**rocks** 31:14 49:14

**role** 69:20

**roof** 17:14 22:10 24:12,15,18,21 25:1 26:10,12 29:14,19 30:1 33:19 34:15 36:3 38:2,19 43:11 44:6,8,10,15 46:3,6,16,23 47:5 48:22,24 49:1,2,5,7,12,14,15,18,21,22,23 50:3,15,23 52:1,5,13,17 54:15,19,22 55:4,10,14,18,22 56:8 66:11 69:16 70:16,18 71:12

**roofers** 51:19

**roofing** 29:9 30:16 38:10 42:23 43:7 53:10

**roofs** 29:12 50:14 53:15 54:8 55:15,17 56:4 72:9

**room** 25:10,12 31:23 32:12,17

**rooms** 20:3,4 31:25 32:3,10,18,19,20,23 33:9,11,15,17 34:2

**rubber/vinyl** 87:1

**rule** 39:22,24 40:3,4,18,22 41:4 54:18

**rules** 4:3 39:8,16 40:9 41:12

**Ryan** 10:9,13 11:4 61:18 62:2 79:5,13 81:5,12,19

**Ryan's** 61:22

**S**

**salary** 9:12,13

**samples** 52:4

**scope** 50:4

**scuttle** 29:13

**Seagren** 73:19 82:17

**seals** 86:14,20

**section** 56:10

**sections** 52:2

**secure** 73:23 75:21

**securing** 69:4

**send** 17:4 57:5 58:2 63:25 64:1 81:5,10

**sending** 58:3

**senior** 16:19

**sense** 13:9

**sentiment** 65:3

**September** 60:25

**serve** 15:2

**served** 64:22

**Services** 52:24 62:21,24

**set** 60:17

**settled** 11:15

**settlement** 11:19,20

**sharp** 53:15

**she'd** 24:12

**Sheraton** 15:12 37:5 75:5

**short** 24:13

**show** 4:21 11:14,17 18:10 23:8 25:19 53:3 61:9 79:9 84:11

**showed** 23:2 58:4

**showing** 28:9

**shown** 30:22

**side** 27:12 30:23 31:8,24 33:2,3 59:25 60:3

**sides** 65:4

**sills** 28:11 32:11

**similar** 74:25

**simply** 34:23 50:9

**single** 41:16

**sir** 4:20 5:3,5,11,25 6:4,7 7:2,5,19,22,25 8:3,6,8,10,12,23 9:5 10:8,10,16,19,23 12:1,11,13 13:1,20 14:3,8,14,22 15:12,15,17,21 22:16 23:7,19,21 24:24 27:22 28:5 29:24 30:10,24 36:13,22,24 44:4 45:12,14 47:9 51:9 54:7 57:19 62:7,11 63:15 66:25 67:5 68:22 69:5,22 70:1 71:5 73:8 79:21 81:18,24 82:2 83:23 84:8,14,16,19,24 85:2,4,12,14 86:11

