# EXHIBIT H

Transcript of

# Leslie Beyer

RDA Hotel Managment Company v. Hudson Specialty Insurance Company

July 14, 2020

CONCISE Legal Reporting, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CASE NO. 1:19-CV-2145-DDD-NYW

---

VIDEO CONFERENCE DEPOSITION OF LESLEY BEYER

July 14, 2020

---

RDA HOTEL MANAGEMENT COMPANY, and LAKEWOOD HOTEL COMPANY,
Plaintiffs,
vs.
HUDSON SPECIALTY INSURANCE COMPANY,
Defendant.

---

Pursuant to Notice and the Colorado Rules of Civil Procedure, the deposition of LESLEY BEYER, called by Defendant, was taken on Tuesday, July 14, 2020, commencing at 9:58 a.m., in Harris County, Texas by remote means before Dianna L. Buckstein, Registered Professional Reporter and Notary Public within and for the State of Colorado, appearing remotely from Denver County, Colorado.



REMOTE APPEARANCES

On Behalf of Plaintiffs:

Christopher P. Peirce, Esq.
HOSSLEY & EMBRY, LLP
100 Fillmore Street
5th Floor
Denver, Colorado 80206

On Behalf of Defendant:
Colin Campbell, Esq.
CAMPBELL WAGNER FRAZIER & DVORCHAK, LLC
5251 DTC Parkway
Suite 350
Greenwood Village, Colorado 80111



I N D E X


DEPOSITION OF LESLEY BEYER

| EXAMINATION BY: | PAGE |
|---|---|
| Mr. Campbell | 5 |
| Mr. Peirce | 113 |

| EXHIBITS | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 44 | Property Loss Notice | 113 |
| Exhibit 63 | Report by Lesley Ann Beyer, dated 3/18/20 | 26 |
| Exhibit 141 | Letter to Kevin Aguilar from Andrew Larson, dated 5/14/19 | 106 |

(Exhibits provided electronically to the court reporter.)

| PREVIOUSLY MARKED EXHIBITS | | PAGE |
|---|---|---|
| Exhibit 26 | Report by Haag Engineering, Matthew Sitzmann, dated 6/16/17 | 56 |
| Exhibit 32 | Report by MCL Global, dated 10/10/17 with attachments | 71 |




P R O C E E D I N G S

(Deposition Exhibits 44, 63, and 141, remotely introduced and provided electronically to the court reporter.)

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare her testimony in this matter is under penalty of perjury. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and your agreement on the record.

THE DEPONENT: My name is Lesley Beyer, and I agree.

MR. CAMPBELL: Colin Campbell on behalf of defendant Hudson Insurance. I agree as well.

MR. PEIRCE: And Chris Peirce on behalf of the plaintiffs. We agree as well.

THE COURT REPORTER: Will the deponent kindly present her government-issued identification

by holding it up to the camera for verification.
(Deponent complied.)
THE COURT REPORTER: Thank you.
EXAMINATION
BY MR. CAMPBELL:
Q All right. Can you please tell us your name.
A My name is Lesley Ann Beyer.
Q And, Ms. Beyer, I understand that you worked at Travelers from 2006 through 2018; is that correct?
A Yes, sir.
Q And I understand that you worked in a variety of different capacities while at Travelers. You started out as a property large loss adjuster; is that right?
A Yes, sir.
Q How long did you work in that capacity?
A In a way, for the entire 11 years at Travelers; just more responsibilities were added on top of that.
Q Okay. How long did you work in that position before added responsibilities came into play?



A From 2006 until 2009.
Q And then you also had a role as a technical specialist; is that correct?
A Technical specialist is actually the title for the large loss adjuster.
Q Okay. And then you also served as a litigation manager; is that right?
A Yes, for property claims.
Q For what years?
A From 2009 until I left Travelers -- 2016? Two thousand -- sorry, I'm not very --
Q Sure.
A Until Hurricane Harvey when I left, yeah.
Q And my understanding was you stayed at Travelers through 2018.
Does that sound about right?
A That's correct. Yes, that's correct.
Q Okay. And then I also have seen the notation that you served as national litigation manager.
Was that a different position than just litigation manager?
A Yes. Originally, it was the litigation manager. I oversaw first-party property



litigation for Texas, Oklahoma, and Louisiana.
At a national home office level, when I took over that role or that role was added to my responsibilities, Travelers determined that there was something better going on. There was -- there was better trends, what have you. And they studied what was different and decided that they liked the partnership that had been created, et cetera, and they consolidated all of the litigation throughout the country into a national litigation team with four and then five, I think -- now there's seven -- national litigation managers, and we began handling litigation nationally, depending on where -- and our territories moved depending on, you know, what was kind of the hot spot at the moment.
Q And when was that program put into place?
A Around 2010, 2011. It was kind of a gradual process.
Q And do I understand from your last answer that the region that you would have been involved in changed from one time to the next?
A Yes. It was always Texas, Louisiana, and Oklahoma. I added in Colorado, most of the Midwest and the Pacific Northwest and the Southwest.



Q When did you --
A At times, I handled litigation in New York, New Jersey, Florida, wherever I was needed.
Q And during what time frame did you handle Colorado?
A I handled Colorado from, I would say, 2011 until 2018. There was a time frame, and I couldn't be specific, where I only handled Dallas hail litigation. That was about a nine-month time frame. I couldn't tell you what year, but it was about -- maybe about four years ago. At that time, Dallas hail litigation was so intense that that's all I did. And then once that had kind of run its course, I took over my areas back in Colorado and the Midwest and Southwest.
Q Why did you leave Travelers in 2018?
A I was -- it was kind of a -- it was just a really natural time for me to leave. And I had had a pretty significant injury to my body in Hurricane Harvey, and it was difficult for me to continue to perform all aspects of my job. And I needed time off to rehab myself and my home.
Q From 2011 through 2018, were you ever out in the field, or were you essentially working a desk position?

A Both.
Q To what extent were you out in the field?
A Are you looking for a percentage?
Q Sure.
A The claims I would -- to clarify, at that point as litigation manager, I received claims that were already in litigation and had generally already been through the adjustment process. I would go into the field with experts during appraisals sometimes. I would say 25 to 35 percent of the time. And then I traveled out for mediations, depositions, trial, what have you. And I was on the road around 50 to 80 percent of the time.
Q And during that same time period of 2011 through 2018, was all of the work you were involved in first-party litigation, or were you also handling third-party litigation as well?
A There was some third-party litigation. It was rare, and it was probably ten cases or less.
Q And how much of the first-party litigation as a percentage involved hail cases?
A That's hard to -- let me -- I haven't thought about that. In Texas, it was near 100



percent. In Colorado, it was at least 50 to 80 percent. There was also a lot of wildfire claims in Colorado as you can imagine. But I would say hail and/or weather events were 75 to 80 percent of the litigation, and I include in that hurricanes, winds, and tornados.
Q Does the Travelers insurance policy define direct physical loss?
A I would have to look at the policy and the definition. There was many different policies in many different states. I couldn't -- I couldn't answer that question without looking at a policy or an insured and looking at the definition.
Q Why did the Travelers' policy language vary from one state to the other?
MR. PEIRCE: Objection, form.
A Well, Texas is different than Louisiana, which is different than Colorado. They all have different statutes and insurance boards and approvals. So while the substance of the policy might be fairly similar, they did vary. So you could never make a blanket statement about an insurance policy without reviewing the policy specific to the insurer in the claim.
Q (By Mr. Campbell) By memory, do you



recall that there were -- that some policies had a definition of direct physical loss and others did not?
A I don't remember that by memory, no.
Q By memory, do you recall if any of the Travelers policies that you worked with defined direct physical loss?
A I don't remember specifically, no.
Q Do you recall whether any of the Travelers policies you worked with defined property damage?
A I'm sure that they did, but I don't remember the definition.
Q So the purposes of your work in overseeing first-party litigation of hail loss claims, did you have a working definition of what direct physical loss entails?
MR. PEIRCE: Objection to form.
A Can you repeat that question, please.
Q (By Mr. Campbell) Sure. During your time at Travelers, did you utilize a working definition of direct physical loss?
MR. PEIRCE: Objection to form.
A I have, based on my experience as an adjuster and understanding of what direct physical



loss is.
Q (By Mr. Campbell) And what is that?
A Then you have to apply the policy, provisions, and endorsements to whatever.
Whatever your own understanding is, is always overridden by the policy definition.
Q Understood. So what, based upon your experience, is your understanding of what direct physical loss entails?
MR. PEIRCE: Objection, form.
A In regards to what peril?
Q (By Mr. Campbell) Hail.
A Any type of -- well, and this is not an all-inclusive answer because I don't have any definition in front of me, but I would say any type of marring, denting, tearing, damage to the look of a material. Something that impedes, obviously, the function of the material, but not just the function of the material, the -- you know, there is a cosmetic aspect to that as well. And it could also be something that would reduce the life span of the material.
So that is not an all-inclusive definition. That's just kind of what I can come up with at this particular time. I don't have an

all-inclusive definition for myself written down anywhere.
Q As far as the aesthetic component or cosmetic component, based upon your experience in working cases for Travelers, did you consider that to come into play if the component we're dealing with was not visible?
MR. PEIRCE: Objection, form.
A I'm going to have to ask you to repeat that question. If a cosmetic component isn't visible?
Q (By Mr. Campbell) Right. Do you care about a cosmetic effect from hail to a component that is not visible?
A Who would it not be visible to? If you can see it, it would be visible.
Q Well, for example, underlayment beneath an EPDM membrane. No one -- no one is going to see that --
(Multiple people talking at once.)
Q (By Mr. Campbell) So that's the example.
(Interruption by the court reporter for clarification of the record.)
A I'm sorry. What was the last



question?
Q (By Mr. Campbell) I asked you: Using the example of underlayment beneath an EPDM roofing, when you were working at Travelers, would you worry about a cosmetic or aesthetic consideration with regard to that building component?
MR. PEIRCE: Objection, form.
A There would be no cosmetic damage, but the underlayment of the EPDM roofing has an effect. The ISO board has -- it's, therefore, a reason, it's required by code for a reason, has a, you know -- so that -- cosmetic consideration, no; functional consideration, yes.
Q (By Mr. Campbell) All right. So I was using that as an example of a building component that wouldn't necessarily be visible, and I believe what you told us is that under those circumstances, you wouldn't be concerned about any aesthetic considerations, correct?
MR. PEIRCE: Objection, form.
A That specific circumstance, no, because I would consider if it was damaged by hail and what that damage entailed as far as the life span of the roof and that particular component itself.



Q (By Mr. Campbell) Okay.
A It can --
(Multiple people talking at once.)
Q (By Mr. Campbell) And, again, my question was related specifically to the aesthetic consideration.
MR. PEIRCE: Objection, form.
Q (By Mr. Campbell) And I understand your answer to be you would not be concerned with any aesthetic considerations under those circumstances; is that correct?
MR. PEIRCE: Objection, form.
A Yes. I would not be concerned with aesthetic considerations specifically.
Q (By Mr. Campbell) Okay. While you were at Travelers, would you consider spatter marks in the absence of any denting to constitute direct visible loss?
MR. PEIRCE: Objection, form.
A It would depend -- I would actually need -- it would depend on a case-by-case basis.
Q (By Mr. Campbell) And why is that?
MR. PEIRCE: Objection, form.
A Not all spatter marks are made equally, and they are all different. I would have



to consider the location; the visibility; the impact; what was the spatter mark on, was it on -- what kind of material?
All of those things would need to be taken into consideration.
Q (By Mr. Campbell) Is it your understanding that spatter marks fade over time?
MR. PEIRCE: Objection, form.
A On different types of materials, yes; on other types of materials, they may not.
Q (By Mr. Campbell) What are materials on which spatter marks may not disappear or fade?
A Well, or have a much longer time and look very bad, would be painting, different types of paint, spatter marks may fade on a fence over time. But, you know, I don't have any knowledge of how long that would take specifically. I think every climate is different. Every -- you know, depends on the rain and the weather. There's so many variables that that's a very difficult question to answer.
Q Did you handle claims while at Travelers for which Travelers did not cover spatter marks from hail?
A Yes.
Q Under what general circumstances?

A I mean, I -- I think I would --
MR. PEIRCE: Objection, form.
A I would like to rescind my prior answer. We handle claims for Travelers where spatter marks were taken into consideration and were generally, if they could be, mitigated without damaging the material.
So, for instance, if a fence had a lot of spatter marks on it, it's a -- the fence itself may not have any sort of physical damage from the spatter marks, but it looks terrible. So we will allow for the power washing of -- to get the rest of the grime or debris that had been knocked off by the hail, we would allow for that.
There are times where on roofing materials there would be a spatter mark. We didn't consider that spatter mark to be damage that would reduce the life span of the roof, but you couldn't clean that spatter mark because power washing an asphalt shingle is counterintuitive.
Q (By Mr. Campbell) So that's something that would be addressed on a case-by-case basis --
A Yes, sir.
Q -- depending upon the location, then, and the extent of the spatter mark?



A Yes. And the material that has the spatter marks on it.
Q To your knowledge, did Travelers have any internal memos or best practices, publications that addressed when spatter marks would be covered?
A Not to my knowledge for spatter marks, no.
Q So have you been doing consulting work since you left Farmers -- excuse me -- Travelers?
A I took a break before I started consulting, and then around six to nine months I started kind of -- I started slowly. I needed to repair my health and my home, so I did take a break.
Q So when did you begin to build up your consulting practice?
A More towards the end of 2018.
Q And how many assignments, roughly, have you undertaken since then?
A I don't know specifically, I'd have to look at my records, but over 25.
Q And how many of those have been for the Hossley Embry law firm?
A I'm sorry. Can you repeat that.
Q Yeah. Of those 25 or so assignments, how many of those have come from the Hossley Embry



law firm?
A Two.
Q And what has been the split as to how many of those you've been retained by a property owner versus how many you've been retained by an insurance company?
A I'm going to ask you to clarify that question. Property owner or insurance -- that's two questions.
Q Well, let me back up, then.
How many of these have been in a litigation context?
A Most all of them -- I've never been -- I will say I've never been hired by an individual. I've always been hired by attorneys.
Q Okay.
A And they've all been in some stage of litigation.
Q Okay. So I can ask the question differently.
What's the split as to the ones where you've been hired by plaintiff's counsel versus been retained by defense counsel?
A 25 percent for defense counsel, for insurance companies; and 75 percent for plaintiff's



counsel.
Q For those 75 percent where you were retained by plaintiff's counsel, did you reach a conclusion that the insurance company had fallen short of their obligations to their insured in each of those cases?
A No.
Q In how many of those did you find that the insurance company had fallen short?
A I don't have a specific answer to that question. I -- I -- I tend to not kind of -- like once I'm finished with a file it tends to -- I put it away until I need to think about it, so I don't know. But there have been, I mean, many, where I have been asked to review a file and I've given my honest opinion and it's not necessarily what the plaintiff's counsel wants to hear, but it's my opinion.
Q Well, we're only dealing with about 25 overall assignments.
A It could be more. Like I said, I didn't think that I would need to answer that specific question.
Q So -- and I'm not holding you to that as a specific --

A Yeah. As long as you don't hold me specifically to it. There's a fair number where I point out the good and the bad, and there's at least, I would say -- I'm trying to think -- seven where I did not find fault with the insurance handling of the claim.
Q Did the Travelers policies you worked with have a policy provision regarding a proof of loss?
A Yes.
Q And just in general terms, what did that policy provision provide for?
A It was the -- I will say that tended to be more standard; however, you know, it was that work would ask, you know, a proof of loss should be submitted, and then especially if it was requested.
I will say that in my experience with Travelers and with Nationwide, the amount of times we asked for a proof of loss was maybe six times.
Q And what would be the circumstances that would trigger your requesting a proof of loss?
A I, myself, have never requested a proof of loss from an insured.
Q Well --
A I would say I was working on files



where one had been requested, and I don't remember the circumstances under which those were requested.
Q What's the purpose of a proof of loss, as you understand it?
MR. PEIRCE: Objection to form.
A I think sometimes it can be used as a tool to ascertain the scope of the damage, or once that scope has already been agreed upon and the repairs have been agreed upon, that that shows an agreement to that. Every proof of loss I have seen has been provided after the adjustment and inspections of the claim. I've never seen a proof of loss requested before the adjuster had done their evaluation of the claim.
Q (By Mr. Campbell) If an insured is aware of hail damage which is not reflected in the insurer's initial estimate, what would you expect the insured to do?
MR. PEIRCE: Object to form.
A May I ask you to repeat the question.
Q (By Mr. Campbell) Yeah. If an insured is aware of hail damage to their property and that particular aspect of hail damage is not reflected in the insurer's initial estimate, what would you expect the insured to do?



MR. PEIRCE: Objection, form.
A Based on my experience, when an insured finds additional damage or damage is not included or they become aware of additional damage that was not investigated, I would expect the insured to contact their adjuster via phone or e-mail.
Q (By Mr. Campbell) Why?
A Because that is in 99.9 percent of the cases what everybody does. That's the normal course of business. However, if they are represented by counsel, they would go through counsel --
Q Sure.
A -- and counsel would contact us; or if they are represented by a public adjuster, the public adjuster would do the same.
Q Okay. And I will accept your premise that that is what occurs in 99.9 percent of the cases, but just explain what purpose that serves.
MR. PEIRCE: Objection, form.
A What purpose what serves?
Q (By Mr. Campbell) The insured contacting their insurance company saying, "Hey, you did not include this particular aspect of the loss in your estimate."



A Well, it gives --
MR. PEIRCE: Object to form.
A -- the insurance company a second chance. If they failed to properly investigate the damage, it gives them a second chance at investigation --
Q (By Mr. Campbell) And is that --
A -- and allows them time to consider a supplement.
Q So do you think it is good practice on behalf of an insured to notify their insurer if they become aware of hail damage that is not included in the insurer's estimate?
MR. PEIRCE: Objection, form.
A I'm sorry. You broke up. Can you say that again?
Q (By Mr. Campbell) Yes. Do you think it is good practice on the part of an insured to inform their insurer if they become aware of additional damage that is not reflected in the insurer's estimate?
MR. PEIRCE: Objection, form.
A Good practice? I don't know. I don't know that they necessarily have to do that immediately. I don't think there's a time frame.

But I think most insureds, if they discover additional damage, that that might start them looking for more additional damage. It might take them time to kind of get certain -- I have -- what I'm trying to say is, I know insureds who will call you with every single item. You know, I get 15 phone calls on 15 different items. Or an insured will call you once with 15 items. They'll wait until they have gotten all of their ducks in a row, as they say -- to have kind of colloquialism there -- but, generally, an insured will then -- will notify the insurance company of missing, you know, damage that's not evaluated -- or investigated.

Q (By Mr. Campbell) Okay. You answered my question by saying that that's common.

My question for you is whether you consider that to be good practice on the part of the insured.

MR. PEIRCE: Objection, form.

A I don't know what you mean by "good practice." I just think it's sensible because the insurance company -- well, if there's damage that the insurance company failed to investigate, it's actually to the betterment of the insurance company.



So, yes, it's good practice. It gives the insurance company a chance to have a second bite of the apple. But it's also good for the insured because they can get -- you know, they have to, then, become their own advocate to get a proper evaluation of their claim.

So, yes, it would be a good practice to get a proper evaluation of their claim.

Q (By Mr. Campbell) Now, you submitted a March 18, 2020 written report, did you not?

A Yes, sir.

Q Have you issued any other reports?

A No.

Q Are all of the opinions which you have formed in this case set forth in your March 18, 2020 report?

A No.

Q When did you form any additional or different opinions?

A Yesterday.

Q Based upon what new information?

A I'm sorry. Sunday and yesterday.

I was provided with the deposition transcripts of some of the people involved in this case and the exhibits that they brought.



Q And which transcripts did you review?

A Briana Miller. Gosh, I don't have them in front of me. I didn't make a list. I know they are on my e-mail. Briana Miller, Mr. Chan, Bill Walls, the 30(b)(6) for RDA, whose name I can't pronounce. I think those are -- I think that's it. I might be forgetting somebody specifically. I know Bill Walls, Briana Miller, the 30(b)(6), and I feel like there's somebody I'm missing. But then there was some of the exhibits as well.

Q When you say the 30(b)(6), are you referring to Hudson's 30(b)(6) deposition?

A No. The 30(b)(6) for RDA.

Q Okay.

A For the hotel.

Q How about Kevin Aguilar?

A I don't know who that is, so no.

Q How about Carl Martin?

A No.

Q How about Matt Sitzmann?

A I did not -- no, but I -- I did re-review quickly the Haag reports.

Q Okay. And I'll -- how about Andrew Larson?

A No. I don't know if his transcript



was available at this time.

Q So the ones you recall are Briana Miller, Kaho Chan, Bill Walls, and RDA's 30(b)(6) deposition transcript?

A Those are the ones that I recall, yeah. There might have been another one, but I don't think so. There's a lot of -- there was a lot of deposition reading yesterday.

Q Okay. And when did you receive those transcripts?

A Yesterday morning, Monday morning.

Q Okay. Well, I am not going to ask you any questions this morning about any new opinions that you formed. So when I ask you about your opinions during the course of this deposition, I'm going to ask you about the deposition -- or excuse me -- the opinions that are set forth in your March 18th, 2020 report. Fair enough?

A I will make every attempt to delineate that.

Q Okay. And I do reserve the right to resume this deposition at a later time, but I would only do so if a request is made for you to be able to submit supplemental opinions; and then if, in fact, they are disclosed in that fashion, then I

might take advantage of the opportunity to take your deposition then regarding those. But I'm not prepared to ask you questions during this deposition about opinions that I would only hear for the first time this morning.

So just for your edification, that's why I'm going to limit this deposition to solely those opinions that have been disclosed to me thus far.

A I understand.

Q Do you have a copy of your deposition that you can refer to if I ask you questions about it?

A I assume you mean my report, not my deposition, because I'm being deposed at the moment.

Q Very appropriate clarification, and that's exactly what I meant to ask you. Yes.

A Yes, sir, I do.

Q Okay. Can you turn to what I believe would be the 16th page of that report. It's the third-to-last one, and the first full paragraph starts with the language, April 2019, the claimants reopened.

A Yes, sir.

Q As far as I can tell, all of the



observations and opinions which you hold concerning JS|Held's role in the 2019 phase of this investigation as set forth on this particular page.

Can you take a moment and tell me whether you agree with that.

(The deponent perused the document.)

A I believe that is a true statement.

Q (By Mr. Campbell) And in the third full paragraph on that page, you reference that you did not believe that JS|Held's estimate accounted for HASP considerations with regard to work site safety while repairs were being conducted; is that correct?

A Yes.

Q Have you reviewed Joe Del Guidice's rebuttal report?

A Yes, but I believe you don't want me to opine on opinions that I formed prior -- or after 3/18, correct?

Q Well, I will -- I will make an exception in this particular case.

A Okay. Yes. I have reviewed his rebuttal report.

Q And --

A I reviewed that yesterday, mid



morning.

Q And so you're aware that he describes in his rebuttal report that site safety and OSHA requirements were considered during the preparation of JS|Held's estimate; is that correct?

