# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02145-DDD-NYW

RDA HOTEL MANAGEMENT COMPANY and LAKEWOOD HOTEL COMPANY,

Plaintiffs,

vs.

HUDSON SPECIALTY INSURANCE COMPANY

Defendant.

---

VIDEOCONFERENCE DEPOSITION OF BRENDAN POWERS

---

PURSUANT TO NOTICE, the above-entitled videoconference deposition was taken on behalf of the Plaintiffs on July 10, 2020, at 8:58 a.m. before Lisa R. Erickson, Court Reporter and Notary Public.



APPEARANCES:

Telephonically for the Plaintiff:
Christopher P. Pierce, Esq.
Jeffrey T. Embry, Esq.
Hossley Embry, LLP
515 South Vine Avenue
Tyler, Texas 75702
(903) 526-1772

Telephonically for the Defendant
Colin Campbell, Esq.
Campbell, Wagner, Frazier, and Dvorchak, LLC
5251 DTC Parkway, Suite 350
Greenwood Village, Colorado 80111
(303) 831-5990

EXAMINATION INDEX


| | |
|---|---|
| By Mr. Pierce | Page 3, 140 |
| By Mr. Campbell | Page 131 |


EXHIBIT INDEX


| FOR IDENTIFICATION | | REFERENCE |
|---|---|---|
| Exhibit 14 | Policy | Page 47 |
| Exhibit 32 | Report | Page 81 |
| Exhibit 38 | Estimate | Page 119 |


(Original exhibits with original transcript.)



P R O C E E D I N G S

WHEREUPON, the following proceedings were taken pursuant to the Colorado Rules of Civil Procedure.

* * * * *

THE REPORTER: Will counsel please stipulate that the court reporter is authorized to administer the oath remotely and that no objection to the admissibility to this deposition shall be made based on the validity of the oath.

MR. PEIRCE: Chris Peirce for the plaintiffs, and we so stipulate.

THE REPORTER: Thank you.

MR. CAMPBELL: Colin Campbell for defendant Hudson, and I stipulate as well.

THE REPORTER: Thank you.

BRENDAN POWERS,

having first been duly sworn to state the whole truth, testified as follows:

EXAMINATION

BY MR. PEIRCE:

Q. Could you state your full name.

**A. Brendan O'Rourke Powers.**

Q. Mr. Powers, did you bring any file materials with you here today?

**A. I did not.**



Q. Okay. Did you receive a copy of the deposition notice that was provided for your deposition?

**A. I did.**

Q. And you are aware there's a subpoena duces tecum attached to it?

**A. Right. I do have my file available. I mean, I'm at the office right now, so I guess I took your question to mean, did I bring the file and produce copies of it.**

Q. Oh, no. You have access to your entire file today?

**A. I do, correct.**

Q. Okay. We received whatever file materials you did have previously. Have you reviewed any depositions taken in this case subsequently to producing your file?

**A. Yes. I reviewed the deposition of Kaho Chan, who was, I guess, the primary claim representative, and then David Schwier, S-c-h-w-i-e-r.**

Q. Any other depositions?

**A. Not that I'm recalling.**

Q. You didn't review the deposition of Briana Miller?

**A. No.**

Q. You did not review the deposition of the corporate representative of RDA Management?
**A. No.**
Q. You did not review the deposition of Bill Walls?
**A. Correct.**
Q. And you did not review the deposition of Matthew Sitzmann, although it was taken earlier this week, so I take it you have not?
**A. I have not.**
Q. And as I understand it, Mr. Powers, you're a partner at Spies -- I might be pronouncing it wrong -- Powers, and Robinson; is that correct?
**A. That's correct. Spies.**
Q. I knew it.
**A. It's a German pronunciation.**
Q. Spies, Powers, and Robinson.
**A. Correct.**
Q. And the "Powers" is you?
**A. That would be me.**
Q. As I understand it, the firm does a lot of insurance defense work.
**A. I don't know how you characterize "a lot," but that is certainly a significant amount of my practice. There's a component of the firm's practice**



**that is not related to insurance defense.**
Q. Well, the firm has on its website insurance defense is one of the foundations of the firm; is that true?
**A. Sure, yeah. We also -- I mean, my partner also has a practice that is entirely plaintiff-related.**
Q. And what percentage of your practice is insurance defense?
**A. I would say 90 percent.**
Q. And "insurance defense" is kind of an umbrella term, but how much of that 90 percent is coverage work?
**A. I would regard coverage work as doing specifically a coverage opinion, so coverage work would be probably 15 percent in terms of taking materials and writing a coverage analysis as to whether this set of facts for the loss that's being claimed.**
Q. Got you. And I agree with you, that coverage opinions, basically, is what constitutes that 15 percent of your practice. What about defending insurance companies in first-party actions?
**A. That would probably be -- I don't mean to be too particular, but when you say "defending insurance companies in first-party actions," I think of active litigation versus pre-litigation work. Do you want me**



**to draw that distinction or just use an umbrella?**
Q. I'd prefer umbrella. I mean, defending them pre-suit versus subsequent to suit, that is kind of the same in my mind, so what is that percentage together?
**A. I apologize, Counsel. The distinction I was drawing was that in a lot of my work, I'm not defending the insurance company. I'm assisting them in getting the facts that are necessary to make an appropriate decision. So I don't regard that as defending the insurance company. I regard that as assisting the insurance company.**
Q. How much of your practice is assisting the insurance company, as you determined it?
**A. I would regard that probably as 30 percent of my practice.**
Q. And is that assisting all done pre-suit?
**A. Yeah. That 30 percent would all be the pre-suit work. A lot of the work can transfer over to later litigation.**
Q. And how much of your work is comprised of first-party insurance defense after the suit is filed?
**A. Probably, I'd say, 20 to 25.**
Q. What about third-party claims where the insurance carrier pays your bill? Do you do any of that?



**A. Yes. That would be the remainder of it. So I think probably -- we've sort of created subcategories on the first-party side, which is probably 50 percent of the insurance work. Then the third-party defense is probably another 50 percent of the insurance work.**
Q. So 100 percent of the work for you is paid by insurance companies; is that fair?
**A. No. I apologize. I'm confusing your math. There's 10 percent of my practice that isn't in any way insurance-related.**
Q. Okay. So 90 percent of your practice is paid by insurance companies. Your bill is paid by insurance companies for 90 percent of your practice; is that fair?
**A. That's fair.**
Q. Okay. As I understand it, you in the past have represented Nationwide Insurance?
**A. Correct.**
Q. Country Mutual Insurance?
**A. Correct.**
Q. Valley Forge Insurance Company?
**A. It's part of the CNA Group.**
Q. Okay. A CNA umbrella company you've represented?
**A. Yeah.**

Page 9

Q. State Farm, you've represented?
**A. Correct.**
Q. Progressive Insurance?
**A. Correct.**
Q. Continental Casualty Company?
**A. That is part of -- I forget if they're part of Nationwide or CNA, but yes.**
Q. All right. You've represented Nova Casualty Company?
**A. Yes.**
Q. You've represented Assurance?
**A. Yes.**
Q. You have represented Country Preferred?
**A. Correct. Which is similar to Country Mutual.**
Q. You've represented American Strategic?
**A. Yeah. It's part of Progressive Group.**
Q. You have represented Durrick?
**A. Yes.**
Q. You've represented National Union?
**A. Yes.**
Q. You've represented American Family?
**A. I have not represented American Family.**
Q. Are there any other insurance companies you've represented other than the ones I've listed?
**A. Not that are coming to mind as I sit here.**

Page 10

**I've been doing this for 30 years, so I'm sure there's one or two I've done support for in the past that are not on my radar as I sit here.**
Q. You've been hired as an expert by, first of all, Hudson, right, in this case?
**A. Correct.**
Q. Have you ever done any previous work for Hudson or any AIG company?
**A. Not that I know of.**
Q. You've previously been hired by Allstate as an expert, correct?
**A. Correct.**
Q. You've also been hired by Travelers as an expert?
**A. Yes.**
Q. Are there any other insurance carriers you can think of where you've been hired as an expert?
**A. Not that I'm thinking of. There was a case that I was involved in that I think was a subsection of Travelers, and I'm not remembering the name of the carrier as I'm sitting here. I think that was a subsection of Travelers. It was an aviation loss.**
Q. Okay. I asked a minute ago about any other file materials that you have besides what you've previously produced, and you mentioned the depositions

Page 11

of Kaho Chan and David Schwier. Anything else you've reviewed since producing your file?
**A. Yeah. Before the deposition, I went through some of the existing file materials, but nothing new in new in addition to what I'd have reviewed prior to authoring my report.**
Q. All right. You understand the insurance carrier in this case, Hudson, is represented by Mr. Colin Campbell, correct?
**A. Correct.**
Q. How long have you known Colin Campbell?
**A. Professionally, we probably have met over the years, you know, a dozen times, maybe. This is the first time I think he and I have ever worked on a shared file or together at all, but I've known him professionally a long time.**
Q. How many years?
**A. Oh, let's say casually, 15 to 20.**
Q. Would you consider yourself personal friends with Mr. Campbell?
**A. I would not.**
MR. PEIRCE: Don't take offense to that, Colin.
MR. CAMPBELL: I don't think that was in the spirit in which it was offered, so it's okay.

Page 12

Q. (By Mr. Peirce) In other words, you don't hang out socially with Mr. Campbell in pre-COVID times, did you?
**A. I did not, I did not. There have been seminars that we've both been at and chatted socially then, but that would literally be the extent of our social interactions.**
Q. Are you a member of the Colorado Defense Lawyers Association?
**A. I am.**
Q. Did you happen to meet and interact with Mr. Campbell at any events for the Colorado Defense Lawyers Association?
**A. Certainly.**
Q. You said you've never worked on a case before with Mr. Campbell?
**A. Not that I'm recalling.**
Q. Is he the one that contacted you to retain you in this file?
**A. Yes.**
Q. You never served as co-defense counsel on any third- or first-party case?
**A. Not that I'm recalling.**
Q. What is your hourly rate in this case, Mr. Powers?

**A. I believe it's 400 an hour.**
Q. How much have you occurred and been paid date?
**A. You know, I've not gotten the bill to Colin. I've gotten about 24 hours or 25 hours of work.**
Q. Would that include the time spent reading the depositions of Kaho Chan and David Schwier?
**A. It would not. So the work I did this week would probably add another five hours to that.**
Q. So if I'm doing the math, 30 hours at $400 an hour is $12,000 so far?
**A. Yeah. It would be less than that, but that's the correct range.**
Q. How much less than that?
**A. I apologize. I haven't finished the bill yet because of COVID issues, but it would be a matter of 1,000 or less.**
Q. Okay.
**A. Yeah.**
Q. So around $11,000 occurred so far?
**A. Correct.**
Q. That would include before starting the deposition today?
**A. Right.**
Q. Does your rate change at all for depositions



or appearances at trial?
**A. It does not.**
Q. Mr. Powers, you're not a professional engineer; is that correct?
**A. That's correct.**
Q. You're not a construction expert, correct?
**A. Correct.**
Q. You are not offering any engineering opinions in this case, correct?
**A. I don't intend to.**
Q. You are not a licensed adjustor in the state of Colorado?
**A. Colorado does not license its adjustors, but the answer is no.**
Q. Are you a licensed adjustor in any state?
**A. No.**
Q. You're not an expert in EPDM roofing, are you?
**A. No.**
Q. Do you have any expertise whatsoever in the analysis of damage to a stick curtain wall system?
**A. Beyond the experience of reading engineering reports, no, I do not.**
Q. And you are not intending to proffer any opinions as an expert in the curtain wall system in



this case, correct?
**A. Correct.**
Q. Are you intending to offer any coverage opinions in this case?
**A. Not necessarily. I don't know that there is a coverage issue. To the extent my report touches on what you would regard as coverage issues, then yes. I apologize for equivocating, but when someone says "coverage issue," it depends on what the policy covered, but. . .**
Q. Well, I'm asking from your perspective and understanding as a lawyer of, you said, 30 years?
**A. Uh-huh, yes.**
Q. And as somebody that does this day in and day out, based on your report and understanding of the facts in this case, are you intending to tell the jury about any coverage opinion in your mind?
**A. To the extent my report touches on what you would regard on a coverage opinion, yes.**
Q. Okay. Why do you keep adding how I would regard it? I'm asking how you would regard it. So in this case, anything you would regard as a coverage opinion in this case.
**A. I make -- I have analysis of the coverage in my report. I do not regard the report as a coverage**



**opinion.**
Q. What do you consider a coverage opinion?
**A. To me, a coverage opinion is a question like, take the auto side of things. If there's a person involved in an accident and they want to make claims for benefit under multiple policies, one of the questions that can arise is, does this person qualify as a resident relative of their house.**
**Analysis of how cases have interpreted a certain provision of the policy, you'd take a set of facts and tell the company, I think you should extent coverage or not. But, very often, it's more of a thumb's-up, thumb's-down on a given issue, rather than something more similar to this, where there's a dispute as to the extent or value the loss.**
Q. And there's no dispute that there was hail damage from the May 8, 2017, storm as this property, correct?
**A. Correct.**
Q. You're not offering any opinions as to causation of hail damage to a particular property at the location from the May 8, 2017, storm, are you?
**A. No. My analysis is based on the opinions issued by engineers with specialties in those areas.**
Q. Right. But you, Brendan Powers, are not

saying, Well, I think this window was damaged from hail versus not damaged from hail or I think this other window was damaged from pre-existing issues and not hail; nothing like that, correct?
**A. Correct.**
Q. Are you intending to instruct the jury or the Court on what the law is in Colorado?
**A. I would, in my testimony, make a reference to legal standards that I applied. I think it's up to the judge to instruct the jury as to the law.**
Q. So is the answer, no, you are to not intending to instruct the Court or the jury on what the law is?
**A. Correct.**
MR. CAMPBELL: Object to form.
Q. (By Mr. Peirce) As I understand -- go ahead.
**A. But as you know, my analysis does have a lot of law incorporated into it. But, no, it's not my role.**
Q. Right. That's why I'm clarifying the issue because you do have a lot of case law in your rebuttal report. So that's why I'm asking, are you intending to tell the jury what the law is based on the application of the facts? And I think your answer is that you're just using it as a reference, in particular to industry


standards, but you're not intending to instruct the jury on what the law is?
**A. It is not my role to instruct the jury as to what the law is. That's the Court's.**
Q. As I understand it, you were retained solely to rebut the opinions that were offered by Leslie Anne Buyer; is that correct?
**A. That's correct.**
Q. Is there any particular part of your report where we can look to see the exact opinions you were rebutting or are they scattered throughout your report?
**A. They're scattered throughout the report.**
Q. You did testify you read the deposition of David Schwier, correct?
**A. Correct.**
Q. And he was the corporate representative for Hudson, correct?
**A. Yes. Responding to a 30(b)(6) notice.**
Q. I want to go over a little bit of that testimony and some of the questions asked of Mr. Schwier to see if you agree with some of his answers. I'll represent that he testified that Hudson has a duty to obtain all information relative to the subject claim as promptly as possible. Would you agree with that?


**A. I would qualify that with the word "reasonable." When somebody says "all," that's a relative word. So what is all to you and all to somebody else can be different, so I would have to add the qualifier "reasonable."**
Q. So as I understand it, you would add the qualifier to Mr. Schwier's testimony that Hudson has the duty to obtain all reasonable information relevant to the subject claim as promptly as possible?
**A. They have a duty to make a reasonable effort to obtain available information relevant to the loss.**
Q. Is it your testimony here that Hudson can ignore relevant information subject to the claim?
**A. I wouldn't say they can ignore relevant information, but they, certainly, at some point, have to make a judgment as to what piece of information they're going to use to guide them.**
Q. Mr. Schwier testified that Hudson performs its own independent investigation of covered losses. Would you agree with that?
**A. I would agree that an insurance has an obligation to perform a reasonable independent investigation.**
Q. So, again, you would add the caveat of "reasonable," correct?


**A. Correct.**
Q. Mr. Schwier testified that Hudson has a duty to determine the extent and amount of damages from a covered peril after a claim is reported, would you agree?
**A. I'm sorry. Could you repeat that?**
Q. Sure. Mr. Schwier testified that Hudson has a duty to determine the extent and amount of damage from a covered peril after a claim is reported.
**A. Right. I would, again, add the qualifier "reasonable."**
Q. Where would you add that qualifier "reasonable" to that? A reasonable duty or a reasonable -- I guess, let me reread that.
Hudson has a duty to determine the extent and amount of damages from a covered peril after a claim is reported. Where would you add "reasonable" in that?
**A. They have a duty to make a reasonable effort, followed by the rest of your sentence.**
Q. Your position is that Hudson has a duty to make a reasonable effort to determine the extent and amount of damages from a covered peril after a claim is reported, correct?
**A. Correct.**
Q. Mr. Schwier testified that Hudson is

Page 21

duty-bound to conduct a full, fair, and prompt investigation of the claim at its own expense. Would you agree with that?

**A. Again, I would add the qualifier "reasonable" because when somebody says "full and fair," those tend to be relative concepts. You know, one of the first things we teach our children is that life's not always necessarily fair. What we mean by that, I always thought, was that "fair" was a relative concept.**

Q. So would you subtract "fair" from that testimony of Mr. Schwier?

MR. CAMPBELL: Object to form.

**A. No, I would not. I would add the qualifier "reasonable" to it.**

Q. (By Mr. Peirce) Okay. So let me read it as what I believe you are saying. Hudson is duty-bound to conduct a reasonable, full, fair, and prompt investigation of a claim at its own expense. Would you agree with that?

**A. Or you could say "reasonably fair," "reasonably full." Right.**

Q. A reasonably full, a reasonably fair, and prompt investigation of a claim at its own expense. Would you agree with that?

**A. And reasonably prompt.**

Page 22

Q. Oh, we're going to add "reasonably" to "prompt"?

**A. Right.**

Q. Reasonably full, reasonably fair, reasonably prompt?

**A. Or you could say it's reasonably full, fair, and prompt, but, yes, the qualifier "reasonably" should be added to each of those.**

Q. Everything in that sentence should have a "reasonably" in front of it?

**A. Correct.**

Q. Mr. Schwier testified that if an insured gives notice of hailstorm damage, Hudson has the duty to thoroughly inspect the property for any damage that may have been caused by the peril of hail. Would you likewise want to add "reasonably" somewhere in there?

**A. Right. I would say "reasonably thorough," depending on the circumstances.**

Q. Mr. Schwier testified that Hudson cannot go into a claim looking for reasons to deny a claim before conducting a thorough, unbiased, reliable, and prompt investigation. Would you qualify that testimony in any respect?

**A. I would qualify the adjectives at the end, but to premise the statement with the idea they shouldn't go into an investigation looking for reasons to deny coverage, I would agree with.**

Page 23

Q. But you would add the qualifier "reasonably" to "investigation," I guess?

**A. Right, right. To the adjectives you used at the end of your statement.**

Q. Did you actually review Hudson's internal claim handling guidelines?

**A. I did not.**

Q. Do you recall what, if anything, they said about what kind of investigation they expect their adjustors to perform?

**A. Having not reviewed them, the answer is no to that.**

Q. Do you think that's kind of important for your determination of whether they acted within their own guidelines?

**A. That's not -- that is not particularly pertinent to my analysis, so I didn't feel that was a necessary step in my analysis.**

Q. Is it your testimony to this jury that an insurance company should operate within the framework of its own guidelines?

**A. I'm not testifying to a jury. I'm responding to your questions in a deposition pursuant to a notice, but a condition is to follow the guidelines, yes.**

Page 24

Q. Will it be your testimony this jury, if asked, that an insurance company should follow its own guidelines in the adjustment of claims?

**A. They should make a reasonable effort to follow their guidelines in the adjustment of a claim. However, if the claims are contrary to the standards in a given state, they should ignore that guideline and respond appropriately to the standards that apply to the given state.**

Q. Would you expect an adjustor for Hudson to have the guidelines for a particular state, say, Colorado, in their file materials or access to them?

**A. When you say "file materials," do you mean in the claim file?**

Q. I mean, access to them. So if Kaho Chan, for instance, gets a Sheraton Denver West hail claim, he can pull up the Colorado guidelines and ensure that he complies with them. Would you expect that effort to be made?

**A. He should pull up the guidelines if he encounters a question that he has. If the question is, should he look up the Claim Settlement Practices Act as it applies to Colorado before he starts adjusting the claim, I don't know that that's necessary before.**

Page 25

Q. I don't mean before. I mean, during the entire process in order to ensure he's doing everything right.
**A. Sure. If a question comes up, meaning --**
Q. Right. But how does he know a question comes up if he doesn't know what the guidelines are?
**A. Meaning, that. . .**
Q. Meaning, if he's never it pulled up, he's never looked at the guidelines, how does he know he's complying with the Colorado guidelines or industry standards if he doesn't know what they are?
**A. What I mean to say is if he encounters a deadline, if he encounters a question concerning Colorado's approach to the Unfair Claims Settlement Practices Act, then, yes, he should consult that. But, typically, the claims rep has a general idea of the guidelines that will apply to the process. And, frankly, guidelines are the reasonable standard in Colorado.**
**So the idea that the claim reps are constantly looking up the Unfair Claims Settlement Practices Act is an unrealistic perspective of how a claim gets handled.**
**There are times when, be it in seminars or be it in meetings, that insurance companies make reference**

Page 26

**to the Unfair Claims Settlement Practices Act, and the claims representatives generally should have an awareness of it.**
**But it is uncommon for claim representatives to need to access those resources during the course of a claim investigation and adjustment.**
Q. Because they should already know the general guidelines, right?
**A. Sure, yeah.**
Q. Do you recall what Kaho Chan testified to with regard to guidelines in Colorado?
**A. As I understood his testimony, it was that he had not consulted those guidelines in conjunction with this particular claim.**
Q. Do you know if he consulted those guidelines prior to this claim based on his testimony?
**A. I don't remember the question being phrased that way, but I don't know, is the answer to that question.**
Q. Are there any time-specific guidelines in Colorado for the handling of a claim of this nature?
**A. There is an insurance reg that has a 60-day deadline for a decision. Unless there's a fairly debatable question associated with it, it's 5-1-14 Section 4. Unfair Claims Settlement Practices Act uses**

Page 27

**the reasonable standard. The policy has a deadline when a sufficient proof of loss has been submitted.**
Q. Anything else?
**A. Not that comes to mind right now.**
Q. And you said the 60-day requirement is based on unless there's an unreasonable debate? Is that what you said?
**A. Unless there's a fairly debatable issue.**
Q. Is that fairly debatable issue codified?
**A. No. It's in case law.**
Q. Okay. What is your understanding of what the case law says constitutes a fairly debatable issue?
**A. Whether it is fairly debatable, whether a claim loss is covered by the policy, including the coverage grant, the exclusions, and also the circumstances of the loss, meaning did the loss occur within the policy period, and is it of a nature that is covered by the policy.**
Q. Okay. But if there is no dispute that there's coverage, does that 60-day deadline apply?
**A. I mean, that's why -- I thought I had qualified the work "coverage." There very often are times when it's not necessarily a technical coverage. It is simply a matter of additional facts are necessary to comply. Whether what is being claimed, if the**

Page 28

**policy affording the coverage for what is being claimed or whether the policy affords benefits for what is being claimed. So I mean to capture in that response that, very often, it is necessary to gather additional information before the insurance company can take a position.**
Q. If the insurance company has all the information necessary to render a decision, then that 60-day time period applies, correct?
**A. Sure.**
Q. Did you read the policy applicable to this case?
**A. I did.**
Q. You understand the policy ensures for direct or physical loss or damage from hail?
**A. Correct.**
Q. Do you believe it is reasonable for Hudson to determine coverage for hail damage based on a definition of hail not included in the policy?
**A. I apologize. I don't understand the question.**
Q. Sure. If Hudson went out to the property and operated off a definition, as an example, they thought hail damage was cosmetic in nature, but it was hail damage, is it proper and reasonable for Hudson to use

such a definition that is not in the policy to determine coverage?

**A. If the policy defines a term, then the term should be according to the policy's definition of the term. If it does not define a term, then the general standard is to use the common meaning of a phrase.**

Q. I'm sorry, Mr. Powers. You are cutting in and out a little on my end.

MR. PEIRCE: Is everybody else hearing that?

THE REPORTER: Yes.

MR. PEIRCE: Lisa is.

Q. (By Mr. Peirce) I didn't quite catch all of that last answer.

**A. If a term is not defined by the policy, its common usage should apply, meaning the commonly accepted use of a term or a word. But if the policy defines the term, you should follow that definition.**

Q. Regardless of that fact or irregardless -- I understand that's a new word -- Hudson shouldn't operate off a definition that is completely not in the policy, correct?

MR. CAMPBELL: Object to form.

**A. Well, I think if there's a term or expression used in the policy that is not defined, then what should be applied is the commonly understood meaning of**



**the word or expression.**

Q. (By Mr. Peirce) Let me give you an example, Mr. Powers. If an engineer was using functional damage, the property had to be functionally damaged, impaired the function of the property, in order for him to consider that hail damage, is that a proper application of the policy's provision in this case?

**A. Yes, is the short answer. But it sort of depends on what item you're talking about, whether the analysis begins and ends with that definition or whether there are other issues to consider in that.**

Q. Okay. So your testimony, if asked, to this jury, will be that it's appropriate for Hudson to apply a definition of damage from hail that is not contained within the policy in certain circumstances?

MR. CAMPBELL: Object to form.

**A. That is not my testimony.**

Q. (By Mr. Peirce) Okay. So I'm having a disconnect understanding your testimony because, for example, let's use the substrate of the EPDM roofing. If the evidence were to show that it was dented from hail and the engineer Hudson retained determined it was dented from hail from this storm, but opine that it wasn't functionally damaged, you believe that the proper application of the terminology is under Hudson's



policy here?

MR. CAMPBELL: Object to form.

**A. With regard to the substrate, is the short answer, right (audio interference) is that --**

Q. (By Mr. Peirce) I'm sorry. You cut out.

**A. With regard to the substrate, functional evaluation of the damage is appropriate.**

Q. Okay. Mr. Powers, is the word "functional" or "function" contained anywhere in the Hudson policy in this case?

**A. I have not done a word search as to whether the word "function" is in there. It might be. But in** terms of the issue about direct physical loss (audio interference) the word "functional" in there.

THE REPORTER: What?