**sitting** 32:15

**Sitzmann** 8:11 34:17 35:6,15 36:16,19 42:21 44:6,11,23 51:25 52:11,15 70:4 71:11 73:25 74:13

**Sitzmann's** 37:11 38:6 43:25 52:7 69:20 71:9 83:1

**sixth** 15:9 29:15

**size** 13:22

**skylight** 68:5

**skylights** 35:10 37:7,16, 19

**sliding** 86:20

**slipped** 46:13

**small** 68:7

**smaller** 63:25 64:1

**son** 10:9,13 61:18

**sound** 18:12

**sounds** 18:13

**source** 38:4,7 54:13

**sources** 33:14

**south** 31:7

**southeast** 30:23 31:8

**southwest** 33:1

**span** 12:18

**speak** 8:7,9,11,15 9:11 18:14,17,23 19:2 50:6

**special** 64:1,2

**Specialty** 4:18

**specific** 20:22 37:25 38:1

**specifically** 13:12 14:2 15:2 19:13 33:20 37:8 40:14 46:2

**spend** 60:25

**spent** 20:2

**spoke** 18:18 19:8

**stains** 33:18

**stairs** 29:13

**stanchion** 31:9,16

**stand** 62:20 69:9

**standpoint** 15:19 24:5

**stands** 69:12

**started** 75:19

**state** 4:7,11 84:25

**stated** 34:5

**statement** 7:16 62:12 80:13 83:10,21 84:18,20 86:12 87:2,10

**states** 24:7 47:18 65:19

**stating** 8:1 42:21

**stayed** 30:14

**stemming** 11:2

**stick** 17:19

**stone** 38:20

**stop** 6:2

**stopped** 6:13

**storm** 14:7 15:13,16 16:8 19:20 27:11 34:10 35:23 56:5 58:21 63:9,10 70:17 72:22,25 85:20

**storms** 72:20

**straight** 74:10

**stuff** 8:17 23:25 24:3 55:9 66:13

**Sturm's** 64:3

**submission** 82:20

**submit** 57:5

**submitted** 62:3,5 81:13 82:21 83:4 84:4

**submitting** 69:2

**substantially** 78:25

**sued** 11:8

**sufficient** 49:8

**summary** 68:9

**supplied** 82:9

**surely** 75:7

**surface** 29:19 42:23 53:10

**surfaces** 30:16 56:8

**surprise** 70:21 71:7

**surprised** 85:22,25

**sworn** 4:7

**system** 17:18,22,25 18:4 38:10 43:8 51:6 55:8

**T**

**takes** 68:6

**talk** 9:7 27:8 34:11 41:22 85:15

**talked** 8:16,19,20 65:12 73:18

**talking** 14:2 24:18 36:11 46:18 49:13,23 50:11 68:23 71:3,17,18

**talks** 25:24 65:6,18 69:14

**tear** 38:11 49:6 70:18

**telling** 16:1 34:14 51:9 54:2,4,12 68:14

**ten** 14:23,25 60:12

**tens** 76:7,8

**term** 27:16

**terms** 71:22

**testified** 4:8 23:4 44:17 46:8 59:9

**testimony** 5:23 43:6 81:1

**Texas** 50:13

**texts** 5:6

**thing** 8:13 51:4 54:21 86:8,21

**things** 6:25 20:5 37:14 46:13 49:9 50:12 53:13 55:6,18 72:11 74:8

**thought** 18:23 27:21 53:4 83:18 86:21,22

**thousands** 76:3,7,8

**threshold** 50:7 63:8,23 64:15

**threw** 31:13

**throw** 55:18

**thrown** 31:5

**time** 8:25 11:20 12:17 17:11,18 18:14 24:13 28:21 30:12,14 37:12 43:3,9 49:13 51:23 53:14, 19 54:6 56:8 63:19 70:10, 12 78:3

**times** 35:16,19 36:1,4,8, 14,15,17 39:21

**today** 5:1,20 7:7 8:2 29:16 32:16 42:21

**told** 19:14 29:4 58:2 63:16 67:24 68:18,19 70:23

**ton** 66:13

**top** 22:2 38:20 51:13 63:12,13

**torn** 55:19

**total** 63:4 82:21

**tough** 34:11

**town** 66:13 81:9

**tracking** 63:1

**transition** 51:12

**trial** 39:23 40:4,16 60:17

**trim** 26:25 27:18 73:7,9, 11,14 86:10,18 87:7,14

**trouble** 65:24

**true** 19:8,9

**truth** 4:8

**tunnel** 76:11

**turned** 14:13

**twelfth** 29:15

**type** 17:17 50:6 81:6

**types** 40:12

**typically** 21:23 53:9 61:2

**typing** 81:20

**U**

**Uh-huh** 26:18 53:2 65:22

**Ulrich** 28:6 37:15 44:16 58:6 59:5 66:22,24

**unaware** 83:5

**underlayment** 49:20

**understand** 4:19 5:19,24 6:3,11,13 10:17 12:5 15:1 19:23 22:17 30:8 35:5,9 36:19 38:19 40:20 41:10 45:5,8,15 57:16 59:24 61:18 69:23 77:3 79:22 80:9 81:25

**understanding** 11:1 45:18,22,23 86:17,24 87:12

**understood** 6:6,9,18 40:19

**underwriting** 17:12

**Union** 15:9

**unit** 16:18

**unitized** 17:19

**unpacking** 27:17

**upper** 33:18

**UV** 27:13 55:17

**V**

**validate** 76:18

**valuation** 46:3 69:6

**vendor** 34:23 78:9 82:18

**vendors** 20:24,25 34:24 58:25 62:6 73:24

**verify** 76:18 78:22 80:2

**vinyl** 26:25 27:10,18 86:9, 18,21

**vision** 76:11

**visit** 25:12

**visiting** 25:10

**W**

**waiting** 24:11

**walk** 55:17

**walked** 23:3 44:15

**walking** 53:23 54:16

**wall** 17:17,22,25 51:13 59:19 73:12 87:8,11

**walls** 4:6,12,13 5:9 6:22 8:24 15:1 17:8 18:8 21:2, 16 23:15 25:5,20 28:3 31:19 32:21 38:23 42:20 43:24 47:14 48:8 49:3 50:2,18 51:5 52:22 54:6 55:21 56:25 58:10 59:8 60:16 65:6 71:6,15,16 73:20 74:22 75:7 76:10, 22 78:14 79:13 84:10 86:3,7 87:20

**Walls'** 41:1

**wanted** 37:15 43:9,13 64:3

**warehouse** 14:13,14

**water** 30:19 33:15,16,20 34:2 37:6,18,22,24 38:3 51:12 52:13,17 69:17

**water-managed** 18:1

**website** 62:22

**week** 7:6,7 20:13 21:17 77:17

**weeks** 72:21

**west** 37:6 59:19

**west-facing** 26:25 27:12, 18

**wheelbarrow** 49:17

**wife** 8:18 60:21,24

**William** 4:6,12,13

**Williams** 10:14

**wind** 46:2 70:22

**window** 26:25 27:18 28:11 30:22 31:5,15,16, 18 32:11 86:10

**windows** 22:10 27:11,13, 15 31:20 32:13,15 35:10

**withdrawing** 57:3

**Woodward** 10:14

**Woody** 10:14

**words** 6:16 20:12 27:24 51:2,5 53:10 71:3 72:1 80:6

**work** 11:23 12:5 13:9,11, 13 19:6 58:6 75:25 77:11, 25 81:5

**worked** 10:18 12:9 13:19, 21 58:1 59:4 75:20

**working** 11:25 12:2 52:25 80:8,12,14

**wrenches** 55:9

**writing** 19:16 75:22

**wrong** 23:5

**wrote** 75:24

**X**

**Xactimate** 75:10 76:9

**Y**

**year** 11:13 14:20

**years** 5:15,18 12:19 14:11,24 24:16,19 25:1 35:19 41:15 46:6,9,21 58:7 77:15