A I believe that is what he says to be true. I don't know -- I believe that is a convenient -- I -- I don't agree with his rebuttal report on that aspect.

Q Okay. And tell me why you disagree with his rebuttal report.

A I don't have the report in front of me.

Do you have it?

Q I have it. Sure.

A I would have to go off my Zoom to look at it specifically, so I'm having to recall from memory --

Q Well --

A -- his estimate, 120 supervisory hours. There is no note in that estimate on -- which is very easy to add in Xactimate -- with what that includes, health and safety, or what does that number include specifically.

And then he also opines that the



second line item for another number of hours for general labor -- and I don't remember the specific number of hours -- and it says something like, "Setup and cleanup of site," which I find to be contradictory because he also in his rebuttal report -- which I'm not looking at, and I'm going by memory -- he talks about that to do some of the -- you know, the lifts, the boasts and stuff, the OSHA stuff, you have to be specifically trained, you have to have specific qualifications, what have you. And -- but that's included in general labor hours when that's more of a skill-based skill set.

And if that included those things, why wouldn't he have included that with site setup and cleanup in the note that he added in his estimate under General Labor? He didn't add any note under Site Supervision.

Q So you question his statement that he considered the site safety in OSHA requirements in the preparation of his estimate --

A I do.

Q -- is that fair to say?

A Yes, sir.

Q Okay. Looking back at Page 16 of your report, would you agree with me that you express no

opinion that is critical of the scope of JS|Held's investigation?
MR. PEIRCE: Objection, form.
A I did not put a criticism in this report.
Q (By Mr. Campbell) And if you considered the scope of JS|Held's investigation to have been deficient, you would have said so, would you not?
MR. PEIRCE: Objection, form.
A On 3/18 I -- perhaps that would have been an omission on my part. I -- I -- I do remember having criticism.
Q (By Mr. Campbell) You did not express any criticism of the scope of JS|Held's investigation in your report, did you?
MR. PEIRCE: Objection to form.
A I did not.
Q (By Mr. Campbell) Did you intend, when you wrote your March 18, 2020 report, to express all of the opinions which you had formed as of that time?
A That's generally the intent, but not necessarily -- I mean, I don't -- I wouldn't necessarily say every single opinion. I would --



let me ask you to repeat the question.
Q Yes. Was it your intent in preparing your March 18, 2020 report to include all of the opinions which you had formed as of that date?
A In regards to JS|Held, yes.
Q Okay. And so when you did not include any criticism of the scope of their investigation, that was a considered decision on your part, was it not?
MR. PEIRCE: Objection, form.
A I don't believe it was a considered decision.
Q (By Mr. Campbell) Don't you agree that that -- that that is a critical issue in this case, as to whether or not JS|Held conducted a sufficient investigation?
MR. PEIRCE: Object to form.
A I don't think it's -- I don't think it's critical. I don't think it -- I don't think it hinges -- anything hinges on JS|Held's investigation, specifically. It's not a linchpin thing.
Q (By Mr. Campbell) Explain your thinking in that regard.
Why is that not a linchpin thing?



A I had a -- I remember having an opinion. I don't -- it didn't get it down into writing. But it was not -- I don't believe it -- I think it's -- it's -- it's -- overall wouldn't change my overall opinion of what I didn't have written down.
Q Is it also fair to say that you express no opinion critical of JS|Held's repair recommendations?
MR. PEIRCE: Objection, form.
A I did not.
Q (By Mr. Campbell) And if you had considered JS|Held's repair recommendations to have been deficient, you would have said so, would you not?
MR. PEIRCE: Objection, form.
A As of 3/18, I did not necessarily have a criticism of their repair recommendations.
Q (By Mr. Campbell) Okay. So to state that another way, as of that point in time, your opinion was that JS|Held's repair recommendations were reasonable, agreed?
MR. PEIRCE: Objection, form.
A Based off of their opinion, their estimate to them might have seemed reasonable. I



did not have access to all of the different experts' opinions. So I couldn't form an opinion on whether or not the estimate was reasonable for the overall claim. But based off of what they believed to be their observations during their inspection on 3/18, I believed their estimate to be reasonable based on their observations.
Whether or not it was reasonable for the overall claim, because I did not have access to all of that information, I did not opine on.
Q (By Mr. Campbell) Well, JS|Held issued their report in August of 2019.
Was there any expert investigation that had been undertaken up to that date that was not made available to you?
A I don't know.
Q What --
A I -- I believe there had been, but I don't know specifically.
Q Well, did you review Kevin Aguilar's estimate?
A Oh, the public adjuster.
Q Yes.
A Thank you. I'm very -- I'm not great with names, I'm good with damage, so thank you.

I do remember looking at his estimate.
Q Okay. And were you familiar with the Seagren Construction bids that had been submitted earlier in time?
A Yes.
Q And the Glass Systems bids that have also been submitted?
A I don't believe I saw a Glass Systems bid.
Q Well, I'll represent to you that there were no other engineers or other forensic investigators who had been out looking at the hail damage at the Denver Sheraton West Hotel prior to August 2019 than the ones that you have expressed you're aware of.
So if you reviewed the same information that JS|Held had, your assessment was that their repair recommendations were reasonable, correct?
MR. PEIRCE: Objection, form.
A I don't agree with you. You just said that there was a Glass Systems, and I believe that there might have been an HVAC.
Q (By Mr. Campbell) No. I'll represent to you -- well, there was a --



A No -- I don't have that information.
Q Well, were you provided with a complete Kevin Aguilar estimate?
A I was provided with his estimate. I don't remember -- I don't think I was provided with any expert supporting documentation.
Q So I think his estimate included as an attachment a report from Draper that addressed HVAC considerations.
Were you not provided with the Draper component of that report?
A I would have to -- I would have to look back at --
Q Can you do that now?
A I would have to go off Zoom. I mean, the amount of production you provided was so disorganized that it was hard to keep everything straight.
Q Well, this -- this was something that you would have received from the attorneys who hired you.
MR. PEIRCE: Objection, form.
A I understand that.
Q (By Mr. Campbell) Okay. So why were you referencing --



A There was -- there was a lot of --
(Multiple people talking at once.)
Q (By Mr. Campbell) Go ahead and answer.
A There was -- there was a lot of information to consolidate into my report. I don't specifically remember Draper, although now that we're speaking of it, I believe that that might have been an attachment to Kevin Aguilar. I don't remember -- and I haven't re-reviewed it since I wrote the report.
Q Okay. Well, let me ask this question as a hypothetical, then.
If it turns out that you had access when you prepared your report to all the same materials that had been provided to JS|Held, then you would agree that JS|Held's repair recommendations were reasonable?
MR. PEIRCE: Objection, form. Objection, foundation.
A I don't -- you know what? I don't think that I would have. I don't think that was my thinking, was to necessarily go into their -- the specifics of their estimate numbers. I wasn't really hired as a technical expert.



I'm hired as a technical expert a lot. I was hired as a claims handling expert, so I wasn't as focused on criticizing the estimate. I really wasn't focused on that. I was focused on the claims handling, which is different than when I'm hired as a technical Xactimate and, you know, expert that way.
I believe you're asking me to be a technical expert in estimating as opposed to a claims handling expert.
Q (By Mr. Campbell) Well, I don't intend to ask you any opinions that you haven't drawn one way or the other.
Are you telling me that you did not form any opinions as to whether JS|Held's repair recommendations were reasonable?
MR. PEIRCE: Objection, form.
A I have opinions on their repair estimate, but I believe that that's outside of the scope of why I was -- why I was hired, and that that could be why I didn't put them in writing specifically, because I -- I was hired as a claims handling expert, not to get into the various technical aspects of this claim.
Q (By Mr. Campbell) Did you review the

Haag Engineering August 22, 2019 report?
A Is that the second report?
Q The second one.
A Yes.
Q And you reviewed --
A I reviewed both.
Q -- that prior to your preparation of your report?
A Yes.
Q I don't see any discussion of that Haag Engineering report anywhere in your report. You reference its existence at one point, but I don't see any discussion about it.
Why is that?
MR. PEIRCE: Objection, form. Objection, foundation.
A I'm sorry. Why didn't -- I --
Q (By Mr. Campbell) Why didn't you discuss the Haag Engineering report?
MR. PEIRCE: Objection, form.
A I don't have an answer to that question.
Q (By Mr. Campbell) If you had formed any opinions that were critical of Mr. Sitzmann's work in his inspection of the roof, would you have



expressed those opinions in your report?
MR. PEIRCE: Objection, form.
A Again, I'm not entirely sure I would have. Again, because that was then getting into the critical of the technical aspects of the claim, and I believe that that's going to be something for the jury to decide and a battle of the experts, as we say in our parlance; but, you know --
Q (By Mr. Campbell) If you had thought that Mr. Sitzmann had performed less than a reasonably thorough roof evaluation in 2019, would you have said so in your report?
MR. PEIRCE: Objection, form.
A I'm not sure if I would have said that in my report or if I would have brought that to the attention of counsel separately for his -- for a separate expert to evaluate.
Q (By Mr. Campbell) Well, you say you're not sure whether you would have.
Let me ask it this way: Did you make a considered decision in writing your report not to express any criticisms of the thoroughness of Mr. Sitzmann's roof inspection?
A No.
MR. PEIRCE: Objection, form.



Q (By Mr. Campbell) You did not make a considered decision to do that?
A I did not make a considered, conscious decision to exclude criticisms of Haag, no.
Q Did you make a considered decision to include all opinions in your report that you considered to be relevant to your role as a claims handling expert?
MR. PEIRCE: Objection, form.
A Please repeat the question.
Q (By Mr. Campbell) Yes. Did you make a considered decision in preparing your report to include all of the opinions that you had formed which you considered to be relevant to your role as a claims handling expert?
A That was my intent when writing the report, yes.
Q Okay. And you chose not to state any opinions that were critical in any way of Mr. Sitzmann's repair recommendations; is that right?
MR. PEIRCE: Objection, form.
A I don't know if I made a conscious choice or not. I do not remember.
Q (By Mr. Campbell) But regardless of



that either way, the fact is that you did not include in your report any criticisms of Mr. Sitzmann's repair recommendations, correct?
MR. PEIRCE: Objection --
A Correct.
MR. PEIRCE: -- form.
Q (By Mr. Campbell) So I'm looking at what is, I believe, the eighth page of your report, and you make the comment that when an adjuster does not have the expertise to make certain determinations, they must consult with an expert to determine causes of loss for determining a proper damage assessment or method of repair.
All right. Do you believe that it was appropriate for Hudson Insurance to retain JS|Held as a consulting expert in 2019?
A You were -- I'm sorry. You were breaking that up. Can you repeat that again. I apologize. I know I'm asking you to repeat things, but I want to make sure I hear you correctly.
Q That's quite all right. I want to make sure you hear me correctly as well.
Was it appropriate, in your view, for Hudson to retain JS|Held as a consulting expert in 2019?

MR. PEIRCE: Objection, form.
A I believe Hudson approved of the retention of JS|Held, but I believe Mr. Larson retained them, not Hudson.
Q (By Mr. Campbell) You are correct, factually, so I can rephrase.
Do you think it was appropriate for JS|Held to have been retained on Hudson's behalf as a consulting expert in 2019?
A Yes. If Mr. Larson did not have the -- if Mr. Larson and Crawford did not have the in-house capabilities to properly evaluate, investigate, and value the damages, I believe it was completely appropriate to bring in experts to assist.
Q And was it also appropriate to bring in Haag Engineering as an expert to assist -- well, let me first ask when that happened -- in 2017?
A They were brought in in a limited degree in 2017. To bring them back in 2019? That's -- that could be a judgment call in the adjuster's point of view.
Q Right. But you're -- you're calling balls and strikes on that judgment call when you sit in the role as an expert. So do you think it was



appropriate to bring Haag Engineering back into play in 2019?
MR. PEIRCE: Objection, form.
A You use baseball references, which I'm not familiar with -- I don't know what you mean by balls and strikes -- but I'm going to take it in context.
Some adjusters might want a brand-new perspective on the roof. They may not want to re-retain a prior expert. And some may want to bring them in. I believe that was the judgment call of Mr. Larson, and that was his judgment to make.
I don't disagree with that.
Q (By Mr. Campbell) Okay. So just in terms of the timeline of events, you're aware that JS|Held and Haag each submitted reports of their re-investigations in August of 2019, correct?
A Yes.
Q And that Hudson determined the amount of benefits they were going to pay RDA in reliance upon JS|Held's and Haag's reports.
Is that also your understanding?
A Yeah. I'm sorry. Can you --
Q Did I break up again?
A Yes. It could be my Internet



connection. I apologize.
MR. CAMPBELL: Dianna and Chris, are you having difficulty hearing me as well?
MR. PEIRCE: I did not -- I have not.
A I also sometimes don't -- you're not necessarily looking at the camera when you speak.
Q (By Mr. Campbell) Right.
A You're tending to look sideways, and I think part of the time I have -- from years in this industry, I have some hearing deficit. So I think that's part of my problem.
Q Okay. No need to apologize. Whenever you don't hear me for whatever reason, please let me know, and I will rephrase until you do hear me.
A Okay.
Q Is it your understanding that Hudson determined the recoverable ACV on this claim based upon reliance on JS|Held's and Haag Engineering's August 2019 reports?
A That was the second time they did that, yes.
Q Did you -- in your opinion, was that appropriate for Hudson to do so?
MR. PEIRCE: Objection, form.
A Based on -- it was appropriate if they



reviewed it themselves and then did that.
Q (By Mr. Campbell) Okay. I mean --
A They should not -- they should not carte blanche take anything from their TPA or their engineer without reviewing it in-house thoroughly.
Q Okay. With that qualification in mind, then you believe it's appropriate for them to rely upon opinions formed by their retained consulting experts?
A Yes.
MR. PEIRCE: Objection, form.
A Yes.
MR. CAMPBELL: We've been going close to an hour. Do you want to take a break at this point? I'm about to shift to a different topic.
MR. PEIRCE: Sure.
THE DEPONENT: Sure.
MR. PEIRCE: 10 minutes?
MR. CAMPBELL: That sounds fine. All right. Thank you.
(Recess taken, 10:59 a.m. to 11:06 a.m.)
MR. CAMPBELL: Okay. So back on the record?
THE DEPONENT: Give me about 30

seconds, please.
Okay. I'm ready.
Q (By Mr. Campbell) Ms. Beyer, I'm going to refer you back to Page 16 of your report --
A Okay.
Q -- and that's the third-to-last page.
A Okay.
Q Beginning at the bottom of that page and then continuing on to the next page, you include a list of the various ways in which you believe that Hudson fell short of its obligations in its handling of RDA's claim, fair?
A Fair.
Q I'm looking at your Item B, B as in boy, and it reads that in your view, Hudson ignored a competent and experienced expert who observed and photographed damage to the window curtain wall, roofs, skylights, curtain walls, et cetera, that should be replaced.
Is that your expressed opinion?
A Yes.
Q Who is the expert you're referring to?
A Mr. Sitzmann in his 2017 narrow scope evaluation. He was -- he was literally just there to determine why the skylight or the pyramidal



skylight over the lobby was leaking. But he also noted that there was damage to the, you know, vertical flashing over the mullion, there was damage to HVAC components, there was damage he could see everywhere that nobody else -- that Mr. Walls just ignored and then Hudson ignored. And pictures in his report, and they ignored it and didn't evaluate it. And Mr. Walls did that and Hudson did that in 2017.
Q Okay. I ask that you list for me, then, each aspect of damage that was observed by Mr. Sitzmann that you believe was then ignored by Hudson.
MR. PEIRCE: Objection, form.
A I don't know if Mr. Sitzmann made a note of this, but I think in my report in another place we talk about just Photo 4 in his 2017 report.
Q (By Mr. Campbell) Okay.
A You can see -- and I don't have that report in front of me -- if you want to put it up as an exhibit or what have you -- you can see there that there is damage to the vertical flashing over the mullions and the curtain walls of the windows.
I don't have his report in front of me, but I believe he discusses that there's dents



and damage to vents, either at the pool barrel roof, which is obvious to the naked eye, should have been seen by Mr. Walls if he is what he says he is, and by Mr. Sitzmann.
Q Okay. We talked about --
A Another roof vent component that I believe he photoed. Like I said, the report or what have you is not in front of me. You know, Mr. Walls was there with Mr. Sitzmann, and I find it hard to believe that if Sitzmann is trying to determine the leak at the skylight and the cause of the leak into the interior of the mezzanine level, that he's --
(Court reporter requested a break due to computer problems.)
(Pause in the proceedings.)
A Are we ready to go?
Q (By Mr. Campbell) Well, do you want to go ahead and complete your answer so that --
A Now she's paused. Okay.
I find it hard to believe that Mr. Sitzmann as an engineer, if he's there with Mr. Walls as, you know, national general adjuster, executive vice president, didn't say, "Wow, look, you can see it. Wow, look at all that hail damage. Wow, look at all that hail damage."



I'm not an engineer. I'm not an expert. But I believe that, you know, you would get the expert or expect your adjuster or your expert to do a thorough investigation.
Now, Mr. Sitzmann's inspection was very limited, but I would expect -- this also brings in Mr. Walls, who is also supposed to be an expert in insurance and adjusting claims. You know, I would be amazed, I would be flabbergasted, that he didn't see these same damages that I can see with a naked eye on a picture, and I have not been to the location. And these things were ignored.
Q Okay. So let me look back at your Paragraph B here that I previously read into the record.
What damage to the skylights was identified by Sitzmann and ignored by Hudson?
A What damage to the skylights -- I -- I -- I don't believe he was there to -- like I believe he had a photograph of the skylights, but I don't believe he was hired to opine on the skylights.
Q Well, your expressed opinion is that Hudson ignored a competent and experienced expert who observed and photographed the damage to the

window curtain wall, roofs, skylights, curtain walls, et cetera.
So I'm just taking the reference to skylights and asking you what damage to skylights was ignored by Hudson?
A Oh. I believe that -- and I don't know that -- because I haven't seen the specifics, but there's HVAC components at the skylight that were not ever mentioned in the report from Sitzmann or from Mr. Walls. The big vents, the big HVAC vents there in the barrel pool skylight.
Q So the reference to skylights in that paragraph is specifically a reference to HVAC equipment?
A Well, it's part of the skylight, but it's also -- has an HVAC component, so it's kind of six of one and half a dozen of the other, I believe.
Q We're talking about the pool dome skylight, correct?
A Yes, the big barrel dome.
Q The big barrel dome. And is it your understanding that Hudson did accept that that skylight would need to be replaced?
A Yes.
Q And that RDA's own contractors



provided a bid for the cost to replace that skylight?
MR. PEIRCE: Objection, form.
A I'm going to tell you we're getting into a realm where I have a new opinion, and it's going to be very hard for me to talk about Hudson and the adjustment of this particular component.
Q (By Mr. Campbell) Well, difficult or not, I will ask you to be consistent with my prior request that you confine your opinions to those that you formed when you prepared this report.
So when you prepared this report, you were aware that Hudson was provided with the bid by RDA's own contractor for the cost to replace this skylight, correct?
MR. PEIRCE: Objection, form.
A Correct. Correct.
Q (By Mr. Campbell) So were you assuming when you prepared your report that that did not incorporate the cost to also replace that vent that is part of that dome skylight?
A There is two vents and I don't know. I don't know if it includes the cost to detach and reset or to replace. I do not know.
Q Okay. So do you have any other



opinions that you formed at that time concerning the skylights other than what you just expressed to me?
A Not at that time.
Q You mentioned "curtain wall" twice in that paragraph. Was that intentional or is that just a redundant comment?
A I should have -- I believe -- and this is, you know, nobody is perfect, and I cannot say that I am. I would have said, you know, "exterior cladding."
Q And which exterior cladding, specifically, did you mean to refer to?
A The acrylic textured concrete.
Q How about the "et cetera"? What did the "et cetera" refer to?
A Things that I don't know that maybe Mr. Sitzmann -- like I said, I was not there during their inspection, I'm not an engineer, and I have never been to the property. But the two of them were insurance -- a purported insurance professional and an engineer were there together.
I don't know "et cetera" what Mr. Sitzmann would have also noted and seen and discussed with Mr. Walls. There, I'm sure, are other components up on that mezzanine level that,



you know, you have to just see when you're around. You know.
Q Okay. Well, but so with regard to damage which you consider Sitzmann to have observed and photographed, as I understand it what we're now talking about is the window curtain wall, roofs, skylights, and acrylic textured concrete.
Fair enough?
A Fair enough. But I think the most obvious example is the window curtain wall.
MR. CAMPBELL: Dianna, could you please pull up Exhibit 26 and specifically --
THE COURT REPORTER: I'm sorry, what page?
MR. CAMPBELL: The fifth page of that exhibit.
Q (By Mr. Campbell) So, Ms. Beyer, do you have that up on your screen?
A Yeah.
THE DEPONENT: Can we -- can we enlarge it? I can barely --
MR. CAMPBELL: I can't.
Thank you, Dianna.
A There we go. Perfect. Yes, I see that.

Q (By Mr. Campbell) So you see that these are Mr. Sitzmann's expressed conclusions at the tail end of this 2017 report.
(Interruption by the court reporter for clarity of the record.)
Q (By Mr. Campbell) Ms. Beyer, do you recognize this to be Mr. Sitzmann's written conclusions, written at the end of his June 16, 2017 report?
A Yes.
Q And the number conclusion 2 was that the EPDM membrane was not damaged by hail.
Do you believe it was reasonable for Hudson to accept that conclusion as accurate for the purposes of its claim handling?
A No.
MR. PEIRCE: Objection, form and foundation.
Q (By Mr. Campbell) You say "no"?
A No.
Q Why was it not appropriate for Hudson to accept that conclusion as reasonable?
A I would refer you back to Page 1 of his report.
MR. CAMPBELL: Dianna, can we pull up what would be the second page of the exhibit.