Q. (By Mr. Peirce) You, what? I'm sorry. You cut out again.

**A. I don't remember the word "function" being in there with respect to a definition of direct physical loss. Whether the word "function" appears somewhere else in the policy later, I don't recall that.**

Q. Did you say you would read "function" into that definition?

**A. No. I was saying -- I think one of the disconnects is you want to switch from how a word means**



**to using the definition you should use, right, so sometimes a definition isn't the right word to be using, but it's what's the intent of the word.**

Q. What wording in the policy supports your position on the substrate example I just gave you?

**A. I don't believe there's a direct physical loss to the substrate when there's a hail dent because the nature of the alteration of the substrate doesn't alter the purpose of the substrate. The substrate is not a visual finish item. You can have physical alterations of property that are not necessarily damaged and not necessarily compensable damage.**

**So if you have no functional issues with the roof, normal set of circumstances -- one of the issues in this case is the deferred maintenance issue -- it would be unlikely that the insured would go up there at any time without any leaks and start cutting holes in the roof to see whether, over the years, there might be some alteration of the substrate.**

**The purpose of the substrate is not to be visual. It's not to be anything other than to enhance the performance of the roof itself. Does that answer the question?**

Q. Not really. I'm sorry. So your testimony a minute ago -- correct me if I'm wrong -- is you

Page 33

admitted it had been physically altered, but it didn't cause physical loss or damage in that hypothetical?
MR. CAMPBELL: Object to form.
**A. Right. You can have a physical alteration of a component of a roofing system that I would regard as direct physical loss (audio interference) benefits under the policy.**
Q. (By Mr. Peirce) You are cutting out at certain times where there's qualifiers and phrases.
MR. PEIRCE: Lisa, are you still hearing him cutting out on occasion?
THE REPORTER: Yeah. It cut out after he said, "What I would regard as direct physical loss." It's breaking up a little bit.
MR. PEIRCE: So if you need --
THE DEPONENT: Let me try turning down my volume. Maybe that's the cause. Let's try that.
THE REPORTER: Okay.
Q. (By Mr. Peirce) So, Mr. Powers, what would be the purpose of the functional loss provision of the policy if you're just going to operate off that anyway?
**A. I don't understand.**
Q. In other words, what is the distinction between having a policy that just says any direct physical loss or damage versus a functional requirement

Page 34

in a policy, such as a cosmetic exclusion or a cosmetic endorsement?
**A. Sir, are you asking why some policies have a cosmetic qualifier?**
Q. No. I'm saying, what's the difference? If you're going to use and operate off of that definition anyway, why would you need it in a policy that says anything more than any direct physical loss or damage?
**A. Let's try it this way. I think I'm being -- so say there's an exterior downspout that is visible on the building and that's hit by hail. Because that downspout serves an aesthetic purpose in addition to that, the downspout is serving two functions, right?**
**It is wicking water away from the building or moving water away from the building, but it also needs to be appropriately aesthetically pleasing for the building or at least consistent with the rest of the building finishes.**
**So you have -- the gutter is still functioning, but because its purpose is also finishing detail on the building to make its appearance consistent, then that would be direct physical loss.**
Q. So is it fair to say you're interpreting what direct physical loss or damage means under this policy?
**A. I am telling you that's the -- it's my**

Page 35

**understanding. And I think that's the common understanding of the expression "direct physical loss."**
Q. It's not just direct physical loss, though, right?
**A. I think it is.**
MR. CAMPBELL: Object to form. Yeah.
Q. (By Mr. Peirce) Mr. Powers, the policy says any direct physical loss or damage. Would you read that to mean any damage as well?
**A. Yes.**
Q. Okay. So if the policy says any direct physical loss or any damage, then that would not be consistent with what you just described, correct?
MR. CAMPBELL: Object to form.
**A. Sir, are we back to the substrate?**
Q. (By Mr. Peirce) No, just in general. Well, let me backtrack. Mr. Powers, does the policy define any direct physical loss or damage?
**A. Not to my knowledge.**
Q. What about an HVAC unit that's dented but still operating? Is that covered under the terms of the policy?
**A. I guess the way I'll answer is, it depends on what's damaged. If it's a component cover, you can if you want, replace the cover.**

Page 36

Q. I'm not asking if you can or not.
**A. But you wouldn't replace the entire unit because there's some dimpling on a cover. You would replace the cover.**
Q. Okay. So just to be clear, if there's a cover that has eight hail strikes that are clearly caused from the date of loss within the terms of the policy, your position is you wouldn't replace the entire unit itself, correct?
**A. Correct.**
Q. Would you agree with me that that dimpling is any physical loss or damage?
**A. Can you repeat that? I'm sorry.**
Q. Sure. If there's hail strikes to an HVAC unit that causes dimpling but does not impair the function of the unit, you would agree with me that that dimpling constitutes any physical loss or damage under the terms of the policy?
**A. Is the question, does the dimpling constitute direct physical loss or damage?**
Q. Correct.
**A. It can.**
Q. Well, what does that mean, Mr. Powers? It can or it does? If Hudson determined -- let me make clearer it for you.

If Hudson determined that eight dimple marks in the HVAC unit were caused by the May 8, 2017, storm, is it your testimony that that constitutes any direct physical loss or damage under the terms of the policy?
**A. I would answer, it can be, right? That's up to the insured to decide if the insured wants to replace that element.**
Q. So it's just up to the whims of Hudson whether they decide on a particular day whether they want to do it or not?
MR. CAMPBELL: Object to form.
**A. I said the insured.**
Q. (By Mr. Peirce) Oh, so Hudson should pay for that as direct physical loss or damage? Is that your testimony?
**A. If the insured replaces it, they are paying for that replacement.**
Q. Sure. In an RCV context, if they replace that unit, then yes full RCV replacement. Should Hudson allow for that to be any physical loss or damage under the terms of the policy if dimpling was caused by the May 8, 2017, hailstorm?
**A. To the covers we're talking about, right?**
Q. Yeah. Should Hudson apply full RCV coverage should the insured replace the unit based on the



dimpling alone, where the unit has not been functionally impaired?
**A. No. When you say "unit," you mean the entire unit, correct?**
Q. Yeah. If it's -- I mean, give me an example of something that would have dimples where you would not replace it.
**A. Right. So if there was a vent cap, you wouldn't replace the vent; you would replace the vent cap. If you have dimpling on -- it presupposes that it is understood that all the dimples relate to the date of loss, so I'm assuming that in my answer.**
**But if there's an HVAC unit with fin damage that can be combed out, they should comb out the fin damage. If there's dimpling on a vent cap, you will replace the vent cap, but you would not replace everything else associated with the vent.**
Q. All right. Let me make it simpler, maybe something that the jury could understand. If I came to your office right now or wherever your car is parked and I banged eight dimples in your hood with a golf ball, would that be any loss or damage in your mind if the car still functioned?
**A. That's a good example because I have this beat-up Subaru that I've been driving because I have**



**these really old dogs, and the hood needs to be replaced.**
**If I get eight hail dents, the car itself is -- it's not a well-kept car, so I think in that case, the answer is no, right, because the hood was in need of replacement before the loss occurred.**
Q. Okay. Take an example of one not dented previously, and I go --
**A. But you asked me about mine though.**
Q. Okay. Well, now I'm moving on from that now, Mr. Powers.
**A. Okay.**
Q. I'm asking about a clean-hooded car, it sustains eight dimples, and your testimony is that that does not constitute physical loss or damage?
**A. Well, I think the answer is it depends on the circumstances, right, your need to change the hypothetical or facts of the hypothetical because of the response really illustrates the point, right?**
**So in that situation, if my brand-new car is in a hailstorm with eight dimples on the hood that are visible, at that point, my car does have -- the hood is serving both the aesthetic purpose of protecting the engine and helping the aerodynamics, I assume. Also, there is an aesthetic component to this. It was not in**



**need of replacement prior to the hail loss.**
Q. Do you remember what I asked though?
MR. CAMPBELL: Object to form.
**A. When?**
Q. (By Mr. Peirce) I'm sorry?
**A. Asked me when? Just now?**
Q. Yeah. The question that you just answered, do you remember what the actual question I asked was?
**A. I think the question was, is eight hail** indentations to a brand-new car hood (audio interference) loss?
Q. I'm sorry. You broke up. What was the last part?
**A. Is that direct physical loss?**
Q. Or damage. Do you consider that any direct physical loss or damage? And I think the answer was, it depends, and then you went on a spiel about the aesthetic nature of it.
The question was fairly simple, I thought, and that was, does that constitute any direct physical loss or damage?
**A. Right. I was trying to explain why that would be direct physical loss or damage.**
Q. So is your answer, it would be? I don't need you to explain. We can talk about that later, but you

Page 41

do believe that would be direct physical loss or damage, correct?

**A. Yes. With the qualifiers in my prior responses.**

Q. Okay. You understand that Bill Walls was the only adjustor that inspected the property for Hudson in 2017?

**A. Correct.**

Q. Do you believe it would be reasonable for Bill Walls to operate off of a definition of hail that was not contained in the policy?

MR. CAMPBELL: Object to form.

**A. I don't regard the role Bill Walls was to incorporate the task you included in your question. So I think Bill Walls goes out and gathers information and communicates that information, and he may communicate an understanding of a general understanding of the policy, Here's what I'm finding out at the site. But it's been the assigned claims representative's obligation to apply the facts to the coverage or to the policy.**

Q. Well --

**A. So I think it helps Bill Walls if he has a working understanding of generally what the insurance industry thinks that expression means, but because of**

Page 42

**the company's position, that's the insured's position.**

Q. Yeah. And what substantive discussion after reading Kaho Chan's deposition occurred between Bill Walls and Kaho Chan about the substance of what he found, if any?

**A. Do you mean beyond what is reported to the company in his reports?**

Q. Beyond the e-mails and reported in the Cunningham Lindsey report, are you aware of any substantive discussion about what is covered versus not covered between Bill Walls and Kaho Chan?

**A. Not that I am aware of.**

Q. Don't you think that's a little bit important if you're making a decision as Hudson Insurance Company to make sure that the proper application was done?

**A. I don't understand the question.**

Q. I mean, so if you blindly adopt whatever Bill Walls said was hail damage and just say, I trust Bill Walls, do you think that's sufficient from Hudson's standpoint?

**A. Well, that wasn't the question. Your question was, had there been --**

Q. Go ahead and answer that one and then we can get back to the other one.

**A. I'm sorry. You cut me off. Could you**

Page 43

**rephase the question or repeat it or. . .**

Q. Sure. If Hudson is relying on Bill Walls to be the boots on the ground to analyze what was hail damage from the May 8, 2017, storm, and Bill Walls sends a report of damage, and then he sends an e-mail to Kaho Chan, do you think it's proper for Kaho Chan to simply adopt whatever Bill Walls found?

MR. CAMPBELL: Object to form.

**A. I apologize, Counsel. I don't mean to be difficult, but when you say, just adopt whatever was found, what are you referring to?**

Q. (By Mr. Peirce) Well, have you reviewed what was sent by Bill Walls to Kaho Chan?

**A. Yes.**

Q. Okay. What was sent by Bill Walls to Kaho Chan?

**A. I would have to go back and do the inventory of what was sent.**

Q. Do you not recall what was sent to Bill Walls to Kaho Chan?

**A. I can certainly go through his report, and we can itemize it.**

Q. Sitting here now, do you recall what was provided by Bill Walls to Kaho Chan?

**A. Yes.**

Page 44

Q. What as provided by Bill Walls to Kaho Chan, based on your recollection?

**A. A general description of what his activities were, of the damage he observed, the grafts he took, and the damage that the building engineer and manager observed.**

**Now, all that is in conjunction with being conducted by Haag, right, so the information from Walls doesn't exist in a vacuum, right? They have him onboard right away, even, I think, before Walls completes his investigation (audio interference).**

Q. I'm sorry. You cut out. Say that again, the last part.

**A. The Walls inspection doesn't exist in a vacuum, right? You also have the Haag Engineering information coming in. You know the Haag information is coming in. And we also have this thing saying, We're going out, and we have our own restoration contract with BluSky and we're obtaining estimates from contractors we may be using.**

Q. Okay. There's a lot to unpack. Are you done? This is far from the question I asked you. I don't mean to cut you off. I'll let you get your speech in, but we can break that down -- I think it will be simpler -- instead of letting you go and me

asking you 700 questions about it. So let's go to the chronology of what happened.
MR. CAMPBELL: Chris, can I make a suggestion at this point?
MR. PEIRCE: Sure.
MR. CAMPBELL: We are losing occasional words from you, Brendan. I'm sure it's probably making Lisa's job more difficult. I'm wondering if it might improve things if you were to mute your computer and call in by phone to the Zoom conference and maybe have a better connection that way.
THE DEPONENT: Certainly. How do I do that?
MR. CAMPBELL: The invite should have a phone number that you can call in for a phone connection.
MR. PEIRCE: Colin, do you mind if we take a break while he does that?
MR. CAMPBELL: Yeah. That's appropriate to do that. I'm just thinking we're losing efficiency because, I mean, we're all having the same experience, losing words here and there from Brendan. It would be nice to be able to get a better connection. Yeah. Let's take a break in the meantime.
MR. PEIRCE: Okay.
(Recess from 9:57 a.m. to 10:06 a.m.)
Q. (By Mr. Peirce) Okay. Mr. Powers, I want to



go back to a couple of questions I was asking about the definition of any direct physical loss or damage. I understand your testimony to say that if one component of a unit, for example, is damaged, but another is not, that the policy doesn't read to mean that you get a replacement of the entire unit; is that fair?
**A. I think so.**
Q. Okay. But what about the example earlier you were using about the substrate with dents? I believe your answer -- and correct me if I'm wrong -- was that, just because it has dents from hail, it doesn't mean you get a new substrate and you replace the roof; is that correct?
**A. Right. Because the substrate is a component of the roof, right, so the roof itself is still functioning. And we're talking about the substrate underneath the rubber EPDM. So that is still functioning. I don't think that falls within the policy or within the intended meaning of direct physical loss or damage.**
Q. Okay. But the only way to get an undented substrate is to rip it out and apply a new one, correct?
MR. CAMPBELL: Object to the form.
Q. (By Mr. Peirce) And I'm not trying to be



facetious. That's the only way to get an undented substrate, correct?
**A. Sure.**
Q. I'm going to share my screen with you, Mr. Powers. Can you point me in the policy why do you believe that would not constitute any direct physical loss or damage.
Can you point to me in the provision an example of the rationale in the policy you were using to come up with that? And if you have the policy in front of you, it would probably be easier. It's Exhibit 14 to your deposition.
**A. Yeah. I'm not able to scroll through it if you display the screen.**
Q. Do you have a copy of it you can access to display in front of you?
**A. I do.**
Q. Feel free to scroll through, and maybe you can just tell me what page you're on.
**A. All right. Hold on. One answer to your question, I'm going to leave out exclude causes like shrinkage and separation and those types of things. I understood your question not to be speaking to those, correct?**
Q. With regard to the substrate. My question



was directed to the substrate example we were talking about earlier.
**A. Right.**
Q. Whatever you're using to say it doesn't warrant any physical loss or damage, that's what I'm trying to understand.
**A. Right.**
Q. And if you could just point me to whatever provision you are using to make that opinion.
**A. Right. What I was saying was, I am leaving out stuff like wear and tear. The policy sort of confirms -- does not define that expression.**
**There's a roof evaluation endorsement to be considered, but I don't think that responds to your question. So that puts us back to a reasonable understanding of the expression, meaning the general meaning of the expression would be reasonably understood to be.**
Q. All right. Mr. Powers, are you aware that my clients reported this storm damage on May 22, 2017?
**A. That's when they notified Hudson.**
Q. Yeah. And are you aware as part of the reporting the property loss notice included that my clients were reporting a major hailstorm that caused damage to its roof and windows?

Page 49

**A. Yes. There's more to the notice than that, but those elements were included.**
Q. Right. And Hudson had possession of the property loss notice. You saw that after reading Mr. Schwier's and Mr. Chan's depositions, correct?
**A. Correct.**
Q. In other words, those were facts reported by RSA to Hudson through its agents, etcetera, correct?
**A. Correct.**
Q. Did you review the testimony of Mr. Schwier and Mr. Chan about how long Mr. Walls spent conducting his investigation of the damage?
**A. I did.**
Q. And what did you understand to be the amount of time spent looking at the damage?
**A. The testimony is a little confusing, but I understood it to be three hours.**
Q. The actual inspection, I'll represent to you, was testified to Mr. Walls as 1.8 hours. I'm talking about when he's going around inspecting for damage, not when he's sitting in a room, you know, at a hotel conference room or something. But actually looking for damage was 1.8 hours. Do have any reason to dispute that?
MR. CAMPBELL: Chris, is your inspection

Page 50

specific to his first visit to the property?
MR. PEIRCE: Yeah. When he went out there on May 25, 2017.
Q. (By Mr. Peirce) Do you have any reason to dispute he spent 1.8 hours?
**A. No. I didn't understand your prior question to be prefacing that, but, sure, I remember that testimony.**
Q. And do you recall any testimony about whether Mr. Ulrich, the building engineer, was with Mr. Walls the entire time he was there?
**A. I don't recall Mr. Ulrich being there the entire time he was there.**
Q. So out of the 1.8 hours that Mr. Walls was there, your understanding is that Mr. Ulrich was not with him that entire 1.8 hours, correct?
**A. That's my understanding.**
Q. You have not reviewed the deposition testimony from Mr. Ulrich, correct?
**A. Correct.**
Q. You don't know with regard to his duties at the hotel or what his knowledge was of damage from the storm, correct?
**A. Well, I know he's a building engineer.**
Q. Well, you're familiar enough with insurance

Page 51

claims that you understand that because you're a building engineer, it doesn't mean you're a licensed engineer for one, correct?
**A. Not necessarily.**
Q. In other words, that's a common term used for somebody that does odd jobs at a hotel; is that fair?
**A. I would completely disagree.**
Q. Okay. A building engineer doesn't do odd jobs at a hotel?
**A. They may do odd jobs at a hotel, but you described that as being the extent of their job description, and that would be contrary to my experience. That would be contrary to the manner in which he was presented to Hudson. They didn't say, Here's our --**
Q. What do you mean -- I'm sorry. To clarify, what does that mean, the way he was presented to Hudson? How was he presented to Hudson? To whom and how?
**A. Right. He was not presented as janitorial staff. He was presented as the building engineer, with -- the individual who would have the knowledge of the building's history.**
Q. Okay. Where was that relayed to Hudson, that last part of your statement?

Page 52

**A. Well, I understood that to be the way --**
Q. Mr. Powers, I'm not trying to quibble with you, but I'm specifically asking, do you recall that or do you just believe you saw that somewhere?
**A. What I'm speaking to is he was introduced as the building engineer, correct?**
Q. Right. And you added, with full knowledge of the building's history, which is what I'm asking you specifically about.
**A. Okay. If you would, let me finish.**
Q. I am. I'm just trying to get you to answer the question.
**A. Your description of the building engineer was that he was maintenance staff and nothing more, and that was not expressed to Hudson in any way, shape, or form. This is a complex building, a large commercial building. They've got an engineering staff.**
**So I did not understand his role to be that of a maintenance man, as you described him, nor was that ever explained or suggested to Hudson or Mr. Walls that he's just the maintenance guy.**
Q. Are you done?
**A. Yes.**
MR. PEIRCE: Objection, non-responsive.
Q. (By Mr. Peirce) Did Hudson ever ask --

Page 53

MR. CAMPBELL: Chris --
Q. (By Mr. Peirce) Did Hudson ever ask you --
MR. CAMPBELL: Chris -- Chris, please.
MR. PEIRCE: I'm sorry. Go ahead, Colin. What do you need to do?
MR. CAMPBELL: Yeah. I will object to your reference that the answer was non-responsive. I think it was responsive. As you and I have discussed in prior depositions, I don't think it's appropriate for you to move to strike deposition testimony.
MR. PEIRCE: I don't think I moved to strike. I think I preserved a non-responsive answer objection under the Federal rules, but anyway --
Q. (By Mr. Peirce) Mr. Powers, did Hudson ever ask what the experience level of Mr. Ulrich was?
**A. I saw nothing in the file that had that expressed.**
Q. How long was Mr. Ulrich at the hotel prior to the May 8, 2017, hailstorm?
**A. I believe it's in the file, but I'm not recalling the details.**
Q. How long was he there after the May 8, 2017, hailstorm?
**A. I know he had left by the time the Aguilar estimate was presented, but I don't know what the time**

Page 54

**frame is after that.**
Q. What was his experience prior to becoming building engineer at the hotel, to your knowledge?
**A. I don't know that.**
Q. Do you know if Mr. Ulrich ever repelled off the outside of the building at any point in time?
**A. Not to my knowledge.**
Q. Do you know if he conducted any repairs on the outside exterior of the hotel at any point in time?
**A. Well, we do know repairs were made. I don't know who made those repairs, being post-loss repairs.**
Q. So the --
**A. I would expect that his feet, meaning the person filling that role, has that information or access to the information.**
Q. I'm sorry. I'm not trying to interrupt you. I'm just trying to get a straight answer. Is the answer that you don't know if he did any repairs to the exterior of the building, then?
MR. CAMPBELL: Object to form.
**A. Right. I answered --**
Q. (By Mr. Peirce) I got your qualifiers in the previous answer, but the answer is you don't know one way or another, correct?
MR. CAMPBELL: Object to form.

Page 55

**A. I don't know, subject to the response I previously gave you.**
Q. (By Mr. Peirce) Okay, you don't know. You don't know, but the building -- first of all, let me backtrack.
Did anybody work under Mr. Ulrich in the relevant time period from the date of the storm to three years prior to the storm, to your knowledge?
**A. I don't know that detail.**
Q. Are you aware of anyone that was employed by the hotel that ever made repairs to the exterior of the hotel?
**A. Yes.**
Q. Who made the repairs and when?
**A. We don't know that or, at least, I don't know that because in the materials I reviewed, the information that had been requested of the insured was not provided.**
Q. So how do you know that employees of the hotel made repairs to the exterior of the hotel?
**A. Because there was evidence of repairs to the exterior of the hotel when the post-loss inspections were conducted.**
Q. Logically, how do you know the employees did those repairs as opposed to a third party?

Page 56

**A. Well, when you said employees making repairs, I would understand that question to be if the employee is able to have the expertise, they'll do the repair, and if the employees needed to hire a contractor to do that, then they hire a contractor to do that.**
Q. The question was specific as to the employee of the hotel, not a contractor hired by the hotel. With regard to employees of the hotel, do you have any knowledge whether any employee of the hotel ever performed repairs?
MR. CAMPBELL: Chris, can I make a request?
MR. PEIRCE: Sure.
MR. CAMPBELL: Can you pull down the screen --
MR. PEIRCE: Oh, sure.
MR. CAMPBELL: -- so that you and Mr. Powers can see each other? I think that will help minimize the speaking over each other, which has been going on here for the last few minutes.
MR. PEIRCE: Okay.
Q. (By Mr. Peirce) Did you understand my last question?
**A. Yes. I don't know whether employees were doing that or if that work was done at the supervision of an employee, but the work was done.**

Page 57

Q. Did Mr. Walls look at any of the curtain wall systems or exterior windows when he inspected on May 25, 2017?

**A. I don't know the answer to that question.**

Q. Would it be reasonable for Mr. Walls to inspect the windows of the hotel after the hailstorm was reported by RDA?

**A. Not necessarily.**

Q. Would it be reasonable for Mr. Walls to inspect the roof level of the hotels after roof damage was reported by RDA from the hailstorm?

**A. It would depend. Here, I understood that he did inspect the roof elements.**

Q. What is your understanding of the inspection of the roof elements that you believe Mr. Walls did on May 25, 2017?

**A. That he viewed the roof, he listened to and gathered the information available from the insured, and that Haag Engineering was coming out to inspect the roof.**

Q. Did Mr. Walls -- first of all, how many roof levels are on the hotel, to your knowledge?

**A. I think in terms of two, but I don't know.**

Q. Okay. Are you aware there are four levels of roof to the hotel?

Page 58

MR. CAMPBELL: Object to form.

**A. Well, I think you and I are you understanding the word "levels" differently.**

Q. (By Mr. Peirce) Okay. How do you define levels of a roof?

**A. Planes.**

Q. Planes. So you believe there's only two planes?

**A. There are two primary planes to the roof. Now, there are finished details, right, so. . .**

Q. I don't know what you're referring to.

**A. Right. So do you consider the overhang to an entrance to be a plane?**

Q. So I'm not trying to quibble with you. J.S. Held and the experts retained by Hudson acknowledge that there are four roof levels. That's the mezzanine roof level, the tower roof level, then two penthouse plane levels of the roof.

I'm not trying to trick you, Mr. Powers. I'm just saying that's what's been acknowledged as four roof levels to this hotel.

**A. Okay.**

Q. And are you aware of how many roof levels Bill Walls actually went up on when he inspected the hotel?

Page 59

**A. I do not know.**

Q. Do you know what the extent of Mr. Sitzmann, the engineer hired in 2017 by Hudson, what the extent of his inspection consisted of?

**A. Not as I sit here, other than what's described in his report.**

Q. Would it be reasonable for Mr. Sitzmann, if he was inspecting potential damage from the hailstorm, to look at all levels of the roof?

**A. It would depend on the information from the insured when he goes out there.**

Q. But I thought you agreed with me earlier that Hudson had an independent duty to investigate the loss after roof damage was reported?

**A. Right. But think of the investigation as a progressive process, right, so when Walls goes out there, as I understand his role, it's not to come up with the definitive statement of, this is covered and this is not covered. Rather, he is there to get some understanding of the loss, some understanding of what is going to be necessary to the investigation, and what the extent of the claim of the investigation is going to be.**

**So he would meet with the insured and get information from the insured as to the nature of the**

Page 60

**loss where the insured is experiencing problems. He knows that Haag is coming out. But I don't view that initial inspection as the beginning and end of the process.**

Q. Okay. Talking about the process, how many times did any representative of Hudson inspect the hotel in 2017?

**A. I believe it was twice, but --**

Q. But that --

**A. Let me finish.**

Q. All right. It feels like you're done answering, and then you start a new sentence. I don't mean to talk over you; I really don't. Go ahead.

**A. That's fine. Do you consider Haag, when you ask that question, to be a representative of the company?**

Q. Yeah. Anybody hired by Hudson in 2017, how many times did they inspect the hotel for hail damage?

**A. My understanding was three times in 2017.**

Q. Okay. And that would be who?

**A. Walls twice and Haag.**

Q. When was the second time Walls went out after May 25, 2017?

**A. I believe he was present for the Haag inspection.**

Page 61

Q. Would you consider that a separate inspection done by Mr. Walls if he was with Mr. Sitzmann when Mr. Sitzmann was doing his inspection?
**A. Yes. Why wouldn't you?**
Q. Do you know if Mr. Walls would have inspected other portions of the property other than what Mr. Sitzmann was analyzing on June 7, 2017?
**A. I don't know the answer to that.**
Q. So, in other words, if Mr. Walls simply just stood next to Mr. Sitzmann the entire time Mr. Sitzmann was looking at it on June 7th, would you consider that a separate independent examination of the property by Mr. Walls?
**A. I would.**
Q. Even though you don't have any idea if he looked at anything new?
**A. Correct. You're using the word "inspection," right? When you look at something, when you lay eyes on it, you are inspecting it.**
Q. Yeah. And I used the word "new" as well. A new inspection as to what he looked at on May 25, 2017. Do you believe this was a new inspection by Mr. Walls on looking at different portions of the property?
**A. Yes. Even if you're looking at the same thing, it's a new inspection, is it not?**

Page 62

Q. That's fine. If that's your interpretation, that's fine. So since you authored your report, have you come to any subsequent understanding of the context of Mr. Sitzmann's assignment, the engineer hired by Hudson in 2017?
**A. No, if I'm understanding your question correctly.**
Q. Do you have any idea what Mr. Sitzmann actually inspected when he went out there?
**A. The way I would answer that is what he inspected is reflected in the photographs he took and the report he wrote.**
Q. Did he look at all of the roof levels?
**A. Not to my knowledge.**
Q. If the testimony were to be that Mr. Sitzmann was only looking at a specific tear in the membrane that corresponded to a leak in the lobby, would you have any reason to dispute that?
MR. CAMPBELL: Object to form.
**A. Meaning, if there's testimony from Mr. Sitzmann that is contrary to photographs or something in his report, then I would defer to his photographs or his report, but as I'm understanding your question, I would defer to his testimony.**
Q. (By Mr. Peirce) Yeah. So for the extent of

Page 63

Mr. Sitzmann's investigation, you would defer to his deposition testimony, correct?
**A. In conjunction with his photographs and his report.**
Q. Sure.
**A. So there are moments in a deposition when a witness forgets some detail and remembers later. That's why I'm adding that qualifier.**
Q. Sure. And if Mr. Schwier testified that he was only looking at a particular area on the mezzanine roof, do believe Hudson conducted a full investigation of all the reported damage from the hailstorm in 2017?
**A. Under the circumstances, yes.**
Q. Okay. What are the circumstances that you're referring to?
**A. The information in the notice of loss and the information being communicated to Sitzmann --**
Q. So is the notice of loss -- I'm sorry.
**A. And the information being communicated to Sitzmann and Walls when they meet with the insured's representative.**
Q. Okay. So if the windows were reported in the notice of loss as being hail-damaged, were they ever inspected by Hudson in 2017?
**A. Well, Hudson inspected the windows that were**

Page 64

**reported to them by the insured.**
Q. Is it your testimony, Mr. Powers, that Hudson doesn't have a duty to examine any portion of the property that's not reported by RDA?
**A. It will depend on the circumstances. Generally, the answer is, it's appropriate to look to the insured to see where there is damage the insured believes is accident-related or hail-related or loss-related and inspect those areas. So I had a hail claim, so I had my roof inspected, right, but I did not have my basement inspected.**
Q. Right. And in this case, RDA did report hail damage to the windows and roof of the hotel; is that correct?
MR. CAMPBELL: Object to form.
**A. They reported specific windows that were damaged and those were examined.**
Q. (By Mr. Peirce) If we look at property loss notice, which you have acknowledged, included reporting damage from hail to the windows of the hotel and the roof, among other things, correct?
MR. CAMPBELL: Object to form.
**A. You're looking at the words "window" and "loss notice" in a vacuum, right? When they get to the site, and I think there's later communication before**

**they get to the site as to which windows the insured believed had sustained hail-related damage.**

Q. (By Mr. Peirce) So is it your testimony that RDA had an obligation with regard to exterior damage to the hotel to give Hudson a list of every single outside room or outside exterior component they believed was damaged before Hudson would investigate it?

MR. CAMPBELL: Object to form.