Q (By Mr. Campbell) So what language were you referring to, Ms. Beyer?
A In accordance with your request, we inspected the Sheridan Denver West Hotel to determine the cause of water intrusion at a bank of skylights above the lobby, and, specifically, whether the leak was due to hail.
He did not inspect the roof for hail. He inspected to determine the cause of the leak into the lobby. And he determined that cause to not be related to hail.
It would be unreasonable for Hudson to use this report to determine if the -- if any other part of the roof was damaged by hail or any components of the building were damaged by hail because his inspection was very limited in scope.
Q So in forming that opinion, you assume that he didn't look at any other areas of the roof, correct?
A In his conclusions, he doesn't talk about any other areas of the roof. He talks about -- and his inspection was very limited and narrow and what he was hired for.
Q My question was: In forming your



opinion, did you assume that he didn't look at any other portions of the roof other than at the skylight?
A If he did, he did not put that in his conclusions.
Q And you're also aware that Mr. Sitzmann conducted a re-inspection of the roof in 2019, correct?
A Correct.
Q And remains of the opinion that the EPDM membrane was not damaged by hail, correct?
A I believe that is his opinion, yes.
Q Do you have any -- and is it reasonable for Hudson to rely on that opinion in its handling of this claim?
MR. PEIRCE: Objection, form.
A It wasn't reasonable for Hudson to rely on this report for the handling of the claim in 2017. What Hudson would have done later, is that what you're asking me?
Q (By Mr. Campbell) Yes.
A Oh, okay. Can you restate the question, then.
Q Yes.
Was it reasonable in August of 2019



for Hudson to rely on Mr. Sitzmann's opinion that the EPDM membrane was not damaged by hail?
MR. PEIRCE: Objection, form.
A Again, they should do their own review of all of the evidence, but it is reasonable to rely on an expert that you --
Q (By Mr. Campbell) Well, you've reviewed all the evidence, correct?
A I don't believe I have reviewed every engineer report and opinion that has been hired on this case, but . . .
Q Well, we're talking about those that were available as of August 2019, right --
A Right.
Q -- because that's when Hudson made its determination.
A Correct.
Q Based on all the evidence that you've reviewed, do you agree that it was reasonable for Hudson to conclude in reliance on Mr. Sitzmann's reports that the EPDM membrane was not damaged by hail?
MR. PEIRCE: Objection, form, foundation.
A In their 2019 review --

Q (By Mr. Campbell) Yes.
A -- yes.
Q So you're not suggesting to the jury in this case that in August of 2019, Hudson should have paid anything to RDA for the cost to repair or replace EPDM membrane, correct?
MR. PEIRCE: Objection, form and foundation, calls for an expert conclusion.
A I'm not an -- again, I'm not an engineer. And I'm not 100 percent confident in document production if there was another dissenting opinion that Hudson had access to. So I find that a hard question to answer.
Q (By Mr. Campbell) Well, you did --
A Only expert opinion they had was a Haag report that they had paid for. If they weren't -- if they didn't have any other experts or weren't looking at experts for information submitted by somebody else -- I mean, it's very murky at that point. It gets very murky in 2019 because so many things had happened that were inappropriate.
So just to say, "Oh, we relied on Haag," all of a sudden our claims handling is, you know, we're done, we have now made ourselves clear because we finally did something maybe correctly in



2019; I don't know the answer to that question.
Q Well, do you think --
A I don't know -- I don't know what other information they might have had.
Q Ms. Beyer, you have all the same information everybody else has in terms of what was available in August of 2019.
A I hope that that's true.
MR. PEIRCE: Objection, form.
Q (By Mr. Campbell) If we assume that to be the case, then it is, in fact, your opinion that it was reasonable for Hudson not to pay for repair or replacement of the EPDM membrane.
Isn't that true?
MR. PEIRCE: Objection, form. It calls for an expert conclusion. Asked and answered.
You can answer.
A I don't have -- I'm not privy to any conversations that the adjuster may have had with Mr. Larson. I know that they didn't do any kind of log notes or what have you that make any -- anything.
It's very difficult to answer that question because I don't know what else that they might have -- discussions they might have had or



opinions that might have been expressed at that time.
Q (By Mr. Campbell) Well, Ms. Beyer, you have expressed the opinion in your report that Hudson failed to pay all moneys owed under the policy as of August of 2019. And so since that is your expressed opinion, I'm just simply trying to pin down whether or not that opinion encompasses the EPDM membrane.
A Then ask me that question.
Q Did Hudson fail to pay money that was owed to RDA in August of 2019 for repair or replacement of EPDM membrane?
A Based on the Haag report and not including any additional information they could have received, then that's reasonable.
Q The third numbered conclusion from Mr. Sitzmann was that the leak at the south wall beneath the bank of skylights above the lobby was due to a long split in the EPDM membrane. This split, likely, was due to mechanical abuse.
Was it reasonable for Hudson to rely on that opinion in its handling of RDA's claim?
A We're not on that part of the exhibit, but I remember that. I believe that -- for that



very specific note, they were partially reasonable in their handling.
Q Partially reasonable. Why do you qualify it?
A Well, in my -- as an adjuster, if I'm going to deny damage because it was a mechanically -- you know, it was a tear, and then you are subsequently denying the interior water damage, I would put that in writing to my insured. I would deny the interior water damage per the policy and let them know that.
That was never done. I don't believe that's ever been done up to this date. I don't believe any of the interior water damage has been denied per the policy based on their reliance on engineers' reports.
Q What is the curtain wall damage which you believe was identified by Mr. Sitzmann and ignored by Hudson?
MR. PEIRCE: Objection, form.
A I take you to Photo Number 4 of the Haag --
Q (By Mr. Campbell) But if -- and we will look at photographs, but before we do that, I just want to make sure that I have a full

understanding of your opinion as to what aspects of the curtain wall --
MR. PEIRCE: Well, Colin, if you will let her answer your question first, I would appreciate that.
MR. CAMPBELL: I didn't mean to cut you off. If I did, I apologize.
A I'm basing my opinion -- I know we'll look at photographs -- I'm basing my opinion on Photo Number 4 --
Q (By Mr. Campbell) Okay. Based upon --
A -- where --
Q -- go ahead.
A -- where you can see in the photo you're going to have the flashing over the mullions in the curtain wall. We're not talking about the sills or the bug plates or what you want to call the horizontal, where the horizontal window is open. I'm talking about the vertical curtain wall and all of that flashing that you can see dings in. You can see hail dents in those, in that. And I believe that that was never addressed by Mr. Walls or Hudson.
Q So are you referring to the aluminum



metal vertical trim on the curtain wall?
A Yes, if that's what you want to call it. It's like a flashing, a trim, yes.
Q And is that the only curtain wall damage which you believe was identified by Sitzmann and ignored by Hudson?
MR. PEIRCE: Objection, form.
A I don't know the answer to that question specifically because I don't -- I mean, also, Mr. Walls didn't take great pictures. But based on the limited amount of pictures I had that I could see from the curtain wall that were that close and in focus, yes, I'm sure there were other damages, but I can't assume that. I have to be specific as to what I can see.
Q (By Mr. Campbell) Okay. I'm going to broaden the question to where we're not only talking about what was documented and photographed by Sitzmann in 2017, but to also incorporate the further phase of the investigation in 2019 as well.
Are you with me so far?
A I believe so.
Q Okay. You're aware that --
THE DEPONENT: Do you need that anymore or can we go back to full screen?



MR. CAMPBELL: We can go back to full screen.
THE DEPONENT: Thank you.
Q (By Mr. Campbell) Okay. So you're aware that it was JS|Held's conclusion that they identified damage to the bug seals along the horizontal bottom reaches of the up -- that's correct?
A Right.
Q And they further identified damage to the vertical metal trim as well, correct?
A Correct.
Q And Hudson has paid to RDA the estimated cost to repair both of those curtain wall items, correct?
MR. PEIRCE: Objection, form. Objection, foundation.
Q (By Mr. Campbell) You may answer.
A Okay. I believe those specific items were included in the estimate.
Q Okay. So going back to your stated opinion that Hudson did not -- or Hudson had refused to pay all moneys owed under the policy.
Is it your opinion that Hudson unreasonably failed to pay for other documented and



observed curtain wall damage?
MR. PEIRCE: Objection, form.
A Other damage or just curtain wall damage? Excuse me -- curtain wall damage.
Q (By Mr. Campbell) Specific to the curtain wall.
A I'm not an expert, though, in curtain walls. I -- I really can't opine on if JS|Held's inspection was all -- I'm not an expert in glass. I'm not sure that the guys that looked from JS|Held were expert in glass. I can't say if everything was included in their estimate.
Q So going back to your opinion -- and this is -- and if you want to look at it in your report, it's under Paragraph E. That's where you say Hudson did not perform in accordance with the policy by refusing to pay all moneys owed under the policy.
But what I'm trying to drill down to understand is whether you're including any curtain wall damage in that expressed opinion.
If you're not, that's fine, and we can take it out. I just -- I need to know one way or the other.
A Can you hear me?

Q I can.
A Okay. I got a popup that said my Internet connection was unstable.
That does not refer to curtain wall damage or to curtain wall specifically, no.
Q Okay. So --
A Like I said, I'm not an expert -- I'm not an engineer. I'm not an expert in curtain walls.
Q Okay. I just want to make sure that I fully understand the parameters of your opinion.
A I would be happy to share with you where I believe the underpayment is if you want to ask that.
Q We'll get to that.
A Okay.
Q We'll get to that.
So you're telling us that you have not opined that Hudson underpaid for curtain wall damage, correct?
MR. PEIRCE: Objection, form.
A Their underpayment did not -- I was not referring to the curtain wall.
Q (By Mr. Campbell) Okay. So, specifically, with curtain wall you do not hold an



opinion that Hudson underpaid for curtain wall damage; is that true?
MR. PEIRCE: Objection, form.
A The -- the -- the purpose of that sentence was to be all-inclusive of the building and damages. If you want to talk about specific components, we can do that.
Q (By Mr. Campbell) We are. We're talking about curtain wall.
A Okay.
Q And I just want to clarify for the record that what you've told me is that you do not hold an opinion that Hudson underpaid for curtain wall damage; is that correct?
MR. PEIRCE: Objection, form. Calls for an expert conclusion.
A Correct.
Q (By Mr. Campbell) It sure does.
I'm sorry?
A It sure does? Thank you. That was nice and sarcastic.
Correct.
Q "Correct" that you do not hold an opinion that Hudson underpaid for curtain wall damage?



Is that what you just said "correct" to?
MR. PEIRCE: Objection, form.
A I don't have an opinion either way.
Q (By Mr. Campbell) All right. So why don't you go ahead and list for me those items for which you do believe that Hudson underpaid.
A I believe Hudson did not pay for damage to the exterior cladding of the building outside of the curtain wall.
Q Anything else?
A Not at this time. Not from -- not as from my 3/18/2020 report, not from that time. Excuse me.
Q And what are you specifically referring to when you mention "exterior cladding"?
A The spatter marks and damage to the exterior acrylic painting that had been -- I believe there was an estimate in 2017 that was included in the statement of loss, and painting the exterior.
Q And give me a moment. I think we can pull that up so we know what we're looking at.
MR. CAMPBELL: So, Dianna, can you pull up Exhibit 32. And, Dianna, if we can scroll down, there's a series of bids that are attached to



the end of this document; and I don't have a page number for you, but if you can scroll down, I will stop you when we get to the right one.
There we go. We can stop there, Dianna.
THE DEPONENT: Landscaping as well. I'm sorry. I forgot about that. If you could scroll up a little bit, Dianna, please.
MR. CAMPBELL: Okay. Great. Thank you.
Q (By Mr. Campbell) So is this the proposal you were referring to, Ms. Beyer?
A Yes.
Q And were you referring specifically to all three of the numbered paragraphs for hail damage to west/east exterior walls or just to number three?
A In my opinion, this estimate is for -- and I know that they say west and east. You know, I don't know that that may -- may or may not be correct. But I believe this entire estimate, labor included, is for the acrylic textured concrete on the sides of the building where there is no window curtain wall. And, you know, around the sides where you have the, you know, the stanchions and the mezzanine. I believe it's for all of that area.

That's what I'm referring to. But that damage was included as a covered damage and was not included in the estimate that was relied upon by Hudson. I believe this damage is still outstanding.
Q Excuse me. You referred to the elevations that don't have the windows.
Did I understand you correctly?
A Yeah. And then you have like the concrete. It's like -- it's an acrylic texture, I believe, over concrete. So you have it like on the sides, and I believe there's a tile mosaic between like two -- what we would say like large, you know, vertical panels. I'm sure there's several panels.
But areas -- and then you have concrete like around the bottom of the mezzanine, you have the concrete stanchion at the, you know, like at the -- the columns, and it goes back. I believe the back of the hotel has -- instead of like an enclosed mezzanine conference space, I believe part of that is parking garage, but acrylic-coated concrete as well.
Q So --
A That area.
Q -- is it your understanding that the north and south sides of the guest room tower are



the ones that don't have the windows?
A Yes, that's my understanding. I believe there's also north and south -- yes, yes, that's true. In addition, there's lots of concrete cladding on the east and west sides as well.
Q So you interpret this Seagren August 17, 2017 proposal to refer to damage to the north and south elevations even though it specifically references the west and east elevations?
A Right. I didn't -- I didn't really -- you know, I don't necessarily always fault the construction guys. They may say north is just the front of the building, and then they consider, you know, east and west to be the sides; but they consider, you know, the front to be north. A lot of construction guys will do that. So they're not necessarily taking a compass reading, where an engineer might take a compass reading.
Q Well, let's look at the language of that Paragraph 3. What it says is: Prime all affected areas and paint with the like color, matching as close as possible to existing north and south sides.
A Yeah.
Q Doesn't that language suggest they



were, in fact, looking at the cost to repair damage to the west and east elevations?
A That could be. I mean, also it's to a lesser -- I mean, there's -- the north and south are going to have a lot more of the concrete, and then the west and east there's a lot less; so that could be why there's separate line items.
Q Well, but they are saying that they are going to try to match the north and south sides.
Doesn't that suggest that they are not making repairs to the north and south sides?
MR. PEIRCE: Objection, form, foundation.
A I don't understand what you're asking me.
Q (By Mr. Campbell) If they -- if they state that they want to match as close as possible the color to existing north and south sides, doesn't that tell us that the painting that they contemplate performing is only on the west and east sides?
MR. PEIRCE: Objection, form, and foundation.
A I mean, I don't know exactly what they were thinking here. I have never spoken with the Seagren people. I mean, you can assume things from



that. It could -- I mean, it could be just the cost to paint the -- or, you know, the -- the west and south sides or the west and east sides.
Regardless of that, this is accepted as covered damage in 2017, and it wasn't in the estimate in 2019.
Q (By Mr. Campbell) So the amount of money that you considered Hudson to have underpaid would be reflected by this proposal; is that correct?
MR. PEIRCE: Object to form.
A I'm sorry. Mr. Peirce cut in when you were asking the question.
Q (By Mr. Campbell) Yes.
The amount of money which you opine Hudson failed to pay is that reflected in this Seagren August 17, 2017 proposal; is that correct?
A That's correct.
MR. PEIRCE: Form.
Q (By Mr. Campbell) Okay.
A That's not all of it, but okay, yeah.
Q Well, you told me earlier that it was limited to just this proposal.
A Okay.
Q Didn't you?

A I don't know.
Q Well, are you -- are you now suggesting that there was other components of damage which you believe Hudson failed to pay?
A I will say that based -- you know, based on that, I don't have all -- like I said, I'm not an engineer. I don't have, I don't think, all of the information that's been produced in litigation. And I think it's maybe up to the jury to decide what the underpayment was. But I believe this is a black-and-white underpayment for sure because this is --
Q This is the only -- this is the only underpayment that you have identified; isn't that correct?
MR. PEIRCE: Objection.
A I believe so.
Q (By Mr. Campbell) Okay.
MR. CAMPBELL: Dianna, let's pull up Exhibit 26 again.
A I would like to further clarify my answer. It's the only underpayment I have identified. With that being said, I'm not an expert on the curtain walls and the costs associated with that and estimates from actual contractors and



experts. I don't have access to that information.
(Pause in the proceedings.)
MR. PEIRCE: Colin, is there a chance we can take a short restroom break now, or do you want to ask --
MR. CAMPBELL: That's fine. Now is probably as good a time as any, so we can do that.
MR. PEIRCE: Just five minutes?
MR. CAMPBELL: Okay. You got it.
MR. PEIRCE: Thanks.
(Recess taken, 11:51 a.m. to 11:58 a.m.)
MR. CAMPBELL: Shall we go back on the record?
MR. PEIRCE: Sure.
Q (By Mr. Campbell) So, Ms. Beyer, during our break we pulled up on the screen Photo 4 from Sitzmann's 2017 report because you had brought this up in one of your prior answers, and there was some aspects of this that you wanted to show me what you viewed as damage.
Now that we have the photograph up, what is it that you wanted to talk about with regard to it?
A Well --



MR. PEIRCE: Object to form.
A Almost smack in the middle of the picture you see the vertical flashing cover -- I don't know what you want to call that -- you can see hail dents up until -- until you can't see specifically any more, but you can definitely see quite a few.
Q (By Mr. Campbell) Okay. And there are two vertical elements. The one on the left is a slightly lighter color than the one on the right.
Would you agree with that assessment?
A True. And I don't know if those are the same materials or gauges or thickness.
Q Well, the dents that we see are on the left side with the lighter-colored material, are they not?
A Yes.
Q And we don't see dents on the darker-colored right element, correct?
MR. PEIRCE: Objection, form.
A I mean, I honestly think I do see some in the lower part of the picture. Well, you can't see where I'm pointing. But it's harder to tell.
Q (By Mr. Campbell) Okay. So -- and you understand that this -- the metal trim that you



were pointing out to me is -- was included in JS|Held's estimate in 2019 --
MR. PEIRCE: Objection, form --
A Yes.
MR. PEIRCE: -- foundation.
Q (By Mr. Campbell) -- and was paid by Hudson, correct?
MR. PEIRCE: Objection, form, foundation.
A Yes.
Q (By Mr. Campbell) Were there any other photographs that you thought demonstrated that Mr. Sitzmann had observed damage that had been ignored by Hudson?
A This is the one that stood out to me.
Q Okay. I'd like to go back to some of your conclusions in your report.
A Okay.
Q So going back to Page 16 -- and you're on that itemized list of opinions -- the first one, A, says that Hudson failed to investigate the claim thoroughly and fairly.
Does that refer specifically to the 2017 phase of the investigation?
A At the time I wrote this report, I

believe that was so.
Q In other words, you were not expressing any opinion critical of the thoroughness or fairness of the 2019 phase of the investigation, correct?
A Correct.
Q We've talked about the -- let's look at C. And you express in this opinion that Hudson compelled party A to institute suit to recover amounts due on an insurance policy by offering nothing to pay a claimant determined to be covered. Do you see that?
A Yes.
Q What was the status of the investigation at the time that RDA chose to file suit?
MR. PEIRCE: Objection, form.
A I believe that at that point the claims notes were redacted, so I can't be 100 percent clear.
Q (By Mr. Campbell) Well, RDA filed suit in July of 2019.
Is that your understanding?
A I don't remember.
Q Well, if I represent to you that's the



case, will you accept my representation?
A If Chris does not have an objection, yes.
Q Okay. And so at that point JS|Held and Haag Engineering had participated in the June 25th and 26th re-investigation of the hotel, correct?
A Correct.
Q And neither of those consulting engineering groups had yet issued their reports, correct?
A Well, not the investigation, but they hadn't conducted, you know, they hadn't investigated, you know, conducted an investigation into every room of --
Q Well --
A -- of the home -- of the hotel.
Q But they hadn't issued their reports at that point, correct?
A Correct.
Q And Kevin Aguilar had been present during the inspections, was he not?
MR. PEIRCE: Objection, form.
A I believe he was present in the first day.



Q (By Mr. Campbell) And he was also present during the June 6th preinspection meeting in which the protocol for the investigations was discussed with RDA, correct?
A I believe --
MR. PEIRCE: Object to form and foundation.
Q (By Mr. Campbell) Correct?
A I believe so.
Q So as of July 2019, wasn't the investigation ongoing?
MR. PEIRCE: Objection, form, foundation.
A Yes, I believe the investigation -- but there was still -- okay. I'm sorry. The investigation was ongoing -- or the reports hadn't been issued, but the inspections had been completed in June.
Q (By Mr. Campbell) Sure.
A And they filed suit in July.
Q Right.
A Okay. It's very common for engineers to give verbal conclusions and estimates, you know, without having the report being completed and stamped. So I believe at that point, you know,



Mr. Aguilar and RDA could have had an idea of what would be considered as damage, which did not include -- you know, include the roof and full replacement of the curtain wall, just the components of the curtain wall, and realized that there was still going to be quite a gap in what was believed to be owed, plus other things that had happened prior. And, you know, the insured -- I can't speak for the insured. I believe they can speak for themselves, saying that they didn't feel like they were being treated correctly. I mean, that's something you would have to ask the insured on the stand, why they felt the need at that point to file suit.
Q RDA certainly had the right to file suit if they chose, but I'm asking you these questions because you have phrased it in terms that they were compelled to file suit because Hudson had refused to pay them on their claim.
A Well, I believe that they -- you know, at that point, their -- you know, their -- their rights or whatever -- I don't know if I want to say "rights," I don't know if that's the right terminology, under the policy had just been -- and the Hudson's claims handling at that point had been

abysmal. And I don't know, but I feel like that would compel me as an individual if I was at that point and the inspections had been done, I have allowed the inspections have been done, I would be -- I would be frightened. I would say, "Hey, let's go ahead and just file suit to protect myself."

Q Okay. Just a few moments ago you acknowledged that at the time you prepared this report you had no indication that JS|Held's and Haag Engineering's 2019 investigation had been anything other than thorough and fair, correct?

MR. PEIRCE: Objection, form.

A Their -- their inspection, sure. I didn't know -- you know, but that's not necessarily leading to, you know, what the insured would view as that. You know, they're putting to repair and replace components of the curtain wall system, where at this time the insured believed that the entire curtain wall system needed to be replaced, not just the components such as the flashing or things of that nature.

So when you know that there's going to be a huge difference in what your insurance company is going to pay, you may not have the specific



number or the stamped reports, versus what your representative is telling you what you are owed, people feel compelled to protect themselves legally, and they have every right to do so.

Q (By Mr. Campbell) I will represent to you that Mr. Aguilar testified in his deposition that following these inspections, he did not have a conversation with JS|Held or Mr. Sitzmann as to what their conclusions were going to be.

A Okay.

Q If that's the case, then why in the world would RDA jump to the conclusion that JS|Held and Haag Engineering were going to underreport the hail damage?

MR. PEIRCE: Objection, form.

A Because all their prior experience with Hudson taught them that. Their prior experience with Bill Walls taught them that. Their prior experience with Mr. Chan taught them that. And they found the additional damages, they let the insurance company know, they opened it up for re-inspection. I would have filed suit before the re-inspection, but I -- I believe they were compelled to protect themselves because all they knew before that was they were not going to get



treated correctly.

Q (By Mr. Campbell) So you stick to that opinion, that you believe Hudson compelled RDA to file suit in July of 2019?

A Yeah.

MR. PEIRCE: Objection, form, asked and answered.

A Yes. I believe all of the claims handling by Hudson and Mr. Chan and Mr. Walls had given the insured a framework on what to expect, and that was unfair treatment and compelling the insured to protect themselves legally by hiring counsel, which they have every right to do.

Q (By Mr. Campbell) Going on to your Opinion D --

A On Page 17?

Q Yes.

-- you state that the initial claim dragged on for over four months unnecessarily and continued to drag on.

Now, this hailstorm was reported to Hudson on or about May -- May 20th of 2017. Is that your understanding?

A From what I can see, I thought it was the 22nd or 23rd, but yes.



Q Okay. And Walls was out there within a few days of that, was he not?

A I believe he went to the property on the 25th.

Q And then Mr. Sitzmann conducted his inspection on June 7, correct?

A Correct. I do not have an issue with the time frame it took for Mr. Walls to show up at the property or hire an engineer.

Q Okay. So what's your understanding of why it took from June 7 until mid October for the value of the claim to have been itemized?

A Because Mr. Walls did not -- Mr. -- because Mr. Walls didn't investigate this claim.

Q What, specifically, was going on between June 7 and mid October?

MR. PEIRCE: Objection, form.