Q. (By Mr. Peirce) I'm trying to figure out what's reasonable, Mr. Powers. If they report damage to the windows and the only windows they looked at were ones the contractors had identified by my client, that's reasonable in your mind?

**A. Correct. Unless and until there is additional information, right? So, for instance, the sworn statement proof of loss provision essentially is describing a process, right, and that is, tell us where you believe there is damage, and we'll examine whether that is covered under the policy; share with us the information you have.**

**But the building owner and its staff are going to know that building far better than the carrier. So the carrier, unfortunately, has to look to the insured to say, Tell us what you think is damaged, right, and if there's an area that the insured doesn't**



**know, the insured can say, We think the curtain wall has some issues, but we don't know. Could you look at that?**

Q. Would you not consider the fact that they reported window damage to encompass that as far as curtain wall damage on the exterior?

**A. Not as I look at the course of communication, no.**

Q. Okay. The same with regard to the roof? Do you mean that the reporting of roof hail damage was not sufficient from RDA's constantly looking at all of the roof levels? Is that your testimony?

**A. I apologize. I wouldn't extend that as an absolute. To me, it's a relative process, right? So you go out and say, Where are you experiencing problems, they point to where they're experiencing problems, you look at those areas, and say anything else. They tell you yes or no. You respond to the information you're given, then you communicate that to the insured and you say, Here's what our understanding of the scope is. Please consult with your contractor, who is present, and the insured is telling Hudson they're also gathering bids from contractors. So all that is part of the process.**

Q. Are you done?



**A. I am.**

Q. Okay. I just wanted to make sure. If RDA reports roof damage, is it your testimony that RDA has to point out to Hudson every crease or dent in the roof in order for Hudson to look at it? They did report roof damage, did they not?

**A. They did. I should say they reported their concern about roof damage.**

Q. But wouldn't that concern basically make Hudson have a duty to go look at the roof damage?

**A. Yeah.**

Q. I mean, wouldn't Hudson have to look at roof damage if the insured reported roof damage from a hailstorm?

**A. Yes.**

Q. And Hudson was aware this was the biggest hailstorm in Colorado's history? You saw that testimony, correct?

**A. Yes.**

Q. Okay. So this is something where there was no dispute whether hail hit the property, correct?

**A. Correct.**

Q. It shattered a skylight in the lobby, correct?

MR. CAMPBELL: Object to form.



**A. I'd disagree with the term "shattered."**

Q. (By Mr. Peirce) Okay. Well, a hail ball went through the skylight into the lobby, correct?

**A. Correct. A hail stone penetrated the glass.**

Q. What specific words would RDA have to use to get Hudson to look at the exterior window and curtain wall system from the hailstorm in 2017?

**A. I would anticipate they would express to their carrier concerns about the curtain wall and what those concerns are.**

Q. Okay. But absent that, Hudson has no duty to investigate the windows if RDA reported they believed the windows were damaged from hail?

MR. CAMPBELL: Objection, asked and answered.

Q. (By Mr. Peirce) You can answer, Mr. Powers.

**A. As you phrased the question, I would disagree with you, right, because what they reported were specific windows of concern.**

Q. Is that what it said in the property loss notice, "specific windows of concern"?

MR. CAMPBELL: Object to form.

**A. It says windows. The carrier's representative said, What windows are of concern? The carrier responded to that information. If there was a concern about the west curtain wall then -- and it**

**doesn't necessarily have to be that day. The insured can always say, Hey, we have concerns about the west curtain wall now, and the carrier will respond appropriately.**

Q. (By Mr. Peirce) So do you expect the insured to have full knowledge of every -- let's use an example of the cap flashing on the west exterior. You realize that was dented by hail and acknowledged as being dented by hail?

**A. Correct.**

Q. And that was acknowledged as dented by hail in 2017 by Matthew Sitzmann, correct?

**A. Correct.**

Q. Why wasn't that paid in 2017?

**A. My understanding is that it is included in the estimate, meaning that it was included to the extent it was to be replaced by the insured. What you're getting into is the functionality component of that, right, that the cap is not -- it doesn't serve an aesthetic purpose. And make sure its functionality as a component of the roof has not been compromised.**

Q. And so the cap flashing should not be covered?

**A. Correct.**

Q. Can you point to anywhere in the policy that



would support that opinion?

**A. That would tie to my understanding of the expression direct physical loss or damage.**

Q. Okay. So if there is dented cap aluminum trim on the west exterior, that's not covered under your understanding of physical loss or damage under the terms of the policy, correct?

**A. If the insured wants to replace it, it might be part of the replacement cost, meaning the insured can say, We think it's necessary to replace these caps. And the carrier can say, Okay, we will make an allowance for that.**

Q. That is a totally different answer to a different question. Your testimony is that that is not physical loss or damage, indentations to aluminum trim from hail, correct?

MR. CAMPBELL: Object to form.

**A. Not direct physical loss or damage requiring replacement.**

Q. (By Mr. Peirce) Got you. And is it your testimony that RDA did not report those specific cap flashing dents when they reported that loss in May of 2017?

**A. I'm sorry. Was the question, is it my understanding that they did?**



Q. Yeah. The cap flashing west exterior of the hotel. Are you with me so far?

**A. I am.**

Q. Is it your testimony that RDA did not report that as being hail-damaged in 2017?

**A. So is the question, RDA did not report it as hail damage? I apologize.**

Q. Correct. Is that your testimony based on your understanding of the file materials?

**A. I apologize. I'm getting up on the double-negative. They did not report that --**

Q. Did RDA report damage to the west exterior cap flashing in 2017 when they reported the claim?

**A. I think that was noted during the Haag inspection.**

Q. That's not what the question was, Mr. Powers. Did RDA report damage to the cap flashing to Hudson in 2017?

**A. What do you mean by "report"? I guess that's where I'm confused.**

Q. How -- I'm using plain English, Mr. Powers.

**A. Okay. So --**

Q. Okay. You know they gave a property loss notice. We had a quibble about what they reported as windows and not windows and roof and not roof. Was cap



flashings reported as damage, to your recollection?

**A. Yes.**

Q. Okay. And where was it reported?

**A. In the interactions on-site. That's why I'm asking what you mean by "report." You seem to think report means a written report.**

Q. Well, a notification in writing. Did they notify Hudson in writing of damage to the cap flashing?

**A. Okay. I apologize. Your prior questions were not notifications in writing. A notification in writing is comprised of each written communication, right, and so you do your initial loss notice, but then each time the insured communicates, if they're reporting something in writing, then they're reporting the damage, right, so --**

Q. Did RDA report in writing in 2017, Mr. Powers, the cap flashing? Yes or no?

**A. Not that I'm recalling, but my memory may not be correct on that.**

Q. And your testimony a minute ago was that you believe that it was relayed in a conversation that was had at the property, that there was damage to cap flashing by RDA to Hudson's representatives?

**A. Right. That was -- that damage was observed.**

Q. Where can I go to look to see where you're

pulling that from?
**A. From Haag's reports and Walls's reports post-inspection.**
Q. I'm making a distinction, though, about the reporting from RDA to Haag or Bill Walls. Your testimony a minute ago -- and correct me if I'm wrong -- was that you believe someone on behalf of RDA reported cap flashing damage, correct?
**A. Now, are you back to reporting as a written statement?**
Q. No, sir. No, sir.
**A. Okay. My understanding is that, yes, that was part of the discussion during those inspections.**
Q. I know. But my question was, where did you get that from, that it was part of a discussion?
**A. Because it's in their reports.**
Q. Do you mean that they saw the damage, not that, Hey, Briana Miller reported cap flashing damage on June 25, 2017. Nothing like that? It's just that it's simply in the report, correct?
**A. Correct.**
Q. So to be fair, you really don't know if anybody from RDA reported damage to cap flashing in 2017 to any representative of Hudson, true?
**A. I disagree.**


Q. Simply because it's in a report? Is that the only rationale you have for that?
**A. Correct.**
Q. Okay. Isn't it feasible, Mr. Powers, that, Oh, my gosh, Matthew Sitzmann took a picture of the cap flashing and that's why it's in his report, and that nobody from RDA reported it?
**A. That's possible. But keep in mind that the Haag report then is produced to the insured, right, so the insured can look at the report and say, It looks like the cap damage isn't in there, the insured can get feedback or additional information and say, Hey, here are the areas we're concerned about that don't appear to be in the report.**
**When the insured gets the report and sees that it's in there, the insured has information -- or both parties have that information.**
Q. Are you aware that the Haag report was not provided to RDA in 2017?
**A. I don't know that.**
Q. So if it wasn't provided, that answer you just gave is completely out the window, correct?
**A. Disagree.**
Q. Okay. So the insured is just supposed to know what Hudson did and didn't do and looked at and


didn't look at, right?
**A. No. They should communicate, right, and so if the insured feels the need for the Hudson report, they should say, We're not understanding. Can you send the Hudson report? Instead, when --**
Q. Do you mean the Haag report?
**A. The Haag report. I apologize. When Hudson explains its findings, the insured says, Well, we have our own contractor, we're getting bids, and we'll get those to you. But there's a dialogue going.**
Q. Okay. So you haven't read the deposition of Briana Miller and RDA, right?
**A. I have not. Not between now and the last time you asked that question.**
Q. So with respect to what the contractors that RDA had asked for information or communicated with, you have really no idea what the discussion was between RDA and the contractors, fair?
**A. Fair enough. Although we have bids from them.**
Q. I understand you have bids from them, but you have no idea what they talked about, correct, or what the assignment was from the contractors?
**A. I don't want to quibble, but the bids are going to reflect some of that substance.**


Q. Some of it, but don't they reflect the overall scope. In other words, you don't know if Briana Miller asked Seagren Construction to go look at the entire hotel concerning damage, correct?
**A. I do not know that.**
Q. Did Hudson ever issue any kind of coverage determination in 2017? In other words, a written determination to Briana Miller about what was covered in the policy language, citing the reasons?
**A. Yeah. They sent a proposed proof of loss.**
Q. Anything else?
**A. No. But there were conversations about it, meaning they communicated the information orally.**
Q. And who you are talking about when you're referencing that?
**A. Kaho Chan.**
Q. Kaho Chan and who?
**A. I believe Walls had discussions along -- to that -- of that nature, I'll say.**
Q. I thought you were talking about communications between my clients and the carrier, Hudson. Are you not talking about that?
**A. I think I'm responding to your question, so --**
Q. Yeah. My question was about the

Page 77

communication with my client. Who is communicating the coverage determinations with my client, and what the rationale and reasons for the coverage was, and I believe you said there were also some conversations that were had, and I'm trying to figure out between who from my client's perspective.

**A. Your client's designated representative to Mr. Chan.**

Q. Who?

**A. But part of that is, here's what we're finding, right? I think Walls -- as I understand it, Walls was sharing that sort of, Here's what we are observing, and that's generally when you wrap up an inspection, you'll say, Here's what I'm taking away from this.**

**The reason I'm adding this is, this isn't a coverage question, like, "Hey, the policy wasn't in place on the date of loss" type of coverage question. This dispute is as to the extent of the loss.**

**And so there are communications with your client about the extent of the loss being communicated. In terms of a formal expression of the coverage position, the claim -- well, the proof of loss and the claim gets withdrawn after the proof of loss is submitted.**

Page 78

Q. Are you done, Mr. Powers, with your answer?

**A. I am.**

MR. PEIRCE: Objection, non-responsive.

Q. (By Mr. Peirce) All I'm asking about, Mr. Powers, is if there's a conversation that was had between Hudson and my client's representatives that you're aware of discussing coverage, a verbal conversation, who was it between exactly, and when did it occur?

**A. Between Mr. Chan and your client's designated representative. I'd have to go through the claim notes for the date of it.**

Q. You keep talking about my client's designated representative. I'm asking you for a name. If you don't know the name, that's fine.

**A. Well, there's Ms. Miller, and I'd have to look, but there was a risk manager that also was part of the initial notice of loss.**

Q. Did Mr. Chan testify that he ever spoke to Briana Miller?

**A. Well, he spoke to the risk manager, correct?**

Q. Did he? I'm asking you.

**A. That's my understanding of his claim notes.**

Q. Okay. So are you talking about John Bresnahan (phonetic)?

Page 79

**A. Yes.**

Q. And you're telling me that Kaho Chan had a telephone call with John Bresnahan where he explained what coverage would be afforded and what wouldn't be; is that fair?

**A. I'm hung up on what's covered and what's not. That conversation didn't occur. The conversation was, Here's what we're finding here, and, Here's the proposed proof of loss.**

Q. I mean after the investigation was completed by Hudson in 2017, did Kaho Chan ever pick up the phone and talk to Briana Miller or John Bresnahan or another representative of RDA about what Hudson was going to cover or not cover?

**A. Not within the time frame you're discussing.**

Q. And that would be in 2017, correct?

**A. Yeah.**

Q. Did you review the correspondence where my client withdrew the claim in 2017?

**A. I did.**

Q. What did it say specifically with regard to the rationale or reasoning for the withdrawal in the claim?

**A. I'm not recalling without looking at that. Do you have it available?**

Page 80

Q. Do you recall if the correspondence simply said, We're withdrawing the claim and provided no further rationale or reasoning?

MR. CAMPBELL: Object to form.

**A. As I said, I'm not recalling. If you have it, I'd like to review it.**

Q. (By Mr. Peirce) Well, it's part of your report. That's why I was asking.

**A. Meaning, I can go through dig through the file and find it, but do you have it at the ready?**

Q. I'll represent to you -- I can find it -- but Ms. Miller e-mailed Mr. Walls and said, We are we're withdrawing the claim because we're having to incur all of the expenses. And this is in response to Mr. Walls telling Ms. Miller that the covered damages after application of the deductible and non-recoverable depreciation was 1500-some-odd dollars. Is that what you recall reviewing?

**A. I can live with that paraphrase.**

Q. All right. Are you aware of what Hudson ultimately determined was the covered damage from the May 8, 2017, hailstorm?

**A. Are we switching to the 2019 time frame?**

Q. I'm talking about any point in time.

**A. Yes. In 2019?**

Q. "Ultimately" was the way I phrased the question. Are you aware of what they ultimately determined was the covered damage from the May storm?
**A. Yes.**
Q. And what was that?
**A. I forget what the number was. Let me look it up. 238,510.61.**
Q. Are you aware that number is based explicitly off of Joseph Del Guidice's estimate from J.S. Held?
**A. Correct, that's my understanding.**
Q. In other words, he applied the, I believe, ACV amount, less the deductible of 100,000, correct?
**A. Correct.**
Q. Are you aware after reviewing David Schwier's deposition of what he testified was the covered damage in 2017 that Hudson acknowledged?
**A. I apologize. I'm not understanding the question.**
Q. Sure. Do you remember what the coverage decision as to what was covered damage in 2017 consisted of?
MR. CAMPBELL: Object to form.
**A. Yes, to the extent I'm understanding your question.**
Q. (By Mr. Peirce) Okay. Well, let me show it to you really quick. All right. This is Exhibit 32.



Mr. Powers, this is the report from Cunningham Lindsey in October of 2017. Have you seen this document?
**A. I have.**
Q. And this provides a measured loss calculation, correct?
**A. Correct.**
Q. Are you aware that Mr. Schwier testified that everything attached to this report from Cunningham Lindsey as far as the invoices from Seagren Construction, glass systems, etcetera, all the invoices attached to this exhibit represented damages that were caused by the May 8, 2017, storm that accounted for the measurement of loss on the first page of Exhibit 32?
**A. I think I'm understanding the question in that, yes, the numbers reflected on Page 1 makes reference to the estimates that are attached to that exhibit.**
Q. Are you aware -- go ahead.
**A. Is that what you're asking?**
Q. Yes.
**A. Okay.**
Q. Are you aware that the estimate that Joseph Del Guidice prepared did not include various items attached to Exhibit 32?



MR. CAMPBELL: Object to form.
Q. (By Mr. Peirce) I'm sorry. Your answer?
**A. As I understand it, the answer is, yes, that it does not necessarily include or, I think, it captures it, but as I understand your question, I agree with you.**
Q. Well, am I being obtuse in any way? I'm not trying to trick you, I promise.
**A. I thought I'd agreed with your characterization.**
Q. Okay. For instance, there's $35,000 in damages that were acknowledged and covered by Hudson based on these invoices, and they're not in Joseph Del Guidice's estimate.
Do you have any explanation or rationale for that if Hudson based its entire payment off of Joseph Del Guidice's estimate?
MR. CAMPBELL: Object to form.
**A. So there, I disagree with your characterization.**
Q. (By Mr. Peirce) All right. Explain.
**A. Well, so when you say $35,000, what damage are you referring to?**
Q. I'll show you the specific invoice if you want, if you need it.



**A. Sure. Or just describe what damage are you referring to with that particular invoice?**
Q. Just as a caveat to the question, though, Mr. Powers, you understand that David Schwier testified all of these numbers in these estimates represent damage caused by hail from the May 8, 2017, hailstorm. Do you understand that?
**A. The way I understood it was that when they do their -- if you look at the exhibit, meaning the report from Walls, Walls was basing the number on these, correct, so what they're saying is our analysis in 2017 was based on these numbers and these bids.**
Q. Yeah. And I'm not talking about that. I'm talking about the sworn deposition testimony of Hudson Insurance Company, where he swore under oath of all these numbers causally related from the May 8, 2017, storm.
My question was, if that's the case, why wouldn't all of these numbers be included in Joseph Del Guidice's estimate that Hudson based its payment on?
**A. All right. I was just looking at the estimate. What was your question again?**
Q. You didn't understand it?
**A. Well, I was -- I apologize. The screen image**

**I have tiny, so you were showing me the exhibit at the same time you were asking me a question. I was trying to read the exhibit, and I lost track of the question. I was trying to --**

Q. Okay, okay, okay, okay. Let me break it for down for you. Hudson Insurance Company testified under oath that these proposals represented covered damages from the May 8, 2017, hailstorm. Are you with me so far?

**A. Correct.**

Q. And they testified that that's what they based their coverage determination on in 2017. Do you understand that?

**A. Correct, yeah.**

Q. And is this what led to Bill Walls asking Briana Miller, Here's our calculation. Please sign this proof of loss for 1500-some-odd dollars. Do you understand that?

**A. I agree with that general premise, yes.**

Q. Okay. And I promise, I'm not trying to trick you.

**A. All right. I don't think that question is trying to trick anybody. I think you're just asking questions.**

Q. Okay, great. So if there's an item or items



that Hudson has said is covered damage from the May 8, 2017, hailstorm, my question is, why wouldn't that be included in Joseph Del Guidice's estimate if that's Hudson's was basing its payment off of?

MR. CAMPBELL: Object to the form.

**A. Because, I guess, where the disconnect is, he does not actually include it in the later estimate.**

Q. (By Mr. Peirce) Right.

**A. The later estimate doesn't have that allowance in it.**

Q. No, it does not. And Joseph Del Guidice testified under oath this week that it did not. So, going back to my question, why would it not be included?

MR. CAMPBELL: Object to form.

Q. (By Mr. Peirce) I went through this specific question with Mr. Del Guidice, Mr. Powers, and he testified under oath that it was not in his estimate.

**A. Correct.**

Q. Can you explain the rationale to that?

**A. If you look at his report, he explains why it's not included in his estimate, right?**

Q. Okay. So why didn't Hudson pay for it, then?

**A. Because Mr. Del Guidice doesn't view it as something requiring replacement at that number.**



Q. Yes. But Hudson did, so why didn't Hudson pay for it?

MR. CAMPBELL: Object to form.

**A. I apologize. I think you're comparing apples and oranges, though, right?**

Q. (By Mr. Peirce) I am really not, Mr. Powers. I'm just being as transparent as possible. Hudson has testified that these numbers are covered damages from the hailstorm in Exhibit 32, and Hudson only paid what was in Joseph Del Guidice's estimate. So if that's the case, wouldn't there be remaining amounts that are due and owing to my client that still haven't been paid?

MR. CAMPBELL: Object to form.

**A. I disagree.**

Q. (By Mr. Peirce) How do you disagree? Can you explain that?

**A. Because I think you're using two pieces of information, right, that Mr. Del Guidice is not of the opinion that requires replacement for hail-related reasons.**

Q. And your testimony earlier was that you don't rely on -- you rely on the carrier to make the ultimate determination, correct?

**A. Right.**

Q. So if the carrier has sworn under oath that



they did make that determination and these are the numbers, that leads me back to the same question, why hasn't it been paid?

MR. CAMPBELL: Object to form.

**A. When you say "it," you mean the, Prime all affected areas and paint with light color, matching as close as possible to the existing north and south sides?**

Q. Yes. That's one example, yes. Why hasn't that been paid? If Hudson --

**A. Del Guidice --**

Q. I'm not asking about Mr. Del Guidice. I'm asking that Hudson determined that to be covered, correct?

**A. I disagree with that expression, "Hudson determined it to be covered," right? Based on the information from Mr. Del Guidice, the proposal we're looking at now does not reflect hail-related damage.**

Q. You are making it apples and oranges. You are aware that there's a possibility of two different sets of eyes looking at something and determine if it's covered or not, correct? So Hudson didn't hire Joseph Del Guidice in 2017, you are aware, correct?

**A. Correct.**

Q. He wasn't involved until two years later,

correct?
**A. Correct.**
Q. So Hudson made a determination in 2017, you know, the damage is only 101,578.66 on Page 1 of Exhibit 32, correct?
**A. That is the information they have at the time they write that letter and make that offer.**
Q. Yes. That's why I specifically asked Hudson under oath whether these numbers and all of these estimates were caused by the May 8, 2017, hailstorm. And the answer was yes, and the answer was, That's what we used to account for the damages on Page 1 of Exhibit 32.
And then Joseph Del Guidice, two years later, does not include this amount in his estimate, but Hudson testified it was covered. So my question, again, gets back to you, why didn't they pay it?
MR. CAMPBELL: Objection, asked and answered.
**A. I apologize. I may be remembering the testimony differently, but I understood it to be that the exhibit we're looking at right now is the information Hudson used to lay out to the insured, Here's the best numbers we're coming up with, right? These are the numbers you have here based on the information you submitted, here is how the math works**



**out.**
**Later, they had to reinspect, right, and Mr. Del Guidice determined that the area of the proposal we were just looking at, the $35,000 number you mentioned that got us down this path, is not hail-related. That was not related to this particular storm, so it would not be covered, so new information has been communicated.**
Q. (By Mr. Peirce) So we should ignore the assessment of damage in 2017, then, correct?
**A. I don't know --**
MR. CAMPBELL: Object to form.
**A. I don't know that you ignore it --**
Q. (By Mr. Peirce) Yeah. I'm having a really hard time with this, Mr. Powers, because this is something sworn by Hudson that is covered damage from the May 8, 2017, storm, and, yet, you're saying that, Well, Joseph Del Guidice, two years later, said I don't think it is, so, therefore, Hudson shouldn't pay it when Hudson already decided it was covered in 2017. Can you explain that?
MR. CAMPBELL: Objection, asked and answered.
**A. So I really do think you're talking about apples and oranges, right? In 2017, they laid out their numbers and say, Based on what you've submitted,**



**here's what we can do, right, and the insured decided not to do it.**
**The insured then asked to reinspect. They gathered additional information, and the proposal you were just talking about later was determined was not hail-related, so it should not be included. It's a very evolutionary process, right, the investigation.**
Q. (By Mr. Peirce) Evolutionary process. Hudson determined it, Mr. Powers. Nobody else determined what the covered damages were in 2017, correct?
MR. CAMPBELL: Object to form.
**A. I think you're arguing. I didn't understand the question.**
Q. (By Mr. Peirce) Who was responsible for determining the amount that it would pay under the terms of the policy in 2017? Was it Hudson or my client?
MR. CAMPBELL: Object to form.
**A. Hudson.**
Q. (By Mr. Peirce) And what did Hudson determine --
**A. With the information from --**
Q. I'm sorry. What did you want to add to that?
**A. With the information from your client.**



Q. Okay. So they made a determination in 2017, correct, Hudson did?
**A. So I guess I disagree with your characterization.**
Q. Are --
**A. So you --**
THE REPORTER: Wait.
Q. (By Mr. Peirce) You can get upset, you can interrupt me, or you can --
**A. I think --**
(Overlapping speakers.)
THE REPORTER: Wait, hang on.
**A. You are asking why -- I think you are asking why Hudson's later number of 238,510.61 doesn't include the proposal we were just looking at, and the reason it doesn't is the proposal we were just looking at references damage that later was determined not to be storm-related for this particular storm.**
MR. PEIRCE: Objection, non-responsive.
Q. (By Mr. Peirce) Mr. Powers --
MR. CAMPBELL: Objection. I disagree. I think it was responsive.
Q. (By Mr. Peirce) Mr. Powers, is it your testimony that Hudson, then, changed its coverage determination?

**A. You can characterize it that way. I don't know that they are changing their coverage. They are applying the facts to the policy, right, and the facts that they have in 2019 are that those north and south curtain walls are not related to this particular storm.**

Q. The south curtain wall was not related to the storm? Is that your testimony?

**A. North and -- I forget. The north and the east, I guess. Whatever -- I don't have control of the document, so whatever you -- you showed me the proposal, then you took it down. I was referring to the proposal you referred me to earlier.**

Q. Was there ever an explanation given by Hudson about why they were changing coverage determination what from they determined in 2017 --

MR. CAMPBELL: Object to form.

Q. (By Mr. Peirce) -- from my client in writing?

**A. I disagree with that characterization. But, yes, Hudson explained what they were willing to do.**

MR. PEIRCE: Objection, non-responsive.

Q. (By Mr. Peirce) Did Hudson ever --

MR. CAMPBELL: I'm going to object. I think it was responsive.

Q. (By Mr. Peirce) Did Hudson ever explain why



they changed their coverage -- that's the keyword, Mr. Powers, why changed their coverage determination from what they determined in 2017?

MR. CAMPBELL: Object to form.

Q. (By Mr. Campbell) Did they ever relay that in writing to my client?

**A. I disagree with your characterization that they changed their coverage position, but they did explain to your client what they were finding and what they were willing to do.**

Q. Was the coverage position the same in 2017 by Hudson as it was in 2019 by Hudson?

**A. The numbers changed. I guess I'm caught up on the coverage decision. The numbers changed and the benefits that are due and owing or are being tendered or proposed are -- those numbers changed, but I don't know if the coverage position changes.**

Q. Okay. Well, did Hudson ever explain the change in the benefits due and owing to RDA from 2017 to 2019?

**A. Between 2017 and 2019 or after the suit was filed? What time frame are you referring to?**

Q. When Hudson made its coverage determination, it's ultimate coverage determination, and determination of benefits due and owing. That was in August of 2019,



right?

**A. You're talking about August of 2019, correct?**

Q. Right. That's when the ultimate payment was issued, correct?

**A. And your question, based on August of 2019, is, what?**

Q. Yeah. Did Hudson ever explain in writing to RDA why it was changing its determination of the benefits due from 2017 that it had made, and excluding certain things that they had determined were due and owing in 2017?

**A. I disagree if there's a change in coverage position.**

Q. I'm saying benefits due and owing, not coverage.

**A. Okay. So yes.**

Q. Okay. What letter or correspondence can we look at to show where they explained why they were changing their determination of the benefits due and owing?

**A. You would then reference the discovery that's gone on in the case.**

Q. Okay. That's a very broad answer. Is there any specific document that you can refer to or that is referred to in your report?



**A. The J.S. Held report, the Haag report, the non-privileged portions --**

Q. You understand that I'm asking specifically within -- and with all due respect, you're interrupting me now, Mr. Powers.

I'm asking specifically with respect to the change in the benefits due and owing that Hudson determined were due and owing in 2017 and then changed in 2019, why stuff was excluded as due and owing in 2019 that had previously been determined was due and owing in 2017. Does that letter or correspondence exist and where?

**A. So your question isn't, did they ever explain it; your question is, did they ever send a single letter pre-suit that says this, correct?**

Q. Did they ever send any letter, first of all? Let's start broader.

**A. Yes. They sent a reservation of rights letter when they reopened the claim.**

Q. Okay. Does a reservation or rights letter explain why they withdrew benefits due and owing that they contend were due and owing in 2017?

MR. CAMPBELL: Object to form.

**A. I thought your question was about whether they sent any letter.**

Page 97

Q. (By Mr. Peirce) You just mentioned a reservation of rights letter. That's what I'm talking about.

**A. You asked me, Did they ever send any letter, and I said yes.**

Q. Yes. And I said in the reservation of rights letter, did they explain that specific issue?

**A. No, they did not address that specific issue in the reservation of rights letter.**

Q. Is there any other letter or correspondence from Hudson where they explained the issue I'm discussing with the benefits due and owing?