A Mr. Walls sat in his office -- well, other than the June 6th -- and he basically sat in his office and sent e-mails.

(Multiple people talking at once.)

MR. PEIRCE: Colin, if you can just let her finish.

Q (By Mr. Campbell) I'm trying to. And I don't mean to speak over you, Ms. Beyer, but there

are times that I've thought you finished your answer, just like there have been times when you've thought I finished my question. So I apologize.
And we can take down the photo, Dianna. That will probably help.
A Is there a question that I need to answer or --
Q Yeah. I'll start over.
As of June 7, had Briana Miller informed Bill Walls that she was going to be submitting bids or proposals from RDA's own retained repair contractors?
MR. PEIRCE: Objection, form.
A Yes. Mr. Walls had put the onus onto Ms. Miller to correct -- to be able to fully identify all of the damages resulting from a large hailstorm.
Q (By Mr. Campbell) Hadn't Ms. Miller already retained those contractors to prepare bids even before she involved Hudson Insurance Company?
MR. PEIRCE: Objection, form and foundation.
A I don't know when she retained them. I believe -- well, can I speak about her deposition?
Q (By Mr. Campbell) Well, you had



information from the file that you reviewed back in March, did you not, that spoke to this?
A Right, but the information I had didn't speak to when she had hired them or when she had asked for repairs or estimates.
Q So as of June 7, Briana Miller had conveyed to Bill Walls that she was awaiting bids from RDA's own contractors, correct?
A Yes, for a limited amount of the damages that were present, correct, which she --
(Multiple people talking at once.)
Q (By Mr. Campbell) When were those bids received?
A She had solicited bids for what she understood to be damaged.
Q And when were those bids received?
A I don't know. I don't have that information in front of me.
Q You recall that one of those that we looked at a little bit ago in your deposition was the proposal from Seagren Construction that was dated August 17 of 2017, correct?
A I don't remember the date on that, but okay.
Q So when was it that RDA submitted



those bids and proposals from its own repair contractors to Hudson?
A I don't know.
MR. PEIRCE: Object to form.
Q (By Mr. Campbell) Isn't it true that it was because both Bill Walls and Briana Miller were waiting for those proposals that the claim wasn't -- or the investigation wasn't wrapped up earlier than it was?
MR. PEIRCE: Objection, form, foundation.
A No, because the investigation wasn't even wrapped up in 2019; so how could it be wrapped up in 2017?
Q (By Mr. Campbell) As far as what everybody's understanding was, it's the scope of damage in 2017 --
A No, not everybody's understanding; Ms. Miller's understanding. Mr. Walls knew better or should have known better, that there was a lot more hail damage at that property that he either didn't want to estimate, didn't want to acknowledge, or did not want to deal with. He put it on Ms. Miller to do that.
Q And it was because both he and



Ms. Miller were waiting for those bids and proposals that Mr. Walls did not prepare his proposed proof of loss any earlier than he did; isn't that true?
MR. PEIRCE: Objection, form and foundation.
A I don't know. I have never seen a proof of loss for this for the 2017. I know it's been talked about. I haven't seen it.
Q (By Mr. Campbell) You weren't provided with that?
A I haven't seen the proof of loss. I've seen the statement of loss, but not the proof of loss. I think my report said that that wasn't included in production.
But if it was on there, if there is a proof of loss and it's on there, that could be. Mr. Walls did sit in his office and wait for somebody else to tell him the scope of the damage. He was waiting for Ms. Miller to send him bids.
Q The next Paragraph E we've already talked about, so we can skip over that one.
In F, you state that Hudson misrepresented pertinent facts or insurance policy provisions.
Which pertinent facts did Hudson

misrepresent?
A Well, there was -- there was an ongoing -- well, I don't know. Let me think about this answer.
Pertinent facts. I think it's a fact that there were -- that there was damage to this building that Mr. Walls either knew or should have known that he did not relate to the insured in 2017. And that's very misleading. And I think that Mr. Walls in that time frame knowing, you know, as we discussed before, the curtain wall damage, the exterior cladding -- I don't know why, if he was, you know, doing an inspection, he didn't investigate one of the most vulnerable components to hail damage, which is HVAC systems, that there was damage to that. I mean, you could see the vents on the barrel pool skylight.
I think that that's very pertinent.
Q So does that fully describe what you consider to be a misrepresentation of pertinent facts?
MR. PEIRCE: Objection, form.
A Yes, as of 3/18, yes.
Q (By Mr. Campbell) And then you -- how about with respect to insurance policy provisions?



What insurance policy provisions do you believe were misrepresented by Hudson?
A The actual damages -- as of 3/18 the actual damages. The damage under the policy, under your -- you know, your coverage for your building.
Q So that goes back to that August 17, 2017 Seagren proposal?
MR. PEIRCE: Objection, form, foundation.
A That and the things that Mr. Walls never advised the insured of.
Q (By Mr. Campbell) Just a moment. I'm getting prompts on my iPad. I'll be done here in a moment.
So, I'm sorry, I didn't catch the end of your answer. You were telling me what insurance policy provisions you believe were misrepresented. Specifically, what provisions do you believe were misrepresented?
MR. PEIRCE: Objection, form.
A Oh, you wanted me to repeat that or you wanted Ms. Dianna to read that back to you? I'm sorry.
Q (By Mr. Campbell) I'll say it again here. Sorry, I'm still getting these prompts.



I was asking you which insurance policy provisions you believe were misrepresented.
MR. PEIRCE: Objection, form.
A I believe that the damage to the, you know, will pay for your covered damages policy provision. The spirit of the policy, I guess you would say, or could say, as of 3/18.
Q (By Mr. Campbell) Moving on to G, what communications did Hudson fail to acknowledge?
A I believe Mr. Walls -- there was times when he was -- when she had sent -- been able to collect the estimates on what she believed was the hail -- all of the hail damage. She had sent that to him and then had to prompt him several times. He was too busy to respond, so had Ryan write up the statement of loss. And that took a little bit.
Q And then with regard to your opinion that Hudson failed to acknowledge and act reasonably promptly upon communications, is that essentially the same answer?
A Yes.
Q H, refusing to pay claims without conducting a reasonable investigation based upon all available information. Again, at the time that you wrote this, it related solely to the 2017 phase of



the investigation; is that correct?
A Yes.
Q Your opinion is that Hudson failed to affirm or deny coverage of claims in a reasonable time --
(Interruption by the court reporter for clarification of the record.)
A And I would like to say, my answer on to the question on H, Reasonable investigation based on all information, that does include the 2017, but also it does include some of the -- you know, the investigation by JS|Held didn't include every room, so that wasn't a completely thorough investigation. They were claiming damage at that point, in 2019, to every room, and not every room -- on that face side, not every room was accessed.
Q (By Mr. Campbell) Well, Ms. Beyer, we previously discussed that in detail when you acknowledged that based upon information available to you at the time you prepared this report, you had no indication that JS|Held performed a less-than-thorough-and-fair investigation.
A Right.
Q You do recall that was your testimony, was it not?

A I do.
MR. PEIRCE: Form.
A I'm supplementing that if that is what I said.
Q (By Mr. Campbell) If you thought -- well, let's go back then -- if you had thought at the time you prepared this report that JS|Held had in any way been less than thorough in its investigation, you would have expressed that opinion in this report, would you not?
A I should have.
MR. PEIRCE: Form.
A I should have done that as a separate bullet point.
Q (By Mr. Campbell) If Kevin Aguilar considered that JS|Held had been in sufficient interior rooms, would you be satisfied with his view?
MR. PEIRCE: Objection, form.
A I have never spoken with Mr. Aguilar. I don't know what his opinion is.
Q (By Mr. Campbell) I know. Hypothetically.
MR. PEIRCE: Objection, form.
Q (By Mr. Campbell) If he thought you



wouldn't --
(Multiple people talking at once.)
Q (By Mr. Campbell) Let me finish my question.
If Mr. Aguilar considered that JS|Held had been in a sufficient number of rooms to conduct a thorough investigation, you would have no reason to second-guess Mr. Aguilar, would you?
MR. PEIRCE: Objection, form.
A My opinion is based on my --
(Multiple people talking at once.)
A My opinion is my opinion. It's not going to change based on Mr. Aguilar's opinion.
Q (By Mr. Campbell) Do you consider a claim investigation to be an interactive process between the insurer's retained engineer and the insured's retained public adjuster or other representative?
MR. PEIRCE: Objection, form.
A In a perfect world it should be.
Q (By Mr. Campbell) And don't you think that the June 6th meeting at the hotel was -- that that represented an appropriate effort to try to have both sides agree on the appropriate protocol for the investigation?



MR. PEIRCE: Objection, form.
A I don't know what happened at the June 6th -- I mean, other than what was typed up, I don't know the tone of anybody's speech. I don't know any of that information. I believe it's an attempt. I don't know if it came across -- if they came across as cooperative or adversarial.
Q (By Mr. Campbell) If Mr. Aguilar conveyed to JS|Held and Haag Engineering that he agreed with their proposed scope of repair, then isn't that sufficient?
MR. PEIRCE: Objection, form.
A Who agreed with whose scope of repair?
Q (By Mr. Campbell) Not scope of repair, scope of investigation.
A My opinion is my opinion. I'm not -- I'm basing my opinion on JS|Held. I'm not basing my opinion on Mr. Aguilar.
What Mr. Aguilar agreed to is not -- I'm not basing my opinion off of what he would have said and done.
Q But isn't Mr. Aguilar's involvement an important piece of the puzzle?
MR. PEIRCE: Objection, form and foundation.



A It's a piece of the puzzle, but --
Q (By Mr. Campbell) But --
A -- I don't know Mr. Aguilar.
Q So it's a piece of the puzzle, but --
(Multiple people talking at once.)
MR. PEIRCE: Objection. Form.
Q (By Mr. Campbell) Why are you disregarding Mr. Aguilar's involvement in the formulation of your own opinions?
MR. PEIRCE: Objection, form.
A I'm not disregarding him. I'm just stating that in my opinion as an adjuster, perhaps if I had been at that June 6th meeting or I was Mr. Chan as the adjuster, it would be my expectation and opinion that they would enter every room or damages claimed. That is my opinion and would have been my expectation, and I would have expressed that if I had been at the June 6th meeting.
Q (By Mr. Campbell) Well, I'll object to that as unresponsive and primarily objecting because it brings into play an opinion that was not expressed in your report.
MR. PEIRCE: And I'll object to your objection because I believe it was responsive and asked and answered multiple times.

Q (By Mr. Campbell) So going to I, you express that Hudson failed to affirm or deny coverage of claims in a reasonable time after proof of loss statements had been completed.
So a proof of loss was submitted in April. Did Hudson not address that proof of loss within a reasonable time?
A In April of two thousand --
Q -- nineteen.
A Right. I believe -- well, unless I'm incorrect, I don't believe they still denied coverage for the interior leaks. They still haven't denied if there's interior damage and if that's covered by the policy.
Q Well, JS|Held -- are you done?
A Yeah. I don't believe I've seen any kind of -- you know, letters from Hudson regarding, you know, the settlement of the claim and if there's --
Q Did --
A -- interior damage and paying for the components that they did allow coverage for.
Q They did send a JS|Held report, did it not?
A I believe that that was received,



yeah, but that's not -- but the report and the estimate don't outline coverage. You can't rely on an engineer to do your coverage analysis for you.
Q The report states that there was no water intrusion due to any hail-related damage, correct?
A True, but the insured had claimed that, so you still need to -- you still as Hudson need to do your coverage evaluation and settlement evaluations on your own at --
Q Well --
A -- the engineer send the report and there's your coverage decision. We didn't pay for it, so it doesn't exist.
Q Well, that's not a coverage determination; it's a determination as to what the scope of the hail-related damage was, correct?
(Multiple people talking at once.)
MR. PEIRCE: Objection, form.
A Yes, I agree with what you're saying, but the insured had claimed that there was interior damage.
Q (By Mr. Campbell) And Hudson relayed to the insured that based on their investigation there was not.



MR. PEIRCE: Objection, form. Foundation.
A I don't believe Hudson did relay that. I think sending an engineer's report in an estimate is not relaying your coverage determination.
Q (By Mr. Campbell) But you just agreed it's not a coverage determination; it's a determination as to the scale of the incurred loss.
MR. PEIRCE: Objection, form.
A You know, I didn't --
(Multiple people talking at once.)
Q (By Mr. Campbell) Go ahead.
A So the insured has asked for coverage for the interior damages and other -- you know, other -- for the entire curtain wall, and the insurance company has sent them, "Well, this is your damage, this is what we believe to be your damage."
But they don't explain that to the insured, how it relates to their policy.
Q In J you state that Hudson did not attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability had become reasonably clear.
As of August of 2019, had Hudson not attempted to effectuate a prompt, fair, and



equitable settlement?
A I believe to this day we're not -- they still haven't paid for the painting on the exterior cladding so --
Q So J would be, again, specific to the painting of exterior cladding?
A Yes.
Q Okay. When did RDA become aware of damage to the vent caps?
MR. PEIRCE: Objection, form.
A I don't know.
Q (By Mr. Campbell) When did RDA become aware of damage to the HVAC equipment covers?
MR. PEIRCE: Objection, form.
A I do not know.
Q (By Mr. Campbell) When did RDA become aware of damage to parapet wall cap flashing?
MR. PEIRCE: Objection, form.
A I do not know.
Q (By Mr. Campbell) Would you expect RDA to make Hudson aware of each of those areas of damage within a reasonable time after RDA became aware of that damage?
MR. PEIRCE: Objection, form, foundation.

A If RDA became aware of that damage?
Q (By Mr. Campbell) Sure.
A Mr. Walls was aware of that damage on his inspection on the 25th and failed to advise Hudson and RDA.
Q That wasn't what I asked about. I asked about RDA's knowledge.
A I don't know when -- I don't know.
Q My question is: Once they did become aware, would you then expect them to bring that to Hudson's attention within a reasonable time?
MR. PEIRCE: Objection, form.
(Multiple people talking at once.)
MR. PEIRCE: You broke up.
THE DEPONENT: I know you can't hear me. I've got a thing that says my Internet connection is unstable. I'm sorry.
MR. PEIRCE: It's okay.
THE DEPONENT: It's the heat.
MR. PEIRCE: Sure.
THE DEPONENT: It really is. And when it's 110 outside, it really affects everything around here.
Would you like to re-ask the question and have me re-answer?



MR. CAMPBELL: Sure.
Q (By Mr. Campbell) Once RDA became aware of damage to vent caps, HVAC equipment covers, and/or parapet wall cap flashing, would you have expected RDA to bring those components of damage to Hudson's attention?
A Yes.
MR. CAMPBELL: Dianna, can you bring Exhibit 141 up on the screen.
THE COURT REPORTER: And this is being marked today for this deposition?
MR. CAMPBELL: Sure.
THE COURT REPORTER: Yeah? Okay.
MR. CAMPBELL: Yes, yes. And can you scroll down to where all the bullet points are in the screen.
Q (By Mr. Campbell) Ms. Beyer, were you aware of this letter from Mr. Larson to Kevin Aguilar, May 14th, 2019?
A I don't remember if I've seen this or not, but I've seen it since yesterday, I believe.
Q Do you believe that these were appropriate requests for Mr. Larson to make of Mr. Aguilar?
MR. PEIRCE: Objection, form.



THE DEPONENT: Can we scroll up just a little bit, please.
MR. CAMPBELL: Yes.
Yeah, Dianna, if you would.
THE DEPONENT: Other way. I'm sorry. The other way. Okay. Thank you.
(The deponent perused the document.)
A I think those are -- insofar as they may or may not exist, I think those are reasonable things to ask for, yes.
Q (By Mr. Campbell) And would you have expected RDA to have responded to these requests?
MR. PEIRCE: Objection, form.
A You cut out. Can you repeat that, please?
Q (By Mr. Campbell) Would you have expected RDA to have responded to this request?
MR. PEIRCE: Objection, form.
A Insofar as the records exist, I would expect them to provide that to Mr. Aguilar.
Q (By Mr. Campbell) In what duration of time?
A Oh, I don't know. I mean, this is 2019 and they're trying to run a major hotel. It could take quite a long time, especially if it's not



readily available. Have to go maybe into files that are three, four, five years old. I don't know.
Q So --
A I've never been a general manager of a hotel. So I don't know how hard it would be or time-consuming it would be to compile this information. I think that's a question for Ms. Miller.
Q Well, to your understanding, did Ms. Miller do anything as of May 2019 to try to put together this information?
MR. PEIRCE: Objection, form.
A I don't know. I mean, other than -- I don't know -- her deposition, which I don't have memorized. I'm not -- I don't know. I don't know the answer to that question.
Q (By Mr. Campbell) Would you have expected RDA at a minimum to have responded and acknowledged these requests and to express that they were gathering the information requested?
MR. PEIRCE: Objection, form.
A Insofar that it's possible to have this information, they would -- they would -- they should be communicating with Mr. Aguilar.
Q (By Mr. Campbell) Sure.

A Yeah.
Q Would it have been inappropriate for RDA to have ignored this request altogether?
MR. PEIRCE: Objection, form. Foundation.
A I don't know what "ignored" means. I don't know if they were -- I think this is information I don't -- that's outside of information that is -- outside of something that I have access to. I don't know what they were doing from this time up until the end of it. I don't know.
Q (By Mr. Campbell) Right. And my question was: Would it have been inappropriate to have disregarded this request altogether; in other words, have taken no -- undertaken no effort whatsoever to try to gather these materials and to provide them to Hudson?
MR. PEIRCE: Objection, form and foundation.
A I don't know, because, again, I don't know if these things need -- were available, needed to be recreated, the time it would take to do that. I think that there's things that fall into that. And I find it hard to believe that somebody would ignore it completely.



Q (By Mr. Campbell) Why do you find it hard to believe?
MR. PEIRCE: Objection, form.
A Because you're asking for it.
Q (By Mr. Campbell) Right.
A But -- but if you just don't have the information, it could seem like you're ignoring it.
Q Well, I'll represent to you that some of this information requested was eventually provided, but wasn't provided until more than a year later after -- long after the lawsuit had been filed. So my question is --
(Multiple people talking at once.)
Q (By Mr. Campbell) Go ahead.
A Yeah. Sometimes information that you requested several times does show up a significant amount of time later.
Q So getting back to whether it would have been appropriate to ignore it, my question was: If at the time this request was made, RDA took -- undertook no effort whatsoever to try to gather the information requested and to provide it to Hudson, that would have been inappropriate, would it not?
MR. PEIRCE: Objection, form, asked and answered, lacks foundation.



Q (By Mr. Campbell) Your answer?
A I believe that they -- if they did -- if they did -- insofar as it existed and it wasn't unreasonable to reconstruct this information, it might take quite a significant amount of time to get it to who was requesting it.
Q You keep telling me that, and I'm not disputing that it may take additional time. I'm just simply asking you to acknowledge that if they didn't even try, they didn't do anything to put that information together, that would have been inappropriate.
MR. PEIRCE: Objection, form.
A "Inappropriate" I think is not the point. I think I'm getting stuck on the word "inappropriate."
Q (By Mr. Campbell) Why? What's difficult about that word?
A Because "inappropriate" seems to be like somebody was, you know, intentionally not cooperating, and I don't believe there would have been any intent not to move their own claim forward.
So it --
Q Well --
A -- there's an implied intention in



"inappropriate." And I don't believe that they -- I -- I can't imagine that there would be any intention to ignore that material. I think "inappropriate" implied negative intent, and I don't believe that --
Q Well --
A -- is here.
Q -- if, in fact, RDA did undertake no effort whatsoever to put together this information at the time it was requested, what other intent can you presume, other than an intent to disregard it?
MR. PEIRCE: Objection, form, foundation, asked and answered.
A I've never run a commercial hotel, so I don't know if you ask for additional information, I don't know what was on their plate at the time. I imagine that there was no negative intent. There might have just been other things that were more -- that were pressing, such as guests and, you know, elevators breaking down or conventions at your hotel. I can't -- I can't put myself in Ms. Miller's shoes and answer that fully as to if what you state is true that there was -- that she undertook zero action.
Q (By Mr. Campbell) Is it fair to say

that you are unaware of any action that Ms. Miller or anyone else on behalf of RDA took to gather the information requested in this letter?
MR. PEIRCE: Objection, form.
A I don't remember her deposition on these -- on this particular subject, so I'm unaware, correct.
MR. CAMPBELL: Ms. Beyer, those are all my questions. Thank you.
THE DEPONENT: Wow. Okay.
MR. PEIRCE: Ms. Beyer, just very briefly.
Can you take down the screen sharing, Dianna.
EXAMINATION
BY MR. PEIRCE:
Q Ms. Beyer, I'm going to show you what has been marked as Exhibit 44 to your deposition.
Do you understand what this document is?
A Yes, of course.
Q And what is this document?
A It's a notice of loss, a loss notice -- well, property loss notice.
Q And you've seen this document before



with respect to this claim?
A Yes.
Q And what is the date at the top of the notice?
A 5/22/17.
Q And based on your experience, is that the date that this claim was recorded?
A Yes. I thought it was on or about 5/22, 5/23.
Q And as far as a description of the loss or damage, do you see where it states: Major hailstorm caused damage to skylights over pool, skylight over lobby, windows, and possibly the roof of the Sheraton West Denver Hotel?
A Yes.
Q And in your experience and based upon your training, after that is reported to an insurance company, would you expect them to do a full and comprehensive investigation of the roofs, the windows, and the areas of the hotel they suspected were hit by a major hailstorm?
A Yes.
Q When Mr. Campbell was asking you questions about, for instance, the parapet wall cap flashing, where is the parapet wall cap flashing



located on this hotel?
A On top of the parapet wall.
Q Is that visible from the roof or the roofing levels?
A Well, there's several parapet walls. There's parapet walls on the mezzanine level, I believe, and at the 12th story. Yeah, so it's visible.
Q If an insured is reporting this type of damage, would you expect that to be inspected if someone is doing a full and comprehensive and thorough investigation?
A Yeah. The cap flashing and the parapet walls are part of the roofing system.
Q And would you expect an insurance company such as Hudson to inspect the windows of the hotel if the windows were reported damaged by a major hailstorm?
A Yes, but I would also expect, even if the windows weren't reported damaged, an experienced adjuster should inspect all aspects of the building, and that always, even in residential claims, includes the windows and the windows screens. And the same thing on commercial buildings. So even if the windows weren't reported, they should be



inspected.
Q But in this case, they actually were reported, correct?
A That is right, yes.
MR. PEIRCE: I'll pass the witness.
MR. CAMPBELL: I don't have any further questions. Thank you.
MR. PEIRCE: Thank you. We're done.
THE COURT REPORTER: Ma'am, would you like to read and sign?
MR. PEIRCE: You can send it to me, Dianna. I will forward it to Lesley.
THE COURT REPORTER: And would you both like your standing orders?
MR. CAMPBELL: Works for me.
MR. PEIRCE: Yeah.
WHEREUPON, the within proceedings were concluded at 12:52 p.m. on July 14, 2020.

I, LESLEY BEYER, the deponent in the above deposition, do hereby acknowledge that I have read the foregoing transcript of my testimony and state under oath that it, together with any attached amendment to deposition pages, constitutes my sworn testimony.