**A. Not that I've seen.**

Q. So it's your position sitting here today, Mr. Powers, that that, for example, the line item of $35,000 is no longer due and owing to my client, correct?

**A. My position would is that it was never due and owing to your client, right, because the engineers now are saying or have been saying that the damage referred to in the proposal was not caused by this particular storm.**

Q. West exterior damage was not caused by this particular storm? Is that your testimony?

**A. The damage referenced in the proposal we were**

Page 98

**looking at earlier.**

Q. Which included the west and east exterior damage, right? And I can show you again if you want.

Hail damage to west and east exterior walls.

Do you see that, the Re: line?

**A. Counsel, you referred to the line item of $35,000. I was referring to that line item that says north and south sides.**

Q. You mentioned a minute ago the south side may have been damaged, but you don't recall and would have to go back and look at the file?

**A. No. If I said that, I misspoke.**

Q. Okay.

**A. What I was saying was, you asked about the line item of $35,000, you showed me the proposal, and we had a series of questions about that. It's my understanding was that it was determined that the exterior damage that to the north and south sides was not related to this particular storm.**

Q. The south side wasn't hit by the storm, to your understanding?

**A. I'm sorry?**

Q. You understanding is the south side was not impacted by the hailstorm?

**A. I'm not talking about the entire south side.**

Page 99

**I'm talking about the damage referenced in that line item.**

Q. Which is all the affected areas, correct?

**A. I'm sorry?**

Q. Prime all the affected areas, is what the line items says. Prime all effective areas and paint. Is it your testimony that the south side's affected areas were not damaged by hail from the 2017 storm?

**A. I would have to go look at the Held report, but that's what I recall.**

Q. All of the damage that was ultimately paid by Hudson was visible when Bill Walls and Matthew Sitzmann went to the property, correct?

**A. I don't have facts to the contrary.**

Q. So why wasn't that included as damage in 2017?

**A. I guess where I'm getting caught up is that the claim was never finalized in 2017, right, meaning that Hudson says, Here is the information we have, and the insured says, Based on what you're presenting to us, we want to withdraw the claim. The insured then provides additional information to Hudson, and Hudson responds accordingly in 2019.**

Q. So your testimony here is that Hudson just waited on the insured to report all the other damage

Page 100

that it acknowledged in 2019? Is that what you said?

**A. No. Based on our inspections and the proposal that you submitted, here is what we're in a position to do in 2017. And your client decided to withdraw the claim at that point.**

Q. So my client decided to withdraw the claim at that point. The client decided to withdraw the claim after it was represented the damage by Hudson was determined to be 1500-some-odd dollars; is that accurate?

MR. CAMPBELL: Object to the form.

Q. (By Mr. Peirce) In the very same correspondence, Mr. Powers, correct?

MR. CAMPBELL: Same objection, object to form.

**A. That's not what the e-mail says that you read earlier.**

Q. (By Mr. Peirce) What doesn't say what?

**A. You read an e-mail from Briana Miller that said it was because of the costs involved.**

Q. I paraphrased an e-mail, and you said, I tend to agree with your paraphrasing. That's what happened, right?

**A. Sure.**

Q. My question is, that was Briana's e-mail to

Page 101

Bill Walls. That was in response to Bill Walls asking Briana Miller to sign a proof of loss for 1500-some-odd dollars; is that accurate?

**A. That is the timing, right, but --**

Q. It's in the same e-mail chain, is it not?

**A. Sure. Hence, that's the timing.**

Q. Okay.

MR. CAMPBELL: Hey, Chris, I'm thinking Lisa's fingers might be getting pretty tired right about now.

MR. PEIRCE: Okay.

MR. CAMPBELL: Let me know if you think this might be an appropriate time for a break.

MR. PEIRCE: Okay. We can take a break now.

MR. CAMPBELL: Okay. About five or ten minutes?

MR. PEIRCE: Yeah, that's fine.

(Recess from 11:20 a.m. to 11:38 a.m.)

Q. (By Mr. Peirce) Mr. Powers, just so the timeline is accurate, as far as I understand, the hail loss was reported by my client on May 22, 2017, correct?

**A. That's my understanding.**

Q. And Hudson's payment it made was over two years and three months later, correct?

Page 102

**A. Yes. I have not done the math, but that's the time frame.**

Q. Are you aware of how many photographs Bill Walls provided to Hudson after his investigation?

**A. I think less than ten, but I'm not remembering.**

Q. When was a proof of loss first requested by Hudson or any representative of Hudson?

**A. With the terms formally requested in the 2017 communication, where a proposed proof of loss is provided. Technically, it's already in the policy.**

Q. When you say "a proposed proof of loss was requested in 2017," do you have any idea when?

**A. I can look it up. It was, I want to say -- oh. . .**

Q. Is that the October request from Bill Walls?

**A. Right. He put together a proposed proof of loss and based on what we're seeing, here's what we understand the proof to be, but that was only a proposal. The policy anticipates that the insured is going to put together a proof of loss.**

Q. Ultimately, the insured did in this case, correct?

**A. Correct.**

Q. In April 2019, Hudson received assigned proof

Page 103

of loss for 17,000,000-some-odd dollars, correct?

**A. Correct.**

Q. What is your position on why you believe that to be so important, the proof of loss?

**A. It's important in this context because you do need to know what the insured intends to claim and what the insured does not intend to claim. So, for instance, Walls says, Here's a proposed proof of loss, and if the insured disagrees with that, the insured can submit a proof of loss saying, No, here's what we think the loss looks like, and here's what the contractors are telling us.**

Q. Okay. I'm sorry. Are you done?

**A. Yeah.**

Q. Okay. So as far as from the carrier's perspective, does it affect Hudson's investigation at all?

**A. Yes.**

Q. Does Hudson do a completely different investigation based on a proof of loss?

**A. No. You added the qualifier "completely different."**

Q. Well, does Hudson do a different investigation based on receipt or non-receipt of a proof of loss?

Page 104

**A. If there's new information or additional information, certainly, they would do -- they should respond according to the information presented.**

Q. Well, for instance, once they receive the $17,000,000 estimate, does that mean they're going to go look at whatever is claimed in the proof of loss?

**A. I mean, that's going to depend, right, meaning, for instance, with the proof of loss, there was a $1 million business interruption. So there was a request for information that would support the business interruption claim. That doesn't really impact the inspection of the building, necessarily, but what the carrier should be doing is responding reasonably to the new information that is provided in the proof of loss.**

Q. What do you contend was new information provided by Kevin Aguilar's estimate that was attached to the proof of loss?

**A. The insured believed all of that was storm-related and that the loss was comprehensive.**

Q. When you say "all of that," what do you mean?

**A. So, say, the replacement of the HVAC units. It was not until the Aguilar estimate that anybody or any of the contractors or any of the bids that RDA communicated to Hudson has the proposal to, Hey, let's upgrade all of our HVAC systems while we're at it.**

Page 105

Q. Was there new damage reported to the roof that hadn't been reported?
**A. Yes. I would need to go through everything to give details on that, but, yes is the answer.**
Q. Is your testimony that Hudson took Mr. Aguilar's estimate and then hired representatives to go through and look at each item in his estimate to see if those were hail-damaged or not?
**A. I wouldn't phrase it that way. I think they said, Here's the estimate we've got and, please, you know, inspect the elements and tell us what you're seeing so we can perform it ourselves.**
Q. Okay. So if the estimate is saying there's interior damage to all of the rooms, should all of the rooms be inspected?
**A. Not necessarily.**
Q. If the curtain wall system is completely damaged according to the estimate, should that be inspected?
**A. Yes. You want to inspect the curtain wall so you can respond to what is in the estimate.**
Q. Did Hudson base its coverage determination in this case at any point in time on the receipt of a proof of loss signed by my client?
MR. CAMPBELL: Object to form.

Page 106

**A. I guess I don't know what you mean by "based on." Do you mean did they pay the amount?**
Q. (By Mr. Peirce) Well, did they find that they were prejudiced by failing to file a proof of loss or were limiting recoverable benefits because you didn't give a proof of loss timely? Anything of that nature is what I'm referring to.
**A. So yes to the extent that your client is now alleging an unreasonable delay or denial of benefits. Yes, they were prejudiced by the delay.**
Q. I'm talking about the actual benefits. Were there any actual benefits that were not paid or delayed because my client didn't provide proof of loss?
**A. No, is the short answer.**
Q. That's a good answer. We can keep it short. Should the representatives -- let me rephrase that.
Should Hudson summarily reject the estimate in support of a proof of loss submitted by an insured?
MR. CAMPBELL: Object to form.
**A. It would depend on the circumstances.**
Q. (By Mr. Peirce) In this case, should they summarily rejected the damage estimate provided in support of a proof of loss that was provided in this case?
MR. CAMPBELL: Object to form, assumes facts

Page 107

not in evidence.
**A. They should not and did not, from what I see.**
Q. (By Mr. Peirce) Do you know --
**A. Hudson was in a position to do so, but they chose to take a more constructive approach.**
Q. Are you aware of who was hired to analyze the reported damage in support of the proof of loss?
**A. I don't know what you're referring to.**
Q. Well, who were the boots on the ground that were going to go analyze what you call the new report of damage?
**A. J.S. Held, Haag, and there was a new independent claim representative that was retained because Walls had retired.**
Q. Do you know if J.S. Held summarily rejected Mr. Aguilar's estimate?
**A. Do I know -- I saw nothing saying they summarily rejected the estimate, and I may not be understanding what you mean by "summarily rejecting an estimate," but. . .**
Q. Do you understand that -- well, I'm using their testimony, which is why I use that phrase, Mr. Powers.
MR. CAMPBELL: Object to form.
Q. (By Mr. Peirce) Do you understand that the

Page 108

west-facing exterior of the property received the brunt of the hail hits from the storm?
**A. Correct.**
Q. Did you review the J.S. Held findings that 126 window sills on the west-facing side were fractured from hail?
**A. I disagree with the characterization that the window sills were fractured. There were components of the window sills that exhibited some damage.**
Q. What component of the window sills are you referring to?
**A. I would have to go to the report and read it to you in terms of the exact phrasing that would that you would use.**
Q. Are you aware of the number, 126, that was found by J.S. Held to be fractured bug seals in 126 different windows?
**A. I don't remember it being bug seals.**
Q. What do you remember it being?
**A. I don't know. We would have to look at the report.**
Q. Okay. But you remember the volume, 126, fractured by hail, correct?
**A. I do.**
Q. And, I mean, you would agree that's part of

Page 109

the window, right?
MR. CAMPBELL: Object to form.
**A. I guess I would disagree with the characterization that it's part of the window. It's part of the assembly that holds the window in place.**
Q. (By Mr. Peirce) Okay. So it's your position that because my client didn't report all 126 of those fractures, that they should not have been receiving benefits from them in 2017?
MR. CAMPBELL: Object to form.
**A. I am not testifying to that.**
Q. (By Mr. Peirce) Okay. Did Hudson ever request a roof of loss in 2019?
**A. They did not request a second proof of loss after they received the one based on the Aguilar estimate.**
Q. Who did you contend was uncooperative and uncommunicative from the insured's standpoint?
**A. Do you mean which individuals?**
Q. Right.
**A. Well, I guess I would go through the depositions in terms of identifying which individuals. But, generally, as I understand in the complaint as it's phrased in the complaint, your client had information that it believes supports an unreasonable**

Page 110

**delay or denial of benefits.**
**And when I went through the file, I had concerns about the lack of communication in terms of what your client was observing and what its intent was, right?**
Q. Who are -- who -- go ahead.
**A. If Briana Miller is not understanding something and communicates that to her superiors, somebody on RDA's side should say, We're not understanding this.**
**Or if there is confusion, say, BluSky had an estimate out there, they should communicate the BluSky estimate. Or if BluSky is not able to put together an estimate, they should communicate that.**
**So, generally, the concerns about cooperation deal more with the suggestion that there was an unreasonable delay or denial of benefits.**
Q. And you mentioned Briana Miller. Is there anyone else you believe was uncooperative or uncommunicative from the insured's standpoint?
**A. Sure. I mean, everybody on the insured's side that would have responded to the request for information or decided not to respond to the request for information.**
Q. When was that request for information you're

Page 111

referring to sent?
**A. Well, the request for the information exists in the policy before the loss even occurs, right, so when the insured gets the policy, they already know that there are certain duties they're going to have to comply with, and one is to provide timely notice.**
**The timely notice is to require -- to include a sworn statement of proof of loss with the supporting documentation. So, technically, that request is in place when the claim is initiated.**
**Then, you know, Walls does his investigation. He has Haag involved. The company communicates what its understanding is. They confirm his Miller statements that she is acquiring her own estimates from her own contractors, and they received those and responded to those.**
**When the claim was reopened then, there is a request for information, and I'll use the business interruption as an example. What is the business interruption loss based upon? We need the supporting documentation for that.**
**And then it was reiterated by -- between the two attorneys involved in this case, either just at the inception of the lawsuit or just prior to the inception of the lawsuit. I believe it was before Hudson was**

Page 112

**aware of the lawsuit.**
Q. So the answer to my question is you don't know when they were sent? I asked you when.
**A. No. You -- you want to point to a single period of time with a broad --**
Q. I'm just trying -- I'm using your report as a reference point. You talk about uncooperative, uncommunicative insured. I'm trying to find out -- and you mentioned the request for information. So I'm trying to find out when the request for information were sent and in what format.
You mentioned the policy and then some kind of correspondence. What I was asking for is when were those issued?
MR. CAMPBELL: Object to form --
Q. (By Mr. Peirce) I understand the policy --
MR. CAMPBELL: Chris --
Q. (By Mr. Peirce) I understand the policy --
(Overlapping speakers.)
THE REPORTER: Hang on, hang on, hang on.
Q. (By Mr. Peirce) When was the letter issued, to your knowledge?
MR. CAMPBELL: Chris, if you want to ask him about the details of his report, I suggest you allow him to refer to his report.

Page 113

Q. (By Mr. Peirce) I thought you had it in front of you. Do you not, Mr. Powers?

**A. I don't.**

Q. You didn't bring your report with you and print it out?

**A. Counsel, we already went through this. I have it electronically. If you need me to look at it, I can.**

Q. Do you need to look at your report to answer that question?

**A. Which question?**

Q. About when requests for information were sent that the insured or its representatives did not respond to?

**A. You have the initial issuance of the policy, you have the initial communications. And, I apologize. I think the disconnect is -- I think when you say "communicate," you mean a written letter, but the question is not phrased that way. So if you mean a formal written letter, is that the question you want me to respond to?**

Q. Well, I was referring to both verbally or in writing. If you know of a verbal request for information, please provide those dates.

**A. That would be during -- I can go through the**

Page 114

**claim notes and give you additional ones, but it, certainly, would be during the -- you have the initial policy issuance and you have Mr. Wall's visit to the site. You have Haag's visit to the site.**

Q. Do you understand, Mr. Powers, what I'm asking about uncooperative and uncommunicative responses? That's the context of it. Requests that were made where the insured or its representative did not respond or provide information requested. Is that what you're answering right now?

**A. That's a different question. But that's what I was trying to get to before the interruption.**

Q. I'm just trying to speed things along, Mr. Powers. I don't need a chronology of the entire claim. That was a specific question.

**A. Your specific question was, when was there information that wasn't responded to, right, and so that's what I'm saying is, the information is requested throughout the process, including, for example, the insured communicates to Hudson that we're obtaining bids from our contractors.**

**Hudson then follows up with that information, and it responds to the information that it receives. Now there's a suggestion that there was additional information that should have been provided -- excuse me**

Page 115

**-- that should have been responded to.**

**That's what I'm saying is, if the insured, for example, is getting water intrusion into 126 rooms, the insured should communicate that to Hudson at any point in the process, right?**

**So after they withdraw their claim, they can always call up and say, We know we withdrew our claim, but now we are observing moisture coming into 126 of our rooms on the west side.**

Q. That was done, right? Both of those things were done, correct?

MR. CAMPBELL: Object to form.

**A. Well, and I disagree with that. And the timing is particularly important here. I feel the questions want to jump back and forth from the inception of the claim and the end of the claim, and when I talk about the claim, it's upsetting to you.**

MR. PEIRCE: Objection, non-responsive.

Q. (By Mr. Peirce) Are you done answering, Mr. Powers?

**A. I am. The fact that you object as non-responsive, I understood to be your understanding that I was finished with the question.**

Q. Are you done, Mr. Powers? Is there anything else you want to add to what you just answered?

Page 116

**A. No.**

Q. Great. What about written communications? Do you understand what I'm asking, number one? You understand what "in writing" means, right?

**A. I believe so.**

Q. Written communications. What written communications by date did my client not respond to or were uncooperative, besides the policy?

**A. I would point to the withdrawal of the claim in response to the proposed proof of loss that was sent in 2017, right? The insured felt that that loss didn't include all the damage that they were observing or that they felt existed. They had an obligation to communicate that thought and share what information supported that thought.**

**When they resubmitted the claim in 2019, the new reservation of rights letter included a request for information to help evaluate the claim. And, later, within the time frame of the agreement being in place Mr. Campbell sent a letter, I believe, to your firm asking for additional information. And when I looked at the file, I didn't see that additional information in there.**

Q. Did anything about the alleged uncooperativeness of my client or failure to

Page 117

communicate inhibit the 2019 inspections that were done by representatives of Hudson?

**A. Yes. To the extent you have incomplete information.**

Q. What incomplete information are you referring to?

**A. Building history.**

Q. Anything else?

**A. Well, please understand, the building history includes who were the contractors that have inspected the premise, who were the contractors that worked on the premises. Who did these repairs that we're observing? When did they occur? Dates as to when damage was first observed. Rooms that were not available for occupancy by clients. All of that.**

Q. Anything else?

**A. All that. And I would suggest everything outlined in Mr. Campbell's, as an example, of the investigation gets inhibited when that information is missing.**

Q. Nothing Hudson paid was immediately related to any interior damage correct?

**A. That's my understanding.**

Q. Not that Hudson paid wasn't obvious damage to the exterior of the building in 2017, correct?

Page 118

**A. If I'm understanding your question correctly, it was -- the issues that are paid are observable issues in 2017.**

Q. So there's nothing that prevented Hudson's representatives from seeing it and paying it, right, in 2017?

**A. To the extent the insured intends to claim it, correct. The company still has to respond to what's being claimed. Ultimately, it's the insured's claim, the insured's building, and the insured has an obligation to say, Here's what we want you to consider.**

**And if the insured feels there's an area that has not been considered or an area that was not inspected, the insured has an obligation to communicate that and ask for clarification if they are confused or in disagreement with the company.**

Q. All right. So the insured did report roof damage, window damage from the major hailstorm, though, right?

MR. CAMPBELL: Object to the form.

**A. So I guess my hiccup is the jump in time, right. It is the suggestion -- at no point when the insured says, We have damage to windows, initially, they're only describing a handful of windows. Later in 2019, they say, We're having trouble in all of our**

Page 119

**rooms on the west side. So I think that's different information or additional information.**

MR. PEIRCE: Object to non-responsive to your characterization of the evidence. I don't believe that's accurate, but I understand what you're saying.

MR. CAMPBELL: And I object. I believe that it is a fair characterization.

Q. (By Mr. Peirce) Did you understand that there was ultimately damage to the roof that was on all four sides of the building that was determined by Matthew Sitzmann to be covered?

MR. CAMPBELL: Object to form.

**A. No.**

Q. (By Mr. Peirce) Around the parapet, the cap around the parapet -- I don't remember the exact terminology that was used. Let me look at it.

I'm not talking about the EPDM surface, but just what he did include as far as roof damage that was included in the Joseph Del Guidice estimate. Let me see if I can find it.

Okay. Do you see Exhibit 38? I'll represent to you this is the estimate prepared by Joseph Del Guidice that Hudson relied on to make its payments. Do you understand that?

**A. I can live with that paraphrase.**

Page 120

Q. Items 7 and 8 on this, do you see where those are under the broader category of Roof?

**A. Yes.**

Q. Was this cap flashing damage part of Mr. Sitzmann's investigation in 2017, to your knowledge?

**A. When I read this, I understand it to be damage that Mr. Del Guidice thinks is related to the storm in question and that it was damage that would be observable to Hudson -- or to Haag when Haag was out there. I'm not sure that is answering the -- I'm not sure I understand the question.**

Q. Was it included in the damage Hudson determined was due and owing benefits in 2017, these Items 7 and 8?

**A. I don't believe so.**

Q. Is that an example where you believe my client adequately reported damage that was not acknowledged by Hudson in 2017, but later acknowledged in 2019?

**A. No. I disagree with that.**

Q. Are you saying that Hudson should not have paid these line items in 2017 because my client didn't report this damage?

**A. I'm not saying that.**

Page 121

Q. Are you saying Hudson's investigators and/or Hudson should have acknowledged this was covered damage in 2017 as part of its investigation?
**A. I'm not saying that either.**
Q. Okay. So we just don't know on Lines 7 and 8 when they should have been acknowledged and paid or not; is that fair?
**A. I'm sorry. Is that a question or a comment?**
Q. Is that fair, is the question. We don't know when they should have been paid or covered or not, based on the investigation of Hudson?
**A. I don't understand your question.**
Q. Okay. So all I'm getting at is why wasn't this acknowledged by Hudson in 2017, these items, Line Items 7 and 8 of Exhibit 38? You testified you didn't believe they were, and then you testified that -- I asked you, Well, is the reason they weren't because my client didn't report them? And you said, I don't believe that's the reason, I think, paraphrasing.
All I'm trying to figure out is, why not? Why weren't they acknowledged in 2017? Is it because of some reporting issue? Some other reason?
**A. The question is, were there benefits extended in 2017 in the roof of loss that was proposed that includes these Line Items 7 and 8?**

Page 122

Q. Is that your question to yourself? That's not my question.
**A. I'm trying to clarify.**
Q. Let me rephrase my question to answer your own question. That was interesting. I stated, were these two line items covered causes of loss that warranted repairs from the storm on May 8, 2017, first of all?
**A. I don't believe so.**
Q. Okay. So cap flashing, you don't believe, was a covered loss from the May 8, 2017, hailstorm?
**A. That wasn't your question. Your question was, did it warrant replacement or repair?**
Q. In 2017, it did not?
**A. Right. I don't think the cap flashing needs to be repaired or replaced, but that's neither here nor there. Your question was, Did this warrant repair or replacement?**
Q. So you are saying no based on the damage, meaning it doesn't warrant removing or replacing it based on the amount of damage it sustained?
**A. Correct. And that is probably right, meaning it's still -- it's not an aesthetic finish item, so when you ask the question, Does it warrant replacement, I don't think it warrants replacement.**

Page 123

Q. Is that a causation opinion that you're making or are you referring to an expert?
**A. Well, that's my perspective on whether it warrants replacement. Now, whether that constitutes direct physical loss that the insured wants to replace, that is a different question.**
Q. Is it your opinion that those items constitute direct physical loss?
**A. I have a question as to whether they were caused by this particular storm, and I think some of the historical information would have helped that.**
Q. What do you mean? A CoreLogic report?
**A. No. I mean the history of the building.**
Q. Oh, okay. Are you aware that Hudson testified they don't make gratuitous payments, correct?
**A. They don't intend to make gratuitous payments.**
Q. But you're aware that Mr. Schwier testified they don't make gratuitous payments? He didn't add any kind of qualifier, correct?
**A. I'm not remembering that specific question and answer, but I don't quibble with your paraphrase.**
Q. Okay. So if it's a payment made by Hudson, at least according to Hudson's own testimony, they believed it was directly correlated to a covered peril,

Page 124

correct?
**A. That's a fair summary, I think.**
MR. CAMPBELL: Chris, let me ask you at this point, how much longer do you think you have to go?
MR. PEIRCE: Not much, Colin. I'm not far off. I think probably just a couple more minutes, to be honest, before I pass him.
MR. CAMPBELL: Okay. So let's continue on, then.
MR. PEIRCE: Okay.
Q. (By Mr. Peirce) Is there anything else in -- I take it you've reviewed Exhibit 38; is that fair?
**A. Yes.**
Q. Is there anything else in here that you don't believe warranted extending benefits to my client?
**A. Not that I'm recalling as I look at this exhibit.**
Q. Do you know what percentage of the rooms were investigated by Hudson in 2019?
**A. I don't remember it being expressed as a percentage. But my impression was that it was, I want to say, 30 percent, but that sounds low as I'm giving voice to that.**
Q. I'll tell you it's 29, is I calculated, so that's fairly accurate, from what I see from the

information.
Are you aware of the testimony of J.S. Held and others that there was nothing my clients did to (audio interference) of the rooms over a period of time?
**A. There was a break-up in the transmission, so I missed some of your question.**
Q. Sure. Are you aware that representatives of J.S. Held have testified that there's nothing my client did to restrict full access to all of the rooms over a period of time?
MR. CAMPBELL: Object to form.
**A. I'm not aware of that testimony. The report does note that they inspected the rooms that were available.**
Q. (By Mr. Peirce) Right. And if they wanted to come back, say, the next week and do more rooms, are you aware of any testimony to that effect and what was said?
**A. No.**
Q. Okay. Are you aware if Hudson ever determined the age of the roof?
**A. I am not aware, other than the roof was more than ten years old.**
Q. Why do you say that?



**A. Because that's the information that was in the report.**
Q. I know. But the basis for the over ten years of age, where did that come from?
**A. The policy provisions that cover it.**
Q. I know. But you're saying it was reported it was over ten years. Was there anything that was relayed to the Hudson from, say, Bill Walls saying, Here, I confirmed it was manufactured on this date, and installed on this date anything like that or is it just that suspected it was over ten years old?
**A. Right. His understanding based on his meeting with your client, the client representative, and his inspection was that it was more than ten years old. Later, there was a request for more specific information in that regard, and I don't believe there was a response to that written request.**
Q. Are you aware that Ms. Miller responded she didn't know the age of the roof?
**A. Right. Because it was more than ten years old.**
Q. She didn't say that. She just didn't know.
MR. CAMPBELL: Object to form.
**A. Is it less than ten years old?**
Q. (By Mr. Peirce) That's what I'm asking. Did



Hudson ever find that out?
**A. They asked your client. Your client did not respond.**
Q. But I thought we just talked about that. Ms. Miller did respond, saying she did not know for sure.
**A. And later there was a written--**
Q. Did you do anything else to find out the age of the roof?
**A. Yes. They made a written request to your client for that information.**
Q. And my client responded they didn't know, correct?
**A. I don't think there was a response. I'm talking about Mr. Campbell's written request. I don't believe there was a response to that.**
Q. Just so I understand your testimony, are you saying Ms. Miller did not respond, I don't know the age of the roof, or you don't know?
**A. I understand her response was that she didn't know, but that all available information was that it was more than ten years old. Then there was a request for more specific information, including documentation, and I didn't see a substantive response to that request.**



Q. You mentioned in here that Bill Walls advised Kaho Chan that Cunningham Lindsey would research the Lakewood Billing Department to determine certain information relating to the roof, correct?
**A. Correct.**
Q. And he did not do that, correct?
MR. CAMPBELL: Object to form.
**A. I don't know whether he did that or not.**
Q. (By Mr. Peirce) Okay. Did Hudson receive new information in 2017 about additional damages to the hotel after the first reporting of the damage?
**A. Yes. To the extent they received the bid proposals your client submitted.**
Q. Did Hudson do any further inspection of the hotel after receiving that information in 2017?
**A. Not prior to the claim withdrawal.**
Q. Do you know when Hudson received that additional information about further damages?
**A. My understanding was that it was with the Aguilar estimate, if I'm understanding what you mean by "other damages."**
Q. No, not in 2019. I'm solely referencing 2017. Are you aware that my client reported additional damages to Hudson in 2017 after the initial reporting of the loss?