______ I have made changes to my deposition.
______ I have NOT made any changes to my deposition.

_________________________
LESLEY BEYER

Subscribed and sworn or affirmed before me this ______ day of ____________, 20___.

_______________________________
Notary Public
Commission expires: ____________



REPORTER'S CERTIFICATE

STATE OF COLORADO )
) ss.
COUNTY OF DENVER )

I, DIANNA L. BUCKSTEIN, a Registered Professional Reporter and Notary Public, ID 19974020573, within and for the State of Colorado, do hereby certify that previous to the commencement of the examination, the deponent verbally declared her testimony in this matter was under the penalty of perjury; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature this 21st day of July, 2020.

My commission expires November 25, 2021.

Dianna L. Buckstein, RPR
Concise Legal Reporting, Inc.
P.O. Box 27523
Denver, Colorado 80227



Concise Legal Reporting, Inc.
P.O. Box 27523
Denver, Colorado 80227
720-556-1109

July 21, 2020

Christopher P. Peirce, Esq.
HOSSLEY & EMBRY, LLP
100 Fillmore Street
5th Floor
Denver, Colorado 80206

Re: Deposition of LESLEY BEYER
RDA Hotel Management Company v. Hudson Specialty Insurance Company
Case No. 1:19-CV-2145-DDD-NYW

Dear Mr. Peirce:

Enclosed please find the original amendment sheet and deponent's certificate for the above deposition. It was agreed you would arrange for signature by the deponent with your copy of the transcript.

After the amendment sheet and deponent's certificate are signed, please have both notarized and return to the deposing attorney within 35 days. Please forward copies to counsel of record and Concise Legal Reporting, Inc.

Thank you for your prompt attention to this matter.

Original transcript filed with Colin Campbell, Esq., on ____________________.

Sincerely,

Dianna L. Buckstein, RPR
Concise Legal Reporting, Inc.

cc: All counsel



- AMENDMENT SHEET -

Deponent: LESLEY BEYER
Date of Deposition: July 14, 2020

Case: RDA Hotel Management Company v. Hudson Specialty Insurance Company

The deponent wishes to make the following changes in the testimony as originally given:

| Page | Line | Change | Reason |
|---|---|---|---|
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |
| ____ | ____ | ____________________ | ________________ |

Signature of Deponent: _______________________

Subscribed and sworn to before me this ____ day of ___________, 2020.

Notary's signature ___________________
Notary's Address___________________
My commission expires________________

**A**

**a.m** 1:19 48:21 48:22 78:11,12
**able** 28:23 89:15 95:11
**absence** 15:17
**abuse** 63:21
**abysmal** 85:1
**accept** 23:17 53:22 57:14,22 82:1
**accepted** 76:4
**access** 36:1,9 39:14 61:12 78:1 109:9
**accessed** 96:16
**accounted** 30:10
**accurate** 57:14
**acknowledge** 4:6,9 91:22 95:9,18 111:9 117:2
**acknowledged** 85:9 96:19 108:19
**acrylic** 55:13 56:7 71:18 72:21 73:9
**acrylic-coated** 73:20
**act** 95:18
**action** 112:24 113:1
**actual** 77:25 94:3,4
**ACV** 47:17
**add** 31:22 32:16
**added** 5:21,24 7:3,24 32:15
**addition** 74:4
**additional** 23:3 23:4 24:20 25:2,3 26:18 63:15 86:20 111:8 112:15
**address** 101:6 120:24
**addressed** 17:22 18:5 38:8 65:23
**adjuster** 5:15 6:5 11:25 22:13 23:6,15 23:16 36:22 44:9 51:22 52:3 62:19 64:5 98:17 100:12,14 115:21
**adjuster's** 45:22
**adjusters** 46:8
**adjusting** 52:8
**adjustment** 9:9 22:11 54:7
**administered** 4:10
**advantage** 29:1
**adversarial** 99:7
**advise** 105:4
**advised** 94:11
**advocate** 26:5
**aesthetic** 13:3 14:5,18 15:5 15:10,14
**affirm** 96:4 101:2
**affirmed** 117:14
**affixed** 118:13
**aforesaid** 118:8
**ago** 8:11 85:8 90:20
**agree** 4:18,20,23 30:5 31:8 32:25 34:13 37:21 39:17 60:19 79:11 98:24 102:20
**agreed** 22:8,9 35:22 99:10,13 99:19 103:6 119:12
**agreement** 4:15 4:16 22:10
**Aguilar** 3:11 27:16 38:3 39:9 82:21 84:1 86:6 97:15,20 98:5 98:8 99:8,18 99:19 100:3 106:19,24 107:20 108:24
**Aguilar's** 36:20 98:13 99:22 100:8
**ahead** 39:3 51:18 65:14 71:6 85:6 103:12 110:14
**all-inclusive** 12:14,23 13:1 70:5
**allow** 17:12,14 101:22
**allowed** 85:4
**allows** 24:8
**altogether** 109:3 109:14
**aluminum** 65:25
**amazed** 52:9
**amendment** 117:5 119:11 119:13 120:1
**amount** 21:18 38:16 46:19 66:11 76:7,15 90:9 110:17 111:5
**amounts** 81:10
**analysis** 102:3
**and/or** 10:4 106:4
**Andrew** 3:12 27:23
**Ann** 3:10 5:8
**answer** 7:21 10:12 12:14 15:9 16:20 17:4 20:10,22 39:4 41:21 51:18 61:13 62:1,17,23 65:4 66:8 67:18 77:22 89:2,7 93:4 94:16 95:20 96:8 108:16 111:1 112:22
**answered** 25:15 62:16 87:7 100:25 110:25 112:13
**answers** 78:19
**anybody's** 99:4
**anymore** 66:25
**apologize** 44:19 47:1,12 65:7 89:3
**APPEARANC...** 2:1
**appearing** 1:22
**apple** 26:2
**apply** 12:3
**appraisals** 9:11
**appreciate** 65:5
**appropriate** 29:16 44:15,23 45:7,14,16 46:1 47:23,25 48:7 57:21 98:23,24 106:23 110:19
**approvals** 10:20
**approved** 45:2
**April** 29:22 101:6,8
**area** 72:25 73:23
**areas** 8:14 58:19 58:22 73:14 74:21 104:21 114:20
**arrange** 119:12
**arrangement** 4:13
**ascertain** 22:7
**asked** 14:2 20:15 21:19 62:16 87:6 90:5 100:25 103:13 105:6,7 110:24 112:13 118:9
**asking** 40:8 44:19 53:4 59:20 75:14 76:13 84:16 95:1 110:4 111:9 114:23
**aspect** 12:20 22:23 23:24 31:9 50:11
**aspects** 8:21 40:24 42:5 65:1 78:20 115:21
**asphalt** 17:20
**assessment** 37:17 44:13 79:11
**assignments** 18:17,24 20:20
**assist** 45:15,17
**associated** 77:24
**assume** 29:14 58:18 59:1 62:10 66:14 75:25
**assuming** 54:19
**attached** 71:25 117:4
**attachment** 38:8 39:9
**attachments** 3:19
**attempt** 28:19 99:5 103:21

**attempted** 103:25
**attention** 42:16 105:11 106:6 119:16
**attorney** 119:14
**attorneys** 4:5 19:15 38:20
**August** 36:12 37:14 41:1 46:17 47:19 59:25 60:13 61:4 62:7 63:6 63:12 74:6 76:17 90:22 94:6 103:24
**available** 28:1 36:15 60:13 62:7 95:24 96:19 108:1 109:21
**awaiting** 90:7
**aware** 22:16,22 23:4 24:12,19 31:2 37:15 46:15 54:13 59:6 66:23 67:5 104:8,13 104:17,21,23 105:1,3,10 106:3,18

**B**

**B** 49:14,14 52:14
**back** 8:14 19:10 32:24 38:13 45:20 46:1 48:23 49:4 52:13 57:23 66:25 67:1,21 68:13 73:17,18 78:13 80:16,19 90:1 94:6,22 97:6 110:18
**bad** 16:14 21:3
**balls** 45:24 46:6
**bank** 58:6 63:19
**barely** 56:21
**barrel** 51:1 53:11,20,21 93:17
**baseball** 46:4
**based** 11:24 12:7 13:4 23:2 26:21 35:24 36:4,6 47:17 47:25 60:18 63:14 64:15 65:11 66:11 77:5,6 95:23 96:9,19 98:10 98:13 102:24 114:6,16
**basically** 88:19
**basing** 65:8,9 99:17,17,20
**basis** 15:21 17:22
**battle** 42:7
**began** 7:12
**Beginning** 49:8
**behalf** 2:2,7 4:20 4:23 24:11 45:8 113:2
**believe** 14:16 29:19 30:7,10 30:17 31:6,7 34:11 35:3 36:18 37:8,22 39:8 40:8,19 42:6 44:8,14 45:2,3,13 46:11 48:7 49:10 50:12,25 51:7,10,20 52:2,19,20,21 53:6,17 55:7 57:13 59:12 60:9 63:25 64:12,14,18 65:22 66:5,22 67:19 69:13 71:7,8,18 72:20,25 73:4 73:10,11,18,19 74:3 77:4,10 77:17 81:1,18 82:24 83:5,9 83:14,25 84:9 84:20 86:23 87:3,8 88:3 89:24 94:2,17 94:18 95:2,4 95:10 99:5 100:24 101:10 101:11,16,25 103:3,17 104:2 106:21,22 109:24 110:2 111:2,21 112:1 112:5 115:7
**believed** 36:4,6 84:6 85:19 95:12
**beneath** 13:18 14:3 63:19
**benefits** 46:20
**best** 18:4
**better** 7:5,6 91:19,20
**betterment** 25:25
**Beyer** 1:5,17 3:3 3:10 4:18 5:8,9 49:3 56:17 57:6 58:3 62:5 63:3 72:12 78:16 88:25 96:17 106:17 113:8,11,17 117:1,11 119:7 120:2
**bid** 37:9 54:1,13
**bids** 37:3,6 71:25 89:11,19 90:7,13,14,16 91:1 92:1,19
**big** 53:10,10,20 53:21
**Bill** 27:5,8 28:3 86:18 89:10 90:7 91:6
**bit** 72:8 90:20 95:16 107:2
**bite** 26:2
**black-and-white** 77:11
**blanche** 48:4
**blanket** 10:22
**board** 14:10
**boards** 10:19
**boasts** 32:8
**body** 8:19
**bottom** 49:8 67:7 73:15
**Box** 118:22 119:1
**boy** 49:15
**brand-new** 46:8
**break** 18:10,13 46:24 48:14 51:13 78:4,17
**breaking** 44:18 112:20
**Briana** 27:2,4,8 28:2 89:9 90:6 91:6
**briefly** 113:12
**bring** 45:14,16 45:20 46:1,11 105:10 106:5,8
**brings** 52:6 100:21
**broaden** 66:17
**broke** 24:15 105:14
**brought** 26:25 42:15 45:19 78:18
**Buckstein** 1:20 118:4,21 119:21
**bug** 65:18 67:6
**build** 18:14
**building** 14:6,15 58:16 70:5 71:9 72:22 74:13 93:7 94:5 115:21
**buildings** 115:24
**bullet** 97:14 106:15
**business** 23:11
**busy** 95:15

**C**

**C** 4:1 81:8
**call** 25:6,8 45:21 45:24 46:11 65:18 66:2 79:4
**called** 1:18
**calling** 45:23
**calls** 25:7 61:8 62:16 70:15
**camera** 5:1 47:6
**Campbell** 2:8,8 3:5 4:19,19 5:5 10:25 11:20 12:2,12 13:12 13:21 14:2,14 15:1,4,8,15,22 16:6,11 17:21 22:15,21 23:8 23:22 24:7,17 25:15 26:9 30:8 33:6,14 33:19 34:13,23 35:12,19 36:11 37:24 38:24 39:3 40:11,25 41:18,23 42:9 42:18 43:1,11 43:25 44:7 45:5 46:14

47:2,7 48:2,13 48:19,23 49:3 50:18 51:17 54:8,18 56:11 56:15,17,22 57:1,6,19,25 58:2 59:21 60:7 61:1,14 62:10 63:3 64:23 65:6,11 66:16 67:1,4 67:18 68:5 69:24 70:8,18 71:5,23 72:9 72:11 75:16 76:7,14,20 77:18,19 78:6 78:9,13,16 79:8,24 80:6 80:11 81:21 83:1,8,19 86:5 87:2,14 88:24 89:18,25 90:12 91:5,15 92:9 93:24 94:12,24 95:8 96:17 97:5,15,22,25 98:3,14,21 99:8,14 100:2 100:7,19 101:1 102:23 103:6 103:12 104:12 104:16,20 105:2 106:1,2 106:8,12,14,17 107:3,11,16,21 108:17,25 109:12 110:1,5 110:14 111:1 111:17 112:25 113:8 114:23 116:6,15 119:17
**cap** 104:17 106:4 114:24 114:25 115:13
**capabilities** 45:12
**capacities** 5:14
**capacity** 5:19
**caps** 104:9 106:3
**care** 13:12
**Carl** 27:18
**carte** 48:4
**case** 1:3 26:15 26:25 30:21 34:15 60:11 61:4 62:11 82:1 86:11 116:2 119:9 120:3
**case-by-case** 15:21 17:22
**cases** 9:21,23 13:5 20:6 23:10,19
**catch** 94:15
**cause** 51:11 58:6 58:10,11
**caused** 114:12
**causes** 44:12
**cc** 119:22
**certain** 25:4 44:10
**certainly** 84:15
**certificate** 118:1 119:11,13
**certify** 118:6,11
**cetera** 7:8 49:18 53:2 55:14,15 55:22
**Chan** 27:4 28:3 86:19 87:9 100:14
**chance** 24:4,5 26:2 78:3
**change** 35:5 98:13 120:6
**changed** 7:22
**changes** 117:8,9 120:4
**choice** 43:24
**chose** 43:18 81:15 84:16
**Chris** 4:22 47:2 82:2
**Christopher** 2:3 119:4
**circumstance** 14:21
**circumstances** 14:17 15:11 16:25 21:20 22:2
**Civil** 1:17
**cladding** 55:10 55:11 71:9,16 74:5 93:12 104:4,6
**claim** 10:24 21:6 22:12,14 26:6 26:8 36:4,9 40:24 42:5 47:17 49:12 57:15 59:15,18 63:23 80:21 84:19 87:18 88:12,14 91:7 98:15 101:18 111:22 114:1,7
**claimant** 81:11
**claimants** 29:22
**claimed** 100:16 102:7,21
**claiming** 96:14
**claims** 6:8 9:6,7 10:2 11:16 16:21 17:4 40:2,4,10,22 43:7,15 52:8 61:23 81:19 84:25 87:8 95:22 96:4 101:3 103:22 115:22
**clarification** 13:24 29:16 96:7
**clarify** 9:6 19:7 70:11 77:21
**clarity** 57:5
**clean** 17:19
**cleanup** 32:4,15
**clear** 61:24 81:20 103:23
**climate** 16:18
**close** 48:13 66:12 74:22 75:17
**code** 14:11
**Colin** 2:8 4:19 65:3 78:3 88:22 119:17
**collect** 95:12
**colloquialism** 25:10
**color** 74:21 75:18 79:10
**Colorado** 1:2,16 1:22,23 2:5,10 7:24 8:5,6,14 10:1,3,18 118:2,5,23 119:2,6
**columns** 73:17
**come** 12:24 13:6 18:25
**commencement** 118:6
**commencing** 1:19
**comment** 44:9 55:6
**commercial** 112:14 115:24
**commission** 117:20 118:15 120:24
**common** 25:16 83:22
**communicating** 108:24
**communicatio...** 95:9,19
**companies** 19:25
**company** 1:8,9 1:12 19:6 20:4 20:9 23:23 24:3 25:12,23 25:24,25 26:2 85:24 86:21 89:20 103:16 114:18 115:16 119:8,8 120:3 120:3
**compass** 74:17 74:18
**compel** 85:2
**compelled** 81:9 84:18 86:3,24 87:3
**compelling** 87:11
**competent** 49:16 52:24
**compile** 108:6
**complete** 38:3 51:18
**completed** 83:17 83:24 101:4
**completely** 45:14 96:13 109:25
**complied** 5:2
**component** 13:3 13:4,6,10,13 14:6,15,24 38:11 51:6 53:16 54:7
**components** 50:4 53:8 55:25 58:16 70:7 77:3 84:4 85:18,21 93:14 101:22 106:5

**comprehensive** 114:19 115:11
**computer** 51:14
**concerned** 14:18 15:9,13
**concerning** 30:1 55:1
**Concise** 118:22 119:1,15,21
**conclude** 60:20
**concluded** 116:18
**conclusion** 20:4 57:11,14,22 61:8 62:16 63:17 67:5 70:16 86:12
**conclusions** 57:2 57:8 58:21 59:5 80:17 83:23 86:9
**concrete** 55:13 56:7 72:21 73:9,10,15,16 73:21 74:4 75:5
**conduct** 98:6
**conducted** 30:12 34:15 59:7 82:13,14 88:5
**conducting** 95:23
**conference** 1:5 73:19
**confident** 61:10
**confine** 54:10
**connection** 47:1 69:3 105:17
**conscious** 43:3 43:23
**consent** 4:13
**consider** 13:5 14:22 15:16 16:1 17:17 24:8 25:18 56:4 74:13,15 93:20 98:14
**consideration** 14:5,12,13 15:6 16:5 17:5
**considerations** 14:19 15:10,14 30:11 38:9
**considered** 31:4 32:19 33:7 34:8,11 35:13 42:21 43:2,3,5 43:7,12,14 76:8 84:2 97:16 98:5
**consistent** 54:9
**consolidate** 39:6
**consolidated** 7:9
**constitute** 15:17
**constitutes** 117:5
**construction** 37:3 74:12,16 90:21
**consult** 44:11
**consulting** 18:8 18:11,15 44:16 44:24 45:9 48:9 82:9
**contact** 23:6,14
**contacting** 23:23
**contemplate** 75:19
**context** 19:12 46:7
**continue** 8:21
**continued** 87:20
**continuing** 49:9
**contractor** 54:14
**contractors** 53:25 77:25 89:12,19 90:8 91:2
**contradictory** 32:5
**convenient** 31:8
**conventions** 112:20
**conversation** 86:8
**conversations** 62:19
**conveyed** 90:7 99:9
**cooperating** 111:21
**cooperative** 99:7
**copies** 119:15
**copy** 29:11 119:12
**correct** 5:11 6:3 6:18,18 14:19 15:11 30:13,19 31:5 37:19 44:3,5 45:5 46:17 53:19 54:15,17,17 58:20 59:8,9 59:11 60:8,17 61:6 67:8,11 67:12,15 69:20 70:14,17,22,23 71:1 72:20 76:10,17,18 77:15 79:19 80:7 81:5,6 82:7,8,11,19 82:20 83:4,8 85:12 88:6,7 89:15 90:8,10 90:22 96:1 102:6,17 113:7 116:3
**correctly** 44:20 44:22 61:25 73:7 84:11 87:1
**cosmetic** 12:20 13:4,10,13 14:5,8,12
**cost** 54:1,14,20 54:23 61:5 67:14 75:1 76:1
**costs** 77:24
**counsel** 4:12 19:22,23,24 20:1,3,17 23:12,12,14 42:16 87:12 118:11 119:15 119:22
**counterintuitive** 17:20
**country** 7:10
**County** 1:19,23 118:3
**course** 8:14 23:10 28:15 113:21
**court** 1:1 3:13 4:4,5,24 5:3 13:23 51:13 56:13 57:4 96:6 106:10,13 116:9,13
**cover** 16:22 79:3
**coverage** 94:5 96:4 101:3,12 101:22 102:2,3 102:9,13,15 103:5,7,13
**covered** 18:5 73:2 76:5 81:11 95:5 101:14
**covers** 104:13 106:3
**Crawford** 45:11
**created** 7:8
**critical** 33:1 34:14,19 35:8 41:24 42:5 43:19 81:3
**criticism** 33:4,13 33:15 34:7 35:18
**criticisms** 42:22 43:4 44:2
**criticizing** 40:3
**curtain** 49:17,18 50:23 53:1,1 55:4 56:6,10 64:17 65:2,17 65:20 66:1,4 66:12 67:14 68:1,3,4,6,7,20 69:4,5,8,19,23 69:25 70:1,9 70:13,24 71:10 72:23 77:24 84:4,5 85:18 85:20 93:11 103:15
**cut** 65:6 76:12 107:14

**D**

**D** 3:1 4:1 87:15
**Dallas** 8:8,12
**damage** 11:11 12:16 14:8,23 17:10,17 22:7 22:16,22,23 23:3,3,4 24:5 24:12,20 25:2 25:3,13,23 36:25 37:13 44:13 49:17 50:2,3,4,11,22 51:1,24,25 52:16,18,25 53:4 56:4 64:6 64:9,10,14,17 66:5 67:6,10 68:1,3,4,4,21 69:5,20 70:2 70:14,25 71:9 71:17 72:15 73:1,2,4 74:7