Page 129

A. Correct. They said that we believe there's some additional damages. We have our contractors looking at it right now. We'll provide our bid proposals. They did that. Hudson responded to that information, and your client withdrew the claim.
Q. Did Hudson change its benefits due and owing analysis after receiving that additional information?
A. I think technically, yes. I mean, the numbers changed, but the net result didn't. Well, the numbers changed because there was a tendered $1500 in benefits.
Q. Yeah. Before it was not over according to Hudson, right?
A. Correct. So what they did -- your client submitted the information and Hudson said, If we presume this is this all accident-related, here's what we will do.
Q. When you say "accident," do you mean the hailstorm?
A. I apologize. Yeah, loss-related.
Q. The numbers changed by, like, 45,000, right?
A. Correct.
Q. My question earlier -- and I don't know if you understood it, based on you thinking it was 2019 -- but in 2017, after receiving the new information of

Page 130

additional damages, did Hudson do any further inspection in 2017?
A. I think I did answer that, and the answer is no, but on --
Q. You did answer it, but I was making sure you were clear on what you were answering because then you referenced 2019. I just want to make sure my question is entirely based on 2017, and you understand that?
A. Right. And the answer is no based on withdrawal of the claim.
Q. Okay. Do you know when the additional information was provided of additional damages?
A. Do you mean the additional bids?
Q. Yeah. When they notified Hudson of additional damages, whether it came from additional bids, an e-mail, in any manner when Hudson notified there was additional damages?
A. I believe it was -- I'd have to look. I want to say the August 2017 time frame. I can look at my report or file to give a more specific date, but as I remember --
Q. Yeah, I believe that's the correct August time frame. And what you call the withdrawal of the claim was made in October of 2017, correct?
A. Correct.

Page 131

Q. Did J.S. Held have architectural plans and building plans from the hotel when they did their inspection in June of 2019?
A. There's reference to some in their report.
Q. Was it your understanding that J.S. Held left the evaluation for damages to the roof to Haag engineer, Matthew Sitzmann, in 2019?
A. I had difficulty tracking that exactly. But that was my takeaway, was that Haag inspected -- as I understand it, they incorporated Haag's findings, but that there were sort of working in conjunction with Haag, but it was not entirely clear to me.
MR. PEIRCE: All right. Mr. Powers, I'm going to pass you to Mr. Campbell.

EXAMINATION

BY MR. CAMPBELL:
Q. I do have a few follow-up questions.
MR. CAMPBELL: Chris, can you take down the document from the screen?
MR. PEIRCE: Sure.
Q. (By Mr. Campbell) So I don't think I'll be long, but I do have a few follow-up questions for you, Mr. Powers. When you were being asked toward the end of the deposition about the timing of Hudson's payment for replacement of the cap flashing to the parapet

Page 132

walls, you phrased one answer in terms of whether that was direct physical loss that the insured wanted to replace.
I will represent to you that during Craig Ulrich's deposition, we learned that RDA was aware of the damage to the cap flashing in the immediate aftermath of the May 2017 hailstorm. I will further represent to you that, by the same token, RDA was aware of dimpling to covers of mechanical equipment in the immediate aftermath of the hailstorm. Yet RDA never made any claim for any of those aspects of damages until it submitted its proof of loss to Mr. Aguilar in April of 2019.
Given that context, do you have any reason to be critical of Hudson with regard to the timing by which it did include payment for that damage in its benefits paid to RDA?
MR. PEIRCE: Objection, form, foundation, leading.
A. I don't.
Q. (By Mr. Campbell) And, just briefly, why would that be?
MR. PEIRCE: Same objections.
A. So it ties to the proof of loss requirements and the conditions of the policy. The policy tells the

**insured, During this process, you're going to need to tell us what you're intending to claim and we'll respond to that.**

**Now, the company goes out and does its own investigation, but the two walk together. So the insured -- and there's lots of times the insured will decide not to claim one item or another for reasons that are personal to the insured.**

**But, no, I don't. The proof of loss requirement, the noted condition clear states that the insured should express what the insured intends to claim so that the company can respond to that.**

Q. (By Mr. Campbell) You were asked to specify by date when Hudson made written requests to RDA for particular information, and you were not presented with your report or any other information to answer that question. You were basically being asked that as a memory test.

I'm looking at Page 10 of your report, and you reference a May 14, 2019, letter written by Andrew Larson to Kevin Aguilar. Do you recall that letter?

**A. I do.**

MR. PEIRCE: Object to form.

Q. (By Mr. Campbell) And then there's a series



of roughly ten bullet point items that are requested by Mr. Aguilar. Do you recall seeing in the file that RDA ever responded to the request for information in any form?

**A. I did not see any response to that.**

Q. And then you otherwise referenced a letter that I sent to RDA's counsel, and that's a letter of July 8, 2019. Is it your recollection that in my letter, I basically reiterated the request for the same information that Mr. Larson had already asked for?

**A. Correct.**

Q. And did you see any indication in the file that RDA ever responded to that letter at any time prior to choosing to file a lawsuit?

**A. No, I did not see any response.**

Q. And the disregard of those two letters, does that, at least in part, play a part in your opinions lack of cooperation from RDA?

MR. PEIRCE: Objection, form. Objection, leading.

**A. Correct. The important part of the investigation is to request information from the insured and respond to information as you receive it.**

Q. (By Mr. Campbell) Mr. Pierce had asked you a question concerning timing of recognition that there



was hail damage to the bug seals, which are the covers that run along the inside of the window.

And he said suggested in his question, at least as I understood it, that those had not been included back at the time of the Hudson 2017 investigation.

Is it your understanding that, in fact, the costs to replace those bug seals was included in that proof of loss submitted by Hudson to RDA in October 2017?

MR. PEIRCE: Objection, form, leading.

**A. Right. Because they were incorporating the proposals that were submitted.**

Q. (By Mr. Campbell) Yeah. And one of the proposals was for $18,000 with a replacement of bug seals, correct?

**A. Correct.**

Q. And Mr. Peirce asked you about comparison of that to Mr. Del Guidice's estimate, and, in fact, they're almost identical, aren't they, from your recollection?

MR. PEIRCE: Objection, form. Objection, leading.

**A. That was my understanding when I was looking at the two.**



Q. (By Mr. Campbell) Okay. So whatever Mr. Peirce may have understood, the actual information would reflect that that was an item of damage that was acknowledged from the start and acknowledged by Hudson to be compensable, correct?

MR. PEIRCE: Objection, form. Objection, leading.

**A. Correct.**

Q. (By Mr. Peirce) You were also asked whether J.S. Held or Hudson summarily rejected the Aguilar estimate. Would you consider putting together a team of eight people to do a two-day inspection of cost of over $15,000 to reinspect the items raised by Mr. Aguilar to constitute a summary rejection of his estimate?

MR. PEIRCE: Objection, form. Objection, leading.

**A. I would not. I thought my responses said that. If they didn't, that's why I took on bridge with the expression "summarily rejected."**

Q. (By Mr. Campbell) All right. You were also asked a series of questions by Mr. Pierce about why in August of 2019 Hudson did not include a line item in its payment for repainting certain aspects of the east and west elevations. Do you recall that line of

Page 137

questioning?
**A. I am not recalling it, actually.**
Q. Well, there was a $35,000 --
**A. Oh, yeah.**
Q. There was a $35,000 bid that was submitted in 2017.
**A. Yes, I recall that.**
Q. And that was specifically with regard to painting certain aspects of the east and west elevations of the curtain wall. Do you recall that?
**A. Yes.**
Q. Now, it is your understanding that Kevin Aguilar was involved in the reinspection process?
**A. Yes. I understood he was there for, I thought, for the pre-inspection meeting and the inspections themselves that were done in 2019, but I can go back and check.**
Q. Generally in terms of your understanding of the claims handling process and sort of the cooperative or interactive aspect of that, Mr. Aguilar thought that Hudson's resulting estimate resulting in its payment in August 2019 missed some element of damage. How does that process work? What would you have expected ordinarily to happen under those circumstances?
MR. PEIRCE: Objection, form.

Page 138

**A. Respond to it, meaning, it's a commutative process. We communicate our understanding of the facts. If Mr. Aguilar disagrees, it's helpful if he lays out, Here's where I'm laying out the analysis and why.**
Q. (By Mr. Campbell) So if Mr. Aguilar thought that there was some painted components that needed to be repainted and thinks it's missing from the estimate, would you want or expect him to bring that to Hudson's attention?
MR. PEIRCE: Objection, form.
**A. I do. And it can be done in various forms. I mean, it can be done in a conversation as well. It doesn't need to be a written report, necessarily. But, yes, he should, and that's what the policy anticipates in his duties in the insured section.**
Q. (By Mr. Campbell) Okay. And just one last time for you, Mr. Powers. You were asked a hypothetical toward the beginning of the deposition. You were asked to assume that the roof inspections or roof evaluations had determined that the substrate had been dented as a result of this hailstorm.
Let me read to you the conclusion that Mr. Sitzmann reached in his August 22, 2019, report, that spoke to that issue. Specifically, what

Page 139

Mr. Sitzmann said was, "There was not an effect from hail on the insulation that could be differentiated from the dents that were created by the ballast on the roof surface."
Given that conclusion by Mr. Sitzmann, do you consider the hypothetical that had been proposed by Mr. Peirce to be an accurate reflection of the facts of this case?
MR. PEIRCE: Objection to form, foundation, leading.
**A. I understood the question to be in a vacuum, meaning assume this fact and no other fact. But when I was answering his question, I wasn't referencing the Haag report because I understood the question to be that he didn't want to reference the Haag report, so. . .**
Q. By (Mr. Campbell) I understand that Mr. Pierce meant it as a hypothetical.
**A. Yeah.**
Q. And I just want to bring it back to the facts of this case and get your perspective on whether you consider that hypothetical to be an accurate reflection of what was actually transpiring in this claims handling process.
**A. I do not.**

Page 140

MR. CAMPBELL: Those are all my questions. Thank you.
EXAMINATION
BY MR. PEIRCE:
Q. A couple of follow-ups, Mr. Powers. This entire investigation that was done by Hudson in 2019 was essentially accomplished in two days as far as the physical examination of the property, correct?
**A. I would incorporate that pre-inspection meeting into it, but. . .**
Q. Okay. I'll add three days, maybe, four if you want. How about that? Four days was adequate to conduct the reinspection, correct?
**A. It was -- the reason I'm hesitating is if there's additional information that gets called to their attention, I think it would be appropriate to respond to that additional information --**
Q. Are you familiar --
**A. -- in terms of where we are, yeah, that was -- they had teams for -- it was an impressive investigation in terms of what went on during that two-day period where they were physically at the site.**
Q. Do you remember what I asked you?
**A. No. Let's read it back.**
Q. Yeah. It's a simple question. Four days was

Page 141

an adequate amount of time for Hudson to reinspect the property in 2019, correct?

**A. Yes, if I'm understanding your question correctly.**

Q. And the proof of loss and estimate of all of the damages being alleged by RDA in 2019 was provided on April 29, 2019, to Hudson, correct?

**A. That sounds correct.**

Q. Why did it take until August 22, 2019, to issue payment if it was reported on April 19, 2019?

**A. Well, you need time for the inspections, you need time if you're going to have teams of people out there, you need time to digest or assimilate that information into a narrative, and the carrier needs time to respond to that. At the same, the carrier is requesting information of the insured. The carrier is reasonably hoping that information is forthcoming.**

Q. Are you given any indication from the file materials that Hudson delayed the payment that was recommend by J.S. Held for anything that the insured did or did not provide?

**A. One more time with that question.**

Q. Sure. Are you aware of any piece of information that caused Hudson to delay payment in 2019 based on the insured not providing that information?

Page 142

**A. Yes. I mean, they're trying to determine the claim, right? They're trying to determine the estimate submitted by Aguilar. They make very detailed requests of Hudson, and there isn't a response that, so in August -- excuse me, RDA.**

**So in August, Hudson says, Here's the information we have, here is our proposal, and then the response is not additional communication. The response is the filing of a lawsuit.**

Q. Is that your understanding of the chronology?

**A. I'm paraphrasing broadly, of course.**

Q. Of course. When was the check issued after Hudson got the J.S. Held report?

**A. I'd have to look at the file on that.**

Q. If the evidence shows the report was dated the same day Hudson wrote the check, would that refresh your recollection?

MR. CAMPBELL: Objection. Assumes facts not in evidence.

Q. (By Mr. Peirce) Well, you are aware the J.S. Held report is dated August 9, 2019, right? I'm sorry. I think I was referring to the Sitzmann August 22nd date. I believe the J.S. Held report was dated August 9, 2019, is that correct, to your recollection?

**A. Yes. Well, we're talking about J.S. Held,**

Page 143

**correct?**

Q. Okay. And then the check was issued, what, August 22nd, by Hudson?

MR. CAMPBELL: I think August 29th.

MR. PEIRCE: The 29th, okay.

Q. (By Mr. Peirce) Is that correct?

**A. That sounds like the timeline the three of us are piecing together. And, again, I can go through and we can look at it specifically, if you like.**

Q. You are aware that Kevin Aguilar reported to Hudson that all the rooms were experiencing active leaking?

MR. CAMPBELL: Object to form.

Q. (By Mr. Peirce) Was the answer yes? I'm sorry.

**A. That was my understanding, is that was Aguilar's position.**

Q. That was reported well before August 2019, correct?

**A. I guess I'm assuming on reported, right? It was the Aguilar estimate, and that's it.**

Q. The conversation. And I'll represent to you it's in the e-mail exchange with Hudson where it talks about what was asked of Mr. Aguilar, what was responded to, there were field notes from Drew Houser talking

Page 144

about how many rooms were experiencing leaking, and an answer provided extensively by Mr. Aguilar. So that information was reported or given to representatives of Hudson, correct?

MR. CAMPBELL: Object to form.

**A. The record speaks for itself in that regard.**

Q. (By Mr. Peirce) But you don't know?

**A. No. I understand that it is your client's position that there was leaking in all those rooms.**

Q. That's not what I'm asking. I'm asking, was that information given to Hudson?

**A. When you say "that information was given to Hudson," what are you referring to?**

Q. How is information given, Mr. Powers? Verbally or in writing, correct?

**A. Correct.**

Q. Okay. So when I'm asking was that information given, I'm including both of those. So was it given to Hudson by Mr. Aguilar in June, at a minimum, of 2019?

**A. There was an indication. Whether there was information given, that's where I disconnect, right? Meaning, Aguilar is suggesting a pervasive issue. This representation of moisture in each room that's storm-related, it occurred -- I'm not remembering when**

Page 145

**that communication occurred.**
Q. Well, one of the things you're being critical of is the lack of providing a list of room numbers which reported active leaking, right? You were saying the insured never gave that information to Hudson, correct?
**A. Well, not just that piece of information though. I mean, all of the information associated with those rooms, right, so --**
Q. Yeah. That's not what it says in the letter, Mr. Powers. I read word for what the request said.
**A. Right.**
Q. So, yes, however you try to distinguish that phrase, that information, at least in part, was provided, correct?
MR. CAMPBELL: Object to form.
**A. I disagree, Counsel.**
Q. (By Mr. Peirce) Okay. We'll move on. The letter speaks for itself. What about invoices of hail damage repair? Some of those were provided to Hudson, correct?
**A. Counsel, can I clarify something about your question?**
Q. Which question?
**A. The one that you suggested I was not**

Page 146

**responding to. When you said "the letter speaks for itself," are you talking about a letter from your client or your client's representative?**
Q. No.
**A. Okay. Then you and I are on the same page. I apologize.**
Q. Great. Hudson did have some invoices of hail damage repair that were formed since the day of the storm, correct?
MR. CAMPBELL: Object to form.
**A. Object to -- I mean, I disagree.**
Q. (By Mr. Peirce) We've got two objections going on. Construction plans were in the possession of J.S. Held when they did their inspection, correct?
**A. Limited construction plans were in there. You've already asked that question.**
Q. And the answer was yes.
**A. That was my answer earlier too.**
Q. Building permits were in the possession of the representatives of Hudson when they inspected the hotel in 2019, correct?
**A. Some permitting was, correct.**
Q. What permits weren't?
**A. I don't know.**
Q. Okay. Do you understand that the maintenance

Page 147

system that reported maintenance was no longer working after 2018? For purposes of maintenance repairs that went into the system at RDA, are you aware of that at all?
MR. CAMPBELL: Object to form.
Q. (By Mr. Peirce) The electronic system is what I'm referring to, where they would record maintenance issues and work orders, things of that nature.
MR. CAMPBELL: Object to form.
Q. (By Mr. Peirce) Are you aware of anything related to that?
**A. I don't have that information, no.**
Q. Are you aware now of what the claimed business loss is or was to the hotel?
**A. I have not been asked to analyze that.**
Q. The mechanical equipment, where is it located on the property?
**A. There's mechanical equipment throughout the property.**
Q. Where is the majority of the mechanical equipment that was analyzed by both J.S. Held and Draper?
**A. What equipment are you referring to?**
Q. HVAC equipment.

Page 148

**A. On the roof.**
Q. Where is the damage located that Matthew Sitzmann acknowledged was covered in 2019?
**A. What damage?**
Q. Whatever damage he said was related to the hailstorm, where would that be located, to your knowledge?
**A. It's reflected in his report. We can go through the report.**
Q. Just generally where? Is it on the roof? Is it at the base? Is it in the lobby? That's what I'm asking.
**A. Generally, it's where he describes it in his report.**
Q. It was on the roof, correct?
**A. I don't mean to --**
Q. I mean, that was Matthew Sitzmann's entire job, was to analyze the roof in 2019, correct?
**A. Right. And you're asking where was the damage he analyzed, and I said it was in his report.**
Q. Right. Which is all consistent with the damage on the roof, right?
**A. Generally, yes. I'd have to go through the report in detail to be absolute.**
Q. All right.

Page 149

MR. PEIRCE: I'll pass the witness.
MR. CAMPBELL: I don't have any further questions.
(WHEREUPON, the deposition ended at 12:50 p.m.)

Page 150

CHANGES AND SIGNATURE

WITNESS NAME: BRENDAN POWERS

DATE OF DEPOSITION: JULY 10, 2020

| PAGE | LINE | CHANGE | REASON |
| --- | --- | --- | --- |
| | | | |

Page 151

I, BRENDAN POWERS, have read the foregoing deposition and hereby affix my signature that same is true and correct except as noted above.

___________________________
BRENDAN POWERS, witness

THE STATE OF ________________)
COUNTY OF ____________________)

Before me, __________________________, on this day personally appeared BRENDAN POWERS, known to me (or proved to me under oath or through ___________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that said person executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _______________, ________.

___________________________
Notary Public in and for
the State of ______________

Page 152

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Civil Action No. 19-cv-02145-DDD-NYW
RDA HOTEL MANAGEMENT COMPANY and LAKEWOOD HOTEL COMPANY,

Plaintiffs,

vs.

HUDSON SPECIALTY INSURANCE COMPANY

-------------------------------------------------------
REPORTER'S CERTIFICATE
VIDEOCONFERENCE DEPOSITION BRENDAN POWERS
TAKEN ON JULY 10, 2020
-------------------------------------------------------

I, LISA ERICKSON, Professional Court Reporter and Notary Public hereby certify to the following:

That the witness, BRENDAN POWERS, was duly sworn by me and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition was submitted on _____________________ to the attorney for Plaintiffs to examine, signature, and return to me by ________________;

That the amount of time used by each party is as follows:

Mr. Christopher P. Pierce - 193 minutes
Mr. Colin Campbell - 12 minutes

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Christopher P. Pierce, Attorney for Plaintiffs, RDA Hotel Management Company and Lakewood Hotel Company

Colin Campbell, Attorney for Defendant, Hudson Specialty Insurance Company

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

Certified to by me this 23rd day of July, 2020.

__________________________

LISA R. ERICKSON
Professional Court Reporter
CO Notary ID 20174027090
Expiration Date: 06/28/2021

## $

**$1** 104:9

**$11,000** 13:20

**$12,000** 13:11

**$15,000** 136:13

**$1500** 129:10

**$17,000,000** 104:5

**$18,000** 135:15

**$35,000** 83:11,22 90:4 97:16 98:7,15 137:3,5

**$400** 13:10

## 1

**1** 82:16 89:4,12

**1,000** 13:17

**1.8** 49:19,23 50:5,14,16

**10** 8:9 133:19

**100** 8:6

**100,000** 81:12

**101,578.66** 89:4

**10:06** 45:24

**11:20** 101:18

**11:38** 101:18

**126** 108:5,15,16,22 109:7 115:3,8

**12:50** 149:5

**14** 47:12 133:20

**15** 6:15,20 11:18

**1500-some-odd** 80:17 85:17 100:9 101:2

**17,000,000-some-odd** 103:1

**19** 141:10

## 2

**20** 7:22 11:18

**2017** 16:17,22 37:2,22 41:7 43:4 48:20 50:3 53:19,22 57:3,16 59:3 60:7,17,19,23 61:7,21 62:5 63:12,24 68:7 69:12, 14 70:23 71:5,13,18 72:16 73:19,24 74:19 76:7 79:11,16,19 80:22 81:16,20 82:3,13 84:6,11, 16 85:8,12 86:2 88:23 89:3,10 90:10,17,20,24 91:10,17 92:1 93:15 94:3, 11,19,21 95:9,11 96:8,11, 22 99:8,16,18 100:4 101:21 102:9,13 109:9 116:11 117:25 118:3,6 120:5,14,19,23 121:3,14, 21,24 122:7,11,14 128:10,15,23,24 129:25 130:2,8,19,24 132:7 135:5,10 137:6

**2018** 147:2

**2019** 80:23,25 93:4 94:12, 20,21,25 95:2,5 96:9,10 99:23 100:1 102:25 109:13 116:16 117:1 118:25 120:20 124:19 128:22 129:24 130:7 131:3,7 132:13 133:20 134:8 136:23 137:16,22 138:24 140:6 141:2,6,7,9, 10,24 142:21,24 143:18 144:20 146:21 148:3,18

**22** 48:20 101:21 138:24 141:9

**22nd** 142:22 143:3

**238,510.61** 81:7 92:14

**24** 13:5

**25** 7:22 13:5 50:3 57:3,16 60:23 61:21 73:19

**29** 124:24 141:7

**29th** 143:4,5

## 3

**30** 7:14,17 10:1 13:10 15:12 124:22

**30(b)(6)** 18:18

**32** 82:1,14,25 87:9 89:5,13

**38** 119:21 121:15 124:12

## 4

**4** 26:25

**400** 13:1

**45,000** 129:21

## 5

**5-1-14** 26:24

**50** 8:3,5

## 6

**60-day** 26:22 27:5,20 28:9

## 7

**7** 61:7 120:1,15 121:5,15, 25

**700** 45:1

**7th** 61:11

## 8

**8** 16:17,22 37:2,22 43:4 53:19,22 80:22 82:13 84:6,16 85:8 86:2 89:10 90:17 120:1,15 121:5,15, 25 122:7,11 134:8

## 9

**9** 142:21,24
**90** 6:9,11 8:11,13
**9:57** 45:24

## A

**a.m.** 45:24 101:18
**absent** 68:11
**absolute** 66:14 148:24
**accepted** 29:16
**access** 4:11 24:13,16 26:5 47:15 54:15 125:10
**accident** 16:5 129:18
**accident-related** 64:8 129:16
**accomplished** 140:7
**account** 89:12
**accounted** 82:13
**accurate** 100:10 101:3,20 119:5 124:25 139:7,22
**acknowledge** 58:15
**acknowledged** 58:20 64:19 69:8,11 81:16 83:12 100:1 120:19 121:2,6,14,21 136:4 148:3
**acquiring** 111:14
**Act** 24:23 25:15,22 26:1, 25
**acted** 23:16
**actions** 6:21,24
**active** 6:24 143:11 145:4
**activities** 44:3
**actual** 40:8 49:18 106:11, 12 136:2
**ACV** 81:12
**add** 13:9 19:4,6,24 20:10, 12,17 21:4,13 22:1,16 23:3 91:24 115:25 123:19 140:11
**added** 22:8 52:7 103:21
**adding** 15:20 63:8 77:16
**addition** 11:5 34:12
**additional** 27:24 28:4 65:15 74:12 91:4 99:22 104:1 114:1,24 116:21,22 119:2 128:10,18,23 129:2,7 130:1,11,12,13, 15,17 140:15,17 142:8
**address** 97:8
**adequate** 140:12 141:1
**adequately** 120:18
**adjectives** 22:24 23:5
**adjusting** 24:24
**adjustment** 24:4,6 26:6
**adjustor** 14:11,15 24:11 41:6
**adjustors** 14:13 23:12
**administer** 3:6
**admissibility** 3:8
**admitted** 33:1
**adopt** 42:17 43:7,10
**advised** 128:1
**aerodynamics** 39:24
**aesthetic** 34:12 39:23,25 40:18 69:20 122:23
**aesthetically** 34:16
**affect** 103:16
**affected** 88:6 99:3,5,7
**afforded** 79:4
**affording** 28:1
**affords** 28:2
**aftermath** 132:7,10
**age** 125:22 126:4,19 127:8,18
**agents** 49:8
**agree** 6:18 18:21,24 19:20,21 20:5 21:3,19,24 23:2 36:11,16 83:5 85:19 100:22 108:25
**agreed** 59:12 83:9
**agreement** 116:19
**Aguilar** 53:24 104:22 109:15 128:20 132:13 133:21 134:2 136:10,14 137:13,20 138:3,6 142:3 143:10,21,24 144:2,19,23
**Aguilar's** 104:16 105:6 107:16 143:17
**ahead** 17:16 42:23 53:4 60:13 82:19 110:6
**AIG** 10:8
**alleged** 116:24 141:6
**alleging** 106:9
**allowance** 70:12 86:10
**Allstate** 10:10
**alter** 32:9
**alteration** 32:8,19 33:4
**alterations** 32:11
**altered** 33:1
**aluminum** 70:4,15
**American** 9:15,21,22
**amount** 5:24 20:3,8,16,22 49:14 81:12 89:15 91:16 106:2 122:21 141:1
**amounts** 87:11
**analysis** 6:16 14:21 15:24 16:9,23 17:17 23:19,20 30:10 84:11 129:7 138:4

**analyze** 43:3 107:6,10 147:16 148:18

**analyzed** 147:22 148:20

**analyzing** 61:7

**and/or** 121:1

**Andrew** 133:21

**Anne** 18:7

**answering** 60:12 114:10 115:19 120:11 130:6 139:13

**answers** 18:22

**anticipate** 68:8

**anticipates** 102:20 138:15

**apologize** 7:5 8:8 13:15 15:8 28:20 43:9 66:13 71:7,10 72:9 75:7 81:17 84:25 87:4 89:19 113:16 129:20 146:6

**appearance** 34:21

**appearances** 14:1

**appears** 31:20

**apples** 87:4 88:19 90:24

**applicable** 28:11

**application** 17:23 30:7,25 42:15 80:16

**applied** 17:9 29:25 81:11

**applies** 24:24 28:9

**apply** 24:9 25:17 27:20 29:15 30:13 37:24 41:20 46:22

**applying** 93:3

**approach** 25:14 107:5

**appropriately** 24:9 34:16 69:4

**April** 102:25 132:13 141:7,10

**architectural** 131:1

**area** 63:10 65:25 90:3 118:12,13

**areas** 16:24 64:9 66:17 74:13 88:6 99:3,5,6,8

**arguing** 91:13

**arise** 16:7

**aspect** 137:20

**aspects** 132:11 136:24 137:9

**assembly** 109:5

**assessment** 90:10

**assigned** 41:19 102:25

**assignment** 62:4 75:23

**assimilate** 141:13

**assisting** 7:7,10,12,16

**Association** 12:9,13

**assume** 39:24 138:20 139:12

**assumes** 106:25 142:18

**assuming** 38:12 143:20

**Assurance** 9:11

**attached** 4:6 82:9,12,17, 25 104:16

**attention** 138:10 140:16

**attorneys** 111:23

**audio** 31:4,13 33:6 40:10 44:11 125:4

**August** 94:25 95:2,5 130:19,22 136:23 137:22 138:24 141:9 142:5,6,21, 22,24 143:3,4,18

**authored** 62:2

**authoring** 11:6

**authorized** 3:6

**auto** 16:4

**aviation** 10:22

**aware** 4:5 42:9,12 48:19, 22 55:10 57:24 58:23 67:16 74:18 78:7 80:20 81:2,8,14 82:8,19,23 88:20,23 102:3 107:6 108:15 112:1 123:14,18 125:2,8,13,18,21,23 126:18 128:23 132:6,9 141:23 142:20 143:10 147:3,11,14

**awareness** 26:3

**B**

**back** 35:15 42:24 43:17 46:1 48:15 73:9 86:13 88:2 89:17 98:11 115:15 125:17 135:5 137:17 139:20 140:24

**backtrack** 35:17 55:5

**ball** 38:22 68:2

**ballast** 139:3

**banged** 38:21

**base** 105:22 148:11

**based** 3:8 15:15 16:23 17:23 26:16 27:5 28:18 37:25 44:2 71:8 81:8 83:13,16 84:12,20 85:12 88:16 89:24 90:25 95:5 99:20 100:2 102:18 103:20,24 106:1 109:15 111:20 121:11 122:19,21 126:12 129:24 130:8,9 141:25