75:1 76:5 77:3 78:21 80:13 84:2 86:14 91:17,21 92:18 93:6,11,15,15 94:4 95:4,13 96:14 101:13 101:21 102:5 102:17,22 103:17,17 104:9,13,17,22 104:23 105:1,3 106:3,5 114:11 114:12 115:10
**damaged** 14:22 57:12 58:15,16 59:11 60:2,21 90:15 115:17 115:20
**damages** 45:13 52:10 66:14 70:6 86:20 89:16 90:10 94:3,4 95:5 100:16 103:14
**damaging** 17:7
**darker-colored** 79:19
**date** 34:4 36:14 64:13 90:23 114:3,7 120:2
**dated** 3:10,12,17 3:18 90:22
**day** 82:25 104:2 117:15 118:14 120:21
**days** 88:2 119:14
**deal** 91:23
**dealing** 13:6 20:19
**Dear** 119:10
**debris** 17:13
**decide** 42:7 77:10
**decided** 7:7
**decision** 34:8,12 42:21 43:2,4,5 43:12 102:13
**declare** 4:11
**declared** 118:6
**defendant** 1:13 1:18 2:7 4:20
**defense** 19:23,24
**deficient** 33:8 35:14
**deficit** 47:10
**define** 10:8
**defined** 11:6,10
**definitely** 79:6
**definition** 10:10 10:13 11:2,13 11:16,22 12:6 12:15,24 13:1
**degree** 45:20
**Del** 30:15
**delineate** 28:19
**demonstrated** 80:12
**denied** 64:15 101:11,13
**denting** 12:16 15:17
**dents** 50:25 65:22 79:5,14 79:18
**Denver** 1:23 2:5 37:13 58:5 114:14 118:3 118:23 119:2,6
**deny** 64:6,10 96:4 101:2
**denying** 64:8
**depend** 15:20,21
**depending** 7:13 7:14 17:24
**depends** 16:18
**deponent** 4:17 4:24 5:2 30:6 48:17,25 56:20 66:24 67:3 72:6 105:15,19 105:21 107:1,5 107:7 113:10 117:1 118:6 119:12 120:2,4 120:20
**deponent's** 119:11,13
**deposed** 29:15
**deposing** 119:14
**deposition** 1:5 1:17 3:3 4:2,6 4:7,8 26:23 27:12 28:4,8 28:15,16,22 29:2,3,7,11,15 86:6 89:24 90:20 106:11 108:14 113:5 113:18 117:2,5 117:8,9 118:7 119:7,11 120:2
**depositions** 9:13
**describe** 93:19
**describes** 31:2
**description** 114:10
**desk** 8:25
**detach** 54:23
**detail** 96:18
**determination** 60:16 102:16 102:16 103:5,7 103:8
**determinations** 44:11
**determine** 44:12 49:25 51:10 58:6,10,14
**determined** 7:4 46:19 47:17 58:11 81:11
**determining** 44:12
**Dianna** 1:20
47:2 56:11,23 57:25 71:23,24 72:5,8 77:19 89:5 94:22 106:8 107:4 113:14 116:12 118:4,21 119:21
**difference** 85:24
**different** 5:14 6:22 7:7 10:10 10:11,17,18,19 15:25 16:9,14 16:18 25:7 26:19 36:1 40:5 48:15
**differently** 19:20
**difficult** 8:20 16:20 54:8 62:23 111:18
**difficulty** 47:3
**dings** 65:21
**direct** 10:8 11:2 11:7,17,22,25 12:8 15:17
**disagree** 31:10 46:13
**disappear** 16:12
**disclosed** 28:25 29:8
**discover** 25:2
**discuss** 41:19
**discussed** 55:24 83:4 93:11 96:18
**discusses** 50:25
**discussion** 41:10 41:13
**discussions** 62:25
**disorganized** 38:17
**disputing** 111:8
**disregard** 112:11
**disregarded** 109:14
**disregarding** 100:8,11
**dissenting** 61:11
**DISTRICT** 1:1 1:2
**document** 30:6 61:11 72:1 107:7 113:19 113:22,25
**documentation** 38:6
**documented** 66:18 67:25
**doing** 18:8 93:13 109:10 115:11
**dome** 53:18,20 53:21 54:21
**dozen** 53:17
**drag** 87:20
**dragged** 87:19
**Draper** 38:8,10 39:7
**drawn** 40:13
**drill** 68:19
**DTC** 2:9
**ducks** 25:9
**due** 51:13 58:8 63:20,21 81:10 102:5
**duration** 107:21
**DVORCHAK** 2:8

**E**

**E** 3:1 4:1,1 68:15 92:20
**e-mail** 23:7 27:4
**e-mails** 88:20
**earlier** 37:4 76:22 91:9 92:3
**east** 72:18 74:5,9

74:14 75:2,6 75:20 76:3
**easy** 31:22
**edification** 29:6
**effect** 13:13 14:9
**effectuate** 103:21,25
**effort** 98:23 109:15 110:21 112:9
**eighth** 44:8
**either** 44:1 51:1 71:4 91:21 93:7
**electronically** 3:13 4:3
**element** 79:19
**elements** 79:9
**elevations** 73:6 74:8,9 75:2
**elevators** 112:20
**Embry** 2:4 18:22,25 119:5
**employed** 118:11
**enclosed** 73:19 119:11
**encompasses** 63:8
**endorsements** 12:4
**engineer** 48:5 51:21 52:1 55:18,21 60:10 61:10 69:8 74:18 77:7 88:9 98:16 102:3,12
**engineer's** 103:4
**engineering** 3:16 41:1,11,19 45:17 46:1 82:5,10 86:13 99:9
**Engineering's** 47:18 85:11
**engineers** 37:11 83:22
**engineers'** 64:16
**enlarge** 56:21
**entailed** 14:23
**entails** 11:17 12:9
**enter** 100:15
**entire** 5:20 72:20 85:19 103:15
**entirely** 42:3
**EPDM** 13:18 14:3,9 57:12 59:11 60:2,21 61:6 62:13 63:9,13,20
**equally** 15:25
**equipment** 53:14 104:13 106:3
**equitable** 103:22 104:1
**especially** 21:16 107:25
**Esq** 2:3,8 119:4 119:17
**essentially** 8:24 95:19
**estimate** 22:17 22:24 23:25 24:13,21 30:10 31:5,20,21 32:15,20 35:25 36:3,6,21 37:1 38:3,4,7 39:24 40:3,19 67:20 68:12 71:19 72:17,20 73:3 76:6 80:2 91:22 102:2 103:4
**estimated** 67:14
**estimates** 77:25 83:23 90:5 95:12
**estimating** 40:9
**et** 7:8 49:18 53:2 55:14,15,22
**evaluate** 42:17 45:12 50:7
**evaluated** 25:13
**evaluation** 22:14 26:5,8 42:11 49:24 102:9
**evaluations** 102:10
**events** 10:4 46:15
**eventually** 110:9
**everybody** 23:10 62:6
**everybody's** 91:16,18
**evidence** 60:5,8 60:18
**exactly** 29:17 75:23
**examination** 3:4 5:4 113:15 118:6
**example** 13:17 13:22 14:3,15 56:10
**exception** 30:21
**exclude** 43:4
**excuse** 18:9 28:16 68:4 71:14 73:5
**executive** 51:23
**exhibit** 3:9,10,11 3:16,18 50:21 56:12,16 58:1 63:24 71:24 77:20 106:9 113:18
**exhibits** 3:8,13 3:15 4:2 26:25 27:10
**exist** 102:14 107:9,19
**existed** 111:3
**existence** 41:12
**existing** 74:22 75:18
**expect** 22:17,25 23:5 52:3,6 87:10 104:20 105:10 107:20 114:18 115:10 115:15,19
**expectation** 100:14,17
**expected** 106:5 107:12,17 108:18
**experience** 11:24 12:8 13:4 21:17 23:2 86:16,18 86:19 114:6,16
**experienced** 49:16 52:24 115:20
**expert** 36:13 38:6 39:25 40:1,2,6,9,10 40:23 42:17 43:8,15 44:11 44:16,24 45:9 45:17,25 46:10 49:16,22 52:2 52:3,3,7,24 60:6 61:8,15 62:16 68:7,9 68:11 69:7,8 70:16 77:23
**expertise** 44:10
**experts** 9:10 42:7 45:14 48:9 61:17,18 78:1
**experts'** 36:1
**expires** 117:20 118:15 120:24
**explain** 23:19 34:23 103:18
**express** 32:25 33:14,21 35:8 42:22 81:8 101:2 108:19
**expressed** 37:14 42:1 49:20 52:23 55:2 57:2 63:1,4,7 68:21 97:9 100:17,22
**expressing** 81:3
**extent** 9:2 17:25
**exterior** 55:9,11 71:9,16,18,20 72:16 93:12 104:4,6
**eye** 51:2 52:11

**F**

**F** 92:22
**face** 96:15
**fact** 28:25 44:1 62:11 75:1 93:5 112:8
**facts** 92:23,25 93:5,21
**factually** 45:6
**fade** 16:7,12,15
**fail** 63:11 95:9
**failed** 24:4 25:24 63:5 67:25 76:16 77:4 80:21 95:18 96:3 101:2 105:4
**fair** 21:2 28:18 32:22 35:7 49:12,13 56:8 56:9 85:12 103:21,25 112:25
**fairly** 10:21

80:22
**fairness** 81:4
**faith** 103:21
**fall** 109:23
**fallen** 20:4,9
**familiar** 37:2 46:5
**far** 13:3 14:23 29:9,25 66:21 91:15 114:10
**Farmers** 18:9
**fashion** 28:25
**fault** 21:5 74:11
**feel** 27:8 84:10 85:1 86:3
**fell** 49:11
**felt** 84:13
**fence** 16:15 17:8 17:9
**field** 8:24 9:3,10
**fifth** 56:15
**file** 20:12,15 81:15 84:13,15 84:18 85:6 87:4 90:1
**filed** 81:21 83:20 86:22 110:12 119:17
**files** 21:25 108:1
**Fillmore** 2:4 119:5
**finally** 61:25
**find** 20:8 21:5 32:4 51:9,20 61:12 109:24 110:1 119:11
**finds** 23:3
**fine** 48:19 68:22 78:6
**finish** 88:23 98:3
**finished** 20:12 89:1,3
**firm** 18:22 19:1
**first** 29:4,21 45:18 65:4 80:20 82:24
**first-party** 6:25 9:18,22 11:15
**five** 7:11 78:8 108:2
**flabbergasted** 52:9
**flashing** 50:3,22 65:16,21 66:3 79:3 85:21 104:17 106:4 114:25,25 115:13
**Floor** 2:5 119:6
**Florida** 8:3
**focus** 66:13
**focused** 40:3,4,4
**following** 86:7 120:4
**foregoing** 117:3 118:9
**forensic** 37:11
**forgetting** 27:7
**forgot** 72:7
**form** 10:16 11:18,23 12:10 13:8 14:7,20 15:7,12,19,23 16:8 17:2 22:5 22:19 23:1,20 24:2,14,22 25:20 26:18 33:3,10,17 34:10,17 35:10 35:16,23 36:2 37:20 38:22 39:19 40:15,17 41:15,20 42:2 42:13,25 43:9 43:22 44:6 45:1 46:3 47:24 48:11 50:14 54:3,16 57:17 59:16 60:3,23 61:7 62:9,15 64:20 66:7 67:16 68:2 69:21 70:3,15 71:3 75:12,21 76:11 76:19 79:1,20 80:3,8 81:17 82:23 83:6,12 85:13 86:15 87:6 88:17 89:13,21 91:4 91:10 92:4 93:22 94:8,20 95:3 97:2,12 97:19,24 98:9 98:19 99:1,12 99:24 100:6,10 102:19 103:1,9 104:10,14,18 104:24 105:12 106:25 107:13 107:18 108:12 108:21 109:4 109:18 110:3 110:24 111:13 112:12 113:4 118:9
**formed** 26:15 28:14 30:18 33:21 34:4 41:23 43:13 48:8 54:11 55:1
**forming** 58:18 58:25
**formulation** 100:9
**forth** 26:15 28:17 30:3
**forward** 111:22 116:12 119:15
**found** 86:20
**foundation** 39:20 41:16 57:18 60:24 61:8 67:17 75:13,22 80:5 80:9 83:7,13 89:22 91:11 92:5 94:9 99:25 103:2 104:25 109:5 109:19 110:25 112:13
**four** 7:11 8:11 87:19 108:2
**frame** 8:4,7,10 24:25 88:8 93:10
**framework** 87:10
**FRAZIER** 2:8
**frightened** 85:5
**front** 12:15 27:3 31:12 50:20,24 51:8 74:13,15 90:18
**full** 29:21 30:9 64:25 66:25 67:1 84:3 114:19 115:11
**fully** 69:11 89:15 93:19 112:22
**function** 12:18 12:18
**functional** 14:12
**further** 4:9 66:20 67:10 77:21 116:7 118:11

**G**

**G** 4:1 95:8
**gap** 84:6
**garage** 73:20
**gather** 109:16 110:21 113:2
**gathering** 108:20
**gauges** 79:13
**general** 16:25 21:11 32:2,11 32:16 51:22 108:4
**generally** 9:8 17:6 25:11 33:23
**getting** 42:4 54:4 94:13,25 110:18 111:15
**give** 48:25 71:21 83:23
**given** 20:15 87:10 118:9 120:5
**gives** 24:1,5 26:1
**glass** 37:6,8,22 68:9,11
**Global** 3:18
**go** 9:10 23:12 31:16 38:15 39:3,23 51:16 51:18 56:24 65:14 66:25 67:1 71:6 72:4 78:13 80:16 85:6 97:6 103:12 108:1 110:14
**goes** 73:17 94:6
**going** 7:5 13:9 13:18 19:7 28:12,16 29:7 32:6 42:6 46:6 46:20 48:13 49:4 54:4,6 64:6 65:16 66:16 67:21 68:13 75:5,9 80:19 84:6 85:23,25 86:9 86:13,25 87:14 88:15 89:10 98:13 101:1 113:17

**good** 21:3 24:10 24:18,23 25:18 25:21 26:1,3,7 36:25 78:7 103:21
**Gosh** 27:2
**gotten** 25:9
**government-is...** 4:25
**gradual** 7:19
**great** 36:24 66:10 72:9
**Greenwood** 2:10
**grime** 17:13
**groups** 82:10
**guess** 95:6
**guest** 73:25
**guests** 112:19
**Guidice's** 30:15
**guys** 68:10 74:12 74:16

**H**

**H** 95:22 96:9
**Haag** 3:16 27:22 41:1,11,19 43:4 45:17 46:1,16 47:18 61:16,23 63:14 64:22 82:5 85:10 86:13 99:9
**Haag's** 46:21
**hail** 8:9,12 9:23 10:3 11:15 12:12 13:13 14:22 16:23 17:14 22:16,22 22:23 24:12 37:12 51:24,25 57:12 58:8,9 58:12,15,16 59:11 60:2,22 65:22 72:15 79:5 86:14 91:21 93:14 95:13,13
**hail-related** 102:5,17
**hailstorm** 87:21 89:17 114:12 114:21 115:18
**half** 53:17
**handle** 8:5 16:21 17:4
**handled** 8:2,6,8
**handling** 7:12 9:19 21:6 40:2 40:5,10,23 43:8,15 49:11 57:15 59:15,18 61:23 63:23 64:2 84:25 87:9
**happened** 45:18 61:21 84:7 99:2
**happy** 69:12
**hard** 9:24 38:17 51:9,20 54:6 61:13 108:5 109:24 110:2
**harder** 79:23
**Harris** 1:19
**Harvey** 6:13 8:20
**HASP** 30:11
**health** 18:13 31:23
**hear** 20:17 29:4 44:20,22 47:13 47:14 68:25 105:15
**hearing** 47:3,10
**heat** 105:19
**help** 89:5
**Hey** 23:23 85:5
**hinges** 34:20,20
**hire** 88:9
**hired** 19:14,15 19:22 38:20 39:25 40:1,2,5 40:20,22 52:21 58:24 60:10 90:4
**hiring** 87:12
**hit** 114:21
**hold** 21:1 30:1 69:25 70:13,23
**holding** 5:1 20:24
**home** 7:2 8:22 18:13 82:17
**honest** 20:16
**honestly** 79:21
**hope** 62:8
**horizontal** 65:19 65:19 67:7
**Hossley** 2:4 18:22,25 119:5
**hot** 7:15
**hotel** 1:8,8 27:15 37:13 58:5 73:18 82:6,17 98:22 107:24 108:5 112:14 112:21 114:14 114:20 115:1 115:17 119:8 120:3
**hour** 48:14
**hours** 31:21 32:1 32:3,11
**Hudson** 1:12 4:20 44:15,24 45:2,4 46:19 47:16,23 49:11 49:15 50:6,8 50:13 52:17,24 53:5,22 54:6 54:13 57:14,21 58:13 59:14,17 59:19 60:1,15 60:20 61:4,12 62:12 63:5,11 63:22 64:19 65:24 66:6 67:13,22,22,24 68:16 69:19 70:1,13,24 71:7,8 73:3 76:8,16 77:4 80:7,14,21 81:8 84:18 86:17 87:3,9 87:22 89:20 91:2 92:22,25 94:2 95:9,18 96:3 101:2,6 101:17 102:8 102:23 103:3 103:20,24 104:21 105:5 109:17 110:22 115:16 119:8 120:3
**Hudson's** 27:12 45:8 84:25 105:11 106:6
**huge** 85:24
**Hurricane** 6:13 8:20
**hurricanes** 10:5
**HVAC** 37:23 38:8 50:4 53:8 53:10,13,16 93:15 104:13 106:3
**hypothetical** 39:13
**Hypothetically** 97:23

**I**

**ID** 118:5
**idea** 84:1
**identification** 4:25
**identified** 52:17 64:18 66:5 67:6,10 77:14 77:23
**identify** 89:16
**ignore** 109:25 110:19 112:3
**ignored** 49:15 50:6,6,7,12 52:12,17,24 53:5 64:19 66:6 80:14 109:3,6
**ignoring** 110:7
**imagine** 10:3 112:2,17
**immediately** 24:25
**impact** 16:2
**impedes** 12:17
**implied** 111:25 112:4
**important** 99:23
**in-house** 45:12 48:5
**inappropriate** 61:21 109:2,13 110:23 111:12 111:14,16,19 112:1,4
**include** 10:5 23:24 31:24 34:3,6 43:6,13 44:2 49:9 84:3 84:3 96:10,11 96:12
**included** 23:4 24:12 32:11,13 32:14 38:7 67:20 68:12 71:19 72:21 73:2,2 80:1 92:14
**includes** 31:23 54:23 115:23
**including** 63:15 68:20

**incorporate** 54:20 66:19
**incorrect** 101:11
**incurred** 103:8
**indicate** 4:15
**indication** 85:10 96:21
**individual** 19:14 85:2
**industry** 47:10
**inform** 24:19
**information** 26:21 36:10 37:17 38:1 39:6 61:18 62:4,6 63:15 77:8 78:1 90:1 90:3,18 95:24 96:10,19 99:5 108:7,11,20,23 109:8,8 110:7 110:9,15,22 111:4,11 112:9 112:15 113:3
**informed** 89:10
**initial** 3:8 22:17 22:24 87:18
**injury** 8:19
**insofar** 107:8,19 108:22 111:3
**inspect** 58:9 115:16,21
**inspected** 58:5 58:10 115:10 116:1
**inspection** 36:5 41:25 42:23 52:5 55:18 58:17,23 68:9 85:14 88:6 93:13 105:4
**inspections** 22:12 82:22 83:17 85:3,4 86:7
**instance** 17:8 114:24
**institute** 81:9
**insurance** 1:12 4:20 10:7,19 10:23 19:6,8 19:25 20:4,9 21:5 23:23 24:3 25:12,23 25:24,25 26:1 44:15 52:8 55:20,20 81:10 85:24 86:21 89:20 92:23 93:25 94:1,16 95:1 103:16 114:18 115:15 119:8 120:3
**insured** 10:13 20:5 21:23 22:15,18,22,25 23:3,6,22 24:11,18 25:7 25:11,19 26:3 64:9 84:8,9,12 85:16,19 87:10 87:11 93:8 94:11 102:7,21 102:24 103:13 103:19 115:9
**insured's** 98:17
**insureds** 25:1,5
**insurer** 10:24 24:11,19
**insurer's** 22:17 22:24 24:13,21 98:16
**intend** 33:19 40:12
**intense** 8:12
**intent** 33:23 34:2 43:16 111:22 112:4 112:10,11,17
**intention** 111:25
112:3
**intentional** 55:5
**intentionally** 111:20
**interactive** 98:15
**interested** 118:12
**interior** 51:12 64:8,10,14 97:17 101:12 101:13,21 102:21 103:14
**internal** 18:4
**Internet** 46:25 69:3 105:16
**interpret** 74:6
**Interruption** 13:23 57:4 96:6
**introduced** 4:3
**intrusion** 58:6 102:5
**investigate** 24:4 25:24 45:13 80:21 88:14 93:13
**investigated** 23:5 25:14 82:14
**investigation** 24:6 30:3 33:2 33:7,16 34:7 34:16,21 36:13 52:4 66:20 80:24 81:4,15 82:12,14 83:11 83:14,16 85:11 91:8,12 95:23 96:1,9,12,13 96:22 97:9 98:7,15,25 99:15 102:24 114:19 115:12
**investigations** 83:3
**investigators** 37:12
**involved** 7:22 9:18,23 26:24 89:20
**involvement** 99:22 100:8
**iPad** 94:13
**ISO** 14:10
**issue** 34:14 88:7
**issued** 26:12 36:12 82:10,18 83:17
**item** 25:6 32:1 49:14
**itemized** 80:20 88:12
**items** 25:7,8 67:15,19 71:6 75:7

**J**

**J** 103:20 104:5
**Jersey** 8:3
**job** 8:21
**Joe** 30:15
**JS|Held** 34:5,15 36:11 37:17 39:16 44:15,24 45:3,8 46:16 68:10 82:4 86:8,12 96:12 96:21 97:7,16 98:5 99:9,17 101:15,23
**JS|Held's** 30:2 30:10 31:5 33:1,7,15 34:20 35:8,13 35:21 39:17 40:15 46:21 47:18 67:5 68:8 80:2 85:10
**judgment** 45:21 45:24 46:11,12
**July** 1:6,18 81:22 83:10,20 87:4 116:18 118:14 119:3 120:2
**jump** 86:12
**June** 57:8 82:5 83:2,18 88:6 88:11,16,19 89:9 90:6 98:22 99:2 100:13,18
**jury** 42:7 61:3 77:9

**K**

**Kaho** 28:3
**keep** 38:17 111:7
**Kevin** 3:11 27:16 36:20 38:3 39:9 82:21 97:15 106:18
**kind** 7:15,18 8:13,17 12:24 16:3 18:12 20:11 25:4,10 53:16 62:20 101:17
**kindly** 4:25
**knew** 86:25 91:19 93:7
**knocked** 17:13
**know** 7:14 12:19 14:11 16:16,18 18:19 20:14 21:14,15 24:23 24:24 25:5,6 25:13,21 26:4 27:3,7,17,25 31:7 32:8 36:16,19 39:21

40:6 42:8 43:23 44:19 46:5 47:14 50:2,15 51:8 51:22 52:2,8 53:7 54:22,23 54:24 55:8,9 55:16,22 56:1 56:2 61:24 62:1,3,3,20,24 64:7,11 65:8 66:8 68:23 71:22 72:18,18 72:19,23,24 73:12,16 74:11 74:14,15 75:23 76:2 77:1,5 79:4,12 82:13 82:14 83:23,25 84:3,8,20,21 84:22,23 85:1 85:15,15,16,17 85:23 86:21 89:23 90:17 91:3 92:6,7 93:3,10,12,13 94:5 95:5 96:11 97:21,22 99:2,4,4,6 100:3 101:17 101:18 103:10 103:14 104:11 104:15,19 105:8,8,15 107:23 108:2,5 108:13,14,15 108:15 109:6,7 109:10,11,20 109:21 111:20 112:15,16,19