**basement** 64:11

**basically** 6:19 67:9 133:17 134:9

**basing** 84:10 86:4

**basis** 126:3

**beat-up** 38:25

**beginning** 60:3 138:19

**begins** 30:10

**behalf** 73:7

**believed** 65:2,6 68:12 104:18 123:25

**believes** 64:8 109:25

**benefit** 16:6

**benefits** 28:2 33:6 94:15, 19,25 95:9,14,19 96:7,21 97:12 106:5,9,11,12 109:9 110:1,17 120:14 121:23 124:15 129:6,11 132:17

**bid** 128:12 129:3 137:5

**bids** 66:23 75:9,19,21,24 84:12 104:23 114:21 130:13,16

**biggest** 67:16

**bill** 5:5 7:24 8:12 13:4,15 41:5,10,13,15,23 42:4,11, 18,19 43:2,4,7,13,15,19, 24 44:1 58:24 73:5 85:15 99:12 101:1 102:4,16 126:8 128:1

**Billing** 128:3

**bit** 18:19 33:14 42:13

**blindly** 42:17

**Blusky** 44:19 110:11,12, 13

**boots** 43:3 107:9

**brand-new** 39:20 40:10

**break** 44:24 45:16,22 85:5 101:13,14

**break-up** 125:6

**breaking** 33:14

**Brendan** 3:16,22 16:25 45:7,20

**Bresnahan** 78:25 79:3,12

**Briana** 4:24 73:18 75:12 76:3,8 78:20 79:12 85:16 100:19 101:2 110:7,18

**Briana's** 100:25

**bridge** 136:19

**briefly** 132:21

**bring** 3:23 4:9 113:4 138:9 139:20

**broad** 95:23 112:5

**broader** 96:17 120:2

**broadly** 142:11

**broke** 40:12

**brunt** 108:1

**bug** 108:16,18 135:1,8,15

**building** 34:11,14,15,17, 18,21 44:5 50:10,24 51:2, 8,21 52:6,13,16,17 54:3, 6,19 55:4 65:21,22 104:12 117:7,9,25 118:10 119:10 123:13 131:2 146:19

**building's** 51:23 52:8

**bullet** 134:1

**business** 104:9,10 111:18,19 147:15

**Buyer** 18:7

**C**

**calculated** 124:24

**calculation** 82:6 85:16

**call** 45:10,14 79:3 107:10 115:7 130:23

**called** 140:15

**Campbell** 3:13 11:9,11, 20,24 12:2,12,16 17:15 21:12 29:22 30:16 31:2 33:3 35:6,14 37:11 40:3 41:12 43:8 45:3,6,13,17 46:24 49:25 53:1,3,6 54:20,25 56:11,13,16 58:1 62:19 64:15,22 65:8 67:25 68:14,21 70:17 80:4 81:22 83:1,18 86:5, 15 87:3,13 88:4 89:18 90:12,22 91:12,19 92:21 93:16,23 94:4,5 96:23 100:11,14 101:8,12,15 105:25 106:19,25 107:24 109:2,10 112:15,17,23 115:12 116:20 118:20 119:6,12 124:3,8 125:12 126:23 128:7 131:14,16, 18,21 132:21 133:13,25 134:24 135:14 136:1,21 138:6,17 139:17 140:1 142:18 143:4,13 144:5 145:16 146:10 147:5,10 149:2

**Campbell's** 117:18 127:15

**cap** 38:8,10,15,16 69:7, 19,22 70:4,21 71:1,13,17, 25 72:8,17,22 73:8,18,23 74:5,11 119:14 120:4 122:10,15 131:25 132:6

**caps** 70:10

**capture** 28:3

**captures** 83:5

**car** 38:20,23 39:3,4,13,20, 22 40:10

**carrier** 7:24 10:21 11:8 65:23 68:9,24 69:3 70:11 76:21 87:22,25 104:13 141:14,15,16

**carrier's** 68:22 103:15

**carriers** 10:16

**case** 4:16 10:5,18 11:8 12:15,22,24 14:9 15:1,4, 16,22,23 17:21 27:10,12 28:12 30:7 31:10 32:15 39:5 64:12 84:18 87:11 95:22 102:22 105:23 106:21,24 111:23 139:8,

21

**cases** 16:9

**casually** 11:18

**Casualty** 9:5,8

**catch** 29:12

**category** 120:2

**caught** 94:13 99:17

**causally** 84:16

**causation** 16:21 123:1

**caused** 22:15 36:7 37:2, 21 48:24 82:13 84:6 89:10 97:21,23 123:10 141:24

**caveat** 19:24 84:3

**chain** 101:5

**Chan** 4:18 11:1 13:7 24:16 26:10 42:4,11 43:6,13,16, 20,24 44:1 49:11 76:16, 17 77:8 78:10,19 79:2,11 128:2

**Chan's** 42:3 49:5

**change** 13:25 39:17 94:19 95:12 96:7 129:6

**changed** 92:24 94:1,2,8, 13,14,16 96:8 129:9,10, 21

**changing** 93:2,14 95:8,19

**characterization** 83:10,20 92:4 93:19 94:7 108:7 109:4 119:4,7

**characterize** 5:23 93:1

**chatted** 12:5

**check** 137:17 142:12,16 143:2

**children** 21:7

**choosing** 134:14

**chose** 107:5

**Chris** 3:10 45:3 49:25 53:1,3 56:11 101:8 112:17,23 124:3 131:18

**chronology** 45:2 114:14 142:10

**circumstances** 22:18 27:16 30:15 32:14 39:17 63:13,14 64:5 106:20 137:24

**citing** 76:9

**Civil** 3:3

**claim** 4:19 18:24 19:9,13 20:4,9,16,22 21:2,18,23 22:20 23:8 24:6,15,17,23, 25 25:20,23 26:4,6,14,16, 21 27:14 59:22 64:10 71:13 77:23,24 78:11,23 79:19,23 80:2,13 96:19 99:18,21 100:5,6,7 103:6, 7 104:11 107:13 111:10, 17 114:1,15 115:6,7,16, 17 116:9,16,18 118:7,10 128:16 129:5 130:10,24 132:11 133:2,7,12 142:2

**claimed** 6:17 27:25 28:1,3 104:6 118:9 147:14

**claims** 7:23 16:5 24:4,7 25:14,16,21 26:1,2,25 41:19 51:1 137:19 139:23

**clarification** 118:15

**clarify** 51:16 122:3 145:22

**clarifying** 17:20

**clean-hooded** 39:13

**clear** 36:5 130:6 131:12 133:10

**clearer** 36:25

**client** 65:12 77:1,2,21 79:19 87:12 91:18,25 93:17 94:6,9 97:16,19 100:4,6,7 101:21 105:24 106:8,13 109:7,24 110:4 116:7,25 120:18,23 121:18 124:15 125:9 126:13 127:2,11,12 128:13,23 129:5,14 146:3

**client's** 77:6,7 78:6,10,13 144:8 146:3

**clients** 48:20,24 76:21 117:15 125:3

**close** 88:7

**CNA** 8:22,23 9:7

**co-defense** 12:21

**codified** 27:9

**Colin** 3:13 11:9,11,23 13:4 45:15 53:4 124:5

**color** 88:6

**Colorado** 3:3 12:8,12 14:12,13 17:7 24:13,18, 24 25:10,19 26:11,21

**Colorado's** 25:14 67:17

**comb** 38:14

**combed** 38:14

**comment** 121:8

**commercial** 52:16

**common** 29:6,15 35:1 51:5

**commonly** 29:15,25

**communicate** 41:16 66:19 75:2 110:12,14 113:18 115:4 116:14 117:1 118:14 138:2

**communicated** 63:17,19 75:16 76:13 77:21 90:8 104:24

**communicates** 41:16 72:13 110:8 111:12 114:20

**communicating** 77:1

**communication** 64:25 66:7 72:11 77:1 102:10

110:3 142:8 145:1

**communications** 76:21 77:20 113:16 116:2,6,7

**commutative** 138:1

**companies** 6:21,24 8:7, 12,13 9:23 25:25

**company** 7:7,10,11,13 8:21,23 9:5,9 10:8 16:11 23:22 24:3 28:5,7 42:7,14 60:16 84:15 85:6 111:12 118:8,16 133:4,12

**company's** 42:1

**comparing** 87:4

**comparison** 135:18

**compensable** 32:12 136:5

**complaint** 109:23,24

**completed** 79:10

**completely** 29:20 51:7 74:22 103:19,21 105:17

**completes** 44:11

**complex** 52:16

**complies** 24:19

**comply** 27:25 111:6

**complying** 25:10

**component** 5:25 33:5 35:24 39:25 46:3,14 65:6 69:18,21 108:10

**components** 108:8 138:7

**comprehensive** 104:19

**comprised** 7:20 72:11

**compromised** 69:21

**computer** 45:9

**concept** 21:9

**concepts** 21:6

**concern** 67:8,9 68:18,20, 23,25

**concerned** 74:13

**concerns** 68:9,10 69:2 110:3,15

**conclusion** 138:23 139:5

**condition** 24:1 133:10

**conditions** 132:25

**conduct** 21:1,17 140:13

**conducted** 44:8 54:8 55:23 63:11

**conducting** 22:21 49:11

**conference** 45:10 49:22

**confirm** 111:13

**confirmed** 126:9

**confirms** 48:12

**confused** 71:20 118:15

**confusing** 8:8 49:16

**confusion** 110:11

**conjunction** 26:13 44:7 63:3 131:11

**connection** 45:11,14,21

**considered** 48:14 118:13

**consisted** 59:4 81:21

**consistent** 34:17,22 35:13 148:21

**constantly** 25:21 66:11

**constitute** 36:19 39:15 40:20 47:6 123:8 136:14

**constitutes** 6:19 27:12 36:17 37:3 123:4

**construction** 14:6 76:3 82:11 146:13,15

**constructive** 107:5

**consult** 25:15 66:21

**consulted** 26:13,15

**contacted** 12:18

**contained** 30:14 31:9 41:11

**contend** 96:22 104:15 109:17

**context** 37:18 62:3 103:5 114:7 132:14

**Continental** 9:5

**continue** 124:8

**contract** 44:19

**contractor** 56:4,5,7 66:21 75:9

**contractors** 44:20 65:12 66:23 75:15,18,23 103:11 104:23 111:15 114:21 117:10,11 129:2

**contrary** 24:7 51:12,13 62:21 99:14

**control** 93:9

**conversation** 72:21 78:5, 8 79:7 138:13 143:22

**conversations** 76:12 77:4

**cooperation** 110:15 134:18

**cooperative** 137:19

**copies** 4:10

**copy** 4:1 47:15

**Corelogic** 123:12

**corporate** 5:2 18:16

**correct** 4:13 5:6,13,14,18 8:18,20 9:2,4,14 10:6,11, 12 11:9,10 13:13,21 14:4, 5,6,7,9 15:1,2 16:18,19 17:4,5,14 18:7,8,14,15,17 19:25 20:1,23,24 22:11 28:9,16 29:21 32:25 35:13 36:9,10,21 38:4 41:2,8 46:10,13,23 47:2, 24 49:5,6,8,9 50:16,19, 20,23 51:3 52:6 54:24 61:17 63:2 64:14,21

65:14 67:18,21,22,24 68:3,4 69:10,12,13,24 70:7,16 71:8 72:19 73:6, 8,20,21 74:3,22 75:22 76:4 78:21 79:16 81:10, 12,13 82:6,7 84:11 85:10, 14 86:19 87:23 88:14,22, 23,24 89:1,2,5 90:10 91:11 92:2 95:2,4 96:15 97:17 99:3,13 100:13 101:22,25 102:23,24 103:1,2 108:3,23 115:11 117:22,25 118:8 122:22 123:15,20 124:1 127:13 128:4,5,6 129:1,14,22 130:22,24,25 134:11,21 135:16,17 136:5,8 140:8, 13 141:2,7,8 142:24 143:1,6,19 144:4,15,16 145:6,15,21 146:9,14,21, 22 148:15,18

**correctly** 62:7 118:1 141:4

**correlated** 123:25

**corresponded** 62:17

**correspondence** 79:18 80:1 95:17 96:11 97:10 100:13 112:13

**cosmetic** 28:24 34:1,4

**cost** 70:9 136:12

**costs** 100:20 135:8

**counsel** 3:5 7:5 12:21 43:9 98:6 113:6 134:7 145:17,22

**Country** 8:19 9:13,14

**couple** 46:1 124:6 140:5

**court** 3:6 17:7,12

**Court's** 18:4

**cover** 35:24,25 36:3,4,6 79:14 126:5

**coverage** 6:12,13,14,16, 18 15:3,6,7,9,17,19,22, 24,25 16:2,3,12 23:2 27:15,20,22,23 28:1,18 29:2 37:24 41:20 76:6 77:2,3,17,18,22 78:7 79:4 81:19 85:12 92:24 93:2, 14 94:1,2,8,11,14,17,23, 24 95:12,15 105:22

**covered** 15:10 19:19 20:4, 9,16,22 27:14,18 35:21 42:10,11 59:18,19 65:19 69:23 70:5 76:8 79:6 80:15,21 81:3,15,20 83:12 85:7 86:1 87:8 88:13,16,22 89:16 90:7, 16,20 91:10 119:11 121:2,10 122:6,11 123:25 148:3

**covers** 37:23 132:9 135:1

**COVID** 13:16

**Craig** 132:5

**crease** 67:4

**created** 8:2 139:3

**critical** 132:15 145:2

**Cunningham** 42:9 82:2,9 128:2

**curtain** 14:21,25 57:1 66:1,6 68:6,9,25 69:3 93:5,6 105:17,20 137:10

**cut** 31:5,17 33:12 42:25 44:12,23

**cutting** 29:7 32:17 33:8,11

**D**

**damage** 14:21 16:17,21 20:8 22:13,14 28:15,18, 24,25 30:4,6,14 31:7 32:12 33:2,25 34:8,24 35:8,9,12,18 36:12,17,20 37:4,14,20 38:13,15,22 39:15 40:15,16,21,23 41:2 42:18 43:4,5 44:4,5 46:2,20 47:7 48:5,20,25 49:12,15,20,23 50:22 57:10 59:8,14 60:18 63:12 64:7,13,20 65:2,4, 10,18 66:5,6,10 67:3,6,8, 10,13 70:3,6,15,18 71:7, 12,17 72:1,8,15,22,24 73:8,17,18,23 74:11 76:4 80:21 81:3,15,20 83:22 84:1,6 86:1 88:18 89:4 90:10,16 92:17 97:20,23, 25 98:3,4,18 99:1,11,15, 25 100:8 105:1,14 106:22 107:7,11 108:9 116:12 117:14,22,24 118:18,23 119:9,18 120:4,8,9,13,18, 24 121:2 122:19,21 128:11 132:6,16 135:1 136:3 137:22 145:20 146:8 148:2,4,5,20,22

**damaged** 17:1,2,3 30:4,24 32:12 35:24 46:4 64:17 65:7,24 68:13 98:10 99:8 105:18

**damages** 20:3,16,22 80:15 82:12 83:12 85:7 87:8 89:12 91:10 128:10, 18,21,24 129:2 130:1,12, 15,17 131:6 132:12 141:6

**date** 13:3 36:7 38:11 55:7 77:18 78:12 116:7 126:9, 10 130:20 133:14 142:23

**dated** 142:15,21,23

**dates** 113:24 117:13

**David** 4:20 11:1 13:7 18:14 81:14 84:4

**day** 15:14 37:9 69:1 142:16 146:8

**days** 140:7,11,12,25

**deadline** 25:13 26:23 27:1,20

**deal** 110:16

**debatable** 26:24 27:8,9,12,13

**debate** 27:6

**decide** 37:6,9 133:7

**decided** 90:20 91:1 100:4,6,7 110:23

**decision** 7:9 26:23 28:8 42:14 81:20 94:14

**deductible** 80:16 81:12

**defendant** 3:13

**defending** 6:20,23 7:2,6,9

**defense** 5:22 6:1,3,8,10 7:21 8:4 12:8,12

**defer** 62:22,24 63:1

**deferred** 32:15

**define** 29:5 35:17 48:12 58:4

**defined** 29:14,24

**defines** 29:3,17

**definition** 28:19,23 29:1,4,17,20 30:10,14 31:19,23 32:1,2 34:6 41:10 46:2

**definitive** 59:18

**Del** 81:9 82:24 83:14,17 84:20 86:3,11,17,24 87:10,18 88:11,12,17,23 89:14 90:3,18 119:19,23 120:8 135:19

**delay** 106:9,10 110:1,17 141:24

**delayed** 106:12 141:19

**denial** 106:9 110:1,17

**dent** 32:7 67:4

**dented** 30:21,23 35:20 39:7 69:8,9,11 70:4 138:22

**dents** 39:3 46:9,11 70:22 139:3

**Denver** 24:17

**deny** 22:20 23:2

**Department** 128:3

**depend** 57:12 59:10 64:5 104:7 106:20

**depending** 22:18

**depends** 15:9 30:9 35:23 39:16 40:17

**DEPONENT** 33:16 45:12

**deposition** 3:8 4:2,3,18,23 5:1,4,7 11:3 13:23 18:13 23:25 42:3 47:12 50:18 53:10 63:2,6 75:11 81:15 84:14 131:24 132:5 138:19 149:4

**depositions** 4:16,21 10:25 13:7,25 49:5 53:9 109:22

**depreciation** 80:17

**describe** 84:1

**describes** 148:13

**describing** 65:17 118:24

**description** 44:3 51:12 52:13

**designated** 77:7 78:10,13

**detail** 34:21 55:9 63:7 148:24

**detailed** 142:3

**details** 53:21 58:10 105:4 112:24

**determination** 23:16 76:7,8 85:12 87:23 88:1 89:3 92:1,25 93:14 94:2,23,24 95:8,19 105:22

**determinations** 77:2

**determine** 20:3,8,15,21 28:18 29:2 88:21 91:22 128:3 142:1,2

**determined** 7:13 30:22 36:24 37:1 80:21 81:3 88:13,16 90:3 91:5,9,10 92:17 93:15 94:3 95:10 96:8,10 98:17 100:9 119:10 120:14 125:22 138:21

**determining** 91:16

**dialogue** 75:10

**difference** 34:5

**differentiated** 139:2

**differently** 58:3 89:20

**difficult** 43:10 45:8

**difficulty** 131:8

**dig** 80:9

**digest** 141:13

**dimple** 37:1

**dimples** 38:6,11,21 39:14,21

**dimpling** 36:3,11,15,17,19 37:21 38:1,10,15 132:9

**direct** 28:14 31:13,19 32:6 33:6,13,24 34:8,22,24 35:2,3,8,11,18 36:20 37:3,14 40:14,15,20,23 41:1 46:2,19 47:6 70:3,18 123:5,8 132:2

**directed** 48:1

**directly** 123:25

**disagree** 51:7 68:1,16 73:25 74:23 83:19 87:14,15 88:15 92:3,21 93:19 94:7 95:12 108:7 109:3 115:13 120:21 145:17 146:11

**disagreement** 118:16

**disagrees** 103:9 138:3

**disconnect** 30:19 86:6 113:17 144:22

**disconnects** 31:25

**discovery** 95:21

**discussed** 53:8

**discussing** 78:7 79:15 97:12

**discussion** 42:2,10 73:13, 15 75:17

**discussions** 76:18

**display** 47:14,16

**dispute** 16:14,16 27:19 49:23 50:5 62:18 67:21 77:19

**disregard** 134:16

**distinction** 7:1,5 33:23 73:4

**distinguish** 145:13

**document** 82:3 93:10 95:24 131:19

**documentation** 111:9,21 127:23

**dogs** 39:1

**dollars** 80:17 85:17 100:9 101:3 103:1

**double-negative** 71:11

**downspout** 34:10,12,13

**dozen** 11:13

**Draper** 147:23

**draw** 7:1

**drawing** 7:6

**Drew** 143:25

**driving** 38:25

**duces** 4:5

**due** 87:11 94:15,19,25 95:9,10,14,19 96:4,7,8,9, 10,21,22 97:12,16,18 120:14 129:6

**duly** 3:17

**Durrick** 9:17

**duties** 50:21 111:5 138:16

**duty** 18:23 19:8,10 20:2,8, 13,15,18,20 22:13 59:13 64:3 67:10 68:11

**duty-bound** 21:1,16

## E

**e-mail** 43:5 100:16,19,21, 25 101:5 130:16 143:23

**e-mailed** 80:12

**e-mails** 42:8

**earlier** 5:8 46:8 48:2 59:12 87:21 93:12 98:1 100:17 129:23 146:18

**easier** 47:11

**east** 93:9 98:2,4 136:24 137:9

**effect** 125:18 139:1

**effective** 99:6

**efficiency** 45:18

**effort** 19:10 20:18,21 24:5,19

**electronic** 147:6

**electronically** 113:7

**element** 37:7 137:22

**elements** 49:2 57:13,15 105:11

**elevations** 136:25 137:10

**employed** 55:10

**employee** 56:2,6,9,25

**employees** 55:19,24 56:1, 4,8,23

**encompass** 66:5

**encounters** 24:22 25:12, 13

**end** 22:24 23:6 29:8 60:3 115:16 131:23

**ended** 149:4

**endorsement** 34:2 48:13

**ends** 30:10

**engine** 39:24

**engineer** 14:4 30:3,22 44:5 50:10,24 51:2,3,8,21 52:6,13 54:3 59:3 62:4 131:7

**engineering** 14:8,22 44:15 52:17 57:19

**engineers** 16:24 97:19

**English** 71:21

**enhance** 32:21

**ensure** 24:18 25:2

**ensures** 28:14

**entire** 4:11 25:2 36:2,9 38:3 46:6 50:11,13,16 61:10 76:4 83:16 98:25 114:14 140:6 148:17

**entrance** 58:13

**EPDM** 14:17 30:20 46:17 119:17

**equipment** 132:9 147:17, 19,22,24,25

**equivocating** 15:8

**essentially** 65:16 140:7

**estimate** 53:25 69:16 81:9 82:23 83:14,17 84:20,23 86:3,7,9,18,22 87:10 89:15 104:5,16,22 105:6, 7,10,13,18,21 106:17,22 107:16,18,20 109:16 110:12,13,14 119:19,22 128:20 135:19 136:11,15 137:21 138:8 141:5 142:2 143:21

**estimates** 44:19 82:17 84:5 89:10 111:14

**etcetera** 49:8 82:11

**evaluate** 116:18

**evaluation** 31:7 48:13 131:6

**evaluations** 138:21

**events** 12:12

**evidence** 30:21 55:21 107:1 119:4 142:15,19

**evolutionary** 91:7,8

**exact** 18:10 108:13 119:15

**examination** 3:19 61:12 131:15 140:3,8

**examine** 64:3 65:18

**examined** 64:17

**exchange** 143:23

**exclude** 47:21

**excluded** 96:9

**excluding** 95:9

**exclusion** 34:1

**exclusions** 27:15

**excuse** 114:25 142:5

**exhibit** 47:12 82:1,12,14, 18,25 84:9 85:1,3 87:9 89:5,13,21 119:21 121:15 124:12,17

**exhibited** 108:9

**exist** 44:9,14 96:12

**existed** 116:13

**existing** 11:4 88:7

**exists** 111:2

**expect** 23:11 24:11,19 54:13 69:5 138:9

**expected** 137:23

**expense** 21:2,18,23

**expenses** 80:14

**experience** 14:22 45:19 51:13 53:15 54:2

**experiencing** 60:1 66:15, 16 143:11 144:1

**expert** 10:4,11,14,17 14:6, 17,25 123:2

**expertise** 14:20 56:3

**experts** 58:15

**explain** 40:22,25 83:21 86:20 87:16 90:21 93:25 94:9,18 95:7 96:13,21 97:7

**explained** 52:20 79:3 93:20 95:18 97:11

**explains** 75:8 86:21

**explanation** 83:15 93:13

**explicitly** 81:8

**express** 68:8 133:11

**expressed** 52:15 53:17 124:20

**expression** 29:23 30:1 35:2 41:25 48:12,16,17 70:3 77:22 88:15 136:20

**extend** 66:13

**extended** 121:23

**extending** 124:15

**extensively** 144:2

**extent** 12:6 15:6,18 16:11, 15 20:3,8,15,21 51:11 59:2,3,22 62:25 69:17 77:19,21 81:23 106:8 117:3 118:7 128:12

**exterior** 34:10 54:9,19 55:11,20,22 57:2 65:4,6 66:6 68:6 69:7 70:5 71:1, 12 97:23 98:2,4,18 108:1 117:25

**eyes** 61:18 88:21

**F**

**facetious** 47:1

**fact** 29:18 66:4 115:21 135:7,19 139:12

**facts** 6:17 7:8 15:16 16:11 17:24 27:24 39:18 41:20 49:7 93:3 99:14 106:25 138:3 139:7,20 142:18

**failing** 106:4

**failure** 116:25

**fair** 8:7,14,15 21:1,5,8,9, 10,17,20,22 22:4,6 34:23 46:6 51:6 73:22 75:18,19 79:5 119:7 121:7,9 124:2, 12

**fairly** 26:23 27:8,9,12,13 40:19 124:25

**falls** 46:18

**familiar** 50:25 140:18

**Family** 9:21,22

**Farm** 9:1

**feasible** 74:4

**Federal** 53:13

**feedback** 74:12

**feel** 23:19 47:18 115:14

**feels** 60:11 75:3 118:12

**feet** 54:13

**felt** 116:11,13

**field** 143:25

**figure** 65:9 77:5 121:20

**file** 3:23 4:7,9,11,14,17 10:24 11:2,4,15 12:19 24:13,14,15 53:16,20 71:9 80:10 98:11 106:4 110:2 116:22 130:20 134:2,12,14 141:18

142:14

**filed** 7:21 94:22

**filing** 142:9

**filling** 54:14

**fin** 38:13,14

**finalized** 99:18

**find** 80:10,11 106:3 112:8, 10 119:20 127:1,8

**finding** 41:18 77:11 79:8 94:9

**findings** 75:8 108:4 131:10

**fine** 60:14 62:1,2 78:15 101:17

**fingers** 101:9

**finish** 32:10 52:10 60:10 122:23

**finished** 13:15 58:10 115:23

**finishes** 34:18

**finishing** 34:20

**firm** 5:21 6:2,3 116:20

**firm's** 5:25

**first-party** 6:21,24 7:21 8:3 12:22

**flashing** 69:7,22 70:22 71:1,13,17 72:8,17,23 73:8,18,23 74:6 120:4 122:10,15 131:25 132:6

**flashings** 72:1

**follow** 24:1,3,6 29:17

**follow-up** 131:17,22

**follow-ups** 140:5

**Forge** 8:21

**forget** 9:6 81:6 93:8

**forgets** 63:7

**form** 17:15 21:12 29:22 30:16 31:2 33:3 35:6,14 37:11 40:3 41:12 43:8 46:24 52:16 54:20,25 58:1 62:19 64:15,22 65:8 67:25 68:21 70:17 80:4 81:22 83:1,18 86:5,15 87:3,13 88:4 90:12 91:12, 19 93:16 94:4 96:23 100:11,15 105:25 106:19, 25 107:24 109:2,10 112:15 115:12 118:20 119:12 125:12 126:23 128:7 132:18 133:24 134:4,19 135:11,22 136:6,16 137:25 138:11 139:9 143:13 144:5 145:16 146:10 147:5,10