**knowing** 93:10

**knowledge** 16:16 18:3,6 105:7

**known** 91:20

93:8

**L**

**L** 1:20 118:4,21 119:21

**labor** 32:2,11,16 72:20

**lacks** 110:25

**LAKEWOOD** 1:8

**Landscaping** 72:6

**language** 10:14 29:22 58:2 74:19,25

**large** 5:15 6:5 73:12 89:16

**Larson** 3:12 27:24 45:3,10 45:11 46:12 62:20 106:18 106:23

**law** 18:22 19:1

**lawsuit** 110:11

**leading** 85:16

**leak** 51:11,11 58:8,10 63:18

**leaking** 50:1

**leaks** 101:12

**leave** 8:16,18

**left** 6:10,13 18:9 79:9,15

**Legal** 118:22 119:1,15,21

**legally** 86:3 87:12

**Lesley** 1:5,17 3:3 3:10 4:17 5:8 116:12 117:1 117:11 119:7 120:2

**less-than-thor...** 96:22

**lesser** 75:4

**let's** 74:19 77:19

81:7 85:6 97:6

**letter** 3:11 106:18 113:3

**letters** 101:17

**level** 7:2 51:12 55:25 115:6

**levels** 115:4

**liability** 103:23

**lieu** 4:9

**life** 12:21 14:23 17:18

**lifts** 32:8

**lighter** 79:10

**lighter-colored** 79:15

**liked** 7:7

**limit** 29:7

**limited** 45:19 52:6 58:17,23 66:11 76:23 90:9

**linchpin** 34:21 34:25

**line** 32:1 75:7 120:6

**list** 27:3 49:10 50:10 71:6 80:20

**literally** 49:24

**litigation** 6:7,20 6:23,25 7:1,9 7:10,12,13 8:2 8:9,12 9:7,8,18 9:19,20,23 10:5 11:15 19:12,18 77:9 118:12

**little** 72:8 90:20 95:16 107:2

**LLC** 2:8

**LLP** 2:4 119:5

**lobby** 50:1 58:7 58:11 63:19 114:13

**located** 115:1

**location** 16:1 17:24 52:12

**log** 62:21

**long** 5:18,23 16:17 21:1 63:20 107:25 110:11

**longer** 16:13

**look** 10:9 12:16 16:14 18:20 31:16 38:13 47:8 51:23,24 51:25 52:13 58:19 59:1 64:24 65:9 68:14 74:19 81:7

**looked** 68:10 90:20

**looking** 9:4 10:12,13 25:3 32:6,24 37:1 37:12 44:7 47:6 49:14 61:18 71:22 75:1

**looks** 17:11

**loss** 3:9 5:15 6:5 10:8 11:2,7,15 11:17,22 12:1 12:9 15:18 21:9,15,19,21 21:23 22:3,10 22:13 23:24 44:12 71:20 92:3,7,11,12 92:13,16 95:16 101:4,5,6 103:8 113:23 113:23,24 114:11

**lot** 10:2 17:8 28:7,7 39:1,5 40:1 74:15 75:5,6 91:20

**lots** 74:4

**Louisiana** 7:1,23 10:18

**lower** 79:22

**M**

**Ma'am** 116:9

**machine** 118:8

**major** 107:24 114:11,21 115:18

**making** 75:11

**Management** 1:8 119:8 120:3

**manager** 6:7,21 6:23,25 9:7 108:4

**managers** 7:12

**manner** 4:14

**March** 26:10,15 28:17 33:20 34:3 90:2

**mark** 16:2 17:16 17:17,19,25

**marked** 3:15 106:11 113:18

**marks** 15:16,24 16:7,12,15,23 17:5,9,11 18:2 18:5,6 71:17

**marring** 12:16

**Martin** 27:18

**match** 75:9,17

**matching** 74:22

**material** 12:17 12:18,19,22 16:3 17:7 18:1 79:15 112:3

**materials** 16:9 16:10,11 17:16 39:16 79:13 109:16

**Matt** 27:20

**matter** 4:11

118:7 119:16
**Matthew** 3:17
**MCL** 3:18
**mean** 17:1 20:14 25:21 29:14 33:24 38:15 46:5 48:2 55:12 61:19 65:6 66:9 75:3 75:4,23,25 76:1 79:21 84:11 88:25 93:16 99:3 107:23 108:13
**means** 1:20 109:6
**meant** 29:17
**mechanical** 63:21
**mechanically** 64:7
**mediations** 9:13
**meeting** 83:2 98:22 100:13 100:18
**membrane** 13:18 57:12 59:11 60:2,21 61:6 62:13 63:9,13,20
**memorized** 108:15
**memory** 10:25 11:4,5 31:18 32:7
**memos** 18:4
**mention** 71:16
**mentioned** 53:9 55:4
**metal** 66:1 67:11 79:25
**method** 44:13
**mezzanine** 51:12 55:25 72:25 73:15,19 115:6
**mid** 30:25 88:11 88:16
**middle** 79:2
**Midwest** 7:25 8:15
**Miller** 27:2,4,8 28:3 89:9,15 89:18 90:6 91:6,24 92:1 92:19 108:8,10 113:1
**Miller's** 91:19 112:22
**mind** 48:7
**minimum** 108:18
**minutes** 48:18 78:8
**misleading** 93:9
**misrepresent** 93:1
**misrepresenta...** 93:20
**misrepresented** 92:23 94:2,17 94:19 95:2
**missing** 25:12 27:9
**mitigated** 17:6
**moment** 7:15 29:15 30:4 71:21 94:12,14
**moments** 85:8
**Monday** 28:11
**money** 63:11 76:8,15
**moneys** 63:5 67:23 68:17
**months** 18:11 87:19
**morning** 28:11 28:11,13 29:5 31:1
**mosaic** 73:11
**move** 111:22
**moved** 7:14
**Moving** 95:8
**mullion** 50:3
**mullions** 50:23 65:16
**multiple** 13:20 15:3 39:2 88:21 90:11 98:2,11 100:5 100:25 102:18 103:11 105:13 110:13
**murky** 61:19,20

**N**

**N** 3:1 4:1
**naked** 51:2 52:11
**name** 4:16,17 5:7,8 27:5
**names** 36:25
**narrow** 49:23 58:24
**national** 6:20 7:2,10,12 51:22
**nationally** 7:13
**Nationwide** 21:18
**natural** 8:18
**nature** 85:22
**near** 9:25
**necessarily** 14:16 20:16 24:24 33:24,25 35:17 39:23 47:6 74:11,17 85:15
**need** 15:21 16:4 20:13,22 47:12 53:23 66:24 68:23 84:13 89:6 102:8,9 109:21
**needed** 8:3,22 18:12 85:20 109:21
**negative** 112:4 112:17
**neither** 82:9
**never** 10:22 19:13,14 21:22 22:12 55:19 64:12 65:23 75:24 92:6 94:11 97:20 108:4 112:14
**new** 8:2,3 26:21 28:13 54:5
**nice** 70:21
**nine** 18:11
**nine-month** 8:9
**nineteen** 101:9
**normal** 23:10
**north** 73:25 74:3 74:7,12,15,22 75:4,9,11,18
**Northwest** 7:25
**notarized** 119:14
**Notary** 1:21 117:19 118:5
**Notary's** 120:23 120:24
**notation** 6:20
**note** 31:21 32:15 32:16 50:16 64:1
**noted** 50:2 55:23
**notes** 62:21 81:19
**notice** 1:16 3:9 113:23,24,24 114:4
**notify** 24:11 25:12
**November** 118:15
**number** 21:2 31:24 32:1,3 57:11 64:21 65:10 72:2,16 86:1 98:6
**numbered** 63:17 72:15
**numbers** 39:24

**O**

**O** 4:1
**oath** 4:9 117:4
**object** 22:19 24:2 34:17 76:11 79:1 83:6 91:4 100:19,23
**objecting** 100:20
**objection** 10:16 11:18,23 12:10 13:8 14:7,20 15:7,12,19,23 16:8 17:2 22:5 23:1,20 24:14 24:22 25:20 33:3,10,17 34:10 35:10,16 35:23 37:20 38:22 39:19,20 40:17 41:15,16 41:20 42:2,13 42:25 43:9,22 44:4 45:1 46:3 47:24 48:11 50:14 54:3,16 57:17 59:16 60:3,23 61:7 62:9,15 64:20 66:7 67:16,17 68:2 69:21 70:3,15 71:3 75:12,21 77:16 79:20 80:3,8 81:17 82:2,23 83:12 85:13 86:15 87:6 88:17 89:13,21

91:10 92:4 93:22 94:8,20 95:3 97:19,24 98:9,19 99:1 99:12,24 100:6 100:10,24 102:19 103:1,9 104:10,14,18 104:24 105:12 106:25 107:13 107:18 108:12 108:21 109:4 109:18 110:3 110:24 111:13 112:12 113:4
**objections** 4:13
**obligations** 20:5 49:11
**observations** 30:1 36:5,7
**observed** 49:16 50:11 52:25 56:4 68:1 80:13
**obvious** 51:2 56:10
**obviously** 12:17
**occurs** 23:18
**October** 88:11 88:16
**offering** 81:10
**office** 7:2 88:18 88:20 92:17
**Oh** 36:22 53:6 59:22 61:22 94:21 107:23
**okay** 5:23 6:6,19 15:1,15 19:16 19:19 23:17 25:15 27:14,23 28:9,12,21 29:19 30:22 31:10 32:24 34:6 35:19 37:2 38:24 39:12 43:18 46:14 47:12,15 48:2,6,23 49:2 49:5,7 50:10 50:18 51:5,19 52:13 54:25 56:3 59:22 65:11 66:16,23 67:4,19,21 69:2,6,10,16 69:24 70:10 72:9 76:20,21 76:24 77:18 78:9 79:8,24 80:16,18 82:4 83:15,22 85:8 86:10 88:1,10 90:24 104:8 105:18 106:13 107:6 113:10
**Oklahoma** 7:1 7:24
**old** 108:2
**omission** 33:12
**once** 8:13 13:20 15:3 20:12 22:7 25:8 39:2 88:21 90:11 98:2,11 100:5 102:18 103:11 105:9,13 106:2 110:13
**ones** 19:21 28:2 28:5 37:14 74:1
**ongoing** 83:11 83:16 93:3
**onus** 89:14
**open** 65:19
**opened** 86:21
**opine** 30:18 36:10 52:21 68:8 76:15
**opined** 69:19
**opines** 31:25
**opinion** 20:16,18 33:1,25 35:2,5 35:8,21,24 36:2 47:22 49:20 52:23 54:5 58:18 59:1,10,12,14 60:1,10 61:12 61:15 62:11 63:4,7,8,23 65:1,8,9 67:22 67:24 68:13,21 69:11 70:1,13 70:24 71:4 72:17 81:3,8 87:3,15 95:17 96:3 97:9,21 98:10,12,12,13 99:16,16,17,18 99:20 100:12 100:15,16,21
**opinions** 26:14 26:19 28:13,15 28:17,24 29:4 29:8 30:1,18 33:21 34:4 36:2 40:12,15 40:18 41:24 42:1 43:6,13 43:19 48:8 54:10 55:1 63:1 80:20 100:9
**opportunity** 29:1
**opposed** 40:9
**orders** 116:14
**original** 119:11 119:17
**originally** 6:24 120:5
**OSHA** 31:3 32:8 32:19
**outcome** 118:12
**outline** 102:2
**outside** 40:19 71:10 105:22 109:8,9
**outstanding** 73:4
**overall** 20:20 35:4,5 36:3,9
**overridden** 12:6
**oversaw** 6:25
**overseeing** 11:15
**owed** 63:5,12 67:23 68:17 84:7 86:2
**owner** 19:5,8

**P**

**P** 2:3 4:1 119:4
**p.m** 116:18
**P.O** 118:22 119:1
**Pacific** 7:25
**page** 3:4,15 29:20 30:3,9 32:24 44:8 49:4,6,8,9 56:14,15 57:23 58:1 72:1 80:19 87:16 120:6
**pages** 117:5
**paid** 61:5,16 67:13 80:6 104:3
**paint** 16:15 74:21 76:2
**painting** 16:14 71:18,20 75:19 104:3,6
**panels** 73:13,13
**paragraph** 29:21 30:9 52:14 53:13 55:5 68:15 74:20 92:20
**paragraphs** 72:15
**parameters** 69:11
**parapet** 104:17 106:4 114:24 114:25 115:2,5 115:6,14
**parking** 73:20
**Parkway** 2:9
**parlance** 42:8
**part** 24:18 25:18 33:12 34:8 47:9,11 53:15 54:21 58:15 63:24 73:20 79:22 115:14
**partially** 64:1,3
**participated** 82:5
**participating** 4:6
**particular** 12:25 14:24 22:23 23:24 30:3,21 54:7 113:6
**parties** 4:12 118:12
**partnership** 7:8
**party** 81:9
**pass** 116:5
**Pause** 51:15 78:2
**paused** 51:19
**pay** 46:20 62:12 63:5,11 67:23 67:25 68:17 71:8 76:16 77:4 81:11 84:19 85:25 95:5,22 102:13
**paying** 101:21
**Peirce** 2:3 3:6 4:22,22 10:16 11:18,23 12:10 13:8 14:7,20

15:7,12,19,23 16:8 17:2 22:5 22:19 23:1,20 24:2,14,22 25:20 33:3,10 33:17 34:10,17 35:10,16,23 37:20 38:22 39:19 40:17 41:15,20 42:2 42:13,25 43:9 43:22 44:4,6 45:1 46:3 47:4 47:24 48:11,16 48:18 50:14 54:3,16 57:17 59:16 60:3,23 61:7 62:9,15 64:20 65:3 66:7 67:16 68:2 69:21 70:3,15 71:3 75:12,21 76:11 76:12,19 77:16 78:3,8,10,15 79:1,20 80:3,5 80:8 81:17 82:23 83:6,12 85:13 86:15 87:6 88:17,22 89:13,21 91:4 91:10 92:4 93:22 94:8,20 95:3 97:2,12 97:19,24 98:9 98:19 99:1,12 99:24 100:6,10 100:23 102:19 103:1,9 104:10 104:14,18,24 105:12,14,18 105:20 106:25 107:13,18 108:12,21 109:4,18 110:3 110:24 111:13 112:12 113:4 113:11,16 116:5,8,11,16 119:4,10

**penalty** 4:12 118:7

**people** 13:20 15:3 26:24 39:2 75:25 86:3 88:21 90:11 98:2,11 100:5 102:18 103:11 105:13 110:13

**percent** 9:11,14 10:1,2,4 19:24 19:25 20:2 23:9,18 61:10 81:20

**percentage** 9:4 9:23

**perfect** 55:8 56:24 98:20

**perform** 8:21 68:16

**performed** 42:10 96:21

**performing** 75:20

**peril** 12:11

**period** 9:16

**perjury** 4:12 118:7

**person** 4:10

**perspective** 46:9

**pertinent** 92:23 92:25 93:5,18 93:20

**perused** 30:6 107:7

**phase** 30:2 66:20 80:24 81:4 95:25

**phone** 23:6 25:7

**photo** 50:17 64:21 65:10,15 78:17 89:4

**photoed** 51:7

**photograph** 52:20 78:22

**photographed** 49:17 52:25 56:5 66:18

**photographs** 64:24 65:9 80:12

**phrased** 84:17

**physical** 10:8 11:2,7,17,22 11:25 12:9 17:10

**physically** 4:7

**picture** 52:11 79:3,22

**pictures** 50:6 66:10,11

**piece** 99:23 100:1,4

**pin** 63:8

**place** 7:17 50:17 118:8

**plaintiff's** 19:22 19:25 20:3,17

**plaintiffs** 1:10 2:2 4:23

**plate** 112:16

**plates** 65:18

**play** 5:25 13:6 46:1 100:21

**please** 4:15 5:6 11:19 43:10 47:13 49:1 56:12 72:8 107:2,15 119:11,14,14

**plus** 84:7

**point** 9:7 21:3 35:20 41:12 45:22 48:15 61:20 81:18 82:4,19 83:25 84:13,21,25 85:3 96:14 97:14 111:15

**pointing** 79:23 80:1

**points** 106:15

**policies** 10:10 11:1,6,10 21:7

**policy** 10:7,9,12 10:14,20,23,23 12:3,6 21:8,12 63:6 64:11,15 67:23 68:17,18 81:10 84:24 92:23 93:25 94:1,4,17 95:2 95:5,6 101:14 103:19

**pool** 51:1 53:11 53:18 93:17 114:12

**popup** 69:2

**portions** 59:2

**position** 5:24 6:22 8:25

**possible** 74:22 75:17 108:22

**possibly** 114:13

**power** 17:12,19

**practice** 18:15 24:10,18,23 25:18,22 26:1 26:7

**practices** 18:4

**preinspection** 83:2

**premise** 23:17

**preparation** 31:4 32:20 41:7

**prepare** 89:19 92:2

**prepared** 29:3 39:15 54:11,12 54:19 85:9 96:20 97:7

**preparing** 34:2 43:12

**present** 4:7,25 82:21,24 83:2 90:10

**president** 51:23

**pressing** 112:19

**presume** 112:11

**pretty** 8:19

**previous** 118:6

**previously** 3:15 52:14 96:18

**primarily** 100:20

**Prime** 74:20

**prior** 17:3 30:18 37:13 41:7 46:10 54:9 78:19 84:8 86:16,17,19

**privy** 62:18

**probably** 9:21 78:7 89:5

**problem** 47:11

**problems** 51:14

**Procedure** 1:17

**proceedings** 51:15 78:2 116:17 118:9

**process** 7:19 9:9 98:15

**produced** 77:8

**production** 38:16 61:11 92:14

**professional** 1:21 55:20 118:5

**program** 7:16

**prompt** 95:14 103:21,25 119:16

**promptly** 95:19
**prompts** 94:13 94:25
**pronounce** 27:6
**proof** 21:8,15,19 21:21,23 22:3 22:10,12 92:2 92:7,11,12,16 101:3,5,6
**proper** 26:5,8 44:12
**properly** 24:4 45:12
**property** 3:9 5:15 6:8,25 11:10 19:4,8 22:22 55:19 88:3,9 91:21 113:24
**proposal** 72:12 74:7 76:9,17 76:23 90:21 94:7
**proposals** 89:11 91:1,7 92:1
**proposed** 92:2 99:10
**protect** 85:6 86:3,24 87:12
**protocol** 83:3 98:24
**provide** 21:12 107:20 109:17 110:22
**provided** 3:13 4:3 22:11 26:23 38:2,4,5 38:10,16 39:16 54:1,13 92:10 110:10,10
**provision** 21:8 21:12 95:6
**provisions** 12:4 92:24 93:25 94:1,17,18 95:2
**public** 1:21 23:15,16 36:22 98:17 117:19 118:5
**publications** 18:4
**pull** 56:12 57:25 71:22,24 77:19
**pulled** 78:17
**purported** 55:20
**purpose** 22:3 23:19,21 70:4
**purposes** 11:14 57:15
**Pursuant** 1:16
**put** 7:16 20:12 33:4 40:21 50:20 59:4 64:9 89:14 91:23 108:10 111:10 112:9 112:21
**putting** 85:17
**puzzle** 99:23 100:1,4
**pyramidal** 49:25

**Q**

**qualification** 48:6
**qualifications** 32:10
**qualify** 64:4
**question** 10:12 11:19 13:10 14:1 15:5 16:20 19:8,19 20:11,23 22:20 25:16,17 32:18 34:1 39:12 41:22 43:10 58:25 59:23 61:13 62:1,24 63:10 65:4 66:9,17 76:13 89:3,6 96:9 98:4 105:9,24 108:7,16 109:13 110:12 110:19
**questions** 19:9 28:13 29:3,12 84:17 113:9 114:24 116:7 118:9
**quickly** 27:22
**quite** 44:21 79:7 84:6 107:25 111:5

**R**

**R** 4:1
**rain** 16:19
**rare** 9:21
**RDA** 1:8 27:5,13 46:20 61:5 63:12 67:13 81:15,21 83:4 84:1,15 86:12 87:3 90:25 104:8,12,16,21 104:22 105:1,5 106:2,5 107:12 107:17 108:18 109:3 110:20 112:8 113:2 119:8 120:3
**RDA's** 28:3 49:12 53:25 54:14 63:23 89:11 90:8 105:7
**re-answer** 105:25
**re-ask** 105:24
**re-inspection** 59:7 86:22,23
**re-investigation** 82:6
**re-investigatio...** 46:17
**re-retain** 46:10
**re-review** 27:22
**re-reviewed** 39:10
**reach** 20:3
**reaches** 67:7
**read** 52:14 94:22 116:10 117:2
**readily** 108:1
**reading** 28:8 74:17,18
**reads** 49:15
**ready** 49:2 51:16
**realized** 84:5
**really** 8:18 39:25 40:3 68:8 74:10 105:21 105:22
**realm** 54:5
**reason** 14:10,11 47:13 98:7 120:6
**reasonable** 35:22,25 36:3 36:6,8 37:18 39:18 40:16 57:13,22 59:14 59:17,25 60:5 60:19 62:12 63:16,22 64:1 64:3 95:23 96:4,9 101:3,7 104:22 105:11 107:9
**reasonably** 42:11 95:18 103:23
**rebuttal** 30:16 30:23 31:3,8 31:11 32:5
**recall** 11:1,5,9 28:2,5 31:17 90:19 96:24
**receive** 28:9
**received** 9:7 38:20 63:16 90:13,16 101:25
**Recess** 48:21 78:11
**recognize** 57:7
**recommendati...** 35:9,13,18,21 37:18 39:18 40:16 43:20 44:3
**reconstruct** 111:4
**record** 4:16 13:24 48:24 52:15 57:5 70:12 78:14 96:7 119:15
**recorded** 114:7
**records** 18:20 107:19
**recover** 81:9
**recoverable** 47:17
**recreated** 109:22
**redacted** 81:19
**reduce** 12:21 17:18
**reduced** 118:8
**redundant** 55:6
**refer** 29:12 49:4 55:12,15 57:23 69:4 74:7 80:23
**reference** 3:8 30:9 41:12 53:3,12,13
**references** 46:4 74:9
**referencing** 38:25
**referred** 73:5