**formal** 77:22 113:20

**formally** 102:9

**format** 112:11

**formed** 146:8

**forms** 138:12

**forthcoming** 141:17

**found** 42:5 43:7,11 108:16

**foundation** 132:18 139:9

**foundations** 6:3

**fractured** 108:5,8,16,23

**fractures** 109:8

**frame** 54:1 79:15 80:23 94:22 102:2 116:19 130:19,23

**framework** 23:22

**frankly** 25:18

**free** 47:18

**friends** 11:19

**front** 22:10 47:11,16 113:2

**full** 3:21 21:1,5,17,21,22 22:4,6 37:19,24 52:7

63:11 69:6 125:10

**function** 30:5 31:9,12,18, 20,22 36:16

**functional** 30:3 31:6,8,14 32:13 33:20,25

**functionality** 69:18,20

**functionally** 30:4,24 38:2

**functioned** 38:23

**functioning** 34:20 46:16, 18

**functions** 34:13

## G

**gather** 28:4

**gathered** 57:18 91:4

**gathering** 66:23

**gathers** 41:15

**gave** 32:5 55:2 71:23 74:22 145:5

**general** 25:16 26:7 29:5 35:16 41:17 44:3 48:16 85:19

**generally** 26:2 41:24 64:6 77:13 109:23 110:15 137:18 148:10,13,23

**German** 5:16

**give** 30:2 38:5 65:5 105:4 106:6 114:1 130:20

**giving** 124:22

**glass** 68:4 82:11

**golf** 38:21

**good** 38:24 106:15

**gosh** 74:5

**grafts** 44:4

**grant** 27:15

**gratuitous** 123:15,16,19

**great** 85:25 116:2 146:7

**ground** 43:3 107:9

**Group** 8:22 9:16

**guess** 4:8,19 20:14 23:4 35:23 71:19 86:6 92:3 93:9 94:13 99:17 106:1 109:3,21 118:21 143:20

**guide** 19:17

**guideline** 24:8

**guidelines** 23:8,17,23 24:1,4,6,12,18,21 25:6,9, 10,17,18 26:8,11,13,15, 20

**Guidice** 82:24 86:11,17, 24 87:18 88:11,12,17,23 89:14 90:3,18 119:19,23 120:8

**Guidice's** 81:9 83:14,17 84:20 86:3 87:10 135:19

**gutter** 34:19

**guy** 52:21

**H**

**Haag** 44:8,15,16 57:19 60:2,14,21,24 71:14 73:5 74:9,18 75:6,7 96:1 107:12 111:12 120:10 131:6,9,12 139:14,15

**Haag's** 73:2 114:4 131:10

**hail** 16:16,21 17:1,2,4 22:15 24:17 28:15,18,19, 24 30:6,14,22,23 32:7 34:11 36:6,14 39:3 40:1,9 41:10 42:18 43:3 46:11 60:18 64:9,12,20 66:10 67:21 68:2,4,13 69:8,9,11 70:16 71:7 84:6 98:4 99:8 101:20 108:2,6,23 135:1 139:2 145:19 146:7

**hail-damaged** 63:23 71:5 105:8

**hail-related** 64:8 65:2 87:19 88:18 90:6 91:6

**hailstorm** 22:13 37:22 39:21 48:24 53:19,23 57:6,11 59:8 63:12 67:14, 17 68:7 80:22 84:6 85:8 86:2 87:9 89:10 98:24 118:18 122:11 129:19 132:7,10 138:22 148:6

**handful** 118:24

**handled** 25:23

**handling** 23:8 26:21 137:19 139:24

**hang** 12:2 92:12 112:20

**happen** 12:11 137:24

**happened** 45:2 100:22

**hard** 90:15

**hearing** 29:9 33:10

**Held** 58:15 81:9 96:1 99:9 107:12,15 108:4,16 125:2,9 131:1,5 136:10 141:20 142:13,21,23,25 146:14 147:22

**helped** 123:11

**helpful** 138:3

**helping** 39:24

**helps** 41:23

**hesitating** 140:14

**Hey** 69:2 73:18 74:12 77:17 101:8 104:24

**hiccup** 118:21

**hire** 56:4,5 88:22

**hired** 10:4,10,13,17 56:7 59:3 60:17 62:4 105:6 107:6

**historical** 123:11

**history** 51:23 52:8 67:17 117:7,9 123:13

**hit** 34:11 67:21 98:20

**hits** 108:2

**Hold** 47:20

**holds** 109:5

**holes** 32:17

**honest** 124:7

**hood** 38:21 39:1,5,21,22 40:10

**hoping** 141:17

**hotel** 49:21 50:22 51:6,9, 10 53:18 54:3,9 55:11,12, 20,22 56:7,8,9 57:6,22,25 58:21,25 60:7,18 64:13, 20 65:5 71:2 76:4 128:11, 15 131:2 146:21 147:15

**hotels** 57:10

**hour** 13:1,11

**hourly** 12:24

**hours** 13:5,9,10 49:17,19, 23 50:5,14,16

**house** 16:8

**Houser** 143:25

**Hudson** 3:14 10:5,8 11:8 18:17,22 19:7,12,18 20:2, 7,15,20,25 21:16 22:13, 19 24:11 28:17,22,25 29:19 30:13,22 31:9 36:24 37:1,8,13,20,24 41:6 42:14 43:2 48:21 49:3,8 51:14,18,24 52:15, 20,25 53:2,14 58:15 59:3, 13 60:6,17 62:5 63:11,24, 25 64:2 65:5,7 66:22 67:4,5,10,12,16 68:6,11 71:17 72:8 73:24 74:25 75:3,5,7 76:6,22 78:6 79:11,13 80:20 81:16 83:12,16 84:14,20 85:6 86:1,23 87:1,7,9 88:10, 13,15,22 89:3,8,16,22 90:16,19,20 91:9,17,20,

21 92:2,24 93:13,20,22, 25 94:12,18,23 95:7 96:7 97:11 99:12,19,22,24 100:8 102:4,8,25 103:19, 23 104:24 105:5,22 106:17 107:4 109:12 111:25 114:20,22 115:4 117:2,21,24 119:23 120:10,13,19,22 121:2, 11,14 123:14,23 124:19 125:21 126:8 127:1 128:9,14,17,24 129:4,6, 13,15 130:1,14,16 132:15 133:14 135:5,9 136:4,10, 23 140:6 141:1,7,19,24 142:4,6,13,16 143:3,11, 23 144:4,11,13,19 145:5, 20 146:7,20

**Hudson's** 23:7 30:25 42:20 72:23 86:4 92:14 101:24 103:16 118:4 121:1 123:24 131:24 137:21 138:9

**hung** 79:6

**HVAC** 35:20 36:14 37:2 38:13 104:21,25 147:25

**hypothetical** 33:2 39:18 138:19 139:6,18,22

**I**

**idea** 22:25 25:16,20 61:15 62:8 75:17,22 102:13

**identical** 135:20

**identified** 65:12

**identifying** 109:22

**ignore** 19:13,14 24:8 90:9, 13

**illustrates** 39:19

**image** 84:25

**immediately** 117:21

**impact** 104:11

**impacted** 98:24

**impair** 36:15

**impaired** 30:5 38:2

**important** 23:15 42:13 103:4,5 115:14 134:21

**impression** 124:21

**impressive** 140:20

**improve** 45:9

**inception** 111:24 115:16

**include** 13:6,22 82:24 83:4 86:7 89:15 92:14 111:7 116:17 119:18 132:16 136:23

**included** 28:19 41:14 48:23 49:2 64:19 69:15, 16 84:19 86:3,14,22 91:6 98:2 99:15 116:17 119:19 120:13 135:5,8

**includes** 117:10 121:25

**including** 27:14 114:19 127:23 144:18

**incomplete** 117:3,5

**incorporate** 41:14 140:9

**incorporated** 17:18 131:10

**incorporating** 135:12

**incur** 80:14

**indentations** 40:10 70:15

**independent** 19:19,22 59:13 61:12 107:13

**indication** 134:12 141:18 144:21

**individual** 51:22

**individuals** 109:19,22

**industry** 17:25 25:10 41:25

**information** 18:23 19:8, 11,13,15,16 28:5,8 41:15, 16 44:8,16 54:14,15 55:17 57:18 59:10,25 63:16,17,19 65:15,20 66:19 68:24 74:12,16,17 75:16 76:13 87:18 88:17 89:6,22,25 90:7 91:4,23, 25 99:19,22 104:1,2,3,10, 14,15 109:25 110:23,24, 25 111:2,18 112:9,10 113:12,24 114:9,17,18, 22,23,25 116:14,18,21,22 117:4,5,19 119:2 123:11 125:1 126:1,16 127:11, 21,23 128:4,10,15,18 129:5,7,15,25 130:12 133:15,16 134:3,10,22,23 136:2 140:15,17 141:14, 16,17,24,25 142:7 144:3, 11,12,14,18,22 145:5,7,8, 14 147:13

**inhibit** 117:1

**inhibited** 117:19

**initial** 60:3 72:12 78:18 113:15,16 114:2 128:24

**initially** 118:23

**initiated** 111:10

**inside** 135:2

**inspect** 22:14 57:6,10,13, 19 60:6,18 64:9 105:11, 20

**inspected** 41:6 57:2 58:24 61:5 62:9,11 63:24,25 64:10,11 105:15,19 117:10 118:14 125:14 131:9 146:20

**inspecting** 49:20 59:8 61:19

**inspection** 44:14 49:18,25 57:14 59:4 60:3,25 61:1, 3,17,21,22,25 71:15 77:14 104:12 126:14

128:14 130:2 131:3 136:12 146:14

**inspections** 55:22 73:13 100:2 117:1 137:16 138:20 141:11

**installed** 126:10

**instance** 24:17 65:15 83:11 103:8 104:4,8

**instruct** 17:6,10,12 18:1,3

**insulation** 139:2

**insurance** 5:22 6:1,2,8,10, 21,23 7:7,10,11,13,21,24 8:4,5,7,12,17,19,21 9:3, 23 10:16 11:7 19:21 23:22 24:3 25:25 26:22 28:5,7 41:24 42:14 50:25 84:15 85:6

**insurance-related** 8:10

**insured** 22:12 32:16 37:6, 12,16,25 55:17 57:18 59:11,24,25 60:1 64:1,7 65:1,24,25 66:1,20,22 67:13 69:1,5,17 70:8,9 72:13 74:9,10,11,15,16, 24 75:3,8 89:22 91:1,3 99:20,21,25 102:20,22 103:6,7,9 104:18 106:18 111:4 112:8 113:13 114:8,20 115:2,4 116:11 118:7,10,12,14,17,23 123:5 132:2 133:1,6,8,11 134:23 138:16 141:16,20, 25 145:5

**insured's** 42:1 63:20 109:18 110:20,21 118:9, 10

**intend** 14:10 103:7 123:16

**intended** 46:19

**intending** 14:24 15:3,16 17:6,12,22 18:1 133:2

**intends** 103:6 118:7 133:11

**intent** 32:3 110:4

**interact** 12:11

**interactions** 12:7 72:4

**interactive** 137:20

**interesting** 122:5

**interference** 31:4,14 33:6 40:11 44:11 125:4

**interior** 105:14 117:22

**internal** 23:7

**interpretation** 62:1

**interpreted** 16:9

**interpreting** 34:23

**interrupt** 54:16 92:9

**interrupting** 96:4

**interruption** 104:9,11 111:19,20 114:12

**introduced** 52:5

**intrusion** 115:3

**inventory** 43:17

**investigate** 59:13 65:7 68:12

**investigated** 124:19

**investigation** 19:19,23 21:2,18,23 22:22 23:1,4, 11 26:6 44:11 49:12 59:15,21,22 63:1,11 79:10 91:7 102:4 103:16, 20,24 111:11 117:19 120:5 121:3,11 133:5 134:22 135:6 140:6,21

**investigators** 121:1

**invite** 45:13

**invoice** 83:24 84:2

**invoices** 82:10,11 83:13 145:19 146:7

**involved** 10:19 16:5 88:25 100:20 111:12,23 137:13

**irregardless** 29:18

**issuance** 113:15 114:3

**issue** 15:6,9 16:13 17:20 27:8,9,12 31:13 32:15 76:6 97:7,8,11 121:22 138:25 141:10 144:23

**issued** 16:24 95:4 112:14, 21 142:12 143:2

**issues** 13:16 15:7 17:3 30:11 32:13,14 66:2 118:2,3 147:8

**item** 30:9 32:10 85:25 97:15 98:6,7,15 99:2 105:7 122:23 133:7 136:3,23

**itemize** 43:22

**items** 82:25 85:25 99:6 120:1,15,23 121:14,15,25 122:6 123:7 134:1 136:13

## J

**J.S.** 58:14 81:9 96:1 107:12,15 108:4,16 125:2,9 131:1,5 136:10 141:20 142:13,20,23,25 146:14 147:22

**janitorial** 51:20

**job** 45:8 51:11 148:18

**jobs** 51:6,9,10

**John** 78:25 79:3,12

**Joseph** 81:9 82:24 83:14, 17 84:20 86:3,11 87:10 88:23 89:14 90:18 119:19,23

**judge** 17:10

**judgment** 19:16

**July** 134:8

**jump** 115:15 118:21

**June** 61:7,11 73:19 131:3 144:19

**jury** 15:16 17:6,10,12,23 18:2,3 23:21,24 24:2 30:13 38:19

**K**

**Kaho** 4:18 11:1 13:7 24:16 26:10 42:3,4,11 43:6,13, 16,20,24 44:1 76:16,17 79:2,11 128:2

**Kevin** 104:16 133:21 137:13 143:10

**keyword** 94:1

**kind** 6:10 7:3 23:11,15 76:6 112:12 123:20

**knew** 5:15

**knowledge** 35:19 50:22 51:22 52:7 54:3,7 55:8 56:9 57:22 62:14 69:6 112:22 120:6 148:7

**L**

**lack** 110:3 134:18 145:3

**laid** 90:24

**Lakewood** 128:3

**language** 76:9

**large** 52:16

**Larson** 133:21 134:10

**law** 17:7,10,13,18,21,23 18:2,4 27:10,12

**lawsuit** 111:24,25 112:1 134:14 142:9

**lawyer** 15:12

**Lawyers** 12:9,13

**lay** 61:18 89:22

**laying** 138:4

**lays** 138:4

**leading** 132:19 134:20 135:11,23 136:7,17 139:10

**leads** 88:2

**leak** 62:17

**leaking** 143:12 144:1,9 145:4

**leaks** 32:17

**learned** 132:5

**leave** 47:21

**leaving** 48:10

**led** 85:15

**left** 53:24 131:5

**legal** 17:9

**Leslie** 18:7

**letter** 89:7 95:17 96:11,15, 16,19,20,25 97:2,4,7,9,10 112:21 113:18,20 116:17, 20 133:20,22 134:6,7,9, 13 145:10,19 146:1,2

**letters** 134:16

**letting** 44:25

**level** 53:15 57:10 58:17

**levels** 57:22,24 58:3,5,16, 18,21,23 59:9 62:13 66:12

**license** 14:13

**licensed** 14:11,15 51:2

**life's** 21:7

**light** 88:6

**likewise** 22:16

**Limited** 146:15

**limiting** 106:5

**Lindsey** 42:9 82:2,10 128:2

**Lines** 121:5

**Lisa** 29:11 33:10

**Lisa's** 45:8 101:9

**list** 65:5 145:3

**listed** 9:24

**listened** 57:17

**literally** 12:6

**litigation** 6:25 7:19

**live** 80:19 119:25

**lobby** 62:17 67:23 68:3 148:11

**located** 147:17 148:2,6

**location** 16:22

**Logically** 55:24

**long** 11:11,16 49:11 53:18,22 131:22

**longer** 97:16 124:4 147:1

**looked** 25:9 61:16,21 65:11 74:25 116:21

**losing** 45:6,18,20

**loss** 6:17 10:22 16:15 19:11 27:2,14,16 28:15 31:13,20 32:7 33:2,6,13, 20,25 34:8,22,24 35:2,3, 8,12,18 36:7,12,17,20 37:4,14,20 38:12,22 39:6, 15 40:1,11,14,16,21,23 41:1 46:2,20 47:7 48:5,23 49:4 59:13,20 60:1 63:16, 18,23 64:18,24 65:16 68:19 70:3,6,15,18,22 71:23 72:12 76:10 77:18, 19,21,23,24 78:18 79:9 82:5,14 85:17 101:2,21 102:7,10,12,18,21 103:1, 4,8,10,11,20,25 104:6,8, 14,17,19 105:24 106:4,6, 13,18,23 107:7 109:13,14 111:3,8,20 116:10,11 121:24 122:6,11 123:5,8

128:25 132:2,12,24 133:9 135:9 141:5 147:15

**loss-related** 64:9 129:20

**losses** 19:19

**lost** 85:3

**lot** 5:21,23 7:6,18 17:17, 21 44:21

**lots** 133:6

**low** 124:22

**M**

**made** 3:8 24:20 54:10,11 55:11,14,20 89:3 92:1 94:23 95:9 101:24 114:8 123:23 127:10 130:24 132:11 133:14

**maintenance** 32:15 52:14, 19,21 146:25 147:1,2,8

**major** 48:24 118:18

**majority** 147:21

**make** 7:8 15:24 16:5 17:8 19:10,16 20:18,21 24:5 25:25 34:21 36:24 38:18 42:15 45:3 48:9 56:11 67:2,9 69:20 70:11 87:22 88:1 89:7 119:23 123:15, 16,19 130:7 142:3

**makes** 82:16

**making** 42:14 45:7 56:1 73:4 88:19 123:2 130:5

**man** 52:19

**Management** 5:2

**manager** 44:5 78:17,21

**manner** 51:13 130:16

**manufactured** 126:9

**marks** 37:1

**matching** 88:6

**materials** 3:23 4:14 6:15 10:24 11:4 24:13,14 55:16 71:9 141:19

**math** 8:8 13:10 89:25 102:1

**matter** 13:16 27:24

**Matthew** 5:8 69:12 74:5 99:12 119:11 131:7 148:3,17

**meaning** 25:4,7,8 27:16 29:6,15,25 46:19 48:16, 17 54:13 62:20 69:16 70:9 76:13 80:9 84:9 99:18 104:8 122:20,22 138:1 139:12 144:23

**means** 31:25 34:24 41:25 72:6 116:4

**meant** 139:18

**meantime** 45:22

**measured** 82:5

**measurement** 82:14

**mechanical** 132:9 147:17, 19,21

**meet** 12:11 59:24 63:20

**meeting** 126:13 137:15 140:10

**meetings** 25:25

**member** 12:8

**membrane** 62:16

**memory** 72:18 133:18

**mentioned** 10:25 90:5 97:1 98:9 110:18 112:9, 12 128:1

**met** 11:12

**mezzanine** 58:16 63:10

**Miller** 4:24 73:18 75:12 76:3,8 78:16,20 79:12 80:12,15 85:16 100:19 101:2 110:7,18 111:13

126:18 127:5,18

**million** 104:9

**mind** 7:4 9:25 15:17 27:4 38:22 45:15 65:13 74:8

**mine** 39:9

**minimize** 56:17

**minimum** 144:20

**minute** 10:23 32:25 72:20 73:6 98:9

**minutes** 56:19 101:16 124:6

**missed** 125:7 137:22

**missing** 117:20 138:8

**misspoke** 98:12

**moisture** 115:8 144:24

**moments** 63:6

**months** 101:25

**move** 53:10 145:18

**moved** 53:11

**moving** 34:15 39:10

**multiple** 16:6

**mute** 45:9

**Mutual** 8:19 9:14

**N**

**narrative** 141:14

**National** 9:19

**Nationwide** 8:17 9:7

**nature** 26:21 27:17 28:24 32:8 40:18 59:25 76:19 106:7 147:9

**necessarily** 15:5 21:8 27:23 32:11,12 51:4 57:8 69:1 83:4 104:12 105:16 138:14

**needed** 56:4 138:7

**net** 129:9

**nice** 45:21

**non-privileged** 96:2

**non-receipt** 103:24

**non-recoverable** 80:16

**non-responsive** 52:24 53:7,12 78:3 92:19 93:21 115:18,22 119:3

**normal** 32:14

**north** 88:7 93:4,8 98:8,18

**note** 125:14

**noted** 71:14 133:10

**notes** 78:11,23 114:1 143:25

**notice** 4:2 18:18 22:13 23:25 48:23 49:1,4 63:16, 18,23 64:19,24 68:20 71:24 72:12 78:18 111:6, 7

**notification** 72:7,10

**notifications** 72:10

**notified** 48:21 130:14,16

**notify** 72:8

**Nova** 9:8

**number** 45:14 81:6,8 84:10 86:25 90:4 92:14 108:15 116:3

**numbers** 82:16 84:5,12, 16,19 87:8 88:2 89:9,23, 24 90:25 94:13,14,16 129:9,10,21 145:3

## O

**O'ROURKE** 3:22

**oath** 3:7,9 84:15 85:7 86:12,18 87:25 89:9

**object** 17:15 21:12 29:22 30:16 31:2 33:3 35:6,14 37:11 40:3 41:12 43:8 46:24 53:6 54:20,25 58:1 62:19 64:15,22 65:8 67:25 68:21 70:17 80:4 81:22 83:1,18 86:5,15 87:3,13 88:4 90:12 91:12, 19 93:16,23 94:4 96:23 100:11,14 105:25 106:19, 25 107:24 109:2,10 112:15 115:12,21 118:20 119:3,6,12 125:12 126:23 128:7 133:24 143:13 144:5 145:16 146:10,11 147:5,10

**objection** 3:7 52:24 53:12 68:14 78:3 89:18 90:22 92:19,21 93:21 100:14 115:18 132:18 134:19 135:11,22 136:6,16 137:25 138:11 139:9 142:18

**objections** 132:23 146:12

**obligation** 19:22 41:20 65:4 116:13 118:11,14

**observable** 118:2 120:10

**observed** 44:4,6 72:24 117:14

**observing** 77:13 110:4 115:8 116:12 117:13

**obtain** 18:23 19:8,11

**obtaining** 44:19 114:20

**obtuse** 83:7

**obvious** 117:24

**occasion** 33:11

**occasional** 45:6

**occupancy** 117:15

**occur** 27:16 78:9 79:7 117:13

**occurred** 13:2,20 39:6 42:3 144:25 145:1

**occurs** 111:3

**October** 82:3 102:16 130:24 135:10

**odd** 51:6,8,10

**offense** 11:22

**offer** 15:3 89:7

**offered** 11:25 18:6

**offering** 14:8 16:20

**office** 4:8 38:20

**on-site** 72:4

**onboard** 44:10

**operate** 23:22 29:20 33:21 34:6 41:10

**operated** 28:23

**operating** 35:21

**opine** 30:23

**opinion** 6:14 15:17,19,23 16:1,2,3 48:9 70:1 87:19 123:1,7

**opinions** 6:19 14:8,25 15:4 16:20,23 18:6,10 134:17

**opposed** 55:25

**orally** 76:13

**oranges** 87:5 88:19 90:24

**order** 25:2 30:5 67:5

**orders** 147:8

**ordinarily** 137:24

**outlined** 117:18

**overhang** 58:12

**overlapping** 92:11 112:19

**owing** 87:12 94:15,19,25 95:11,14,20 96:7,8,9,11, 21,22 97:12,16,19 120:14 129:6

**owner** 65:21

P

**p.m.** 149:5

**paid** 8:6,11,12 13:2 69:14 87:9,12 88:3,10 99:11 106:12 117:21,24 118:2 120:23 121:6,10 132:17

**paint** 88:6 99:6

**painted** 138:7

**painting** 137:9

**parapet** 119:14,15 131:25

**paraphrase** 80:19 119:25 123:22

**paraphrased** 100:21

**paraphrasing** 100:22 121:19 142:11

**parked** 38:20

**part** 8:22 9:6,16 18:9 40:13 44:13 48:22 51:25 66:24 70:9 73:13,15 77:10 78:17 80:7 108:25 109:4,5 120:4 121:3 134:17,21 145:14

**parties** 74:17

**partner** 5:12 6:5

**party** 55:25

**pass** 124:7 131:14 149:1

**past** 8:16 10:2

**path** 90:5

**pay** 37:13 86:23 87:2 89:17 90:19 91:16 106:2

**paying** 37:16 118:5

**payment** 83:16 84:21 86:4 95:3 101:24 123:23 131:24 132:16 136:24 137:21 141:10,19,24

**payments** 119:24 123:15, 17,19

**pays** 7:24

**Peirce** 3:10,20 11:22 12:1 17:16 21:15 29:9,11,12 30:2,18 31:5,16 33:8,10, 15,19 35:7,16 37:13 40:5 43:12 45:5,15,23,25 46:25 50:2,4 52:24,25 53:2,4,11,14 54:22 55:3 56:12,15,20,21 58:4 62:25 64:18 65:3,9 68:2, 15 69:5 70:20 78:3,4 80:7 81:25 83:2,21 86:8,16 87:6,15 90:9,14 91:8,15, 21 92:8,19,20,23 93:17, 21,22,25 97:1 100:12,18 101:11,14,17,19 106:3,21 107:3,25 109:6,12 112:16,18,21 113:1 115:18,19 119:3,8,14 124:5,10,11 125:16 126:25 128:9 131:13,20 132:18,23 133:24 134:19 135:11,18,22 136:2,6,9, 16 137:25 138:11 139:7,9 140:4 142:20 143:5,6,14 144:7 145:18 146:12 147:6,11 149:1

**penetrated** 68:4

**penthouse** 58:17

**people** 136:12 141:12

**percent** 6:9,11,15,20 7:14, 17 8:3,5,6,9,11,13 124:22

**percentage** 6:7 7:4 124:18,21

**perform** 19:22 23:12 105:12

**performance** 32:22

**performed** 56:10

**performs** 19:18

**peril** 20:4,9,16,22 22:15 123:25

**period** 27:17 28:9 55:7 112:5 125:4,11 140:22

**permits** 146:19,23

**permitting** 146:22

**person** 16:4,7 54:14

**personal** 11:19 133:8

**perspective** 15:11 25:22 77:6 103:16 123:3 139:21

**pertinent** 23:19

**pervasive** 144:23

**phone** 45:10,13,14 79:11

**phonetic** 78:25

**photographs** 62:11,21,23 63:3 102:3

**phrase** 29:6 105:9 107:22 145:14

**phrased** 26:17 68:16 81:1 109:24 113:19 132:1

**phrases** 33:9

**phrasing** 108:13

**physical** 28:15 31:13,19 32:6,10 33:2,4,6,13,25 34:8,22,24 35:2,3,8,12,18 36:12,17,20 37:4,14,20 39:15 40:14,16,20,23 41:1 46:2,20 47:6 48:5 70:3,6,15,18 123:5,8 132:2 140:8

**physically** 33:1 140:22

**pick** 79:11

**picture** 74:5

**piece** 19:16 141:23 145:7

**pieces** 87:17

**piecing** 143:8

**Pierce** 134:24 136:22 139:18

**place** 77:18 109:5 111:10 116:19

**plain** 71:21

**plaintiff-related** 6:6

**plaintiffs** 3:10

**plane** 58:13,18

**planes** 58:6,7,8,9

**plans** 131:1,2 146:13,15

**play** 134:17

**pleasing** 34:16

**point** 19:15 39:19,22 45:4 47:5,8 48:8 54:6,9 66:16 67:4 69:25 80:24 100:5,7 105:23 112:4,7 115:5 116:9 118:22 124:4 134:1

**policies** 16:6 34:3

**policy** 15:9 16:10 27:1,14,17,18 28:1,2,11,14,19 29:1,3,14,16,21,24 30:15 31:1,9,21 32:4 33:7,21,24 34:1,7,24 35:7,11,17,22 36:8,18 37:4,21 41:11,18,21 46:5,19 47:5,9,10 48:11 65:19 69:25 70:7 76:9 77:17 91:17 93:3 102:11,20 111:3,4 112:12,16,18 113:15 114:3 116:8 126:5 132:25 138:15

**policy's** 29:4 30:7

**portion** 64:3

**portions** 61:6,23 96:2

**position** 20:20 28:6 32:5 36:8 42:1 77:23 94:8,11,17 95:13 97:14,18 100:4 103:3 107:4 109:6 143:17 144:9

**possession** 49:3 146:13,19

**possibility** 88:20

**post-inspection** 73:3

**post-loss** 54:11 55:22

**potential** 59:8

**Powers** 3:16,22,23 5:11,13,17,19 12:25 14:3 16:25 29:7 30:3 31:8 33:19 35:7,17 36:23 39:11 45:25 47:5 48:19 52:2 53:14 56:16 58:19 64:2 65:10 68:15 71:16,21 72:17 74:4 78:1,5 82:2 84:4 86:17 87:6 90:15 91:9 92:20,23 94:2 96:5 97:15 100:13 101:19 107:23 113:2 114:5,14 115:20,24 131:13,23 138:18 140:5 144:14 145:11