**referring** 27:12 49:22 58:3 65:25 69:23 71:16 72:12,14 73:1
**reflected** 22:16 22:24 24:20 76:9,16
**refused** 67:22 84:19
**refusing** 68:17 95:22
**regard** 14:6 30:11 34:24 56:3 78:23 95:17
**regarding** 21:8 29:2 101:17
**regardless** 43:25 76:4
**regards** 12:11 34:5
**region** 7:21
**Registered** 1:21 118:4
**rehab** 8:22
**relate** 93:8
**related** 15:5 58:12 95:25 118:11
**relates** 103:19
**relay** 103:3
**relayed** 102:23
**relaying** 103:5
**relevant** 43:7,14
**reliance** 46:20 47:18 60:20 64:15
**relied** 61:22 73:3
**rely** 48:8 59:14 59:18 60:1,5 63:22 102:2
**remains** 59:10
**remember** 11:4 11:8,13 22:1 32:2 33:13 35:1 37:1 38:5 39:7,10 43:24 63:25 81:24 90:23 106:20 113:5
**remote** 1:20 2:1
**remotely** 1:23 4:3,8
**reopened** 29:23
**repair** 18:13 35:8,13,18,21 37:18 39:17 40:15,18 43:20 44:3,13 61:5 62:13 63:12 67:14 75:1 85:17 89:12 91:1 99:10,13 99:15
**repairs** 22:9 30:12 75:11 90:5
**repeat** 11:19 13:9 18:23 22:20 34:1 43:10 44:18,19 94:21 107:14
**rephrase** 45:6 47:14
**replace** 54:1,14 54:20,24 61:6 85:18
**replaced** 49:19 53:23 85:20
**replacement** 62:13 63:13 84:4
**report** 3:10,16 3:18 26:10,16 28:18 29:14,20 30:16,23 31:3 31:9,11,12 32:6,25 33:5 33:16,20 34:3 36:12 38:8,11 39:6,11,15 41:1,2,8,11,11 41:19 42:1,12 42:15,21 43:6 43:12,17 44:2 44:8 49:4 50:7 50:16,17,20,24 51:7 53:9 54:11,12,19 57:3,9,24 58:14 59:18 60:10 61:16 63:4,14 68:15 71:13 78:18 80:17,25 83:24 85:10 92:13 96:20 97:7,10 100:22 101:23 102:1,4,12 103:4
**reported** 87:21 114:17 115:17 115:20,25 116:3
**reporter** 1:21 3:14 4:4,5,24 5:3 13:23 51:13 56:13 57:4 96:6 106:10,13 116:9,13 118:5
**REPORTER'S** 118:1
**reporting** 4:8,14 115:9 118:22 119:1,15,21
**reports** 26:12 27:22 46:16,21 47:19 60:21 64:16 82:10,18 83:16 86:1
**represent** 37:10 37:24 81:25 86:5 110:8
**representation** 82:1
**representative** 86:2 98:18
**represented** 23:11,15 98:23
**request** 28:23 54:10 58:4 107:17 109:3 109:14 110:20
**requested** 21:16 21:22 22:1,2 22:13 51:13 108:20 110:9 110:16,22 112:10 113:3
**requesting** 21:21 111:6
**requests** 106:23 107:12 108:19
**required** 14:11
**requirements** 31:4 32:19
**rescind** 17:3
**reserve** 28:21
**reset** 54:24
**residential** 115:22
**respect** 93:25 114:1
**respond** 95:15
**responded** 107:12,17 108:18
**responsibilities** 5:21,24 7:4
**responsive** 100:24
**rest** 17:12
**restate** 59:22
**restroom** 78:4
**resulting** 89:16
**resume** 28:22
**retain** 44:15,24
**retained** 19:4,5 19:23 20:3 45:4,8 48:8 89:11,19,23 98:16,17
**retention** 45:3
**return** 119:14
**review** 20:15 27:1 36:20 40:25 60:4,25
**reviewed** 30:15 30:22,25 37:16 41:5,6 48:1 60:8,9,19 90:1
**reviewing** 10:23 48:5
**right** 5:6,16 6:7 6:17 13:12 14:14 28:21 43:21 44:14,21 45:23 47:7 48:20 60:13,14 67:9 71:5 72:3 74:10 79:10,19 83:21 84:15,23 86:4 87:13 90:3 96:23 101:10 109:12 110:5 116:4
**rights** 84:22,23
**road** 9:14
**role** 6:2 7:3,3 30:2 43:7,14 45:25
**roof** 14:24 17:18 41:25 42:11,23 46:9 51:1,6 58:9,15,19,22 59:2,7 84:3 114:13 115:3
**roofing** 14:3,9 17:15 115:4,14
**roofs** 49:18 53:1 56:6 114:19
**room** 4:7 73:25 82:15 96:12,15

96:15,16 100:15
**rooms** 97:17 98:6
**roughly** 18:17
**row** 25:9
**RPR** 118:21 119:21
**Rules** 1:16
**run** 8:13 107:24 112:14
**Ryan** 95:15

**S**

**S** 4:1
**safety** 30:12 31:3,23 32:19
**sarcastic** 70:21
**sat** 88:18,19
**satisfied** 97:17
**saw** 37:8
**saying** 23:23 25:16 75:8 84:10 102:20
**says** 31:6 32:3 51:3 74:20 80:21 105:16
**scale** 103:8
**scope** 22:7,8 33:1,7,15 34:7 40:20 49:23 58:17 91:16 92:18 99:10,13 99:14,15 102:17
**screen** 56:18 66:25 67:2 78:17 106:9,16 113:13
**screens** 115:23
**scroll** 71:24 72:2 72:8 106:15 107:1
**Seagren** 37:3 74:6 75:25
76:17 90:21 94:7
**seals** 67:6
**second** 24:3,5 26:2 32:1 41:2 41:3 47:20 58:1
**second-guess** 98:8
**seconds** 49:1
**see** 13:16,19 41:10,13 50:4 50:19,21 51:24 52:10,10 56:1 56:24 57:1 65:15,21,22 66:12,15 79:3 79:4,5,6,14,18 79:21,23 81:12 87:24 93:16 114:11
**seen** 6:19 22:10 22:12 51:3 53:7 55:23 92:6,8,11,12 101:16 106:20 106:21 113:25
**send** 92:19 101:23 102:12 116:11
**sending** 103:4
**sensible** 25:22
**sent** 88:20 95:11 95:13 103:16
**sentence** 70:5
**separate** 42:17 75:7 97:13
**separately** 42:16
**series** 71:25
**served** 6:6,20
**serves** 23:19,21
**set** 26:15 28:17 30:3 32:12
**settlement** 101:18 102:9
104:1
**settlements** 103:22
**setup** 32:4,14
**seven** 7:11 21:4
**share** 69:12
**sharing** 113:13
**sheet** 119:11,13 120:1
**Sheraton** 37:13 114:14
**Sheridan** 58:5
**shift** 48:15
**shingle** 17:20
**shoes** 112:22
**short** 20:5,9 49:11 78:4
**shorthand** 118:8
**show** 78:20 88:8 110:16 113:17
**shows** 22:9
**side** 79:15 96:15
**sides** 72:22,23 73:11,25 74:5 74:14,23 75:9 75:11,18,20 76:3,3 98:24
**sideways** 47:8
**sign** 116:10
**signature** 118:14 119:12 120:20 120:23
**signed** 119:14
**significant** 8:19 110:16 111:5
**sills** 65:18
**similar** 10:21
**simply** 63:7 111:9
**Sincerely** 119:19
**single** 25:6 33:25
**sir** 5:12,17 17:23 26:11 29:18,24 32:23
**sit** 45:24 92:17
**site** 30:11 31:3 32:4,14,17,19
**Sitzmann** 3:17 27:20 42:10 49:23 50:12,15 51:4,9,10,21 52:17 53:9 55:17,23 56:4 59:7 63:18 64:18 66:5,19 80:13 86:8 88:5
**Sitzmann's** 41:24 42:23 43:20 44:3 52:5 57:2,7 60:1,20 78:18
**six** 18:11 21:19 53:17
**skill** 32:12
**skill-based** 32:12
**skip** 92:21
**skylight** 49:25 50:1 51:11 53:8,11,15,19 53:23 54:2,15 54:21 59:3 93:17 114:13
**skylights** 49:18 52:16,18,20,22 53:1,4,4,12 55:2 56:7 58:7 63:19 114:12
**slightly** 79:10
**slowly** 18:12
**smack** 79:2
**solely** 29:7 95:25
**solicited** 90:14
**somebody** 27:7 27:9 61:19 92:18 109:24 111:20
**sorry** 6:11 13:25 18:23 24:15
26:22 41:17 44:17 46:23 56:13 70:19 72:7 76:12 83:15 94:15,23 94:25 105:17 107:5
**sort** 17:10
**sound** 6:17
**sounds** 48:19
**south** 63:18 73:25 74:3,8 74:23 75:4,9 75:11,18 76:3
**Southwest** 7:25 8:15
**space** 73:19
**span** 12:21 14:24 17:18
**spatter** 15:16,24 16:2,7,12,15 16:22 17:5,9 17:11,16,17,19 17:25 18:2,5,6 71:17
**speak** 47:6 84:8 84:9 88:25 89:24 90:4
**speaking** 39:8
**specialist** 6:3,4
**Specialty** 1:12 119:8 120:3
**specific** 8:8 10:24 14:21 20:10,23,25 32:2,10 64:1 66:15 67:19 68:5 70:6 85:25 104:5
**specifically** 11:8 15:5,14 16:17 18:19 21:2 27:7 31:17,24 32:9 34:21 36:19 39:7

40:22 53:13 55:12 56:12 58:7 66:9 69:5 69:25 71:15 72:14 74:8 79:6 80:23 88:15 94:18
**specifics** 39:24 53:7
**speech** 99:4
**spirit** 95:6
**split** 19:3,21 63:20,21
**spoke** 90:2
**spoken** 75:24 97:20
**spot** 7:15
**ss** 118:2
**stage** 19:17
**stamped** 83:25 86:1
**stanchion** 73:16
**stanchions** 72:24
**stand** 84:13
**standard** 21:14
**standing** 116:14
**start** 25:2 89:8
**started** 5:15 18:10,12,12
**starts** 29:22
**state** 1:22 10:15 35:19 43:18 75:17 87:18 92:22 103:20 112:23 117:3 118:2,5
**stated** 67:21
**statement** 10:22 30:7 32:18 71:20 92:12 95:16
**statements** 101:4
**states** 1:1 10:11
102:4 114:11
**stating** 4:16 100:12
**status** 81:14
**statutes** 10:19
**stayed** 6:15
**stick** 87:2
**stood** 80:15
**stop** 72:3,4
**story** 115:7
**straight** 38:18
**Street** 2:4 119:5
**strikes** 45:24 46:6
**stuck** 111:15
**studied** 7:6
**stuff** 32:8,9
**subject** 113:6
**submit** 28:24
**submitted** 21:16 26:9 37:3,7 46:16 61:18 90:25 101:5
**submitting** 89:11
**Subscribed** 117:14 120:21
**subsequently** 64:8
**substance** 10:20
**sudden** 61:23
**sufficient** 34:16 97:16 98:6 99:11
**suggest** 74:25 75:10
**suggesting** 61:3 77:3
**suit** 81:9,16,22 83:20 84:14,16 84:18 85:6 86:22 87:4
**Suite** 2:9
**Sunday** 26:22
**Supervision**
32:17
**supervisory** 31:20
**supplement** 24:9
**supplemental** 28:24
**supplementing** 97:3
**supporting** 38:6
**supposed** 52:7
**sure** 6:12 9:5 11:12,20 23:13 31:15 42:3,14 42:19 44:20,22 48:16,17 55:24 64:25 66:13 68:10 69:10 70:18,20 73:13 77:11 78:15 83:19 85:14 105:2,20 106:1 106:12 108:25
**suspected** 114:21
**sworn** 117:5,14 120:21
**system** 85:18,20 115:14
**systems** 37:6,8 37:22 93:15

**T**

**tail** 57:3
**take** 16:17 18:13 25:4 29:1,1 30:4 46:6 48:4 48:14 64:21 66:10 68:23 74:18 78:4 89:4 107:25 109:22 111:5,8 113:13
**taken** 1:18 16:5 17:5 48:21 78:11 109:15
118:7
**talk** 50:17 54:6 58:21 70:6 78:23
**talked** 51:5 81:7 92:8,21
**talking** 13:20 15:3 39:2 53:18 56:6 60:12 65:17,20 66:17 70:9 88:21 90:11 98:2,11 100:5 102:18 103:11 105:13 110:13
**talks** 32:7 58:22
**taught** 86:17,18 86:19
**team** 7:10
**tear** 64:7
**tearing** 12:16
**technical** 6:3,4 39:25 40:1,6,9 40:24 42:5
**tell** 5:6 8:10 29:25 30:4 31:10 54:4 75:19 79:23 92:18
**telling** 40:14 69:18 86:2 94:16 111:7
**ten** 9:21
**tend** 20:11
**tended** 21:13
**tending** 47:8
**tends** 20:12
**terminology** 84:24
**terms** 21:11 46:15 62:6 84:17
**terrible** 17:11
**territories** 7:14
**testified** 86:6
**testimony** 4:11 96:24 117:3,6 118:7,9 120:5
**Texas** 1:20 7:1 7:23 9:25 10:17
**texture** 73:9
**textured** 55:13 56:7 72:21
**thank** 5:3 36:24 36:25 48:20 56:23 67:3 70:20 72:9 107:6 113:9 116:7,8 119:16
**Thanks** 78:10
**thickness** 79:13
**thing** 34:22,25 105:16 115:24
**things** 16:4 32:13 44:19 52:12 55:16 61:21 75:25 84:7 85:21 94:10 107:10 109:21,23 112:18
**think** 7:11 16:17 17:1 20:13,22 21:4 22:6 24:10,17,25 25:1,22 27:6,6 28:7 34:18,18 34:19,19 35:4 38:5,7 39:22 39:22 45:7,25 47:9,10 50:16 56:9 62:2 71:21 77:7,9 79:21 92:13 93:3,5,9,18 98:21 103:4 107:8,9 108:7 109:7,23 111:14,15

112:3
**thinking** 34:24 39:23 75:24
**third** 30:8 63:17
**third-party** 9:19 9:20
**third-to-last** 29:21 49:6
**thorough** 42:11 52:4 85:12 96:13 97:8 98:7 115:12
**thoroughly** 48:5 80:22
**thoroughness** 42:22 81:3
**thought** 9:25 42:9 80:12 87:24 89:1,3 97:5,6,25 114:8
**thousand** 6:11 101:8
**three** 72:15,16 108:2
**tile** 73:11
**time** 7:22 8:4,7,9 8:11,18,22 9:12,15,16 11:21 12:25 16:7,13,15 24:8,25 25:4 28:1,22 29:5 33:22 35:20 37:4 47:9,20 55:1,3 63:2 71:12,13 78:7 80:25 81:15 85:9,19 88:8 93:10 95:24 96:5,20 97:7 101:3,7 104:22 105:11 107:22 107:25 109:11 109:22 110:17 110:20 111:5,8 112:10,16 118:8
**time-consuming** 108:6
**timeline** 46:15
**times** 8:2 17:15 21:18,19 89:1 89:2 95:10,14 100:25 110:16
**title** 6:5
**today** 106:11
**told** 14:17 70:12 76:22
**tone** 99:4
**tool** 22:7
**top** 5:22 114:3 115:2
**topic** 48:15
**tornados** 10:6
**tower** 73:25
**TPA** 48:4
**trained** 32:9
**training** 114:17
**transcript** 27:25 28:4 117:3 118:9 119:12 119:17
**transcripts** 26:24 27:1 28:10
**traveled** 9:12
**Travelers** 5:10 5:14,21 6:10 6:16 7:4 8:16 10:7 11:6,10 11:21 13:5 14:4 15:16 16:22,22 17:4 18:3,9 21:7,18
**Travelers'** 10:14
**treated** 84:11 87:1
**treatment** 87:11
**trends** 7:6
**trial** 9:13
**trigger** 21:21
**trim** 66:1,3 67:11 79:25
**true** 30:7 31:7 62:8,14 70:2 74:4 79:12 91:5 92:3 102:7 112:23 118:9
**try** 75:9 98:23 108:10 109:16 110:21 111:10
**trying** 21:4 25:5 51:10 63:7 68:19 88:24 107:24
**Tuesday** 1:18
**turn** 29:19
**turns** 39:14
**twice** 55:4
**two** 6:11 19:2,8 54:22 55:19 73:12 79:9 101:8
**type** 12:13,15 115:9
**typed** 99:3
**types** 16:9,10,14
**typewritten** 118:8

**U**

**unaware** 113:1,6
**underlayment** 13:17 14:3,9
**underpaid** 69:19 70:1,13,24 71:7 76:8
**underpayment** 69:13,22 77:10 77:11,14,22
**underreport** 86:13
**understand** 5:9 5:13 7:20 15:8 22:4 29:10 38:23 56:5 68:20 69:11 73:7 75:14 79:25 113:19
**understanding** 6:15 11:25 12:5,8 16:7 46:22 47:16 53:22 65:1 73:24 74:2 81:23 87:23 88:10 91:16,18 91:19 108:9
**understood** 12:7 90:15
**undertake** 112:8
**undertaken** 18:18 36:14 109:15
**undertook** 110:21 112:24
**unfair** 87:11
**UNITED** 1:1
**unnecessarily** 87:19
**unreasonable** 58:13 111:4
**unreasonably** 67:25
**unresponsive** 100:20
**unstable** 69:3 105:17
**use** 46:4 58:14
**utilize** 11:21

**V**

**v** 119:8 120:3
**value** 45:13 88:12
**variables** 16:19
**variety** 5:14
**various** 40:23 49:10
**vary** 10:15,21
**vent** 51:6 54:20 104:9 106:3
**vents** 51:1 53:10 53:11 54:22 93:16
**verbal** 83:23
**verbally** 4:10 118:6
**verification** 5:1
**versus** 19:5,22 86:1
**vertical** 50:3,22 65:20 66:1 67:11 73:13 79:3,9
**vice** 51:23
**VIDEO** 1:5
**view** 44:23 45:22 49:15 85:16 97:18
**viewed** 78:21
**Village** 2:10
**visibility** 16:1
**visible** 13:7,11 13:14,15,16 14:16 15:18 115:3,8
**vs** 1:11
**vulnerable** 93:14

**W**

**WAGNER** 2:8
**wait** 25:8 92:17
**waiting** 91:7 92:1,19
**waive** 4:13
**wall** 49:17 53:1 55:4 56:6,10 63:18 64:17 65:2,17,20 66:1,4,12 67:14 68:1,3,4

68:6,21 69:4,5 69:19,23,25 70:1,9,14,24 71:10 72:23 84:4,5 85:18 85:20 93:11 103:15 104:17 106:4 114:24 114:25 115:2
**walls** 27:5,8 28:3 49:18 50:5,8 50:23 51:3,8 51:22 52:7 53:2,10 55:24 65:23 66:10 68:8 69:9 72:16 77:24 86:18 87:9 88:1,8,13,14 88:18 89:10,14 90:7 91:6,19 92:2,17 93:7 93:10 94:10 95:10 105:3 115:5,6,14
**want** 30:17 44:20,21 46:8 46:9,10 48:14 50:20 51:17 64:25 65:18 66:2 68:14 69:10,13 70:6 70:11 75:17 78:5 79:4 84:22 91:22,22 91:23
**wanted** 78:20,23 94:21,22
**wants** 20:17
**washing** 17:12 17:19
**wasn't** 39:24 40:2,4 59:17 76:5 83:10 91:8,8,12
92:13 96:13 105:6 110:10 111:3
**water** 58:6 64:8 64:10,14 102:5
**way** 5:20 35:20 40:7,13 42:20 43:19 44:1 68:23 71:4 97:8 107:5,6
**ways** 49:10
**we'll** 65:8 69:15 69:17
**we're** 13:6 20:19 39:8 53:18 54:4 56:5 60:12 61:24 63:24 65:17 66:17 70:8 71:22 104:2 116:8
**we've** 48:13 81:7 92:20
**weather** 10:4 16:19
**went** 88:3
**weren't** 61:17,18 92:9 115:20,25
**west** 37:13 58:5 72:18 74:5,9 74:14 75:2,6 75:20 76:2,3 114:14
**west/east** 72:16
**whatsoever** 109:16 110:21 112:9
**WHEREOF** 118:13
**wildfire** 10:2
**window** 49:17 53:1 56:6,10 65:19 72:22
**windows** 50:23 73:6 74:1
114:13,20 115:16,17,20 115:23,23,25
**winds** 10:5
**wishes** 120:4
**witness** 4:10 116:5 118:13
**word** 111:15,18
**words** 81:2 109:15
**work** 5:18,23 9:17 11:14 18:8 21:15 30:11 41:25
**worked** 5:10,13 11:6,10 21:7
**working** 8:24 11:16,21 13:5 14:4 21:25
**Works** 116:15
**world** 86:12 98:20
**worry** 14:4
**wouldn't** 14:16 14:18 32:14 33:24 35:4 98:1
**Wow** 51:23,24 51:25 113:10
**wrapped** 91:8 91:13,13
**write** 95:15
**writing** 35:3 40:21 42:21 43:16 64:9
**written** 13:1 26:10 35:6 57:7,8
**wrote** 33:20 39:11 80:25 95:25

**X**

**X** 3:1
**Xactimate** 31:22
40:6

**Y**

**yeah** 6:14 18:24 21:1 22:21 28:6 46:23 56:19 73:8 74:24 76:21 87:5 89:8 101:16 102:1 106:13 107:4 109:1 110:15 115:7,13 116:16
**year** 8:10 110:10
**years** 5:20 6:9 8:11 47:9 108:2
**yesterday** 26:20 26:22 28:8,11 30:25 106:21
**York** 8:3

**Z**

**zero** 112:24
**Zoom** 31:16 38:15

**0**

**1**

**1** 57:23
**1:19-CV-2145...** 1:3 119:9
**10** 48:18
**10/10/17** 3:19
**10:59** 48:21
**100** 2:4 9:25 61:10 81:19 119:5
**106** 3:11
**11** 5:20
**11:06** 48:21
**11:51** 78:11
**11:58** 78:11
**110** 105:22
**113** 3:6,9
**12:52** 116:18
**120** 31:20
**12th** 115:7
**14** 1:6,18 116:18 120:2
**141** 3:11 4:2 106:9
**14th** 106:19
**15** 25:6,7,8
**16** 32:24 49:4 57:8 80:19
**16th** 29:20
**17** 74:7 76:17 87:16 90:22 94:6
**18** 26:10,15 33:20 34:3
**18th** 28:18
**19974020573** 118:5

**2**

**2** 57:11
**20** 117:15
**2006** 5:10 6:1
**2009** 6:1,10
**2010** 7:18
**2011** 7:18 8:7,23 9:17
**2016** 6:11
**2017** 45:18,20 49:23 50:9,17 57:3,8 59:19 66:19 71:19 74:7 76:5,17 78:18 80:24 87:22 90:22 91:14,17 92:7 93:8 94:7 95:25 96:10
**2018** 5:10 6:16 8:7,16,23 9:17 18:16
**2019** 29:22 30:2

36:12 37:14 41:1 42:11 44:16,25 45:9 45:20 46:2,17 47:19 59:8,25 60:13,25 61:4 61:20 62:1,7 63:6,12 66:20 76:6 80:2 81:4 81:22 83:10 85:11 87:4 91:13 96:14 103:24 106:19 107:24 108:10
**2020** 1:6,19 26:10,15 28:18 33:20 34:3 116:18 118:14 119:3 120:2,22
**2021** 118:15
**20th** 87:22
**21** 119:3
**21st** 118:14
**22** 41:1
**22nd** 87:25
**23rd** 87:25
**25** 9:11 18:20,24 19:24 20:19 118:15
**25th** 82:6 88:4 105:4
**26** 3:10,16 56:12 77:20
**26th** 82:6
**27523** 118:22 119:1

**3**

**3** 74:20
**3/18** 30:19 33:11 35:17 36:5 93:23 94:3 95:7
**3/18/20** 3:10
**3/18/2020** 71:13
**30** 48:25
**30(b)(6)** 27:5,8 27:11,12,13 28:3
**32** 3:18 71:24
**35** 9:11 119:14
**350** 2:9

**4**

**4** 50:17 64:21 65:10 78:17
**44** 3:9 4:2 113:18

**5**

**5** 3:5
**5/14/19** 3:12
**5/22** 114:9
**5/22/17** 114:5
**5/23** 114:9
**50** 9:14 10:1
**5251** 2:9
**56** 3:16
**5th** 2:5 119:6

**6**

**6/16/17** 3:17
**63** 3:10 4:2
**6th** 83:2 88:19 98:22 99:3 100:13,18

**7**

**7** 88:6,11,16 89:9 90:6
**71** 3:18
**720-556-1109** 119:2
**75** 10:4 19:25 20:2

**8**

**80** 9:14 10:1,4
**80111** 2:10
**80206** 2:5 119:6
**80227** 118:23 119:2

**9**

**9:58** 1:19
**99.9** 23:9,18