**practice** 5:25 6:6,7,20 7:12,15 8:9,11,13

**Practices** 24:23 25:15,22 26:1,25

**pre-covid** 12:2

**pre-existing** 17:3

**pre-inspection** 137:15 140:9

**pre-litigation** 6:25

**pre-suit** 7:3,16,18 96:15

**prefacing** 50:7

**prefer** 7:2

**Preferred** 9:13

**prejudiced** 106:4,10

**premise** 22:25 85:19 117:11

**premises** 117:12

**prepared** 82:24 119:22

**present** 60:24 66:22

**presented** 51:14,17,18,20,21 53:25 104:3 133:15

**presenting** 99:20

**preserved** 53:12

**presume** 129:16

**presupposes** 38:10

**pretty** 101:9

**prevented** 118:4

**previous** 10:7 54:23

**previously** 4:15 10:10,25 39:8 55:2 96:10

**primary** 4:19 58:9

**Prime** 88:5 99:5,6

**print** 113:5

**prior** 11:5 26:16 40:1 41:3 50:6 53:9,18 54:2 55:8 72:9 111:24 128:16 134:14

**problems** 60:1 66:16,17

**Procedure** 3:3

**proceedings** 3:2

**process** 25:2,17 59:16 60:4,5 65:17 66:14,24 91:7,8 114:19 115:5 133:1 137:13,19,23 138:2 139:24

**produce** 4:9

**produced** 10:25 74:9

**producing** 4:17 11:2

**professional** 14:3

**professionally** 11:12,16

**proffer** 14:24

**progressive** 9:3,16 59:16

**promise** 83:8 85:20

**prompt** 21:1,17,23,25 22:2,5,7,21

**promptly** 18:24 19:9

**pronouncing** 5:12

**pronunciation** 5:16

**proof** 27:2 65:16 76:10 77:23,24 79:9 85:17 101:2 102:7,10,12,17,19, 21,25 103:4,8,10,20,25 104:6,8,14,17 105:24 106:4,6,13,18,23 107:7 109:14 111:8 116:10 132:12,24 133:9 135:9 141:5

**proper** 28:25 30:6,25 42:15 43:6

**property** 16:17,21 22:14 28:22 30:4,5 32:11 41:6 48:23 49:4 50:1 61:6,12, 23 64:4,18 67:21 68:19 71:23 72:22 99:13 108:1 140:8 141:2 147:18,20

**proposal** 88:17 90:4 91:4 92:15,16 93:11,12 97:21, 25 98:15 100:3 102:20 104:24 142:7

**proposals** 85:7 128:13 129:4 135:13,15

**proposed** 76:10 79:9 94:16 102:10,12,17 103:8 116:10 121:24 139:6

**protecting** 39:23

**provide** 106:13 111:6 113:24 114:9 129:3 141:21

**provided** 4:2 43:24 44:1 55:18 74:19,21 80:2 102:4,11 104:14,16 106:22,23 114:25 130:12 141:6 144:2 145:15,20

**providing** 141:25 145:3

**provision** 16:10 30:7 33:20 47:8 48:9 65:16

**provisions** 126:5

**pull** 24:18,21 56:13

**pulled** 25:8

**pulling** 73:1

**purpose** 32:9,20 33:20 34:12,20 39:23 69:20

**purposes** 147:2

**pursuant** 3:3 23:25

**put** 102:17,21 110:13

**puts** 48:15

**putting** 136:11

## Q

**qualified** 27:22

**qualifier** 19:5,7 20:10,12 21:4,13 22:7 23:3 34:4 63:8 103:21 123:20

**qualifiers** 33:9 41:3 54:22

**qualify** 16:7 19:1 22:22,24

**question** 4:9 16:3 24:22 25:4,5,13 26:17,19,24 28:21 32:23 36:19 40:7,8, 9,19 41:14 42:16,21,22 43:1 44:22 47:21,23,25 48:15 50:6 52:12 56:2,6, 22 57:4 60:15 62:6,24 68:16 70:14,24 71:6,16 73:14 75:14 76:23,25 77:17,18 81:2,18,24 82:15 83:5 84:3,18,23 85:2,4,22 86:2,13,17 88:2 89:16 91:14 95:5 96:13, 14,24 100:25 112:2 113:10,11,19,20 114:11, 15,16 115:23 118:1 120:9,12 121:8,9,12,23 122:1,2,4,5,12,17,24 123:6,9,21 125:7 129:23 130:7 133:17 134:25 135:3 139:11,13,14 140:25 141:3,22 145:23, 24 146:16

**questioning** 137:1

**questions** 16:7 18:20 23:25 45:1 46:1 72:9 85:24 98:16 115:15 131:17,22 136:22 140:1 149:3

**quibble** 52:2 58:14 71:24 75:24 123:22

**quick** 82:1

## R

**radar** 10:3

**raised** 136:13

**range** 13:13

**rate** 12:24 13:25

**rationale** 47:9 74:2 77:3 79:22 80:3 83:15 86:20

**RCV** 37:18,19,24

**RDA** 5:2 57:7,11 64:4,12 65:4 67:2,3 68:5,12 70:21 71:4,6,12,17 72:16,23 73:5,7,23 74:7,19 75:12, 16,17 79:13 94:19 95:8 104:23 132:5,8,10,17 133:14 134:2,13,18 135:9 141:6 142:5 147:3

**RDA's** 66:11 110:9 134:7

**reached** 138:24

**read** 18:13 21:15 28:11 31:22 35:8 46:5 75:11 85:3 100:16,19 108:12 120:7 138:23 140:24 145:11

**reading** 13:6 14:22 42:3 49:4

**ready** 80:10

**realize** 69:7

**reason** 49:23 50:4 62:18 77:16 92:15 121:17,19,22 132:14 140:14

**reasonable** 19:2,5,8,10, 22,25 20:11,13,14,17,18, 21 21:4,14,17 24:5 25:18 27:1 28:17,25 41:9 48:15 57:5,9 59:7 65:10,13

**reasoning** 79:22 80:3

**reasons** 22:20 23:1 76:9 77:3 87:20 133:7

**rebut** 18:6

**rebuttal** 17:21

**rebutting** 18:11

**recall** 23:10 26:10 31:21 43:19,23 50:9,12 52:3 80:1,18 98:10 99:10 133:21 134:2 136:25 137:7,10

**recalling** 4:22 12:17,23 53:21 72:18 79:24 80:5 124:16 137:2

**receipt** 103:24 105:23

**receive** 4:1 104:4 128:9 134:23

**received** 4:14 102:25 108:1 109:15 111:15 128:12,17

**receives** 114:23

**receiving** 109:8 128:15 129:7,25

**recess** 45:24 101:18

**recognition** 134:25

**recollection** 44:2 72:1 134:8 135:21 142:17,24

**recommend** 141:20

**record** 144:6 147:7

**recoverable** 106:5

**refer** 95:24 112:25

**reference** 17:8,25 25:25 53:7 82:17 95:21 112:7 131:4 133:20 139:15

**referenced** 97:25 99:1 130:7 134:6

**references** 92:17

**referencing** 76:15 128:22 139:13

**referred** 93:12 95:25 97:21 98:6

**referring** 43:11 58:11 63:15 83:23 84:2 93:11 94:22 98:7 106:7 107:8 108:11 111:1 113:22 117:5 123:2 142:22 144:13 147:7,24

**reflect** 75:25 76:1 88:18 136:3

**reflected** 62:11 82:16 148:8

**reflection** 139:7,22

**refresh** 142:16

**reg** 26:22

**regard** 6:13 7:9,10,14 15:7,19,21,22,25 26:11 31:3,6 33:5,13 41:13 47:25 50:21 56:8 65:4 66:9 79:21 126:16 132:15 137:8 144:6

**reinspect** 90:2 91:3 136:13 141:1

**reinspection** 137:13 140:13

**reiterated** 111:22 134:9

**reject** 106:17

**rejected** 106:22 107:15,18 136:10,20

**rejecting** 107:19

**rejection** 136:14

**relate** 38:11

**related** 6:1 84:16 90:6 93:5,6 98:19 117:21 120:8 147:12 148:5

**relating** 128:4

**relative** 16:8 18:23 19:3 21:6,9 66:14

**relay** 94:5

**relayed** 51:24 72:21 126:8

**relevant** 19:8,11,13,14 55:7

**reliable** 22:21

**relied** 119:23

**rely** 87:22

**relying** 43:2

**remainder** 8:1

**remaining** 87:11

**remember** 26:17 31:18 40:2,8 50:7 81:19 108:18, 19,22 119:15 124:20 130:21 140:23

**remembering** 10:20 89:19 102:6 123:21 144:25

**remembers** 63:7

**remotely** 3:7

**removing** 122:20

**render** 28:8

**reopened** 96:19 111:17

**rep** 25:16

**repainted** 138:8

**repainting** 136:24

**repair** 56:3 122:13,17 145:20 146:8

**repaired** 122:16

**repairs** 54:8,10,11,18 55:11,14,20,21,25 56:1, 10 117:12 122:7 147:2

**repeat** 20:6 36:13 43:1

**repelled** 54:5

**rephase** 43:1

**rephrase** 106:16 122:4

**replace** 35:25 36:2,4,8 37:7,18,25 38:7,9,16 46:12 70:8,10 123:5 132:3 135:8

**replaced** 39:2 69:17 122:16

**replacement** 37:17,19 39:6 40:1 46:6 70:9,19 86:25 87:19 104:21 122:13,18,24,25 123:4 131:25 135:15

**replaces** 37:16

**replacing** 122:20

**report** 11:6 15:6,15,18,25 17:22 18:9,11,12 42:9 43:5,21 59:6 62:2,12,22, 23 63:4 64:12 65:10 67:5 70:21 71:4,6,11,12,17,19 72:5,6,16 73:20 74:1,6,9, 10,14,15,18 75:3,5,6,7 80:8 82:2,9 84:9 86:21 95:25 96:1 99:9,25 107:10 108:12,21 109:7 112:6,24,25 113:4,9 118:17 120:24 121:18 123:12 125:13 126:2 130:20 131:4 133:16,19 138:14,24 139:14,15 142:13,15,21,23 148:8,9, 14,20,24

**reported** 20:4,9,17,23 42:6,8 48:20 49:7 57:7,11 59:14 63:12,22 64:1,4,16 66:5 67:7,13 68:12,17 70:22 71:13,24 72:1,3 73:8,18,23 74:7 101:21 105:1,2 107:7 120:18 126:6 128:23 141:10 143:10,18,20 144:3 145:4 147:1

**reporter** 3:5,6,12,15 29:10 31:15 33:12,18 92:7,12 112:20

**reporting** 48:23,24 64:19 66:10 72:14 73:5,9 121:22 128:11,24

**reports** 14:23 42:7 67:3 73:2,16

**represent** 18:22 49:18 80:11 84:5 119:21 132:4, 8 143:22

**representation** 144:24

**representative** 4:19 5:2 18:16 60:6,15 63:21 68:23 73:24 77:7 78:11, 14 79:13 102:8 107:13 114:8 126:13 146:3

**representative's** 41:19

**representatives** 26:2,4 72:23 78:6 105:6 106:16 113:13 117:2 118:5 125:8 144:3 146:20

**represented** 8:17,24 9:1, 8,11,13,15,17,19,21,22, 24 11:8 82:12 85:7 100:8

**reps** 25:20

**request** 56:11 102:16 104:10 109:13,14 110:22, 23,25 111:2,9,18 112:9, 10 113:23 116:17 126:15, 17 127:10,15,22,25 134:3,9,22 145:11

**requested** 55:17 102:7,9, 13 114:9,18 134:1

**requesting** 141:16

**requests** 113:12 114:7 133:14 142:3

**require** 111:7

**requirement** 27:5 33:25 133:10

**requirements** 132:24

**requires** 87:19

**requiring** 70:18 86:25

**reread** 20:14

**research** 128:2

**reservation** 96:18,20 97:2,6,9 116:17

**resident** 16:8

**resources** 26:5

**respect** 22:23 31:19 75:15 96:4,6

**respond** 24:9 66:18 69:3 104:3 105:21 110:23 113:13,21 114:9 116:7 118:8 127:3,5,18 133:3, 12 134:23 138:1 140:17 141:15

**responded** 68:24 110:22 111:16 114:17 115:1 126:18 127:12 129:4 134:3,13 143:24

**responding** 18:18 23:24 76:23 104:13 146:1

**responds** 48:14 99:23 114:23

**response** 28:3 39:19 55:1 80:14 101:1 116:10 126:17 127:14,16,20,24 134:5,15 142:4,8

**responses** 41:4 114:7 136:18

**responsible** 91:15

**responsive** 53:8 92:22 93:24

**rest** 20:19 34:17

**restoration** 44:18

**restrict** 125:10

**resubmitted** 116:16

**result** 129:9 138:22

**resulting** 137:21

**retain** 12:18

**retained** 18:5 30:22 58:15 107:13

**retired** 107:14

**review** 4:23 5:1,4,7 23:7 49:10 79:18 80:6 108:4

**reviewed** 4:15,18 11:2,5 23:13 43:12 50:18 55:16 124:12

**reviewing** 80:18 81:14

**rights** 96:18,20 97:2,6,9 116:17

**rip** 46:22

**risk** 78:17,21

**Robinson** 5:13,17

**role** 17:19 18:3 41:13 52:18 54:14 59:17

**roof** 32:14,18,22 46:12,15 48:13,25 57:10,13,15,17,20,21,25 58:5,9,16,17,18,21,23 59:9,14 62:13 63:11 64:10,13,21 66:9,10,12 67:3,4,6,8,10,12,13 69:21 71:25 105:1 109:13 118:17 119:9,18 120:2 121:24 125:22,23 126:19 127:9,19 128:4 131:6 138:20,21 139:4 148:1,10,15,18,22

**roofing** 14:17 30:20 33:5

**room** 49:21,22 65:6 144:24 145:3

**rooms** 105:14,15 115:3,9 117:14 119:1 124:18 125:4,10,14,17 143:11 144:1,9 145:9

**roughly** 134:1

**RSA** 49:8

**rubber** 46:17

**rules** 3:3 53:13

**run** 135:2

**S**

**S-C-H-W-I-E-R** 4:20

**scattered** 18:11,12

**Schwier** 4:20 11:1 13:7 18:14,21 19:18 20:2,7,25 21:11 22:12,19 49:10 63:9 82:8 84:4 123:18

**Schwier's** 19:7 49:5 81:14

**scope** 66:21 76:2

**screen** 47:4,14 56:14 84:25 131:19

**scroll** 47:13,18

**Seagren** 76:3 82:10

**seals** 108:16,18 135:1,8,16

**search** 31:11

**section** 26:25 138:16

**sees** 74:15

**seminars** 12:5 25:24

**send** 75:4 96:14,16 97:4

**sends** 43:5

**sentence** 20:19 22:9 60:12

**separate** 61:1,12

**separation** 47:22

**series** 98:16 133:25 136:22

**serve** 69:19

**served** 12:21

**serves** 34:12

**serving** 34:13 39:23

**set** 6:16 16:10 32:14

**sets** 88:21

**Settlement** 24:23 25:14,21 26:1,25

**shape** 52:15

**share** 47:4 65:19 116:14

**shared** 11:15

**sharing** 77:12

**shattered** 67:23 68:1

**Sheraton** 24:17

**short** 30:8 31:3 106:14,15

**show** 30:21 81:25 83:24 95:18 98:3

**showed** 93:10 98:15

**showing** 85:1

**shows** 142:15

**shrinkage** 47:22

**side** 8:3 16:4 98:9,20,23,25 108:5 110:9,22 115:9 119:1

**side's** 99:7

**sides** 88:8 98:8,18 119:10

**sign** 85:16 101:2

**signed** 105:24

**significant** 5:24

**sills** 108:5,8,9,10

**similar** 9:14 16:14

**simple** 40:19 140:25

**simpler** 38:18 44:25

**simply** 27:24 43:7 61:9 73:20 74:1 80:1

**single** 65:5 96:14 112:4

**sir** 34:3 35:15 73:11

**sit** 9:25 10:3 59:5

**site** 41:18 64:25 65:1

114:4 140:22

**sitting** 10:21 43:23 49:21 97:14

**situation** 39:20

**Sitzmann** 5:8 59:2,7 61:2, 3,7,10 62:8,15,21 63:17, 20 69:12 74:5 99:12 119:11 131:7 138:24 139:1,5 142:22 148:3

**Sitzmann's** 62:4 63:1 120:5 148:17

**skylight** 67:23 68:3

**social** 12:7

**socially** 12:2,5

**solely** 18:5 128:22

**sort** 8:2 30:8 48:11 77:12 131:11 137:19

**sounds** 124:22 141:8 143:7

**south** 88:7 93:4,6 98:8,9, 18,20,23,25 99:7

**speakers** 92:11 112:19

**speaking** 47:23 52:5 56:18

**speaks** 144:6 145:19 146:1

**specialties** 16:24

**specific** 50:1 56:6 62:16 64:16 68:5,18,20 70:21 83:24 86:16 95:24 97:7,8 114:15,16 123:21 126:15 127:23 130:20

**specifically** 6:14 52:3,9 79:21 89:8 96:3,6 137:8 138:25 143:9

**speech** 44:24

**speed** 114:13

**spent** 13:6 49:11,15 50:5

**spiel** 40:17

**Spies** 5:12,14,17

**spirit** 11:25

**spoke** 78:19,21 138:25

**staff** 51:21 52:14,17 65:21

**standard** 25:18 27:1 29:6

**standards** 17:9 18:1 24:7, 9 25:11

**standpoint** 42:20 109:18 110:20

**start** 32:17 60:12 96:17 136:4

**starting** 13:22

**starts** 24:24

**state** 3:17,21 9:1 14:11,15 24:8,10,12

**stated** 122:5

**statement** 22:25 23:6 51:25 59:18 65:16 73:10 111:8

**statements** 111:14

**states** 133:10

**step** 23:20

**stick** 14:21

**stipulate** 3:5,11,14

**stone** 68:4

**stood** 61:10

**storm** 16:17,22 30:23 37:2 43:4 48:20 50:23 55:7,8 81:3 82:13 84:17 90:7,17 92:18 93:5,7 97:22,24 98:19,20 99:8 108:2 120:9 122:7 123:10 146:9

**storm-related** 92:18 104:19 144:25

**straight** 54:17

**Strategic** 9:15

**strike** 53:10,11

**strikes** 36:6,14

**stuff** 48:11 96:9

**Subaru** 38:25

**subcategories** 8:2

**subject** 18:24 19:9,13 55:1

**submit** 103:10

**submitted** 27:2 77:25 89:25 90:25 100:3 106:18 128:13 129:15 132:12 135:9,13 137:5 142:3

**subpoena** 4:5

**subsection** 10:19,22

**subsequent** 7:3 62:3

**subsequently** 4:16

**substance** 42:4 75:25

**substantive** 42:2,10 127:24

**substrate** 30:20 31:3,6 32:5,7,8,9,19,20 35:15 46:9,12,14,16,22 47:2,25 48:1 138:21

**subtract** 21:10

**sufficient** 27:2 42:19 66:11

**suggest** 112:24 117:17

**suggested** 52:20 135:3 145:25

**suggesting** 144:23

**suggestion** 45:3 110:16 114:24 118:22

**suit** 7:3,21 94:21

**summarily** 106:17,22 107:15,18,19 136:10,20

**summary** 124:2 136:14

**superiors** 110:8

**supervision** 56:24

**support** 10:2 70:1 104:10 106:18,23 107:7

**supported** 116:15

**supporting** 111:8,20

**supports** 32:4 109:25

**supposed** 74:24

**surface** 119:17 139:4

**suspected** 126:11

**sustained** 65:2 122:21

**sustains** 39:14

**switch** 31:25

**switching** 80:23

**swore** 84:15

**sworn** 3:17 65:16 84:14 87:25 90:16 111:8

**system** 14:21,25 33:5 68:7 105:17 147:1,3,6

**systems** 57:2 82:11 104:25

**T**

**takeaway** 131:9

**taking** 6:15 77:14

**talk** 40:25 60:13 79:12 112:7 115:17

**talked** 75:22 127:4

**talking** 30:9 37:23 46:16 48:1 49:19 60:5 76:14,20, 22 78:13,24 80:24 84:13, 14 90:23 91:5 95:2 97:2 98:25 99:1 106:11 119:17 127:15 142:25 143:25 146:2

**talks** 143:23

**task** 41:14

**teach** 21:7

**team** 136:11

**teams** 140:20 141:12

**tear** 48:11 62:16

**technical** 27:23

**technically** 102:11 111:9 129:8

**tecum** 4:6

**telephone** 79:3

**telling** 34:25 66:22 79:2 80:15 103:12

**tells** 132:25

**ten** 101:15 102:5 125:24 126:3,7,11,14,20,24 127:22 134:1

**tend** 21:5 100:21

**tendered** 94:15 129:10

**term** 6:11 29:3,5,14,16,17, 23 51:5 68:1

**terminology** 30:25 119:16

**terms** 6:15 31:13 35:21 36:7,18 37:4,21 57:23 70:7 77:22 91:17 102:9 108:13 109:22 110:3 132:1 137:18 140:19,21

**test** 133:18

**testified** 3:18 18:22 19:18 20:2,7,25 22:12,19 26:10 49:19 63:9 81:15 82:8 84:4 85:6,11 86:12,18 87:8 89:16 121:15,16 123:15,18 125:9

**testify** 18:13 78:19

**testifying** 23:24 109:11

**testimony** 17:8 18:20 19:7,12 21:11 22:22 23:21 24:2 26:12,16 30:12,17,19 32:24 37:3, 15 39:14 46:3 49:10,16 50:8,9,19 53:10 62:15,20, 24 63:2 64:2 65:3 66:12 67:3,18 70:14,21 71:4,8 72:20 73:6 84:14 87:21 89:20 92:24 93:7 97:24 99:7,24 105:5 107:22 123:24 125:2,13,18 127:17

**thing** 44:17 61:25

**things** 16:4 21:7 45:9 47:22 64:21 95:10 114:13 115:10 145:2 147:8

**thinking** 10:18 45:18 101:8 129:24

**thinks** 41:25 120:8 138:8

**third-** 12:22

**third-party** 7:23 8:4

**thought** 21:9 27:21 28:23 40:19 59:12 76:20 83:9 96:24 113:1 116:14,15 127:4 136:18 137:15,20 138:6

**thumb's-down** 16:13

**thumb's-up** 16:13

**tie** 70:2

**ties** 132:24

**time** 11:14,16 13:6 28:9 32:17 49:15 50:11,13 53:24,25 54:6,9 55:7 60:22 61:10 72:13 75:14 79:15 80:23,24 85:2 89:6 90:15 94:22 101:13 102:2 105:23 112:5 116:19 118:21 125:5,11 130:19, 23 134:13 135:5 138:18 141:1,11,12,13,15,22

**time-specific** 26:20

**timeline** 101:20 143:7

**timely** 106:6 111:6,7

**times** 11:13 12:2 25:24 27:23 33:9 60:6,18,19

133:6

**timing** 101:4,6 115:14 131:24 132:15 134:25

**tiny** 85:1

**tired** 101:9

**today** 3:24 4:12 13:23 97:14

**token** 132:8

**totally** 70:13

**touches** 15:6,18

**tower** 58:17

**track** 85:3

**tracking** 131:8

**transfer** 7:18

**transmission** 125:6

**transparent** 87:7

**transpiring** 139:23

**Travelers** 10:13,20,22

**trial** 14:1

**trick** 58:19 83:8 85:20,23

**trim** 70:5,15

**trouble** 118:25

**true** 6:4 73:24

**trust** 42:18

**truth** 3:17

**turning** 33:16

**two-day** 136:12 140:22

**type** 77:18

**types** 47:22

**typically** 25:16

**U**

**Uh-huh** 15:13

**Ulrich** 50:10,12,15,19 53:15,18 54:5 55:6

**Ulrich's** 132:5

**ultimate** 87:22 94:24 95:3

**ultimately** 80:21 81:1,2 99:11 102:22 118:9 119:9

**umbrella** 6:11 7:1,2 8:23

**unbiased** 22:21

**uncommon** 26:4

**uncommunicative** 109:18 110:20 112:8 114:6

**uncooperative** 109:17 110:19 112:7 114:6 116:8

**uncooperativeness** 116:25

**undented** 46:21 47:1

**underneath** 46:17

**understand** 5:11,21 8:16 11:7 17:16 18:5 19:6 28:14,20 29:19 33:22 38:19 41:5 42:16 46:3 48:6 49:14 50:6 51:1 52:18 56:2,21 59:17 75:21 77:11 83:3,5 84:4,7,24 85:13,18 91:13 96:3 101:20 102:19 107:21,25 109:23 112:16,18 114:5 116:3,4 117:9 119:5,8,24 120:7,12 121:12 127:17,20 130:8 131:10 139:17 144:8 146:25

**understanding** 15:12,15 27:11 30:19 35:1,2 41:17,24 48:16 50:15,17 57:14 58:2 59:20 60:19 62:3,6,23 66:20 69:15 70:2,6,25 71:9 73:12 75:4 78:23 81:10,17,23 82:15 98:17,21,23 101:23 107:19 110:7,10 111:13 115:22 117:23 118:1 126:12 128:19,20 131:5 135:7,24 137:12,18 138:2 141:3 142:10 143:16

**understood** 26:12 29:25 38:11 47:23 48:18 49:17 52:1 57:12 84:8 89:20 115:22 129:24 135:4 136:2 137:14 139:11,14

**Unfair** 25:14,21 26:1,25

**Union** 9:19

**unit** 35:20 36:2,9,15,16 37:2,19,25 38:1,3,4,13 46:4,6

**units** 104:21

**unpack** 44:21

**unrealistic** 25:22

**unreasonable** 27:6 106:9 109:25 110:17

**upgrade** 104:25

**upset** 92:8

**upsetting** 115:17

**usage** 29:15

**V**

**vacuum** 44:9,15 64:24 139:11

**validity** 3:9

**Valley** 8:21

**vent** 38:8,9,15,16,17

**verbal** 78:7 113:23

**verbally** 113:22 144:15

**versus** 6:25 7:3 17:2 33:25 42:10

**view** 60:2 86:24

**viewed** 57:17

**visible** 34:10 39:22 99:12

**visit** 50:1 114:3,4

**visual** 32:10,21

**voice** 124:23

**volume** 33:17 108:22

W

**Wait** 92:7,12

**waited** 99:25

**walk** 133:5

**wall** 14:21,25 57:1 66:1,6 68:7,9,25 69:3 93:6 105:17,20 137:10

**Wall's** 114:3

**walls** 5:5 41:5,10,13,15,23 42:4,11,18,19 43:2,4,7, 13,15,19,24 44:1,8,10,14 49:11,19 50:10,14 52:20 57:1,5,9,15,21 58:24 59:16 60:21,22 61:2,5,9, 13,22 63:20 73:5 76:18 77:11,12 80:12,15 84:10 85:15 93:5 98:4 99:12 101:1 102:4,16 103:8 107:14 111:11 126:8 128:1 132:1

**Walls's** 73:2

**wanted** 67:2 125:16 132:2

**warrant** 48:5 122:13,17, 20,24

**warranted** 122:7 124:15

**warrants** 122:25 123:4

**water** 34:14,15 115:3

**wear** 48:11

**website** 6:2

**week** 5:9 13:8 86:12 125:17

**well-kept** 39:4

**west** 24:17 68:25 69:2,7 70:5 71:1,12 97:23 98:2,4 115:9 119:1 136:25 137:9

**west-facing** 108:1,5

**whatsoever** 14:20

**whims** 37:8

**wicking** 34:14

**window** 17:1,3 64:23 66:5 68:6 74:22 108:5,8,9,10 109:1,4,5 118:18 135:2

**windows** 48:25 57:2,6 63:22,25 64:13,16,20 65:1,11 68:12,13,18,20, 22,23 71:25 108:17 118:23,24

**withdraw** 99:21 100:5,6,7 115:6

**withdrawal** 79:22 116:9 128:16 130:10,23

**withdrawing** 80:2,13

**withdrawn** 77:24

**withdrew** 79:19 96:21 115:7 129:5

**wondering** 45:8

**word** 19:1,3 29:16,19 30:1 31:8,11,12,14,18,20,25 32:2,3 58:3 61:17,20 145:11

**wording** 32:4

**words** 12:1 33:23 45:6,20 49:7 51:5 61:9 64:23 68:5 76:2,7 81:11

**work** 5:22 6:12,13,14,25 7:6,18,20 8:4,5,6 10:7 13:5,8 27:22 55:6 56:24, 25 137:23 147:8

**worked** 11:14 12:15 117:11

**working** 41:24 131:11 147:1

**works** 89:25

**wrap** 77:13

**write** 89:7

**writing** 6:16 72:7,8,10,11, 14,16 93:18 94:6 95:7 113:23 116:4 144:15

**written** 72:6,11 73:9 76:7 113:18,20 116:2,6 126:17 127:10,15 133:14,20 138:14

**written--** 127:7

**wrong** 5:12 32:25 46:10 73:6

**wrote** 62:12 142:16

Y

**years** 10:1 11:13,17 15:12 32:18 55:8 88:25 89:14 90:18 101:25 125:24 126:3,7,11,14,20,24 127:22

Z

**Zoom** 45:10